No. 25-1393

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

———————————————

D.V.D., *et al.*,

*Plaintiffs-Appellees*,

v.

U.S. Department of Homeland Security, *et al.*,

*Defendants-Appellants.*

———————————————

On Appeal from the United States District Court
for the District of Massachusetts

———————————————

## BRIEF FOR APPELLANTS

———————————————

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

ELIANIS N. PEREZ
*Assistant Director*

MATTHEW P. SEAMON
MARY L. LARAKERS
*Senior Litigation Counsel*
U.S. Department of
Justice, Civil Division
Office of Immigration
Litigation
P.O. Box 868,
Ben Franklin Station
Washington, DC 20044

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ..................................................... 1

STATEMENT OF THE ISSUES ......................................................... 1

STATEMENT OF THE CASE ............................................................ 2

I.   Procedural History ................................................................ 5

II.  Legal Background .................................................................. 8

SUMMARY OF THE ARGUMENT .................................................. 17

ARGUMENT. ................................................................................... 23

I.   The District Court Flouted Three Independent
     Jurisdictional Bars ............................................................... 23

     A.   The Injunction Violates 8 U.S.C. § 1252(f)(1) ............... 23

     B.   The Injunction Violates the Foreign Affairs Reform
          and Restructuring Act and Section 1252(a)(4). ........... 32

     C.   The Injunction Runs Afoul of Section 1252(a)(5), (b)(9),
          and (g) ........................................................................... 35

II.  Plaintiffs' Claims Are Meritless In Any Event ..................... 44

III. The Non-Merits Factors Likewise Support The
     Government, Not Plaintiffs ................................................... 57

CONCLUSION ................................................................................ 62

CERTIFICATE OF COMPLIANCE ................................................. 64

i

# TABLE OF AUTHORITIES

## CASE LAW

*A.A.R.P. v. Trump,*
  No. 24A1007, 2025 WL 1417281 (May 16, 2025) ................................ 55

*Arizona v. Biden,*
  40 F.4th 375 (6th Cir. 2022) ............................................................... 29

*Camarena v. Dir., ICE,*
  988 F.3d 1268 (11th Cir. 2021) ........................................................... 38

*Del Carmen Amaya-De Sicaran v. Barr,*
  979 F.3d 210 (4th Cir. 2020) ............................................................... 12

*DHS v. D.V.D.,*
  2025 WL 1732103 (June 23, 2025) ......................................... 57, 58, 59

*DHS v. Thuraissigiam,*
  591 U.S. 103 (2020) ............................................ 10, 21, 52, 53, 55, 56

*E.F.L., v. Prim,*
  986 F.3d 959 (7th Cir. 2021) ............................................................... 39

*Fiallo v. Bell,*
  430 U.S. 787 (1977) ............................................................................. 60

*Foster v. Townsley,*
  243 F.3d 210 (2001) ............................................................................ 39

*Galvan v. Press,*
  347 U.S. 522 (1954) ............................................................................. 59

*Garland v. Aleman Gonzalez,*
  596 U.S. 543 (2022) ............................... 18, 19, 23, 24, 26, 28, 29, 30, 40

*Haaland v. Brackeen,*
    599 U.S. 255 (2023)...................................................................49

*Hamama v. Adducci*
    912 F.3d 874 (6th Cir. 2018).................................................39

*Hollingsworth v. Perry,*
    558 U.S. 183 (2010)...................................................................57

*INS v. Cardoza-Fonseca,*
    480 U.S. 421 (1987)...................................................................12

*Jama v. ICE,*
    543 U.S. 335 (2005)...................................................................10

*Jennings v. Rodriguez,*
    583 U.S. 281 (2018)................................................... 34, 35, 41

*Johnson v. Guzman Chavez,*
    594 U.S. 523 (2021)...................................................................13

*Kaplan v. Tod,*
    267 U.S. 228 (1925)...................................................................53

*Kiyemba v. Obama,*
    561 F.3d 509 (D.C. Cir. 2009).....................................46, 47

*Landon v. Plasencia,*
    459 U.S. 21 (1982) ...................................................................54

*Ludecke v. Watkins,*
    335 U.S. 160 (1948)...................................................................55

*Mapoy v. Carroll,*
    185 F.3d 224 (4th Cir. 1999).................................................36

*Maryland v. King,*
    567 U.S. 1301 (2012)................................................................59

*Munaf v. Geren,*
  553 U.S. 674 (2008)................................................................... 20, 46, 47

*Nasrallah v. Barr,*
  590 U.S. 573 (2020).......................................................................... 12

*Nielsen v. Preap,*
  586 U.S. 392 (2019)............................................................................ 9

*Nishimura Ekiu v. United States,*
  142 U.S. 651 (1892).................................................................... 52, 57

*Nken v. Holder,*
  556 U.S. 418 (2009).......................................................................... 62

*Noem v. Doe,*
  145 S. Ct. 1524 (2025) ..................................................................... 59

*Noem v. Nat'l TPS Alliance,*
  No. 24A1059, 2025 WL 1427560 (U.S. May 19, 2025)........................ 59

*Rauda v. Jennings,*
  55 F.4th 773 (9th Cir. 2022) .............................................................. 38

*Reno v. American-Arab Anti-Discrimination Committee,*
  525 U.S. 471 (1999)............................................... 19, 36, 37, 38, 40, 48

*Reno v. Flores,*
  507 U.S. 292 (1993).......................................................................... 48

*Riley v. Bondi,*
  606 U.S. --, 2025 WL 1758502 (2025)...................................... 34, 41, 42

*Shaughnessy v. United States ex rel. Mezei,*
  345 U.S. 206 (1953).......................................................................... 53

*Silva v. United States,*
  866 F.3d 938 (8th Cir. 2017).............................................................. 39

iv

*Tazu v. Att'y Gen. U.S.*,
 975 F.3d 292 (3d Cir. 2020) ................................................... 39

*Trump v. CASA, Inc.*,
 2025 WL 1773631  (U.S. June 27, 2025) ............................... 59

*Trump v. J.G.G.*,
 145 S. Ct. 1003 (2025) ........................................................... 55

*Tsering v. U.S. Imm. & Customs Enf't.*,
 403 F. App'x. 339 (10th Cir. 2010) ................................... 39, 40

*United States ex rel. Turner v. Williams*,
 194 U.S. 279 (1904) .............................................................. 54

*United States v. Fausto*,
 484 U.S. 439 (1988) .............................................................. 34

*Wong Yang Sung v. McGrath*,
 339 U.S. 33 (1950) ............................................................... 54

*Yamataya v. Fisher*,
 189 U.S. 86 (1903) ......................................................... 54, 57

## ADMINISTRATIVE DECISION

*Matter of I-S- & C-S-*,
 24 I. & N. Dec. 432 (BIA 2008) ............................................ 13

## STATUTES LAW

8 U.S.C. § 1158 ........................................................................ 8

8 U.S.C. § 1225(a)(1) .............................................................. 54

8 U.S.C. § 1225(b) .................................................................. 50

8 U.S.C. § 1225(b)(1)(A)(i) ........................................................ 10

8 U.S.C. § 1225(b)(1)(A)(iii) ...................................................... 10

8 U.S.C. § 1225(b)(1)(B)(i) ......................................................... 50

8 U.S.C. § 1225(b)(1)(B)(iii)(III) ........................................ 10, 50

8 U.S.C. § 1225(b)(1)(C) ............................................................ 10

8 U.S.C. § 1226(e) ...................................................................... 37

8 U.S.C. § 1228(b) ...................................................................... 16

8 U.S.C. § 1229a ............................................................. 8, 12, 16

8 U.S.C. § 1229a(c)(7) ............................................................... 43

8 U.S.C. § 1229b(a) ................................................................. 8, 9

8 U.S.C. § 1229b(b) ...................................................................... 9

8 U.S.C. § 1231 ............................................... 15, 19, 23, 57

8 U.S.C. § 1231(a)(5) .............................................................. 9, 16

8 U.S.C. § 1231(b) ...................................................................... 15

8 U.S.C. § 1231(b)(1) .................................................................. 10

8 U.S.C. § 1231(b)(1)(C)(iv) ...................................................... 11

8 U.S.C. § 1231(b)(2) ............................................................ 10, 11

8 U.S.C. § 1231(b)(2)(A)-(E) ..................................................... 51

8 U.S.C. § 1231(b)(3) ............................................................... 9, 12

8 U.S.C. § 1252(a)(4) ............................................................... 1, 13, 19, 32

8 U.S.C. § 1252(a)(5) ................................................................... 1, 19, 36

8 U.S.C. § 1252(b)(9) ................................................ 1, 19, 35, 36, 41, 42

8 U.S.C. § 1252(f)(1) ................................... 1, 2, 7, 8, 17, 23, 24

8 U.S.C. § 1252(g) ..................................... 1, 19, 36, 37, 38, 42

8 U.S.C. § 1331 ............................................................................. 1

8 U.S.C. § 2242(d) ................................................................... 1, 32

28 U.S.C. § 1292(a)(1) ................................................................... 1

50 U.S.C. § 21 ............................................................................. 55

## FEDERAL REGULATIONS

8 C.F.R. § 208.18(a)(1) ................................................................ 12

8 C.F.R. § 208.18(a)(2) ................................................................ 12

8 C.F.R. § 208.18(c) ................................................................ 51, 58

8 C.F.R. § 208.18(e) ................................................................... 32

8 C.F.R. § 208.31 ........................................................................ 11

8 C.F.R. § 241.8(e) ..................................................................... 11

8 C.F.R. § 235.3(b)(4) ................................................................. 13

8 C.F.R § 1003.2(c) ..................................................................... 43

8 C.F.R § 1003.42(e) ................................................................... 50

8 C.F.R. § 1208.18(c)(1) ............................................................. 47

8 C.F.R. § 1208.30(g)(2)(iv)(A) .................................................. 47

8 C.F.R. § 1240.1(a)(1)(iii) ................................................... 12, 13

8 C.F.R. § 1240.10(f ) .................................................................. 43

8 C.F.R. § 1240.11(c) .................................................................. 43

8 C.F.R. § 1240.12(c) .................................................................. 13

## FEDERAL RULES FOR APPELLATE PROCEDURE

Fed. R. App. P. 27(d)(1)(E) ...................................................... 64

## PUBLIC LAW

Pub. L. No. 105-277 .................................................................. 11

## EXECUTIVE ORDER

Exec. Order No. 14165 (Jan. 20, 2025) ................................... 13

## JURISDICTIONAL STATEMENT

The district court asserted jurisdiction under 8 U.S.C. § 1331. As explained below, however, the court lacked jurisdiction over the claims in the complaint due to 8 U.S.C. § 1252(a)(5), (a)(4), (b)(9), (g), and Section 2242(d) of the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA). Further, the district court lacked jurisdiction to issue a classwide preliminary injunction under 8 U.S.C. § 1252(f)(1).

The district court issued its injunction on April 18, 2025. Appx. 473. Defendants-Appellants timely filed a notice of appeal on April 22, 2025. ECF No. 69. This Court has jurisdiction over this appeal under 28 U.S.C. § 1292(a)(1) because this is an appeal of an order granting a preliminary injunction.

## STATEMENT OF THE ISSUES

I.    Whether the district court lacked jurisdiction under 8 U.S.C. § 1252(a)(5), (a)(4), (b)(9), (g), and Section 2242(d) of the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA) to enjoin the removal of a class of aliens with final orders of removal to a country other than was designated in removal proceedings.

1

II.     Whether the district court lacked jurisdiction under 8 U.S.C.
        § 1252(f)(1) to issue a classwide injunction enjoining the removal
        of aliens with final orders of removal to third countries.

III.    Whether Plaintiffs, who all have final orders of removal, are
        entitled to additional procedures under the Due Process Clause
        prior to their removal to a country not previously designated in
        removal proceedings notwithstanding the Department of
        Homeland Security's (DHS) March 30, 2025 Guidance Regarding
        Third Country Removals.

## STATEMENT OF THE CASE

This case is about a remarkable injunction issued by the district
court that prevented the Executive Branch from removing some of the
worst of the worst illegal aliens in this country. That injunction had no
basis in law. It has been stayed by the Supreme Court. And it should now
be vacated by this Court.

When illegal aliens commit crimes in this country, they are
typically ordered removed. When an alien's crimes are especially
heinous—for example, here, an alien was convicted of sexually abusing a
seven-year-old, another was convicted of sexually abusing a woman with

the mental capacity of a three-year-old, and at least two more have been convicted of murder—their countries of origin are often unwilling to take them back. *See* Appx. 752-62. As a result, criminal aliens often stay in the United States for years on end, victimizing law-abiding Americans in the meantime—for example, here, an alien ordered removed 25 years ago has been convicted, since being ordered removed, of armed robbery and kidnapping, and an alien ordered removed 12 years ago has been convicted, since being ordered removed, of attempted first-degree murder. *Id.*

The Executive Branch has taken steps to resolve this problem, as permitted by statute, by removing aliens to third countries that have agreed to accept them. Convincing third countries to accept some of the most undesirable aliens requires sensitive diplomacy, which involves negotiation and the balancing of other foreign-policy interests.

In the decision below, the district court stalled those efforts nationwide, issuing a preliminary injunction that restrains DHS from exercising its statutory authority to remove an alien to a country not specifically identified in his removal order (a "third country"), unless DHS first completes an onerous set of procedures invented by the district

court. Yet all these aliens have already received extensive legal process in their removal proceedings. The law does not demand more process than the government already provides.

The Supreme Court has stayed the district court's injunction, and this Court should now reverse. The district court has managed to defy all three branches of government in the short time since this case was filed. Before the Supreme Court stayed the district court's injunction, the injunction usurped the Executive's authority over immigration policy, disrupted sensitive diplomatic, foreign-policy, and national-security efforts, and created a diplomatic and logistical morass emphasized in declarations submitted by the Secretaries of State and Defense. Appx. 763-93. Instead of permitting the Executive Branch to formulate the Nation's immigration policy, the district court invoked its own "sense" of "fairness" to promulgate procedures for third-country removals. Add. 49. The district court's injunction also rejected *three* different sets of jurisdictional bars that Congress enacted, exercising its control over lower courts' jurisdiction, to prevent the judiciary from invading the primacy of the Executive Branch in carrying out the core sovereign function of removing aliens from the country. And the district court

defied the Supreme Court by purporting to continue to enforce its injunction after the Supreme Court stayed it. Add. 94.

The Supreme Court concluded just last week that the Government is likely to succeed on the merits and that the remaining considerations favor the Government, not Plaintiffs. Appx. 821. This Court should respect that ruling—unlike the district court—and reverse.

## I.    Procedural History

The named Plaintiffs are four aliens with final orders of removal resulting from proceedings in which they were notified that they could be removed to a designated country of removal or, potentially, a third country of removal. *See generally* Appx. 1-50. On March 23, 2025, Plaintiffs sued on behalf of a putative class, alleging that DHS violates the Immigration and Nationality Act (INA), its regulations, and the Due Process Clause of the Fifth Amendment by removing, or seeking to remove, the aliens to a third country without first providing them with notice or an opportunity to assert a claim that they fear persecution or torture if removed to that third country. *See generally id*. On that same date, Plaintiffs moved for a temporary restraining order, preliminary injunction, and class certification. ECF Nos. 4, 7.

On March 28, the Court granted Plaintiffs' Motion and issued a temporary restraining order. ECF No. 34. Hours later, Defendants moved for an emergency stay of this order in this Court. On April 7, this Court denied a stay, citing concerns about its jurisdiction. *D.V.D. v. DHS,* No. 25-1311, Stay Order (April 7, 2025).

On April 18, 2025, the district court certified a class and issued a classwide preliminary injunction. Appx. 473. On May 21, 2025, the court clarified the preliminary injunction. Appx. 747. The court certified a class consisting of:

> All individuals who have a final order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA (including withholding-only proceedings) whom DHS has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceeding as a country to which the individual would be removed.

Appx. 23. The court's preliminary injunction, as clarified, provides that all removals to a country other than the country or countries designated during immigration proceedings must be preceded by

> written notice to both the non-citizen and the non-citizen's counsel in a language the non-citizen can understand. Following notice, the individual must be given a meaningful opportunity, **and a minimum of ten days,** to raise a fear-based claim for CAT protection prior to removal. If the non-

citizen demonstrates "reasonable fear" of removal to the third country, Defendants must move to reopen the non-citizen's immigration proceedings. If the non-citizen is not found to have demonstrated a "reasonable fear" of removal to the third country, Defendants must provide a meaningful opportunity, and a minimum of fifteen days, for the non-citizen to seek reopening of their immigration proceedings.

Appx. 748 (cleaned up).

Defendants immediately appealed and moved for a stay of the district court's illegal injunction in this Court. ECF No. 69. This Court denied Defendants' motion on May 16, 2025. In doing so, the Court directed the Parties to address the following questions related to 8 U.S.C. § 1252(f)(1):

(1) "[D]oes the class-based injunction 'enjoin or restrain the operation of' covered INA provisions insofar as it requires compliance with the terms of such provisions or the terms of removal orders previously generated pursuant to those provisions?"

(2) "[D]oes 8 U.S.C. § 1252(f)(1) presume the availability of individualized judicial review to individuals subject to third-country removals and therefore does not bar class-wide injunctive relief where such relief is necessary to make individualized review available?"

(3) "[D]o the APA/due process claims stated in Counts I to III of the complaint have a sufficiently attenuated connection to the statutory removal provisions covered by § 1252(f)(1) that they do not fall within its sweep?"

Order at 2.

7

On May 27, 2025, Defendants applied for a stay of the injunction in the Supreme Court. *DHS v. D.V.D.*, Application for a Stay, 24A1153A (May 2, 2025). On June 23, 2025, the Supreme Court granted the stay. Appx. 821. That same day, despite the Supreme Court's stay, the district court purported nonetheless to enforce its since-stayed injunction as to eight class members—all convicted of heinous crimes—in DHS custody in Djibouti. ECF No. 176. It ordered Defendants to carry out the procedures the Supreme Court found the district court was precluded from requiring. *Id.* Defendants immediately moved to clarify the Supreme Court's stay. *DHS v. D.V.D.*, Motion for Clarification, 24A1153A (June 24, 2025).

## II.   Legal Background

1.     The INA authorizes the removal of classes of aliens from the United States. 8 U.S.C. § 1182, 1227. The removal process can include a hearing before an immigration judge, an appeal to the Board of Immigration Appeals, and review in a court of appeals. 8 U.S.C. § 1229a, 1252. Many aliens facing removal have an opportunity to apply for relief or protection from removal. *See*, *e.g.*, 8 U.S.C. § 1158 (asylum); 8

U.S.C. § 1229b(a) (cancellation of removal); 8 U.S.C. § 1229b(b) (adjustment of status); 8 U.S.C. § 1231(b)(3) (withholding of removal).

Congress has established a streamlined process for removing aliens who, having previously been removed from the United States under a final order of removal, have reentered the country unlawfully. If DHS "finds that an alien has reentered the United States illegally after having been removed . . . under an order of removal, the prior order of removal is reinstated from its original date." 8 U.S.C. § 1231(a)(5); *see Nielsen v. Preap*, 586 U.S. 392, 397 n.2 (2019) (explaining Congress transferred enforcement of certain provisions from Attorney General to DHS Secretary). DHS may "at any time" effectuate removal "under the prior order." 8 U.S.C. § 1231(a)(5). The reinstated order "is not subject to being reopened or reviewed," and the alien "is not eligible and may not apply for any relief" from that order. *Id.*

Congress has further established a process for the expedited removal of certain aliens, regardless of whether they have received a prior final order of removal. Expedited-removal procedures may be applied to defined categories of aliens who have not been admitted into the United States, including those who, lacking valid entry documents,

are either arriving in the United States or unable to adequately show that they have been continuously present in the United States for the two years immediately prior. *See* 8 U.S.C. § 1225(b)(1)(A)(i) and (iii). Under that expedited removal process, inadmissible aliens are entitled to speedy administrative review (typically within days) of any asserted fears of persecution in the country to which they will be removed; they are not entitled to judicial review of an adverse administrative determination. *See DHS v. Thuraissigiam*, 591 U.S. 103, 109-13 (2020) (citing provisions); 8 U.S.C. § 1225(b)(1)(B)(iii)(III), (C).

2. In the INA, Congress has enacted provisions governing the determination of the country to which an alien is to be removed. *See* 8 U.S.C. § 1231(b)(1), (2); *Jama v. ICE*, 543 U.S. 335, 338-341 (2005). For certain aliens arriving in the United States (Section 1231(b)(1)) and then all other aliens (Section 1231(b)(2)), the statute establishes sequences of countries where an alien shall be removed, subject to certain disqualifying conditions (e.g., the receiving country will not accept the alien). For instance, under Section 1231(b)(2), possible countries of removal can include a country designated by the alien, the alien's country of citizenship, the alien's previous country of residence, the alien's

10

country of birth, and the country from which the alien departed for the United States. *See* 8 U.S.C. § 1231(b)(2). Importantly, under both Section 1231(b)(1) and (b)(2), Congress provided a fail-safe option in the event that other options do not work: An alien may be removed to any country willing and able to accept him. *See* 8 U.S.C. § 1231(b)(1)(C)(iv), (2)(E)(vii).

3. Congress has also provided means for an alien to challenge removal to a particular country where he may face persecution or torture. As relevant here, the alien may seek withholding or deferral of removal under regulations implementing the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), adopted Dec. 10, 1984, S. Treaty Doc. No. 20, 100th Cong., 2d Sess. (1988), 1465 U.N.T.S. 85—a treaty concerned with the prevention of torture through domestic measures by each Member State. *See* Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, § 2242(b), 112 Stat. 2681-822; 8 C.F.R. 208.31, 241.8(e). "Torture" is defined as an "extreme form of cruel and inhuman treatment," which intentionally inflicts "severe pain or suffering" on another for an improper purpose, and is performed "at the instigation of or with the consent or acquiescence of a public official acting in an official

11

capacity or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1), (a)(2); *see, e.g., Del Carmen Amaya-De Sicaran v. Barr,* 979 F.3d 210, 218-19 (4th Cir. 2020) (torture is a "high bar").[1]

CAT protection does not alter whether an alien may be removed or their underlying removal order; it affects only where an alien may be removed. That is, a grant of CAT protection "means only that notwithstanding the order of removal, the noncitizen may not be removed to the designated country of removal, at least until conditions change in that country." *Nasrallah v. Barr*, 590 U.S. 573, 582 (2020). The United States remains free to remove that alien "at any time to another country where he or she is not likely to be tortured." *Id.* (citation omitted); *see INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987).

Ordinarily, an alien raises a CAT claim during removal proceedings under 8 U.S.C. § 1229a, where the immigration court decides both the alien's removability and CAT claim together. *See, e.g.*, 8 C.F.R. § 1240.1(a)(1)(iii), 1240.12(c); *Matter of I-S- & C-S-*, 24 I. & N. Dec.

---

[1] An alien may also seek "withholding of removal" under 8 U.S.C. § 1231(b)(3), which prohibits the removal of an alien to a country where he would face persecution because of a protected trait. *Id*. This form of protection is not at issue in this appeal, because the district court limited its injunction to the procedures for raising CAT claims. Add. 27.

432, 433-434 (BIA 2008). But sometimes, CAT claims arise outside of those removal proceedings. For instance, aliens subject to a reinstated order of removal—where the prior order of removal is restored—may nonetheless seek CAT protection in "withholding-only" proceedings. *See Johnson v. Guzman Chavez*, 594 U.S. 523, 530 (2021). Likewise, aliens placed in expedited-removal proceedings are still able to raise CAT claims, and receive administrative procedures, the extent of which depends on the claim's credibility. *See, e.g.*, 8 C.F.R. § 235.3(b)(4).

An alien may seek judicial review of his CAT claim only under defined circumstances. Specifically, Congress directed that the "sole and exclusive means for judicial review of any cause or claim under [CAT]" must be "a petition for review filed with an appropriate court of appeals in accordance with [Section 1252]." 8 U.S.C. § 1252(a)(4); *see* FARRA § 2242(d), 112 Stat. 2681-822 (same for "any other determination made with respect to the application of [CAT]").

On his first day in office, President Trump declared that the millions of aliens who have illegally crossed the border pose a serious threat to national security. *Securing Our Borders*, Exec. Order No. 14165 (Jan. 20, 2025). To combat this, the President directed DHS to take "all

13

appropriate actions" to detain and remove aliens who had been ordered removed, but who had nonetheless been "released into the United States." *Id.* § 5.

Following this order, on February 18, DHS issued internal guidance that directed the Enforcement and Removal Operations directorate (ERO) of U.S. Immigration and Customs Enforcement (ICE) to review cases of aliens who had been ordered removed, but for whom CAT protection had impeded their removal to a particular country. ECF No. 1-4, at 2. DHS directed ERO to "determine the viability of removal to a third country" for such aliens, especially "in light of the Administration's significant gains with regard to previously recalcitrant countries." *Id.*

Third-country removals—again, removals to a country other than the ones designated on an alien's order of removal—are often the only viable option for removing certain aliens. At times, the country (or countries) specified in an immigration judge's removal order are no longer possible destinations by the time DHS is prepared to actually remove the alien. In other cases, an alien may obtain CAT protection from the only location listed on his removal order, either in his original proceedings or later ones (as with reinstated orders). Thus, to effectuate

a removal, the government often needs to remove an alien to a country other than the ones specifically designated on his removal order. As a practical matter, that third country often falls within Section 1231(b)'s catch-all provisions for any country willing and able to accept the alien.

While the INA provides for third-country removals, it does not delineate a particular process for carrying out those removals. *See* 8 U.S.C. § 1231(b). More specifically, Congress did not provide a particular process for ensuring that third-country removals remain consistent with the United States's obligations under CAT. Instead, it delegated to the Executive Branch the responsibility for developing such procedures. *See* 8 U.S.C. § 1231 note (providing that the "heads of the appropriate agencies shall prescribe regulations to implement" the United States's CAT obligations).

On March 30, DHS issued guidance clarifying its "policy regarding the removal of aliens with final orders of removal pursuant to sections 240, 241(a)(5), or 238(b) of the [INA] to countries other than those designated for removal in those removal orders." Appx. 120-21 (March

15

Guidance).[2] The Guidance distinguishes between removals to countries that have provided credible assurances that any aliens removed there will not be tortured, and removals to those countries that have not done so. *Id.*

For countries that have provided such an assurance, "the alien may be removed without the need for further procedures." Appx. 120-21. For countries that have not, DHS must first inform the alien of removal to the country, and give him an opportunity to "affirmatively express a fear of persecution or torture" there. *Id.* at 121. If he does so, an immigration officer will conduct a prompt screening to determine whether he "would more likely than not be" tortured in the country of removal. *Id.* If the alien fails to satisfy this standard, he "will be removed." *Id.* If he does satisfy it, he will be put into additional administrative procedures, consistent with how CAT claims are typically handled. *See id.* "Alternatively, ICE may choose to designate another country for removal," and start the process afresh. *Id.*

---

[2] Section 240 corresponds with 8 U.S.C. § 1229a ("Removal proceedings"); Section 241(a)(5) corresponds with 8 U.S.C. § 1231(a)(5) ("Reinstatement of removal orders against aliens illegally reentering"); and Section 238(b) corresponds with 8 U.S.C. § 1228(b) ("Removal of aliens who are not permanent residents").

16

## SUMMARY OF THE ARGUMENT

In the INA, Congress vested the Executive Branch with broad authority over the removal of aliens and narrowly circumscribed the authority of the Judiciary to superintend those functions. The injunction below inverts that distribution of power. It sets aside the chosen policy of DHS to effectuate third country removals, replaces that policy with one of the district court's own devising, and invites continued judicial micromanagement of such removals going forward, contrary to Congress's instruction. As the Supreme Court recognized in staying the district court's injunction, the injunction exceeds the district court's lawful authority several times over.

I.    The Supreme Court concluded that Defendants are likely to succeed on the merits of this appeal. This Court should therefore reverse and vacate the district court's already stayed injunction.

At the outset, the injunction runs afoul of multiple independent jurisdictional bars. *First*, 8 U.S.C. § 1252(f)(1) prohibits lower federal courts from issuing classwide relief that "enjoin[s] or restrain[s] the operation of [specified] provisions" in the INA. Specifically, Section 1252(f)(1) prohibits classwide "injunctions that order federal officials to

17

take or refrain from taking actions to enforce, implement, or otherwise carry out" their statutory authority to conduct third-country removals. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022).

Contrary to the district court's holding, it makes no difference that Plaintiffs' claim is "based on" CAT, which is not one of the statutory provisions specified in Section 1252(f)(1). *See* Add. 27. The injunction unquestionably restrains the operation of a provision that is specified in Section 1252(f)(1)—namely, DHS's implementation of Section 1231(b)'s authorization of third-country removals—because it bars DHS from exercising its authority to conduct third-country removals unless it first meets various conditions. *See Aleman Gonzalez*, 596 U.S. at 552-54 and n.4. That conclusion cannot be avoided by an argument that the injunction merely requires compliance with the INA or removal orders: The Supreme Court has already specifically rejected that too-narrow view of the statute. *Id.*

Nor does Section 1252(f)(1) permit an exception for classwide relief in order to make individualized review available. Its text recognizes just two exceptions: one for the Supreme Court, and the other for the application of the provisions to an individual alien. The Supreme Court

has "stated on more than one occasion that [§ 1252(f)(1)] bars class-wide relief," without creating a new, atextual exception. *Aleman Gonzalez*, 596 U.S. at 554-55.

In addition, the immigration laws specifically strip district courts of jurisdiction to review claims challenging the government's implementation of CAT, and generally strip them of jurisdiction to adjudicate freestanding suits arising from actions taken to execute removals. Such claims may be brought, *if at all*, only in a petition for review of a final removal order filed in a court of appeals. *See* 8 U.S.C. § 1252(a)(4) and (5), (b)(9), and (g); *see also* 8 U.S.C. § 1231 note. Both sets of bars apply here in full: Plaintiffs demand greater process for their CAT claims, and they seek to prevent the execution of their removal orders until they get that process. The district court held itself above these limits, largely by ignoring the statutory text and emphasizing the importance of judicial review. That is no way to read any statute, but especially not these. The INA reflects a comprehensive effort by Congress to restrict judicial review to "protect[] the Executive's discretion from the courts." *Reno v. American-Arab Anti-Discrimination Committee* (*AADC*), 525 U.S. 471, 486 (1999). Congress intentionally drafted these provisions

to bar legal challenges and challenges to the Executive Branch's core discretionary decisions. Indeed, any other interpretation would effectively nullify them. The district court's injunction intrudes upon the core executive functions that Congress sought to shield.

II.    Even assuming the district court had jurisdiction to issue its sweeping injunction, the district court's analysis of the merits is also fatally flawed. Without any mooring in law, the district court revised the government's policy to better comport with the court's "sense" of "fairness." Add. 49. It rejected the government's approach to utilizing country-wide assurances as to the treatment of removed aliens, instead insisting that "individualized assessment[s]" are required. *Id.* at 45. But as the Supreme Court has made clear, the "Judiciary is not suited to second-guess such determinations," in either substance or scope, given their "foreign policy" ramifications. *Munaf v. Geren*, 553 U.S. 674, 702 (2008). The district court also crafted new timelines, ordering that aliens must be given at least 10 days to raise a CAT-based fear claim, and another 15 days to seek to reopen immigration proceedings after an adverse finding as to that claim. Add. 59. But it typically takes "minutes," not weeks, for an alien to express a fear of being tortured in a country.

ECF No. 130-2 ¶ 11. These arbitrary deadlines are also out of step with analogous immigration law, which tolerates far more efficient proceedings.

All of this is particularly unjustifiable because many class members are aliens who have never been admitted into the United States. Thus, they do not have due process rights to any additional removal procedures beyond the ones the political branches have provided. *See Thuraissigiam*, 591 U.S. at 138-140. The district court thus lacked authority to create new procedural requirements under the Due Process Clause for them. *See id.*

III.   The remaining considerations favor the government, not Plaintiffs, as the Supreme Court concluded in granting a stay. *See* Appx. 821. Plaintiffs have not established irreparable harm: Plaintiffs have not identified any irreparable harm from the government's ability to obtain assurances that an alien will not be tortured categorically rather than one-by-one, and the March Guidance, in the absence of assurances, already provides Plaintiffs with notice and an opportunity to raise a fear of removal. Add. 2-3. By contrast, the government suffers irreparable harm from the district court's decision to take the reins on immigration

policy and override the Executive Branch's conduct of foreign policy. Appx. 790-803. Those effects are particularly obvious here because of the district court's avowed intent to continue revising the procedures it requires the government to follow and the serious practical consequences, including diplomatic consequences, of the injunction.

The Court should follow the Supreme Court's lead and vacate the injunction.

## ARGUMENT

## I. The District Court Flouted Three Independent Jurisdictional Bars.

### A. The Injunction Violates 8 U.S.C. § 1252(f)(1).

The district court's injunction ran roughshod over *three* independent sets of jurisdictional bars. To start, the district court's injunction is prohibited by 8 U.S.C. § 1252(f)(1), which deprives lower federal courts of jurisdiction to issue classwide injunctions that restrain the operation of third-country removals pursuant to 8 U.S.C. § 1231. Section 1252(f)(1) provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter ... other than with respect to the application of such provisions to an individual alien against whom proceedings ... have been initiated.

8 U.S.C. § 1252(f)(1).

The district court's injunction clearly violates Section 1252(f)(1). It runs to "an entire class of aliens," *Aleman Gonzalez*, 596 U.S. at 550-51, rather than an "individual alien," 8 U.S.C. § 1252(f)(1). And it concerns one of the covered statutory provisions: Section 1231(b)—which authorizes the Executive to remove aliens to third countries, when

appropriate—is within the "provisions" covered by Section § 1252(f)(1). *See Aleman Gonzalez*, 596 U.S. at 551 (holding injunction restraining the operation of Section 1231(a) was covered by Section 1252(f)(1)).

There is also no doubt that the injunction below "restrain[s] the operation" of Section 1231(b). 8 U.S.C. § 1252(f)(1). That was the whole point. The district court enjoined DHS from "removing any alien to a third country" until the mandated procedures are followed. Add. 49. That is, the court ordered the government to "refrain" from "carry[ing] out" its third-country removal authority under Section 1231(b) unless certain conditions are satisfied. *Aleman Gonzalez*, 596 U.S. at 550.

That is exactly the type of injunction that *Aleman Gonzalez* held that Section 1252(f)(1) forbids. There, as here, the district court enjoined the government, classwide, from taking action under a specified provision (detaining aliens under Section 1231(a)(6 for more than 180 days)) until it provided additional process to those aliens (a bond hearing). *Aleman Gonzalez*, 596 U.S. at 547. The Supreme Court held that such an injunction was "barred" by Section 1252(f)(1), because an injunction that stops the government from implementing a statutory provision until certain conditions are satisfied is one that "enjoin[s] or restrain[s]" the

operation of that provision. *Id.* at 551.

That same reasoning is controlling here: The injunction below "'enjoin[s] or restrain[s] the operation' of [Section 1231(b)] because [it] require[s] officials to take actions that (in the Government's view) are not required by [Section 1231(b)] and to refrain from actions that (again in the Government's view) are allowed by [Section 1231(b)]." *Id.* It is the precise type of injunction that cannot run to an entire class of aliens under Section 1252(f)(1).

Notwithstanding the Supreme Court's holding in *Aleman Gonzalez*, the district court held that Section 1252(f)(1) "simply does not apply." Add. 27. It observed that Plaintiffs' claim "concerning the availability of CAT protection" is "based on" FARRA, which is "a different statute" and is not covered by Section 1252(f)(1). *Id.* Additionally, the district court reasoned the injunction has a mere "collateral[]" effect on "covered parts of the INA." *Id.* at 28.

That reasoning does not work. Section 1252(f)(1) asks whether the injunction enjoins or restrains "the operation of" a covered provision. It does not ask—as the district court did—whether the plaintiffs' arguments are based on a covered provision, as the district court

evidently reasoned. For purposes of Section 1252(f)(1), all that matters is whether the action that the injunction restrains is taken to enforce or implement one of the covered statutory provisions (i.e., those "governing the inspection, apprehension, examination, and removal of aliens"). *Aleman Gonzalez*, 596 U.S. at 549-50. It does not matter whether that action is in fact "what the statute allows or commands." *Id.* at 552. And it does not matter whether that action violates some external legal limit, be it "constitutional" or "statutory." *Id.* at 553-54 and n.4. So long as the governmental conduct at issue is taken pursuant to a covered provision, Section 1252(f)(1) bars classwide injunctive relief to stop it. *Id.* at 554-55.

Indeed, *every* Justice in *Aleman Gonzalez* rejected the district court's reading of Section 1252(f)(1). While members of the Court disagreed over whether Section 1252(f)(1) reaches injunctions correcting the government's misapplication of a covered provision itself, the full Court agreed that Section 1252(f)(1) would forbid an injunction premised on the government's application of a covered provision violating some *external* legal limit. *See* 596 U.S. at 553-554 and n.4. In other words, while members of the Court disagreed about whether Section 1252(f)(1) reached claims *internal* to a covered provision, all Justices agreed that,

at minimum, it would "prohibit injunctive relief" against the operation of a covered provision based on "claims that arise from any statutes external to the covered INA provisions (for example, a claim that a covered provision violates [RFRA])." *Id.* at 567 (Sotomayor, J., concurring in the judgment in part and dissenting in part). As the Court's opinion noted, even the respondents in that case agreed that Section 1252(f)(1) would bar "injunctive relief against the enforcement of one of the covered immigration provisions" for violating some "statute not specified in § 1252(f)(1)." *Id.* at 553 n.4. is That is the precise situation here, so classwide relief restraining DHS's operation of third-country removals pursuant to Section 1231(b) is barred, notwithstanding that Plaintiffs' claims are "based on a different statute" than Section 1231(b). Add. 27.

Following this reasoning, D.C. Circuit recently rejected a similar argument attempting to justify a classwide injunction as merely "relate[d] to" a non-covered provision governing warrantless arrests. *N.S. v. Dixon*, No. 21-5275 (D.C. Cir. June 27, 2025), slip op. at 16. As that court correctly explained, the injunction was barred by § 1252(f)(1) because it has the effect of "restrain[ing] the Government from carrying out an arrest and detention of a criminal defendant pursuant to an I-200

form," so it "clearly affects provisions to which § 1252(f)(1) applies." *Id.* at 17.

Likewise, the injunction's "impact" on DHS's operations pursuant to Section 1231(b) is far more than "collateral[]" or "attenuated." Add. 28; Stay Order at 2. This is nothing like cases where an injunction restrains the "operation of a provision that is not specified in § 1252(f)(1)," which then has a downstream "collateral effect on the operation of a covered provision." *Aleman Gonzalez*, 596 U.S. at 553 n.4. Rather, the injunction itself bears directly on Section 1231(b), and expressly restrains DHS's operation of third-country removals under that specified provision; *see also N.S.*, No. 21-5275, slip op. at 18 (rejecting a similar "collateral effect" argument when the injunction "directly and substantially restricts the ability of … federal officials to 'carry out' provisions covered by § 1252(f)(1)").

The answers to the Court's three questions regarding Section 1252(f)(1) support this conclusion.

*First*, the Supreme Court has already rejected an argument that Section 1252(f)(1) does not bar class-wide relief that merely orders the Government to comply with the law as properly understood. *Aleman*

*Gonzalez*, 596 U.S. at 552. The Court explained the word "operation" in the statute is a reference 'not just to the statute itself *but to the way that it is being carried out.*" *Id.* at 550 (emphasis added). Orders that "require officials to take actions that (*in the Government's view*) are not required . . . and refrain from actions that (*again in the Government's view*) are allowed" . . . interfere with the Government's efforts to operate." *Id.* at 551 (emphasis added).

The Court did not stop there. Apart from this ordinary meaning of the word "operate," the Court gave three reasons for rejecting the argument that "'the operation' of the covered immigration provisions" for purposes of § 1252(f)(1) "means the operation of those provisions 'as properly interpreted.'" *Id.* at 552. The interpretation (1) would conflict with Section 1252(f)(1)'s prefatory clause "[r]egardless of the nature of the action or claim"; (2) would limit Section 1252(f)(1)'s restriction to constitutional claims; and (3) would make the court's jurisdiction dependent on the merits of the claim. *Id.* at 552-54. In sum, "§ 1252(f)(1) has the same force even when the National Government allegedly enforces the relevant statutes unlawfully." *Arizona v. Biden*, 40 F.4th 375, 394 (6th Cir. 2022) (Sutton, C.J., concurring).

29

*Second*, Section 1252(f)(1) does not presume the availability of individual relief. Instead, it applies notwithstanding the availability of individual relief. Nothing in the statute contemplates or otherwise suggests any other reading. The statute's use of the word "individual" denotes just "one exception," and the Supreme Court "has already commented on the meaning of this exception." *Aleman Gonzalez,* 596 U.S. at 550. It means nothing more and nothing less than that Section 1252(f)(1) "does not extend to individual cases." *Id.* The "individual alien" phrase in the statute is an exception—not a condition.

*Third*, the district court's injunction, based on Plaintiffs' APA and due process claims, is not attenuated from the provisions covered by Section 1252(f)(1). As explained, the injunction prohibits the government from removing aliens until it complies with the additional procedures ordered by the district court. Again, Section 1252(f)(1)'s reach "does not depend on the nature of the claim in question," but instead turns on the injunction's effect on the INA's removal provisions. *Id.* at 554. Here, that effect is clear: Defendants cannot, without complying with the district court's "sense of fairness," Add. 49, remove aliens—even those who have committed the most heinous crimes—to third countries. That injunction

has a direct effect on the government's implementation of its third-country removal authority, and the Supreme Court has made it abundantly clear that Section 1252(f)(1) prohibits such an injunction.

In sum, district courts do not have jurisdiction to "improve" immigration processes as they see fit. *See* H.R. Rep. No. 469, 104th Cong., 2d Sess. Pt. 1, at 161 (1996) (House Report) ("[S]ingle district courts or courts of appeal do not have authority to enjoin procedures established by Congress to reform the process of removing illegal aliens from the U.S."). Congress permissibly chose to bar courts from interfering with the Executive's enforcement of certain immigration statutes until the Supreme Court has spoken on the issue. Even if the district court otherwise had jurisdiction over Plaintiffs' claims (it does not) and was correct on the merits of those claims (it is not), the nationwide preliminary injunction clearly violates § 1252(f)(1). For that reason, as the Supreme Court has already recognized, it should be immediately vacated.

**B.    The Injunction Violates the Foreign Affairs Reform and Restructuring Act and Section 1252(a)(4).**

The second jurisdictional problem with the district court's injunction is the CAT-specific bars in the INA and FARRA.

The INA provides that "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of any cause or claim under [CAT]." 8 U.S.C. § 1252(a)(4). Likewise, FARRA confirms that "no court shall have jurisdiction to review . . . any . . . determination made with respect to the application of [CAT] . . . except as part of the review of a final order of removal." § 2242(d), 112 Stat. 2681-822; *see* 8 C.F.R. § 208.18(e). FARRA also bars judicial review of the "regulations adopted to implement [CAT]," and assigns to the Executive alone the duty to design procedures to "implement the obligations of the United States" under that treaty. § 2242(d), 112 Stat. 2681-822.

The injunction runs afoul of these limits. Plaintiffs' suit—which challenges DHS's existing procedures for certain CAT claims—both concerns the "application" of CAT and is a "cause or claim under [CAT]." Add. 27 (recognizing the "class-wide injunctive relief Plaintiffs seek" is "based on" FARRA). And there is no doubt that this action arises outside

32

of a petition for review from a final order of removal. Thus, the district court lacked jurisdiction: The sorts of claims raised here can only be reviewed, *if at all*, in an appellate court through a petition for review.

For its part, the district court largely ignored FARRA. *See generally* 4-48. It never explained how it had authority to issue an injunction regarding the "application" of CAT here. § 2242(d), 112 Stat. 2681-822. Nor did it try to justify how it had "jurisdiction to review" the procedures that the Executive Branch has adopted to "implement" CAT. *Id.* By definition, in augmenting the procedures that the Executive Branch has crafted for CAT claims in this context, the district court "review[ed]"— and held inadequate—those that the Executive "implemented." *Id.*

As for Section 1252(a)(4), the district court held the provision applies only to matters that could have been raised in a petition for review of a final order of removal. Add. 22. And because Plaintiffs' CAT objections arose after the final removal order was issued, the court reasoned they fell outside Section 1252(a)(4). *Id.*

That rationale is flawed at multiple levels. To start, the premise is wrong: CAT claims like those here can be raised in the administrative process. *Infra* at 43. But more fundamentally, the conclusion does not

33

follow. Section 1252(a)(4) identifies a type of action—"any cause or claim under [CAT]"—and specifies the "sole and exclusive" way that such a claim can be reviewed in court: a petition for review filed in a court of appeals. To the extent an action does not fit within that means for review, the result is that judicial review is not available. That is the nature of exclusive review. *See, e.g.*, *United States v. Fausto*, 484 U.S. 439, 454-455 (1988) (holding that the comprehensive framework of the CSRA precluded review of certain claims); *Riley v. Bondi,* 606 U.S. --, 2025 WL 1758502 *7 (2025) (rejecting an argument that the majority's interpretation could deprive an alien of any judicial review because the Court "must nevertheless follow the statutory text"). And that holds particular force in the context of CAT, which is a non-self-executing treaty that Congress implemented through FARRA, by giving the Executive broad discretion over setting its procedures. *See* § 2242(b) and (d), 112 Stat. 2681-822.

Concluding otherwise, the district court invoked the Supreme Court's decision in *Jennings v. Rodriguez* to argue that the INA's channeling provisions "cannot be read to strip jurisdiction over claims that could not have been raised in the removal proceedings." Add. 22

(citing 583 U.S. 281, 293 (2018)). But *Jennings* did not adopt such a categorical rule. Instead, the Court read a specific statutory term narrowly ("arising from") to limit the reach of a different jurisdiction-stripping provision. 583 U.S. at 293 (interpreting 8 U.S.C. § 1252(b)(9)). There is a world of difference between adopting the narrower reading of an open-ended phrase and ignoring the plain text of a limitation entirely. The district court did the latter here. When Congress specifies the "sole and exclusive" means for judicial review over a claim, there is only one way for the federal courts to review that claim. Anything more involves rewriting the statute, not interpreting it. *Riley,* 2025 WL 1758502 *7 (noting that though "an alien may thus be deprived of any judicial review" "we must nevertheless follow the statutory text and our prior precedents").

This Court should accordingly vacate the injunction because by requiring additional procedures than those already provided by the CAT, the district court's injunction violated the FARRA.

## C.    The Injunction Runs Afoul of Section 1252(a)(5), (b)(9), and (g).

In addition to those two independent jurisdictional problems, the injunction also violates the INA's provisions that prohibit district courts

35

from exercising jurisdiction over suits challenging actions taken to execute removal orders. Congress has explicitly and unambiguously stripped district courts of jurisdiction over "any cause or claim by or on behalf of any alien arising from the decision or action . . . to commence proceedings, adjudicate cases, or execute removal orders." 8 U.S.C § 1252(g). To the extent claims arising from these distinct actions are reviewable at all, they are only reviewable along with any other "questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien"—in a petition for review of a "final order" of removal. 8 U.S.C. § 1252(b)(9). And that petition, again, is the "sole and exclusive means for judicial review" of such claims. 8 U.S.C § 1252(a)(5).

Together, these provisions strictly limit judicial review over certain "stages in the deportation process." *AADC,* 525 U.S. at 483-484. One such stage is the execution of a removal order. *Id.* If an alien wishes to challenge that discrete act in court, his sole and exclusive means of doing so is a petition for review; if that means is unavailable, then nothing in the INA "provides for jurisdiction" for the federal courts to intervene. *Id.* at 487; *Mapoy v. Carroll,* 185 F.3d 224, 229-30 (4th Cir. 1999) (holding that Section 1252(g) has a singular exception to the general rule in

36

§ 1252(g) that jurisdiction is stripped from the enumerated claims" and that is for claims "specifically provided for by § 1252.").

Once more, that principle precludes the injunction below. Plaintiffs' claims arise entirely from actions taken to "execute removal orders," 8 U.S.C. § 1252(g)—namely, to remove Plaintiffs to third countries without the additional process demanded by the district court—and thus those claims "fall[] squarely within" the INA's jurisdictional bar, *AADC*, 525 U.S. at 487. The district court lacked the authority to enjoin the government from removing Plaintiffs to third countries without additional process—i.e., from executing those aliens' removal orders in a particular way.

The district court's attempts to avoid these jurisdictional bars again fail. As for Section 1252(g), the court read that bar to cover "only discretionary decisions." Add. 23-24. And it held the actions here were thus not covered, because the government lacks discretion to remove an alien contrary to law. *Id.*

That misreads Section 1252(g). Nothing in that provision's text is limited to acts of "discretion"—a kind of limitation Congress knows how to create. *See, e.g.*, 8 U.S.C. § 1226(e) ("The [Secretary's] discretionary

37

judgment regarding the application of this section shall not be subject to review."). Rather, the text reaches "*any* cause or claim . . . arising from the decision or action by the [Secretary] to commence proceedings, adjudicate cases, or execute removal orders." 8 U.S.C. § 1252(g) (emphases added).

To be sure, those actions often involve "discretion" on the part of the Executive Branch, and Congress sought to protect that discretion from judicial review. *AADC*, 525 U.S. at 486. But nothing in Section 1252(g) limits its sweep to only the discretionary aspects of the specified actions; rather, its text reaches "any" "action" taken to "execute removal orders."

For that reason, this Court's sister circuits have widely rejected the argument that this bar is limited to discretionary actions, even when an alien pressing a constitutional claim seeks to pause removal while the alien seeks other immigration relief. *See*, *e.g.*, *Rauda v. Jennings*, 55 F.4th 773, 778 (9th Cir. 2022) (holding that Section 1252(g) barred plaintiff's constitutional claim seeking a stay of removal until he could obtain judicial review of his motion to reopen based on new threats from actors in his country of citizenship); *Camarena v. Dir., ICE*, 988 F.3d 1268, 1274 (11th Cir. 2021) ("[W]e do not have jurisdiction to consider

38

'any' cause or claim brought by an alien arising from the government's decision to execute a removal order. If we held otherwise, any petitioner could frame his or her claim as an attack on the government's authority to execute a removal order rather than its execution of a removal order."); *E.F.L.*, *v. Prim,* 986 F.3d 959, 964-965 (7th Cir. 2021) (rejecting the argument that jurisdiction remained in similar circumstances because petitioner was challenging DHS's legal authority as opposed to its "discretionary decisions"); *Tazu v. Att'y Gen. U.S.*, 975 F.3d 292, 297 (3d Cir. 2020) (observing that "the discretion to decide *whether* to execute a removal order includes the discretion to decide *when* to do it" and that "[b]oth are covered by the statute") (emphasis in original); *Hamama*, 912 F.3d at 874-77 (vacating district court's injunction staying removal, concluding that § 1252(g) stripped district court of jurisdiction over removal-based claims and remanding with instructions to dismiss those claims); *Silva v. United States*, 866 F.3d 938, 941 (8th Cir. 2017) (Section 1252(g) applies to constitutional claims arising from the execution of a final order of removal, and language barring "any cause or claim" made it "unnecessary for Congress to enumerate every possible cause or claim."); *Foster v. Townsley*, 243 F.3d 210, 214 (2001); *Tsering v. U.S.*

*Imm. & Customs Enf't.*, 403 F. App'x. 339, 342-43 (10th Cir. 2010). This Court should join these courts in holding as much.

Moreover, Congress had good reason to sweep more broadly. A jurisdictional bar that turns on the merits of the underlying action is no bar at all. *See Aleman Gonzalez*, 596 U.S. at 554. Nor would it do much for Section 1252(g)'s goal of curbing the "prolongation of removal proceedings." *AADC*, 525 U.S. at 487. Any plaintiff can style a claim as a challenge to legal authority instead of a challenge to an exercise of discretion. The straightforward reading of Section 1252(g) is the more sensible one: If a claim challenges the execution of a removal order, it must be brought via a petition for review or not at all.

Compounding the error, the district court dismissed Sections 1252(a)(5) and (b)(9) on the ground that they only cover actions that "could have been raised in [an alien's] removal proceedings." Add. 16. And because Plaintiffs' objections to third-country removal arose after their final removal orders were entered, the court reasoned that they were not barred.

That reasoning, however, fares no better than it did under the CAT-specific bars. Again, when a statutory scheme creates an exclusive

40

mechanism for reviewing a type of grievance, the fact that a subset of those claims cannot satisfy that mechanism is not a license for a federal court to create another one. *See Riley,* 2025 WL 1758502 *7 (rejecting an interpretation of Section 1252(b)(1) that would have provided greater access to judicial review because it was inconsistent with the statutory text). That role of revising statutes to create new avenues of judicial review beyond the exclusive ones that already exist is reserved to Congress. *See id.*

Here too, the district court relied heavily on its misunderstanding of *Jennings*. Add. 17. But again, there, the Supreme Court declined to interpret Section 1252(b)(9) so broadly as to cover categories of claims that either had nothing to do with removal (*e.g.*, assault) or could never be "effectively" reviewable in any form (*e.g.*, prolonged detention). 583 U.S. at 293. None of that bears on the allegations here, which inescapably—indeed, exclusively—target an "action taken . . . to remove an alien from the United States." 8 U.S.C. § 1252(b)(9).

Tellingly, the district court never attempted to square its ruling with the actual text of the INA. Nowhere did it say how a suit seeking to impose conditions on third country removals does not challenge an

"action" to "execute removal." 8 U.S.C. § 1252(g). Nor did it explain how a case objecting to the process for third-country removals was not one "arising from" "action[s] taken" to "remove an alien." 8 U.S.C. § 1252(b)(9). Its sole response was to insist that these sorts of claims must be reviewable at some point, by some court—and working from that premise, the district court held that those jurisdictional bars did not control, because they could not apply.

That is no way to read a statute. Indeed, that logic undermines the whole point of jurisdictional bars, which is, after all, to create at least some situations where judicial review is actually barred. And it is especially misguided here, because many aliens can raise CAT objections to third-country removals in the administrative process—and, in turn, before a court of appeals. On the front end, aliens can raise in their initial removal proceedings the list of countries where they fear removal. *See* U.S. Citizenship & Immigration Servs., DHS, Form I-589: Application for Asylum and for Withholding of Removal (Edition: Jan. 20, 2025) (asking

alien to list and explain "any" country "to which [he] may be returned" where he fears "torture"); *see also* 8 C.F.R §§ 1240.10(f ), 1240.11(c).

And on the back end, aliens can move to reopen proceedings to assert new fear claims regarding removal to a third country. *See*, *e.g.*, 8 U.S.C. § 1229a(c)(7) (allowing a motion to reopen within 90 days after removal order becomes administratively final); 8 C.F.R § 1003.2(c), 1003.23(b) (allowing a motion to reopen after 90 days under immigration court or BIA's sua sponte authority).

The district court found those options inadequate. Add. 43. It maintained, for instance, that forcing an alien to affirmatively list where he might "have a reasonable fear" would be "impractical." *Id*. But that, at bottom, is a policy objection to the scheme Congress designed. And it is a weak one at that. There is little to recommend a system where the government is forced to go country-by-country until the alien acquiesces to removal without further, lengthy process. *See* Appx. 785 (detailing "time consuming" and "operationally burdensome" process of finding viable third countries for removal).

Nor is it unreasonable to place the burden on the alien to proactively identify where he fears he may be "tortured," as defined

under CAT. CAT protection is an extraordinary remedy reserved for the "extreme" scenario when an alien faces a specific threat of severe pain or suffering intentionally inflicted by the hand or with the consent or acquiescence of a government official in the receiving country. *See supra* 11. It does not, as the district court seemed to suggest, extend to whenever an alien is removed to a country with a high crime rate, civil unrest, or other risk of private violence. *See* Add. 58. Given that demanding standard, it is far from unreasonable to expect that an alien with a bona fide CAT claim will be able to identify all the countries where he would have a valid CAT claim—especially aliens like the class members, who have already "gone through a removal process" and would have been "advised" as to the scope of CAT. Appx. 782. This Court should therefore immediately vacate the injunction because it violates these clear statutory provisions, consistent with the Supreme Court's conclusion, in staying the preliminary injunction, that the government is likely to succeed on the merits in this appeal.

## II.    Plaintiffs' Claims Are Meritless In Any Event.

Even setting aside the injunction's many jurisdictional defects, Plaintiffs are not likely to succeed even on the underlying merits. The

44

government's procedures for implementing CAT in this context are fully consistent with due process, and the district court had no legal basis to order that those procedures be supplemented with ones it preferred.

Notably, all class members here have final orders of removal. All have had the opportunity to raise CAT claims in prior proceedings, voice fears as to any potential countries of removal, and move to reopen past proceedings as new fears have arisen.

The March Guidance explains that the government provides these aliens with additional process, before any one of them is removed to a third country. Add. 2-3. That process, as detailed below, ensures that an alien will either be sent to a country where the United States has received adequate assurance the alien will not be persecuted or tortured, or that the alien will be given notice and an opportunity to be heard regarding any fear as to his country of removal. *Id*. The district court erred in second-guessing the details of these procedures under the guise of constitutional due-process analysis.

1.     As noted, the March Guidance provides that an alien may be removed to a "country [that] has provided diplomatic assurances that aliens removed from the United States will not be persecuted or

tortured." Add. 2-3. If the State Department finds that country's assurances credible, "the alien may be removed without the need for further procedures." *Id.*

The Constitution requires nothing further. The Supreme Court has already held that when the Executive determines a country will not torture a person on his removal, that is conclusive. *Munaf v. Geren*, 553 U.S. 674, 702-703 (2008). Indeed, "[u]nder *Munaf* … the district court may not question the Government's determination that a potential recipient country is not likely to torture a detainee." *Kiyemba v. Obama*, 561 F.3d 509, 514 (D.C. Cir. 2009), *cert. denied*, 559 U.S. 1005 (2010).

The "*Munaf* decision applies here a fortiori: That case involved transfer of American citizens, whereas this case involves transfer of alien detainees with no constitutional or statutory right to enter the United States." *Id.* at 517-18 (Kavanaugh, J., concurring). When the Executive decides an alien will not be tortured abroad, courts may not "second-guess [that] assessment," at least unless Congress has specifically authorized judicial review of that decision. *Id.* at 517 (citation omitted); *see Munaf*, 553 U.S. at 703 n.6.

The district court disagreed, but it gave no sound reason for doing so. It mainly insisted that the Executive Branch must make an "individualized assessment" to satisfy due process. Add. 49. But courts may not "second-guess" the scope of the Executive's conclusion any more than its substance. *See Kiyemba*, 561 F.3d at 517-18 (Kavanaugh, J., concurring). The decision that a foreign government's categorial assurance against torture is sufficient to be accepted for all aliens is itself a "foreign policy" judgment the Judiciary "is not suited" to question. *Munaf*, 553 U.S. at 702.[3]

Relatedly, the district court's objection does not sound in procedural due process at all. It is a substantive objection that an assurance alone provides insufficient basis for the government to find that an alien is not likely to be tortured. The Supreme Court has rejected attempts to "recast

---

[3] The district court also stated that an individualized determination was required under CAT regulations. Add. 49. Of course, that has no bearing on what the Constitution might require. Anyway, the court was wrong. While the regulations say that an assurance must be limited to a "specific country," nothing requires an alien-by-alien determination as to what will likely happen in that country. 8 C.F.R. § 1208.18(c)(1). The Secretary is free to conclude that "an alien" would not be tortured upon removal, on the ground that no alien would be treated that way in light of the strength and reliability of the assurance provided by that country. *Id.*

in 'procedural due process' terms" what is really a challenge to the "'substantive'" criteria that the government has adopted. *Reno v. Flores*, 507 U.S. 292, 308 (1993) (rejecting similar argument for "individual[ized]" procedure). For good reason: It makes no sense to require the government to provide additional process with respect to potential evidence that is immaterial under the substantive standard the government has adopted. When the government is satisfied based on foreign assurances that no alien will be tortured in the receiving country, a further "individualized" assessment serves no rational purpose.

The district court also held that the March Guidance was insufficient because it did not provide for judicial review before removal. Add. 46. But that too is irreconcilable with *Munaf's* recognition that certain determinations by the political branches are conclusive in this context. Moreover, the district court never explained why judicial review would be required here, but not for the many other provisions in the INA that make the Executive's decisions conclusive and unreviewable. *See*, *e.g.*, *AADC*, 525 U.S. at 486-487 (collecting examples); *cf.* 8 C.F.R. § 1208.30(g)(2)(iv)(A) (barring judicial review over adverse fear determination in expedited-removal proceedings). The court just

provided an overwrought citation to *Marbury v. Madison* for the notion that every right must have a remedy. Add. 43. But it never provided a coherent legal rationale why a judicial remedy is necessary in these circumstances, yet not elsewhere across the INA where an administrative remedy is sufficient. *See Haaland v. Brackeen*, 599 U.S. 255, 279 (2023). (It also bears noting that Mr. Marbury never received his commission to service as a justice of the peace.)

2.     For aliens being removed to a third country not covered by an adequate assurance, the March Guidance states that DHS will first inform the alien of removal to that country, and then the alien has the opportunity to affirmatively state that he fears removal there. Add. 3. If the alien does so, immigration officials will generally screen the alien within 24 hours to determine whether he "would more likely than not" be persecuted or tortured if sent to that country. *Id*. If not, the alien will be removed; if so, the alien will be placed in further administrative proceedings—or, if appropriate, the government "may choose to designate another country for removal." *Id*.

The district court deemed those procedures unconstitutional too. According to the court, the Constitution requires (i) not just that an alien

be given a "meaningful opportunity" to simply express a fear of return, but that he be given a "minimum of ten days" to do so; (ii) the government must use a "reasonable fear" standard, rather than a "more likely than not" standard, in evaluating that asserted fear; and (iii) an alien must have "a minimum of 15 days" to "move to reopen" immigration proceedings if he fails to establish a reasonable fear. Add. 59.

The district court offered no basis in law for those supposed constitutional dictates and instead simply invented them wholecloth according to its personal sense of fairness. Add. 49. Those judicial creations are further inconsistent with established immigration law. Most analogous, in expedited-removal proceedings, aliens are expected to raise fears of removal "almost immediately," and are often processed in a matter of hours. ECF No. 130-2 ¶¶ 11, 13; *see*, *e.g.*, 8 U.S.C. § 1225(b)(1)(B)(i). If the asylum officer determines the alien does not have a credible fear, any review by an immigration judge must be completed within seven days after that finding was made. 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R § 1003.42(e). The expedited-removal statute does not limit the countries to which an alien can be removed pursuant to Section 1231(b), *see* 8 U.S.C. § 1225(b), so its

expedited procedures for raising and assessing fear claims apply even when an alien is removed somewhere other than the country he designates or his home country, *see*, *e.g.*, 8 U.S.C. § 1231(b)(2)(A)-(E).

The district court did not explain why those sorts of procedures are adequate for expedited removal, but not here—where, again, the entire class comprises aliens who already have valid removal orders, and who already have had a prior opportunity to raise claims under CAT. The court underscored that the additional measures it imposed tracked its "sense of what fairness requires," Add. 49; but that is an improper basis to displace DHS's judgment about the best way to carry out the core executive power of removing aliens consistent with our treaty obligations.

Nor does the district court's preferred policy even make sense on its own terms. The injunction requires that all class members receive at least 15 days to move to reopen proceedings after an adverse "reasonable fear" finding. Add. 59. But when the government makes a decision to accept an individualized assurance from a foreign nation that an alien would not be tortured upon removal—as even the district court acknowledged could be permissible, *see id*. at 46—that determination is conclusive for the Executive Branch. *See* 8 C.F.R. § 208.18(c). Yet if the

51

government opts to take that course as to a particular alien, the court's injunction still requires two plus weeks for that alien to file a futile motion to reopen. Add. 59. While aliens in that position may welcome the manufactured delay, such judicial policymaking only further burdens an immigration system already plagued by protraction.

3. The district court's creation of novel due-process requirements is particularly misguided here because, for many aliens included in the class, the Due Process Clause requires no more process than what the political branches provide. This Supreme Court has held that "the due process rights of an alien seeking initial entry" are no greater than "[w]hatever the procedure[s] authorized by Congress." *Thuraissigiam*, 591 U.S. at 139 (citation omitted). For aliens who have never been admitted—a group which undoubtedly includes many class members here—"the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law." *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892) (emphasis added); *accord Thuraissigiam*, 591 U.S. at 138-40.

To this end, the Supreme Court has also long applied the so-called "entry fiction" that all "aliens who arrive at ports of entry . . . are treated

for due process purposes as if stopped at the border." *Thuraissigiam*, 591 U.S. at 139 (citation omitted). Indeed, that is so "even [for] those paroled elsewhere in the country for years pending removal." *Id*. The Supreme Court has applied the entry fiction to aliens with highly sympathetic claims to having "entered" and developed significant ties to this country. *See*, *e.g.*, *Kaplan v. Tod*, 267 U.S. 228, 230 (1925) (holding that a mentally disabled girl paroled into the care of relatives for nine years must be "regarded as stopped at the boundary line" and "had gained no foothold in the United States"); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 214-15 (1953) (holding that an alien with 25 years' of lawful presence who sought to reenter enjoyed "no additional rights" beyond those granted by "legislative grace"). Compared to these cases, it follows *a fortiori* that an unlawful entrant who violates our laws and evades detection must, once found, be "treated as if stopped at the border." *Mezei*, 345 U.S. at 215.

Accordingly, the Supreme Court's precedents indicate that illegal aliens who evade detection in crossing the border should be treated the same as those who are stopped at the border in the first place. *See Thuraissigiam*, 591 U.S. at 138-40. While aliens who have been admitted

may claim due-process protections beyond what Congress has provided, even when their legal status changes (e.g., an alien who overstays a visa, or is later determined to have been admitted in error), *see Wong Yang Sung v. McGrath*, 339 U.S. 33, 49-50 (1950), the Supreme Court has never held that aliens who have "entered the country clandestinely" are entitled to such additional rights, *The Japanese Immigrant Case*, 189 U.S. 86, 100 (1903). Put differently, "once an alien gains admission to our country and begins to develop the ties that go with permanent residence"—a status that, by definition, unlawful entrants are legally barred from obtaining—"his constitutional status changes accordingly." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982). But before then, an alien who clandestinely enters "does not become one of the people to whom these things are secured by our Constitution by an attempt to enter, forbidden by law." *United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904); accord *Wong Yang Sung*, 339 U.S. at 49-50.

Congress has codified that distinction by treating all aliens who have not been admitted—including unlawful entrants who evade detection for years—as "applicants for admission." 8 U.S.C. § 1225(a)(1) ("An alien present in the United States who has not been

admitted . . . shall be deemed for purposes of [the INA] an applicant for admission."). That rule comports with the Constitution. The Due Process Clause does not offer a windfall for those who successfully circumvent our laws and evade detection. For constitutional purposes, it should not matter whether an alien was apprehended "25 yards into U.S. territory" or 25 miles; nor should it matter whether he was here unlawfully and evades detection for 25 minutes or 25 years. *See Thuraissigiam*, 591 U.S. at 139. When an illegal alien has never been admitted to this country by immigration officers, his constitutional status for due-process objections to removal is no different from an alien stopped at the border.[4]

---

[4] This conclusion is consistent with the Supreme Court's recent rulings that aliens detained and subject to removal under the Alien Enemies Act (AEA), 50 U.S.C. 21 et seq., are entitled to judicial review, including notice and opportunity to be heard regarding their AEA status. *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (per curiam); *A.A.R.P. v. Trump*, No. 24A1007, 2025 WL 1417281, at *2 (May 16, 2025) (per curiam). As noted in the government's application in *J.G.G.*, Gov't Br. at 18-20, *Trump v. J.G.G.*, 145 S. Ct. 1003 (2025) (No. 24A931), the Supreme Court in *Ludecke v. Watkins*, 335 U.S. 160 (1948), interpreted the AEA and the habeas corpus statute to provide for limited but significant judicial review of the Executive's AEA determinations, including review of "questions of interpretation and constitutionality," *id.* at 163, and "[t]he additional question as to whether the person restrained is in fact an alien enemy," *id.* at 171 n.17. In those cases, therefore, Congress has provided procedures by statute that comport with due process, and they apply regardless of whether the AEA-designated alien is an applicant for

*Continued on next page.*

That principle is fatal to the classwide relief granted below. The class covers "[a]ll individuals who have a final order of removal issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA." Add. 26. That includes aliens who were apprehended at the border reentering after having been removed. It includes aliens deemed inadmissible at the border but then released into the country for removal proceedings. And it includes aliens who were able to clandestinely enter the country illegally, only to be apprehended later.

The Due Process Clause does not give such aliens a constitutional entitlement to any extra removal procedures beyond what the political branches have provided. *See Thuraissigiam*, 591 U.S. at 138-40. But that is precisely what the district court's injunction does. Again, the INA is silent as to any specific process that aliens must be afforded under CAT before they are removed to a third country, and FARRA delegates that

---

admission who lacks due-process removal rights beyond what Congress provides. Here, by contrast, the district court created an entirely new process without any statutory basis, based on its subjective "sense of what fairness requires"; Add. 49, superimposed that process upon the more limited (but still constitutionally adequate) procedures adopted by the political branches; and then applied that judge-manufactured process to many aliens who lack due-process removal rights beyond what Congress provides. Add. 59.

decision to the Executive Branch. *See* 8 U.S.C. § 1231 note. The March Guidance thus constitutes the political branches' reasoned judgment as to what that process should be in these circumstances, for aliens who have a final order of removal. For aliens who were never admitted to the United States, the Executive's policies and decisions made under FARRA "are due process of law." *Nishimura Ekiu*, 142 U.S. at 660 (emphasis added). And as detailed, far from some exercise of "arbitrary power," *Japanese Immigrant*, 189 U.S. at 101, that Guidance is exceedingly reasonable, and provides aliens with more than ample process to effectuate their responsible removal. As the Supreme Court has already recognized, the Constitution requires nothing further. This Court should reverse.

## III. The Non-Merits Factors Likewise Support The Government, Not Plaintiffs.

The district court likewise erred in concluding that the remaining considerations favor Plaintiffs. The Supreme Court concluded, in granting relief, that the government will be irreparably harmed by the preliminary injunction and—to the extent it considered this a close case—that the balance of equities tips in favor of the government, not Plaintiffs. *See Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010); *DHS v.*

*D.V.D.*, 2025 WL 1732103, at *6 (June 23, 2025) (Sotomayor, J., dissenting) (criticizing majority's conclusions regarding the non-merits factors).

Plaintiffs have not established irreparable harm that warrants extraordinary relief. The Secretary of State already has the authority to obtain "assurances" from a foreign country that an alien will not be tortured if removed there, and those assurances are already dispositive with regard to CAT protection. 8 C.F.R. § 208.18(c). Neither the district court nor Plaintiffs have identified any sort of imminent or irreparable harm from the government's ability to obtain these assurances categorically versus one-by-one. Nor could they: Because either decision would rest on the same basis (i.e., that no alien will be tortured), any requirement for an "individualized" determination would amount to a paperwork demand. Likewise, as for aliens set to be removed to a country who has not provided assurances, the March Guidance already provides them notice and an eminently reasonable opportunity to raise a fear of removal. *See* Appx. 2-3. And Plaintiffs have never justified why the district court's added measures—which, as noted, go well beyond the typical timeframe in expedited removal—are necessary to forestall

irreparable harm here. That is especially so given the lack of any realistic risk that they will be tortured with the concurrence of foreign governments in third countries where they have little or no preexisting connection, particularly given that the Executive Branch has determined those countries are acceptable places of removal.

By contrast, as underscored by the Supreme Court's recent trio of stays in similar cases involving immigration policy, the government suffers irreparable harm when the Executive Branch is barred from implementing its immigration policies. *See Noem v. Nat'l TPS Alliance*, No. 24A1059, 2025 WL 1427560 (U.S. May 19, 2025); *Noem v. Doe*, 145 S. Ct. 1524 (2025); *D.V.D.*, 2025 WL 1732103. The government suffers an irreparable sovereign harm whenever its policy is blocked by a court order. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *cf. Trump v. CASA, Inc.*, 2025 WL 1773631at * 24 (holding that the Executive Branch is irreparably harmed by an injunction that exceeds a district court's power and improperly intrudes on executive prerogatives). That harm is even more acute in the immigration context, where the Constitution assigns preeminent power to the political branches. *See Galvan v. Press*, 347 U.S. 522, 531 (1954).

Those harms are particularly pronounced in this case. While the Constitution envisions that "the Government's political departments [will be] largely immune from judicial control" in the immigration sphere, *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (citation omitted), the district court's injunction portends the opposite, with that court generally superintending third-country removals so long as its injunction is in effect. As the episode with South Sudan confirms, the injunction's open-ended terms allow the district court to continually revise its invented removal policy. *See* Add. 59 (purporting to "clarify" that "meaningful opportunity" means at least "ten days"). And indeed, the court has indicated that further revisions are to come—with those details fleshed out over the course of "experience," which in practice could only mean seriatim contempt hearings. *Id.* at 57. That is unworkable. It was problematic enough for the court to write its own procedures, but it is simply untenable for that project to be a work-in-progress in which the goalposts continuously move. *See id.*

The practical consequences of the district court's injunction only underscore why the Constitution assigns immigration policy to the political branches. As noted, the court's policy allows for at least 25 days'

60

worth of delay for every alien being removed to a third country who decides to voice a fear under CAT—regardless of how frivolous his claim. Add. 59. Because ICE "often has only a short window to remove an alien"—including because travel documents are not "valid indefinitely"— this unfounded delay can scuttle an alien's "entire" removal process, forcing ICE to start anew. Appx. 788. And because ICE has both limited legal authority and practical ability to detain aliens, the result may be that ICE must "release these dangerous criminals once again" while it restarts removal. *Id.* Those operational burdens from the injunction will weigh heavily on an already strained immigration system.

Worse, the injunction has harmed—and will continue to harm— American foreign policy and national security, as Secretaries Rubio and Hegseth explained below. Arranging removal to a third country is a delicate diplomatic endeavor, which is the product of a carefully negotiated process. *See* Appx. 776 (Rubio) (describing diplomatic consequences of disrupting possible removals to Libya). When a court upends those efforts, it visits "significant and irreparable harm to U.S. foreign policy." *Id.* at 776. And that is exactly what happened here. By interrupting the transfer of aliens to South Sudan, the district court's

injunction "derail[ed]" our efforts to "quietly rebuild a productive working relationship" with that country, and to gain South Sudan's "cooperation" in broader regional priorities. Appx. 777.

Nor are these severe costs in service of any public benefit. As noted, the United States relies on third countries to facilitate the removal of criminal aliens who are difficult to otherwise remove. Appx. 785. Absent an effective third-country removal policy, the United States is forced to retain (and often, release) vicious criminals who have already harmed our communities. Appx. 788. The aliens sent to South Sudan—a group of convicted sex offenders and murderers, among others—are illustrative of a broader problem. The March Guidance marks a long overdue solution, and the public is not served by an order that hollows its efficacy. *See Nken v. Holder*, 556 U.S. 418, 436 (2009) (recognizing the "public interest in prompt execution of removal orders").

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that this Court vacate the district court's injunction.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney
General

ELIANIS N. PEREZ
Assistant Director

MATTHEW P. SEAMON
Senior Litigation Counsel

*/s/Mary L. Larakers*
MARY L. LARAKERS
(Texas Bar # 24093943)
Senior Litigation Counsel
U.S. Department of Justice, Civil
Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin
Station
Washington, DC 20044
(202) 353-4419
(202) 305-7000 (facsimile)
mary.l.larakers@usdoj.gov

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,981 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) and First Circuit Rule 32(a)(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Mary L. Larakers*
MARY L. LARAKERS