No. 25-1393

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

———————————

D.V.D., *et al.*,

*Plaintiffs-Appellees*,

v.

U.S. Department of Homeland Security, *et al.*,

*Defendants-Appellants*.

———————————

On Appeal from the United States District Court
for the District of Massachusetts

———————————

**JOINT APPENDIX**
Volume 1 of 2

———————————

# TABLE OF CONTENTS

## I. Documents

Plaintiffs' Complaint & Exhibits (ECF No. 1) ................................................. 1

Index and Select Exhibits in Support of Plaintiffs' Motions for Class Certification, Temporary Restraining Order, Preliminary Injunction and Stay Administrative Action, and Leave to Appear Under Pseudonyms (ECF Nos. 8–8-4, 8-8—8-24) ...................................................................................................................... 51

Memorandum and Order Granting Temporary Restraining Order (ECF No. 34) ...................................................................................................................... 115

Electronic Order Denying Defendants' Motion for Partial Stay (ECF No. 41) ...................................................................................................................... 117

Department of Homeland Security Guidance Regarding Third Country Removals (ECF No. 43-1) ........................................................................................... 119

Index and Exhibits in Support of Plaintiffs' Opposition to Defendants' Motion for an Indicative Ruling Under Federal Rule of Civil Procedure 62.1 (ECF Nos. 50—50-11) ..................................................................................................... 122

Index and Exhibits in Support of Plaintiffs' Reply in Support of Motion for Class Certification and Plaintiffs' Reply in Support of Motion for a Preliminary Injunction (ECF Nos. 59—59-17) ............................................................. 423

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| D.V.D.; M.M.; E.F.D.; and O.C.G., | |
| Plaintiffs, | Case No. _____ |
| v. | **CLASS ACTION COMPLAINT** |
| U.S. DEPARTMENT OF HOMELAND SECURITY; Kristi NOEM, Secretary, U.S. Department of Homeland Security, in her official capacity; Pamela BONDI, U.S. Attorney General, in her official capacity; and Antone MONIZ, Superintendent, Plymouth County Correctional Facility, in his official capacity, | |
| Defendants. | |

## INTRODUCTION

1.      Plaintiffs and proposed class members are noncitizens with final removal orders resulting from proceedings in which they have been notified that they could be deported to a designated country of removal (usually their country of origin) and, in some cases, an alternative country of removal (usually a country of which they are a citizen or in which they hold status) and had an opportunity to contest removal to the designated country based on a claim of fear. They bring this class action to challenge the policy or practice of the Department of Homeland Security (DHS) of deporting, or seeking to deport, them to a *third* country – a country *never* designated for removal – without first providing them with notice or opportunity to contest removal on the basis that they have a fear of persecution, torture, and even death if deported to that third country.

2.      DHS' policy or practice of failing to afford these basic, minimal protections violates the Immigration and Nationality Act, the Foreign Affairs Reform and Restructuring Act

Appx.001

of 1998, the Due Process Clause of the Fifth Amendment, and the treaty obligations of the United States. Indeed, the Office of the Solicitor General (OSG) recognized these legal obligations when it informed the Supreme Court in *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021), that DHS will not deport to a third country noncitizens with final orders who have already been granted protection by an immigration judge (IJ) until after the individual receives meaningful notice of the opportunity to assert a fear-based claim against removal to that third country. *See* Transcript of Oral Argument at 20-21, *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021).

3.     As Plaintiffs and proposed class members' cases demonstrate, and as litigation after the OSG's representations revealed, DHS has *no* written policy to provide noncitizens either with notice or an opportunity to present a fear-based claim before DHS deports them to a third country where they face persecution, torture, and/or death.

4.     The absence of written policies and procedures has in the past resulted in cases where individuals, including those granted protection from removal, were deported to third countries without warning. But on February 18, 2025, DHS issued a policy directive that has magnified the practical impact of this lack of a written policy. The directive instructs DHS officers to review all cases of individuals previously released from immigration detention – including those who have complied with the terms of their release for years, even decades – for re-detention and removal to a third country. This directive to re-detain places an untold number of noncitizens at imminent risk of the deprivation of liberty and deportation to a third country without the basic procedural protections of notice and opportunity to present a fear-based claim.

5.     DHS' failure to provide a meaningful notice and opportunity to present a fear-based claim before deportation to a third country has caused, and is causing, irreparable harm.

Appx.002

For example, Plaintiff O.C.G., a Guatemalan man to whom the IJ granted protection from deportation to Guatemala, thought he was being released from immigration detention when DHS instead placed him and approximately 20 other men on a bus without telling them that they were being deported to Mexico. Plaintiff O.C.G. had no notice and no opportunity to present his claim that he had been raped in Mexico and feared persecution and torture there. In Mexico, authorities gave Plaintiff O.C.G. the Hobson's choice of waiting several months in detention to apply for asylum in Mexico, a country in which he had been persecuted and feared future persecution, or being deported to Guatemala, the country where an IJ had found it was more likely than not that he would be persecuted. He currently remains in hiding in Guatemala.

6.     Plaintiffs, on behalf of themselves and similarly situated individuals, challenge DHS' policy or practice of failing to provide meaningful notice and the opportunity to present a fear-based claim prior to deportation to a third country and DHS' policy of re-detention pursuant to the February 18, 2025 directive. Plaintiffs ask this Court to declare these policies unlawful and to set them aside, to enjoin DHS from continuing to fail to provide meaningful advanced notice in writing and the opportunity to present a fear-based claim to an IJ prior to any deportation to a third country, and to order DHS to return Plaintiff O.C.G. and proposed class members who have been deported without these procedural protections.

## JURISDICTION

7.     This case arises under the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*, the regulations implementing the INA, the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105–277, div. G, Title XXII, § 2242(a), 112 Stat. 2681, 2681–822 (1998) (codified as Note to 8 U.S.C. § 1231), the regulations implementing the FARRA, the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*; and 5 U.S.C. §

Appx.003

552 *et. seq.*

8.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as the instant case is a civil action arising under the laws of the United States. For Plaintiffs in immigration custody, 28 U.S.C. § 2241 also provides jurisdiction. The Court may grant declaratory and injunctive relief pursuant to 5 U.S.C. §§ 705-06, 28 U.S.C. § 1651, 28 U.S.C. §§ 2201–02, 28 U.S.C. § 2241, and its equitable powers. The government has waived its sovereign immunity pursuant to 5 U.S.C. § 702.

## VENUE

9.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(e) because this is a civil action in which one of the defendants is an agency of the United States, there is no real property involved in this action, and Plaintiffs D.V.D. and E.F.D. reside in this District.

## PARTIES

10.     Plaintiff D.V.D. is a noncitizen from Cuba and resident of Pittsfield, Massachusetts. He has a final removal order from 2017 following removal proceedings in which Cuba was the only country designated for removal. On March 28, 2025, Plaintiff D.V.D. faces imminent risk of re-detention and deportation to a third country when he is required to report for an in-person check-in with U.S. Immigration and Customs Enforcement (ICE) in Burlington, Massachusetts – only three weeks after his last check-in with that office.

11.     Plaintiff M.M. is a noncitizen from Honduras and resident of Fort Worth, Texas. In 2021, an IJ granted her application for withholding of removal to Honduras, the only country designated for removal, in withholding-only proceedings. On April 4, 2025, Plaintiff M.M. faces imminent risk of re-detention and deportation to a third country when she is required to report for an in-person check-in with ICE in Dallas, Texas – only three weeks after her last check-in with

Appx.004

that office and after ICE officers informed her that she was on a list of people scheduled to be deported.

12.     Plaintiff E.F.D. is a noncitizen from Ecuador and resident of Milford, Massachusetts. In 2018, in removal proceedings, an IJ granted his application for protection from deportation to Ecuador, the only country designated for removal, under the United Nations Convention Against Torture (CAT). On March 18, 2025, ICE and other agents took E.F.D. and his other co-workers into custody after their search for a different person was unsuccessful. He is currently detained at the Plymouth County Correctional Center in Plymouth, Massachusetts. He is at imminent risk of deportation to a third country.

13.     Plaintiff O.C.G. is a noncitizen from Guatemala. On February 19, 2025, an IJ granted his application for withholding of removal to Guatemala, the only country designated for removal, in withholding-only proceedings. On or around February 19, 2025, DHS deported Plaintiff O.C.G to Mexico without any advance notice, and Plaintiff O.C.G. had no opportunity to present his claim that he would suffer persecution and/or torture in Mexico. Following his deportation to Mexico, Mexican authorities deported him to Guatemala, the country from which the United States has granted him protection, where he remains in hiding to this day.

14.     Defendant U.S. Department of Homeland Security (DHS) is the federal agency responsible for implementing and enforcing the INA and is an agency within the meaning of the APA, 5 U.S.C. § 551(1). DHS oversees its component agencies, including ICE, U.S. Customs and Border Protection, and U.S. Citizenship and Immigration Services.

15.     Defendant Kristi Noem is the Secretary of DHS. In that capacity, she is charged with the administration and enforcement of the INA. She is sued in her official capacity.

16.     Defendant Pamela Bondi is the United States Attorney General. In this capacity,

Appx.005

she directs agencies within the United States Department of Justice, including the Executive Office for Immigration Review (EOIR), which houses the immigration courts and Board of Immigration Appeals. Defendant Bondi is responsible for the administration of immigration laws pursuant to 8 U.S.C. § 1103(g) and oversees EOIR. She is sued in her official capacity.

17.    Antone Moniz is the Superintendent of the Plymouth County Correctional Facility, and he has physical custody of Plaintiff E.F.D. pursuant to the facility's contract with ICE to detain noncitizens. Mr. Moniz is a legal custodian of Plaintiff E.F.D.

## FACTUAL ALLEGATIONS

### I.    Legal Background

#### A.    Section 240 Removal Proceedings

18.    In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). The Act generally retained prior procedures for removal hearings for all noncitizens—i.e., full immigration court hearings, appellate review before the Board of Immigration Appeals, and federal court review.  *See* 8 U.S.C. § 1229a; 8 U.S.C. § 1252(a).  In these removal proceedings (commonly referred to as "Section 240" proceedings), the noncitizen is entitled to select a country of removal. 8 U.S.C. § 1231(b)(2)(A); *see also* 8 C.F.R. § 1240.10(f) ("[T]he immigration judge shall notify the respondent that if he or she is finally ordered removed, the country of removal will in the first instance be the country designated by the respondent . . . ."). The IJ will designate the country where the person "is a subject, national, or citizen," if either the noncitizen does not select a country or as an alternative in the event the noncitizen's designated country does not accept the individual. 8 U.S.C. § 1231(b)(2)(D). The IJ also may designate alternative countries, as specifically set out by 8 U.S.C. § 1231(b)(2)(E). For individuals placed in Section 240 proceedings upon arrival, the statute provides designation to

the country from which the individual boarded a vessel or aircraft and then can consider alternative countries. *See* 8 U.S.C. § 1231(b)(1); *see also* 8 C.F.R. § 1240.10(f).

19.     An IJ must provide sufficient notice and opportunity to apply for protection from a designated country of removal. 8 C.F.R. § 1240.10(f) (providing that the "immigration judge *shall* notify the respondent" of designated countries of removal) (emphasis added); 8 C.F.R. § 1240.11(c)(1)(i) (providing that the IJ shall "[a]dvise the [noncitizen] that he or she may apply for asylum in the United States or withholding of removal to [the designated countries of removal]").

20.     Asylum is a form of protection available in Section 240 removal proceedings. An IJ may grant asylum in the exercise of discretion where the applicant demonstrates a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion" in their country of origin. 8 U.S.C. §§ 1101(a)(42), 1158(b)(1)(A); *see also* 8 C.F.R. §§ 208.1, 1208.1. Once granted asylum, an individual generally cannot be deported to their country of origin or any other country absent subsequent unlawful conduct, evidence of fraud in the asylum application, or a fundamental change in country conditions. *See generally* 8 U.S.C. § 1158(c)(2); 8 C.F.R §§ 208.24, 1208.24.

21.     For individuals determined to be ineligible for asylum, Congress further provided, with certain exceptions not relevant here, that "notwithstanding [8 U.S.C. §§ 1231(b)(1) and (2)], the Attorney General [i.e., DHS] may not remove [a noncitizen] to a country if the Attorney General [(i.e., an  immigration judge)] decides that [the noncitizen's] life or freedom would be threatened in that country because of [the noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *see also* 8 C.F.R. §§ 208.16, 1208.16.  This form of protection, known as withholding of removal, is mandatory,

i.e., it cannot be denied to eligible individuals in the exercise of discretion. Unlike asylum, the protection of withholding of removal is country-specific.

22.    Individuals in Section 240 proceedings who are ineligible for withholding of removal, are still entitled to receive protection under the Convention Against Torture (CAT), in the form of withholding or deferral of removal, upon demonstrating a likelihood of torture if removed to the designated country of removal. *See* FARRA (codified as Note to 8 U.S.C. § 1231); 8 C.F.R. §§ 208.16(c), 208.17(a), 1208.16(c), 1208.17(a); 28 C.F.R. § 200.1. Like withholding of removal under 8 U.S.C. § 1231(b)(3), CAT protection is mandatory. *Id*. With respect to any individual granted deferral of removal under CAT, the IJ "shall also inform the [noncitizen] that removal has been deferred only to the country in which it has been determined that the [noncitizen] is likely to be tortured, and that the [noncitizen] may be removed at any time to another country where he or she is not likely to be tortured." 8 C.F.R. §§ 208.17(b)(2), 1208.17(b)(2).

23.    An IJ may only terminate a grant of CAT protection based on evidence that the person will no longer face torture. DHS must move for a new hearing and provide evidence "relevant to the possibility that the [noncitizen] would be tortured in the country to which removal has been deferred and that was not presented at the previous hearing." 8 C.F.R. §§ 208.17(d)(1), 1208.17(d)(1). If a new hearing is granted, the IJ must provide notice "of the time, place, and date of the termination hearing," and must inform the noncitizen of the right to "supplement the information in his or her initial [withholding or CAT] application" "within 10 calendar days of service of such notice (or 13 calendar days if service of such notice was by mail)." 8 C.F.R. §§ 208.17(d)(2), 1208.17(d)(2).

24.    Individuals in Section 240 proceedings are entitled to an administrative appeal to

the BIA along with an automatic stay of deportation while the appeal is pending, and to seek judicial review of an adverse administrative decision by filing a petition for review in the court of appeals. *See* 8 U.S.C. §§ 1101(a)(47)(B), 1252(a); 8 C.F.R. §§ 1003.6(a), 1240.15.

### B.    Withholding-Only Proceedings

25.    Individuals who have been deported and subsequently return to the United States without inspection are subject to a summary removal process known as reinstatement of removal. *See* 8 U.S.C. § 1231(a)(5); 8 C.F.R. § 241.8. This summary process is carried out by DHS officers. Individuals subject to reinstatement orders are barred from seeking most forms of relief from removal, including asylum.

26.    Some individuals who are not lawful permanent residents are subject to a separate summary removal process—known as Section 238(b) administrative removal—if a DHS officer determines that they are deportable due to an aggravated felony conviction. *See* 8 U.S.C. § 1228(b); 8 C.F.R. § 238.1(b)(1). That process is also carried out by DHS officers and, like individuals subject to reinstatement orders, individuals with 238(b) administrative removal orders are barred from most forms of relief from removal, including asylum.

27.    However, consistent with the United States' commitment to *non-refoulement*—the fundamental principle that no one should be returned to a country where they would face persecution, torture, cruel, inhuman, or degrading treatment, or serious harm—critical protections from removal remain available in reinstatement and 238(b) administrative removal proceedings: withholding of removal under 8 U.S.C. § 1231(b)(3) and CAT protection. *See* 8 C.F.R. §§ 241.8(e), 238.1(f)(3); *see also* 8 C.F.R. §§ 208.31, 1208.31. Individuals who express a fear of return to their countries of origin are given the opportunity to demonstrate a reasonable fear of persecution or torture in interviews before asylum officers. *Id.* If the asylum officer

determines their fear is not reasonable, the individual can seek review of that determination before an IJ in reasonable fear proceedings. 8 C.F.R. §§ 208.31(g), 1208.31(g). If either the asylum officer or the reviewing IJ finds their fear is reasonable, the individual is placed in withholding-only proceedings before an IJ where they can seek protection from deportation by applying for withholding of removal and/or CAT protection. 8 C.F.R. §§ 208.31(e), (g)(2), 1208.31(e), (g)(2).

28.     If the IJ denies the withholding and/or CAT application, the individual may seek review before the BIA, 8 C.F.R. §§ 208.31(e), (g)(2)(ii), 1208.31(e), (g)(2)(ii). Judicial review of these orders and administrative decisions is available by filing a petition for review in the court of appeals. 8 U.S.C. § 1252(a).

**C.      Statutory Scheme for Removal to a Third Country**

29.     Congress established the statutory process for designating countries to which noncitizens may be removed, 8 U.S.C. § 1231(b)(1)-(3).[1]

30.     Subsection (b)(1) applies to noncitizens "[a]rriving at the United States," including from a contiguous territory, but expressly contemplates arrival via a "vessel or aircraft." It designates countries and alternative countries to which the noncitizen may be removed. 8 U.S.C. § 1231(b)(1)(B) (removal to contiguous country from which the noncitizen traveled), § 1231(b)(1)(C) (alternative countries).

31.     Subsection (b)(2) applies to all other noncitizens, and like Subsection (b)(1), designates countries and alternative countries to which the noncitizen may be removed. 8 U.S.C.

---

[1]     References to the Attorney General in Section 1231(b) refer to the Secretary of DHS for functions related to carrying out a removal order and to the Attorney General for functions related to selection of designations and decisions about fear-based claims. 6 U.S.C. § 557. The Attorney General has delegated the latter functions to the immigration courts and Board of Immigration Appeals. *See* 8 C.F.R. §§ 1208.16, 1208.17, 1208.31,1240.10(f), 1240.12(d).

Appx.010

§ 1231(b)(2)(A) (noncitizen's designation of a country of removal), 1231(b)(2)(B) (limitation on

designation), 1231(b)(2)(C) (disregarding designation), 1231(b)(2)(D) (alternative country),

1231(b)(2)(D) (alternative countries), 1231(b)(2)(E) (additional removal countries).

32.    Critically, both Subsections (b)(1) and (b)(2), have a specific carve-out provision

prohibiting removal of persons to countries where they face persecution or torture. Specifically,

§ 1231(b)(3)(A), entitled "Restriction on removal to a country where [noncitizen's] life or

freedom would be threatened," reads:

> **Notwithstanding paragraphs [b](1) and [b](2)**, the Attorney General **may not remove**
> [a noncitizen] to a country if the Attorney General decides that the [noncitizen's] life or
> freedom would be threatened in that country because of the [noncitizen's] race, religion,
> nationality, membership in a particular social group, or political opinion.

*Id*. § 1231(b)(3)(A) (emphasis added).

33.    Similarly, with respect to the Convention Against Torture, the implementing

regulations allow for removal to a third country, but only "where he or she is not likely to be

tortured." 8 C.F.R. §§ 208.17(b)(2), 1208.17(b)(2).

34.    In *Jama v. Immigr. & Customs Enf't*, the Supreme Court addressed the

designation procedure under Subsection (b)(2). 543 U.S. 335 (2005). Critically, the Court stated

that noncitizens who "face persecution or other mistreatment in the country designated under §

1231(b)(2), . . . have a number of available remedies: asylum; withholding of removal; relief

under an international agreement prohibiting torture . . . ." *Jama*, 543 U.S. at 348 (citing 8 U.S.C.

§§1158(b)(1), 1231(b)(3)(A); 8 C.F.R. §§ 208.16(c)(4), 208.17(a)).

35.    Although individuals granted CAT protection may be removed to a third country,

the regulations provide that they may not be removed to a country where they are likely to be

tortured: "The immigration judge shall also inform the [noncitizen] that removal has been

deferred only to the country in which it has been determined that the [noncitizen] is likely to be

Appx.011

tortured, and that the [noncitizen] may be removed at any time to another country where he or she is not likely to be tortured." 8 C.F.R. §§ 208.17(b)(2), 1208.17(b)(2).

36.     Notably, the regulations also provide that protection under CAT may be terminated based on evidence that the person will no longer face torture but nevertheless provides certain protections to noncitizens. First, the regulations require DHS to move for a new hearing, requiring that DHS support their motion for the new hearing with evidence "relevant to the possibility that the [noncitizen] would be tortured in the country to which removal has been deferred and that was not presented at the previous hearing. 8 C.F.R. §§ 208.17(d)(1), 1208.17(d)(1). Second, even if a new hearing is granted, the regulations require that the IJ provide the noncitizen with notice "of the time, place, and date of the termination hearing. Such notice shall inform the [noncitizen] that the [noncitizen]  may supplement the information in his or her initial application for withholding of removal under the Convention Against Torture and shall provide that the [noncitizen] must submit any such supplemental information within 10 calendar days of service of such notice (or 13 calendar days if service of such notice was by mail)." 8 C.F.R. §§ 208.17(d)(2), 1208.17(d)(2). Thus, not only is the noncitizen provided notice, but also an opportunity to submit documentation in support of their claim for protection.

**D.    DHS' Obligation to Provide Notice and Opportunity to Present a Fear-Based Claim Before Deportation to a Third Country**

37.     For individuals in removal proceedings, the designation of a country of removal (or, at times, countries in the alternative that the IJ designates) on the record provides notice and an opportunity to permit a noncitizen who fears persecution or torture in the designated country (or countries) to file an application for protection. *See* 8 C.F.R. § 1240.10(f) (stating that "immigration judge shall notify the [noncitizen]" of proposed countries of removal); 8 C.F.R. § 1240.11(c)(1)(i) ("If the [noncitizen] expresses fear of persecution or harm upon return to any of

Appx.012

the countries to which the [noncitizen] might be removed pursuant to § 1240.10(f) . . . the

immigration judge shall . . . [a]dvise [the noncitizen] that he or she may apply for asylum in the

United States or withholding of removal to those countries[.]").

38.    Pursuant to § 1231(b)(3)(A), courts repeatedly have held that individuals cannot

be removed to a country that was not properly designated by an IJ if they have a fear of

persecution or torture in that country. *See Andriasian v. INS*, 180 F.3d 1033, 1041 (9th Cir.

1999); *Kossov v. INS*, 132 F.3d 405, 408-09 (7th Cir. 1998); *El Himri v. Ashcroft*, 378 F.3d 932,

938 (9th Cir. 2004); *cf. Protsenko v. U.S. Att'y Gen.*, 149 F. App'x 947, 953 (11th Cir. 2005) (per

curiam) (permitting designation of third country where individuals received "ample notice and an

opportunity to be heard").

39.    Providing such notice and opportunity to present a fear-based claim prior to

deportation also implements the United States' obligations under international law. *See* United

Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150; United

Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S.

267; Refugee Act of 1980, Pub. L. 96-212, § 203(e), 94 Stat. 102, 107 (codified as amended at 8

U.S.C. § 1231(b)(3)); *INS v. Stevic*, 467 U.S. 407, 421 (1984) (noting that the Refugee Act of

1980 "amended the language of [the predecessor statute to § 1231(b)(3)], basically conforming it

to the language of Article 33 of the United Nations Protocol"); *see also* United Nations

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,

*opened for signature* Dec. 10, 1984, art. III, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S.

85, 114; FARRA at 2681–822 (codified at Note to 8 U.S.C. § 1231) ("It shall be the policy of the

United States not to expel, extradite, or otherwise effect the involuntary return of any person to a

country in which there are substantial grounds for believing the person would be in danger of

Appx.013

being subjected to torture, regardless of whether the person is physically present in the United States."); United Nations Committee Against Torture, General Comment No. 4 ¶ 12, 2017, Implementation of Article 3 of the Convention in the Context of Article 22, CAT/C/GC/4 ("Furthermore, the person at risk [of torture] should never be deported to another State where he/she may subsequently face deportation to a third State in which there are substantial grounds for believing that he/she would be in danger of being subjected to torture.").

40.    Meaningful notice and opportunity to present a fear-based claim prior to deportation to a country where a person fears persecution or torture are also fundamental due process protections under the Fifth Amendment. *See Andriasian*, 180 F.3d at 1041; *Protsenko*, 149 F. App'x at 953; *Kossov*, 132 F.3d at 408; *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1004 (W.D. Wash. 2019). Similarly, a "last minute" IJ designation of a country during removal proceedings that affords no meaningful opportunity to apply for protection "violate[s] a basic tenet of constitutional due process." *Andriasian*, 180 F.3d at 1041.

41.    The federal government has repeatedly acknowledged these obligations. In June 2001, the former Immigration and Naturalization Service drafted a document entitled "Notice to Alien of Removal to Other than Designated Country (Form I-913)," which would have provided noncitizens with written notice of deportation to a third country and a 15-day automatic stay of removal to allow the noncitizen to file an unopposed motion to reopen removal proceedings and accompanying Form I-589 (protection application) before an IJ. *See* Attachment A, Records Produced in Response to Freedom of Information Act (FOIA) Litigation, *Nat.'l Immigr. Litigation Alliance v. ICE*, No. 1:22-cv-11331-IT (D. Mass. filed Aug. 17, 2022), at 2022-ICLI-00055* 9-14. Almost twenty years later, in June 2020, DHS again drafted a model "Notice of Removal to Other than Designated Country," that likewise provided these protections. *See*

14

Appx.014

Attachment B, Records Produced in Response to FOIA Litigation, *Nat.'l Immigr. Litigation Alliance v. ICE*, No. 1:22-cv-11331-IT (D. Mass. filed Aug. 17, 2022), at 2022-ICLI-00055* 8 (Notice).[2] Although neither form was ever published, both reflect how notice must be provided to be meaningful.[3]

42.    Additionally, in 2005, in jointly promulgating regulations implementing 8 U.S.C. § 1231(b), the Departments of Justice and Homeland Security asserted that "[a noncitizen] will have the opportunity to apply for protection as appropriate from any of the countries that are identified as potential countries of removal under [8 U.S.C. § 1231(b)(1) or (b)(2)]." Execution of Removal Orders; Countries to Which Aliens May Be Removed, 70 Fed. Reg. 661, 671 (Jan. 5, 2005) (codified at 8 C.F.R. pts. 241, 1240, 1241) (supplementary information). Furthermore, the Departments contemplated that, in cases where ICE sought removal to a country that was not designated in removal proceedings, namely, "removals pursuant to [8 U.S.C. § 1231(b)(1)(C)(iv) or (b)(2)(E)(vii)]," DHS would join motions to reopen "[i]n appropriate circumstances" to allow the noncitizen to apply for protection. *Id.*

43.    Furthermore, consistent with the above-cited authorities, at oral argument in *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021), the Assistant to the Solicitor General represented that the government must provide a noncitizen with notice and an opportunity to present a fear-based claim before that noncitizen can be deported to a non-designated third country. Specifically, at oral argument in that case, the following exchange between Justice Kagan and Vivek Suri, Assistant to the Solicitor General, took place:

JUSTICE KAGAN: . . . [S]uppose you had a third country that, for whatever reason,

---

[2]    The complete production is available at https://tinyurl.com/2t868ykr. Pages 1-7 (Bates 2022-ICLI-00055* 1-7) indicate that the notice was drafted on or about May 21, 2020.
[3]    The forms fell short of providing a meaningful opportunity to present a fear-based claim, however, because they placed the burden on the noncitizen to file a motion to reopen.

was willing to accept [a noncitizen]. If -- if -- if that [noncitizen] was currently in withholding proceed -- proceedings, you couldn't put him on a plane to that third country, could you?

MR. SURI: We could after we provide the [noncitizen] notice that we were going to do that.

JUSTICE KAGAN: Right.

MR. SURI: But, without notice --

JUSTICE KAGAN: So that's what it would depend on, right? That -- that you would have to provide him notice, and if he had a fear of persecution or torture in that country, he would be given an opportunity to contest his removal to that country. Isn't that right?

MR. SURI: Yes, that's right.

JUSTICE KAGAN: So, in this situation, as to these [noncitizens] who are currently in withholding proceedings, you can't put them on a plane to anywhere right now, isn't that right?

MR. SURI: Certainly, I agree with that, yes.

JUSTICE KAGAN: Okay. And that's not as a practical matter. That really is, as -- as you put it, in the eyes of the law. In the eyes of the law, you cannot put one of these [noncitizens] on a plane to any place, either the -- either the country that's referenced in the removal order or any other country, isn't that right?

MR. SURI: Yes, that's right.

See Transcript of Oral Argument at 20-21, *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021).

44.     Notice is only meaningful if it is presented sufficiently in advance of the deportation to stop the deportation, is in a language the person understands, and provides for an automatic stay of removal for a time period sufficient to permit the filing of a motion to reopen removal proceedings so that a third country for removal may be designated as required under the regulations and the noncitizen may present a fear-based claim. *Andriasian*, 180 F.3d at 1041; *Aden*, 409 F. Supp. 3d at 1009 ("A noncitizen must be given sufficient notice of a country of deportation [such] that, given his capacities and circumstances, he would have a reasonable

16

opportunity to raise and pursue his claim for withholding of deportation.").

45.     An opportunity to present a fear-based claim is only meaningful if the noncitizen is not deported before removal proceedings are reopened. *See Aden*, 409 F. Supp. 3d at 1010 (holding that merely giving petitioner an opportunity to file a discretionary motion to reopen "is not an adequate substitute for the process that is due in these circumstances" and ordering reopening); *Dzyuba v. Mukasey*, 540 F.3d 955, 957 (9th Cir. 2008) (remanding to BIA to determinate whether designation is appropriate).

### E.    DHS Routinely Violates Its Obligations to Provide Notice and Opportunity to Present a Fear-Based Claim Before Deportation to a Third Country

46.     As a matter of policy or practice, DHS violates the statutory, regulatory, and due process framework by depriving Plaintiffs of any notice, let alone meaningful notice, and any opportunity, let alone a meaningful opportunity, to present a fear-based claim prior to deportation to a third country.

47.     Although DHS has a nondiscretionary duty to provide both these protections, DHS routinely fails to do so.

48.     DHS has no written policy to provide, or guarantee provision of, either of these protections.

49.     DHS did not produce any policy in response to the FOIA request and subsequent litigation for such a policy in *Nat.'l Immigr. Litigation Alliance v. ICE*, No. 1:22-cv-11331-IT (D. Mass filed Aug. 17, 2022).

50.     In litigation involving a plaintiff who was removed to a third country after being granted withholding of removal to Cuba, DHS has admitted it has no policy to provide notice or an opportunity to apply for protection regarding removal to a third country. *See Ibarra-Perez v. United States*, No. 2:22-cv-01100-DWL-CDB (D. Ariz. filed Jun. 29, 2022). In both written

Appx.017

discovery and two depositions of DHS witnesses conducted pursuant to Federal Rule of Civil Procedure 30(b)(6), the government repeatedly stated it has no obligation to provide written or oral notice if it intends to deport a noncitizen to a third county, and has no written policy requiring such written notice; instead, the government claimed that if such notifications are provided, they are usually oral. In addition, the government admitted it has no policy to ensure a noncitizen has an opportunity to seek fear-based protection from removal to a third country before that removal takes place.

51.    Nonetheless, DHS has, in a limited number of cases over the years, filed a motion to reopen removal proceedings to designate a new country and allow a noncitizen to pursue a fear-based claim, demonstrating that it is aware of what should be done to provide a meaningful opportunity to seek protection prior to removal to a third country.

52.    DHS' routine failure to provide meaningful notice and opportunity to present a fear-based claim prior to deportation to a third country has led to hundreds of unlawful deportations, placing individuals at serious risk of persecution, torture, and/or death.

## II.    Increased Third Country Deportation Efforts and Re-detention Directive

53.    Defendants have been in longstanding violation of their obligation to create a system to provide noncitizens with notice and an opportunity to present a fear-based claim to an immigration judge before DHS deports them to a third country.

54.    On information and belief, until January 20, 2025, the number of individuals subjected to DHS' policy or practice was relatively small.

55.    Prior to taking office, the Trump Administration stated its intention to pressure

third countries to accept noncitizens ordered deported from the United States.[4]

56.    On January 20, 2025, President Trump signed an Executive Order, entitled Securing our Borders, in which he instructed the Secretary of State, Attorney General, and DHS Secretary to "take all appropriate action to facilitate additional international cooperation and agreements, . . ., including [safe third country agreements] or any other applicable provision of law." *See* Exec. Order No. 14165, 90 Fed. Reg. 8467, 8468 (Jan. 20, 2025).

57.    In early February, news outlets reported that Secretary of State Marco Rubio visited several Central American countries to negotiate increased acceptance of noncitizens in or arriving in the United States, including individual with final removal orders.[5]

58.    On or about February 18, 2025, ICE issued a directive instructing officers to review cases for third country deportations and re-detained previously released individuals, including individuals granted withholding or removal or CAT protection and individuals previously released because removal was not reasonably foreseeable. Attachment C.[6]

59.    On March 5, 2025, the New York Times reported: "[ICE leadership] are considering deporting people who have been found to have a legitimate fear of torture in their home countries to third nations, according to documents obtained by The New York Times."[7]

---

[4]    Julia Ainsley, *Incoming Trump Administration Plans to Deport Some Migrants to Countries Other Than Their Own,* NBC News (Dec. 5, 2024); Commonwealth of the Bahamas, *Statement from the Office of the Prime Minister on the Trump Administration Transition Team Proposal* (Dec. 5, 2024) (rejecting Trump transition team proposal to "to accept deportation flights of migrants from other countries").

[5]    Camilo Montoya-Galvez, *Trump Eyes Asylum Agreement with El Salvador to Deport Migrants There*, CBS News (Jan. 27, 2025); Matthew Lee, *Guatemala Gives Rubio a Second Deportation Deal for Migrants Being Sent Home from the US*, AP News (Feb. 5, 2025).

[6]    Nick Miroff and Maria Sacchetti, *Trump Seeks to Fast-Track Deportations of Hundreds of Thousands*, The Washington Post (Feb. 28, 2025).

[7]    Hamed Aleaziz and Zolan Kanno-Youngs, *Frustration Grows Inside the White House Over Pace of Deportations*, N.Y. Times (Mar. 5, 2025).

60.    On March 6, 2025, Reuters published a copy of the February 18, 2025, directive.[8] The directive expressly instructs officers to review the cases of noncitizens granted withholding of removal or protection under CAT "to determine the viability of removal to a third country and accordingly whether the [noncitizen] should be re-detained" and, in the case of those who previously could not be removed because their countries of citizenship were unwilling to accept them, to "review for re-detention . . . in light of . . . potential for third country removals."

61.    Since on or about January 20, 2025, on information and belief, DHS has dramatically increased the number of individuals being re-detained and/or deported to third countries and being considered for deportation to a third country.

III.    **Plaintiffs' Cases**

A.    **Plaintiff D.V.D.**

62.    Plaintiff D.V.D. is a citizen of Cuba who is married to a U.S. citizen and has two U.S. citizen children. He has a history of severe mental illness which currently is controlled by psychiatric treatment he receives. In February 2017, an IJ ordered him removed to Cuba in removal proceedings. In those proceedings, the IJ designated only Cuba as a country to which he could be removed. ICE released him from detention on an Order of Supervision (OSUP) in May 2017.

63.    Plaintiff D.V.D. consistently has checked in with ICE as required, starting in December 2017. Since September 2019, his check-ins were with ICE's Enforcement and

---

[8]    Ted Hesson and Kristina Cooke, *Trump Weighs Revoking Legal Status of Ukrainians as US Steps Up Deportations*, Reuters (Mar. 6, 2025). The article links to the directive (Attachment C): https://fingfx.thomsonreuters.com/gfx/legaldocs/gkpljxxoqpb/ICE_email_Reuters.pdf (last visited Mar. 23, 2025).

Removal (ERO) office in Burlington, Massachusetts.[9] His most recent check-ins were by telephone or email. He only needed to check in once a year, except in 2019, when he checked in twice.

64.    On Friday, March 7, 2025, D.V.D. completed a check-in with ICE's ERO office in Burlington by email through his immigration attorney. Three days later, on Monday, March 10, 2025, ICE instructed his attorney that he needed to report in person on March 28, 2025 at 8:00am to the Burlington ERO office, only three weeks from the date of his last check-in.

65.    On March 12, 2025, his attorney asked ICE why he needed to check in again so soon after the email check and why it needed to be in person. She also informed them of a separate pending immigration relief application that had been filed in 2021.

66.    On March 15, 2025, the ICE office responded that ICE was requiring all people to report in person and more frequently on a case-by-case basis. Plaintiff D.V.D. is worried because his attorney has never heard of ICE calling someone back for an in-person check-in three weeks after the earlier check-in.

67.    On information and belief, ICE intends to re-detain D.V.D. at the March 28, 2025 check-in pursuant to the February 18, 2025 directive. D.V.D. fears deportation to any third country without notice and a meaningful opportunity to apply for protection—especially with respect countries where he will be deprived of access to psychiatric treatment and will therefore be at risk of persecution due to his mental health conditions or countries where he will be imprisoned upon arrival.

---

[9]    The Burlington ERO office is part of the Boston Field Office of ICE. *See* https://www.ice.gov/contact/field-offices.

**B.    Plaintiff M.M.**

68.    M.M. is a citizen of Honduras and resident of Fort Worth, Texas. In 2014, she arrived in the United States, fleeing persecution and torture by her husband, the father of her three eldest children, who had beaten her and the children after having been released from prison for killing two people. M.M. had previously fled Honduras and her husband found her in Mexico and threw her out a second-floor window.

69.    Because M.M. had previously been ordered removed, when she arrived in 2014, DHS reinstated her earlier order, but because M.M. expressed a fear of return to Honduras, an asylum officer interviewed her. The officer found that she had a reasonable fear of persecution or torture in Honduras, and she was placed in withholding-only proceedings before an immigration judge.

70.    In 2021, an IJ granted M.M.'s withholding of removal application, protecting her against deportation to Honduras. Following the IJ's decision, M.M. had to report to ICE in Dallas once a year, which she has been doing.

71.    At her regularly scheduled check-in on February 21, 2025, an ICE officer told M.M. to report again on March 7, 2025, and also placed an ankle shackle on her. On March 7, 2025, M.M. again reported to ICE and an officer told her that she needed to leave the United States because she was on a list of people who would be deported on March 21. The officer made a copy of her passport. M.M. was terrified.

72.    Then, on March 17, 2025, an ICE officer telephoned M.M. in the morning and told her she needed to report in person on April 4, 2025, to the same ICE office that had put on the ankle shackle and where she was told that she is on a list of people ICE is going to deport.

73.    On information and belief, ICE intends to re-detain M.M. at the April 4, 2025

check-in pursuant to the February 18, 2025 directive. M.M. is afraid that, if she is deported to a third country, they would send her back to Honduras, where her husband will hurt or kill her. She also fears that her husband would find her in a third country through his connections in the region, as he previously found her in Mexico, or through his connections in other countries, including his family in El Salvador. She is afraid that her children would suffer and that they would be in danger if she cannot continue to protect them.

C.    **Plaintiff E.F.D.**

74.    E.F.D. is citizen of Ecuador who resides in Milford, Massachusetts. He fled the country after he was threatened and beaten by Ecuadorian police after he refused to transport drugs for them in his taxi. The police smashed his taxi's windshield and windows, robbed him, and promised to come back to "finish" him and his family. During his journey to the United States, E.F.D. was kidnapped and robbed in Guatemala and Mexico. He arrived in the United States in 2015 and told immigration officers he was afraid of being returned. After E.F.D. demonstrated to an asylum officer that his fear was credible, he was placed in removal proceedings.

75.    In 2018, an IJ granted E.F.D.'s application for CAT protection, preventing his deportation to Ecuador. Subsequently, ICE released E.F.D. from immigration custody and he has been reporting to ICE in Burlington as part of the terms of his release.

76.    On March 18, 2025, ICE encountered E.F.D. and his co-coworkers when agents were conducting a search for another person who was not there. ICE took E.F.D. and his co-workers into custody. E.F.D. has been at the Plymouth County Correction Facility since that time.

77.    On information and belief, ICE has re-detained E.F.D. pursuant to the February

18, 2025 directive with the intention of deporting to him to a third country. E.F.D. fears

deportation to any third country without notice and a meaningful opportunity to apply for

protection—especially with respect countries that will deport him back to Ecuador where he won

protection, with respect to El Salvador, Colombia, or Peru, where he fears individuals in the drug

trade will mark him, and to Mexico and Guatemala based on his past experiences of being

robbed and kidnapped.

### D.    Plaintiff O.C.G.

78.    Plaintiff O.C.G. is a gay man from Guatemala who fled the country after facing

multiple death threats on account of his sexuality. He arrived at the U.S. border in March 2024

and attempted to present himself for inspection to seek asylum. At the border, he told DHS

officers that he was afraid to go back to Guatemala. After he spent about a week in immigration

custody, DHS officers told O.C.G. that he would be removed. O.C.G. asked officers to have a

credible fear interview, but DHS officers told him that it would not be possible, without

providing an explanation. He was summarily ordered removed pursuant to 8 U.S.C. § 1225(b)

and deported to Guatemala. Still unsafe, he again fled Guatemala and entered Mexico in April

2024.

79.    Shortly after arriving in Iztapalapa, Mexico, O.C.G. was raped by one of the men

who had been helping him reach the U.S.-Mexico border. These men locked O.C.G. in a room

for several days. O.C.G. was let go after his sister paid these men. He then fled to the United

States seeking protection.

80.    O.C.G. entered the United States in May 2024 and voiced his fear of return to

Guatemala. DHS officers issued a reinstatement order against him pursuant to 8 U.S.C.

§ 1231(a)(5), designating Guatemala as the country of removal. But because O.C.G. articulated a

Appx.024

fear of persecution in Guatemala, DHS referred him for an interview with an asylum officer. After he established in that interview that his fear was reasonable, DHS placed him in withholding-only proceedings before an IJ in Eloy, Arizona.

81.    In June 2024, O.C.G. appeared pro se for his first hearing. After the IJ told him that he was ineligible for asylum, O.C.G. asked the IJ if he could be deported to a country other than Guatemala or Mexico. The IJ advised O.C.G. that Guatemala was already designated as the country of removal but reassured him that "we cannot send you back to Mexico, sir, because you are a native of Guatemala."

82.    Even though Mexico was not designated as a country or alternative country of removal in the course of those proceedings, O.C.G. nevertheless provided both documentation and testimony about his past harm in Mexico. On February 19, 2025, after hearing testimony and reviewing his documentary evidence, the IJ granted his application for withholding of removal to Guatemala. The IJ determined that it was more likely than not he would be persecuted in Guatemala on account of his sexuality because of the threats of serious harm against him.

83.    Prior to his closing arguments, DHS counsel asked the IJ to clarify whether Mexico was designated as a country of removal. The IJ indicated that Mexico was not designated as a country of removal and that it was too late to designate Mexico as alternate country of removal.

84.    After rendering his decision, the IJ then asked DHS counsel if DHS wanted to reserve appeal. DHS counsel stepped out of the courtroom for approximately 10 minutes and, upon return, indicated that the government waived appeal.

85.    O.C.G. remained detained at Eloy Detention Center after he won withholding. Approximately two days later, a deportation officer told him to gather his belongings because he

was being taken out of the facility. O.C.G. asked where he was being taken, but the officer would not specify. O.C.G. signed a document he was informed was to reclaim his belongings.

86.    After O.C.G. was taken out of the detention center, an officer told him that he was being deported to Mexico. O.C.G. protested that he had won his case and showed the IJ's order. The officer told him that the grant had "expired." He then asked to use a phone to call his attorney, but the officer told him that it was too late to call anyone now that they were outside the facility.

87.    O.C.G. was then taken by bus to Nogales, Mexico with approximately 20 other men. In Nogales, the group was made to board a second bus driven by a man that appeared to be with the Mexican national guard/armed forces and taken to Tabasco, Mexico.

88.    In Tabasco, O.C.G. and the other men were held at a detention facility where he was permitted a two-minute phone call. At the facility, Mexican authorities gave O.C.G. a Hobson's choice: he could either go to another detention facility hours away by bus where they said he would remain detained and wait several months to apply for asylum in Mexico, a foreign country in which he was raped, held hostage, and extorted and did not feel safe, or Mexican authorities would take him to Guatemala, the country from which he fled and in which an IJ had found it was more likely than not he would again be persecuted.

89.    With no safe option, on February 25, 2025, Mexican authorities deported Plaintiff O.C.G. to Guatemala. To date, Plaintiff O.C.G. remains in hiding in Guatemala.

## CLASS ACTION ALLEGATIONS

90.    Plaintiffs bring this action on behalf of themselves and all others who are similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2). A class action is proper because this action involves questions of law and fact common to the class, the class is

Appx.026

so numerous that joinder of all members is impractical, Plaintiffs' claims are typical of the claims of the class, and Plaintiffs will fairly and adequately protect the interests of the class. Defendants have acted on grounds that apply generally to the class, so that relief under the Administrative Procedure Act and declaratory relief are appropriate with respect to the class as a whole.

91.    Plaintiffs seek to represent the following class:

All individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA (including withholding-only proceedings) whom DHS has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed.

92.    The proposed class meets the numerosity requirements of Federal Rule of Civil Procedure 23(a)(1). The class is so numerous that joinder of all members is impracticable. DHS is in sole possession of the information regarding the precise number of potential class members. On information and belief, there are thousands of individuals with final removal orders that DHS presently cannot execute to the designated country(ies), including because, inter alia, the individual has won withholding of removal or CAT protection specific to the designated country of removal or because the designated country of removal or alternative country of removal is recalcitrant, uncooperative, or unwilling to accept the individual. These individuals are now at significant risk of both re-detention and deportation to third countries without an opportunity to present a fear-based claim of persecution or torture. On information and belief, there are hundreds of individuals DHS has deported to third countries since January 20, 2025.

93.    The proposed class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2). The members of the class are all subject or will be subject to DHS' unlawful policy or practice of refusing to provide meaningful notice and opportunity to present a fear-

Appx.027

based claim to an immigration judge prior to deportation to a third country and to the February 18, 2025 re-detention directive. The lawsuit raises questions of law common to members of the proposed class, including whether DHS' policy or practice of third country removal, and the re-detention directive, violate the INA, FARRA, implementing regulations, and/or due process.

94.     The proposed class meets the typicality requirements of Federal Rule of Civil Procedure 23(a)(3) because the claims of the representative Plaintiffs are typical of the class. Each of the class members will be subject to, or has been subjected to, DHS' policy or practice of not providing notice or a meaningful opportunity to present a fear-based claim to an immigration judge prior to deportation to a third country and ICE's re-detention directive. This is true even though the INA, FARRA, implementing regulations, and due process requires Defendants to provide these basic safeguards and due process mandates that detention must be narrowly tailored to achieve a legitimate government purpose. Plaintiffs and the proposed class share the same legal claims, which assert the same substantive and procedural rights under the INA, FARRA, implementing regulations, APA, and Due Process Clause.

95.     The proposed class meets the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). The representative Plaintiffs seek the same final relief as the other members of the class—namely, an order declaring Defendants' policy or practice and February 18, 2025 re-detention directive unlawful, declaring Plaintiffs' rights under the INA, FARRA, implementing regulations, and the Constitution, enjoying Defendants from failing to provide Plaintiffs with meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports a person to a third country, and setting aside Defendants' February 18, 2025 directive.

96.     Plaintiffs will fairly and adequately protect the interests of the proposed class

Appx.028

members because they seek relief on behalf of the class as a whole and have no interest that is antagonistic to other class members.

97.     Plaintiffs are represented by competent counsel with extensive experience in complex class actions and immigration law.

98.     The proposed class also satisfies Federal Rule of Civil Procedure 23(b)(2). Defendants have acted on grounds generally applicable to the proposed class, thereby making final declaratory, APA, and injunctive relief appropriate with respect to the class as a whole.

### CLAIMS FOR RELIEF

#### Count I

#### Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)

99.     The allegations in the above paragraphs are realleged and incorporated herein.

100.     The APA entitles "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . to judicial review." 5 U.S.C. § 702.

101.     The APA compels a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary [or] capricious, . . . otherwise not in accordance with law," *id.* § 706(2)(A), or "short of statutory right," *id.* § 706(2)(C).

102.     Defendants have a policy or practice of failing to provide noncitizens who have final removal orders with meaningful notice and opportunity to present a fear-based claim prior to deportation to a third country.

103.     Defendants' policy or practice is arbitrary and capricious. It deprives individuals with final removal orders of meaningful notice of DHS' intent to deport them to a third country and deprives them of an opportunity to present a fear-based claim to an immigration judge prior to deportation to a third country. It endangers their lives and safety by subjecting them to the

Appx.029

very persecution and torture they fear in the third country.

104.    In addition, Defendants' February 18, 2025 directive explicitly instructing DHS officers to review cases for removal to third countries and to re-detain individuals prior to providing notice of the third country and an opportunity to apply for protection is arbitrary and capricious and not in accordance with law because Defendants have no mechanism to ensure meaningful notice and an opportunity to present a fear-based claim prior to removal to a third country. As such, their civil detention is not tied to a lawful purpose.

105.    Defendants' policy or practice is also not in accordance with law, short of statutory rights, and violates the INA, FARRA, and implementing regulations all of which mandate that Defendants refrain from removing Plaintiffs to a third country where they will likely be persecuted or tortured, thus requiring Defendants to provide meaningful notice of deportation to a third country and the opportunity to present a fear-based claim to an immigration judge before deporting an individual to a third country, yet Defendants do not do so.

106.    Accordingly, the Court should hold unlawful and set aside Defendants' policy or practice of failing to provide noncitizens who have final removal orders with meaningful notice and opportunity to present a fear-based claim prior to deportation to a third country.

107.    The Court also should order Defendants to provide Plaintiffs and class members with meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports a person to a third country, and should set aside Defendants' February 18, 2025 directive to re-detain Plaintiffs D.V.D. and M.M. and previously released class members until they have been provided meaningful notice and opportunity to apply for protection.

### Count II

### Administrative Procedure Act, 5 U.S.C. § 706(1)

108.    The allegations in the above paragraphs are realleged and incorporated herein.

109.    The APA empowers federal courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

110.    The INA, FARRA, and implementing regulations, and the Constitution mandate meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports a person to a third country. Defendants have unlawfully withheld the provision of these statutory, regulatory, and constitutional rights.

111.    Accordingly, the Court should compel Defendants to provide Plaintiffs and class members with meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports a person to a third country.

### Count III

### Fifth Amendment Due Process Clause and
### Administrative Procedure Act, 5 U.S.C. § 706(2)(D)

112.    The allegations in the above paragraphs are realleged and incorporated herein.

113.    The INA, FARRA, and implementing regulations mandate meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports a person to a third country.

114.    Plaintiffs have a due process right to meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports a person to a third country. *See, e.g.*, *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1004 (W.D. Wash. 2019). Plaintiffs also have a due process right to implementation of a process or procedure to afford these protections. *See, e.g.*, *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 491 (1991). Plaintiffs also have a due

31

process right to not be re-detained pursuant to the February 18, 2025 directive because Defendants have no procedural protections to ensure meaningful notice and an opportunity to present a fear-based claim prior to removal to a third country. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The APA also compels a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

115.    By failing to implement a process or procedure to afford Plaintiffs meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports a person to a third country and by re-detaining previously released individuals pursuant to the February 18, 2025 directive, Defendants have violated Plaintiffs' substantive and procedural due process rights and are not implementing procedures required by the INA, FARRA, and the implementing regulations.

116.    Accordingly, the Court should declare that Defendants have violated Plaintiffs' constitutional right to due process and that the Due Process Clause affords Plaintiffs the right to a process and procedure ensuring that DHS provides meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports a person to a third country and ensuring that Plaintiffs D.V.D. and M.M. and previously released class members are not re-detained pursuant to the February 18, 2025 directive.

117.    The Court should enjoin Defendants from failing to provide Plaintiffs and class members with meaningful notice and opportunity to present a claim for protection to an immigration judge before DHS deports a person to a third country. The Court should also set aside the implementation of the February 18, 2025 directive to re-detain Plaintiffs D.V.D. and M.M. and previously released class members, and should release Plaintiff E.F.D., until

Appx.032

Defendants provide meaningful notice and an opportunity to apply for protection.

## Count IV

### Declaratory Judgment, 28 U.S.C. § 2201

118.    The allegations in the above paragraphs are realleged and incorporated herein.

119.    Under 28 U.S.C. § 2201(a), a court "may declare the rights and other legal relations of any interested party seeking such declaration."

120.    Plaintiffs seek a declaration that the Immigration and Nationality Act, the Foreign Affairs Reform and Restructuring Act of 1998, implementing regulations, the Due Process Clause of the Fifth Amendment, and the treaty obligations of the United States require Defendants to provide meaningful notice and opportunity to present a fear-based claim to an immigration judge prior to deportation and prior to re-detaining Plaintiffs and class members based on potential removal to a third country.

121.    Defendants have a policy or practice of ignoring these statutory, regulatory, and constitutional mandates.

122.    Accordingly, Plaintiffs request that the Court declare their rights and legal relations under the INA, and FARRA and implementing regulations and the Due Process Clause of the Fifth Amendment.

## Count V

### Violation of 8 U.S.C. § 1231(a) and Fifth Amendment Due Process Clause
### (Brought by Plaintiffs E.F.D., D.V.D., and M.M.)

123.    The allegations in the above paragraphs are realleged and incorporated herein.

124.    The INA requires mandatory detention of individuals with final removal orders only during the 90-day removal period. 8 U.S.C. § 1231(a)(2).

125.    A noncitizen who is not removed within that period "shall be subject to

Appx.033

supervision under regulations prescribed by the Attorney General." 8 U.S.C. § 1231(a)(3).

126.    While § 1231(a)(6) permits detention beyond the removal period in certain situations, "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Zadvydas*, 533 U.S. at 699.

127.    No statute permits Defendants to re-detain an individual who has been released under § 1231(a)(3) without evidence that removal is now reasonably foreseeable or that the individual has violated the conditions of their release.

128.    The Due Process Clause of the Fifth Amendment forbids the government from depriving any "person" of liberty "without due process of law." U.S. Const. amend. V.

129.    Plaintiffs E.F.D., D.V.D., and M.M. were previously detained by ICE and released after an individualized custody determination that considered any danger or unmitigable flight risk. They have a liberty interest in remaining free from physical confinement where removal is not reasonably foreseeable, they have not violated the conditions of their release, and where re-detention is unlawful because Defendants have not created a lawful mechanism to ensure that noncitizens receive meaningful notice and an opportunity to present a fear-based claim before deportation to a third country.

130.    For these reasons, Defendants have violated the INA, implementing regulations, and the Due Process Clause of the Fifth Amendment.

### Count VI

### Violation of FOIA, 5 U.S.C. § 552
### Failure to Proactively Disclose Records
### (Against Defendant DHS)

131.    The allegations in the above paragraphs are realleged and incorporated herein.

132.    Defendant DHS is obligated under 5 U.S.C. § 552(a)(2)(B) and (a)(2)(C) to proactively disclose "those statements of policy and interpretations which have been adopted by

the agency and are not published in the Federal Register" and "administrative staff manuals and instructions to staff that affect a member of the public."

133.    Defendant DHS may not "rel[y] on, use[], or cite[] as precedent" any "final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public" against a party unless the material is "indexed and either made available or published as provided by [5 U.S.C. § 552(a)(2)(E)]" or "the party has actual and timely notice of the terms thereof." 5 U.S.C. § 552(a)(2)(E).

134.    The February 18, 2025 directive is a statement of policy adopted by DHS but not published in the Federal Register and an instruction to staff which affects members of the public. On information and belief, Defendant DHS has similar statements of policy, instruction, or guidance covered by 5 U.S.C. § 552(a)(2)(E) related to Defendants' increased efforts to deport noncitizens to third countries exist.

135.    Defendant DHS has failed to proactively disclose the February 18, 2025 directive and/or related statements of policy, instruction, or guidance covered by 5 U.S.C. § 552(a)(2)(E), and no legal basis exists for Defendant DHS's failure to proactively disclose these materials.

136.    Defendant DHS has nonetheless relied upon the February 18, 2025 directive, and has possibly relied on other statements of policy or instruction or guidance covered by 5 U.S.C. § 552(a)(2)(E), against Plaintiffs.

137.    Defendant DHS's failure to proactively disclose the February 18, 2025 directive and other statements of policy, instruction, or guidance covered by 5 U.S.C. § 552(a)(2)(E), is in violation of 5 U.S.C. § 552(a)(2). Defendant DHS's reliance on these materials against Plaintiffs is violation of 5 U.S.C. § 552(a)(2)(E).

138.    For these reasons, Defendants cannot rely on or use the February 18, 2025

directive to re-detain Plaintiffs and class members.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

a.    Assume jurisdiction over this action;

b.    Certify the case as a class action as proposed herein and in the accompanying motion for
class certification;

c.    Declare that Defendants have violated Plaintiffs' and class members' statutory, regulatory,
and constitutional rights by depriving them of meaningful notice and opportunity to
present a fear-based claim to an immigration judge prior to deportation to a third country
and by re-detaining them pursuant to the February 18, 2025 directive;

d.    Declare that Defendants have a mandatory duty to provide Plaintiffs and class members
with meaningful notice and opportunity to present a fear-based claim to an immigration
judge prior to deportation to a third country;

e.    Declare that Defendants' February 18, 2025 directive is unlawful because re-detention is
not tied to a lawful removal process;

f.    Set aside Defendants' current policy of failing to provide Plaintiffs and class members
with written notice and a meaningful opportunity to present a fear-based claim to an
immigration judge prior to deportation to a third country;

g.    Set aside Defendants' February 18, 2025 directive to re-detain Plaintiffs and class
members who were previously released based on potential removal to a third country;

h.    Preliminarily and permanently enjoin Defendants from failing to provide individual
named Plaintiffs with written notice and a meaningful opportunity to present a fear-based
claim under 8 U.S.C. § 1231(b)(3) and/or under the Convention Against Torture to an

Appx.036

immigration judge prior to deportation to a third country;

i. Preliminarily and permanently enjoin Defendants from failing to provide class members with written notice and a meaningful opportunity to present a fear-based claim under the Convention Against Torture to an immigration judge prior to deportation to a third country;

j. Stay and set aside Defendants' February 18, 2025 directive to re-detain Plaintiffs and class members who were previously released where re-detention is not tied to a lawful removal process (i.e., without providing meaningful notice and an opportunity to present a protection claim regarding removal to a third country);

k. Order Defendants to immediately return Plaintiff O.C.G. to the United States and provide him with written notice and a meaningful opportunity to present a fear-based claim under 8 U.S.C. § 1231(b)(3) and/or under the Convention Against Torture to an immigration judge prior to any effort to again deport him to a third country;

l. Order Defendants to immediately return class members who have been removed to a third country without written notice and a meaningful opportunity to apply for protection under the Convention Against Torture unless the class member confirms they do not wish to return;

m. Enjoin Defendants from relying on or using the February 18, 2025 directive pursuant to 5 U.S.C. § 552(a)(2);

n. Award costs and reasonable attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

o. Order all other relief that the Court deems just and proper.

Respectfully submitted,

s/*Tomás Arango*

Tomas Arango
Trina Realmuto*
Kristin Macleod-Ball*
Mary Kenney*
**NATIONAL IMMIGRATION
    LITIGATION ALLIANCE**
10 Griggs Terrace
Brookline, MA, 02446
(617) 819-4649
trina@immigrationlitigation.org

Anwen Hughes*
**HUMAN RIGHTS FIRST**
75 Broad Street, 31st Floor
New York, NY 10004
(212) 845-5244
HughesA@humanrightsfirst.org

Matt Adams*
Leila Kang*
Aaron Korthuis*
Glenda M. Aldana Madrid*
**NORTHWEST IMMIGRANT
    RIGHTS PROJECT**
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611
matt@nwirp.org

*Attorneys for Plaintiffs*

\* *Application for admission pro hac vice forthcoming*

Dated: March 23, 2025

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

D.V.D.; M.M.; E.F.D.; and O.C.G.

## DEFENDANTS

U.S. Department of Homeland Security, et al.

**(b)** County of Residence of First Listed Plaintiff   Berkshire County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
See attached sheet.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 2 U.S. Government Defendant
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☒ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☒ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
5 U.S.C. § 701 et seq.; 8 U.S.C. § 1101 et seq.; 28 U.S.C. § 2201; 5 U.S.C. § 552; FARRA; 5th Am. Due Process Cl.;
Brief description of cause:
Class action challenging lack of notice and opportunity to present fear-based claim prior to third country deportation

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $   n/a

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE   n/a     DOCKET NUMBER   n/a

DATE   3/23/2025

SIGNATURE OF ATTORNEY OF RECORD   s/ Tomas Arango

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**Attachment to JS-44**

**I.(c) Complete listing of Plaintiffs' counsel**

Tomas Arango
Trina Realmuto
Kristin Macleod-Ball
Mary Kenney
National Immigration Litigation Alliance
10 Griggs Terrace
Brookline, MA, 02446
(617) 819-4649

Matt Adams
Leila Kang
Aaron Korthuis
Glenda M. Aldana Madrid
Northwest Immigrant Rights Project
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611

Anwen Hughes
Human Rights First
75 Broad Street, 31st Floor
New York, NY 10004
(212) 845-5244

**U.S. Department of Justice**
Immigration and Naturalization Service

## Notice to Alien of Removal to Other than Designated

Alien's Name _____ A# _____ Detention Facility _____

You have been ordered removed to _____ , as you or the immigration judge designated during your removal proceeding. The immigration judge has ordered, in the alternative, that you be removed to _____ . The INS has made a formal request(s) to the government(s) of this/these country(ies) for a travel document.

The government of _____ :

☐ has formally responded to the INS request by stating that it is not willing to accept you; or
☐ has failed to respond to the INS request in a timely manner.

In the alternative, the government of_____ :

☐ has also responded by stating that it is not willing to accept you; or
☐ has failed to respond to the INS request in a timely manner.

Since your removal to the country(ies) designated in the removal order is not possible, you are hereby notified that the INS intends to disregard the designation in accordance with section 241(b)(2)(C) of the Immigration and Nationality Act (Act). Pursuant to section 241(b)(2)(D) or (E) of the Act, the INS is making arrangements to remove you to an alternate country, specifically _____ , which is:

☐ the country of which you are a subject, national, or citizen;

☐ the country from which you were last admitted to the United States;

☐ the country in which is located the foreign port from which you left for the United States;

☐ the country of which you last resided before entering the country from which you entered the United States;

☐ the country of your birth;

☐ whose government is willing to accept you.

☐ the country that had sovereignty over your birthplace when you were born;

If you believe that your life or freedom would be threatened in the alternate country of removal, due to your race, religion, nationality, membership in a particular social group, or political opinion, or that you would be tortured in that country, you may file a motion to reopen with the immigration court or the Board of Immigration Appeals, as applicable, for the purpose of applying for withholding of removal or relief under the Convention Against Torture. Your motion must be accompanied by your application (Form I-589) and any supporting documentation. If you fail to file a motion to reopen within fifteen (15) days of the date you are served with this notice, you will be considered to have waived any opportunity to contest removal to that country, and the INS will proceed with your removal. The INS may extend the fifteen (15) day time period for good cause.

Sincerely,

_____                    _____
Name                                         Title

Form I-041 (06/15/01)

**Attachment A**

Alien's Name _____   A# _____   Detention Facility _____

You have been ordered removed to _____ , as you or the immigration judge designated during your removal proceeding. The immigration judge has ordered, in the alternative, that you be removed to _____ . The INS has made a formal request(s) to the government(s) of this/these country(ies) for a travel document.

The government of _____ :

☐ has formally responded to the INS request by stating that it is not willing to accept you; or
☐ has failed to respond to the INS request in a timely manner.

In the alternative, the government of _____ :

☐ has also responded by stating that it is not willing to accept you; or
☐ has failed to respond to the INS request in a timely manner.

Since your removal to the country(ies) designated in the removal order is not possible, you are hereby notified that the INS intends to disregard the designation in accordance with section 241(b)(2)(C) of the Immigration and Nationality Act (Act). Pursuant to section 241(b)(2)(D) or (E) of the Act, the INS is making arrangements to remove you to an alternate country, specifically _____ , which is:

☐ the country of which you are a subject, national, or citizen;

☐ the country from which you were last admitted to the United States;

☐ the country in which is located the foreign port from which you left for the United States;

☐ the country of which you last resided before entering the country from which you entered the United States;

☐ the country of your birth;

☐ whose government is willing to accept you.

☐ the country that had sovereignty over your birthplace when you were born;

If you believe that your life or freedom would be threatened in the alternate country of removal, due to your race, religion, nationality, membership in a particular social group, or political opinion, or that you would be tortured in that country, you may file a motion to reopen with the immigration court or the Board of Immigration Appeals, as applicable, for the purpose of applying for withholding of removal or relief under the Convention Against Torture. Your motion must be accompanied by your application (Form I-589) and any supporting documentation. If you fail to file a motion to reopen within fifteen (15) days of the date you are served with this notice, you will be considered to have waived any opportunity to contest removal to that country, and the INS will proceed with your removal. The INS may extend the fifteen (15) day time period for good cause.

Sincerely,


_____          _____
Name                                Title

Appx042 (06/15/01)

Alien's Name _____   A# _____   Detention Facility _____

You have been ordered removed to _____ , as you or the immigration judge designated during your removal proceeding. The immigration judge has ordered, in the alternative, that you be removed to _____ . The INS has made a formal request(s) to the government(s) of this/these country(ies) for a travel document.

The government of _____ :

☐ has formally responded to the INS request by stating that it is not willing to accept you; or
☐ has failed to respond to the INS request in a timely manner.

In the alternative, the government of _____ :

☐ has also responded by stating that it is not willing to accept you; or
☐ has failed to respond to the INS request in a timely manner.

Since your removal to the country(ies) designated in the removal order is not possible, you are hereby notified that the INS intends to disregard the designation in accordance with section 241(b)(2)(C) of the Immigration and Nationality Act (Act). Pursuant to section 241(b)(2)(D) or (E) of the Act, the INS is making arrangements to remove you to an alternate country, specifically _____ , which is:

☐ the country of which you are a subject, national, or citizen;

☐ the country from which you were last admitted to the United States;

☐ the country in which is located the foreign port from which you left for the United States;

☐ the country of which you last resided before entering the country from which you entered the United States;

☐ the country of your birth;

☐ whose government is willing to accept you.

☐ the country that had sovereignty over your birthplace when you were born;

If you believe that your life or freedom would be threatened in the alternate country of removal, due to your race, religion, nationality, membership in a particular social group, or political opinion, or that you would be tortured in that country, you may file a motion to reopen with the immigration court or the Board of Immigration Appeals, as applicable, for the purpose of applying for withholding of removal or relief under the Convention Against Torture. Your motion must be accompanied by your application (Form I-589) and any supporting documentation. If you fail to file a motion to reopen within fifteen (15) days of the date you are served with this notice, you will be considered to have waived any opportunity to contest removal to that country, and the INS will proceed with your removal. The INS may extend the fifteen (15) day time period for good cause.

Sincerely,

_____                    _____

Name                                        Title

## Certificate of Service

Alien's Name _____    Alien's A-Number _____

- I hereby certify that I served this notice on the above-named alien.

_____          _____
        (Signature)                      (Date)

_____          _____
        (Name)                          (Title)

- I have read this notice to the above-named alien in the _____ language, which the alien understands.

_____          _____
        (Signature)                      (Date)

_____          _____
        (Name)                          (Title)

- I hereby certify that I served this notice on the attorney or personal representative of record, if any, of the above-named alien.
  Attorney's/Representative's Name: _____

  Method of Service *(Check one):*    ☐ By personal delivery
                                      ☐ By fax
                                      ☐ By first class mail

_____          _____
        (Signature)                      (Date)

_____          _____
        (Name)                          (Title)

## Alien's Acknowledgment of Service

- I have been personally served with the attached Notice to Alien of Removal to Other than Designated Country and have been read this Notice in the _____ language, which I understand.

_____          _____
        (Signature)                      (Date)

Appx.044

DRAFT

## Certificate of Service

Alien's Name _____    Alien's A-Number _____

● I hereby certify that I served this notice on the above-named alien.

_____        _____
(Signature)                                     (Date)

_____        _____
(Name)                                          (Title)

● I have read this notice to the above-named alien in the _____ language, which the alien understands.

_____        _____
(Signature)                                     (Date)

_____        _____
(Name)                                          (Title)

● I hereby certify that I served this notice on the attorney or personal representative of record, if any, of the above-named alien.

Attorney's/Representative's Name: _____

Method of Service *(Check one)*:      ☐ By personal delivery
                                      ☐ By fax
                                      ☐ By first class mail

_____        _____
(Signature)                                     (Date)

_____        _____
(Name)                                          (Title)

## Alien's Acknowledgment of Service

● I have been personally served with the attached Notice to Alien of Removal to Other than Designated Country and have been read this Notice in the _____ language, which I understand.

_____        _____
(Signature)                                     (Date)

Appx 045    Form I-158 (06/15/01)

## Certificate of Service

Alien's Name _____    Alien's A-Number _____

- I hereby certify that I served this notice on the above-named alien.

_____
(Signature)

_____
(Date)

_____
(Name)

_____
(Title)

- I have read this notice to the above-named alien in the _____ language, which the alien understands.

_____
(Signature)

_____
(Date)

_____
(Name)

_____
(Title)

- I hereby certify that I served this notice on the attorney or personal representative of record, if any, of the above-named alien.

Attorney's/Representative's Name: _____

Method of Service *(Check one):*    ☐ By personal delivery
☐ By fax
☐ By first class mail

_____
(Signature)

_____
(Date)

_____
(Name)

_____
(Title)

## Alien's Acknowledgment of Service

- I have been personally served with the attached Notice to Alien of Removal to Other than Designated Country and have been read this Notice in the _____ language, which I understand.

_____
(Signature)

_____
(Date)

Appx.046

Form I-1408 (06/15/01)

**\* DRAFT MODEL NOTICE FOR REPRESENTED ALIENS ONLY & FOLLOWING ICE OPLA ILPD CLEARANCE \***

[Alien Name and A#]

## Notice of Removal to Other than Designated Country

In a decision dated _____, the Immigration Court ordered you removed to _____, but subsequently granted withholding of removal to that country under section 241(b)(3) of the Immigration and Nationality Act (Act). By this notice, the Department of Homeland Security (DHS) formally advises you that it is pursuing your removal to _____ as an alternate country pursuant to section 241(b)(2) of the Act.

If you believe that your life or freedom would be threatened in the alternate country of removal, due to your race, religion, nationality, membership in a particular social group, or political opinion, or that you would be tortured in that country, you may wish to apply with the Immigration Court for withholding of removal under section 241(b)(3) of the Act, or protection pursuant to the regulations implementing the U.S. obligations under Article 3 of the Convention Against Torture.[1]

Accordingly, assuming that you do so within fifteen (15) days of the date of service of this notice, DHS will not oppose your filing of a motion to reopen with the Immigration Court for this purpose accompanied by a properly completed Form I-589 and any supporting documentation. DHS reserves the right to contest your applications for protection from removal on the merits.

If you believe that you need more time to prepare and file any such motion to reopen, please contact the undersigned immediately and explain why you need additional time and how much additional time is needed.

If you fail to file a motion to reopen as set forth above, DHS will assume that you do not wish to seek protection from removal to the alternate country of removal and will proceed with your removal.

[OPLA Signature Bloc]

[cc: Immigration Court]

[Certificate of Service on Alien's Counsel]

---

[1] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted and opened for signature Dec. 10, 1984, G.A. Res. 39/46. 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) (implemented in the removal context in principal part at 8 C.F.R. §§ 1208.16(c) - .18).

Appx047  Appendix B

On January 20, 2025, President Donald J. Trump issued Executive Order 14165, *Securing Our Borders*, in which he highlighted that "catch-and-release policies undermine the rule of law and our sovereignty, create substantial risks to public safety and security, and divert critical resources away from stopping the entry of contraband and fugitives into the United States" and directed "the appropriate and consistent use of lawful detention authority under the INA, including the termination of the practice commonly known as 'catch-and-release,' whereby illegal aliens are routinely released into the United States shortly after their apprehension for violations of immigration law." 90 Fed. Reg. 8467, 8468.

## Unprocessed Cases

ERO officers should consider for expedited removal (ER) all aliens previously released by U.S. Customs and Border Protection (CBP) who have not affirmatively filed an application for asylum with U.S. Citizenship and Immigration Services, when they report to an ERO Field Office. This includes: (1) paroled arriving aliens; (2) aliens issued a CBP "Notice to Report" (NTR); and (3) aliens processed for "Parole + ATD" or "Parole with Conditions" (PWC).

### Arriving Aliens

ERO officers may process for ER any arriving alien (i.e., encountered at a port of entry) who CBP determined to be inadmissible and released, as long as the alien is inadmissible under INA § 212(a)(6)(C) (fraud or willful misrepresentation) or 212(a)(7) (lack of valid immigration documents). There is no time limit on the ability to process such aliens for ER.

### NTR Cases, Parole + ATD, and PWC Cases

Under the NTR process, certain aliens encountered at the Southwest Border were released into the United States without a Notice to Appear (NTA) or parole. Parole + ATD and PWC were two processes whereby aliens encountered at the Southwest Border were paroled without an NTA and instructed to report to ICE for further processing.

**Attachment C**

1

Appx.048

Aliens identified as having been subject to any of these processes are subject to ER if they are inadmissible under INA § 212(a)(6)(C) or (a)(7) and either (1) the initial CBP encounter was within 14 days and 100 air miles of the border; or (2) the alien has not been continuously physically present in the United States for two years prior to the finding of inadmissibility by ERO.

If an alien identified above is not processed for ER, he or she should be processed for section 240 removal proceedings with issuance of an NTA.

If the alien is on an active parole, the NTA or ER charging document will terminate the parole.

## Non-detained Reporting Generally

Recognizing the unprecedented strides the Administration has made with regard to removal cooperation, ERO should carefully review for removal all cases reporting on the non-detained docket.

### Aliens Granted Withholding of Removal or CAT Protection

Withholding of removal under the INA and under the regulations implementing U.S. obligations under the Convention Against Torture (CAT) and CAT deferral of removal (DCAT) are country-specific protections from removal. Accordingly, when an alien granted such protection reports on the non-detained docket, ERO officers should review the case to determine the viability of removal to a third country and accordingly whether the alien should be re-detained.

### Aliens Previously Released for Lack of SLRRFF

ERO officers should review for re-detention the case of any alien reporting on the non-detained docket who was previously released due to no significant likelihood of removal in the reasonably foreseeable future (SLRRFF) in light of the Administration's significant gains with regard to previously recalcitrant countries and the potential for third count removals. Revocation of release is authorized for removal or to enforce conditions of release and is provided for in 8 C.F.R. §§ 241.4 and 241.13. If removal appears significantly likely in the reasonably foreseeable future, the arrest may proceed without further investigation. At the time of arrest, the alien should be provided written notification of the reason for his or her detention. Promptly, ideally, within two days, the arresting officer or another officer, if necessar should conduct an informal interview of the alien and provide an opportunity for the alien to ask questions and tell th interviewer anything that the alien wishes in support of why he or she should be released.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only)  D.V.D. v. U.S. Department of Homeland Security

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

   [ ]  I.   160, 400, 410, 441, 535, 830*, 835*, 850, 880, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.

   [✓]  II.  110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820*, 840*, 895, 896, 899.

   [ ]  III. 120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 485, 490, 510, 530, 540, 550, 555, 560, 625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.
   *Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.
   n/a

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?   YES [ ]   NO [✓]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)   YES [ ]   NO [✓]
   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?   YES [ ]   NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?   YES [ ]   NO [✓]

7. Do all of the parties in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).   YES [ ]   NO [✓]

   A. If yes, in which division do all of the non-governmental parties reside?
   Eastern Division [ ]   Central Division [ ]   Western Division [ ]

   B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
   Eastern Division [✓]   Central Division [ ]   Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)   YES [ ]   NO [✓]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME  Tomas Arango
ADDRESS  National Immigration Litigation Alliance, 10 Griggs Terrace, Brookline, MA 02446
TELEPHONE NO.  (617) 819-4649

(CategoryForm11-2020.wpd )

Appx.050

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| D.V.D.; M.M.; E.F.D.; and O.C.G., | |
| Plaintiffs, | Civil Action No. 25-cv-10676 |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY; Kristi NOEM, Secretary, U.S. Department of Homeland Security, in her official capacity; Pamela BONDI, U.S. Attorney General, in her official capacity; and Antone MONIZ, Superintendent, Plymouth County Correctional Facility, in his official capacity, | |
| Defendants. | |

**INDEX OF EXHIBITS IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION,**
**PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION AND STAY OF ADMINISTRATIVE ACTION,**
**AND**
**PLAINTIFFS' MOTION FOR LEAVE TO APPEAR UNDER PSEUDONYMS**

Appx.051

| Exhibit | Description |
|---------|-------------|
| A | Declaration of Plaintiff D.V.D. |
| B | Declaration of Plaintiff M.M. |
| C | Declaration of Plaintiff E.F.D. |
| D | Declaration of Plaintiff O.C.G. |
| E | Declaration of Trina Realmuto |
| F | Declaration of Matt Adams |
| G | Declaration of Anwen Hughes |
| H | Declaration of Tiffany Wang |
| I | Declaration of Marie Vincent |
| J | Declaration of Ian Austin Rose |
| K | Declaration of Laura Jones |
| L | Declaration of Leslie Parra |
| M | Declaration of Daniela Hernández Chong Cuy |
| N | Declaration of Zoey Jones |
| O | Declaration of Danielle Strandburg-Peshkin |
| P | Declaration of Denise Acevedo Perez |
| Q | Declaration of Laura Belous |
| R | Declaration of Melissa Chua |
| S | Declaration of Patrick Taurel |
| T | Declaration of Ambreen Walji |
| U | Declaration of Deborah Lee |
| V | Declaration of Elyssa N. Williams |
| W | Declaration of Guadalupe Perez |
| X | Declaration of Paul O'Dwyer |

Appx.052

## DECLARATION OF ███████

I, ███████████ make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.  My name is ████████████ I am over the age of 18 and am competent to testify regarding the matters described below.

2.  I am a citizen of Cuba. I reside in Pittsfield, Massachusetts.

3.  In 1999, I first arrived in the United States. I left Cuba because I was opposed to the government and involved in the resistance.

4.  I suffer from schizoaffective disorder, major depressive disorder, and post-traumatic stress disorder. About a year after I arrived in the United States, I went to a psychologist for the first time because of the voices I had been hearing in my head, but I had been having symptoms for a long time before that. Because of the noises and voices in my head, I had not been able to keep a stable job; at times the voices would tell me to hurt myself or end my life. I was homeless for some years and also suffered from alcoholism and drug addiction until 2017, when I began going to church and became sober.

5.  In January 2017, I was arrested by immigration officials when reentering the United States. I explained that I was afraid of being deported to Cuba and an asylum officer found that I had a credible fear of persecution.

6.  I received a Notice to Appear in February 2017. The immigration judge said that Cuba was the country where I could be deported. On February 10, 2017, the immigration judge ordered me deported to Cuba. I appealed but then withdrew my appeal because I could not remain detained. U.S. Immigration and Customs Enforcement (ICE) released me from detention on an Order of Supervision in May 2017.

7.  I checked in with ICE like I was required to, starting in November 2017. Since September 2019, my check-ins were with the office in Burlington, Massachusetts. My most recent check-ins were by telephone or email. I usually only needed to check in once a year, except in 2019, when I checked in twice.

8.  I married my wife who is a U.S. citizen in 2023. I have a daughter and a step-son who are also U.S. citizens.

9.  On Friday, March 7, 2025, I checked in by email with the Burlington ICE office with the help of my attorney, Laura Putnam.

10. Three days later, on Monday, March 10, 2025, the ICE office sent an email to Ms. Putnam, telling her that I needed to report to the office in Burlington, Massachusetts in person on March 28, 2025 at 8:00 am.

11. On March 12, 2025, Ms. Putnam emailed back to ask why I needed to check in again so soon after the email check and why it needed to be in person. She also told them that I have a pending application for a U visa filed in 2021.

12. On March 15, 2025, the ICE office told Ms. Putnam by email that they were requiring all people to report in person and more frequently on a case-by-case basis. I am worried because my attorney told me that she has never heard of ICE calling someone back for an in-person check-in three weeks after the earlier check-in.

13. I am very afraid that, at the check-in, they will arrest me and deport me to a country without any warning. I am afraid of being deported to any country where I will be imprisoned when I arrive and/or where I will be deprived of access to psychiatric treatment and will therefore be at risk of persecution due to my mental health conditions. If I was deported and separated from my partner and family, I would not have health insurance and mental health treatment. I am very afraid that I would become homeless again or even die without that support.

14. As a named plaintiff in this case, I understand that if the Court grants the motion for class certification, I would represent a large number of people with final removal orders who have been deported, or who are threatened with being deported, to a country or countries where they have not been provided notice and/or an opportunity to apply for protection relating to a fear of persecution or torture related to that country.

15. I understand that, as a class representative, I represent the interests of all class members in this lawsuit and that it is my responsibility to represent the interests of the whole class and not just my own personal interests.

16. I understand that my duty to be a class representative continues until the Court decides this case is no longer a class action, or the case is over.

17. I understand and accept that any resolution of the lawsuit, for example by settlement and dismissal, is subject to Court approval and must be in the best interests of the class as a whole.

18. I understand that, by agreeing to become a class representative, I have a duty to take steps to help move the case forward, which I will do with my attorneys. I know that I must attend court if necessary; provide information to my attorneys that they feel is necessary for the case; give them documents I have if it is required; testify at a deposition or trial if necessary; and provide my attorneys with my contact information and current whereabouts because it may be necessary for them to contact me on short notice.

19. I understand that I am volunteering to represent many other persons with similar claims. I believe it is important that people in my situation receive advanced notice and a fair opportunity to apply for protection before they are deported to a third country.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Pittsfield, Massachusetts on March ⎯⎯⎯, 2025.

By

**DECLARATION OF** ▌▌▌▌▌▌▌▌▌▌▌▌

I, ▌▌▌▌▌▌▌▌▌▌ make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.  My name is ▌▌▌▌▌▌▌▌▌▌ I am over the age of 18 and am competent to testify regarding the matters described below.

2.  I am a citizen of Honduras. I reside in Fort Worth, Texas. I am the mother to four children and the primary caretaker of my three youngest children. Two of my children, who are teenagers, ages 13 and 17, have lawful permanent resident status. My youngest child, who is 5 years-old, is a U.S. citizen.

3.  In 2014, I arrived in the United States. I was fleeing persecution and torture by my husband, the father of my three eldest children.

4.  I had been ordered removed in the past, so after I arrived in 2014, that old order of removal against me was reinstated. I had an interview with an asylum officer. The officer found that I had a reasonable fear of persecution or torture in Honduras and sent my case to the immigration court so that I could apply for withholding of removal before an immigration judge.

5.  During proceedings, I was released from detention. At the beginning, I had to wear an ankle shackle. I had to report to Immigration and Customs Enforcement (ICE) in Dallas every eight days and then every fifteen days.

6.  During my proceedings, the immigration judge said that Honduras was the country where I could be deported.

7.  I applied for withholding of removal and protection under the Convention Against Torture, because of my fear of what my husband had done and would do to my children and me if we were forced to return there. My husband beat me and my children. If I tried to leave him or go to the police, he would threaten me. He threatened me with a gun and put it in my mouth and against my neck. He went to prison for killing two people and, when he was released, he began to threaten me again and I fled Honduras.

8.  The immigration judge granted my application for withholding of removal on July 19, 2021. The government did not appeal the judge's decision to the Board of Immigration Appeals.

9.  After the judge's decision, I had to check in with ICE in Dallas once a year, which I have been doing.

10. This year, my check-in was on February 21. I met with a specialist at the Immigration and Customs Enforcement (ICE) office in Dallas. She told me that I had a removal order,

which I did not understand because the judge had told me I could not be deported to Honduras. The woman told me to come back and report in again on March 7, 2025. That had not happened at any of my previous check ins. I thought maybe the officer had made a mistake about my case. ICE also put an ankle shackle on me again.

11. On March 7, 2025, I went to the ICE office again, and the officer I met with said that I needed to leave the United States because I was on a list of people who would be deported on March 21. My 13-year-old daughter was with me because she would not go to school because she was afraid, I would be taken away. The officer asked for my passport and the passports of my children, but I only had my passport with me. The officer made a copy of my passport. I was terrified that I would be deported that day.

12. Then, on March 17, 2025, I received a telephone call from someone at ICE at about 9:30 in the morning. They told me that I needed to report in person to the ICE office again on April 4, 2025. The ICE officer did not explain anything else about why I needed to go back to the ICE office. But the ICE office where I must report on April 4 is the same office that had put the ankle shackle on me and the same office that told me I am on a list of people they are going to deport.

13. I am afraid that if I am deported to another country, I will be harmed, tortured, or killed. I am afraid that if I am deported to another country, they will send me back to Honduras, where my husband will hurt me or kill me. I am also afraid that he could find me in another country, because he is a very dangerous and well-connected person. In 2006, when I left Honduras, he found me in Mexico and hurt me because I had left—he threw me out of a second-floor window. He also has family and knows people in other countries, including El Salvador and Mexico, who could help him to find me. I am also afraid that my children would suffer if I am deported to another country and that they would be in danger if I cannot continue to protect them.

14. As a named plaintiff in this case, I understand that if the Court grants the motion for class certification, I would represent a large number of people with final removal orders who have been deported, or who are threatened with being deported, to a country or countries where they have not been provided notice and/or an opportunity to apply for protection relating to a fear of persecution or torture related to that country.

15. I understand that, as a class representative, I represent the interests of all class members in this lawsuit and that it is my responsibility to represent the interests of the whole class and not just my own personal interests.

16. I understand that my duty to be a class representative continues until the Court decides this case is no longer a class action, or the case is over.

17. I understand and accept that any resolution of the lawsuit, for example by settlement and dismissal, is subject to Court approval and must be in the best interests of the class as a whole.

18.   I understand that, by agreeing to become a class representative, I have a duty to take steps to help move the case forward, which I will do with my attorneys. I know that I must attend court if necessary; provide information to my attorneys that they feel is necessary for the case; give them documents I have if it is required; testify at a deposition or trial if necessary; and provide my attorneys with my contact information and current whereabouts because it may be necessary for them to contact me on short notice.

19.   I understand that I am volunteering to represent many other persons with similar claims. I believe it is important that people in my situation receive advanced notice and a fair opportunity to apply for protection before they are deported to a third country.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Fort Worth. Texas on March 21, 2025.

By:   

I, Yovanna Vargas, hereby certify that I am fully competent in both English and Spanish languages, that I have read the above English document to ████████ in true and accurate Spanish to the best of my ability, and that she has signed her name with full understanding of its contents.

Dated this 21st day of March 2025.

Yovanna Vargas

## DECLARATION OF ███████████

I, ███████████ make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. My name is ███████████ I am over the age of 18 and am competent to testify regarding the matters below.

2. I am a citizen of Ecuador. I am currently detained at Plymouth County Correctional Facility in Plymouth, Massachusetts. I am a resident of Milford, Massachusetts.

3. I was a taxi driver in Ecuador. After I refused to transport drugs for the Ecuadorian police in my taxi, the police told me to think twice about denying them. In 2015, two people who worked as drug mules for the police were arrested, and I was again accosted by the police who threatened me to run drugs for them. The police officer blamed me for the drug mules' arrest, and stated I would "pay the consequences" for his losses. I was once again asked to join them in order to compensate them for "losses" and when I refused, the police officer directed two bodyguards to beat me. They also smashed my taxi's windshield and windows to deprive me of my work, robbed me of all my money, and promised to come back to "finish" me and my family.

4. Terrified, I made plans to flee Ecuador. I took my wife and daughter to my mothers-in-law home, sold my car, and borrowed money to make the difficult journey to the United States.

5. During my journey to the United States, there were two times when the coyotes stole my money, this happened in Mexico and Guatemala. I was also kidnapped in a house in Huehuetenango, Guatemala for fifteen days, where I was not allowed to go out or have contact with my family. This also happened in Chiapas, Mexico for fifteen days too, under the same circumstances.

6. I arrived in the United States in October 2015. After I told immigration officials that I was afraid to return to Ecuador, an officer interviewed me about my fear. The officer found that my fear was credible, and I was released from the detention facility and placed in removal proceedings before an immigration judge.

7. I was detained by ICE upon entry for a total of three months. After release, I went to live with my brother in New York. I was detained again from November 2017 to June 2018.

8. During my proceedings, the immigration judge said that Ecuador was the only country where I could be deported. I applied for asylum, withholding of removal, and protection under the Convention Against Torture based on my fear of harm by the Ecuadoran police who threatened my life when I refused to run drugs for them.

9.  In April 2018, the judge granted my application for protection under the Convention Against Torture. The government attorney reserved appeal but then did not appeal and so the order was final.

10. On or about June 11, 2018, Immigration and Customs Enforcement (ICE) released me from detention under an Order of Supervision. As part of the terms of my release, I had to regularly report to ICE in Burlington, Massachusetts. My next check in date is scheduled for September 9, 2025.

11. I work in construction/roofing. On March 18, 2025, I was outside my brother-in-law's house preparing for the workday with about five of my co-workers at around 6:30 in the morning, when a lot of law enforcement officers showed up. I think they were a mix of police officers and immigration officers, but I am not sure. They were looking for a person named Luis Quispe, who was not there. Even though he was not there, the officers detained everyone else. They arrested all of us and took us to the Milford Police Station.

12. We were there only briefly. Only one woman who had a young daughter at home was released. From there, they took the four of us who remained to the ICE office in Burlington where immigration officers took our fingerprints and collected personal information about each of us.

13. After that, ICE took us to the detention center in Plymouth. I asked immigration officers why I was there. They would not tell me anything, only that I need to contact my lawyer.

14. That same day, my wife contacted my lawyer who emailed ICE a copy of the judge's decision blocking my deportation to Ecuador. ICE told her that they would forward it to my deportation officer.

15. My lawyer sent another email the next day, March 19, but ICE did not respond.

16. I am afraid. ICE will not tell me or my lawyer why I am detained. I fear that ICE is going to deport me to another country, including El Salvador or Mexico, because I know from my lawyer that ICE deported hundreds of people to those countries and also to Panama and Guantanamo. I am afraid that if I am deported to another country, I could be detained or that they will send me back to Ecuador. If I am sent back to Ecuador, I am sure to be harm, tortured, or even killed. I am also afraid that if I am deported to El Salvador, Colombia, or Peru, as the drug trade is also deeply entrenched in the police culture in those countries, and I fear that I will be marked as someone who dissents when police recruit you to engage in their corruption, which would make me vulnerable to torture by police forces yet again. I am also afraid to be deported to Mexico or Guatemala based on my past experience with being kidnapped in those countries.

17. As a named plaintiff in this case, I understand that if the Court grants the motion for class certification, I would represent a large number of people with final removal orders who have been deported, or who are threatened with being deported, to a country or countries

where they have not been provided notice and/or an opportunity to apply for protection relating to a fear of persecution or torture related to that country.

18. I understand that, as a class representative, I represent the interests of all class members in this lawsuit and that it is my responsibility to represent the interests of the whole class and not just my own personal interests.

19. I understand that my duty to be a class representative continues until the Court decides this case is no longer a class action, or the case is over.

20. I understand and accept that any resolution of the lawsuit, for example by settlement and dismissal, is subject to Court approval and must be in the best interests of the class as a whole.

21. I understand that, by agreeing to become a class representative, I have a duty to take steps to help move the case forward, which I will do with my attorneys. I know that I must attend court if necessary; provide information to my attorneys that they feel is necessary for the case; give them documents I have if it is required; testify at a deposition or trial if necessary; and provide my attorneys with my contact information and current whereabouts because it may be necessary for them to contact me on short notice.

22. I understand that I am volunteering to represent many other persons with similar claims. I believe it is important that people in my situation receive advanced notice and a fair opportunity to apply for protection before they are deported to a third country.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Person, _____ on March 21, 2025.

By: ███████████████████

I, Nuria Gonzalo, hereby certify that I am fully competent in both English and Spanish languages, that I have read the above English document to ████████ in true and accurate Spanish to the best of my ability, and that he has signed his name with full understanding of its contents.

Dated this 21 day of March 2025.

signature

Appx.061

**DECLARATION OF** ██████████████████████

I, ██████████████████████ make the following declaration based on my personal knowledge and declare/under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

My name is ██████████████████ I am over the age of 18 and am competent to testify regarding the matters described below.

1.  I am a citizen of Guatemala. I am currently living in hiding in Guatemala.

2.  In March of 2024, I first left my home country and travelled to the United States to escape persecution and torture. At the border I presented myself so I could apply for asylum. I was arrested and held for about a week. The immigration officers told me that I could not have an interview with an asylum officer, an instead they deported me to Guatemala.

3.  I was threatened again in Guatemala so I decided the only option was to try to return again and see if they would let me apply for asylum. I crossed into Mexico on my way back to the U.S. in April of 2024. Shortly after arriving in Iztapalapa, Mexico, I was raped. A group of men then locked me in a room for several days. I was only released after my sister sent the men money so they would release me.

4.  I then continued on to the United States, arriving in May of 2024. I told the immigration officers I was afraid of returning to Guatemala and I wanted to apply for asylum. I explained why I was afraid to go back to my country and they referred me for an interview with an asylum officer. The asylum officer interviewed me and determined that I had a reasonable fear. I was then transferred to present my case in front of the immigration judge. I remained in immigration detention during this time.

5.  I had my first hearing in June of 2024. When the immigration judge told me I was ineligible for asylum because I had a prior expedited removal order from the first I came, I asked if I could be deported to a country other than Mexico or Guatemala. He told me Guatemala was designated as the country of removal, but also told me that they cannot send me back to Mexico, because I am from Guatemala.

6.  At the final hearing on February 19, 2025, I explained to the judge what had happened to me in Guatemala and why I had to flee. I also explained how I had been targeted in Mexico because I was gay, and how I had been raped, and how the men kept me locked up until my sister sent them money.

7.  At the immigration hearing the government attorney asked the judge whether Mexico was a country for removal, but the judge said that it was not e. The judge then found that it was likely that I would be persecuted if I were sent back to Guatemala and granted me

protection called withholding. I was so relieved that I was finally going to be able to stay somewhere safe. The judge asked the prosecutor if he wanted to appeal, but after leaving the room for several minutes, the attorney returned and said they were not going to appeal.

8. However, they kept me locked up at the detention center in Arizona for another couple of days. About two days later an immigration officer told me to grab my stuff because I was leaving. I asked where they were taking me but he did not answer. He gave me a document to sign to get my belongings back.

9. After I was taken out of the prison the immigration officer told me that I was being deported to Mexico. I was so scared and surprised. I told him that I had won my case and showed him the order the judge gave me. But the immigration officer said the order had expired. I begged him to let me call my attorney but he said it was too late to call anyone now.

10. I was put on a bus with about 20 other men, and they drove us to Nogales, Mexico. In Nogales, Mexico, they made us get on a second bus, where they drove us Tabasco, Mexico. Once we got there they held us in another facility. They told me I could apply for asylum in Mexico, but I would be kept locked up for the months it took to make a decision or I could just accept for them to take me back to Guatemala. After what had happened to me in Mexico I was too afraid to ask for asylum there. I had no safe options so I just told them to send me back to Guatemala so I would not be kept locked up.

11. As a named plaintiff in this case, I understand that if the Court grants the motion for class certification, I would represent a large number of people with final removal orders who have been deported, or who are threatened with being deported, to a country or countries where they have not been provided notice and/or an opportunity to apply for protection relating to a fear of persecution or torture related to that country.

12. I understand that, as a class representative, I represent the interests of all class members in this lawsuit and that it is my responsibility to represent the interests of the whole class and not just my own personal interests.

13. I understand that my duty to be a class representative continues until the Court decides this case is no longer a class action, or the case is over.

14. I understand and accept that any resolution of the lawsuit, for example by settlement and dismissal, is subject to Court approval and must be in the best interests of the class as a whole.

15. I understand that, by agreeing to become a class representative, I have a duty to take steps to help move the case forward, which I will do with my attorneys. I know that I must attend court if necessary; provide information to my attorneys that they feel is necessary for the case; give them documents I have if it is required; testify at a deposition or trial if

necessary; and provide my attorneys with my contact information and current whereabouts because it may be necessary for them to contact me on short notice.

16.    I understand that I am volunteering to represent many other persons with similar claims. I believe it is important that people in my situation receive advanced notice and a fair opportunity to apply for protection before they are deported to a third country.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in _____ Guatemala __ on March 19 , 2025.

By: ███████████████████

I, ___Matt Adams___, hereby certify that I am fully competent in both English and Spanish languages, that I have read the above English document to ████████████ in true and accurate Spanish to the best of my ability, and that he has signed his name with full understanding of its contents.

Dated this 19 day of March 2025.        _____
                                          Matt Adams

Appx.064

**DECLARATION OF TIFFANY WANG**

I, Tiffany Wang, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am a practicing attorney licensed to practice before the State of New Mexico. My business address is PO Box 90191, Albuquerque, NM 87199. I have been employed as a Fellow Attorney at Innovation Law Lab since August 2024. I am over the age of 18 and am competent to testify regarding the matters described below.

2.      I work almost exclusively with immigrants currently and formerly detained at the Torrance County Detention Facility in Estancia, NM. In addition to providing legal orientations to hundreds of detained individuals with fear-based claims on a biweekly basis, I have provided selective representation to some of these people in front of the Board of Immigration Appeals (BIA) or with applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services.

3.      I represent AL before the BIA. On or about February 21, 2025, AL was deported to a third country. AL is a citizen of Venezuela, and the only country the immigration judge (IJ) designated for removal was Venezuela.

4.      AL entered the United States in January 2024 and was placed in removal proceedings pursuant to 8 U.S.C. § 1229a. He entered the United States from Mexico, where he had been robbed. He was detained at the Torrance County Detention Facility. AL was originally served with a Notice to Appear at the immigration court where his U.S. sponsor was located and was set to be released from detention. However, a few days later, AL provided potentially life-saving assistance to another detained individual who was experiencing a medical emergency and needed medical attention. After doing so, ICE placed AL in administrative segregation and he was forced to attend all his immigration hearings while remaining detained.

5.      AL was pro se before the immigration court. AL filed Form I-589, the application for asylum, withholding of removal, and protection under the Convention Against Torture, with the immigration court on or about April 2, 2024. AL expressed fear of persecution based on his opposition to the Venezuelan government. After participating in peaceful protests against the Venezuelan government, AL was detained and tortured by the Bolivarian National Guard. He was subsequently labeled as a traitor to the country, harassed by members of the Bolivarian National Guard and the Colectivos, a pro-government criminal organization, and captured and tortured by the Colectivos.

6.      At his merits hearing on June 18, 2024, the IJ denied AL's application for protection and ordered him removed. AL felt forced to waive his right to appeal due to threats of prolonged detention.

7.      AL was released from detention around July 2024 and went to North Carolina to live with his sponsor. He wore an ankle monitor and had monthly phone check-ins with U.S.

Immigration and Customs Enforcement (ICE) in Charlotte, North Carolina. ICE once visited his home. AL complied with all requirements of release set by ICE.

8.      On or around January 26, 2025, ICE came to AL's home to arrest him. ICE redetained him at the Stewart Detention Center in Lumpkin, GA.

9.      On February 6, 2025, I filed a *sua sponte* Motion to Reopen AL's removal proceedings with the IJ. After the IJ denied the motion without any reasoning, I represented AL in an appeal to the BIA and submitted a motion to stay his removal pending the adjudication of his appeal. AL's appeal and motion to stay were filed on February 12, 2025 and February 18, 2025, respectively, and remain pending to date.

10.     On or around February 14, 2025, ICE transferred AL to the Adams County Correctional Center in Natchez, MS, with a group of other Venezuelan men who had also received final orders of removal. While detained, AL heard rumors about deportations to Guantanamo Bay and Mexico. During a call, he expressed to me his fear of being sent to either of those locations, especially since he had been threatened and robbed in Mexico during his initial journey to the United States.

11.     On or around February 20, 2025, AL, along with other Venezuelan men with final orders of removal, was transferred to Florence Service Processing Center in Florence, AZ, where they spent one night. ICE officers told AL and the other men that they were going to be deported to Venezuela. Instead, ICE took them on a bus to Nogales, AZ, where they were handed over to Mexican authorities. The Mexican authorities told the men they had been voluntarily expelled to Mexico, despite the men never having been told where they were going. The men then spent three days on a bus that transported them to Villahermosa, Mexico, near the Mexico-Guatemala border. AL did not have an opportunity to express fear of being deported to Mexico before his deportation.

12.     As AL's attorney of record on an ongoing BIA appeal, I was never informed of AL's deportation.

13.     AL was left in southern Mexico without any identification documents, which had been confiscated by ICE. While making every effort to remain undetected, AL traveled to Mexico City, where he is currently in hiding. He continually fears harm from gangs or militias, who he reasonably fears will assault and rob him, as they did during AL's initial journey to the United States.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 5th day of March 2025 at Albuquerque, NM.

_____
Tiffany Wang

## DECLARATION OF MARIE VINCENT, ESQ.

I, Marie Vincent, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a practicing attorney licensed in the State of California. My business address is 391 Sutter Street, Suite 500, San Francisco, CA 94108. I have been employed as an immigration attorney at Pangea Legal Services since 2013. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I have practiced exclusively in immigration law since 2012, representing hundreds of noncitizens in removal proceedings before the Executive Office for Immigration Review (EOIR) and federal courts and in applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services (USCIS).

3. I have represented many clients with final removal orders pursuant to 8 U.S.C. § 1229a (Section 240 proceedings) and/or by the Department of Homeland Security (DHS) pursuant to 8 U.S.C. § 1231(a)(5) (reinstatement orders) or 8 U.S.C. § 1228(b) (238b orders). In addition, I have represented many clients with fear-based claims in either removal or withholding-only proceedings.

4. I currently represent a client with documented cognitive and intellectual disabilities who was granted withholding of removal in 2018 and re-detained by the DHS in February 2025. This client is originally from El Salvador. Placed in Section 240 removal proceedings in 2006, he was ordered removed *in absentia* when he missed a hearing due to his disabilities. The 2006 removal order designated El Salvador as the country of removal. No alternate countries were designated.

5. In 2011, the DHS arrested the client and reinstated his 2006 removal order to El Salvador, but he was found to have a reasonable fear of persecution and/or torture, and was referred to an immigration judge ("IJ") for withholding-only proceedings. The client was detained by the DHS for 9 months in 2011 and was then released after a bond was paid. I was the attorney of record in these proceedings. In the course of his withholding-only proceedings, the IJ found him mentally incompetent and granted safeguards. The IJ subsequently concluded that the client was more likely than not to be persecuted in El Salvador on account of his family's political opinion, and granted him withholding of removal. Both parties waived appeal.

6. The client was not detained at the time he was granted withholding of removal in 2018. Between 2011 and 2025, he reported regularly to Immigration and Customs Enforcement ("ICE"), first about every 3 months, and then about every 6 months.

7. In February 2025, the client was re-detained at a scheduled reporting appointment with ICE. ICE did not provide any notice to my client or to me that he would be detained at

this appointment. While taking him into custody, ICE apparently served on my client a "Notice of Revocation of Release," but never provided this notice to me. The notice stated that ICE had made a "determination that there are changed circumstances in your case" but did not explain what the changed circumstances were. It also stated that "ICE has also determined that you can be expeditiously removed from the United States pursuant to the outstanding order of removal against you." However, the notice gave no explanation for where my client would be removed to, and did not acknowledge that he had been granted withholding of removal. I was able to obtain a copy of this notice only after contacting employees of the contract detention center where my client was being held and requesting copies of any documents he had in his possession.

8.  Starting on March 3, 2025, I contacted the Kansas and Chicago Enforcement and Removal Operations ("ERO") offices multiple times by phone and email in order to determine why my client was detained, and to which country ERO intends to deport him. I informed ERO that my client had documented cognitive disabilities, had been found incompetent by an immigration judge, and had a fear of return to other countries besides El Salvador.

9.  ERO initially refused to substantively respond to my questions or to provide the information requested. For example, in response to my question in an email asking "to what country ERO plans to deport" my client, an officer responded, on March 7, 2025, "will provide more details when information is available." At this point my client had already been in detention for more than 10 days.

10. After several requests for this information over the course of more than a week, ERO indicated in an email on March 11, 2025 that it served Form M-488 (handout on the reasonable fear interview) on my client. Although I asked for ERO to serve me with any copies of documents they had served on my client, they did not provide me a copy of this document or any other documents served on my client. When I responded and asked ERO to which country this document related to, ERO responded: "Costa Rica, Guatemala, Honduras, Mexico and Panama." ERO did not provide me requested information about when a reasonable fear interview would occur, and did not confirm that I would be notified prior to any interview. ERO also did not state that these were the countries—or the only countries—to which ERO was intending to seek removal. I also asked ERO whether any of the named countries had agreed to accept my client, but they entirely ignored my question.

11. My client was previously assaulted and threatened by armed individuals, including law enforcement officials, in Guatemala and Mexico because of his national origin and intellectual disabilities. He is vulnerable to being harmed in any third country because of his disabilities. He is unable to live alone without a trusted adult because he does not recognize danger. My client and his family also fear that if he is deported to any of the countries referenced by ERO, that country will deport him to El Salvador.

12. Based on my communications with ERO and their actions in detaining my client, I am concerned that my client will not have the opportunity to make a full fear claim from each country to which ERO intends to deport him, that he may be forced or coerced to waive his rights without notice to counsel, and that ERO will remove him without notice.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 13th day of March 2025.

Marie Vincent

## DECLARATION OF IAN AUSTIN ROSE

I, Ian Austin Rose, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.    I am a practicing attorney licensed to practice before the State of Maryland, as well as several federal courts. Since September 2021, I have been employed at Amica Center for Immigrant Rights, where I am currently a Managing Attorney. I am over the age of 18 and am competent to testify regarding the matters described below.

2.    Working within a department of Amica Center called the Immigration Impact Lab, I bring federal litigation on behalf of detained non-citizens along the East Coast. I focus on habeas petitions and class-wide detention litigation in federal district court. I also litigate Petitions for Review in the federal circuit courts.

3.    In my position, I frequently represent or supervise those representing non-citizens with final removal orders issued by an Immigration Judge (IJ) in removal proceedings under 8 U.S.C. § 1229a, non-citizens with reinstated removal orders issued by the Department of Homeland Security (DHS) pursuant to 8 U.S.C. § 1231(a)(5), and non-citizens with Final Administrative Removal Orders issued by DHS pursuant to 8 U.S.C. § 1228(b).

4.    I currently represent a non-citizen with a final removal order and a final grant of protection under the Convention Against Torture (CAT) whom Immigration and Customs Enforcement (ICE) appears to be attempting to remove to an alternative country not designated on his removal order. The client, who I will refer to as Rafael, is from El Salvador. He entered removal proceedings under 8 U.S.C. § 1229a (Section 240 proceedings) in April 2024 and has been in ICE detention since then. My colleague at Amica Center represented Rafael in his removal proceedings.

5.    In November 2024, an IJ granted Rafael CAT protection, blocking his removal to El Salvador due to the high risk he would be tortured there. The IJ designated El Salvador as the country of removal and deferred his removal there. No alternative country was designated. DHS waived appeal, rendering the removal order and CAT grant final in November 2024.

6.    As of today, March 17, 2025, Rafael remains in ICE custody despite winning CAT protection four months ago. In January 2025, ICE notified him in writing that he would receive a custody review under 8 C.F.R. § 241.4 on or about February 19, 2025. Rafael provided release information to ICE in advance of the custody review date, at which non-citizens in Rafael's situation are routinely released. However, one month later, neither Rafael nor his counsel have received a custody decision from ICE. Counsel has repeatedly followed up with ICE to inquire about the delay. Rafael's assigned Deportation Officer stated by email that ICE is looking for a "safe third country" to which to remove Rafael. He also said that he is waiting for information on next steps from his superiors.

7.      At the beginning of March, counsel sent an email to the Deportation Officer, along with other ICE officials, expressing Rafael's fear of returning to any alternative country due to the risk that the alternative country would in turn deport him to El Salvador. Rafael furthermore expressed a fear of return to specific countries surrounding El Salvador, including Mexico, Honduras, and Guatemala. Counsel requested that ICE provide her with notice of its intent to deport Rafael to a specific country, should it identify such a country. Two weeks later, no one from ICE has responded to the email. Rafael remains detained, unaware of whether ICE intends to remove him to an alternative country and, if so, which country that is.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 17th day of March 2025 at Washington, D.C.

_____
Ian Austin Rose

# DECLARATION OF LAURA JONES

I, Laura Jones, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.   I am a practicing attorney licensed to practice before the State of California. My business address is P.O. Box 70610, Oakland, CA 94612. I have been employed as an attorney at the Law Office of Helen Lawrence since 2021. I am over the age of 18 and am competent to testify regarding the matters described below.

2.   I have practiced exclusively in immigration law since being barred in January 2021, representing dozens of noncitizens in removal proceedings before the Executive Office for Immigration Review (EOIR), federal courts, state courts, and with applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services (USCIS).

3.   I have represented approximately five clients with final removal orders in removal proceedings pursuant to 8 U.S.C. § 1229a (Section 240 proceedings) or by the Department of Homeland Security pursuant to 8 U.S.C. § 1231(a)(5) (reinstatement orders). I have represented about 20 clients with fear-based claims in either removal or withholding-only proceedings.

4.   Before receiving a call from my client on March 3, 2025, I had never had one of my clients, who was granted withholding of removal or protection under the Convention Against Torture (CAT) and released from Immigration and Customs Enforcement (ICE) custody, be re-detained by ICE after appearing for a routine check-in with no new criminal conduct and threatened with deportation to a third country.

5.   I represent a client who I will refer to as J.R.R.. J.R.R. is from El Salvador. In May 2022 DHS issued a reinstatement order against him. After he demonstrated a reasonable fear of persecution in El Salvador to an asylum officer, ICE placed him in withholding-only proceedings before an immigration judge. The only country designated for removal was El Salvador.

6.   The immigration judge granted J.R.R's application for CAT protection on July 5, 2023. The judge found that if J.R.R. returns to El Salvador, he will be targeted by authorities and criminals under the current State of Emergency in El Salvador and would be imprisoned and tortured. The ICE attorney did not appeal the judge's decision, and it became final.

7.   From apprehension until he won CAT protection, J.R.R. was detained. After he won his case, he was finally released under conditions set forth in an Order of Supervision (OSUP) requiring him to periodically check-in with ICE in Santa Maria and with an ankle monitor. ICE removed the ankle monitor after his first check-in, about five days

post-release. His next check-in was three months after that, and the third check-in was five months after that. His subsequent check-ins were six months apart. J.R.R. was compliant with all the terms and conditions in his OSUP.

8.      J.R.R. reported to his ICE check-in on March 3, 2025 at the Santa Maria ICE Field Office, as he had been doing since July 5, 2023. When he was at the check-in, although he has no new criminal history, ICE detained him and told him he was going to be deported. He requested a call to me, his attorney, and asked where he would be detained, however was only provided with a general guess of likely Los Angeles. When I entered his information into the ICE detainee locator system, it yielded zero results.

9.      J.R.R. called me from detention in Santa Maria, California. I briefly spoke with an officer who told me they had taken him into custody so that he can be removed to a third country. I asked what country, and the officer would not tell me. I asked where they would be detaining J.R.R., and the officer said maybe Los Angeles, California, but provided no other information. After trying to get more information, the officer interrupted me and said he was handing the phone back to J.R.R. and refused further communication.

10.     Immediately after this phone call, I sent a letter on behalf of my client expressing fear of removal to eight other countries, in addition to El Salvador, including removal to: Mexico, Guatemala, Honduras, Costa Rice, Panama, Cuba, Belize, Nicaragua, as no third country had been designated yet. I sent the letter via email to LosAngeles.Outreach@ice.dhs.gov. I then called the Santa Maria Field Office to ensure that an officer saw the letter, however no one answered. I left a voicemail. The following day I called the detention center in Santa Maria and was told that J.R.R. had been transferred to Adelanto ICE Processing Center. I then emailed the Los Angeles Outreach email as well as #APCERO000-500@ice.dhs.gov, and #APCERO501-999@ice.dhs.gov with the same letter. DVFERORResponseice.dhs.gov@ice.dhs.gov responded that they received my G-28.

11.     On March 5, 2025, I had a confidential video meeting with J.R.R., and he told me he feared being deported to Mexico, as he is afraid that gangs will target him there and that Mexico will deport him to El Salvador, where he will be tortured.

12.     On March 7, 2025, after numerous requests, Officer Quevedo communicated that DHS was going to deport J.R.R. to Mexico.

13.     On March 7, 2025, I called the Adelanto Detention Center to speak with J.R.R. and was told by Officer Monroy that he had been deported. After numerous other calls and emails to the detention center, ICE, and the Office of the Principal Legal Advisor (OPLA), I discovered he had not been deported yet, but was in Florence, Arizona. I attempted to speak with him multiple times, but was only given access to J.R.R. on March 10, 2025. On March 10, 2025, in a confidential legal call, he told me that on March 7, 2025, around 3:00 am, ICE officers woke him while he was in the detention center in Adelanto. He reported that phone access was denied. Around 7:00 am, ICE officers loaded him onto a

bus but they did not tell him where he was going. Around 9:00 am, ICE officers loaded him onto a plane with about 37 other detainees, and they landed in El Paso, Texas. After about an hour, they were then taken to Florence, Arizona. On Saturday, March 8, 2025, immigration officers loaded two buses of people around 7:00 am. At this time, ICE officers told J.R.R. that he was being deported to Mexico. He screamed and demanded to see an immigration judge and talk to his attorney; he refused to get on the bus that would take him to Mexico. He also refused to sign any deportation order and was taken back to the detention center.

14.  On March 10, 2025, I filed an Emergency Motion to Reopen and Stay Request with the Adelanto Immigration Court, including a declaration from J.R.R. articulating his fear of deportation to Mexico, attached to this declaration as Exhibit A. I also emailed a copy to the Office of the Principal Legal Advisor (OPLA, attorneys with ICE who represent DHS in immigration court proceedings) and the ICE officers in Arizona and Los Angeles. On March 10, 2025, Officer Quevedo stated that they would wait and see the IJ's decision on the Motion to Reopen.

15. On March 11, 2025, Immigration Judge Halperin denied the Motion to Reopen and Motion to Stay Removal. A copy of that decision is attached as Exhibit B. Contrary to Ninth Circuit law, IJ Halperin refused to reopen the case. I then filed a Notice of Appeal and accompanying Emergency Motion to Stay Removal with the Board of Immigration Appeals. It remains pending. I also emailed Los Angeles OPLA, Los Angeles Asylum Office, among others to request a Reasonable Fear Interview (RFI) for J.R.R. because he fears persecution and torture in Mexico. An ICE deportation officer named E. Navarro from the Los Angeles Field Office responded the same day, March 11, 2025. Officer Navarro indicated that ICE had received the RFI request and that J.R.R. would transferred back to Adelanto. As of March 18, 2025, J.R.R. has been returned to the Adelanto Detention Center in California; no RFI has yet been scheduled.

11.    J.R.R. is fearful of being removed to Mexico for several reason. Mexican authorities could deport him back to the El Salvador where he won protection from removal, as it is more than likely his own government would torture him there. Additionally, due to his criminal background and gang-affiliated background, he is at a similar risk of persecution or torture if removed to Mexico.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 18th day of March 2025 at Oakland, California.

_____
Laura Riley Jones

### DECLARATION OF ███████████

I, ████████████, hereby declare and state:

1.      I make this declaration in support of my emergency request to reopen removal proceedings based on my fear of being deported to Mexico and my emergency request to stay deportation.

2.      I won protection from deportation to El Salvador in July 2023.

3.      When I attended my ICE check in in Santa Maria, CA on March 3, 2025, I was detained and told I was going to be deported to a third country.

4.      I am afraid of deportation to Mexico. I am afraid because I was associated with MS-13, and they are present in Mexico. You cannot just leave a gang; the current gang members will punish you for defecting through torture and death. I am also very afraid that Mexico will deport me back to El Salvador where my own government will torture or kill me. I will be hurt or killed by MS-13 gang members, other gangs' members, or the government of Mexico or El Salvador.

5. I am not a Mexican citizen.


I declare under penalty of perjury that the foregoing statement is true and correct to the best of my own personal knowledge. Executed this 5 day of March at Adelanto, CA.



1



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**ADELANTO IMMIGRATION COURT**

Respondent Name:

    RODAS-RODAS, JOSE

To:

    Jones, Laura Riley
    P.O. Box 70610
    Oakland, CA 94612

A-Number:
099540169
Riders:
In Withholding Only Proceedings
Initiated by the Department of Homeland Security
Date:
03/11/2025

## ORDER OF THE IMMIGRATION JUDGE

EMERGENCY MOTION TO REOPEN BASED ON DHS'S INTENT TO DEPORT
RESPONDENT TO MEXICO WITHOUT AN OPPORTUNITY TO CONTEST REMOVAL
BASED ON HIS FEAR OF PERSECUTION AND TORTURE
AND
EMERGENCY MOTION TO STAY REMOVAL PENDING
ADJUDICATION OF RESPONDENT'S FEAR-BASED CLAIMS.

Respondent was granted protection under the United Nations Convention Against Torture
(CAT) on July 5, 2023, which prevents Respondent's deportation to El Salvador. The
regulations provide that the Immigration Judge is charged with identifying the country to which
the respondent's removal may in the first instance be made pursuant to the provisions of section
241(b) of the Act. 8 C.F.R. § 1240.12(d). The Immigration Judge identified El Salvador as the
country of removal in the first instance, and there is no dispute as to the propriety of that order
of removal.

On March 7, 2025, the Department of Homeland Security (DHS) informed Respondent that it
intends to remove Respondent to Mexico. During his removal proceedings, the
Immigration Judge (IJ) only designated El Salvador as a country of removal, and did not
designate Mexico or any other countries, as either the country of removal or an alternative
country of removal. Respondent has not meaningfully argued that he is a native or citizen of
Mexico, or that he has "resided" in Mexico. See INA Section 241(b)(2)(B) (permitting the
Immigration Judge to place limitations on designations of certain contiguous countries,
including Mexico). Immigration Judges nor the Board of Immigration Appeals have
jurisdiction to review any determination by officers of the DHS under 8 C.F.R. § 241.15
regarding the country of removal. See 8 C.F.R. § 1241.15. See also Execution of
Removal Orders; Countries to Which Aliens May Be Removed, 70 Fed. Reg. 661 et. seq. (Jan.
5 2005).

Nothing in this order forbids DHS from acting on its own authority to designate a

country, or forbids the parties from litigating that issue in any forum outside of the Executive
Office of Immigration Review.  The Court declines to Sua Sponte Reopen this matter.

**Order:**

Motion is DENIED.

Immigration Judge: HALPERIN, RAVIT 03/11/2025

Appeal:    Department of Homeland Security:  ☐  waived   ☐  reserved
           Respondent:                       ☐  waived   ☐  reserved

Appeal Due:

## Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable
To: [ ] Noncitizen | [ ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS
Respondent Name : █████████████ | A-Number █████████
Riders:
Date: 03/11/2025 By: BOUWHUIS, BRITTANY, Court Staff

Appx.077

## DECLARATION OF LESLIE PARRA

I, Leslie Parra, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a practicing attorney licensed to practice before the State of Texas. My business address is 314 E. Highland Mall Blvd, Ste. 501, Austin, Texas 78752. I have been employed as a staff attorney at American Gateways since November 2021. I am over the age of 18 and am competent to testify regarding the matters described below.

2. I have practiced exclusively in immigration law since 2019, representing at least a hundred noncitizens, both in removal proceedings before the Executive Office for Immigration Review (EOIR) and noncitizens applying for immigration benefits with U.S. Citizenship and Immigration Services (USCIS). I have also provided pro se assistance to many more noncitizens.

3. Many of my clients and the pro se applicants I assisted applied for asylum, withholding of removal, or protection under the Convention Against Torture in removal proceedings. Several of these individuals also had had final orders of removal that were issued in removal proceedings under 8 U.S.C. 8 U.S.C. § 1229a (Section 240 proceedings) or by the Department of Homeland Security pursuant to 8 U.S.C. § 1231(a)(5) (reinstatement orders).

4. Until last month, I had never seen a case in which a non-citizen was removed to a country other than their country of nationality/the designated country of removal. However, in late February, one of my clients—a Venezuelan man—was removed to Mexico.

5. Prior to my representation, my client applied for asylum and withholding of removal pro se in Section 240 proceedings, while in ICE custody. I believe that Venezuela was the only designated country of removal. His application was denied, and he was issued a final order of removal in December 2023. In February 2024, he was released on an Order of Supervision, which required him to check-in with ICE.

6. I represented this client in his application for Temporary Protected Status (TPS), which was filed in February 2024. Since the client was prima facie eligible for TPS, he was entitled to "temporary treatment benefits" pursuant to 8 U.S.C. § 1254a(a)(4). Temporary treatment benefits include a work permit, which he received in April 2024, and an automatic stay of deportation while the TPS application is pending (unless the executive publishes notice of the termination of the country's designation). 8 C.F.R. §§ 244.13, 244.10(e)(2).

7. My client was re-detained at the beginning of December 2024 after reporting for a scheduled ICE check-in appointment. He remained detained by ICE for almost three

months before he was abruptly removed to Mexico in late February 2025 even though his TPS application was pending at the time.

8. Based on what he has told me when I spoke with him after the deportation, my client was not given advance notice of this removal to Mexico, nor was he given an opportunity to contest removal or express a fear of removal to Mexico.

9. The client remains in Mexico today. I have had limited communication with him because he is transient. He does not have money or a phone—DHS refused to return his phone to him upon removal. My understanding is that he is traveling on top of a train to the interior of the country, which is presumably safer than the border region. I am very concerned for his safety given high rates of violence and discrimination against migrants in Mexico.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 18th day of March 2025 at Austin, Texas.

Leslie Parra

## DECLARATION OF DANIELA HERNÀNDEZ CHONG CUY

I, Daniela Hernández Chong Cuy, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.  I am a practicing attorney licensed to practice before the State of California. My business address is 680 E Colorado Blvd. Suite 180, Pasadena, California. I have been employed as founder and directing attorney at the Law Office of Daniela Hernández Chong Cuy since 2020. I am over the age of 18 and am competent to testify regarding the matters described below.

2.  I have practiced exclusively in immigration law since 2018, representing hundreds of noncitizens in removal proceedings before the Executive Office for Immigration Review (EOIR) and with applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services (USCIS). I have been Qualified Representative with the National Qualified Representative Program (NQRP), a program that provides legal representation to individuals found to be mentally incompetent to represent themselves, since 2018 and my office has been a legal service provider for NQRP since our office's inception in 2020.

3.  I represent individuals with final removal orders in removal proceedings pursuant to 8 U.S.C. § 1229a (Section 240 proceedings) and final removal orders issued by the Department of Homeland Security pursuant to 8 U.S.C. § 1231(a)(5) (reinstatement orders) or 8 U.S.C. § 1228(b) (238b orders).

4.  I represent Ms. M, a woman from Somalia who previously had lawful permanent resident (LPR) status, through NQRP, after she was deemed incompetent to represent herself in removal proceedings by an Immigration Judge (IJ). Ms. M had prior proceedings, but I began representing her in August 29, 2024. At that time, DHS had issued Ms. M a Notice to Appear (NTA) on July 25, 2024, placing her in Section 240 removal proceedings.

5.  On January 30, 2025, the IJ ordered Ms. M removed but granted her deferral of removal to Somalia, a form of protection under the Convention Against Torture (D-CAT). She was granted protection on the basis that it is more likely than not that she would be tortured if returned to Somalia, due to her serious mental illness, her gender, and her membership in a minority ethnic group.

6.  The IJ designated Somalia as the country of removal in those proceedings. At the end of Ms. M's individual hearing, DHS, without any prior notice, attempted to also designate Kenya as a country of removal, but the IJ expressly denied their request on the record, stating that there was no basis to do so at that stage of the proceedings.

7.  DHS waived appeal and the order became final on January 30, 2025.

Exhibit 080
Appx1080

8.   Ms. M has been in immigration detention since February 2024. For individuals who are part of NQRP, after they have won relief or protection in removal proceedings, U.S. Immigration and Customs Enforcement (ICE) must follow its safe release policy to ensure that the individual's transportation and other needs are provided for before release. As part of this process, Megan Hope, MSW, from Mariposa Legal, an NQRP legal service provider, with whom I worked on this case for post release planning, prepared a safe release plan for Ms. M after we received the order in her case and submitted it to Deportation Officer Shane Blea, the ICE officer working on Ms. M's case on February 4, 2025. Both Megan and I also sent several follow up messages to Officer Blea and/or a supervising officer, on February 7, 11, and 18, 2025.

9.   On February 16, 2025, Ms. M told us that she spoke Officer Blea, who told her that ICE was making arrangements for her removal.

10.  On February 19, 2025, I heard back from Officer Blea for the first time. The Officer told me that he was required to look for two other countries that Ms. M could be removed to, and that ICE had started that process, but he could not provide a timeline of when it would be complete. On February 21, 2025, we responded explaining that Ms. M had no status in any other country and again providing the release plan.

11.  On February 21, 2025, Ms. M called us to explain that Officer Blea had asked her if there were any other countries that she wanted to be removed to and that she told him no. Officer Blea told her that ICE was working on her case that day.

12.  On February 25, 2025, we again emailed Officer Blea regarding the safe release plan. On February 27, 2025, he responded and stated that, on February 26, he had submitted requests for acceptance to three countries to which Ms. M might or might not be removed and that those countries had 30 days to accept or decline. He did not specify what three countries he was referring to. He wrote that he could not move forward with release until the end of the 30-day period or once he had heard back from all three countries.

13.  That same day, we wrote to Officer Blea asking what three countries he had contacted. Then, on February 28, 2025, I submitted a letter to ICE, explaining Ms. M's fear of deportation to a third country, including Kenya or other African countries, El Salvador, Panama, or Costa Rica.

14.  On March 6, 2025, I spoke to Ms. M by telephone. She said that, on February 26, 2025, she had spoken to a different ICE officer who told her ICE had to try a different list of three countries where she might be removed. She told them that, if she had to be removed, she asked to be removed to Canada, France, or Poland. The officer told her that they were trying to remove her to Panama, Guatemala, or Nicaragua, but Guatemala had already declined.

15.  On that same day, I wrote to ICE with an update to the February 28 letter, explaining that Ms. M had a fear of deportation to Nicaragua and reiterating her fear of deportation to Panama or Guatemala. At no point has ICE acknowledged receipt of the letter or update

or given any response or indication that Ms. M will be provided with an opportunity to seek protection from deportation to a third country.

16.  Ms. M has a fear of being deported to a third country. She is afraid that she will be deported from any third country back to Somalia, where she will be tortured or killed. She also fears that she will not be able to survive if deported to a third country, given her unique and serious vulnerabilities, including serious mental health issues which have led to her being unhoused for more than 16 years. Her family, including U.S. citizen father and siblings, live in the United States.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 19th day of March 2025 at Los Angeles, California.


_____
Daniela Hernández Chong Cuy

## DECLARATION OF ZOEY JONES

I, Zoey Jones, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.     I am a practicing attorney licensed to practice before the State of New York. My business address is 177 Livingston Street, Floor 7, Brooklyn, New York 11201. I have been employed by Brooklyn Defender Services since September 2014. I am currently the Interim Director of the Immigration Practice. I am over the age of 18 and am competent to testify regarding the matters described below.

2.     I became a licensed attorney in 2012 and have practiced exclusively in immigration law since September 2014. I have represented more than one hundred noncitizens in removal proceedings before the Executive Office for Immigration Review (EOIR), the United States district courts, and the United States Court of Appeals for the Second Circuit. I have also filed hundreds of applications and petitions for immigration benefits and relief with U.S. Citizenship and Immigration Services (USCIS).

3.     In my capacity as Interim Director, I supervise a team of immigration lawyers who represent individuals before EOIR and USCIS. This team frequently represents noncitizens who have final removal orders issued pursuant to 8 U.S.C. § 1229a (Section 240 proceedings) and final removal orders issued by the Department of Homeland Security pursuant to 8 U.S.C. § 1231(a)(5) (reinstatement orders). Statements by Immigration and Customs Enforcement (ICE) officers and recent events have led us to believe that some of these individuals are at high risk of removal to a nondesignated country where they fear persecution and torture. Some of these individuals are described below. All individuals are referred to by pseudonym.

4.     AA was arrested by ICE and placed in withholding-only proceedings after ICE issued a reinstatement order. The only country designated for removal was Honduras. AA was released from ICE custody after paying bond. In 2024, AA was ordered removed to Honduras but was granted withholding of removal to Honduras. No appeals were filed. AA was not required to report to ICE following the grant of withholding of removal. Recently, however, a deportation officer ordered AA's family to report to ICE on a date in April and to bring valid passports and all immigration documents. ICE's order to report is highly unusual given that AA has a final grant of withholding of removal, was not already reporting to ICE, and has not incurred any new arrests. I believe this order to report may indicate that ICE intends to remove AA to a nondesignated country. AA fears persecution and torture if removed to El Salvador, Mexico, Honduras, and Guatemala. AA also fears removal to an unknown country that may in turn deport AA back to Honduras, where AA is likely to be persecuted and tortured.

EXHIBIT.083
App. 083

5.      BB is from El Salvador. BB was arrested by ICE and placed in Section 240 proceedings. Only El Salvador was designated as a country of removal. In 2024, BB was ordered removed to El Salvador but was granted withholding of removal to El Salvador. No appeals were filed. In February 2025, ICE ordered that BB request travel documents from three specific consulates for nondesignated countries. Because BB was ordered to do so, BB complied with the request but has been unable to obtain travel documents to any of the nondesignated countries. BB nevertheless fears persecution and torture if removed to any of these three countries. BB also fears persecution and torture if removed to an unknown country that may in turn deport BB back to El Salvador, where BB is likely to be persecuted and tortured. ICE has not confirmed that it will refrain from removal to a nondesignated country where BB fears harm nor that it will comply with its other obligations concerning removals to nondesignated countries.

6.      CC is from Venezuela. CC was arrested by ICE and placed in Section 240 proceedings. The only country designated for removal was Venezuela. CC was ordered removed to Venezuela in 2024. CC remains in ICE custody. CC has cooperated with ICE's attempts to obtain travel documents to Venezuela but has not been removed to Venezuela. ICE recently informed CC that CC would be "placed on a plane" but did not state to which country. CC fears that ICE intends to remove CC to the nondesignated country of El Salvador, as they recently admitted doing to hundreds of other Venezuelan individuals with final orders of removal on March 15 and 16. CC fears persecution and torture in El Salvador. Our office notified ICE of CC's fears of removal to these nondesignated countries and reminded ICE of its obligation to notify CC of the country to which CC will be removed and to reopen CC's proceedings if removal is intended to one of those countries. ICE has not confirmed that it will refrain from removal to a nondesignated country where CC fears harm nor that it will comply with its other obligations.

7.      DD is from Venezuela. DD was placed in Section 240 proceedings. The only country designated for removal was Venezuela. In 2024, DD was ordered removed to Venezuela. DD is currently in ICE custody. DD has cooperated with ICE to obtain travel documents to Venezuela but nevertheless has not been removed to Venezuela. Recently, DD was transferred to a detention facility in Texas without notice to DD or DD's counsel. Based on recent events, I believe this may signal ICE's intent to remove DD to El Salvador or another nondesignated country, as they recently admitted doing to hundreds of other Venezuelan individuals with final orders of removal on March 15 and 16. DD fears persecution and torture in El Salvador. DD also fears persecution and torture in Honduras and Panama. Our office notified ICE of DD's fears of removal to these nondesignated countries and reminded ICE of its obligation to notify DD of the country to which DD will be removed and to reopen DD's proceedings if removal is intended to one of those countries. Subsequently, an immigration judge granted our motion to reopen DD's proceedings and stayed DD's removal. ICE has not confirmed that it will refrain

2

from removal to a nondesignated country where DD fears harm nor that it will comply with the Immigration Judge's order staying removal.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 19th day of March, 2025, at Brooklyn, NY

_____
Zoey Jones

3

## DECLARATION OF DANIELLE STRANDBURG-PESHKIN

I, Danielle Standburg-Peshkin, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am a practicing attorney licensed to practice before the State of New York, Second Judicial Department since September of 2019. I have been employed by the Newark, New Jersey-based Immigrant Rights Program of the American Friends Service Committee (AFSC) since March of 2019 – initially as a law graduate and then as a staff attorney. My business address is 570 Broad Street, Suite 1001, Newark, New Jersey 07102. I am over the age of 18 and am competent to testify regarding the matters detailed below.

2.      Since September of 2019, I have practiced exclusively immigration law. Over the past six years I have thus provided *pro bono* legal counsel and/or representation to hundreds of noncitizens in a range of immigration matters, including in removal proceedings before the Executive Office for Immigration Review (EOIR), in petitions before the federal circuit courts, in advocacy and coordination with U.S. Immigration and Customs Enforcement (ICE) in regards to custody and detention status, and in applications and petitions for immigration benefits, relief, or protection with U.S. Citizenship and Immigration Services (USCIS).

3.      During the past years I have provided representation or legal counsel to over fifty detained non-citizens with final orders of removal. Over forty of these individuals with final orders raised fear-based claims for relief or protection from removal.

### *Y-M-R-*

4.      My client Y-M-R- is Venezuelan. In 2023, he fled Venezuela because of fear of harm on account of his actual and imputed political opinion opposing the current national government, and because of direct threats made against him by an officer in the Venezuelan military. En route to the United States, Y-M-R- traveled through Mexico, arriving in about October of 2023. Pursuant to United States policy at that time, Y-M-R- waited near the US-Mexico border for over a month, at the outset of which time he registered for an appointment via the "CBP One" phone application but did not receive an appointment. While in Mexico, YMR was aware of frequent kidnappings of other Venezuelans and migrants by border-area Mexican criminal organizations and also of the complicity of Mexican authorities in this violence. In addition, YMR had no manner to retain shelter or support himself as he had no legal status in Mexico or manner to seek lawful employment. Y-M-R- thus crossed the US-Mexico border without admission on or about November 14, 2023. He was apprehended by immigration officers shortly after entering the United States and seeking to present himself.

5. While detained in Laredo, Texas, Y-M-R- requested and was given a fear interview. At the time of the interview, the law restricted asylum relief for individuals who crossed the U.S.-Mexico border and did not meet a limited set of exceptions, one of which was if they faced an extreme and imminent threat to their life and safety in Mexico. During his interview with the asylum officer while detained in Texas in November of 2023, Y-M-R- was asked questions

about his experiences in Mexico, but he was never given a full fear interview with respect to his fear of persecution and/or torture in Mexico.

6. Shortly after the interview, Y-M-R- was informed that he had not made a threshold fear showing. He was not given a copy of the officer's determination. As required, he was given the opportunity to request review by an Immigration Judge. At the review, on November 27, 2023, the Immigration Judge, sitting in Laredo, Texas, issued a decision affirming the asylum officer's negative fear finding and affirming YMR's order of removal to Venezuela.

7. Following the decision, Y-M-R- was transferred to several additional ICE facilities over the course of the next nearly five months. In or around the first week of April of 2024, Y-M-R- was one of several Venezuelans in comparable procedural posture transferred to the Elizabeth Contract Detention Facility ("ECDF") located in Elizabeth, New Jersey.

8. I engaged in an initial interview and legal consultation with Y-M-R- shortly after his arrival at ECDF, on April 11, 2025. I then agreed to represent Y-M-R- in advocacy to ICE regarding his custody status and to request that the Department consider the regulatory violations in his fear process as basis for the issuance of a Notice to Appear in removal proceedings, as an exercise of discretion. At the time, and since February of 2024, Venezuela had not accepted deportation flights from the United States.

9. Within an email sent to ICE Enforcement and Removal Operations Supervising Deportation Officer Ian Patel on April 14, 2024, I stated that "[a]s in the cases of numerous other Venezuelans in comparable procedural posture, the credible fear process which Y-M-R- was given towards the outset of his detention was rife with regulatory and legal violations. *That said, he fears return to Mexico*, and his deportation to Venezuela is far from imminent where that country has not accepted US deportations for over two months at this time" (emphasis added).

10. While ICE did not respond substantively to the request for discretionary intervention in regards to Y-M-R-'s procedural posture, because of the agency's inability to deport Y-M-R- to Venezuela, he was released from ICE custody just over a month later, on or around May 18, 2024, on an Order of Supervision (OSUP).

11. To my knowledge, in the nine-month period following Y-M-R-'s release he complied with the terms and conditions in the OSUP, including reporting requirements. On about February 26, 2025, I learned from Y-M-R-'s sister that Y-M-R- had been re-detained at a routine ICE check in appointment and had since been deported to Mexico.

12. On February 27, 2025, I communicated directly with Y-M-R- who confirmed that he had been deported to Mexico. He said that he was taken with a group of about 50 other detainees who were citizens of a range of countries in Central and South America, including El Salvador, Honduras, Colombia, and Venezuela. He said they were first transferred to Arizona and then, from Arizona, they were put into three buses and driven to the US-Mexico border. He said that they were given no documents and were not notified of the Department's intention to deport them all to Mexico until the buses had reached the US-Mexico border. They were then driven to Villahermosa, Mexico, where they were told to disembark the buses and were left without any

identification or other forms of documentation. Y-M-R- had entered the United States with his Venezuelan identity card and had had that identification confiscated by ICE upon his 2023 apprehension. The card was not returned to him upon his deportation.

13. As noted, ICE provided Y-M-R- with no notice that he was to be deported to Mexico. Had Y-M-R- been provided notice, he would have re-asserted his fear of deportation to that country – a fear he had already expressed in his interview with an asylum officer in November of 2023, to an Immigration Judge in that same month and year, and to an ICE officer via counsel in email correspondence prior to his release on OSUP, in April of 2024.

14. Because Y-M-R- was left in Mexico without identity documents – a situation he stated was shared by many of the other third country nationals transported with him – he found himself in a situation where he felt endangered by criminal organizations in Villahermosa and was unable to travel to Mexico City to seek identity documents that might assist him in travelling to any other location or otherwise beginning to seek shelter and safety or rebuild any type of life.

***C-V-***

15. C-V-, a former client, is also from Venezuela and was also recently removed to Mexico without notice. CV and his family fled Venezuela after being threatened and assaulted by Venezuelan intelligence officials both for their actual and imputed anti-government political opinion and for his wife's work with a United States-based nongovernmental organization.

16. *En route* to the United States, CV traveled through Mexico on a bus which was stopped by armed men who demanded payment of $500 from the passengers and, for those who could not pay, held the individuals, including CV, against their will alongside the bus for approximately 8 hours before eventually releasing them. In light of this experience and having witnessed others kidnapped, CV did not wait to obtain an appointment but crossed the US-Mexico border on or about September 20, 2023.

17. After entering the United States, CV presented himself to US immigration authorities in the South. He was transferred to ECDF on or about October 2, 2023. On or about October 18, 2023, CV was interviewed telephonically by a USCIS asylum officer regarding his fear of persecution and/or torture in Venezuela.

18. Under the heightened standard of review in effect at that time, like Y-M-R-, CV was not successful in proving to the asylum officer that he had a credible fear of persecution in Venezuela. On October 31, 2023, an immigration judge in Elizabeth, New Jersey affirmed the asylum officer's decision. Because ICE was not able to deport CV to Venezuela at the time, he remained detained for the next five months. During this time, he was transferred to Florida and then back to New Jersey. Prior to his release, in about March or April of 2024, ICE officials presented CV with what they communicated was a document, in English, declaring that CV did *not* have a fear of removal to Mexico. CV refused to sign this document.

19. In light of the inability to remove CV, in April of 2024 CV was released on an order of supervision, with an address and plan for supervision by ISAP in Miami, Florida.

20. For the entirety of his time on OSUP, CV was entirely compliant, including by participating in in-person ISAP appointments approximately once every three weeks in addition to approximately weekly photographic and/or telephonic check-ins.

21. During this time, CV's family, who were in Colombia, completed processing for refugee resettlement in the United States, which they were granted in January of 2025. Accordingly, CV informed the ICE agents supervising his release of his intended move to New Jersey to reunify with his family, who would be arriving there. In or around early January of 2025 CV received ICE permission to move and traveled to New Jersey on January 26, 2025.

22. CV's wife and children arrived in New Jersey on or about January 17, 2025. After just two days of reunification with his wife and two minor children, CV attended his scheduled post-move appointment with the ICE-ERO field office in Newark on or about January 28, 2025. He was accompanied by his 10-year-old daughter and was given no advance notice of the possibility of re-detention. CV was detained directly from this appointment – a family friend had to be called to collect his daughter from the waiting area of the ICE-ERO floor of the Newark Federal Building.

23. Upon re-detention, CV was held in Elizabeth, New Jersey, for two days, after which he was transferred to Virginia, where he was held for 19 days, to Louisiana, where he was held for about one day, and then to Port Isabel, Texas, where he was held until February 22, 2025.

24. On or about February 23, 2025, CV recalled that officers entered the dorm in Port Isabel in the early morning hours and yelled for him and others to get up and told them they'd be moving. CV asked where he would be going and did not get a response. Officers restrained CV and the other detainees also transported with him and put them into buses.

25. In the buses, CV recalls that there were people of nationalities including Honduran, Nicaraguan, Venezuelan, Haitian, and Salvadoran. He recalls that the passengers asked questions as to where they were being taken and were not given answers until they arrived to the bridge leading to Reynosa. He recalls that people on the buses saw what was happening and started to shout that they didn't want to be sent to Mexico, that they are not Mexican, and that they were afraid. He recalls that there were women and children on the buses, as well as people in poor medical condition. Of the Venezuelans with CV, one stated that he had United States work authorization and a social security number. Another woman said she had a United States citizen 1-year-old.

26. Had officers told CV he was to be deported to Mexico with sufficient notice to allow him to request a fear interview, CV would have done so. CV's wife had reached out to numerous advocates and had retained separate *pro bono* counsel for him and for the family by the time of CV's removal, but due to the lack of notice of the planned removal to Mexico, neither CV's counsel, nor my organization, nor his family or other advocates were able to intervene.

27. CV states that he and 84 other third country nationals removed on United States buses were left in Villahermosa, Tobasco, Mexico. CV's Venezuelan identity card was returned to him, but he, as well as the 83 others, were not left with any money or manner to sustain them. He recalls

that they were shown a paper stating that they could not re-enter the United States for a period of time, but the paper was then taken from them.

28. CV states that the area where they were left – and the manner in which they arrived – placed the third country nationals, including CV, at extreme risk of violence by Mexican criminal organizations who targeted the group in the days thereafter. Among those targeted were two young Venezuelan men, one of whom had been in CV's dorm with him in Port Isabel. The men were kidnapped by a Mexican criminal organization.

### *L-R-M-*

29. I provided a limited *pro bono* consultation to a third Venezuelan man, L-R-M-, on or about February 25, 2025, during which time L-R-M-, previously a New Jersey resident, had been transferred to the South Texas ICE Detention Facility.

30. Like Y-R-M- and C-V-, L-R-M- was detained by ICE in Newark when he appeared for a check-in appointment, despite his full compliance with the terms of his supervised release for nearly the entire year prior. By the time I spoke with L-R-M- I had already become aware of the possibility of third-country deportation, and was informed by L-R-M- of his fear of the possibility of being deported to Mexico. In light of this, and because I was not representing L-R-M-, I advised that he write to ICE to expressly state his fear of removal to Mexico and any other potential country of removal about which he had fear.

31. On about February 28, 2025, I communicated with L-R-M-'s relative in Trenton, New Jersey, who stated that, in response to attempts by L-R-M- and another Venezuelan detainee to contest their potential removal to Mexico and expressly state fear, they had been told by an official that if they did not consent to removal to Mexico, they would be sent to Guantanamo.

32. I have not spoken with L-R-M- since that time but my understanding from communication with his relative is that--in light of this threatened punishment, which he understood to indicate potential indefinite detention – and in light of pressing health concerns, he consequently withdrew his fear claim in regards to Mexico.

33. I last checked the ICE detainee locator for L-R-M-'s status on March 17, 2025, at which time he had been transferred to the federal detention facility in Lasalle, Louisiana.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 19th day of March, 2025, in Brooklyn, New York.

_____
Danielle Standburg-Peshkin

## DECLARATION OF DENISE ACEVEDO PEREZ

I, Denise Acevedo Perez, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.    I am a practicing attorney licensed to practice before the States of Massachusetts and Rhode Island. My business address is 1395 Atwood Avenue, Suite 206, Johnston, RI. I am the founding Attorney of the Rhode Island Immigration and Family Law Group since August 2021. I am over the age of 18 and am competent to testify regarding the matters described below.

2.    I have practiced immigration law since 2015 representing dozens of noncitizens in removal proceedings before the Executive Office for Immigration Review (EOIR) and federal courts and/or with applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services (USCIS).

3.    I represent and have represented individuals with both final removal orders in removal proceedings pursuant to 8 U.S.C. § 1229a (Section 240 proceedings); and final removal orders issued by the Department of Homeland Security (DHS) pursuant to 8 U.S.C. § 1231(a)(5) (reinstatement orders).

4.    I represent S.M., a 57-year-old native of Laos. S.M. is married to a United States citizen and has a child who is also a United States citizen. S.M. is currently in DHS custody. S.M. has a 1998 final order of removal from removal proceedings. DHS was unable to deport S.M. to Laos. DHS permitted S.M. to continue living and working in the United States.

5.    S.M. is currently detained in a detention facility in Florida; S.M. was detained when returning from a family trip to a United States territory in February 2025. I have been communicating with S.M. through the spouse. DHS has not authorized attorney phone calls despite S.M.'s official request to add me to the call list and my submission of an executed Notice of Entry of Appearance as Attorney (Form G-28) to the DHS case manager. DHS asked S.M. which country S.M. would like to be removed to, S.M. has requested to remain in the United States. DHS has not provided S.M. with any information about the country or countries DHS is pursuing for deportation . S.M. is afraid of not knowing this information, including because S.M. fears being deported to many countries in Central America and of being detained in those countries, as had been widely reported.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 20th of March 2025 at Johnston, Rhode Island.

Denise Acevedo Perez

EApp.091

## DECLARATION OF LAURA BELOUS

I, Laura Belous, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a practicing attorney licensed to practice before the States of Arizona. My business address is PO Box 86299 Tucson, AZ 85754. I have been employed as an attorney at the Florence Immigrant & Refugee Rights Project (FIRRP) between 2010 and 2012 and since 2013. I am over the age of 18 and am competent to testify regarding the matters described below.

2. FIRRP is a non-profit 501(c)(3) organization that provides free legal and social services to the thousands of adults and children detained in immigration custody in Arizona on any given day. The Florence Project was founded in 1989 to provide free legal services to asylum seekers and other migrants in a remote immigration detention center in Florence, Arizona where people had no meaningful access to counsel. The Florence Project has expanded significantly since that time and now provides free legal and social services, including legal orientation program services, to thousands of detained adults. We also provide legal and social services to unaccompanied children throughout Arizona. As the only 501(c)(3) non-profit organization in Arizona dedicated to providing free legal and social services to people in immigration detention, our vision is to ensure that every person facing removal proceedings has access to counsel, understands their rights under the law, and is treated fairly and humanely.

3. Between 2010 and 2012, I had an Equal Justice Works fellowship with FIRRP and provided representation to detained noncitizens with mental health disabilities in Eloy and Florence, Arizona. During the fellowship, I represented about 50 individuals before the Executive Office for Immigration Review (EOIR) and United States Citizenship and Immigration Services (USCIS). In 2013, I was hired at FIRRP to mentor pro bono attorneys representing unaccompanied immigrant children in removal proceedings. I then became the managing attorney of FIRRP's Tucson office in 2014 and represented hundreds of unaccompanied immigrant children before EOIR, USCIS, and the Pima County Juvenile Court. In 2019, I moved to FIRRP's advocacy team and began representing clients before federal district court on habeas, Federal Tort Claim Act, and other related matters. I maintain active communication with our direct services teams about ongoing case work and offer consultation services with those teams on their case work as needed. I have also represented individuals before EOIR and USCIS in my current position.

4. Throughout my career, I have represented individuals with both final removal orders in removal proceedings pursuant to 8 U.S.C. § 1229a (Section 240 proceedings) and final removal orders issued by the Department of Homeland Security pursuant to 8 U.S.C. § 1231(a)(5) (reinstatement orders) or 8 U.S.C. §

EXhibit 092
App.1092

1228(b) (238b orders)

5.  In January 2025, I filed a petition for habeas corpus for a Honduran man pursuant to *Zadvydas v. Davis,* 533 U.S. 678 (2001). At the time of filing, the client, S.M.V., had been detained for nearly a year after his reinstated removal order to Honduras became final because ICE had been unable to deport him there. Not long after filing the petition, the Assistant U.S. Attorney (AUSA) assigned to the case called my co-counsel and asked if we would be willing to dismiss the case because ICE was going to deport S.M.V. to Mexico that evening or the following day. We informed her that we suspected that S.M.V. had not received any notice of his planned removal. When we were finally able to speak to S.M.V. that night, he confirmed that he had not received any notice and indeed feared return to Mexico because he had been kidnapped and assaulted there in the past. We had to file an emergency temporary restraining order with the district court to stop removal to Mexico, after which ICE agreed to allow S.M.V. the opportunity to voice a fear claim to Mexico and ask the asylum office to screen his fear. That interview was scheduled about two weeks later. S.M.V. ultimately decided to withdraw his claim to Mexico because he felt that he could no longer bear to be detained, having been in ICE detention for more than a year already. Had the AUSA not told my co-counsel in passing that the client was about to be removed to Mexico, neither S.M.V. nor counsel would have had any notice.

6.  The Florence Project also represents C.M., a woman from Mexico who suffers from various mental health conditions and cognitive deficits. She is in withholding-only proceedings pursuant to a reinstated removal order. The Florence Project attorney requested that DHS provide notice of any planned removal to a third country as a safeguard under *Franco-Gonzalez v. Holder*, 767 F. Supp. 2d 1034 (9th Cir. 2010), which applies the section 504 of the Rehabilitation Act to immigration removal proceedings and provides additional protections and reasonable accommodations for persons in removal proceedings who have been found incompetent to represent themselves. If C.M. is granted protection from Mexico, her attorney is concerned that she will be removed to another country in Latin America where she may face harm or abuses on account of her mental health conditions and/or where she may be at increased risk of refoulement by that third country to Mexico.

7.  FIRRP works with numerous clients at risk of removal to a non-designated third country. One such client is R.M., a Russian national who fled Russia after his political activities placed him at risk of persecution. At the time of his detention by ICE, R.M. had a significant aortic aneurism that required open heart surgery. He is also legally blind. The surgery was significantly delayed after various transfers while in ICE custody. R.M. had the surgery in February 2025 and was eventually granted deferral of removal under the Convention Against Torture. No third country was designated in removal proceedings and R.M. reserved appeal. R.M. is desperate to be released from detention to his wife in the Los Angeles

area so that he can recover from his open-heart surgery outside of detention. However, if he does not pursue the appeal, he faces the possibility of a removal without notice to a third country, which could put his fragile health in enormous peril. R.M. has a fear of various countries because of his health status and political opinions, but we are also very concerned that he could be refouled to Russia by one of the third counties he could be removed to. This would entirely undermine the immigration judge's grant of deferral of removal under the Convention Against Torture, which provides protection against removal to Russia by DHS.

8. Our team that provides legal orientation services to pro se individuals is also working with several people at risk of removal to third countries. A.A. is a Jordanian national who was granted Withholding of Removal and protection under the Convention Against Torture based on A.A's sexuality. Both DHS and A.A. waived appeal and A.A. remains detained. He has not received notice of any proposed third country of removal and remains fearful that he will be removed without notice to a country where he could also be harmed on account of his sexuality. Our team is also working with an Iraqi national, H.A, with a removal order from 2015. He has been detained since October 2024 without a court date. It is our understanding that Iraq is not accepting removals at this time, and the client is very afraid that he will be summarily removed to another country where he does not speak the language and has no connections.

9. FIRRP attorneys have struggled to provide adequate counsel to non-citizens regarding third country removals. We often find ourselves and our clients in a difficult situation: we cannot assist clients to advise DHS of a fear of a third country of removal without notice, and clients have been removed to third countries without notice. This means that we often have to file notices of fear of multiple countries, trying to guess where clients might be removed and hoping that the notices will be read and respected. We have devoted substantial time and energy toward both advising represented clients about the possibility of third country removal and educating clients who attend our legal orientation programming about how to advocate for themselves.

10. Currently, it is our understanding that Mexico is accepting removal of nationals from Guatemala, Honduras, El Salvador, Cuba, Haiti, Nicaragua, and Venezuela. We are also aware that El Salvador is accepting removal of Venezuelan nationals and is detaining or refouling people upon return. Additionally, we know that people from various other countries, including but not limited to China, Russia, Pakistan, Afghanistan, Iran, Nepal, Somalia, Cameroon, may be at risk of being deported to Panama and Costa Rica. In the detention centers where we provide legal orientation services, generally between 20 and 25% of the total population of approximately 2,000 is from those countries. Those individuals find themselves at particular peril of being removed to Mexico, El Salvador, or other third countries without notice or an opportunity to voice fear of removal.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 21st day of March 2025 at Tucson, Arizona.

_____
Laura Belous

## DECLARATION OF MELISSA CHUA

I, Melissa Chua, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.     I am a practicing attorney licensed to practice before the State of New York. My business address is 100 Pearl Street, 19th Floor, New York, NY 10004. I am the Co-Director of the Immigrant Protection Unit at the New York Legal Assistance Group (NYLAG) and have most recently been employed at NYLAG since 2019. I am over the age of 18 and am competent to testify regarding the matters described below.

2.     I am currently the Co-Director of the Immigrant Protection Unit at NYLAG.  I have practiced immigration law exclusively for over a decade, focusing on the representation of individuals in removal proceedings, appeals, and with final orders of removal. I have also taught the course on Immigration Law at Cardozo Law School and currently serve as an Adjunct Professor at Brooklyn Law School, teaching the Deportation Defense Clinic. As such, I have represented and supervised the representation of hundreds of noncitizens in removal proceedings before the Executive Office for Immigration Review (EOIR), the Board of Immigration Appeals (BIA) and federal courts and/or with applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services (USCIS).

3.     NYLAG is one of three organizations that comprise the Rapid Response Legal Collaborative (RRLC).  The RRLC provides free representation to individuals who have final orders of removal in removal proceedings pursuant to 8 U.S.C. § 1229a (Section 240 proceedings); and/or final removal orders issued by the Department of Homeland Security pursuant to 8 U.S.C. § 1231(a)(5) (reinstatement orders) or 8 U.S.C. § 1228(b) (238b orders).  I supervise NYLAG staff representing clients as part of the RRLC.

4.     NYLAG is currently representing D.N.B., a national of Venezuela, in removal proceedings pursuant to 8 U.S.C. § 1229a.  In or around April 2024, D.N.B. was ordered removed *in absentia* after failing to attend an immigration court hearing because of a serious motor vehicle accident. D.N.B. was charged as a national of Venezuela on the Notice to Appear on Form I-862, the Immigration Judge designated Venezuela for removal, and D.N.B. was subsequently ordered removed to Venezuela.  Upon information and belief, no other countries were designated for removal.

5.     In or around November 2024, NYLAG assisted D.N.B. with a Motion to Reopen for D.N.B. pursuant to 8 U.S.C. § 1229a(b)(5)(C).  Along with the Motion to Reopen, NYLAG attached D.N.B.'s application for asylum on Form I-589 stating D.N.B.'s fear of returning to Venezuela because of his participation in political protests. In November 2024, D.N.B.'s Motion to Reopen was denied by the Immigration Judge. NYLAG filed a timely appeal with the BIA on behalf of D.N.B.; that appeal is currently pending. Pursuant to that representation, NYLAG has had numerous calls with D.N.B.

EXhibit 096

6.    Upon information and belief, D.N.B. has no ties to Tren de Aragua, nor has the government alleged any against him. ICE did not indicate that D.N.B. is a gang member on his detention booking paperwork, leaving the box labeled "Gang Member/Leader" unchecked.

7.    In or around October 2024, D.N.B. was detained by Immigration and Customs Enforcement (ICE) and sent to Orange County Correctional Center (OCJ) in Goshen, New York.  As of March 2025, D.N.B. was housed in an OCJ unit with approximately 14 other men.  All of the men in D.N.B.'s unit at OCJ were Venezuelan nationals.

8.    D.N.B. was detained at OCJ until the evening of Thursday, March 13, 2025.  At approximately 11 pm on March 13, 2025, D.N.B. and all of the other men in his unit were informed that they were going to be deported to Venezuela at 3 am the following morning. D.N.B. believes that of the 14 individuals in his unit, 12 individuals have final orders of removal after proceedings pursuant to 8 U.S.C. § 1229a, and two are in active proceedings pursuant to 8 U.S.C. § 1229a.

9.    In the middle of the night on March 14, 2025, D.N.B. and the rest of the men in his unit were taken to the Jacob J. Javits Federal Building at 26 Federal Plaza.  From there, D.N.B. and the rest of the men in his unit were transferred to the Nassau County Jail, where they spent the rest of the evening.

10.   At approximately 1 pm on Friday, March 14, 2025, NYLAG spoke to D.N.B.'s deportation officer (DO) regarding D.N.B.'s location. The DO stated that D.N.B. was in New Jersey and would be transferred to Webb County Detention Center in Laredo, Texas by the end of the weekend. The DO further stated that ICE did not have a removal date for D.N.B. and was transferring D.N.B. due to lack of bed space at OCJ. NYLAG asked if ICE planned to remove D.N.B. to any country other than Venezuela, and the DO said no.

11.   On Saturday, March 15, 2025, D.N.B. and all of the other men in his unit were flown to Buffalo, New York; then Boston, Massachusetts; and eventually to the Alexandria Staging Facility in Louisiana. They spent the night of March 15, 2025 at the Alexandria Staging Facility. On Sunday, March 16, 2025, D.N.B. and those in his unit were flown to Miami, Florida and then to the Webb County Detention Center in Laredo, Texas.

12.   As of March 19, 2025, D.N.B. was still at the Webb County Correctional Center. NYLAG spoke with D.N.B. on March 18, 2025 by phone, during which he reported that four men from his unit were taken on the evening of March 17, 2025.  Those four men were told that they were being moved to another detention center.  Yesterday, March 18, 2025, two ICE officers visited D.N.B. and the remaining men in his unit and told them that if removal to Venezuela was not feasible, they may be removed to Mexico, Colombia, or Panama.  D.N.B. and the remaining men in his unit all expressed a fear of removal to El Salvador to the officers.

13.   On March 17, 2025, NYLAG emailed D.N.B.'s DO to report D.N.B.'s fear of removal to El Salvador and request to have an individualized hearing as to his fear of return before removal to El Salvador. The DO confirmed receipt of NYLAG's email. On March 18,

2025, NYLAG emailed the DO a second time, reasserting D.N.B.'s fear of removal to El Salvador and communicating his assent to removal to Venezuela, Panama, Colombia or Mexico.  NYLAG is in the process of amending D.N.B.'s briefing before the BIA to assert his fear of removal to El Salvador and request to have an individualized hearing about his fear of return to El Salvador.

14.    NYLAG also currently represents E.F.G. E.F.G is a national of Venezuela. Pursuant to that representation, NYLAG has had numerous calls with E.F.G. ICE reinstated E.F.G.'s prior removal order pursuant to 8 U.S.C. § 1231(a)(5). After passing a Reasonable Fear Interview, E.F.G. was placed into withholding only proceedings.  Upon information and belief, the only country designated for removal was Venezuela.  In March 2024, E.F.G. was ordered removed to Venezuela after missing his hearing because of a medical emergency.  In March 2025, NYLAG assisted E.F.G. in filing a Motion to Reopen pursuant to 8 U.S.C. § 1229a(b)(5)(C).  Along with the Motion to Reopen, NYLAG attached E.F.G.'s application for asylum on Form I-589 stating E.F.G.'s fear of returning to Venezuela because of his sexual orientation, and work as a police officer, during which he participated in the investigation of Tren de Aragua.

15.    E.F.G.'s Motion to Reopen is currently still pending and he is currently detained at OCJ. E.F.G. fears that ICE intends to remove him to a nondesignated country because other Venezuelan nationals from his unit have been removed from OCJ and believes they have been or will be removed to El Salvador.  E.F.G. fears persecution in several third countries, including El Salvador. On March 20, 2025, NYLAG alerted ICE to E.F.G.'s fears of being removed to El Salvador and requested a hearing before such a removal is initiated.

16.    E.F.G. currently has a motion to rescind and reopen pending before the immigration court and, as such, has an administrative stay pursuant to 8 U.S.C. § 1229a(b)(5)(C) and 8 C.F.R. § 1003.23(b)(4)(ii). In addition, E-F-G has submitted an application for asylum on Form I-589 seeking protection because of his fear of persecution on account of his sexual orientation and work as a police officer.

17.    Upon information and belief, E.F.G. has no ties to Tren de Aragua, nor has the government alleged any against him.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 20th day of March 2025 at New York, New York.


_____
Melissa Chua

3

## DECLARATION OF PATRICK TAUREL

I, Patrick Taurel, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.    I am a practicing attorney licensed to practice before the State of New York and the District of Columbia. I am also admitted to practice before numerous federal courts, including the U.S. Courts of Appeals for the Fourth, Ninth, and Tenth Circuits, and several U.S. district courts. My business address is 4922 Fairmont Ave., Suite 200, Bethesda, MD 20814. I have been employed as a Partner at Grossman Young & Hammond, LLC since April 2022. I am over the age of 18 and am competent to testify regarding the matters described below.

2.    I have been practicing exclusively immigration law for approximately fifteen years. My practice focuses on the immigration consequences of criminal convictions, immigration-related federal court litigation, and removal defense. I have represented approximately 100 noncitizens in proceedings before the Executive Office for Immigration Review ("EOIR"). I also help noncitizens apply for affirmative benefits before U.S. Citizenship and Immigration Services and U.S. consulates abroad.

3.    I represent numerous individuals subject to final orders of removal. Most of these individuals were issued removal orders following proceedings conducted under 8 U.S.C. § 1229a. Some of my clients, however, are subject to final orders of removal issued pursuant to 8 U.S.C. §§ 1231(a)(5) and 1228(b).

4.    I am concerned that numerous individuals I represent with upcoming check-ins with U.S. Immigration and Customs Enforcement ("ICE") who have been granted deferral or withholding of removal under the Convention Against Torture ("CAT") or withholding of removal under 8 U.S.C. § 1231(b)(3) will be summarily removed to third countries where they could well face persecution or torture. I discuss three of these cases below.

**Andres Barajas (a pseudonym) ("Mr. Barajas")**

5.    Mr. Barajas is a native and citizen of Mexico who was granted withholding of removal under the CAT by an immigration judge ("IJ") following removal proceedings conducted under 8 U.S.C. § 1229a held at the Otay Mesa Immigration Courft.[1] He has no criminal history. He is married to a U.S. citizen. The IJ denied Mr. Barajas's applications for asylum and for statutory withholding of removal not because he was criminally barred from asylum or did not merit asylum in the exercise of discretion or anything of that sort, but because he did not establish that he was persecuted or feared persecution "on account of" a protected ground.

---

[1] His order of removal designates Mexico as the country of removal. No alternative countries of removal appear in the IJ's decision.

EApp.1099

6.     Mr. Barajas's CAT claim stemmed from an altercation that occurred a decade ago in Mexico involving Mr. Barajas and the son of a wealthy and influential man. The man's father proceeded to use his power and influence to manipulate Mexico's judicial system into an apparatus to punish Mr. Barajas for the altercation. He hired a notorious lawyer with connections to drug cartels who is known for fabricating criminal charges against defendants and using dangerous tactics such as murder, kidnappings, and torture to win his cases. Ultimately, the IJ granted Mr. Barajas's application for withholding of removal under the CAT because he concluded that Mexican authorities were certain to detain Mr. Barajas upon return to Mexico in a prison where corrupt guards would look the other way as paid-off henchmen inflicted brutal violence upon Mr. Barajas.

7.     The IJ's decision contains a remarkable passage. The decision describes how two agents of the notorious lawyer showed up during one of Mr. Barajas's hearings at the Otay Mesa Immigration Court pretending to be members of Mr. Barajas's family. It wasn't until a private hearing was requested and the two agents were singled out, that they were escorted out of the courthouse/detention facility, but then apparently waited in the parking lot for a member of Mr. Barajas's family to emerge from the facility where they proceeded to intimidate her. The following day, Mr. Barajas's family member discovered that her vehicle had a flat tire, which she replaced with a spare. While parked at the facility to visit Mr. Barajas, the spare tire was flattened. That same day, suspected agents of the notorious lawyer were spotted walking away from the home Mr. Barajas's family was renting.

8.     This case illustrates that Mr. Barajas's would-be persecutors are willing and able to cross borders to find and harm him. That they had the wherewithal to find out the date, time, and location of Mr. Barajas's removal hearing, and that they had the audacity to come to the United States to intimidate Mr. Barajas underscores how dangerous and capable these people are. If Mr. Barajas were to be removed to a third country, there is good reason to believe that such information would become known to his would-be persecutors, that his would-be persecutors would locate him there, and that once they tracked him down, they would do unspeakable things to him.

9.     Mr. Barajas was detained throughout the duration of his proceedings. Neither party appealed the IJ's decision. Mr. Barajas was released on an order of supervision following the IJ's grant of withholding of removal under the CAT. To the best of my knowledge, Mr. Barajas is in full compliance with his order of supervision.

**M.N.**

10.     M.N. is a fifty-two-year-old Moroccan national who has resided in the United States since he was brought here as a child. In 2022, M.N. was granted deferral of removal under the CAT. His proceedings were conducted in the first instance by an IJ sitting at the now-closed York Immigration Court. The IJ denied relief to M.N. He appealed. The Board of Immigration Appeals sustained his appeal and remanded the case to the IJ (who, at this point, had been transferred to the Baltimore Immigration Court) to grant relief

upon completion of background checks. M.N.'s proceedings were conducted under 8 U.S.C. § 1229a.[2]

11.     The Board of Immigration Appeals instructed the IJ to grant M.N. deferral of removal under the CAT on the basis of the following. The Board determined that M.N. satisfactorily established that Morocco is a police state in which it is impossible to avoid interacting with law enforcement. The Board further found that M.N. was likely to have an aggravated encounter with the authorities because he suffers from antisocial personality disorder, which prevents him from being able to control his behavior and from complying with authority, and because he will be subject to additional scrutiny by authorities as a deportee. Moreover, according to the Board, M.N. established that torture is used routinely by law enforcement in Morocco and that he would be tortured following a negative encounter with Moroccan authorities.

12.     A forensic psychologist who conducted a risk assessment of M.N. and who formally diagnosed him with antisocial personality disorder determined that he was at high risk of recidivating in a place like Morocco, because he would have no support network, did not speak the language, would likely not be able to obtain identification, housing, or a job, and was unfamiliar with the customs. He has not recidivated in the United States, as the forensic psychologist predicted, because he enjoys family support, speaks the language, possesses identification, and is familiar with the customs.

13.     If M.N. were to be removed to a third country, given his diagnosis and the myriad challenges he would face, it is highly foreseeable he would recidivate. If he were to recidivate, the evidence in his trial reflects that there is a high likelihood he would have particularly hostile interactions with abusive law enforcement officials.

14.     M.N. was held in ICE custody the entire time his case was pending before the Executive Office for Immigration Review, including throughout the duration of his appeal and remand. He was released on an order of supervision following the IJ's decision granting him deferral of removal under the CAT. To the best of my knowledge, M.N. is in full compliance with his order of supervision.

**M.R.A.**

15.     M.R.A. is a 25 year-old Salvadoran national who has resided in the United States since the age of three. He is married to a U.S. citizen and is the father of two U.S. citizen children. In 2024, he was granted statutory withholding of removal by an IJ sitting at the Elizabeth Immigration Court. Neither party appealed the IJ's decision.[3]

16.     The IJ granted M.R.A. statutory withholding of removal because he determined it was more likely than not that if M.R.A. were returned to El Salvador, he would be subject to government-inflicted persecution on account of his suspected gang membership. Although M.R.A. is not in a gang, he has numerous tattoos that law enforcement officials

---

[2] M.N. was ordered removed to Morocco. No alternative country of removal is listed in the IJ's decision.
[3] M.R.A. was ordered removed to El Salvador. No alternative country of removal is listed in the IJ's decision.

could conclude are gang-related, and he acquired several controlled substance convictions.[4] An expert on contemporary Salvadoran human rights violations testified that in light of M.R.A.'s profile, if he were to be removed to El Salvador, he would highly likely be immediately remanded to a Salvadoran prison without trial where he would face a severe risk of harm and even death from prison guards and gang members.

17. As a young Salvadoran man with tattoos and a criminal history, if M.R.A. were to be removed to any number of countries, particularly countries where gangs like MS-13 are prevalent, he would be at considerable risk of persecution or death, because he would likely be perceived as a would-be rival. Similarly, if he were removed to a country with a track record of operating with an iron fist when it comes to suspected gang members, he could well face government persecution.

18. M.R.A. was held in ICE custody for the entire duration of his removal proceedings before the IJ. Following the IJ's decision to grant him relief, M.R.A. was released from ICE custody on an order of supervision. To my knowledge, M.R.A. has been fully compliant with that order of supervision.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 20th day of March 2025 at Bethesda, MD

Patrick Taurel

---

[4] To my knowledge, M.R.A. has not recidivated since his release from ICE custody.

## DECLARATION OF AMBREEN WALJI

I, Ambreen Walji, make the following declaration based on my personal knowledge and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.     I am a practicing attorney licensed to practice before the State of New York. I have been employed as attorney and then Managing Attorney at an immigration non-profit since September 30, 2019. I am over the age of 18 and am competent to testify regarding the matters described below.

2.     I have practiced exclusively in immigration law since 2019, representing hundreds of noncitizens in removal proceedings before the Executive Office for Immigration Review (EOIR) and federal courts and with applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services (USCIS). In my current role, I also supervise and mentor volunteer attorneys representing noncitizens on a pro bono basis.

3.     Among other types of cases, I represent individuals with final removal orders in removal proceedings pursuant to 8 U.S.C. § 1229a (Section 240 proceedings); and also those with final removal orders issued by the Department of Homeland Security pursuant to 8 U.S.C. § 1231(a)(5) (reinstatement orders) or 8 U.S.C. § 1228(b) (238b orders).

4.     Before I represented him, Mr. BC had been in Section 240 removal proceedings at the immigration court within the Otay Mesa Detention Center in San Diego, California, the Otay Mesa Immigration Court. The Immigration Judge (IJ) designated his country of removal as Venezuela. No alternative countries were identified. Mr. BC's relief from removal was based on his fear of persecution in Venezuela on account of his anti-Venezuelan government political opinion. Mr. BC's asylum application testified to the fact that members of the Venezuelan National Guard and a paramilitary group kidnapped, tortured, and beat Mr. BC after he protested the Venezuelan government.

5.     On January 22, 2025, the IJ granted Mr. BC withholding of removal. While the government reserved its right to appeal the withholding of Mr. BC's removal, it never filed a Notice of Appeal, and the appeal deadline has since expired. After his proceedings were complete, Mr. BC remained detained at the Otay Mesa Detention Center, where he had been detained for the duration of his removal proceedings.

6.     On February 21, 2025, DHS notified Mr. BC that it intended to pursue removal to Mexico, a country not designated for removal. DHS officers told Mr. BC that if he did not sign documents consenting to be removed to Mexico, he would be transferred to an ICE facility in Guantanamo or El Salvador. Despite the threats, Mr. BC refused to sign and expressed a fear of persecution in Mexico.

7.      Mr. BC fears for his life if he were to be deported to Mexico. Prior to entering the United States, Mr. BC testified that he spent some time in Mexico. He asserts that, while he was there, he was beaten, kidnapped, and suffered injuries. Mr. BC believes he runs a risk of death if removed to Mexico.

8.      On March 6, 2025, I took on representation of Mr. BC. On March 7, 2025, Mr. BC was abruptly transferred to Webb County Detention Center, Laredo, Texas without notice to him.

9.      On March 13, 2025, I requested DHS release Mr. BC from custody and provided a copy of the order granting him withholding of removal.

10.     On this date, I also sent a declaration that Mr. BC feared persecution in Mexico to the ICE Harlingen office. In addition, I called the ICE Harlingen office and requested a return phone call, spoke to a clerk at this office requesting to speak to a supervisor and left a message with the Laredo Sub Field Office providing my information and explaining that Mr. BC feared removal to Mexico and also Venezuela, and that there was a final order withholding his removal to Venezuela. I received no return phone calls despite leaving messages beginning at 9 am PDT. That day, DHS officers informed Mr. BC to gather his belongings as he would be removed to Venezuela. I filed a Motion for an Emergency Stay of Removal and Motion to Reopen challenging his deportation to Venezuela or another country.

11.     On March 14, at around 10 am CDT, Mr. BC was put on a bus with several other Venezuelans. He was told that he was being taken to the airport, 3 hours away. The bus was turned around within 15 minutes and Mr. BC, along with around 50 other ICE detainees returned to Webb County Detention Center. When he returned to the detention center, the tablets the detainees normally used to communicate with ICE had been removed from the dorms.

12.     At around 4:55 pm PDT on March 14, the IJ issued an emergency stay of removal in Mr. BC's case. I then forwarded a copy of that order to the Harlingen Field office and several Assistant United States Attorneys. The IJ's clerk assured me that the order had been communicated to the Office of the Chief Counsel for DHS.

13.     On Sunday March 16, 2025, at around 8 am CDT, Mr. BC was put on a plane. Mr. BC believed, and was told, he was going to Venezuela. However, based on news reports indicating El Salvador was accepting Venezuelan suspected Tren de Aragua members, he feared he would be deported to El Salvador, although he is not a member of Tren de Aragua.

14.     After buckling his seatbelt, Mr. BC and four other Venezuelan individuals were called off the plane. Mr. BC's belongings remained on the plane. Mr. BC told me the

2

cellphone of an individual who was also pulled off the plane GPS confirms that the plane landed in El Salvador. This cellphone is being tracked by that individual's family. Mr. BC was then transported to El Valle Detention Center in Raymondville, Texas.

15.  Mr. BC was provided with no advance notice of deportation to El Salvador.

16.  Until March 20, 2025, Mr. BC had been provided with no advance notice of deportation to El Salvador, and it remained unclear if DHS intended to remove him to El Salvador. On March 20, 2025, an ICE officer came to Mr. BC's dorm area and asked if he was one of the five individuals who were taken off the flight to El Salvador on Sunday, March 16, 2025. The officer then told Mr. BC that if his attorney had not filed the motion for a stay of removal, he would have already been in El Salvador. He told Mr. BC that he would be deported to El Salvador, along with the others who had been taken off the plane. He did not give Mr. BC an opportunity to ask any questions and told Mr. BC that he had nothing to say to him, and that if his attorney had anything to say, they could contact him. Mr. BC wanted to ask for an email address, but the officer left before he had the opportunity. Mr. BC himself had no opportunity to articulate fear of persecution or torture he would face if he was removed to El Salvador.

17.  After speaking with Mr. BC on March 20, 2025, I sent a letter articulating Mr. BC's fear of persecution in El Salvador to the ICE Harlingen office.

18.  Although there is at present an order staying his removal, Mr. BC is extremely fearful he would be removed to El Salvador. He has stated to me that he is not a gang member and has no criminal history, but since his transfer to El Valle Detention Center, DHS has reclassified him as a high-level security risk, giving him a red uniform to wear while in custody. When he asked his deportation officer why, the officer said it was because DHS believed that he had gang affiliations, and because he was from Venezuela. Mr. BC told me that he'd rather die in his own country than in El Salvador. Additionally, Mr. BC is not aware of any other country that DHS might seek to deport him to, but he fears deportation to other countries that might imprison him or deport him back to Venezuela.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 20 day of March 2025 at San Diego, CA.

S:// Ambreen Walji

## DECLARATION OF DEBORAH LEE

I, Deborah Lee, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.  I am an attorney licensed to practice before the State of New Jersey and the District of Columbia. My business address is 199 Water Street, 3rd Floor, New York, New York 10038. Since November 2022, I have been employed as Attorney-in-Charge of the Immigration Law Unit at The Legal Aid Society and have been otherwise employed with The Legal Aid Society since December 2018. I am over the age of 18 and am competent to testify regarding the matters described below.

2.  I have practiced exclusively in immigration law since 2003. Over the course of my career, I have represented hundreds of non-citizens, including with applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services (USCIS) and in removal proceedings before the Executive Office for Immigration Review (EOIR).

3.  As the Attorney-in-Charge of the Immigration Law Unit at The Legal Aid Society, I currently manage over 80 staff members in providing immigration legal services to low-income non-citizen New Yorkers. Our staff represent non-citizens before U.S. Citizenship and Immigration Services (USCIS), before immigration judges in removal proceedings, on appeals to the Board of Immigration Appeals (BIA), and in federal courts on *habeas corpus* petitions, petitions for review, and other federal litigation matters.

3.  The Legal Aid Society represents individuals with: (a) final removal orders in removal proceedings pursuant to 8 U.S.C. § 1229a (Section 240 proceedings); and (b) those with final removal orders issued by the Department of Homeland Security pursuant to 8 U.S.C. § 1231(a)(5) (reinstatement orders) or 8 U.S.C. § 1228(b) (238b orders).

4.  Our client, A.A., is a citizen of El Salvador. He was detained in ICE custody and Section 240 removal proceedings were initiated against him. The Immigration Court designated El Salvador, and no other country, as the country of removal. On February 21, 2025, the Immigration Court granted him withholding of removal under the Immigration and Nationality Act, based on A.A.'s fear that that the government of El Salvador and MS-13 gang members would harm him. Both A.A. and the Department of Homeland Security waived appeal.

5.  To this day, A.A. remains detained in ICE custody. On February 24, 2025, ICE informed our office that they will hold A.A. for at least 90 days while ICE attempts to find a third country to which to remove him. Recently, A.A. informed us that ICE stated they will hold him for an additional 90 days even if they do not find a country to which to remove him. ICE has not provided A.A. with any information about the specific third countries they are considering for his removal. ICE has not provided A.A. with any information about an opportunity to express fear of removal to a third country.

6.    Our client, B.B., is a citizen of Nigeria. He was detained in ICE custody and Section 240 removal proceedings were initiated against him. The Immigration Court designated Nigeria, and no other country, as the country of removal. On December 9, 2024, B.B. was granted deferral of removal under the Convention Against Torture ("CAT"). His application for CAT was based on his fear of torture by a transnational criminal group. The Department of Homeland Security waived appeal.

7.    B.B. remains detained in ICE custody. As of this date, it has been more than 100 days since he was granted protection by the Immigration Judge. Recently, ICE informed us that B.B.'s detention will be continued pending further review by ICE HQ. The ICE officer stated that there was no timeframe for how long the process of HQ review would take. Moreover, B.B. informed us that ICE stated that all deferral and withholding cases were being referred to HQ for review. In light of his continued detention and the delay in releasing B.B., we believe that ICE may be attempting to remove B.B. to a third country because ICE cannot remove him to Nigeria.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 21st day of March 2025 at New York, New York.

Deborah Lee

2

Appx.107

### DECLARATION OF ELYSSA N. WILLIAMS

I, Elyssa N. Williams, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.   I am a practicing attorney licensed to practice before the State of New York.  My business address is 360 E. 161st Street, Bronx, New York, 10451. I am currently employed as the Interim Legal Director at the Bronx Defenders and have worked at the organization since 2018 as a Staff Attorney, Supervising Attorney and Senior Legal Counsel. I am over the age of 18 and am competent to testify regarding the matters described below.

2.   I have practiced immigration law since 2010, representing hundreds of noncitizens in removal proceedings before the Executive Office for Immigration Review (EOIR), federal courts and with applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services (USCIS).

3.   At the Bronx Defenders we represent individuals with: (a) final removal orders in removal proceedings pursuant to 8 U.S.C. § 1229a (Section 240 proceedings); and (b) final removal orders issued by the Department of Homeland Security pursuant to 8 U.S.C. § 1231(a)(5) (reinstatement orders) or 8 U.S.C. § 1228(b) (238b orders).

4.   Our client, A.A., is a citizen of the Dominican Republic. A.A. was placed into Section 240 removal proceedings and detained in ICE custody.  The Immigration Judge in his case designated the Dominican Republic, and no other country, as the country of removal.  A.A. was granted deferral of removal under the Convention Against Torture ("CAT").  His application for CAT was based on his fear of torture by a cartel. The Department of Homeland Security waived appeal.

5.   A.A. remains detained in ICE custody.  Recently, A.A. informed us that ICE stated that they are looking for a third country to remove him to.  A.A. has a fear of removal to any country where the cartel he fears operates.  ICE has not provided A.A. any information about an opportunity to express fear of removal to a third country.

6.   Our former client, B.B., is a citizen of Venezuela.  B.B. was placed into section 240 removal proceedings and detained in ICE custody.  The Immigration Judge in his case designated Venezuela, and no other country, as the country of removal. The Immigration Court ordered B.B. removed.  B.B. had a pending application for Temporary Protected Status and a pending I-130 Petition for Alien Relative based on his marriage to a U.S. Citizen.

7.   In March 2025, the attorney who had represented B.B. in removal proceedings

1

spoke with an ICE Deportation Officer who informed him that B.B. had been recently removed to San Salvador, El Salvador. Based on our communications with B.B., it does not appear that B.B. was ever informed that he was going to be removed to a third country. B.B. had been preparing for a review of his custody and his attorney submitted documents to ICE in support of release. The attorney who represented B.B. in removal proceedings last spoke with B.B. on March 13, 2025. Since then, we have not spoken with B.B. and the ICE detainee locator now shows that he is not in ICE custody. B.B.'s attorney was never informed that B.B. would be removed to a third country. At no point did B.B. share with his legal team that he had been informed about removal to a third country. B.B. was not provided with advanced notice prior to his deportation to El Salvador, and DHS did not provide an opportunity to contest removal on the basis of fear to removal to a third country.

8. Our client, C.C., is a citizen of Venezuela. He was placed into section 240 removal proceedings and detained in ICE custody. In February 2025, C.C. was ordered removed and he waived appeal. C.C.'s attorney has been in communication with the assigned ICE Deportation Officer. The DO has C.C.'s Venezuelan identity documents and has indicated that C.C. is on a list for removal. The DO has not provided C.C. with any information about an opportunity to express a fear of removal to a third country. Based on experiences with other clients, we believe that C.C. will be removed to a third country such as El Salvador or Mexico.

9. Our client, D.D., is a citizen of Gambia. D.D. was placed into section 240 removal proceedings and was ordered removed. D.D. was recently asked to report to the ICE field office for the purpose of removal. ICE has not provided D.D. with any information about an opportunity to express a fear of removal to a third country. We believe that D.D. will be removed to a third country because Gambia does not regularly accept deportees.

10. A former client, E.E., recently called us because ICE abruptly asked him to return for a check-in within just two months of his previous one. Our former client was granted CAT over a decade ago. He informed us that he had previously only had to check in once a year.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 21st day of March 2025 at New York, New York.

*Elyssa Williams*

Elyssa N. Williams, Esq.

2

## DECLARATION OF GUADALUPE PEREZ

I, Guadalupe Perez, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am a practicing attorney licensed to practice before the State of Illinois. My business address is 69 W. Washington, Suite 1600, Chicago, Il 60602. I have been employed as an Immigration Attorney/Assistant Public Defender II at Law Office of the Cook County Public Defender since February 14, 2022. I am over the age of 18 and am competent to testify regarding the matters described below.

2.      I have practiced exclusively in immigration law since 2016, representing dozens of noncitizens in removal proceedings before the Executive Office for Immigration Review (EOIR) and federal courts and/or with applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services (USCIS). Prior to my work at the Law Office of the Cook County Public Defender, I worked with the Detention Project at the National Immigrant Justice Center, representing detained individuals in removal proceedings. I represent individuals with:
        (a) final removal orders in removal proceedings pursuant to 8 U.S.C. § 1229a (Section 240 proceedings); and
        (b) final removal orders issued by the Department of Homeland Security pursuant to 8 U.S.C. § 1231(a)(5) (reinstatement orders) or 8 U.S.C. § 1228(b) (238b orders).

3.      I currently represent two individuals who DHS is seeking to deport to a country that was not designated as a country of removal:

OGM is from El Salvador and was detained in withholding only proceedings after DHS issued a reinstatement order. He was granted withholding of removal under the Convention Against Torture to El Salvador. MGO feared returning to El Salvador due to having been kidnapped and tortured by gangs and police in El Salvador. The DHS did not reserve or appeal the decision. He is currently detained in DHS custody despite being granted protection. OGM has been moved from the detention facility he was originally held at during the six months of his proceedings to a new jail. A couple of days after he was granted relief, he had an interview with an ICE official who asked him if he was willing to return to Mexico. As counsel I informed DHS that they needed to inform me of any attempts to remove him to a third country, but DHS has not provided further information.  Due to the prevalence of gangs from El Salvador to Mexico, OGM fears that they will be able to reach him in other Latin American countries. OGM also fears that other countries will remove him to El Salvador.

RRJ is from Honduras and was detained in withholding-only proceedings after DHS issued a reinstatement order. He was granted deferral of removal under the Convention Against Torture to Honduras. JRR feared returning to Honduras due to having been kidnapped and tortured by gangs and police in Honduras. The DHS did not reserve or

appeal the decision. He is currently detained in DHS custody despite being granted protection. Recently, RRJ was moved from the facility he had been at for the last 8 months. I was informed that DHS would attempt a third country removal, most likely to Mexico, but they refused to provide me with further details. I informed them that I needed to be updated as my client has a fear of deportation to other countries where the Honduran gangs may reach him.

4.     Both OGM and RRJ have a post-traumatic stress disorder diagnosis stemming from the time they were kidnapped and beaten by police members. Their time in detention has exacerbated these symptoms. Further, the uncertainty of not knowing whether DHS will deport them to a third country without having an opportunity to make a fear claim is traumatic to both them and their families.


I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 21 day of March 2025 at Chicago, Illinois

_____
Guadalupe Perez

## DECLARATION OF PAUL O'DWYER

I, Paul O'Dwyer, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a practicing attorney licensed to practice before the State of New York. My business address is 11 Broadway, Suite 715, New York NY 10004.  I have been employed as an immigration attorney with my own practice for over twenty-five years.  I am over the age of 18 and am competent to testify regarding the matters described below.

2. I have practiced mostly immigration law since the late 1990s, representing hundreds of noncitizens with applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services (USCIS), with a particular focus on people seeking asylum, as well as in in removal proceedings before the Executive Office for Immigration Review (EOIR) and federal courts.

3. I have represented numerous individuals in expedited removal proceedings pursuant to 8 U.S.C. § 1225(b), in reinstatement of removal proceedings pursuant to 8 U.S.C. § 1231(a)(5), in credible and reasonable fear interviews pursuant to 8 C.F.R. § 1208.31, as well as in withholding of removal proceedings before the EOIR.

4. I have represented EO in his immigration matters since on or about 2012.

5. EO is a forty-three-year-old native and citizen of Peru.  He attempted to enter the US in 2000, using a fake Peruvian passport.  He was detained by immigration inspection officers and stated that he was fearful of being returned to Peru and

requested an asylum hearing, but then withdrew that request, and was deported back to Peru. He re-entered the US in 2002.

6.  In August 2012, EO filed an application for asylum and withholding of removal, claiming a fear of persecution on account of his sexual orientation if returned to Peru.

7.  In October 2012, when EO appeared for his asylum interview, ICE re-instated the 2000 removal order, ordering that he be removed to Peru, and took him into custody. In November 2012, after a "reasonable fear" interview by an asylum officer, EO was found to have a reasonable fear of persecution if returned to Peru, and placed in "withholding-only" proceedings before an Immigration Judge.

8.  In February 2013, EO was released from ICE custody on an order of supervision.

9.  On May 16, 2017, the Immigration Judge granted EO's application for withholding of removal, and DHS waived any appeal from that decision.

10. Since then, EO has continued to live in New Jersey. He has been consistently employed and files and pays taxes every year and has never been arrested or charged with a crime.

11. EO has also been fully compliant with the terms of his order of supervision, checking in with ICE in person each year.

12. On February 25, 2025, at his annual ICE check in, EO was told by his deportation officer that he had to return to ICE on March 25 with his passport and a ticket to leave the country, and that if he did not do so, ICE would come to his home and detain and deport him to a third country. This was the first time ICE

had stated to EO that he faced possible deportation to a third country, and they did not identify which country they intended to deport him to. EO is not a citizen or national of any country other than Peru, and does not have the right to live or reside in any other country.

13. On or about March 14, I filed a petition for a writ of habeas corpus on behalf of EO in the US District Court for the District of New Jersey, and notified the local US Attorney's Office of my intention to file a TRO, to enjoin his detention and removal while the petition was being decided. Subsequently, ICE notified EO that his check-in date had been extended and that they did not intend to detain him at this check-in.

Executed this 21st day of March 2025 at New York, NY.

*Paul O'Dwyer*
Paul O'Dwyer

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| D.V.D., et al., ) | |
| ) | |
| **Plaintiffs,** ) | **Civil Action No.** |
| ) | **25-10676-BEM** |
| **v.** ) | |
| ) | |
| **U.S. DEPARTMENT OF HOMELAND** ) | |
| **SECURITY, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

## TEMPORARY RESTRAINING ORDER

**MURPHY, J.**

This matter comes before the Court on Plaintiff D.V.D., M.M., E.F.D., and O.C.G.'s Motion for a Temporary Restraining Order and Preliminary Injunctive Relief.  Having considered the motion and related filings, the Court ORDERS as follows:

1) Plaintiffs' Motion for a Temporary Restraining Order is GRANTED in part.

2) Defendants, and all of their officers, agents, servants, employees, attorneys, successors, assigns, and persons acting in concert or participation with them are hereby ENJOINED and RESTRAINED from:

   a) Removing Plaintiffs D.V.D., M.M., and E.F.D. from the United States to a third country, i.e., a country other than the country designated for removal in the prior immigration proceedings, UNLESS and UNTIL Defendants provide Plaintiffs D.V.D., M.M. and E.F.D., and their respective counsel, with written notice of the third country to where they may be removed, and UNTIL Defendants provide a meaningful opportunity for Plaintiffs D.V.D., M.M. and E.F.D. to submit an

application for protection, including withholding of removal under 8 U.S.C. § 1231(b)(3) and protection under the Convention Against Torture (CAT) to the immigration court, and if any such application is filed, UNTIL Plaintiffs D.V.D., M.M., and E.F.D. receive a final agency decision on any such application;

b) Removing any individual subject to a final order of removal from the United States to a third country, i.e., a country other than the country designated for removal in immigration proceedings, UNLESS and UNTIL Defendants provide that individual, and their respective immigration counsel, if any, with written notice of the third country to where they may be removed, and UNTIL Defendants provide a meaningful opportunity for that individual to submit an application for CAT protection to the immigration court, and if any such application is filed, UNTIL that individual receives a final agency decision on any such application.

3) No security bond is required under Federal Rule of Civil Procedure 65(c).

4) This Order shall remain in effect until the Court rules on Plaintiffs' motion for a preliminary injunction.

5) The Court's previous order, Dkt. 12, remains in effect.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated:  March 28, 2025                    Judge, United States District Court

2

Appx.116

| From: | ECFnotice@mad.uscourts.gov |
| --- | --- |
| To: | CourtCopy@mad.uscourts.gov |
| Subject: | Activity in Case 1:25-cv-10676-BEM D.V.D. et al v. U.S. Department of Homeland Security et al Order on Motion to Stay |
| Date: | Saturday, March 29, 2025 12:41:33 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## United States District Court

### District of Massachusetts

## Notice of Electronic Filing

The following transaction was entered on 3/29/2025 at 12:40 PM EDT and filed on 3/29/2025

**Case Name:** D.V.D. et al v. U.S. Department of Homeland Security et al

**Case Number:** 1:25-cv-10676-BEM

**Filer:**

**Document Number:** 41(No document attached)

**Docket Text:**
Judge Brian E. Murphy: ELECTRONIC ORDER entered denying [38] Defendants' Motion For Partial Stay of the Temporary Restraining Order, for the reasons stated in the [40] Memorandum on Plaintiffs' Motion for Temporary Restraining Order issued this day. (BIB)

**1:25-cv-10676-BEM Notice has been electronically mailed to:**

Trina Realmuto    trina@immigrationlitigation.org

Mary Larakers    mary.l.larakers@usdoj.gov, maria.n.latimer@usdoj.gov

Kristin Macleod-Ball    kristin@immigrationlitigation.org

Mark Sauter    mark.sauter@usdoj.gov, CaseView.ECF@usdoj.gov, USAMA.ECF@usdoj.gov, andrea.leone@usdoj.gov

Mary Kenney    mary@immigrationlitigation.org

Matthew Patrick Seamon    matthew.seamon2@usdoj.gov

Tomas Arango    tomas@immigrationlitigation.org

Leila Kang     leila@nwirp.org

Aaron Korthuis     aaron@nwirp.org

Anwen Hughes     hughesa@humanrightsfirst.org

Glenda M. Aldana Madrid     glenda@nwirp.org

Matt Adams     matt@nwirp.org

**1:25-cv-10676-BEM Notice will not be electronically mailed to:**

# EXHIBIT A



*Office of the Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

March 30, 2025

MEMORANDUM FOR:    Kika Scott
Senior Official Performing the Duties of the Director
U.S. Citizenship and Immigration Services

Pete R. Flores
Senior Official Performing the Duties of the Commissioner
U.S. Customs and Border Protection

Todd Lyons
Acting Director
U.S. Immigration and Customs Enforcement

FROM:    Kristi Noem
Secretary of Homeland Security

SUBJECT:    **Guidance Regarding Third Country Removals**

**Purpose**

This memorandum clarifies DHS policy regarding the removal of aliens with final orders of removal pursuant to sections 240, 241(a)(5), or 238(b) of the Immigration and Nationality Act (INA) to countries other than those designated for removal in those removal orders (third country removals).[1]  DHS has used similar processes before, including with respect to Title 42 expulsions and the Migrant Protection Protocols.

**Process Regarding Third Country Removals[2]**

*Written Notice to the Alien & Fear Screening*

Prior to the alien's removal to a country that had not previously been designated as the country of removal, DHS must determine whether that country has provided diplomatic assurances that aliens removed from the United States will not be persecuted or tortured.  If the United States has received such assurances, and if the Department of State believes those assurances to be credible, the alien

---

[1] This memorandum does not address expedited removals pursuant to INA § 235(b)(1).
[2] These procedures only apply to aliens who have no ongoing proceeding in which to raise a claim under INA § 241(b)(3) or the Convention Against Torture.  For aliens who have such proceedings, DHS will follow existing procedures.

Page 2

may be removed without the need for further procedures. If the United States has not received those assurances, or if the Department of State does not believe them to be credible, DHS must follow the procedures below.

DHS will first inform the alien of removal to that country. Immigration officers will not affirmatively ask whether the alien is afraid of being removed to that country. DHS is taking this approach in line with its determination in mid-2024 that such questioning may be suggestive and that asking them leads to false claims rendering the immigration system as a whole less efficient. *Securing the Border*, 89 Fed. Reg. 48710, 48743 (June 7, 2024) (noting that aliens are "more likely to respond in the affirmative, even if they do not in fact have a fear of return or intention of seeking asylum" when asked affirmative fear questions); *Securing the Border*, 89 Fed. Reg. 81156, 81235 (Oct. 7, 2024). The allegation that a foreign country's government will torture an alien or allow an alien to be persecuted, particularly a government with which the United States has a diplomatic relationship, is a serious one. It is not unreasonable for an alien in that circumstance to be expected to affirmatively express a fear of persecution or torture.

Immigration officers will refer any alien who affirmatively states a fear of removal to U.S. Citizenship and Immigration Services (USCIS) for a screening for eligibility for protection under INA § 241(b)(3) and the Convention Against Torture (CAT) for the country of removal.

> *Where the Alien Affirmatively States a Fear*

In cases where the alien affirmatively states a fear, USCIS will generally screen the alien within 24 hours of referral from the immigration officer. This screening may be done remotely. USCIS will determine whether the alien would more likely than not be persecuted on a statutorily protected ground or tortured in the country of removal. If USCIS determines that the alien has not met this standard, the alien will be removed.

If USCIS determines that the alien has met this standard and the alien was not previously in proceedings before the Immigration Court, USCIS will refer the matter to the Immigration Court in the first instance. In cases where the alien was previously in proceedings before the Immigration Court, USCIS will notify the referring immigration officer of its finding, and the immigration officer will inform U.S. Immigration and Customs Enforcement (ICE). ICE OPLA may file a motion to reopen with the Immigration Court or the Board of Immigration Appeals, as appropriate, for further proceedings for the sole purpose of determining eligibility for protection under INA § 241(b)(3) and CAT for the country of removal. Alternatively, ICE may choose to designate another country for removal.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| D.V.D.; M.M.; E.F.D.; and O.C.G., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY; Kristi NOEM, Secretary, U.S. Department of Homeland Security, in her official capacity; Pamela BONDI, U.S. Attorney General, in her official capacity; and Antone MONIZ, Superintendent, Plymouth County Correctional Facility, in his official capacity, <br><br> Defendants. | Civil Action No. 25-cv-10676 |

## INDEX OF EXHIBITS IN SUPPORT OF
## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR AN INDICATIVE
## RULING UNDER FEDERAL RULE OF CIVIL PROCEDURE 62.1

| Exhibit | Description |
|---------|-------------|
| A | Marco Rubio (@SecRubio), X (Mar. 31, 2025, 8:25 AM), https://x.com/SecRubio/status/1906684174020284784 |
| B | Nayib Bukele (@nayibbukele), X (Mar. 31, 2025, 9:42 AM), https://x.com/nayibbukele/status/1906703745158660177 |
| C | Declaration of Robert L. Cerna, Acting Field Office Director, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement, *J.G.G. v. Trump*, No. 1-25-cv-00766-JEB, ECF 28-1 (D.D.C. Mar. 18, 2025) |
| D | U.S. Department of State, Bureau of Democracy, Human Rights and Labor, Country Reports on Human Rights Practices for 2023: El Salvador (Apr. 2024) |
| E | U.S. Department of State, Bureau of Democracy, Human Rights and Labor, Country Reports on Human Rights Practices for 2023: Mexico (Apr. 2024) |
| F | U.S. Department of State, Bureau of Democracy, Human Rights and Labor, Country Reports on Human Rights Practices for 2023: Honduras (Apr. 2024) |
| G | U.S. Department of State, Bureau of Democracy, Human Rights and Labor, Country Reports on Human Rights Practices for 2023: Libya (Apr. 2024) |
| H | U.S. Department of State, Bureau of Democracy, Human Rights and Labor, Country Reports on Human Rights Practices for 2023: Rwanda (Apr. 2024) |
| I | *Diplomatic Assurances and Rendition to Torture: The Perspective of the Statement Department's Legal Advisor Before the House Foreign Affairs Subcommittee on International Organizations, Human Rights, and Oversight*, 110th Cong. 192 (2008) (statement of John B. Bellinger, III, Legal Advisor to the U.S. Secretary of State) |
| J | Defendants' Memorandum of Law in Opposition to Plaintiffs' Emergency Motion for Temporary Restraining Order, *Abrego Garcia v. Noem*, No. 8:25-cv-00951-PX, ECF 11 (D. Md. Mar. 31, 2025) |
| K | Emails between Plaintiffs' Counsel and Defendants' Counsel (Mar. 31, 2025 4:10 PM; Mar. 31, 2025 4:19 PM; Apr. 1, 2025 4:48 PM; Apr. 2, 2025 7:35 PM) |

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing (NEF).

s/ *Trina Realmuto*
Trina Realmuto
National Immigration Litigation Alliance

Dated: April 4, 2025



**X**



← **Post**



**New to X?**

Sign up now to get your own personalized timeline!

**Secretary Marco Rubio** ✔
@SecRubio

Last night, in a successful counter-terrorism operation with our allies in El Salvador, the United States military transferred a group of 17 violent criminals from the Tren de Aragua and MS-13 organizations, including murderers and rapists.

In order to keep the American people safe, @POTUS designated the Tren de Aragua and MS-13 as Foreign Terrorist Organizations. These criminals will no longer terrorize our communities and citizens.

Once again, we extend our gratitude to @nayibbukele and the government of El Salvador for their unparalleled partnership in making our countries safe against transnational crime and terrorism.

8:25 AM · Mar 31, 2025 · **1.6M** Views

💬 3.2K          ↻ 11K          ♡ 59K          🔖 628          ⬆

💬 **Read 3.2K replies**

G **Sign up with Google**

 **Sign up with Apple**

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Something went wrong. Try reloading.

Retry

Terms of Service   Privacy Policy   Cookie Policy
Accessibility   Ads info   More ···   © 2025 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in          Sign up

Appx125

Case 1:25-cv-10676-BEM   Document 50-2   Filed 04/04/25   Page 1 of 2



X

Settings

← Post

⇄ **Secretary Marco Rubio reposted**
**Nayib Bukele** ✓
@nayibbukele

Last night, in a joint military operation with our allies from the United States, we transferred 17 extremely dangerous criminals linked to Tren de Aragua and MS-13.

All individuals are confirmed murderers and high-profile offenders, including six child rapists.

This operation is another step in the fight against terrorism and organized crime.



9:42 AM · Mar 31, 2025 · **64M** Views

💬 8.9K        ⇄ 31K        ♡ 152K        🔖 8.3K        ⬆

💬 Read 8.9K replies

**New to X?**
Sign up now to get you

G   Sign u

🍎 Sign

Creat

By signing up, you agre
Privacy Policy, includin

Something wen

Terms of Service   Priv
Accessibility   Ads info

**Don't miss what's happening**
People on X are the first to know.

Log in

Appx126



Naya Bukele on X: "Last night, in a joint military operation with our allies from the United States, we transferred 17 extremely danger…

X

⚙ Settings

**New to X?**

Sign up now to get you

 Sign t

Creat

By signing up, you agre
Privacy Policy, includin

Something wer

Terms of Service   Priv
Accessibility   Ads inf

**Don't miss what's happening**

People on X are the first to know.

Log in

UNITED  TATE  DI  TRICT COURT
FOR T  E DI  TRICT OF COLU   BIA

J.G.G.   *t a* .,

Petitioner,

v.

DONALD J. TRUMP,  *t a* .,

Respondents.

No. 1:25-cv-766 (JEB)

<u>Declaration Of Acting Field Office Director
Robert L. Cerna</u>

**DECLARATION OF ROBERT L  CERNA**

I, Robert L. Cerna, pursuant to 28 U.S.C.   1746, declare under penalty of perjury as follows:

1.      I am an Acting Field Office Director Enforcement and Removal Operations ("ERO") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

2.      As the (A)FOD of the Harlingen Field Office, I am responsible for, among other things, the detention and enforcement operations of more than 350 employees, assigned to six ERO Harlingen offices. ERO Harlingen encompasses fifteen South Texas counties and is responsible for six detention facilities with a combined total of 3,790 detention beds.

3.    I am aware that the instant lawsuit has been filed regarding the removal of Venezuelan members of Tren de Aragua ("TdA") pursuant to the Alien Enemies Act ("AEA").

4.    I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

5.    ICE understood the Proclamation *nvo at on o  th    n  n      t   a d n th  nva on o  h   n t d Stat       n D    a  ua* to be effective only once it was posted to the White House website (https:  www.whitehouse.gov presidential-actions 2025 03 invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua ), which was at or around 3:53 PM EDT on March 15, 2025.  Based on the face of the Proclamation, it had been signed by the President on March 14, 2025.

6.    On March 15, 2025, after the Proclamation was publicly posted and took effect, three planes carrying aliens departed the United States for El Salvador International Airport (SAL).  Two of those planes departed U.S. territory and airspace before 7:25 PM EDT.  The third plane departed after that time, but all individuals on that third plane had Title 8 final removal orders and thus were not removed solely on the basis of the Proclamation at issue.  To avoid any doubt, no one on any flight departing the United States after 7:25 PM EDT on March 15, 2025, was removed solely on the basis of the Proclamation at issue. ICE carefully tracks the TdA members who are amenable to removal proceedings. At this time approximately 54 members of TdA are in detention and on the detained docket, approximately 172 are on the non-detained docket, and approximately 32 are in criminal custody with active detainers against them. Should they be transferred to ICE custody, they will likely be placed in removal proceedings.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of March 2025.

ROBERT L
CERNA II

Digitally signed by
ROBERT L CERNA II
Date: 2025.03.18
10:45:15 -05'00'

Robert L. Cerna
Acting Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# El Salvador 2023 Human Rights Report

## Executive Summary

Under the state of exception, reports of gang violence decreased significantly, allowing citizens to exercise their right to life, liberty, and security of person, and to engage in daily activities and commerce without the constant threat of violence and extortion.  Arbitrary arrests and mass pretrial hearings, however, undermined due process and exacerbated historically difficult conditions in overcrowded prisons.

Significant human rights issues included credible reports of:  unlawful or arbitrary killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; arbitrary or unlawful interference with privacy; extensive gender-based violence, including domestic and sexual violence, and femicide; substantial barriers to sexual and reproductive health services access; trafficking in persons, including forced labor; and crimes involving violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons.

The government took credible steps to identify and punish officials who may have committed human rights abuses.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx 131

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were reports that the government or its agents committed arbitrary or unlawful killings, largely stemming from deaths of detainees while in prison, either from medical neglect or physical abuse.  The human rights nongovernmental organization (NGO) Socorro Jurídico Humanitario recorded the deaths of 79 detainees as of August 16 and determined that 33 of the deaths were violent.  The human rights organization Cristosal confirmed 71 deaths of detainees and determined that 13 of the deaths showed signs of violence, including beatings by a club or baton.  In March the newspaper *El Pais* interviewed several released detainees, one of whom stated prison guards beat his cellmate to death.  Socorro Jurídico Humanitario reported that 21 detainees died from a lack of medical attention.  Cristosal reported two of the detainees who died had anemia and 11 died of complications from illnesses such as diabetes to chronic kidney disease.

On June 13, the attorney general announced his office had investigated 143 deaths in prison during the state of exception and that his office, in conjunction with the Institute for Legal Medicine, had determined the 143 deaths resulted from pre-existing conditions or illness.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.132

The government reported that widespread killings by criminal gangs decreased significantly in comparison with previous years.  The Attorney General's Office reported intentional homicides of a criminal nature (excluding ones resulting from a family or social dispute) decreased from 366 during the first half of 2022 to 32 during the first half of 2023.  The government and observers widely attributed the decrease to the government's policies under the state of exception, declared in March 2022 and extended monthly.  As of December, it continued in effect.  Despite the reduction, the Observatory for Human Rights at the University of Central America, a human rights think tank, argued the government homicide figures could have been undercounted, as they did not take into consideration the number of human remains located or disappearances reported.

## b. Disappearance

There were regular reports that security and law enforcement officials arrested persons and did not inform their families of their whereabouts. Socorro Jurídico Humanitario reported that as of August, it was tracking 1,376 cases in which the families of those detained under the state of exception did not receive confirmation that their relatives were in the prison system, information regarding their whereabouts, or confirmation that they were alive.  Socorro Jurídico Humanitario also reported that in three cases, detainees' bodies were interred before their families were notified of their

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.133

deaths.  The Human Rights Ombudsperson's Office (PDDH) received 17 complaints regarding the lack of information on detainees under the state of exception.

Media and human rights groups reported cases of disappearances and missing persons continued to occur, although it was often impossible to distinguish between a "disappearance" and a "missing person," due to limited law enforcement resources to investigate.  In June the Foundation of Studies for the Application of Law calculated there were 2,397 unresolved cases of missing persons first reported between January 2019 and June 2022.  The National Civil Police (PNC) reported that of the missing persons reported from January to August, 143 cases remained unsolved as of August 11.

On March 27, the minister of justice and public security announced that investigations into disappearances would remain suspended, as authorities continued to prioritize capturing gang members.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

The law prohibited such practices, but there were credible reports that government officials employed them.

Human rights organizations and media outlets reported complaints of abuse

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.134

and mistreatment of detainees by prison guards.  On July 14, a coalition of human rights organizations at an Interamerican Human Rights Commission public audience stated they collectively interviewed more than 100 released detainees, many of whom reported systemic abuse in the prison system, including beatings by guards and the use of electric shocks.  The coalition alleged the treatment of prisoners constituted torture.

On March 25, the newspaper *El País* reported a man released from Izalco prison said guards beat one of his cellmates to death with batons and the butts of their rifles.  He also said guards activated electric stun guns against the prison's wet floors to deliver electric shocks to all the prisoners in a cell.

Cristosal spoke with the family of a prisoner who died of stomach cancer on February 10, after being released from Zacatecoluca prison on January 28. Cristosal reported his body showed signs of torture, including significant bruising on his back and stomach, as well as signs of malnutrition and gastrointestinal hemorrhaging.

There were sporadic complaints of mistreatment by police and members of the armed forces.  As of July 26, the PNC registered 48 complaints of threats committed by police officers.  As of July 31, 129 victims registered complaints with the PDDH regarding the violation of physical integrity, mistreatment, or physical abuse by the PNC, and seven registered complaints of the same abuses committed by members of the armed forces. Five victims registered complaints with the PDDH concerning torture or

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.135

cruel and inhuman punishment at the hands of PNC officers, and one victim registered a complaint of the same treatment committed by members of the armed forces.

The judiciary continued prosecuting several cases from the civil war against members of the armed forces. The judge in the 1981 El Mozote massacre case continued to hear witness testimony. The government, however, continued to deny expert witnesses access to military archives to determine criminal responsibility for the massacre, in defiance of a 2020 judicial order. On February 7, a judge opened trial proceedings against three former soldiers who allegedly belonged to a death squad that kidnapped, tortured, and killed civilians in San Miguel during the civil war. This was the first time a case involving death squad members had come to trial.

Impunity was a problem in the General Directorate of Penal Centers, particularly for prison guards. Human rights organizations noted the Attorney General's Office had not opened any complaints into the allegations of torture, abuse, or mistreatment by prison guards.

Some concerns remained regarding impunity in the PNC and armed forces. The state of exception empowered security forces to make arrests without meeting traditional evidentiary standards, and media and civil society reported some security officials might have used that authority to extract bribes, sexual favors, or other concessions from citizens. Some members of the security forces were convicted, however, and were facing criminal

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.136

proceedings for misconduct, such as sexual assault.

## Prison and Detention Center Conditions

Prison conditions before the state of exception were harsh and life threatening due to gross overcrowding; inadequate sanitary conditions; insufficient food and water shortages; a lack of medical services in prison facilities; and physical attacks.  The addition of 72,000 detainees under the state of exception exacerbated the problem.  Human rights organizations reported that as of August 22, more than 70 detainees died in prisons from violence, insufficient medical care, and chronic health conditions.

**Abusive Physical Conditions:**  Prisons were severely overcrowded, as the number of detainees increased and only a limited number were released.  As of July, the government reported that 71,776 persons were detained under the state of exception.  In 2021, the prison system had a capacity of 30,000 and was already overcrowded.  The government inaugurated a new prison with a reported capacity for 40,000 on January 31, but as of September, only 12,000 detainees had been moved into it.  A prisoner released from the Izalco prison reported that 100 prisoners were held in a cell built for 50.

Detainees released from the Izalco and La Esperanza prisons reported a lack of food and potable water and being limited to two tortillas, one spoonful of beans, and one glass of water per day.  They also reported limited water for

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.137

sanitation.  Human rights organizations noted released prisoners reported severe heat and lack of ventilation in the cells and prolonged confinement, without the opportunity for movement or the use of sanitary facilities.

Released prisoners and their families reported a lack of access to medical care or medicine in prison.  One released prisoner reported to *El País* that his diabetic cellmate received insulin only two or three times during his period of incarceration and died suddenly in his sleep.  Although families of prisoners were often instructed to bring medicine to the prison for the prisoner, the medicine often did not reach the prisoner.  Human rights organizations reported communicable diseases such as tuberculosis and scabies were widespread in the prisons.

Human rights groups and news outlets reported unsanitary conditions and limited food and medical care in women's prisons.  There were reports of life-threatening lack of medical care or sanitation for detained pregnant women and young children held with their mothers.  On July 24, the newspaper *El Faro* published an interview with a released prisoner who gave birth while in prison.  She reported being held in a unit with 150 other pregnant women in the Izalco prison farm, with two doctors assigned to them.  She reported receiving only sporadic prenatal care and extremely limited access to medicine.  Cristosal published a statement from a released prisoner who reported many pregnant women miscarried due to a lack of medical care.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.138

Young babies often stayed with their mothers in prison and received limited medical care, despite widespread scabies and other communicable diseases. The newspaper *El Diario de Hoy* reported that on May 17, a girl, age one, died of pneumonia after being held in Apanteos prison with her mother for six months.  Socorro Jurídico Humanitario reported a baby, age six months, born while his mother was held in Izalco, died of kidney failure, liver failure, and pneumonia on June 26, six days after he was transferred from the prison to the care of other members of his family.

**Administration:**  The PDDH had the authority to investigate allegations of abusive conditions in prison; however, the human rights ombudsperson reported the PDDH did not receive access to visit prisons during the year. PDDH representatives conducted 32 visits to jails in the Ahuachapan Department, where they found the detainees' basic needs were provided for but detainees were transferred to prisons within five days of their arrest, without the ability to contact their families.

**Independent Monitoring:**  The International Committee of the Red Cross had access to prison facilities.

## d. Arbitrary Arrest or Detention

The constitution prohibited arbitrary arrests, and the law provided for the right of any person to challenge the lawfulness of their arrest or detention in court.  The state of exception, itself a legal mechanism, suspended the right

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.139

to legal defense, as well as the requirement that persons be informed of the reason of their arrest at the time of their detention, and increased the number of days an individual could be held in detention before being formally charged.  The government did not always observe the requirements of the law and constitution.

## Arrest Procedures and Treatment of Detainees

The constitution required a written warrant for arrest, except in cases where an individual was caught in the act of committing a crime.  The language of the state of exception decree did not detail changes to enforcement procedures.

Security forces arrested suspected gang members or collaborators "in the act" of being a gang member or collaborator without a warrant and entered homes without warrants, ostensibly with verbal permission of the residents. The state of exception decree suspended the right to legal counsel, and law enforcement agents did not wait for suspects to obtain counsel before questioning them.

A July 2022 change in the law provided that hearings for gang membership charges could proceed without the detainees' physical presence, although with defense counsel participating in person.  Many detainees' hearings were conducted virtually and en masse, often with one defense lawyer in the courtroom representing hundreds of persons appearing by video, unable

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.140

to consult with their defense lawyers in real time or hear the proceedings because of technical problems, complicated by the number of participants.

In July the Legislative Assembly approved legislation for the prosecution of detainees under the state of exception cases, eliminating the previous provision that a criminal process could not exceed 24 months. As of November, no case from the state of exception had gone to trial.

The court system was slow to respond to habeas corpus petitions filed by those challenging their detention under the state of exception. In July Socorro Jurídico Humanitario submitted 1,285 requests for habeas corpus and received 28 responses, of which 25 were declared inadmissible.

**Arbitrary Arrest:** As of July 31, the PDDH reported 738 complaints of arbitrary detention, compared with 283 from January to July 2022. Civil society entities also received complaints from the public regarding arbitrary arrests during the state of exception, although fewer than in 2022. Cristosal reported that as of August 9, it received 348 complaints of arbitrary arrest, compared with 3,110 such complaints in 2022. Several human rights organizations asserted that many detainees who remained in pretrial detention were arrested arbitrarily in 2022, without evidence of gang affiliation and only for having tattoos or living in a gang-controlled area. Leaked arrest files of 690 persons detained in March-April 2022 showed 50 were charged with being a gang member based on a suspicious or nervous appearance, and 50 for having a tattoo, with no indication if the tattoo was

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.141

gang-related.

The government established an anonymous tip line to provide information about gang members.  Media reported cases in which detainees, or their families, believed they had been arrested on the basis of anonymous complaints.  On March 30, in an interview with the BBC, the vice president declared police did not carry out arrests based on tattoos or being named in an anonymous call.  He stated the government maintained a database of profiled gang members and carried out arrests based on that database.  The vice president acknowledged it was possible persons with no gang ties were arrested but noted that courts released more than 3,000 detainees after determining they had no such ties.  On August 22, the minister of justice and public security reported that of the more than 71,000 persons arrested under the state of exception, approximately 7,000 had been released.

On July 28, the PNC reported four police officers were arrested on charges of detaining civilians and extorting their relatives for money in exchange for their release.

**Pretrial Detention:**  Lengthy pretrial detention was a significant problem. COVID-19 pandemic closures had already severely delayed trial and hearing dates, and the sharp increase in cases during the state of exception further exacerbated the situation.  For example, in the majority of hearings, judges ordered defendants to remain in detention even when the Attorney General's Office failed to provide sufficient evidence demonstrating

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.142

defendants were affiliated with a gang.

In March the Foundation for the Study of the Application of Law noted prosecutors often requested extensions to the six-month evidence-gathering period due to their large caseload resulting from the state of exception. This further prolonged pretrial detention.

## e. Denial of Fair Public Trial

The law provided for an independent judiciary. The government held approximately 72,000 detainees to try under the state of exception but presented no plan to accomplish this. The government indicated it likely would resort to mass trials, calling into question the availability of a fair public trial for these detainees.

### Trial Procedures

The law provided for the right to a fair and public trial, but the state of exception suspended the right to be informed promptly of charges and the right to defense. Other rights were not always respected. The law allowed for trials for gang membership charges to proceed without the defendants' physical presence, although with defense counsel participating in person. On July 26, the Legislative Assembly approved amendments to the law that would allow collective trials with up to 900 defendants for those who were already detained under the state of exception and were charged as gang

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.143

members.  No case of persons detained under the state of exception had gone to trial as of November.

After implementation of the state of exception, the demand for public defenders exceeded the capacity of the Public Defender's Office.  One public defender noted in 2022 that his caseload had grown from 45-50 new cases a month to 95 new cases a day.  In March the Foundation for the Study of the Application of Law reported that defense lawyers continued to be overwhelmed by cases.

## Political Prisoners and Detainees

The government arrested or continued to detain sitting and former politicians from opposition parties and the governing party.  Media questioned the legitimacy of the detentions, but the government declared the charges against them were legitimate.  The detainees were generally subjected to the same harsh prison conditions as convicted prisoners.

As of August 24, Ernesto Muyshondt, former mayor of San Salvador and a prominent opposition politician, had been detained for more than two years and two months, even though the criminal code prior to the state of exception did not allow for defendants to be held for more than two years in pretrial detention without a sentence.  Arrested in 2021, he was acquitted of misappropriation of tax withholdings and breach of duty on August 9.  The remaining charges against him were for appropriation of five million dollars

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.144

in labor contributions and also electoral fraud and illicit associations for allegedly negotiating with gangs in exchange for votes in the 2015 legislative elections.

Muyshondt developed serious health problems during his detainment and in 2022 said that while detained he was beaten and tied up. In January he was hospitalized after a four-week hunger strike. Prison officials did not comply with seven subsequent orders issued by a judge for Muyshondt to be taken to a hospital. During a preliminary hearing on April 23, Muyshondt said prison officials planned to kill him and that the Director of Penitentiaries, Osiris Luna, had denied him access to a hospital for 63 days.

Two former Farabundo Marti National Liberation Front (FMLN) party officials, charged in 2021 with money laundering and illicit enrichment, remained in detention. Three other former FMLN officials also charged in the same case were under house arrest. Defenders of the three claimed they were detained for political reasons, while the government asserted the charges against them were legitimate. Investigations continued as of October.

On January 11, six former FMLN guerrillas were arrested in Santa Marta, Cabañas, for the 1989 kidnapping, torture, and killing of Maria Inés Alvarenga during the civil war. Many in the Santa Marta community recalled the accused parading Alvarenga's body around town as a warning and few denied the allegations, but they said the government was pursuing the

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.145

charges for possibly political reasons.  Five of those arrested were members of an FMLN-linked community organization that advocated against mining. Defenders of those arrested claimed authorities chose to prosecute the case to silence their environmental activism.  The repeal of the civil war amnesty law in 2016 allowed for the prosecution of cases from the civil war.  The government declared the charges against the former guerrillas were legitimate and based on testimony from multiple witnesses.

## f. Transnational Repression

Not applicable.

## g. Property Seizure and Restitution

Not applicable.

## h. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The constitution prohibited such actions.  Reforms to the criminal code introduced in 2022 allowed the Attorney General's Office to carry out a wide range of undercover digital monitoring activities without a warrant, with no restrictions on scope or duration.  There were allegations the government tracked journalists, members of NGOs, and political opponents and collected information from private messages on their cell phones.  There were reports

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.146

security forces entered homes without warrants.

As of August, the Association of Journalists of El Salvador (APES) reported two cases of government officials monitoring of journalists, two cases of surveilling journalists, and one case of illegally accessing the telephone of a journalist.

The PNC reported that as of July 26, they received nine complaints that police officers entered homes without a warrant.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The constitution provided for freedom of expression, including for members of the press and other media, and the government generally respected this right.  Journalists, media and civil society organizations, and opposition figures criticized the government's online harassment of critics and rhetoric towards journalists.  There were sporadic reports of monitoring and threats against journalists.

**Freedom of Expression:**  In November the government repealed a 2022 amendment to the criminal code that prohibited creating, reproducing, or transmitting any visual content (texts, images, graffiti, or other forms of

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.147

visual expression) that related to gangs, and stipulated a penalty of 10 to 15 years in prison. Media organizations and NGOs stated this had served as a threat to journalists and had created a chilling effect on the independent media for the duration of time it was active. The government stated the legislation was designed to prevent persons from relaying gang messages to the public. No one was arrested under this law while it was in effect.

**Violence and Harassment:** As of August, the APES Center for Monitoring Attacks on Journalists reported 14 acts of intimidation against journalists committed by government officials, six cases in which government officials threatened journalists, and two instances in which government officials issued threats of legal action against journalists.

APES and other media outlets reported one journalist was detained arbitrarily. The journalist, Victor Barahona, host of a local television show, was arrested in June 2022 on charges of gang associations and released on parole on May 19. Barahona said his arrest was either because he interviewed a guest on his show who criticized local government leaders for corruption or because of his involvement in a community organization in a gang-controlled neighborhood. In July he gave an interview regarding prison conditions to national media. After the interview, he was summoned to a hearing to review his conditions of release, during which he was warned to keep the process confidential, according to his lawyer.

APES reported that from January to August, five journalists left the country.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.148

Two left pre-emptively after publishing investigative pieces, and three cited threats as their reason for leaving.  One other journalist moved internally after publishing an investigative piece, and another moved internally after he reported he was followed to his residence by police and military officials.

APES raised concerns that in 10 separate instances, government officials arbitrarily stopped journalists and prevented them from carrying out their work, restricting their access into certain areas and demanding that they delete photographic or video footage.  In one such instance, on March 31, five soldiers prevented two journalists from *El Diario de Hoy* from entering a section of a neighborhood and said they needed a permit to enter.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:**  In April *El Faro*, an investigative online newspaper, moved its administrative headquarters and legal registration to Costa Rica, citing primarily the multiple audits it faced from the Ministry of Finance and fabricated criminal accusations, as well as surveillance, threats, harassment of advertisers, and defamation by public officials.  Its journalists remained in the country and continued to report.

There were reports that other news outlets also experienced harassment of advertisers and chose to self-censor or reduce operations.

**Nongovernmental Impact:**  Unlike in previous years, there were no reports that journalists who reported on gangs and narcotics trafficking were

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.149

subject to threats from criminal groups.

**Internet Freedom**

The government did not restrict or disrupt access to the internet or censor online content.

There were reports that government-backed bots and troll accounts were used to manipulate social media discourse.  On July 14, the investigative digital magazine *Revista Factum* tracked the activity of a network of progovernment accounts they determined to be trolls.  The site's reporters determined the most prolific account tweeted up to 700 times per day and had 61,000 followers.  *Revista Factum* reported that in one case, the network generated more than 2,000 negative tweets against a target in 24 hours.

# b. Freedoms of Peaceful Assembly and Association

The constitution provided for the freedoms of peaceful assembly and association, and the government generally respected these rights.

# c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

# d. Freedom of Movement and the Right to Leave the

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.150

## Country

The constitution provided for freedom of internal movement, foreign travel, emigration, and repatriation.  As part of Phase V of the administration's "territorial control plan," security forces occasionally restricted movement around and into certain, mostly low-income, neighborhoods with a history of gang activity.

In contrast with previous years, gangs did not restrict movement between neighborhoods and areas.  In February *El Faro* visited 14 previously gang-controlled communities.  The residents interviewed reported gangs no longer restricted movement between communities or the circulation of outside service providers in their neighborhoods.  The residents reported having access for the first time to services such as ride-hailing apps and food delivery.  Communities were able to use communal spaces, including soccer fields and cemeteries, without restriction; previously only gang members were allowed access.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees and other humanitarian organizations in providing protection and assistance to refugees or asylum seekers, as well as other persons of concern.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.151

**Access to Asylum:**  The law provided for the granting of asylum or refugee status, and the government had a system for providing protection to refugees, but the law had major regulatory and operational gaps.  The legal framework required persons with international protection needs to file their claim within five days of entering the country and asylum seekers to renew their status every 30 days.

# f. Status and Treatment of Internally Displaced Persons (IDPs)

The Internal Displacement Monitoring Center estimated there were 52,000 new IDPs due to violence in 2022 (most recent data available), noting the causes included threats, extortion, and killings perpetrated by criminal gangs.  The center also reported an additional 4,600 IDPs in 2022, affected mostly by Tropical Storm Julia.

# Section 3. Freedom to Participate in the Political Process

The constitution provided citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.152

# Elections and Political Participation

**Abuses or Irregularities in Recent Elections:**  National elections were widely reported to be fair and free of abuses and irregularities.

**Political Parties and Political Participation:**  On March 15, the Legislative Assembly repealed a section of the electoral code that prohibited changes to election laws within one year of elections.  In June the Legislative Assembly approved laws to reduce the number of deputies in the assembly from 84 to 60 and the number of municipalities from 262 to 44.  The law also changed the formula for calculating party seat distribution in the assembly.  Some opposition politicians and political analysts argued these reductions were designed to consolidate the power of the president's party, Nuevas Ideas (New Ideas).  The NGO Acción Ciudadana (Citizen Action) stated several small minority parties risked losing representation in the Legislative Assembly altogether under the new formula.  President Nayib Bukele and Nuevas Ideas legislators asserted the change would return the number of deputies to the same number that existed in 1991 prior to the signing of the peace accords, which added deputies to increase FMLN representation, and that reducing the number of municipalities was necessary to streamline government administration and to save money.  The reforms were passed quickly, but in line with democratic requirements per the constitution.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.153

**Participation of Women and Members of Marginalized or Vulnerable Groups:** Some transgender persons reported difficulties registering to vote and voting because their gender identities did not match the gender stated on their identification cards.

# Section 4. Corruption in Government

The law provided criminal penalties for corruption by officials, and the government implemented the law, prosecuting officials from both the opposition and the governing party.

**Corruption:** President Bukele touted his government's enforcement actions against corrupt officials, declaring a "war on corruption" on June 1. The Attorney General's Office filed civil and criminal charges against, and courts convicted, high-ranking officials from past administrations. Charges were also filed against sitting officials in municipal governments as well as several lower-level sitting Nuevas Ideas officials and one Nuevas Ideas Legislative Assembly member. Courts convicted former high-ranking officials from several past administrations on charges of corruption. Allegations of corruption among sitting officials persisted, however. Opposition critics argued the government selectively prosecuted corruption charges to persecute political opponents.

As of July 26, the Attorney General's Office opened investigations into 285 cases involving corruption, including embezzlement, extortion, illicit

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.154

negotiations, illicit enrichment, and bribery.  As of August 10, the Government Ethics Tribunal reported it opened 178 administrative proceedings against 290 public officials.  The tribunal imposed sanctions in 25 cases and referred eight cases to the Attorney General's Office.

On May 29, a court sentenced former President Mauricio Funes to 14 years in prison for arranging a gang truce during his administration.  Funes, who resided in Nicaragua, called the trial unjust and politically motivated.  On August 10, court proceedings began against Funes' former wife and nine other former high-level members of his administration for money laundering, embezzlement, and tax evasion.

As part of President Bukele's "war on corruption," the Attorney General's Office seized the assets of former President Alfredo Cristiani on June 1, alleging he stole public funds while in office and used those funds to enrich himself and family members.  Cristiani did not reside in the country.  Corruption-related charges were brought against a former Supreme Electoral Tribunal president and a former president of the Legislative Assembly.  A former minister of defense, a former minister of justice, a former Legislative Assembly deputy, a former state intelligence agency director, and a former vice minister of commerce and industry were convicted of corruption-related charges.

Municipal officials were also the subject of corruption charges and investigations.  On August 11, the mayors of two municipalities, Conchagua

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.155

and Tacuba, along with various other municipal officials and council members, were arrested on unrelated corruption charges.  The mayor of Conchagua and two associates charged with him remained under arrest as of August 22, while the remaining officials were released pending their initial hearing.

Although most officials investigated for or charged with corruption were from the ARENA party, FMLN, or minor opposition parties, several sitting members of the Nuevas Ideas party also faced corruption investigations.  On January 11, the Attorney General's Office charged the mayor of Soyapango, Nercy Patricia Montano De Martínez, and four other officials in the mayor's office with misappropriation and embezzlement of public funds.  Montano, a member of the Nuevas Ideas party, had been the subject of municipal unrest and protests due to her mismanagement of funds.  In February a waste disposal company filed a complaint with the Attorney General's Office against the Nuevas Ideas mayor of Mejicanos, Saúl Antonio Meléndez, accusing the mayor of embezzlement and breach of duty for nonpayment of services rendered totaling more than $896,000, plus interest.  On August 9, the attorney general accused Nuevas Ideas deputy Erick Garcia of fraud relating to election campaign expenses and requested the Legislative Assembly strip Garcia of his immunity.  The Legislative Assembly voted to do so on August 17, and Garcia was arrested the same day.  Garcia's alternate deputy, Nidia Aracely Turcios Anaya, was also arrested.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.156

For additional information about corruption in the country, please see the Department of State's *Investment Climate Statement* for the country, and the Department of State's *International Narcotics Control Strategy Report*, which includes information on financial crimes.

# Section 5. Governmental Posture Towards International and Nongovernmental Monitoring and Investigation of Alleged Abuses of Human Rights

A variety of domestic and international human rights groups generally operated without government restriction to monitor or investigate human rights conditions or cases and publish their findings. Several domestic human rights groups, including Cristosal, accused the government of opening excessive audits into their operations as an intimidation tactic and using the revocation of tax-exempt status as a tool to punish organizations critical of the government.

Human rights groups observed that the government increasingly declined to make public data for monitoring and analysis purposes. *Gato Encerrado*, an investigative newspaper, noted the government continued to expand the types of information it classified as confidential and not subject to public disclosure requirements.

**Government Human Rights Bodies:** The principal human rights

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.157

investigative and monitoring body was the autonomous PDDH, whose ombudsperson was chosen by the Legislative Assembly for a three-year term. The PDDH had a constitutional duty to investigate human rights abuses and defend human rights conventions in the country. Some NGOs believed the PDDH was not fully independent or effective.

On May 25, President Bukele created a Presidential Commission for Human Rights and Freedom of Speech and appointed Andrés Guzmán Caballero as the commissioner. The responsibilities and duties of the commission were unclear.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:** The law criminalized rape of women or men, domestic or intimate partner rape, and other forms of domestic and sexual violence, including so-called corrective rape of lesbian, gay, bisexual, transgender, queer, or intersex (LGBTQI+) persons. The law could apply to spousal rape, at the judge's discretion. The law required the Attorney General's Office to prosecute rape cases whether or not the survivor pressed charges and did not permit the survivor to withdraw the charge. The penalty for rape was generally imprisonment for six to 10 years. Laws against rape were not effectively enforced.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.158

Violence against women, including domestic violence, remained a widespread and serious problem.  The law prohibited domestic violence and generally provided for sentences ranging from one to three years in prison, although some forms of domestic violence carried higher penalties.  The law also permitted restraining orders against offenders.  The law against domestic violence was poorly enforced.  The domestic NGO Feminist Network Against Violence Against Women analyzed cases of violence reported in the first half of 2021 and found the conviction rate was 6 percent.  They attributed the low conviction rate to fear of aggressors, normalization of violence, a lack of understanding regarding survivors' rights, impunity, and an overall patriarchal system.

ORMUSA, a domestic women's rights organization, registered 26 femicides between January and May 31, 42 percent of which were committed by the partner of the victim and 54 percent of which were committed in the home of the victim.  On February 21, the Legislative Assembly unanimously voted to remove the statute of limitations for prosecuting femicide.

**Other Forms of Gender-based Violence or Harassment:** The law prohibited sexual harassment and established sentences of five to eight years' imprisonment for the crime.  Courts also could impose fines in cases in which the perpetrator held a position of trust or authority over the victim.  By law, employers were required to create and implement programs to prevent sexual harassment.  The government, however, did not consistently

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.159

enforce the law effectively.  The Union of Seamstresses and Tailors asserted the Ministry of Labor lacked the will to investigate one such sexual harassment case it filed during the year.

As of August 26, the PNC registered 21 complaints of sexual harassment committed by police officers.  On February 7, a police officer filed a complaint against the chief inspector of her division for sexual harassment.

**Discrimination:**  The constitution granted women and men the same legal status.  The law was generally respected, but with exceptions.  Women faced discrimination in employment and occupation.  Although the law provided for equal pay between men and women, women did not receive equal pay.  In 2021, the United Nations reported that women made 18 percent less than men in the same jobs.  The law established sentences of one to three years in prison for public officials who denied a person's civil rights based on gender, and six months to two years for employers convicted of discriminating against women in the workplace, but labor organizations noted that employees generally did not report such discrimination due to fear of employer reprisals.

**Reproductive Rights:**  There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

The law banned abortion under all circumstances.  Civil society advocates expressed concern the ban led to the wrongful incarceration of women who

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.160

suffered severe pregnancy complications, including miscarriages.  As of July 26, the Attorney General's Office reported six women were under investigation for abortions and two for alleged feticide, which the legal system termed "homicide of a 'recently born' child," a charge often invoked for suspicions related to the cause of miscarriage.  Charges were brought in one case of feticide.

Numerous factors served as barriers to access sexual and reproductive health services.  In 2021, UN experts noted that there was "a systemic practice of discrimination against women who suffer obstetric emergencies or pregnancy losses."  In 2022, the women's rights organization Las Dignas presented the results of a study on contraception access carried out in two rural districts.  It found that 20 percent of the population studied had an active sex life but did not use contraceptives for reasons including dangerous or difficult conditions that prevented travel to health centers, not having required parental authorization for minors to obtain contraceptives, and a lack of availability of contraceptives in health centers.

The government provided access to sexual and reproductive health services for survivors of sexual violence, and emergency contraception and postexposure prophylaxis were available as part of clinical management of rape.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.161

# Systemic Racial or Ethnic Violence and Discrimination

There were several laws to protect members of racial or ethnic minorities or groups from violence and discrimination.  The government did not enforce the laws effectively, and the administration took no action to implement a 2018 policy designed to focus on the inclusion of ethnic groups in all social and economic aspects.  Some civil society organizations and individuals reported instances of racial discrimination against Afro-descendent persons and Indigenous groups.

# Indigenous Peoples

The constitution recognized Indigenous peoples and stated the government was required to adopt policies to maintain and develop the ethnic and cultural identity, world view, values, and spirituality of Indigenous peoples. The law provided for the preservation of Indigenous languages and archeological sites.  The municipalities of Cacaopera and Yucuaiquin, in the eastern part of the country, had special laws to recognize Indigenous cultural heritage.

Although the law provided for Indigenous groups to participate in decision making on issues that affected their rights, it did not include the right to be consulted regarding development and other projects envisioned on Indigenous land, nor did it provide Indigenous groups the right to share in revenue from exploitation of natural resources on historically Indigenous

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.162

lands.  The government did not demarcate any lands as belonging to Indigenous communities.  Because few Indigenous persons possessed title to land, opportunities for bank loans and other forms of credit were limited.

As of October, there was no progress in the case against the Attorney General's Office brought by victims' family members for failing to investigate the death of three Indigenous persons during "The Massacre of 1932."

# Children

**Child Abuse:**  The law prohibited child abuse.  Penalties for child abuse included losing custody of the child and three to 26 years' imprisonment, depending on the nature of the abuse.  The government enforced the law effectively.

**Child, Early, and Forced Marriage:**  The legal minimum age for marriage was 18.  The law banned child marriage to prevent child abusers from avoiding imprisonment by marrying their underage victims, and the law likewise banned exceptions to child marriage in cases where the child was pregnant.  The government enforced the law effectively.

**Sexual Exploitation of Children:**  The law prohibited the sale, grooming, or use of children for commercial sexual exploitation, including sex trafficking.  The law stipulated imprisonment of 16 to 20 years.

The minimum age for consensual sex was 18.  The law classified statutory

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.163

rape as sexual relations with anyone younger than age 18 and included sentences of four to 13 years' imprisonment.

The law prohibited paying anyone younger than 18 for sexual services. The law prohibited participating in, facilitating, or purchasing materials containing child pornography and provided for prison sentences of up to 16 years. Despite these provisions, sexual exploitation of children remained a problem. The government did not enforce the law effectively.

## Antisemitism

The Jewish community totaled approximately 150 persons. There were no reports of antisemitic incidents.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:** The law did not criminalize consensual same-sex conduct between adults, cross-dressing, or other sexual or gender characteristic-related behaviors.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.164

**Violence and Harassment:** COMCAVIS TRANS, a domestic NGO that promoted LGBTQI+ rights, found 43 percent of transgender women, 42 percent of cisgender men, and 14 percent of cisgender women had encountered problems with law enforcement officials.

Violence against LGBTQI+ persons was a problem. The Attorney General's Office reported that as of July 26, 13 LGBTQI+ persons were victims of sexual assault or harassment, and one was the victim of bodily harm.

The law allowed for stricter sentences for crimes committed on the basis of sex, gender identity, and gender expression, among other categories. The PDDH recorded and investigated complaints of violence and harassment against LGBTQI+ individuals. As of July 31, the PDDH received 20 complaints, involving 23 victims, ranging from five victims of acts of cruel and degrading punishment to five victims of insults.

**Discrimination:** The law prohibited discrimination by state and nonstate actors based on sexual orientation, gender identity or expression, or sex characteristics. Discrimination against LGBTQI+ persons was widespread and hindered access to education and employment. Surveys conducted in 2021 by COMCAVIS TRANS found that 39 percent of LGBTQI+ individuals surveyed were unemployed, compared with 5 percent of the general population. Transgender persons regularly faced discrimination in health care, banking, and voting.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.165

**Availability of Legal Gender Recognition:**  The Legislative Assembly did not take steps to create a procedure allowing transgender persons to change their identity documents to reflect their gender, despite a 2022 Supreme Court ruling to do so by February.

**Involuntary or Coercive Medical or Psychological Practices:**  There were no reports of the practice of so-called conversion therapy targeting LGBTQI+ individuals in an attempt to change their sexual orientation, gender identity, or expression.  There were no reports that medically unnecessary and irreversible "normalization" surgeries were performed on children or on nonconsenting adult intersex persons.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** There were no restrictions on freedom of expression or association regarding LGBTQI+ matters.

## Persons with Disabilities

The law prohibited discrimination against persons with physical, sensory, intellectual, and mental disabilities, but the government did not enforce the law.  Persons with disabilities did not have access to education, health services, public buildings, or transportation on an equal basis with others. Persons with disabilities faced discrimination in employment and occupation.  No formal system existed for filing a discrimination complaint based on disability.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.166

The National Council for Comprehensive Attention to Persons with Disability (CONAIPD), composed of representatives from multiple government entities, was the agency responsible for protecting the rights of persons with a disability, but it lacked enforcement power. According to a CONAIPD representative, the government did not effectively enforce legal requirements for access to buildings or information and communications for persons with disabilities. Few access ramps or provisions for the mobility of persons with disabilities existed.

Disability advocates said children with disabilities faced access problems in school, including a lack of ramps and other accommodations. The government provided little support for schools to include accommodations, and there were few teachers trained to teach students with disabilities.

Persons with disabilities also faced discrimination in the public health-care system. Disabilities rights groups reported that women with disabilities were often instructed by their doctors to use birth control to avoid having children, believing the women would bear children with disabilities.

Persons with disabilities faced discrimination in employment and occupation. CONAIPD stated there was no mechanism to verify compliance with the law requiring businesses and nongovernment agencies to hire one person with disabilities for every 25 hires. CONAIPD reported employers frequently fired persons who acquired disabilities and would not consider persons with disabilities for work for which they were qualified. The

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.167

Network of Survivors and Persons with Disabilities Foundation noted the Special Law on Inclusion of Persons with Disabilities was never implemented or enforced.  The Association of Blind Women added that companies preferred to pay fines instead of employing workers with disabilities.

## Other Societal Violence or Discrimination

The law prohibited discrimination based on HIV or AIDS status.  As of August 11, the PDDH received three complaints of discrimination against persons with HIV or AIDS.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provided for the right of most workers to form and join independent unions, in certain workplaces to bargain collectively, and after a lengthy regulated process, the right to strike.  The government did not enforce these rights.  Unions experienced lengthy delays in processing their credentials with the Ministry of Labor, some waiting nine months or longer.  Without credentials, unions could not engage in collective bargaining or participate in tripartite entities that governed worker-related issues such as setting a minimum wage, health care, and housing.  According to media reports and union representatives, the minister of labor rewarded unions

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.168

loyal to him and his party with expedited credentials and punished unions critical of the government by delaying their certifications.

The law prohibited antiunion discrimination, and workers were protected from firing or demotion for union organizing activity. If fired during this time, they could bring cases to court for reinstatement. Members of the military, judges, and high-level public officers could not form or join unions. Workers in private security firms could not form or join unions. The labor code did not cover public-sector workers and municipal workers, whose wages and terms of employment were regulated by law. Only citizens could serve on unions' executive committees. The labor code also barred individuals from holding membership in more than one trade union. Unions had to meet certain requirements to register, including having a minimum of 35 members. If the Ministry of Labor denied registration, the law prohibited any attempt to organize for up to six months following the denial.

Collective bargaining was strictly regulated. Unions representing fewer than 51 percent of the workers in an enterprise did not have the right to bargain, even on behalf of their own members. Provisions of the law allowed either party to a collective bargaining agreement, under some conditions, to seek to change its provisions after one year in force. Employees of most public institutions did not have the right to bargain collectively.

The law contained cumbersome and complex procedures for conducting a legal strike. The law did not recognize the right to strike for public and

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.169

municipal employees or for workers in essential services.  The law did not specify which services met this definition, and courts therefore applied this provision on a case-by-case basis.  The law required that 30 percent of all workers in an enterprise support a strike for it to be legal and that 51 percent support the strike before all workers were bound by the decision to strike.  Unions could strike only to obtain or modify a collective bargaining agreement or to protect the common professional interests of the workers.  Unions were required to engage in negotiation, mediation, and arbitration processes before striking, although many unions often skipped or expedited these steps.  Workers at times engaged in strikes that did not meet legal requirements.  The law provided no way for workers to appeal a government decision declaring a strike illegal.

The government did not effectively enforce the laws on freedom of association and the right to collective bargaining, and penalties were less than those for other laws involving denials of civil rights, such as discrimination.  Penalties were rarely applied against violators.  Judicial procedures were subject to lengthy delays and appeals.  According to union representatives, the government inconsistently enforced labor rights for a wide range of workers, and enforcement was dependent upon the political affiliations of their labor unions.

Unions reported that their members sometimes faced violence or threats of violence and that viable legal recourse against such violence was

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.170

unavailable.  Public-sector union members reported public officials threatened to dismiss employees who made labor complaints.

On January 10, three members of the union of municipal workers in Soyapango were arrested on charges of public disorder and resisting arrest during a demonstration in which they demanded payment of salary owed. The charges against them were provisionally dismissed in June.

There were concerns the lowered standard of evidence required for an arrest under the state of exception allowed employers and municipal officials to retaliate against union members by alleging they were gang members.  The human rights NGO Socorro Jurídico Humanitario reported 21 union members were arrested during the state of exception, 40 percent on charges of gang associations and 60 percent on charges of public disorder or resisting arrest.  The NGO stated the individuals were arrested for their labor-related activities, but their cases were handled following the same procedures as other state-of-exception cases, as if the arrestees were members of illicit groups.  The NGO further reported that as of August 16, 10 union members remained in pretrial detention.

Although many unions were aligned with political parties, they functioned independently from the government and political parties.

## b. Prohibition of Forced or Compulsory Labor

See the Department of State's annual *Trafficking in Persons Report* at

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.171

https://www.state.gov/trafficking-in-persons-report/.

# c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

# d. Discrimination (see section 6)

# e. Acceptable Conditions of Work

**Wage and Hour Laws:** The law provided for a minimum wage for all sectors, to be set by the government. The minimum wage varied by sector; all were above poverty income levels. The law set a maximum normal workweek of 44 hours – limited to no more than six days per week and to no more than eight hours per day – but allowed overtime, which was to be paid at double the usual hourly wage. The law mandated that full-time employees receive pay for an eight-hour day of rest in addition to the 44-hour normal workweek. The law prohibited compulsory overtime for all workers other than domestic employees, such as maids and gardeners, who were obligated to work on holidays if their employer made this request. In such cases, they were entitled to double pay.

**Occupational Safety and Health:** The Ministry of Labor set and enforced

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.172

occupational safety and health (OSH) standards, and the standards were appropriate for the main industries.  The law established a tripartite committee to review the standards.  The law required employers to take steps to meet OSH requirements in the workplace, including providing proper equipment and training and a violence-free environment.  The law promoted occupational safety awareness, training, and worker participation in OSH matters.

Workers could legally remove themselves from situations that endangered health or safety without jeopardy to their employment.

**Wage, Hour, and OSH Enforcement:**  The government did not adequately enforce wage, hour, or OSH laws.  Penalties were less than those for similar crimes, such as fraud, and were rarely applied against violators.  Some companies reportedly found it more cost-effective to pay fines than comply with the law.  The Ministry of Labor was responsible for enforcing wage, hour, and OSH laws.

The government trained inspectors on legal standards.  The number of inspectors was insufficient to enforce compliance.  Inspectors did not have the authority to initiate unannounced inspections or sanctions.  Inspections were scheduled according to a calendar set by the Inspections Directorate or to verify a complaint, and labor inspectors notified companies prior to their arrival.  Allegations of corruption among labor inspectors continued.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.173

The Ministry of Labor received complaints regarding failure to pay overtime, minimum wage violations, unpaid salaries, and the illegal withholding of benefits, including social security and pension funds.  Reports of overtime and wage violations occurred in several sectors.  According to the ministry, employers in the agricultural sector routinely violated the laws requiring annual bonuses, vacation days, and rest days.  Women in domestic service faced exploitation, mistreatment, verbal abuse, threats, sexual harassment, and generally poor work conditions.  Workers in the textile industry reportedly experienced violations of wage, hour, and safety laws.

The informal sector represented almost 75 percent of the economy.  The government did no enforce labor laws in this sector.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.174

# Mexico 2023 Human Rights Report

## Executive Summary

There were no significant changes in the human rights situation in Mexico during the year.

Significant human rights issues included credible reports of: unlawful or arbitrary killings, including extrajudicial killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; serious restrictions on freedom of expression and media freedom, including violence against journalists and enforcement of or threat to enforce criminal libel laws to limit expression; serious government corruption; extensive gender-based violence, including domestic or intimate partner violence, sexual violence, workplace violence, child, early, and forced marriage, femicide, and other forms of such violence; crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons; crimes involving violence or threats of violence targeting persons with disabilities; and significant or systematic restrictions on workers' freedom of association, including crimes of violence and intimidation against workers.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx3175

The government generally took credible steps to identify and punish officials who may have committed human rights abuses.

Criminal elements, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of homicide, torture, kidnapping, extortion, human trafficking, bribery, intimidation, and other threats, resulting in high levels of violence and exploitation. The government investigated and prosecuted some of these crimes, but the majority remained uninvestigated and unprosecuted.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were several reports that government entities or their agents committed arbitrary or unlawful killings, including extrajudicial killings, during the year.

On February 26, members of the Secretariat of National Defense's (SEDENA) 16th Motorized Calvary Regiment shot at a vehicle in Nuevo Laredo, Tamaulipas, killing five civilians and wounding one other. On April 10, a civilian federal judge ordered the detention of four SEDENA soldiers on charges of attempted homicide in the incident. Additional SEDENA soldiers could face lesser charges for not preventing the incident.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.176

On June 6, a media outlet published an article and video in which soldiers appeared to commit extrajudicial killings of five civilians in Nuevo Laredo on May 18.  According to sources, the civilians, who were members of the transnational criminal organization Cartel del Noreste, shot at the soldiers in a vehicle chase.  SEDENA confirmed the soldiers were members of the 3rd Special Forces Section.  Sixteen soldiers, including the commanding officer, were confined in a military prison while military and civilian judicial authorities conducted investigations.

On March 18, authorities found the body of Jose Portillo Gil "El Chueco," who had been shot and killed in Sinaloa.  Portillo Gil allegedly killed two Jesuit priests and a tour guide in Cerocahui, Chihuahua State, in June 2022.  As of October, authorities had not arrested the individuals who killed Portillo Gil, and the investigation continued.

The Mexican Center for Environmental Law 2022 report noted a rise in violence against environmental defenders, who were victims of intimidation, kidnapping, and homicide.  In April, attackers kidnapped and killed environmental defender, activist, and legal representative Naua don Eustasio Alcalá in Michoacán State.  Alcalá had advocated against mining exploitation in his community San Juan Huitzontla, Michoacán, without prior consultation.  The community previously obtained a favorable ruling that suspended mining concessions in 2022.

On October 25, a judge sentenced 11 security officials to 50 years in prison

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.177

for the killing of 19 persons, many of whom were migrants, in Camargo, Tamaulipas State, in 2021. The officers were found guilty of aggravated homicide, abuse of authority, and committing crimes while performing administrative duties.

## b. Disappearance

There were reports of numerous enforced disappearances by criminal groups, sometimes with allegations of collusion with authorities. Investigations, prosecutions, and convictions of enforced disappearance crimes were rare. Enforced disappearance was a persistent problem throughout the country, especially in areas with high levels of cartel- or gang-related violence.

Federal and state databases tracking enforced disappearances were incomplete and had data-sharing problems; forensic systems were highly fragmented among the local, state, and federal levels; and the volume of unsolved cases was far greater than the forensic systems were capable of handling. In its data collection, the government often merged statistics on forcibly disappeared persons with missing persons not suspected of being victims of enforced disappearance, making it difficult to compile accurate statistics on the extent of the problem.

On August 24, the Interior Secretariat's National Commission for the Search of Persons published the official registry of victims of enforced

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.178

disappearance, totaling 113,188 victims between 1964 and August 2023. The registry, published in 2013 by the Enrique Peña Nieto administration, was removed from public access in 2019 after President Andrés Manuel López Obrador classified the information as "reserved."  The registry reported police or military members had deprived 733 registered victims of liberty since the registry was first published, including 33 others who were seen in a public ministry agency before their enforced disappearance.  The registry also reported 522 migrants disappeared while traveling through the country.

The government made efforts to prevent, investigate, and punish acts of enforced disappearance involving government agents.  From January to August 2022, the National Human Rights Commission (CNDH) received seven complaints accusing government agents of enforced disappearances, including three against the army and three against the Attorney General's Office.

In August 2022, Undersecretary of Human Rights Alejandro Encinas released a report confirming the 2014 enforced disappearances of 43 students from the Ayotzinapa Rural Teachers' College in Iguala, in the state of Guerrero, was a "state" crime.  The report found various local, state, and federal officials – by commission or omission – were involved in carrying out or covering up crimes in conjunction with the atrocities.  Following several arrests in 2022, the Attorney General's Office reissued 17 arrest warrants in

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.179

June for additional suspects who were previously suspended in October 2022. Sixteen warrants were issued for military personnel and one for a suspect who had asylum in a neighboring country. On June 25, authorities arrested Gualberto Ramírez, who oversaw the initial investigation of the students' enforced disappearances in 2014 as the former head of the antikidnapping unit of the former Special Prosecutor's Office for Organized Crime Investigation. Ramírez was charged with torture and investigation mismanagement. On July 6, the Attorney General's Office arrested retired General Rafael Hernández Nieto, the second-highest-ranking detainee and former commander of the 41st Infantry Battalion in Iguala, for enforced disappearance and participation in organized crime, but on August 22, a judge released him. As of November, no suspects had been convicted for their involvement.

In July, the Interdisciplinary Group of Independent Experts, appointed by the Inter-American Commission on Human Rights (IACHR), presented its sixth and final report on Ayotzinapa. The report determined the 43 students were not involved with criminal groups and stated members of the former Center for Investigation and National Security, former Prosecutor General's Office antikidnapping unit, SEDENA, and the Secretariat of the Navy withheld key information during the investigation, including their presence at the scene when the students were forcibly disappeared. The report determined SEDENA refused to comply with President López Obrador's order to provide crucial information, including telephone and message

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.180

records.

On September 27, Undersecretary Encinas presented the Presidential Ayotzinapa Truth and Justice Commission's second report, which outlined areas controlled by criminal organizations in Guerrero and pointed to possible student locations. Encinas stated there was no evidence linking any of the students to the criminal organization Guerreros Unidos and confirmed SEDENA's involvement in the students' enforced disappearance.

The National Search Commission reported carrying out 5,194 exhumations as of July 21; 2,404 bodies were identified and 1,437 were returned to their families. In May, authorities reported finding 30 clandestine graves in Tecoman, Colima, that contained at least 53 bodies and hundreds of bone fragments.

Since 2020, perpetrators killed seven relatives of disappeared victims in alleged retaliation for their efforts to find family members. On May 2, Teresa Magueyal, who was searching for her son, was killed in Guanajuato. The Attorney General's Office opened an investigation into the case, but no suspects were charged as of October.

On August 21, government authorities reportedly violently removed relatives of disappeared persons who participated in a protest outside the Queretaro Attorney General's Office. The protesters demanded the government allow access to government services, including Forensic

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.181

Medical Services and Social Reintegration Centers, to search for the disappeared.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

Federal law prohibited torture or cruel, inhuman, or degrading treatment or punishment, as well as the admission of confessions obtained through illicit means as evidence in court. Despite these prohibitions, there were reports that security forces tortured detainees.

Civil society groups reported torture was a generalized practice. In 2022, the Mexican Commission for the Defense and Promotion of Human Rights stated that human rights organizations received approximately 9,500 complaints for torture and inhuman treatment. Victims most often accused municipal police, public security, and state attorney general's offices of torture or inhuman treatment. Between January and April, the CNDH registered 20 complaints of torture and 94 of arbitrary detention committed by personnel in the Secretariat of Security, National Guard, Attorney General's Office, armed forces, and the National Migration Institute.

There were accusations of sexual abuse committed by authorities during arrest and detention. In March, authorities published new guidelines for the Mechanism for Monitoring Cases of Sexual Torture against Women, in response to a recommendation from the Inter-American Court of Human

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.182

Rights.  Civil society organizations reported that despite publishing the new guidelines, the mechanism was not operating sufficiently, administrators had met only once, and no new cases had been reviewed as of July 31.

On July 13, authorities detained Adolfo Karam, the former judicial police director of Puebla, accused of torturing Lydia Cacho, who exposed former Puebla Governor Mario Marín and several business leaders' involvement in a child sex trafficking ring in 2005.  Marín remained in detention as of October.

Impunity for torture was prevalent among the security forces. Nongovernmental organizations (NGOs) stated that authorities failed to investigate torture allegations adequately.  As of August 14, the Attorney General's Office was investigating more than 2,600 torture-related inquiries and conducting 700 investigations.

## Prison and Detention Center Conditions

Conditions in prisons and detention centers were often harsh and life threatening.

**Abusive Physical Conditions:**  According to the NGO Legal Assistance for Human Rights, some federal and state prisons were grossly overcrowded. The state of Mexico had the highest rate of overcrowding at 242 percent capacity.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.183

Authorities reportedly transferred individuals from one prison to another without prior notice and without the possibility of prisoners or family members challenging the transfers. Women inmates said transfers to a prison in the state of Morelos left them without the possibility of receiving visits. The CNDH and the National Mechanism reported human rights abuses of women in that prison, particularly their rights to physical and mental health, and made recommendations to prison authorities to reduce the prison population and provide adequate health, education, work, and exercise resources for inmates. Access to sleeping and medical areas was limited.

Civil society organizations stated that individuals in migratory detention reported cases of threats and degrading treatment, spoiled food, generally bad conditions, and sensory deprivation, deprivation of vital needs, and difficulty sleeping due to lights being turned on full time.

On March 27, 40 migrants died and 27 were seriously injured after a fire at a migrant detention center in Ciudad Juarez, Chihuahua, administered by the National Institute of Migration. The fire allegedly started after detained migrants set fire to their mattresses to protest overcrowded detention conditions, lack of sufficient food, and water shortages. Video footage showed migration agents failed to unlock doors of the holding cell where migrants were trapped.

Criminal groups reportedly continued to oversee illicit activities from within

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.184

penitentiaries, and rival drug cartel members often fought in prisons. In January, during a violent prison break, armed criminal gunmen opened fire in a Ciudad Juarez prison, resulting in the deaths of seven prisoners, 10 guards, and two gunmen. During the confrontation, 25 prisoners escaped.

The CNDH found many prisons did not provide sufficient care for elderly persons, women and minors living with them, Indigenous persons, persons with disabilities, persons with HIV or AIDS, and lesbian, gay, bisexual, transgender, queer, or intersex (LGBTQI+) persons.

**Administration:** Authorities did not always conduct investigations into credible allegations of mistreatment.

**Independent Monitoring:** The government permitted independent monitoring of prison conditions by the International Committee of the Red Cross, the CNDH, and state human rights commissions.

# d. Arbitrary Arrest or Detention

Federal law prohibited arbitrary arrest and detention and provided for the right of any person to challenge the lawfulness of their arrest or detention in court; however, the government sometimes failed to observe these requirements.

## Arrest Procedures and Treatment of Detainees

The constitution allowed any person to arrest another if a crime was

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.185

committed in their presence.  A warrant for arrest was not required if an official detained a person in the act of committing a crime.  Bail was available for most crimes, except 22 crimes, including violent offenses, and crimes involving criminal groups.  In most cases, the law required detainees to appear before a judge for a custody hearing within 48 hours of arrest, during which authorities had to produce sufficient evidence to justify continued detention.  This requirement was not followed in all cases, particularly in remote areas of the country.  In cases involving criminal groups, the law allowed authorities to hold suspects up to 96 hours before requiring them to seek judicial review.

The procedure known in Spanish as *arraigo* (a constitutionally permitted form of pretrial detention employed during the investigative phase of a criminal case before probable cause was fully established) allowed, with a judge's approval, for certain suspects to be detained prior to filing formal charges.

Detainees complained police made arrests arbitrarily without a warrant, denied them access to family members and to counsel, and held them in isolation for several days.  Police occasionally failed to provide impoverished detainees access to counsel during arrests and investigations as provided for by law.

**Arbitrary Arrest:** Allegations of arbitrary detentions occurred throughout the year.  The IACHR, the UN Working Group on Arbitrary Detention, and

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.186

NGOs expressed concerns regarding arbitrary detention and the potential for it to lead to other human rights abuses.

**Pretrial Detention:** Lengthy pretrial detention was a problem, and authorities did not always promptly release those detained unlawfully. The law provided time limits and conditions on pretrial detention, but federal authorities sometimes failed to comply with them since caseloads far exceeded the capacity of the federal judicial system. Abuses of time limits on pretrial detention were endemic in state judicial systems. In November 2022, the Supreme Court eliminated automatic pretrial detention for fraud and tax crimes. Activists claimed the decision did not go far enough to protect habeas corpus rights, while local legal experts noted the decision could hinder the government's ability to curb financial crimes. The UN Office of the High Commissioner for Human Rights documented cases in the states of Mexico and Chiapas in which detainees remained in pretrial detention for more than 12 years.

In May, authorities rearrested Daniel García Rodríguez, who was accused of murder in 2001. Rodríguez was previously arrested and held in pretrial detention for more than 17 years before being released with an ankle monitor in 2019. He remained in pretrial detention as of October.

As of August 9, Verónica Razo had been in pretrial detention for 12 years, awaiting trial for allegedly kidnapping and participating in criminal group activities. In 2022, the UN Working Group on Arbitrary Detention called for

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.187

her release, and the Federal Defense Public Institute maintained that police sexually tortured her and forced her to plead guilty. Brenda Quevedo Cruz remained in pretrial detention as of October, despite a 2020 announcement by authorities they would release her. Quevedo Cruz had been detained without trial since 2007 for allegedly participating in organized crime activities and for kidnapping.

## e. Denial of Fair Public Trial

Although the constitution and law provided for an independent judiciary, court decisions were susceptible to improper influence by both private and public entities, particularly at the state and local level, as well as by transnational criminal organizations. Authorities sometimes failed to respect court orders, and arrest warrants were sometimes ignored, consistent with the lack of judicial independence and rule of law throughout the legal system. Across the criminal justice system, many actors lacked the necessary training and capacity to carry out their duties fairly and consistently in line with the principle of equal justice.

President López Obrador and other government actors verbally attacked the judiciary, particularly the Supreme Court, criticizing judges who ruled against the administration on numerous occasions. In March, during a massive rally in Mexico City, government supporters burned an effigy of Chief Justice Norma Piña, accusing her of corruption. In May, Veracruz Governor

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.188

Cuitlahuac Garcia led a demonstration in Mexico City where supporters carried coffins with the names of seven of the 11 Supreme Court justices and accused them of siding with conservative opponents and ruling against administration priorities.

On June 16, the National Guard detained Judge Angélica Sánchez Hernández without an arrest warrant in Mexico City for alleged crimes against public faith and influence peddling after she ordered the release of murder suspect Itiel Palacios from pretrial detention.  A federal judge ordered her immediate release after concluding local authorities violated the suspension of an injunction Hernández obtained on July 9.  Authorities previously arrested Sánchez Hernández on June 5 for allegedly shooting at police officers, which she denied, and was later released.  She remained under house arrest while the investigations continued.

## Trial Procedures

The law provided for the right to a fair and public trial, and the judiciary generally enforced the right.

Defendants had the right to an attorney of their choice at all stages of criminal proceedings.  By law, attorneys were required to meet professional qualifications to represent a defendant.  Not all public defenders were qualified, however, and often the state public defender system was understaffed.  According to the Center for Economic Research and Teaching,

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.189

most criminal suspects did not receive representation until after their first custody hearing, thus making individuals vulnerable to coercion to sign false statements prior to appearing before a judge.

Defendants had the right to free assistance of an interpreter, if needed, although interpretation and translation services for speakers of Indigenous languages were not always available. According to the Indigenous Professional Center for Advice, Advocacy, and Translation, Indigenous defendants who did not speak Spanish sometimes were unaware of the status of their cases and were convicted without fully understanding the documents they were instructed to sign.

**Political Prisoners and Detainees**

There were no reports of political prisoners or detainees.

# f. Transnational Repression

Not applicable.

# g. Property Seizure and Restitution

Not applicable.

# h. Arbitrary or Unlawful Interference with Privacy, Family,

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.190

## Home, or Correspondence

The law prohibited arbitrary or unlawful interference with privacy, family, home, or correspondence and required search warrants.  There were some complaints that authorities conducted illegal searches or illegal destruction of private property.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The law provided for freedom of expression, including for members of the press and other media, and the government generally respected this right. The government continued exerting significant pressure due to being a source of advertising revenue for many media organizations, which at times influenced coverage.

**Freedom of Expression:**  Independent media were active and expressed a wide variety of views without restriction but often self-censored due to fear of reprisals from government officials and transnational criminal organizations.

Official discrediting of press workers continued.  Politicians, including President López Obrador, publicly discredited and criticized such journalists,

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.191

presenting them as biased, partisan, and corrupt.  The administration continued to showcase a weekly "Who's Who in Lies" segment in the president's morning press conference to expose journalists who allegedly reported fake news.  In 2022, the NGO Article 19 registered at least 176 disparaging comments from the President's Office directed toward media outlets, journalists, and civil society organizations.  Several journalists cited constant threats.  Reyna Haydee Ramírez, a journalist for the news agency Communication and Information on Women (CIMAC), said the president's discourse caused listeners to interpret his words as an "order to attack."  Ramírez was subsequently barred from attending the president's morning conferences.

**Violence and Harassment:**  Journalists were killed or subjected to physical attacks, cyberattacks, harassment, and intimidation (especially by state agents and transnational criminal organizations) in response to their reporting.  This limited media's ability to investigate and report, since many of the reporters who were killed covered crime, corruption, and local politics.  High levels of impunity, including for killings or attacks on journalists, resulted in self-censorship and reduced freedom of expression and the press.

According to civil society representatives, as of September 25, at least four journalists were killed:  Marco Aurelio Ramírez (Puebla), Luis Martín Sánchez (Nayarit), Nelson Matus (Guerrero), and Jesús Gutiérrez Vergara (Sonora).

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.192

In addition, on July 8, journalist Luis Marín Sánchez Íñiguez was found dead in Tepic, Nayarit. The correspondent for the daily newspaper *La Jornada* and media site *Crítica Digital Noticias* disappeared from his home on July 5. The state attorney general's office confirmed he was killed possibly due to his work in journalism. Two of his colleagues, who were also reported missing, were found alive on July 8-9.

On July 6, journalist Juan Carlos Hinojosa disappeared in Nanchital, Veracruz; the case remained unsolved as of October.

On July 15, unidentified attackers shot at independent journalist María Luisa Estrada and her daughter in Guadalajara, Jalisco. Estrada and her daughter were unharmed, but Estrada said a police officer at the crime scene cautioned her regarding her crime and corruption reporting and described the attack as a warning.

The Interior Secretariat registered 72 verbal and physical attacks against journalists in 2022, 42 percent of which the secretariat attributed to public servants. The most common aggressions were intimidation and harassment, followed by threats and physical attacks, according to civil society groups. In November 2022, CIMAC reported a 210 percent increase in attacks against women in journalism from January 2019 to July 2022, compared with 2012-18, which CIMAC noted was the period of the previous presidency. CIMAC found most common attacks against women in journalism were stigmatization, intimidation, and harassment online and in person.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.193

Between 2019 and June 2022, the Office of the Special Prosecutor for Crimes against Journalists, a unit in the Attorney General's Office, charged 186 persons with crimes against journalists.  As of October, the Attorney General's Office prosecuted only 16 cases.  Since its inception, the Special Prosecutor's Office took to trial only 21 percent of the 1,629 cases it opened.  Digital media journalists covering stories such as crime, corruption, and human rights violations experienced physical violence and online abuse. Online discrimination, harassment, and threats were problems particularly for women journalists and politicians, as well as any individual and organizations advocating for women's rights.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:**  Human rights groups reported that some state and local governments censored media.  Journalists reported altering their coverage due to a lack of government protection, attacks against members of media and newsrooms, and threats or retributions against their families, among other reasons.  There were reports of journalists practicing self-censorship due to threats from criminal groups and government officials.

Freedom of expression advocacy groups reported the government, despite reductions in its advertising budgets, continued to have a strong financial impact and influence on the largest media companies.  The civil society groups Fundar and Article 19 underscored a lack of federal government

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.194

transparency in selecting media outlets for public advertising, noting that 55 percent of its budget went to only 10 media outlets in 2022.

**Libel/Slander Laws:** There were no federal criminal laws against defamation, libel, or slander; however, nine states had criminal laws regarding these three acts. In four states, the crimes of defamation and libel were prosecuted, with penalties ranging from three days to five years in prison and fines for committing defamation or slander, both considered "crimes against honor." Slander was punishable under the criminal laws of five states, with sentences ranging from three months to six years in prison and fines. Twenty-five states had laws protecting authorities from alleged insults. Five states had laws that restricted the publishing of political caricatures or "memes" but seldom enforced them. In addition to criminal libel and defamation laws, civil law defined "moral damage" as similar to defamation concerning harm to a person's "feelings, affections, beliefs, dignity, honor, reputation, and privacy," according to the NGO Committee to Protect Journalists.

On April 25, President López Obrador repealed the 1917 Law on Printing Crimes, which previously increased punishments for insults against the president, congress, army, and other institutions.

**Nongovernmental Impact:** Criminal groups exercised grave influence over media outlets and reporters, threatening individuals who published critical views of criminal groups. Concerns persisted regarding criminal groups' use

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.195

of physical violence in retaliation for information posted online, which exposed journalists, bloggers, and social media users to the same level of violence faced by traditional journalists.  According to organizations defending journalists, the number of attacks against the press by organized crime groups continued to increase.  A civil society organization registered at least 86 attacks by criminal organizations and reported at least 13 of the 16 journalist homicides from 2022 to July were possibly linked to criminal groups.

In June, Chiapas press outlets reported alleged members of criminal groups hung banners in various places around the state to intimidate media.

## Internet Freedom

The government did not restrict or disrupt access to the internet or block or filter online content.

According to Freedom House's *Freedom on the Net Report 2023*, state and nonstate actors increasingly used legal threats and other methods to pressure social media platforms, web-hosting providers, and individual users to remove content.  Article 19 recorded 12 removals of journalistic content in 2022.  In April, Supreme Court Judge Yasmín Esquivel Mossa filed a complaint against journalist Lourdes Mendoza, who tweeted photographs of Mossa vacationing in Canada, accompanied by critical comments regarding the judge.  Mossa asked a court to order the removal of the photographs

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.196

and to delete Mendoza's account on X (formerly called Twitter), on the grounds that her minor son appeared in one of them and the comments allegedly incited hatred. The court ordered Mendoza and other journalists to remove or blur the photographs to protect the identity of Mossa's son but did not force Mendoza to delete her account.

NGOs alleged provisions in laws threatened the privacy of internet users by forcing telecommunication companies to retain data for two years, providing real-time geolocation data to police, and allowing authorities to obtain metadata from private communications companies without a court order. While the Supreme Court upheld the provisions, it noted the need for authorities to obtain a judicial warrant to access user metadata.

Unidentified users and bots on X posted threats against journalists who asked "difficult" questions of government officials during press engagements and in some cases disseminated the journalists' identities and media outlets and made veiled threats.

The *Freedom on the Net 2023* reported online campaigns amplified support for President López Obrador and trolled his perceived rivals or users who questioned or criticized him. In March, the digital news site *Animal Político* reported that pro-López Obrador accounts disseminated more than 20,000 tweets in an online smear campaign against the recently elected president of the Supreme Court, Norma Lucía Piña Hernández, who often ruled against López Obrador's government in judicial decisions. Many of the tweets used

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.197

the hashtag #PiñaMadrinaDeLosNarcos (#PiñaGodmotherOfTheNarcos) to make unsubstantiated links between Piña and drug trafficking.

## b. Freedoms of Peaceful Assembly and Association

The law provided for the freedoms of peaceful assembly and association, and the government generally respected these rights, with some exceptions. Twelve states had laws restricting public demonstrations. There were reports of security forces using excessive force against demonstrators. Government failures to investigate and prosecute attacks on protesters and human rights defenders resulted in impunity for these crimes, consistent with high impunity rates for all crimes. Amnesty International and other NGOs reported that acts of excessive use of force and arbitrary detention occurred against women protesters, especially those protesting gender-based violence.

On August 5, the National Guard allegedly removed and seized property from protesters in front of the Secretariat of the Interior. The protesters had participated in a sit-in for months, and during their removal, police confiscated a protester's camper and a car.

In February, President López Obrador criticized demonstrators who gathered peacefully in Mexico City to protest cuts to election funding. According to news sources, the president called the demonstrators "allies of drug cartels" and accused them of pickpocketing in the capital's main plaza.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.198

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at
https:www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

Federal law provided for freedom of internal movement, foreign travel,
emigration, and repatriation, and the government generally respected these
rights.

**In-country Movement:**  There were numerous instances of armed groups
limiting the movements of migrants, including by threats and acts of
kidnapping, extortion, and homicide.  Criminal groups dominated migrant
smuggling operations and often kidnapped, threatened, and extorted
migrants to pay a fee for facilitating northbound travel.  On August 17,
international organizations in Ciudad Juárez reported an increase in
extortion and kidnappings by smugglers.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner
for Refugees (UNHCR) and other humanitarian organizations in providing
protection and assistance to refugees, asylum seekers, and other persons of

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.199

concern.

**Access to Asylum:**  Federal law provided for granting asylum, refugee status, or complementary protection to those fleeing persecution or facing possible threats to their life, security, or liberty in their country of origin.  The government had an established procedure for determining refugee status and providing protections.  The government worked with UNHCR to improve access to refugee status determinations, improve shelter and reception conditions for vulnerable migrants and asylum applicants, and support local integration programs (including access to school, work, and other social services) for those approved for refugee and complementary protection status.

**Abuse of Refugees and Asylum Seekers:**  The press, international organizations, and NGOs reported targeting and victimization of migrants and asylum seekers by criminal groups and in some cases by police, immigration officers, and customs officials.  There were numerous instances of criminal groups extorting, threatening, or kidnapping asylum seekers and other migrants.  In many parts of the country, human smuggling organizations wielded significant power, and media alleged frequent collusion among local authorities.  There were credible reports of gender-based violence against migrants.  There were also credible reports of officially recognized asylum seekers being denied movement across the country and detained by migration authorities.  Civil society groups reported

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.200

migration authorities did not provide information regarding access to request asylum and migratory regularization and, in some cases, dissuaded migrants from pursuing such alternatives.

The government did not detain migrant children and generally exempted accompanying adults from detention to preserve family unity. Child protection authorities lacked sufficient capacity to shelter and process migrant children and families, but the government made progress to improve shelter space for children and strengthen child protection authorities. During the year, the National System for Integral Family Development transferred 1.1 billion pesos ($67 million) to 26 states to strengthen their capacity to respond to child migration. In May, the government declared it had completed the construction of 58 of the 90 shelters planned.

The government increased efforts to target human smuggling organizations, with limited results. In November 2022, the Attorney General's Office arrested the Los Panchos human smuggling leader and main collaborators. The Attorney General's Office carried out arrests in Ciudad Juarez, Chihuahua; Silao, Guanajuato; and the state of Mexico. In May, the Attorney General's Office arrested three alleged smugglers in the state of Nuevo León. Authorities found 17 migrants with the smugglers and identified 11 others at a safe house.

Obstacles to accessing international protection related most closely to

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.201

capacity limitations and lack of coordination among the relevant agencies, as opposed to official government policy.

# f. Status and Treatment of Internally Displaced Persons (IDPs)

There were 386,000 IDPs as a result of conflict and violence in 2022, according to NGOs.  The states of Chiapas, Michoacan, and Zacatecas together accounted for almost 90 percent of the total number of IDPs.  Of the IDPs in Chiapas, Indigenous peoples in Chenalhó and Frontera Comalapa represented a significant number.

Land conflicts, social and ethnic violence, or local political disputes also caused significant displacement.  Forced internal displacement disproportionately affected Indigenous communities.

The Mexican Commission for the Defense and Promotion of Human Rights recorded the highest incidence of forced internal displacement in 2022 in Frontera Comalapa and La Trinitaria, Chiapas, where 4,250 IDPs across seven communities fled criminal gang violence.  On May 25, the news outlet *Aristegui Noticias* reported families fled these regions to escape violence between Sinaloa and Jalisco Nueva Generación cartels vying for control of the border with Guatemala.

The government, in conjunction with international organizations, made

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.202

efforts to promote the safe, voluntary return, resettlement, or local integration of IDPs. The National Institute for Indigenous People had a program to assist displaced Indigenous and Afro-Mexican women.

For further information about IDPs in the country, please see the materials of the Internal Displacement Monitoring Center: https://www.internal-displacement.org.

# Section 3. Freedom to Participate in the Political Process

Federal law provided citizens the ability to choose their government through free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

## Elections and Political Participation

**Abuses or Irregularities in Recent Elections:** International observers considered the most recent national elections to be generally fair and free of abuses and irregularities.

# Section 4. Corruption in Government

The law provided criminal penalties for corruption by officials. The government generally enforced the law effectively, but there were

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.203

numerous reports of government corruption.

**Corruption:**  In February, the Federal Commission for the Protection against Sanitary Risks announced it fired 11 public servants for alleged collusion with private entities,  after finding they had destroyed evidence and shared confidential information regarding the institution's internal deliberations with outside parties.  This resulted from an investigation of allegations against commission officials for corrupt operations awarding pharmaceutical bids alleged to have occurred in 2021.

In June, the Secretariat of Public Administration announced an audit had found irregularities amounting to $550 million regarding transactions by the Mexican Food Security Agency under the Secretariat for Agriculture and Rural Development.  The case continued under investigation as of August.

Between December 2018 and June, the Secretariat of Public Administration received more than 127,000 complaints related to failure to comply with regulations and duties, misuse and authority abuse, and negligence or lack of attention in the performance of duties, of which approximately 114,000 were resolved.

For additional information about corruption in the country, please see the Department of State's *Investment Climate Statement* for the country, and the Department of State's *International Narcotics Control Strategy Report*, which includes information on financial crimes.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.204

# Section 5. Governmental Posture Towards International and Nongovernmental Monitoring and Investigation of Alleged Abuses of Human Rights

A variety of domestic and international human rights groups generally operated without government restriction to monitor or investigate human rights conditions or cases and publish their findings. Government officials were mostly cooperative and responsive to the views of these groups. President López Obrador, however, chastised civil society groups at the morning press conferences he hosted daily. Some NGOs alleged individuals who organized campaigns to discredit human rights defenders at times acted with tacit support from government officials.

**Retribution against Human Rights Defenders:** On January 15, human rights defenders Ricardo Lagunes and Antonio Díaz disappeared in Colima after advocating against mining company Ternium. While searching for her brother who disappeared in 2020, Esthela Guadalupe Estrada Ávila, an activist and member of a collective of relatives of disappeared persons, disappeared on March 29 in Tlajomulco de Zúñiga, Jalisco. On April 21, Indigenous human rights defender Alejandro Ortiz Vázquez was forced into a vehicle with four armed men in Metlatónoc, Guerrero; as of October, his whereabouts remained unknown.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.205

**Government Human Rights Bodies:**  The CNDH was a semiautonomous federal agency funded by the legislature to monitor and act on human rights abuses.  The CNDH could call on government authorities to impose administrative sanctions or pursue criminal charges against officials, but it was not authorized to impose penalties or legal sanctions.  Civil society groups questioned the CNDH's independence and effectiveness.  They noted the CNDH failed to speak out regarding pressing concerns such as the role of the military in public security activities.

All states had their own human rights commissions.  The state commissions were funded by state legislatures and were semiautonomous.  Some civil society groups, however, asserted that state commissions were subservient to the state executive branch.  State commissions did not have uniform reporting requirements, making it difficult to compare state data and therefore compile nationwide statistics.   The CNDH could take on cases from state-level commissions if it received a complaint that the state commission did not adequately investigate the case.  The independence and effectiveness of the commissions varied widely.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:**  Federal law criminalized the rape of men and women, including spousal rape and domestic or intimate partner rape and

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.206

other forms of domestic and sexual violence, as well as so-called corrective rape of LGBTQI+ persons.  Conviction carried penalties of up to 20 years' imprisonment.  Spousal rape was criminalized in 27 of the 32 states.  The government did not enforce the law effectively.  There were high rates of impunity for these crimes, consistent with high impunity rates for all crimes.

Federal law prohibited domestic violence, including gender-based violence, and stipulated penalties between six months' and four years' imprisonment. The law included media and digital violence as a form of gender-based violence.  Of the 32 states, 29 stipulated similar penalties, although sentences were often more lenient.  Federal law criminalized spousal abuse. State and municipal laws addressing domestic violence largely failed to meet the required federal standards and often were unenforced.

The National Commission to Prevent and Eradicate Violence against Women was responsible for leading government programs to combat domestic violence.  In addition to shelters, women's external assistance centers provided services including legal, psychological, and protective; however, the number of cases far surpassed institutional capacity.  Legal experts said the country lacked sufficient psychological and anthropological experts to issue the appropriate expert reports that judges required in femicide and domestic violence cases.  Federal funding assisted the operation of more than 69 shelters, external attention centers, emergency houses, and transition houses.  NGOs operated 85 percent of the facilities, and

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.207

government organizations operated the remaining 15 percent.

**Other Forms of Gender-based Violence or Harassment:**  Femicide was a federal offense punishable by 40 to 70 years in prison.  It was also a criminal offense in all states.  The Executive Secretariat of the National Public Security System reported more than 1,290 killings of women, including 426 femicides, from January to June.

On May 27, Guillermo "N" was arrested for burning his girlfriend Guadalupe "N" alive using gasoline in Tonala, Chiapas, and was awaiting trial as of August.  According to a report by *Animal Político*, in 2022 at least 90 women were attacked with acid or gasoline.  On March 2, Puebla became the first state to approve the "Malena Law," which considered acid attacks as femicide attempts and punishable by up to 40 years in prison.

In the case of the death of Debanhi Escobar in Monterrey, Nuevo León, in 2022, in January authorities arrested two persons who managed the motel where Escobar was found.

In the case of the death of Cecilia Monzón in Cholula, Puebla, in 2022, as of August 8, three of the alleged conspirators were awaiting trial, and one was released due to lack of evidence.

On March 2, Puebla's congress approved the "Monzon Law," in honor of femicide victim Cecilia Monzon.  The law suspended parental rights for men under investigation for femicide.  The law also introduced penalties for

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.208

officials who failed to act or who hindered investigations.  Mexico City, Sinaloa, Colima, and Aguascalientes adopted similar laws.

Federal law prohibited sexual harassment and provided for fines from 250 to 5,000 times the minimum daily wage, but the law was not effectively enforced.  Of the 32 states, 24 criminalized sexual harassment, and all states had provisions for punishment when the perpetrator was in a position of power.

**Discrimination:**  The law provided women the same legal status and rights as men and "equal pay for equal work performed in equal jobs, hours of work, and conditions of efficiency."  The government did not enforce the law effectively.  Women tended to earn substantially less than men did for the same work.  Women were more likely to experience discrimination in wages, working hours, and benefits.  Afro-Mexican and Indigenous women reported structural inequality in their daily lives.  Job announcements specifying desired gender, age, marital status, and parental status were common.

**Reproductive Rights:**  There were no confirmed reports of coerced abortion or involuntary sterilization on the part of government authorities.

The CNDH observed recurrent cases of obstetric violence during childbirth in the forms of neglect and physical abuse, sometimes with serious consequences on women's sexual and reproductive health.  As of October,

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.209

the CNDH issued 51 recommendations to improve or address the denial of health services, including physical and psychological abuse, performance of risky procedures, and inadequate neonatal evaluation, diagnosis, and treatment for diseases.

Federal authorities supported access to contraceptive methods, including for the purpose of family planning, but states' efforts varied widely.  Barriers to accessing contraceptives stemmed from lack of knowledge, poverty, lack of access to health services, and sexual violence from family members, strangers, or friends.

Government health service providers in 21 states said they were obligated by law to offer sexual and reproductive emergency health services for survivors of sexual violence within 120 hours of the sexual assault. Emergency contraception and postexposure prophylaxis were available in all states, including for survivors of sexual assault.  Nevertheless, women nationwide faced obstacles to accessing emergency services due to health providers' personal objections to emergency contraception or misunderstanding of their legal obligations to provide services.

Authorities reported the cause of most maternal deaths nationwide was obstetric hemorrhage (21 percent), followed by hypertension (15 percent), and abortion (8 percent).  Factors associated with maternal deaths included parents with lower levels of education, inadequate hospital infrastructure and human capacity, and lack of access to maternity care, especially for

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.210

pregnant women living in rural areas.  Southern states reported the lowest access to skilled health care during pregnancy due to geographic, financial, and cultural barriers.

A 2022 report based on a survey in five states pointed out the main barriers to menstrual health were stigma, lack of sanitation, and access to information.  It found 69 percent of menstruating persons had little or no information when their first period occurred, and 15 percent lacked access to menstrual products.

The National Population Council reported that in 2022, there were more than 350,000 pregnancies in women younger than age 19, of which approximately 9,200 were in girls ages 15 or younger (98 percent in girls ages 13-14).  The states with the majority of cases were Chiapas, Coahuila, Guerrero, and Veracruz.  Authorities attributed high adolescent birth rates to low economic status, social inequities, school dropout, low usage of contraceptives, sexual abuse, and child marriages.  Sometimes family members arranged marriages for girls younger than 18, although it was illegal nationwide.

## Systemic Racial or Ethnic Violence and Discrimination

The constitution prohibited discrimination based on ethnicity, and a federal law prohibited all forms of discrimination.  Nonetheless, discrimination was common against racial and ethnic minorities, including Black and Afro-

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.211

Mexican persons.  All states had additional laws against discrimination.  A 2019 constitutional reform recognized Afro-Mexicans as an ethnic group. The government did not enforce the law effectively.

According to a 2021 report by the National Council to Prevent Discrimination (CONAPRED), in Mexico City dark-skinned individuals experienced the most discrimination, followed by Indigenous peoples.

The National Statistical Institute (INEGI) reported that 2 percent of the population (2.5 million) self-identified as Afro-Mexican.  INEGI's 2022 National Survey on Discrimination found 36 percent of Afrodescendants older than 12 faced discrimination in the last 12 months.  The survey also reported 38 percent of Afrodescendants older than 12 said their rights were respected "little" and 28 percent that their rights were denied in the past five years.  A 2022 report from the Black Alliance for Just Immigration found Black migrants faced widespread racial discrimination from individuals and authorities, particularly in accessing employment and services.  Black migrants reported migration authorities detained Black migrants for longer periods than other migrants.

## Indigenous Peoples

CONAPRED's 2017 national survey on discrimination found 65 percent of Indigenous persons considered their rights were respected "little or not at all."  The CNDH reported Indigenous women were among the most

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.212

vulnerable groups in society.  They often experienced racism and discrimination and were frequently victims of violence.  Due at least in part to services offered only in the Spanish language, Indigenous persons generally had limited access to health care, education services, and legal means to seek justice.  In 2022, the National Council for the Evaluation of Social Development Policy published a report that found 65 percent of Indigenous peoples lived in poverty and 26 percent in extreme poverty.

In mid-July, the government resumed construction of the Mayan Train, a dual cargo-passenger railroad to cross the Yucatán Peninsula through Indigenous lands, citing a 2021 decree deeming all public infrastructure to be a matter of national security, which limited the ability of civil society and Indigenous groups to use legal avenues to halt the project.  Several Indigenous communities brought legal actions to oppose the construction, many of which were dismissed or denied.  In December 2022, the United Nations published a press release citing concerns regarding the Mayan Train's construction impact on the rights of Indigenous peoples, land and natural resources, and cultural and health rights.  On May 7, the civil society group El Sur Resiste (The South Resists) issued a statement describing how police and military agents threatened them while they raised awareness regarding megaprojects, such as the Isthmus of Tehuantepec Interoceanic Corridor and the Mayan Train.

On January 17, authorities arrested Indigenous leader David Hernández

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.213

Salazar for arson and attacks on roads and indicted 17 other Indigenous members of the Binniza community of Puente Madera in Oaxaca. According to civil society groups, including Front Line Defenders, Hernández was prosecuted for his work in opposition of megaprojects in the Isthmus of Tehuantepec, Oaxaca.

On April 23, Hugo Rolando Arévalo Abarca was sentenced to 25 years in prison for the 2021 killing of Simon Pérez, human rights activist and member of the Las Abejas de Acteal civil society organization in Chiapas, but family members continued advocating for authorities to find the suspect who ordered the killing.

The constitution provided Indigenous persons the right to self-determination, autonomy, and education. Conflicts arose from the interpretation of Indigenous communities' self-governing "normative systems." Uses and customs laws applied traditional practices to resolve disputes, choose local officials, and collect taxes, with limited federal or state government involvement. Communities and NGOs representing Indigenous groups criticized the government for failing to consult Indigenous communities adequately when making decisions regarding extractive industry and natural resource development projects on Indigenous lands.

On January 27, Indigenous persons in Xochimilco obtained an injunction to stop the construction of a National Guard base. The court asserted Mexico

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.214

City authorities failed to conduct a culturally appropriate consultation and infringed on their right to land and territory, their collective right to a territory free of militarization, and the right to a healthy environment.

On August 8, President López Obrador signed a decree to recognize and protect the sacred sites and pilgrimage routes of Indigenous peoples in the states of Jalisco, Nayarit, Durango, and San Luis Potosí.

## Children

**Birth Registration:**  Failure to register births could result in the denial of public services such as education or health care.

**Child Abuse:**  The law provided for protection against child abuse.  There were numerous reports of child abuse.  The government generally enforced the law effectively.  The National Program for the Integral Protection of Children and Adolescents, mandated by law, was responsible for coordinating the protection of children's rights at all levels of government.

**Child, Early, and Forced Marriage:**  The legal minimum marriage age was 18. Enforcement, however, was inconsistent across the states.  With a judge's consent, children could marry at younger ages.  According to a 2022 investigation by the news outlet *La Lista*, at least 153,000 child marriages took place between 2010 and 2021.  On March 15, the senate approved legislation that criminalized forced child marriage and stipulated a penalty of up to 22 years in prison.  On April 26, federal law authorities reformed the

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.215

federal penal code to prohibit forced cohabitation of minors and persons with intellectual disabilities, with punishments of eight to 15 years' imprisonment and possibly higher penalties if the victim identified as Indigenous or Afro-Mexican.

**Sexual Exploitation of Children:**  The law prohibited the sale, grooming, or use of children for commercial sexual exploitation, including sex trafficking, and authorities generally enforced the law.  Nonetheless, NGOs and media reported occurrences of sexual exploitation of minors, including child sex tourism in resort towns and northern border areas.  Authorities estimated 21,000 children were kidnapped annually for sexual exploitation.  The statute of limitations did not apply for sexual crimes against minors, including child pornography distribution, child sex tourism, corruption of minors, pederasty, sexual abuse, and rape.

## Antisemitism

The Jewish population numbered 58,876 (according to the 2020 INEGI survey).  The community experienced low levels of antisemitism.  In January, civil society organizations and activists protested against the Greek band Der Strumer, accused of being a neo-Nazi group, who was set to perform but later canceled its January 13 show in Guadalajara.

In June, local media reported multiple swastikas and Nazi insignias painted around Morelia, Michoacan.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.216

Between January and June 30, the civil society organization Central Committee (Comité Central) found 3 percent of social media content mentioning Jewish persons was antisemitic.

Jewish community representatives reported good cooperation with the government in addressing instances of antisemitic acts.

For further information on incidents in the country of antisemitism, whether or not those incidents were motivated by religion, and for reporting on the ability of Jews to exercise freedom of religion or belief, please see the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:**  No laws criminalized consensual same-sex sexual conduct between adults, cross-dressing, or other sexual or gender characteristic-related behavior.  There were no reports that neutral laws (e.g., on statutory

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.217

rape, immorality, or loitering) were disproportionately applied to LGBTQI+ persons.

**Violence and Harassment:** There were reports the government did not always investigate and punish those complicit in abuses against LGBTQI+ persons, especially outside Mexico City. Civil society groups claimed police routinely subjected LGBTQI+ persons to mistreatment while in custody.

In 2022, there were 87 killings of individuals who identified as LGBTQI+, of whom 48 were transgender, that could have been motivated by their sexual identity, according to civil society groups.

On July 15, assailants killed Ulises Nava Juárez, LGBTQI+ rights defender and head of the Department of Sexual Diversity at the Autonomous University of Guerrero, as he left the National Congress of Strategic Litigation for the Defense of Rainbow Quotas, in Aguascalientes. As of July 31, the UN Office of the High Commissioner for Human Rights documented seven killings of human rights activists, two of whom were LGBTQI+ advocates.

According to CONAPRED, the most frequent forms of aggression LGBTQI+ persons experienced were verbal violence; denial of entry, services, and rights; and killings.

**Discrimination:** Federal law prohibited discrimination against LGBTQI+ individuals. The government generally did not enforce the law. A Mexico City municipal law provided increased penalties for hate crimes based on

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.218

sexual orientation and gender identity.  As of November 16, Mexico City and the states of Baja California, Campeche, Chiapas, Chihuahua, Coahuila, Colima, Guanajuato, Morelos, Querétaro, San Luis Potosí, and Yucatán allowed LGBTQI+ couples and families adoption rights.

The 2021 National Survey of Sexual Diversity and Gender found that of three million employed LGBTQI+ individuals, one-third reported experiencing discrimination in the past 12 months.  In March, a professor who identified as gay was fired for alleged sexual misconduct in Álvaro Obregón, Durango, prompting student protests that the school's director had filed false charges against him.  From January to August 23, CONAPRED registered 22 reports of discrimination against LGBTQI+ persons.

**Availability of Legal Gender Recognition:**  Twenty states permitted adult individuals and eight states allowed children 12 years and older to update names and gender markers via a simple administrative process.  In May, for the first time, the Secretariat of Foreign Affairs issued passports with "X" as a third sex designation option.

**Involuntary or Coercive Medical or Psychological Practices:**  Sixteen states banned so-called conversion therapy practices.  According to INEGI, 14 percent of transgender persons and 10 percent of lesbian, gay, and bisexual persons were subjected to so-called conversion therapy practices.  Civil society organizations reported that, as part of the treatment process, LGBTQI+ persons undergoing so-called conversion therapy practices were

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.219

often isolated, beaten, given electroshocks, and made to undergo hormone or steroid therapies, among other actions.

Medically unnecessary surgeries and treatment continued to be done on infants and children born with sex characteristics that did not align with either a typical male or female body.  There were no reports of such surgeries done on nonconsenting intersex adults.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** There were no reports of restrictions on freedom of expression, association, or peaceful assembly related to LGBTQI+ matters.

## Persons with Disabilities

Public buildings and facilities often did not comply with the law requiring access for persons with disabilities.  Federal law prohibited discrimination against persons with physical, sensory, intellectual, and mental disabilities. The government did not effectively enforce the law.  According to the 2021 INGEI survey on the dynamics of household relationships, 73 percent of the six million women and girls older than 15 who identified having disabilities reported experiencing violence.  On June 7, the government enacted the National Code of Civil and Family Procedures, championed by disability advocacy groups.  The legislation established the right to independently decide and make decisions with appropriate support for persons with disabilities older than 18.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.220

The law prohibited discrimination against persons with disabilities, and the government approved the *National Work and Employment Program for People with Disabilities 2021-2024*, aimed at strengthening labor inclusion of persons with disabilities and supporting the employment of persons with disabilities in decent work. Nevertheless, employment discrimination against individuals with disabilities continued.

The education system provided education for students with disabilities nationwide. Nevertheless, children with disabilities attended school at a lower rate than those without disabilities.

Voting centers for federal elections were generally accessible for persons with disabilities, and ballots were available with a braille overlay for federal elections in Mexico City, but these services were inconsistently available for local elections elsewhere in the country.

The law required the Secretariat of Health to promote the creation of long-term institutions for persons with disabilities in distress, and the Secretariat of Social Development was required to establish institutions to care for, protect, and house poor, neglected, or marginalized persons with disabilities. NGOs reported authorities had not implemented programs for community integration.

Abuses occurred in institutions and care facilities housing persons with mental disabilities, including those for children. Abuses included the use of

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.221

physical and chemical restraints; physical and sexual abuse; human trafficking, including forced labor; enforced disappearance; and the illegal adoption of institutionalized children.  Persons with disabilities were vulnerable to abuse from staff members, other patients, or guests at facilities where there was inadequate supervision.  Documentation supporting the identity and origin of those staying in the facilities was lacking, and access to justice was limited, according to NGOs.  NGOs reported no changes in the mental health system to create community services or any efforts by authorities to have independent experts monitor human rights abuses in psychiatric institutions.

Institutionalized persons with disabilities often lacked adequate medical care and rehabilitation services, privacy, and clothing.  They often ate, slept, and bathed in unhygienic conditions.

## Other Societal Violence or Discrimination

The Catholic Multimedia Center reported criminal groups harassed Roman Catholic priests and religious leaders of other denominations in some parts of the country and subjected them to extortion, death threats, and intimidation.  On May 22, authorities found Catholic priest Javier Garcia Villafana shot and killed in his car on the Cuitzeo-Huandacareo highway in Michoacán.  Government officials stated the harassment of Catholic priests and evangelical Protestant pastors reflected high levels of generalized

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.222

violence throughout the country and not targeted attacks based on religious beliefs.

According to Christian Solidarity Worldwide, Catholic-majority communities sometimes discriminated against, harassed, threatened, and displaced individuals who left Catholicism or belonged to other faith communities, in addition to denying them basic services and destroying their property. On August 20, authorities in Simojovel, Chiapas, detained Presbyterian pastor Gilberto Diaz Pérez for his work, and villagers allegedly threatened to set fire to Diaz if he did not pay a fine. Diaz was released on August 26 in exchange for three other members of the Presbyterian Church, including his wife, who were released the same day after the Chiapas Interior Ministry and municipal authorities reached an agreement that Diaz would not preach in the community.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provided for the right of workers to form and join independent unions, collectively bargain, and conduct legal strikes, and it prohibited antiunion discrimination. The government continued to strengthen freedom of association protections, promote union democracy, and improve the

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.223

ability of workers to bargain collectively. By law, all groups, including agricultural and migrant workers, were protected equally.

Government efforts focused on implementation of the 2019 labor law reform that transformed the labor justice system. The reforms provided workers with the right to freely elect union representatives and approve or reject collective bargaining agreements through a secret ballot process before the agreements were registered. The reforms prevented the registration of collective bargaining agreements that nonrepresentative, undemocratic unions often negotiated and signed without the knowledge of workers as protectionist contracts, which undermined genuine collective bargaining. The reforms called for the creation of independent labor courts to replace the Conciliation and Arbitration Boards (CABs) that favored corporatist nonrepresentative unions in the resolution of disputes and facilitated the registration of protection contracts. The reforms also established an expedited and more transparent judicial process for unions to obtain collective bargaining rights.

In addition to a more impartial and streamlined judicial process for labor disputes, the reforms transferred the registration of unions and collective bargaining agreements from the CABs to a new independent Federal Center for Conciliation and Labor Registration (Federal Center). The Federal Center also carried out mandatory prejudicial conciliations at the federal level, with local conciliation centers performing the same function at the state level.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.224

During the year, the new institutions completed their first year operating in all 32 states.  The reforms required unions to amend their bylaws to ensure union democracy and proportional gender equity in their leadership.  Most unions at the federal level had amended their bylaws, and the majority of unions at the local level had also done so.

The Federal Center continued to oversee a verification process, called the "legitimization process," which required unions to organize a secret ballot vote for workers to approve or reject existing collective bargaining agreements (CBAs) by July 1.

The Secretariat for Labor and Social Welfare provided support to the Federal Center's verification of legitimization votes.  July 31 marked the deadline for the Federal Center to schedule and verify all CBA legitimization votes.  The Federal Center reported that as of September 30, 31,186 CBAs had undergone the legitimization process, 30,510 CBAs were legitimized, while 676 CBAs were nullified.  The Federal Center noted not all collective bargaining agreements required legitimization because records were duplicated, worksites had closed, work had concluded, or the collective bargaining agreement was an illegal protection contract held by a nonrepresentative union that would not request a legitimization vote.

Federal labor law required a minimum of 20 workers to form a union.  To receive government recognition, unions and their leaders were required to file for registration with the Federal Center.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.225

By law, a union could call for a strike or bargain collectively in accordance with its own statutes. Under the labor reform, to negotiate a collective bargaining agreement, the union had to first obtain a certificate of representativeness from the Federal Center demonstrating it had support from at least 30 percent of workers to be covered by the agreement, or 50 percent plus one as part of a secret ballot if there was a competing union. Before a strike could take place, a union had to file a "notice to strike" with the appropriate labor court. Workers, the employer, or an interested third party could request the court to rule on the legality of the strike, which could find the strike illegal.

Federal labor law prohibited antiunion discrimination and prohibited employers from intervening in union affairs or interfering with union activities, including through implicit or explicit reprisals against workers. The law allowed for the reinstatement of workers if the court found the employer fired the worker without just cause and the worker requested reinstatement; however, the law also exempted broad categories of employees from this protection, including so-called trusted employees and workers in the job for less than one year.

The government's failure to enforce labor laws left workers with little recourse for violations of freedom of association, poor working conditions, and other labor provisions. Penalties for these violations were commensurate with similar violations of civil rights. Penalties were rarely

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.226

applied against violators.  Labor experts reported that sanctions against companies or unions were rarely applied, including in priority sectors covered by the United States-Mexico-Canada Trade Agreement.

According to several NGOs and unions, many workers faced violence and intimidation perpetrated by protection union leaders and employers supporting them, as well as other workers, union leaders, and vigilantes hired by a company to suppress opposition to an existing union in bargaining-rights elections.  Some employers attempted to influence these elections through the illegal hiring of temporary or fake employees immediately prior to the election to vote for the company-controlled union. There were also reports of employers firing workers who attempted to organize independent unions.

From January to October, labor officials reviewed cases of alleged denial of freedom of association and collective bargaining rights at 10 facilities as part of the United States-Mexico-Canada Agreement's Rapid Response Mechanism.  Some of these were resolved and resulted in the reinstatement of workers with backpay, recognition of an independent union as the legitimate representative of workers, or both.

## b. Prohibition of Forced or Compulsory Labor

See the Department of State's *Trafficking in Persons Report* at
https://www.state.gov/trafficking-in-persons-report/.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.227

## c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

## d. Discrimination (see section 6)

## e. Acceptable Conditions of Work

**Wage and Hour Laws:** The labor law provided for a minimum wage for all sectors, with a tripartite National Minimum Wage Commission responsible for establishing minimum wages. The minimum wage was above the official estimated monthly poverty line's monetary level. More than 70 percent of formal-sector workers received between one and three times the minimum wage.

Federal law set six eight-hour days and 48 hours per week as the legal workweek. Any work of more than eight hours in a day was considered overtime, for which a worker was to receive double pay. After accumulating nine hours of overtime in a week, a worker earned triple the hourly wage. The law prohibited compulsory overtime. The law provided for 10 paid public holidays and one week of paid annual leave after completing one year of work. On January 1, the amount of paid annual leave was increased to 12 days after completion of the first year of work.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.228

According to labor rights NGOs, employers in all sectors sometimes used the illegal "hours bank" approach – requiring long hours when the workload was heavy and cutting down hours when it was light – to avoid compensating workers for overtime.  This was a common practice in the maquiladora sector, in which employers forced workers to take leave at low moments in the production cycle and obliged them to work in peak seasons, including the Christmas holiday period, without the corresponding triple pay mandated by law for voluntary overtime on national holidays.

News reports indicated poor working conditions in some factories.  These included wages lower than what the law stipulated, contentious labor management, long work hours, unjustified dismissals, a lack of social security benefits, unsafe workplaces, and no freedom of association.  Many women working in the industry reported suffering some form of abuse.

Observers from grassroots labor rights groups, international NGOs, and multinational apparel brands reported that employers in export-oriented supply chains increasingly used hiring methods that weakened job security.  For example, manufacturers commonly hired workers on one- to three-month contracts and then waited a period of days before rehiring them on new short-term contracts to avoid paying severance and to prevent workers from accruing seniority.  This practice violated federal law and restricted workers' rights to freedom of association and collective bargaining.  Observers noted it also increased the likelihood of work-related illness and

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.229

injury.  Outsourcing practices made it difficult for workers to identify their legally registered employer, thus limiting their ability to seek redress of labor grievances.

The situation of agricultural workers remained particularly precarious, with similar patterns of exploitation throughout the sector.  Labor recruiters enticed families to work during harvests with verbal promises of decent wages and a good standard of living.  Rather than receiving daily wages once a week, as mandated by law, day laborers had to meet certain harvest quotas to receive the promised wage.  Wages were illegally withheld until the end of the harvest to ensure workers did not leave.  Civil society organizations alleged workers were prohibited from leaving by threats of violence or by nonpayment of wages.  Workers had to buy food and other items at the company store at high markups, at times leaving them with no money at the end of the harvest after settling debts.  Civil society groups reported families living in inhuman conditions, with inadequate and cramped housing, no access to clean water or bathrooms, insufficient food, and without medical care.  With no access to schools or childcare, many workers took their children to work in the fields.

**Occupational Safety and Health:**  The law required employers to observe occupational safety and health (OSH) regulations appropriate for the main industries, issued jointly by the Labor Secretariat and Institute for Social Security.  Legally mandated joint management and labor committees set

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.230

standards and were responsible for overseeing workplace standards in plants and offices.  Individual employees or unions could complain directly to inspectors or safety and health officials.  By law, workers could remove themselves from situations that endangered health or safety without jeopardy to their employment.

**Wage, Hour, and OSH Enforcement:**  The government did not effectively enforce the minimum wage, overtime, and OSH laws.  Civil society organizations reported the number of labor inspections was not sufficient to secure compliance.  Criminal cases related to such violations were rarely carried out.  Penalties for violations regarding hours and minimum wage were commensurate with those for other similar laws but were rarely enforced.

A voluntary reporting system allowed formally registered businesses to enroll and self-identify as compliant with the program's requirements related to working conditions.  Registered businesses deemed to be complying according to documentation submitted were exempt from routine labor inspections for one year, although this did not prevent the Labor Secretariat from conducting complaint-based labor inspections in these businesses.

The Labor Secretariat had the authority to order labor inspections at any time in the event of labor law violations, imminent risk to employees, or workplace accidents.  Penalties for violations of OSH regulations were

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.231

commensurate with those for other similar laws but were rarely enforced.

According to INEGI, informal-sector workers represented 55 percent of total workers in the country.  The government did not enforce labor laws in this sector.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.232

# Honduras 2023 Human Rights Report

## Executive Summary

The human rights situation in Honduras was problematic, due to the prolonged *estado de excepción* (state of emergency) and an increase in gender-based violence.  The Office of the UN High Commissioner for Human Rights raised concerns regarding illegal detentions, excessive use of force, and abuses committed during warrantless home searches committed in the context of the estado de excepción.  Violence and extortion persisted at high levels, due to competition among gangs.

Significant human rights issues included credible reports of:  arbitrary or unlawful killings; torture or cruel, inhuman, or degrading treatment or punishment by government agents; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; serious restrictions on freedom of expression and media freedom, including threats against media members by criminal elements; serious government corruption; extensive gender-based violence, including domestic violence, sexual violence, and femicide; and crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons.

The government took credible steps to identify and punish officials who may

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx. 233

have committed human rights abuses or engaged in corruption, but a weak judicial system and corruption were major obstacles to obtaining convictions.

Criminal groups, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of homicide, torture, kidnapping, extortion, human trafficking, intimidation, and other threats and violence directed against human rights defenders, judicial authorities, lawyers, business community members, journalists, bloggers, women, and other vulnerable populations. The government investigated and prosecuted some of these crimes, but impunity was widespread.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were reports that the government or its agents committed one arbitrary or unlawful killing within the National Penal Institute. No further information was publicly available regarding the incident.

The Public Ministry reported eight killings of human rights activists as of September. For example, unknown assailants shot and killed Aly Domínguez on January 7 and Oquelí Domínguez on June 15. Both men were members

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.234

of the Municipal Committee in Defense of Common and Public Goods of Tocoa, in the department of Colón.  Their family was one of the most prominent environmental defenders of the Guapinol River and surrounding area, in the northern part of the country.  The government continued to investigate the killings.

In July, the government signed an agreement establishing a tripartite commission to investigate human rights abuses in the Bajo Aguan area and provide reparations to victims.

Criminal groups, such as drug traffickers and local and transnational gangs including MS-13 and the 18th Street gang, committed killings.

## b. Disappearance

There were no reports of disappearances by or on behalf of government authorities.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

Although the law prohibited such practices, there were credible reports of abuses by members of the security forces.

The National Human Rights Commission (CONADEH) reported 66 cases of alleged torture or cruel and inhuman treatment of detainees and prisoners

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.235

by security forces through August, while the Public Ministry received five such reports through July.  The quasi-governmental National Committee for the Prevention of Torture, Cruel, Inhuman, or Degrading Treatment (CONAPREV) received 41 complaints of the use of torture or cruel and inhuman treatment through September.

Corruption, a lack of investigative resources, and judicial delays led to widespread impunity, including for members of security forces.

## Prison and Detention Center Conditions

Prison conditions were harsh and at times life threatening due to gross overcrowding, malnutrition and lack of medical care, and abuse by prison officials.  The government's failure to control criminal activity and pervasive gang-related violence contributed significantly to insecurity.

**Abusive Physical Conditions:**  Prisons were severely overcrowded. CONAPREV reported that as of March 31, the prison population was more than 19,500, in a system designed for approximately 13,000 inmates.

Prisoners suffered from malnutrition, lack of adequate sanitation and medical care, and, in some prisons, lack of adequate ventilation and lighting.

CONADEH and CONAPREV reported more than 100 cases of alleged torture or cruel and inhuman treatment of detainees and prisoners by security forces.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.236

The government failed to control pervasive gang-related violence and criminal activity within the prisons.  Many prisons lacked sufficient security personnel.  Prisoners had access to weapons and other contraband, inmates attacked other inmates with impunity, and inmates and their associates outside prison threatened prison officials and their families.

On June 21, members of the 18th Street gang attacked members of a rival gang, MS-13, in the Tamara women's prison, San Pedro Sula.  Forty-six women were killed.  Following the attack, President Castro transferred control of the prison system to the military police.

**Administration:**  The judicial system was legally responsible for monitoring prison conditions.  The government tasked CONAPREV with visiting prisons and making recommendations for protecting the rights of prisoners.

**Independent Monitoring:**  After the government ordered an emergency military takeover of prisons following a deadly riot in June in the women's prison, the government generally permitted prison visits by independent local and international human rights observers, including the International Committee of the Red Cross, with some exceptions.

# d. Arbitrary Arrest or Detention

The law prohibited arbitrary arrest and detention and provided for the right of any person to challenge the lawfulness of their arrest or detention in court.  While no official statistics were provided, there were allegations of

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.237

arbitrary detention and unlawful arrest as a result of the imposed estado de
excepción.

## Arrest Procedures and Treatment of Detainees

By law, police could make arrests only with a warrant unless they made the
arrest during the commission of a crime, there was strong suspicion that a
person had committed a crime and might otherwise evade criminal
prosecution, or they encountered a person in possession of evidence related
to a crime.  The law required police to inform persons of the grounds for
their arrest and bring detainees before a competent judicial authority within
24 hours.  It stipulated that a prosecutor had 24 additional hours to decide if
there was probable cause for indictment, whereupon a judge had 24 more
hours to decide whether to issue a temporary detention order.  Such an
order could be effective for up to six days, after which the judge was
required to hold a pretrial hearing to examine whether there was probable
cause to continue pretrial detention.  The law allowed bail for persons
charged with some felonies and gave prisoners the right of prompt access to
family members.  The law allowed the release of other suspects pending
formal charges, on the condition that they periodically reported to
authorities, although management of this reporting mechanism was often
weak.  The government generally respected these provisions.

Persons suspected of any of 21 specific felonies remained in custody,
pending the conclusion of judicial proceedings against them.  Some judges

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.238

ruled that such suspects could be released on the condition they report periodically to authorities.  The law granted prisoners the right to prompt access to a lawyer of their choice and, if indigent, to government-provided counsel, although the public defender mechanism was weak, and authorities did not always abide by these requirements.

**Arbitrary Arrest:**  CONADEH and the Public Ministry did not report any statistics on cases of illegal detention or arbitrary arrest.  Nongovernmental organizations (NGOs) reported three cases of arbitrary arrest.  There were also allegations of arbitrary detention and unlawful arrest as a result of the imposed estado de excepción.

Guapinol defender Arnol Aleman was detained for 26 hours, despite having a provisional release letter.

**Pretrial Detention:**  Judicial inefficiency, corruption, and insufficient resources delayed proceedings in the criminal justice system, and lengthy pretrial detention was a serious problem.  For crimes with minimum sentences of six years' imprisonment, the law authorized pretrial detention of up to two years.  The prosecution could request an additional six-month extension, but many detainees remained in pretrial detention much longer, including for more time than the maximum period of incarceration for their alleged crime.  The law did not authorize pretrial detention for crimes with a maximum sentence of five years or less.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.239

The law mandated that authorities release detainees whose cases had not yet come to trial and whose time in pretrial detention already had exceeded the maximum prison sentence for their alleged crime.  Nonetheless, many prisoners remained in custody after completing their full sentences, and sometimes even after an acquittal, because officials failed to process their releases expeditiously.

## e. Denial of Fair Public Trial

The law provided for an independent judiciary, but the justice system was poorly staffed, inadequately equipped, often ineffective, and subject to intimidation, corruption, politicization, and patronage.  Low salaries and a lack of internal controls rendered judicial officials susceptible to bribery. Powerful special interests, including criminal groups, exercised influence on the outcomes of some court proceedings.

### Trial Procedures

The law provided for the right to a fair and public trial; however, the judiciary was often slow to enforce this right.

Credible observers noted problems in trial procedures, such as a lack of admissible evidence, judicial corruption, witness intimidation, and an ineffective witness protection program.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.240

**Political Prisoners and Detainees**

There were no reports of political prisoners or detainees.

## f. Transnational Repression

Not applicable.

## g. Property Seizure and Restitution

Not applicable.

## h. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

Although the law generally prohibited such actions, a legal exception allowed government authorities to enter a private residence to prevent a crime or in case of an emergency.  On December 6, the Office of the UN High Commissioner for Human Rights expressed concerns regarding illegal detentions, excessive use of force, and abuses committed during warrantless home searches committed in the context of the estado de excepción.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.241

# Press and Other Media

The law provided for freedom of expression, including for members of the press and other media, with some restrictions, and the government generally respected this right.  Although many press outlets were politically aligned, the press and prevailing democratic norms combined to promote freedom of expression, including for media members.

**Freedom of Expression:**  Senior government representatives criticized civil society and members of the international community for comments perceived as critical of the government.  Civil society groups reported these statements had a chilling effect on freedom of expression.

**Violence and Harassment:**  Journalists and other members of civil society reported they self-censored due to fear of criticism, harassment, and retribution by the government and its supporters.  Others reported direct acts of intimidation or threats of violence from government officials or supporters for being critical of the government.  For example, National Police agents intimidated journalist Orlin Martinez, claiming he was an informant for criminal groups.  Civil society organizations criticized the government's failure to investigate threats and incidents of violence adequately.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:**  Media members and NGOs stated the

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.242

press self-censored due to fear of retaliation from criminal groups, drug trafficking organizations, or criticism by government officials. Media also engaged in self-censorship to avoid losing lucrative advertising contracts with the government.

**Libel/Slander Laws:** Libel and slander were criminal offenses. No cases were reported during the year.

**Nongovernmental Impact:** Some journalists and other members of civil society reported threats from members of criminal groups. It was unclear how many of these threats were related to the victims' professions or activism. For example, on January 30, unknown assailants shot and killed television media editor Carlos Barahona in Tegucigalpa. On December 22, unknown assailants shot and killed social communicator Javier Ramírez Amador in the city of Danlí. Ramírez worked for Channel 24 primetime television and the Public Prosecutor's Office and had been receiving police protection since May under the National Protection Mechanism. The police officer protecting Ramírez was also shot during the attack. NGOs believed the killing was reprisal for Ramirez's work investigating criminal activities. The government continued to investigate the killing.

Several anonymous social media sites criticized journalists (as well as activists and civil society organizations) who were critical of the government or of opposition party policies.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.243

## Internet Freedom

The government did not restrict or disrupt access to the internet or censor online content.

# b. Freedoms of Peaceful Assembly and Association

The constitution provided for the freedoms of peaceful assembly and association, but the government did not always respect the right of peaceful assembly, due to a continued estado de excepción beginning in November 2022, in which these rights were suspended.

## Freedom of Peaceful Assembly

On May 9, citizens marched in a peaceful protest in the southern city of Choluteca against tax law reforms proposed by the governing LIBRE party. In response, the Castro administration convened a meeting of the National Defense and Security Council, condemned the protest, and ordered an investigation, claiming the protesters had been coerced by business owners into participating in the protest. The government promised to prosecute those involved, based on the allegation the march organizers coerced protesters to participate. As of September, police and other justice sector officials had yet to publicly identify any of the protest leaders as having committed a crime.

In another instance, in July supporters of the ruling party chased peaceful

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.244

protesters while throwing objects at them to disrupt their demonstration. The government also reportedly used its control of the Honduran Transportation Institute to arbitrarily enforce intercity bus travel rules in August to reduce numbers of protesters at another opposition-led protest in Tegucigalpa.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

The law provided for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these rights.

**In-country Movement:**  There were areas where authorities could not assure freedom of movement due to criminal activity and a lack of significant government presence.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.245

protection and assistance to refugees, returning refugees, or asylum seekers, and other persons of concern.

**Access to Asylum:**  The law provided for granting asylum or refugee status. The government had a nascent system to provide legal protection to refugees.  Its operations to receive and process cases relied on substantial support from UNHCR.  UNHCR's support focused on providing training to officers of the National Institute for Migration, supporting decisions on submitted claims, and improving reception conditions for asylum seekers.

**Abuse of Refugees and Asylum Seekers:**  Transiting migrants, forcibly displaced populations, and asylum seekers with pending cases were vulnerable to abuse and sexual exploitation by criminal organizations. Women, children, and lesbian, gay, bisexual, transgender, queer, or intersex (LGBTQI+) individuals were especially vulnerable to abuse.  Transiting migrants, refugees, and other vulnerable populations faced acute security risks in border zones.

# f. Status and Treatment of Internally Displaced Persons (IDPs)

The Internal Displacement Monitoring Center estimated that between 2004 and 2018 (most recent data available), there were approximately 247,000 IDPs due to violence in the country.  Gang activity, including attacks on and exploitation of nonmembers, was the primary contributor to violence-

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.246

related internal displacement.  Official data on forced displacement, especially displacement due to violence, was limited in part because gangs controlled many of the neighborhoods where individuals were forced from their homes and communities.  NGOs reported IDPs were at increased risk of victimization and exploitation by criminal groups.

The government maintained the Interinstitutional Commission for the Protection of Persons Displaced by Violence and created the Directorate for the Protection of Persons Internally Displaced by Violence within the Ministry of Human Rights.  Despite incremental progress, government capacities to respond to the needs of IDPs was limited.

In March President Castro enacted the Law for the Prevention, Care, and Protection of Internally Displaced People, created to provide a legal framework to protect the rights of IDPs.

For further information about IDPs in the country, please see the materials of the Internal Displacement Monitoring Center at https://www.internal-displacement.org.

# Section 3. Freedom to Participate in the Political Process

The law provided citizens the right to choose their government in free and fair periodic elections held by secret ballot and based on nearly universal

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.247

and equal suffrage.  The law did not permit active members of the military or civilian security forces to vote.  The constitution prohibited practicing clergy from running for office or participating in political campaigns.

## Elections and Political Participation

**Abuses or Irregularities in Recent Elections:**  The most recent national elections, held in November 2021, were generally considered to be fair and free of abuses and irregularities.  Some NGOs and political parties reported irregularities, but international observers reported they were not systematic and not widespread enough to affect the outcome of the presidential election.

# Section 4. Corruption in Government

The law provided for criminal penalties for corruption by officials, but authorities did not implement the law effectively, and officials continued to engage in corrupt practices with impunity.  There were numerous reports of government corruption.

**Corruption:**  On May 23, the Special Prosecutor's Office for the Protection of Children reported it had received official complaints filed against the former director of the Directorate for Children, Adolescents, and the Family, Dulce Villanueva, for irregular adoption proceedings and alleged collection of bribes.  On May 26, President Castro accepted her resignation.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.248

For additional information regarding corruption in the country, please see the Department of State's *Investment Climate Statement* for the country, and the Department of State's *International Narcotics Control Strategy Report,* which includes information on financial crimes.

# Section 5. Governmental Posture Towards International and Nongovernmental Monitoring and Investigation of Alleged Abuses of Human Rights

A wide variety of domestic and international human rights groups generally operated without government restriction to monitor or investigate human rights conditions or cases and publish their findings.  Government officials were somewhat cooperative and responsive to the views of these groups, but some human rights organizations criticized government officials for lack of access and responsiveness.

**Retribution against Human Rights Defenders:**  The Public Ministry reported eight killings of human rights and environmental activists as of September.  For example, on January 7, Aly Domínguez and Jairo Bonilla were shot and killed by unknown assailants.  Domínguez and Bonilla were cofounders of a grassroots resistance protesting a controversial open-pit iron oxide mining project that was polluting a river that runs through the Bajo Aguán valley in northern part of the country.  On June 15, Oqueli Domínguez, Aly's brother,

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.249

was shot and killed in similar circumstances.  The government continued to investigate the killings.

**Government Human Rights Bodies:**  A semiautonomous commission for human rights, CONADEH, investigated complaints of human rights abuses. NGOs and other civil society groups generally considered the commission independent but at times ineffective.

The Ministry of Human Rights served as an advocate for human rights within the government.  The Public Ministry's Office of the Special Prosecutor for Human Rights handled cases involving charges of human rights abuses by government officials.  The Public Ministry also had a Special Prosecutor's Office for the Protection of Human Rights Defenders, Journalists, Social Communicators, and Justice Officials.  There was also a Human Rights Commission in the national congress.  The Ministries of Security and of Defense both had human rights offices that coordinated human rights-related activities with the Ministry of Human Rights.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:**  The law criminalized all forms of rape, including spousal rape and domestic or intimate partner rape and other forms of domestic and sexual violence, as well as so-called corrective rape of

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.250

LGBTQI+ persons.  The government considered rape a crime of public concern, and the state prosecuted suspected rapists even if survivors did not press charges.  The penalties for rape ranged from nine to 13 years' imprisonment.  The law was not effectively enforced; weak public institutional structures contributed to the inadequate enforcement.

The law did not specifically criminalize domestic violence but provided penalties of up to 12 years in prison for violence against a family member, depending on the severity of the assault and aggravating circumstances.  If a victim's physical injuries did not reach the severity required to categorize the violence as a criminal act, the legal penalty for a first offense was a sentence of one to three months of community service.

Survivors of domestic violence were entitled to certain protective measures, such as removing the abuser from the home and prohibiting the abuser from visiting the victim's workplace or other frequently visited locations. Persons who disobeyed the prohibition could be detained for up to 24 hours as a preventive measure.  The law provided a maximum sentence of three years in prison for disobeying a restraining order connected with the crime of violence against a woman.

Civil society groups reported women often did not report domestic violence or withdrew charges because they feared, or were economically dependent on, the aggressor.  In addition, women experienced delays in accessing justice due to police who failed to process complaints in a timely manner or

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.251

judicial system officials who deferred scheduling hearings.

**Other Forms of Gender-based Violence or Harassment:**  The Ministry of Security reported 229 violent women deaths from January to June, a nearly 49 percent increase compared with the same period in 2022.  The Human Rights Observatory of the Center for Women's Rights registered 341 violent deaths of women as of October 31.

The law criminalized sexual harassment, including in employment.  The law stipulated penalties of one to three years in prison and possible suspension of offenders' professional licenses, but the government did not effectively enforce the law.

**Discrimination:**  Although the law accorded women and men the same legal rights and status, including property rights in divorce cases, many women did not fully enjoy such rights due to barriers in access to justice and lack of information regarding legal protections.  Most women in the workforce engaged in lower-status and lower-paying informal occupations, such as domestic service, without the benefit of legal protections.  The law did not mandate equal pay for equal work.  The law prohibited employers from requiring pregnancy tests as a prerequisite for employment.  The law stated a woman's employment should be appropriate to her physical state and capacity.  Many employers discriminated against women.  For example, it was common in job announcements that only male applicants should apply.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.252

**Reproductive Rights:** There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

The government did not provide government-sponsored access to sexual and reproductive health services for survivors of sexual violence, and emergency contraception and postexposure prophylaxis were not available as part of clinical management of rape. President Castro signed an executive order in March allowing the sale, distribution, and use of emergency contraception, but it was not widely available. The government's ability to provide health-care services to survivors of sexual violence was limited. Survivors relied on assistance from NGOs such as Doctors Without Borders.

In 2019 (most recent data available), 94 percent of births were attended by skilled health-care personnel; however, NGOs reported significant gaps in obstetric care, especially in rural areas. The United Nations reported the adolescent birth rate was 89 births per 1,000 girls ages 15 to 19. UN human rights experts stated the difficulty of access to contraception, particularly in rural areas, contributed to a high rate of adolescent pregnancy.

The Ministry of Health estimated that there were 86 maternal deaths per year and that the vast majority of the leading causes were preventable.

## Systemic Racial or Ethnic Violence and Discrimination

The law criminalized discrimination based on race and ethnicity and

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.253

included crimes committed against individuals due to race or ethnicity as aggravating circumstances to increase penalties for other criminal offenses. NGOs reported the government did not effectively combat discrimination or promote equal access to government services and employment opportunities.

The government's National Policy to Combat Racism and Racial Discrimination sought to promote equality and combat discrimination related to the country's two Afro-descendent groups, with a focus on social and political participation; access to education, health care, justice, and employment opportunities; and rights to ancestral lands and natural resources.  NGOs reported the government did not make sufficient efforts to comply with Inter-American Court of Human Rights rulings, specifically cases related to territorial rights for Garífuna communities.

## Indigenous Peoples

Indigenous groups had limited representation in the national government and consequently little direct input into decisions affecting their lands, cultures, traditions, and the allocation of natural resources.

Indigenous communities continued to report threats and acts of violence against them and against community and environmental activists.  Violence was often rooted in a broader context of conflict regarding land and natural resources, corruption, lack of transparency and community consultation,

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.254

other criminal activity, and limited state ability to protect the rights of vulnerable communities.

Ethnic minority rights leaders, international NGOs, and farmworker organizations claimed the government failed to redress actions taken by security forces, government agencies, private individuals, and businesses to dislodge Indigenous persons from lands over which they claimed ownership based on land reform law or ancestral land titles.

Persons from Indigenous and Afro-descendant communities experienced discrimination in employment, education, housing, and health services.

As of September, there was no conclusion after evidence hearings in June regarding the November 2022 killing of Marcos Pineda Aguilar during a police raid in the community of El Encinal, department of La Paz.  National Police agents allegedly killed the victim, a member of the Civic Council of Popular and Indigenous Organizations of Honduras.  The hearings relied on police testimony.

## Children

**Birth Registration:**  Failure to register births resulted in denial of public services, including access to health services or school enrollment.

**Child Abuse:**  The law established prison sentences of up to two and one-half years for child abuse.  The government did not enforce the law

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.255

effectively.

**Child, Early, and Forced Marriage:**  The minimum legal age of marriage was 18.  The government did not enforce the law effectively.  International NGOs reported 34 percent of girls and 12 percent of boys were married before age 18, with the practice more prevalent in rural areas.  Most unions were informal rather than a formal marriage.

**Sexual Exploitation of Children:**  The law prohibited the sale, grooming, or use of children for commercial sexual exploitation, including sex trafficking.  The commercial sexual exploitation of children, especially in sex trafficking, was a problem, and the government made efforts to enforce the law, but its measures were not effective.  The country was a destination for child sex tourism, particularly in the tourist area of the Bay Islands.  The legal age of consent was 18.  The law prohibited the use of children younger than 18 for exhibitions or performances of a sexual nature or in the production of pornography.

## Antisemitism

The Jewish community numbered approximately 150 members.  There were no known reports of antisemitic incidents.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.256

https://www.state.gov/trafficking-in-persons-report/.

# Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:**  No laws existed to criminalize consensual same-sex conduct between adults, cross-dressing, or other sexual or gender characteristic-related behavior.  NGOs reported concern that the Public Ministry and government bodies lacked investigative processes to deal with cases of violence and hate crimes against LGBTQI+ persons, because investigative units did not receive training on gender and sexual diversity issues.  There was also a general lack of investigative personnel, contributing to a large number of unresolved cases.

**Violence and Harassment:**  NGOs reported police or other government agents incited, perpetrated, condoned, or tolerated violence against LGBTQI+ individuals.  Impunity for such crimes was high.  LGBTQI+ organizations reported they were the target of hate speech from media, public officials, and religious organizations.  The Public Ministry reported seven killings of LGBTQI+ persons as of September, while NGOs reported 47 violent deaths and 83 hate crimes against LGBTQI+ persons as of November.

On January 29, the Special Prosecutor's Office for Crimes Against Life

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.257

coordinated a raid in Roatán to capture Erick Gerardo del Arca, for the alleged rape and killing of Manuel Enrique Cruz, a member of the LGBTQI+ community.

In June police detained Miguel Ángel Cabrera Oviedo and Antonio Josué Medina Vargas for the February 19 killing of Maryuri Lizeth Pineda, a member of the LGTBQI+ community.

On May 18, a member of the National Police assigned to Intibucá Departmental Police Unit 13 of the municipality of Gracias, department of Lempira, reported Deputy Commissioner Jessica Aguilar for harassment regarding his sexual orientation.

**Discrimination:** The law prohibited discrimination based on sexual orientation and gender identity characteristics and included crimes committed against individuals because of their sexual orientation or gender identity as aggravating circumstances to increase penalties for criminal offenses. Nevertheless, discrimination against LGBTQI+ persons persisted. As of August, CONADEH received 25 reports of discrimination based on sexual orientation. Same-sex couples and households headed by same-sex couples were not eligible for the same legal protections available to opposite-sex married couples.

LGBTQI+ rights groups asserted government agencies and private employers engaged in discriminatory hiring practices. Transgender women were

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.258

particularly vulnerable to employment and education discrimination; many could find employment only as sex workers, increasing their vulnerability to violence and extortion.

**Availability of Legal Gender Recognition:**  The law prohibited transgender persons from changing their name and legal gender status.  Other forms of legal gender recognition, such as nonbinary or intersex, were not available.

**Involuntary or Coercive Medical or Psychological Practices:**  There were no documented cases of "conversion therapy," but NGOs reported there were known cases of conversion therapies.  There were no reports medically unnecessary and irreversible "normalization" surgeries were performed on children or on nonconsenting adult intersex persons.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** There were no restrictions of freedom of expression, association, or peaceful assembly regarding LGBTQI+ matters or events.

## Persons with Disabilities

The law required that persons with disabilities have access to buildings, but few buildings were accessible, and the government did not effectively implement laws or programs to provide such access.

According to government estimates, children with disabilities attended school at a lower rate than the general population.  The Institute for

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.259

National Statistics put net enrollment for primary school at 77 percent in 2021, but the National Center for Social Sector Information stated that in 2020, 43 percent of persons with disabilities received no formal education.

The government had an Office for Persons with Disabilities located within the Ministry of Development and Social Inclusion, but its ability to provide services to persons with disabilities was limited.

## Other Societal Violence or Discrimination

Persons with HIV and AIDS continued to be targets of discrimination, including in employment and occupation, and they suffered disproportionately from gender-based violence.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law granted workers the right to form and join unions of their choice, bargain collectively, and strike.  It prohibited employer retribution against employees for engaging in trade union activities.  The law placed restrictions on these rights, such as requiring that a recognized trade union represent at least 30 workers, prohibiting foreign nationals from holding union offices, and requiring that union officials work in the same substantive area of the

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.260

business as the workers they represented.  The law prohibited members of the armed forces and police, as well as certain other public employees, from forming labor unions.  The Ministry of Labor and Social Security also required that union leaders be employed under permanent contracts, limiting the ability of seasonal agricultural workers to exercise their right to freedom of association.

The law required an employer to begin collective bargaining once workers established a union, and it specified that if more than one union existed at a company, the employer had to negotiate with the largest.

The law allowed only local unions to call strikes, prohibited labor federations and confederations from calling strikes, and required that a two-thirds majority of both union and nonunion employees at an enterprise approve a strike.  The law prohibited workers from legally striking until direct negotiations and government-accompanied mediation and conciliation had failed.  The Ministry of Labor had the power to declare a work stoppage illegal and grant employers the ability to discipline employees consistent with their internal regulations, including by firing strikers.  In addition, the law limited strikes in sectors the government designated as essential services but did not necessarily meet the criteria for essential services.  The law required workers in public health care, social security, staple food production, and public utilities (municipal sanitation, water, electricity, and telecommunications) to provide basic services during a strike.  The law also

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.261

required that public-sector workers involved in the refining, transportation, and distribution of petroleum products submit their grievances to the Ministry of Labor.  The law permitted strikes by workers in export-processing zones and free zones for companies that provided services to industrial parks, but it required that strikes not impede the operations of other factories in such parks.

The government did not effectively enforce the law.  Employers frequently refused to comply with Ministry of Labor orders that required them to reinstate workers who had been dismissed for participating in union activities.  The Ministry of Labor could order a company to reinstate workers, but the ministry lacked the personnel and transportation resources to verify compliance.  By law, the ministry could fine companies that violated the right to freedom of association.  The law permitted fines, and the penalty was commensurate with those for other laws involving denials of civil rights, such as discrimination.  Penalties were sometimes applied against violators, but the failure of the government to collect fines facilitated continued violations.  During the year, the government issued the highest penalty ever against an employer in a long outstanding case of violation of freedom of association and other labor law violations.

Workers had difficulty exercising the right to form and join unions and to engage in collective bargaining.  Public-sector trade unionists raised concerns regarding government interference in trade union activities,

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.262

including its ignoring or suspending collective agreements and its dismissals of union members and leaders.

Some employers either refused to engage in collective bargaining or made it very difficult to do so.  Some companies also delayed appointing or failed to appoint representatives for required Ministry of Labor-led mediation, a practice that prolonged the mediation process and impeded the right to strike.  Unions also raised concerns that employers used temporary contracts to prevent unionization and to avoid providing full benefits.

The government investigated violence and threats of violence against union leaders.  Impunity for such crimes was high.

On June 24, unknown assailants shot and killed 13 persons in Choloma, department of Cortés.  Most of the victims were not union members; however, union leaders and maquila workers in Choloma, including the president of the Gildan San Miguel Workers' Union, were among the victims.  The shooting was preceded by an announcement that Gildan Activewear planned to shut down its factory in Choloma, which led to threats against the union leaders from local gang members, who blamed the union for the closure and loss of employment.  The company noted the closure was strictly due to market conditions, reiterated its commitment to freedom of association and collective bargaining, and continued to engage with the union.  In June authorities arrested three suspects in relation to the shooting – Javier Antonio Colindres Hernández, José Andrés Hernández Gutiérrez, and

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.263

an unnamed minor member of the Barrio 18 gang.  It was unclear whether the shooting was related to union activity.

## b. Prohibition of Forced or Compulsory Labor

See the Department of State's annual *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

## d. Discrimination (see section 6)

## e. Acceptable Conditions of Work

**Wage and Hour Laws:**  The law provided for a minimum wage for most sectors.  There were 45 categories of monthly minimum wage, based on the industry and the size of a company's workforce; minimum wages were above the poverty line.  The minimum wage law did not cover domestic workers, the vast majority of whom were women.

The law prescribed a maximum eight-hour shift per day for most workers, a 44-hour workweek, and at least one 24-hour rest period for every six days of

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.264

work.  It also provided for paid national holidays and annual leave.  The law required overtime pay, banned excessive compulsory overtime, limited overtime to four hours a day for a maximum workday of 12 hours, and prohibited the practice of requiring workers to complete work quotas before leaving their place of employment.

In some industries, including agriculture, domestic service, and security, employers did not respect maternity rights or pay minimum wage, overtime, or vacation.  In these sectors, employers frequently paid workers for the standard 44-hour workweek irrespective of any additional hours they worked.  In the security and domestic service sectors, workers were frequently forced to work more than 60 hours per week but were paid only for 44 hours.  Employers frequently penalized agricultural workers for taking legally authorized days off.  Employers paid the minimum wage inconsistently in other sectors.  Civil society continued to raise problems with minimum wage violations, highlighting agricultural companies in the south as frequent violators.

On July 25, the Ministry of Labor modified a 2018 agreement on Honduran Maquiladora Textile Sector and other Free Zone Companies to increase the minimum wage for maquila workers by 10 percent.

**Occupational Safety and Health:**  Occupational safety and health (OSH) standards were appropriate for the main industries in the country, and OSH experts actively identified unsafe conditions, in addition to responding to

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.265

workers' OSH complaints.  By law, workers could remove themselves from situations that endangered their health or safety without jeopardizing continued employment.  Under the inspection law, the Ministry of Labor had the authority to temporarily shut down workplaces where there was an imminent danger of fatalities.  Enforcement of OSH standards was particularly weak in the construction, garment assembly, and agricultural sectors, as well as in the informal economy.

**Wage, Hour, and OSH Enforcement:**  The Ministry of Labor was responsible for enforcing wage, hour, and OSH laws, but it did so inconsistently and ineffectively.  Penalties for violations of OSH law were commensurate with penalties for similar crimes but rarely applied against violators and rarely collected.

The law permitted fines for wage and hour violations; these were commensurate with the penalties for similar crimes, such as fraud.  The government sometimes applied penalties against violators, but failure to collect fines facilitated wage and hour violations.  The Ministry of Labor had an insufficient number of inspectors to enforce the wage, hour, and OSH laws effectively.  Inspectors had the authority to make unannounced inspections and initiate sanctions.

While all formal workers were entitled to social security, there were reports that both public- and private-sector employers failed to pay into the social security system.  The Ministry of Labor could levy a fine against companies

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.266

that failed to pay social security obligations, but the amount was not sufficient to deter violations.

According to 2021 Ministry of Labor data, approximately 75 percent of workers worked in the informal economy.  The government did not enforce the labor laws in this sector since these workers were not protected by the labor code.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.267

# Libya 2023 Human Rights Report

## Executive Summary

The UN Independent Fact-Finding Mission on Libya concluded its three-year mandate in March and found reasonable grounds to believe state and nonstate actors committed crimes against humanity in Libya.  The Fact-Finding Mission's final report identified the Libyan Coast Guard, the Tripoli-based interim Government of National Unity and its aligned armed groups, the Government of National Unity's Department for Combatting Illegal Migration, and the Benghazi-based nonstate actor known as the Libyan National Army and its aligned armed groups as perpetrators of abuses against Libyans and migrants.  The conclusion of the Fact-Finding Mission's mandate without establishing a follow-on mechanism raised questions about addressing abuses documented in the report and holding perpetrators accountable.  Amid increased pressure on civil society across the country, the Government of National Unity revived a Gaddhafi-era law restricting the registration and operation of civil society organizations.  Following objections from civil society and the international community, the Prime Minister's Office of the Government of National Unity issued new rules in March allowing local and foreign organizations to operate temporarily until they were registered.  In addition to worsening repression in areas under its control in the east and south, the Libyan National Army

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx 268

launched a campaign to oust Chadian rebel groups.  Critics characterized the campaign as a pretext for targeting members of the marginalized Tebu community.

Significant human rights issues included credible reports of:  arbitrary or unlawful killings, including extrajudicial killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment perpetrated by the government and armed groups on all sides; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; political prisoners or detainees; arbitrary or unlawful interference with privacy; punishment of family members for alleged offenses by a relative; serious abuses in a conflict, including reportedly widespread civilian deaths or harm; unlawful recruitment or use of children in armed conflict; serious restrictions on freedom of expression and media, including violence against journalists and enforcement of or threat to enforce criminal libel laws to limit expression; serious restrictions on Internet freedom; substantial interference with freedom of peaceful assembly and freedom of association; refoulement of refugees to a country where they would face torture or persecution; inability of citizens to change their government peacefully through free and fair elections; serious and unreasonable restrictions on political participation; serious government corruption; extensive gender-based violence, including domestic violence and sexual violence; crimes involving threats of violence targeting members of ethnic minority groups, including

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.269

the Tebu and Tuareg communities; trafficking in persons, including forced labor; laws criminalizing consensual same-sex sexual conduct between adults, which the government enforced; crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons; and significant restrictions on workers' freedom of association.

The Government of National Unity took limited steps to investigate, prosecute, and punish officials who committed human rights abuses within areas it controlled, but its limited resources, lack of political will, and inability to control significant portions of the country reduced its ability to do so.

Reports of human rights abuses committed by groups aligned with the government, the Libyan National Army, other nonstate actors, and foreign actors, including mercenaries from various countries, were widespread throughout the year. These included abuses involving killings, arbitrary detention, unlawful recruitment or use of children, and torture.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were numerous reports that armed groups aligned with the Government of National Unity ("the government"), as well as with the

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.270

Libyan National Army (LNA) and other nonstate actors, including foreign fighters and mercenaries, committed arbitrary or unlawful killings.  Shifting alliances between government officials, nonstate actors, and former or active officers in the armed forces participating in extralegal campaigns made it difficult to ascertain the role of the government in attacks by armed groups.

The final report of the UN Independent Fact-Finding Mission on Libya (FFM), released in March at the conclusion of the FFM's three-year mandate, documented the arbitrary killing of hundreds of persons in the country since 2016, including during hostilities and violent clashes.

In April, nongovernmental organizations (NGOs) Lawyers for Justice in Libya and Libya Crimes Watch documented abuses in the LNA-controlled al-Kwaifiya prison's Military Police wing in Benghazi.  According to witness testimonies, at least 16 detainees died between 2017 and 2022 of causes ranging from torture to medical neglect.

In June, government authorities identified the remains of al-Khoms primary court judge Mohamed Bin Amer in one of the mass graves discovered in the western town of Tarhouna.  Bin Amer was kidnapped in 2020 in Tripoli during the al-Kaniyat militia's attack on Castleverde.

The government continued to discover mass graves throughout the year.  In January, the General Authority for Search and Identification of Missing

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.271

Persons announced the discovery of 18 unidentified bodies in Sirte.  In July, the organization announced the discovery of 12 unidentified bodies in a grave near al-Jufra Airbase, south of Sirte.

## b. Disappearance

Government-and LNA-aligned armed groups, other nonstate armed groups, criminal gangs, and tribal groups committed an unknown number of forced disappearances.  Domestic and international human rights organizations reported security services or armed groups throughout the country forcibly disappeared or detained dozens of civil society activists, politicians, judges, and journalists for making comments or pursuing activities perceived as disloyal to the government or the LNA.  The FFM final report noted that a victim's family origin or ties were also factors in some cases of forced disappearance.  According to the UN Support Mission in Libya (UNSMIL), the whereabouts of thousands of men, women, and children remained unknown.  Some were illegally detained and later released, while the bodies of other missing and disappeared persons were found in locations throughout the country, including in mass graves.  Authorities made few effective efforts to prevent, investigate, or penalize forced disappearances, although a military court in February convicted 30 persons of murder for their role in the 2019 mass killings in Tarhouna.  Prison terms ranged from six years to life in prison.  As of year's end, the whereabouts of Siham Sergiwa, a parliamentarian abducted from her home in 2019 after criticizing

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.272

the LNA's Tripoli offensive in a televised interview, remained unknown.

In February, local media reported masked gunmen kidnapped Tarhouna member of parliament Hassan Jaballah al-Ferjani as he exited the headquarters of the Administrative Control Authority in Tripoli.  Local media alleged the gunmen were members of a Tarhouna militia led by Feraj Keshar, working under the direction of the government-aligned Security Deterrence Force (SDF or Rada).

In June, gunmen allegedly affiliated with the eastern Internal Security Agency (ISA East) kidnapped activist, university professor, and parliamentary candidate Belgasem Mohamed al-Jared from his home in Benghazi and took him to an undisclosed location, according to local NGO Libya Crimes Watch.

Migrants, refugees, and other foreign nationals were especially vulnerable to kidnapping.  UNSMIL received reports that hundreds of migrants and refugees intercepted or rescued at sea by the Libyan Coast Guard (LCG) and other entities went missing after disembarking at Libyan ports.  The International Organization for Migration (IOM) reported such individuals remained vulnerable to seizure by armed groups engaged in human trafficking or migrant smuggling.  In July, the UN Panel of Experts expressed serious concern regarding the situation of 120 migrants and refugees allegedly released by the Libyan Directorate for Combating Illegal Migration (DCIM) from a warehouse in the southeastern oasis of Tazirbu in February.  According to the Panel of Experts, the migrants and refugees were taken to

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.273

an undisclosed location and continued to be detained without access to lawyers, assistance, or protection.

The International Commission on Missing Persons estimated that up to 10,000 missing-person cases in the country remained unresolved, dating back to the Gaddhafi era.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

The 2011 Constitutional Declaration and postrevolutionary legislation prohibited such practices. The FFM final report documented widespread instances of torture, and cruel, inhuman, or degrading treatment in all prisons it investigated, irrespective of prison location or the entity in control of the detainees.

An unknown number of individuals, including refugees, asylum seekers, and other migrants, were held in facilities under the control of armed groups affiliated with either the government or the LNA, or in extralegal facilities run by smugglers and other nonstate actors. The criminal and nonstate armed groups controlling extralegal facilities routinely tortured and abused detainees, subjecting them to arbitrary killings, rape and sexual violence, beatings, electric shocks, burns, forced labor, and deprivation of food and water, according to dozens of testimonies shared with international aid agencies and human rights groups. In many instances, the purpose of this

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.274

abuse was reportedly to extort payments from detainees' families.

In April, Lawyers for Justice in Libya and Libya Crimes Watch documented torture, rape, medical neglect, arbitrary detention, lack of access to family and legal counsel, and other mistreatment inside the al-Kwaifiya prison's military wing in Benghazi.  Witnesses stated that the center's staff routinely administered severe beatings to detainees and committed harassment and rape.  Male detainees testified they often heard screaming coming from the women's wing.  They reported one woman detainee attempted to climb over the detention center wall to commit suicide.

In April, protests erupted in the northwestern city of Zawiya after a video posted to social media purported to show sub-Saharan African mercenaries torturing young Libyan men inside the headquarters of a local unnamed militia.  According to local media, the videos showed the apparent mercenaries flogging, burning, and suspending the youths by their limbs from the ceiling.

Impunity was a significant problem in the security forces.  The government took limited steps to investigate, prosecute, and punish officials who committed human rights abuses and acts of corruption within its area of reach; however, its limited resources, as well as political considerations, reduced its ability and willingness to prosecute and punish perpetrators.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.275

## Prison and Detention Center Conditions

Prisons and detention facilities were often overcrowded, and conditions were harsh and life threatening.

In its final report, the FFM found reasonable grounds to believe the SDF elements in control of Mitiga detention complex in Tripoli committed crimes against humanity, as did the LNA, LNA-aligned Tarek Ben Ziyad (TbZ) Brigade, and ISA East elements in control of Gernada and al-Kwaifiya prisons in Benghazi. According to the FFM, no detainee it interviewed during its three-year mandate had been held in acceptable conditions of detention.

**Abusive Physical Conditions:** Prisons were grossly overcrowded. The FFM final report found detainees were denied adequate access to water, food, toilets, sanitation, light, exercise, medical care, legal counsel, and communication with family members. Poor and unsafe infrastructure was common and exacerbated sanitation problems, which contributed to the spread of communicable diseases. The ratio of detainees and prisoners to guards varied significantly during the year. Monitoring and training of prison staff by international organizations remained largely suspended, although training of judicial police continued. There was a lack of adequate gender-sensitive training for male guards.

Although there were often separate facilities for men and women, women were almost universally guarded by male prison guards. UNSMIL and

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.276

international NGOs received numerous reports of women subjected to forced prostitution in prisons or detention facilities in what amounted to sexual slavery.

Communicable diseases, including tuberculosis, scabies, and HIV and AIDS, affected detainees in some prisons and detention centers.  Most prisons lacked functioning health units, and inmates depended on family members for medicine.  Inmates needing medical attention were sometimes transferred to public hospitals within the jurisdiction of whichever police unit or militia controlled the prison; these transfers often depended on the availability of private vehicles, as most prisons lacked ambulances.  In February, a local NGO reported the death of Fathi Mohammed, age 72, Khawaja in SDF-controlled Mitiga prison as a result of illness and deliberate medical neglect throughout his six-year detention.

There were reportedly no functioning juvenile detention facilities in the country.

**Administration:**  There was no credible information available as to whether authorities conducted investigations of credible allegations of mistreatment.

**Independent Monitoring:**  Multiple independent monitoring organizations reported difficulties gaining access to prison and detention facilities, particularly those administered by the LNA.  The government permitted limited, chaperoned independent monitoring of its detention facilities by

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.277

international organizations, including the International Committee of the Red Cross, but controlled these movements tightly.  UN and international aid organization sources reported DCIM officials repeatedly denied access requests.  Although some international organizations received permission to visit DCIM-administered migrant detention facilities, the responsiveness of government authorities and level of access varied widely from visit to visit.  As of October, the United Nations High Commissioner for Refugees (UNHCR) and its partners had conducted 486 monitoring visits to DCIM facilities during the year to administer aid and register refugees and asylum seekers.

## d. Arbitrary Arrest or Detention

Neither the 2011 Constitutional Declaration nor the Gaddhafi-era criminal code prohibited arbitrary arrest and detention, nor did they provide for the right of any person to challenge the lawfulness of their arrest or detention in court.  The government had weak control over police and armed groups providing internal security, and some armed groups carried out illegal and arbitrary detentions unimpeded.  The low level of international monitoring meant there were no reliable statistics on the number of arbitrary detentions.

As of March, the government reported there were 18,523 detainees in prisons across the country.  The FFM assessed the true number of individuals arbitrarily detained was likely much higher.  An unknown number

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.278

of individuals were arbitrarily held without judicial authorization, for extended periods, without legal charges, in unknown locations, in prisons nominally controlled by the Ministry of Interior or the Ministry of Defense, or in extralegal facilities controlled by government-affiliated armed groups, LNA-affiliated armed groups, and other nonstate actors.

## Arrest Procedures and Treatment of Detainees

The law required an arrest warrant for a formal arrest, but authorities could detain persons without charge for as long as six days and could renew detention for up to three months, provided there was "reasonable evidence."  The law also specified that authorities were required to inform detainees of the charges against them and have a detainee appear before a judicial authority every 30 days to renew a detention order, although these rights were not respected, according to UNSMIL.  Detainees often faced prolonged and sometimes indefinite detention, without judicial oversight, procedural guarantees, or consideration of individual protection needs.

The law gave the government power to detain persons for up to two months if considered a "threat to public security or stability," based on their "previous actions or affiliation with an official or unofficial apparatus or tool of the former regime."

Although the 2011 Constitutional Declaration recognized the right to counsel, most detainees did not have access to a lawyer.  Government

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.279

authorities and armed groups held detainees incommunicado for protracted periods in official and unofficial detention centers.

According to the FFM final report, detainees were almost never informed of the reason for their arrest or provided with information on the charges against them.  Some detainees were imprisoned for years without appearing before a judge, and release orders were frequently ignored.

**Arbitrary Arrest:**  Various government-aligned and nonstate armed groups arrested and detained persons arbitrarily throughout the year.

In July, local media reported elements of the government-aligned ISA West detained former Finance Minister Faraj Bomtari, allegedly in response to his bid to replace Central Bank of Libya Governor Sadek Elkaber.  Bomtari was released after his tribe shut down crucial oil fields.

In October, local media and rights groups reported the LNA-aligned ISA East detained former member of the National Transitional Council and former ambassador to Canada Fathi Bajaa and two colleagues on charges of seeking to overthrow the LNA.  ISA East personnel reportedly detained the three men for participating in a discussion at a Benghazi-based think tank regarding the collapse of two dams during the September 10-11 floods in Derna, a city in the eastern region under LNA control.

The UN Panel of Experts on Libya reported state and nonstate actors detained migrants and refugees arbitrarily in official and unofficial detention

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.280

centers.

UNICEF reported authorities continued to arbitrarily detain migrant children in detention centers in and around Tripoli.  These children lacked access to legal assistance, due process, and basic protection and health services, according to UNICEF.  UNSMIL called for the release of all arbitrarily detained individuals and stressed the imperative to conduct any security operations in full respect of the rights and freedoms of the population.

**Pretrial Detention:**  While authorities had to order detention for a specific period not exceeding 90 days, an ambiguity in the language of the law permitting judges to renew the detention period if the suspect was of "interest to the investigation" resulted in extended pretrial detentions.  In addition, limited resources and court capacity caused a severe backlog of cases.  According to international NGOs, many pretrial detainees were held for periods longer than the sentences for the minor crimes they allegedly committed.  UNSMIL continued to call on the Ministry of Justice to apply international standards for pretrial detention.  The number of persons held in pretrial detention in Ministry of Interior, Ministry of Defense, and extralegal detention facilities was not publicly known.

Armed groups held most of their detainees without charge and outside the government's authority.  With control of the security environment divided among various armed groups and a largely nonfunctioning judiciary, circumstances prevented most of these detainees from accessing due

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.281

process.

The law allowed a detained suspect to challenge pretrial detention before the prosecutor and a magistrate judge. If the prosecutor did not order release, the detained person could appeal to the magistrate judge. If the magistrate judge ordered continued detention following review of the prosecutor's request, and despite the detainee's challenge, there was no further right to appeal the assigned detention order. A breakdown in the court system, intimidation of judges, and difficulties in securely transporting prisoners to the courts effectively limited detainee access to the courts. For persons held in migrant detention facilities, there was no access to immigration courts or due process.

## e. Denial of Fair Public Trial

The government generally did not respect judicial independence and impartiality. The 2011 Constitutional Declaration provided for an independent judiciary and stipulated every person had a right of recourse to the judicial system. Nonetheless, thousands of detainees lacked access to lawyers and information concerning the charges against them. In some cases, trials were held without public hearings. Judges and prosecutors, lacking resources and facing threats, intimidation, and violence from armed groups, cited concerns regarding the overall lack of security in and around the courts in various parts of the country, further hindering the rule of law.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.282

UNSMIL and local NGOs documented several cases, especially in LNA-controlled areas, in which military "judicial authorities" tried cases that would normally fall under the jurisdiction of civilian courts; according to UNSMIL, these "trials" did not meet international standards. UNSMIL also received reports of the unlawful deprivation of liberty and the issuance of sentences by so-called courts operating outside national and international legal norms.

## Trial Procedures

The 2011 Constitutional Declaration provided for the right to a fair trial, the presumption of innocence, and the right to legal counsel, provided at public expense for the indigent. Government and nonstate actors did not respect these standards. There were multiple reports of individuals denied fair and public trials, choice of attorney, language interpretation, the ability to confront witnesses, protection against forced testimony or confessions, and the right to appeal.

According to reports from international and domestic NGOs, arbitrary detention and torture by armed groups, including those operating nominally under government oversight, contributed to a climate of lawlessness that made fair trials elusive. Armed groups and families of the victims or the accused regularly threatened lawyers, judges, and prosecutors.

Amid threats, intimidation, and violence against the judiciary, the

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.283

government did not take steps to screen detainees systematically for prosecution or release.  The courts were more prone to process civil cases, which were less likely to invite retaliation, although capacity was limited due to a lack of judges and administrators.

## Political Prisoners and Detainees

There were reports of political prisoners and detainees.  Armed groups, some of which were nominally under government authority, held persons on political grounds, particularly former Gaddhafi regime officials and others accused of subverting the 2011 revolution, in a variety of temporary facilities.  As of December, UNSMIL and local and international NGOs reported the government continued to prohibit access by human rights or humanitarian organizations to such facilities.

Due to the lack of international monitoring, there were no reliable statistics on the number of political prisoners.

In February, former Gaddhafi Internal Security chief Abdalla Mansour was released from prison, after nine years in detention, as part of the Presidential Council's national reconciliation process.  It was the only known case of a released political prisoner during the year.

## f. Transnational Repression

Not applicable.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.284

# g. Property Seizure and Restitution

Past government policy actions and a weak regulatory environment complicated property rights in the country.  The government eliminated all private property rights and most private businesses in 1978.  This step, in addition to the destruction of some official files at the property registrar in 1986, greatly complicated any subsequent effort to prove clear title to property throughout the country.  There was no clear pathway for restitution or compensation for property seized during the Gaddhafi period. The national property register remained frozen since 2011.

In March, UNSMIL and local media reported forced evictions and demolition of cultural sites in central Benghazi, purportedly as part of the LNA's campaign to restore parts of the city damaged by fighting.  As of September, the UN Panel of Experts reported TbZ members, functionally under the control of LNA commander Khalifa Haftar's son Saddam, and Brigade 20/20 evicted more than 20,000 Benghazi residents on short notice and forced them to surrender their property or ownership documents.  According to reports received by the Panel of Experts, there were no prior consultations with concerned residents nor any publicly communicated decision-making process.  According to the reports, there was no compensation scheme in place and evicted residents were not offered assistance to secure new housing of equal value.  Residents who opposed or protested the eviction plans were pressured into compliance or silence, including through power

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.285

cuts, harassment, and violence.

# h. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The 2011 Constitutional Declaration considered correspondence, telephone conversations, and other forms of communication inviolable unless access, collection, or use was authorized by a court order.  Nonetheless, media reports, including on social media, indicated government-aligned groups violated these prohibitions by monitoring communications without judicial authorization, imposing roadside checks, and entering private homes.

Domestic human rights organizations continued to protest authorities' searches of cell phones, tablets, and laptops at roadside checkpoints, airports, and border crossings.  These organizations noted the practice was widespread across both western and eastern regions of the country to target activists, lawyers, media professionals, bloggers, and migrants.

Invasion of privacy left citizens vulnerable to targeted attacks based on political affiliation, ideology, and identity.  Extrajudicial punishment extended to targets' family members and tribes.  Armed groups arbitrarily entered, seized, or destroyed private property with impunity.

# i. Conflict-related Abuses

Civil society and media reports documented abuses by government-aligned

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.286

groups, LNA-aligned groups, nonstate groups, foreign actors including mercenaries from various countries, and terrorist organizations.  Conflict-related abuses committed by armed groups reportedly included killings, kidnapping, arbitrary detention, and torture.

**Killings:**  There were numerous reports members of government-aligned groups, LNA-aligned groups, foreign actors, mercenaries, and other nonstate actors committed arbitrary and unlawful killings of civilians.  According to the FFM final report, evidence obtained by the FFM established reasonable grounds to believe elements of the LNA and its affiliated groups killed members of the Tebu community in 2019.  Video footage showed eight bodies, two of them handcuffed, of alleged Tebu members off a main road north of the city of Murzuq.  The FFM also found reasonable grounds to believe Tebu men killed two children, ages five and 14, from the al-Ahaali community with gunshots to the head in the presence of their relatives in a family home in Murzuq in 2019, allegedly because their father was fighting for the LNA.

**Abductions:**  Government-aligned groups, LNA-aligned groups, and other armed groups were reportedly responsible for the disappearance of civilians, although few details were available.  Kidnappings targeted activists, journalists, government officials, migrants, and refugees.  Kidnappings for ransom, including of migrants and other foreign workers, remained a frequent occurrence in many cities.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.287

The FFM final report documented 21 cases of alleged disappearances and abductions of al-Ahaali community members around Murzuq, mostly in 2019.

**Physical Abuse, Punishment, and Torture:**  According to UN and NGO reporting, guards at both government and extralegal detention centers tortured prisoners, although the law prohibited torture.

Child Soldiers:  The Secretary of State determined Libya had government-supported armed groups that recruited or used child soldiers during the reporting period of April 2022 to March 2023.  See the Department of State's annual Trafficking in Persons Report at https://www.state.gov/trafficking-in-persons-report/.

The United Nations reported an LNA-affiliated armed group recruited or used children in support roles.

# Section 2. Respect for Civil Liberties

# a. Freedom of Expression, Including for Members of the Press and Other Media

The 2011 Constitutional Declaration provided for freedom of opinion, expression, and press, but censorship was pervasive by all sides and various armed groups, including those aligned with the government, exerted

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.288

significant control over media content.  Unidentified assailants targeted journalists as reprisal for their reporting.

**Freedom of Expression:**  Freedom of expression was limited in law and practice.  The law criminalized acts that "harm the February 17 revolution," which was the start of protests in 2011.  The House of Representatives, since its election in 2014, and the government, since taking power in Tripoli in 2021, did little to reduce restrictions on freedom of expression.  Observers reported individuals censored themselves in everyday speech.  Civil society organizations (CSOs) practiced self-censorship because members of armed groups previously threatened or killed activists.  Skirmishes in major urban areas deepened the climate of fear and provided cover for armed groups to target vocal opponents with impunity.

Press freedoms were limited in all forms of media, creating an environment in which virtually no independent media existed.

**Violence and Harassment:**  The international NGO Reporters Without Borders reported all sides used threats and violence to intimidate journalists.  Harassment, threats, abductions, violence, and killings made it nearly impossible for media to operate in any meaningful capacity in several areas of the country.  Freedom House's annual report on internet freedom found activists and journalists continued to experience physical insecurity, with several individuals kidnapped in retaliation for online content.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.289

Impunity for attacks on members of media exacerbated the problem, with no monitoring organizations, security forces, or functioning judicial system to constrain or record these attacks.

Many armed groups aligned with the government or the LNA maintained databases of persons being sought for their alleged opposition activities or due to their identity. Some journalists and human rights activists chose to depart the country rather than remain and endure harassment.

Armed groups reportedly used social media to monitor and target political opponents, incite violence, and engage in hate speech.

In April, Euro-Med Human Rights Monitor reported a TbZ unit arrested Benghazi municipality media office director Maher Elgheryani after he criticized the campaign to demolish buildings and forcibly evict residents in Benghazi.

In September, local media reported armed men associated with the government-aligned Joint Operations Force (JOF) kidnapped journalist and activist Abdulmalik al-Madani in Misrata after he shared a Facebook post criticizing Prime Minister Dabaiba concerning Foreign Minister Mangoush's meeting with Israeli Foreign Minister Eli Cohen. Closed-circuit television footage posted on social media purportedly showed JOF vehicles surrounding al-Madani's car before armed men forced the journalist into a JOF vehicle.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.290

According to UNSMIL, various news publications and television stations published calls to violence, intentionally spread false news, and permitted defamation.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:**  Journalists practiced self-censorship due to intimidation and the lack of security.  The unstable security situation created hostility towards civilians and journalists associated with opposing armed groups or political factions.  International news agencies reported difficulties obtaining journalist visas, encountered refusals to issue or recognize press cards, and were barred from reporting freely in certain areas, especially eastern cities.  UNSMIL documented restrictions imposed by the Foreign Media Department at the Ministry of Foreign Affairs seriously affecting the operations of journalists in Tripoli.

**Libel/Slander Laws:**  The penal code criminalized a variety of political speech, including speech considered to "insult constitutional and popular authorities" and "publicly insulting the Libyan Arab people."  The penal code and other laws provided criminal penalties for defamation and insults to religion; these were generally applied only to cases involving alleged defamation of Islam.

**National Security:**  The penal code criminalized speech considered to "tarnish the [country's] reputation or undermine confidence in it abroad," but the government did not enforce this provision.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.291

**Nongovernmental Impact:**  Members of nongovernmental armed groups, terrorist groups, and civilians regularly harassed, intimidated, or assaulted journalists.

## Internet Freedom

The government and LNA occasionally restricted or disrupted access to the internet and continued to censor online content.  According to the Freedom House report, internet freedom continued to decline.  Selective filtering or blocking of access existed, although no reliable public information identified those responsible for censorship.  There were reports elements of government-aligned groups monitored private online communications without appropriate legal authority.  Activists on social media reported Facebook pages were regularly hacked by unknown actors or overwhelmed by a deluge of critical comments.

In February, local media reported security forces affiliated with the Benghazi-based "Government of National Stability Ministry of Interior" arrested two women, Ahlam al-Yamani and Hanin al-Abdali, in Benghazi for "violations of moral turpitude" under the cybercrime law, which gave government authorities broad remit to remove digital content deemed offensive to the country's culture and values.

In October, Benghazi faced an eight-day telecommunications outage that coincided with local media reports of fighting between LNA-aligned armed

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.292

groups and supporters of former Government of National Accord Defense Minister Mahdi al-Barghati.  UNSMIL called on "eastern authorities" to urgently restore telecommunications, emphasizing that "obtaining and sharing information is a human right, and communications represent a lifeline for civilians in conflict zones."

A significant body of evidence suggested foreign actors sought to influence domestic opinion and incite violence in the country by spreading deliberate misinformation on social media and other platforms.

Many bloggers, online journalists, and citizens reported practicing self-censorship due to intimidation by armed groups and the uncertain political situation.  The online space reportedly became less diverse as internet users increasingly self-censored and online activists ceased their activities in response to harassment from authorities.  Journalists, activists, and bloggers continued to face online harassment, arbitrary detention, and, in some cases, physical violence relating to their online activity.

## b. Freedoms of Peaceful Assembly and Association

The 2011 Constitutional Declaration provided for the freedoms of peaceful assembly and association, but in practice the government limited these freedoms.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.293

## Freedom of Peaceful Assembly

The 2011 Constitutional Declaration provided for a general right to peaceful assembly, and the government generally respected this right. The law on peaceful demonstrations, however, failed to include relevant assurances and severely restricted the exercise of the right of assembly. The law required protesters to inform the government of any planned protest at least 48 hours in advance and permitted the government to ban a protest on as little as 12 hours' notice.

In August, local media reported government-affiliated security forces at the al-Khoms port fired live ammunition into a crowd of approximately 1,000 protesters who were chanting antigovernment and anti-Turkish slogans following the spread of rumors that the government had signed a 99-year lease with the Turkish government to operate the port. Media reported injuries among protesters.

## Freedom of Association

The 2011 Constitutional Declaration included freedom of association for political and civil society groups. The government lacked capacity, however, to protect freedom of association. Targeted attacks on journalists, activists, and religious figures by state and nonstate actors severely undermined this freedom and caused some activists to seek sanctuary abroad. Numerous CSO staff members received threats, including death threats, because of

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.294

their human rights activities, and several of them believed they were under surveillance by intelligence services; they also reported being unjustly detained for short periods.

In March, the Supreme Judicial Council declared that all civil society organizations not registered were illegal, under a Ghaddafi-era civil society law that had not been used since 2011. The Prime Minister's Office issued a memorandum supporting the council's opinion and confirming the illegality of unregistered organizations. According to the Cairo Institute for Human Rights Studies, the law reimposed an executive approval process to establish CSOs; gave authorities broad latitude to close, dissolve, or merge organizations; and prohibited the establishment of organizations working on human rights. Following objections from civil society and the international community, the Prime Minister's Office issued another memorandum in March allowing local and foreign organizations to operate temporarily until they were registered.

In May, the Government of National Unity created a new committee under the auspices of the Prime Minister's Office to oversee CSOs. In August, the committee began soliciting registration applications from local and international civil society groups. The mandate of the newly established committee overlapped significantly with the existing civil society commission, whose Benghazi and Tripoli branches reunified in August. As a result, local and international civil society organizations reported significant

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.295

confusion in registering or renewing registrations, including in clarifying if registrations issued by one body would be respected by the other.

In May, the Benghazi-based General Intelligence Service published a warning to local CSOs and public institutions receiving foreign funding that they would be subject to prosecution and security measures if they did not disclose their finances, activities, and the movement of foreign employees.

## c. Freedom of Religion

See the Department of State's International Religious Freedom Report at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

The 2011 Constitutional Declaration recognized freedom of movement, including foreign travel, emigration, and repatriation, although the law provided the government with the power to restrict a person's movement if it viewed that person as a "threat to public security or stability," based on the person's "previous actions or affiliation with an official or unofficial apparatus or tool of the former regime."

The law criminalized irregular migration and required the detention of irregular migrants.  As of the end of October, IOM and UNHCR reported authorities had intercepted at sea and disembarked more than 12,600

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.296

migrants in 178 operations.  The largest groups were from Bangladesh, Syria, and Egypt, although nationalities for the vast majority of disembarked individuals remained unrecorded due to lack of UNHCR access to disembarkation points.

**In-country Movement:**  The government did not restrict internal movement in the west, although armed groups aligned with it established some internal checkpoints.  The LNA established checkpoints restricting movement in the east and south.

There were reports armed groups controlling airports within the country conducted random checks on departing domestic and international travelers, including of their personal electronic devices.  The country lacked a unified customs and immigration system.

**Foreign Travel:**  In May, the government-affiliated ISA West began requiring women traveling without a male escort to complete a detailed form about the reasons for their travel, past travel, and why they were traveling alone. Human Rights Council Special Procedures mandate-holders expressed in a July public statement deep concern regarding a discriminatory policy issued by the Government of National Unity in April that effectively restricted the rights of women and girls to travel abroad without a mahram (male guardian).  According to the UN Panel of Experts, the policy was systematically implemented without formal or prior announcement.  In July, the Panel of Experts reported attempts by ISA West personnel to intimidate

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.297

human rights defenders, including women, who spoke out against these policies.  Women and girls who refused to complete or submit the form were reportedly denied exit.

In July, local media reported ISA West confiscated the passports of five High State Council members at Mitiga Airport in Tripoli, allegedly to prevent them from traveling to Turkey for a work trip.

**Citizenship:**  The law stated citizens could lose citizenship if they obtained a foreign citizenship without receiving permission beforehand from authorities, but there was no process for obtaining such permission.  The state lacked the capacity to investigate the authenticity of citizenship applications.

If a father's citizenship was revoked, his children lost theirs as well.  The law did not specify whether a wife lost her citizenship if her husband's was revoked, or whether minors and adult children could lose their own citizenship due to the revocation of their mother's.

## e. Protection of Refugees

Government cooperation with UNHCR, IOM, and other international agencies operating within the country was inconsistent, and government-imposed restrictions often prevented humanitarian access and movement. These agencies were allowed to assist refugees and migrants in some geographic areas and facilities across the country.  UN agencies monitored

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.298

and publicly reported on refugees and migrants in the country, including those in government detention centers.  International aid organizations provided basic services directly and through domestic implementing partners to refugees and asylum seekers.  This report uses the term "migrant" to refer also to refugees and asylum seekers.

**Access to Asylum:**  Libya was not party to the 1951 Refugee Convention or its 1967 Protocol, although the 2011 Constitutional Declaration recognized the right of asylum and forbade forcible repatriation of asylum seekers.  The government had not established a system for protecting refugees or asylum seekers by year's end.  Absent an asylum system, authorities could detain and deport asylum seekers without giving them the opportunity to request asylum.  The government did not legally recognize asylum seekers without documentation as a class distinct from migrants without residency permits.

As of October, UNHCR put the number of registered refugees and asylum seekers in the country at 50,986.  The vast majority of these were from the nine registered nationalities, among whom Sudanese and Syrians were the largest groups.  UNHCR registered 53 refugees and asylum seekers from other nationalities as of September.  Each adult asylum seeker was issued a printed UNHCR asylum seeker certificate that included a photograph and basic biodata serving as evidence that the bearer was entitled to protection and assistance under the UNHCR mandate.

Authorities made no progress in the registration of migrants and refugees at

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.299

disembarkation points after interception operations, or in detention facilities.  Due to the complexity of direct resettlement out of the country, UNHCR relied on processes such as the Emergency Transit Mechanism to resettle vulnerable populations of concern.

**Abuse of Refugees and Asylum Seekers:**  The country's unique political, security, and economic landscape made distinguishing between migrants, refugees, and asylum seekers all but impossible; all were highly vulnerable to abuse.  As of June, IOM reported there were 704,369 migrants in the country.  According to UNICEF, 74,797 of the migrants were children, of whom approximately 21,000 were unaccompanied.

According to various UN agencies and rights groups, migrants routinely experienced unlawful killings, arbitrary detention, torture, sexual exploitation, and other abuses.  Perpetrators included state officials, armed groups, smugglers, traffickers, and criminal gangs.  The FFM observed that perpetrators profited financially from the exploitation of migrants.

Various UN entities documented human rights abuses committed against migrants in detention centers throughout the year.  Specifically, the FFM final report stated the Ministry of Interior, DCIM, and armed groups in de facto control of migrants in Tariq al-Matar, Abu Isa, Gharyan, Tariq al-Sikka, Zawiya, Salah al-Din, Mabani, and al-Shwarif committed crimes against humanity.  According to the FFM, the systematic and widespread character of documented crimes strongly implicated DCIM personnel and officials at

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.300

all levels.  The FFM also found reasonable grounds to believe the Stability Support Apparatus (SSA) elements committed crimes against humanity in detention facilities under their control in Ayn Zarah and Abu Salim.  According to the FFM, conditions in government and extralegal migrant detention facilities included severe overcrowding, insufficient access to toilets and washing facilities, malnourishment, lack of potable water, and spread of communicable diseases.  As of October, UNHCR estimated that over 4,900 migrants were in official detention centers across the country.

According to OHCHR, women migrants in detention centers were also routinely held in facilities without female guards and strip-searched by male guards.  Women and girls were vulnerable to sex trafficking and were routinely detained in houses in Tripoli and Sabha.  Migrant women and girls were forced into commercial sex in both official and unofficial detention facilities in conditions that sometimes amounted to sexual slavery.  The FFM final report found reasonable grounds to believe sexual slavery was present in detention facilities in Bani Walid and Sabratha under the actual or nominal control of the DCIM.

The FFM found the LCG responsible for crimes against humanity for returning migrants to detention centers where crimes against humanity were committed.  The FFM also found reasonable grounds to believe personnel on LCG ships shot at or near boats carrying migrants, causing migrants to jump into the water to seek temporary safety.  According to the

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.301

final report, LCG personnel and other security officials often physically and verbally assaulted and threatened migrants during their transfer onto Libyan LCG ships and forced them to return to Libya.  The FFM also found reasonable grounds to believe high-ranking LCG staff, the government-aligned SSA, and the DCIM colluded with traffickers and smugglers to intercept, detain, and exploit migrants.  The FFM did not assign responsibility to specific individuals or elements within the SSA.

A July report from the Global Initiative against Transnational Organized Crime documented a rise in migrant departures from the eastern part of the country, particularly Tobruk.  The report assessed that sophisticated, transnational human smuggling networks previously involved in drug trafficking contributed to the movement of large numbers of migrants through the eastern region.

IOM reported 13,611 migrants intercepted at sea by Libyan authorities as of November, as well as 938 deaths and 1,248 missing at sea.  As of June, IOM also reported 83 deaths and disappearances of migrants along land routes in the country.  In June, the migrant vessel Adriana departed Tobruk with approximately 700 passengers on board and sank off the coast of Greece, killing hundreds.  In August, the Ministry of Interior Border Guards reported recovering the bodies of 27 sub-Saharan African migrants among the hundreds of migrants whom Tunisian authorities expelled starting in July.

Numerous reports suggested migrant smugglers and human traffickers

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.302

caused the death and serious injury of migrants.  In July, the UN Panel of Experts reported an estimated 700 migrants, including victims of trafficking, were transferred to detention centers after suspected smugglers held them captive, tortured them for ransom, and subjected them to starvation and sexual violence, in various locations in Tazirbu during the past two years. Videos of torture and other abuses were reportedly sent to victims' families to demand ransom.  Graveyards containing the remains of at least 20 migrants and refugees who were victims of torture were reportedly found.

International organizations documented extensive cases of sexual and gender-based violence against women and girls, as well as against men and boys.  The FFM final report found instances of rape and gender-based violence in migrant detention facilities in Mabani, al-Shwarif, Zuwarah, Sabha, Sabratah, and Bani Walid.  Observers reported rape was often used as a form of torture and in some cases resulted in death.

The mistreatment of migrants resulted in long-term physical and emotional harm and could lead to suicide attempts, according to the FFM final report. In one incident the FFM documented, a boy hanged himself in Ayn Zarah after allegedly being tortured and suffering severe headaches.  His body was left hanging in front of other migrants for at least a day and a half before being taken down.

The government conducted limited arrests and prosecutions of persons engaged in human trafficking or migrant smuggling.  In July, courts in Tripoli

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.303

and the eastern city of al-Bayda handed various sentences, including life in prison, to 38 defendants convicted of human trafficking.  The UN Panel of Experts expressed concerns in July that investigations into detention abuses were limited and often focused only on non-Libyan perpetrators.

**Freedom of Movement:**  Migrants were generally considered to be illegally present in the country and were subject to fines, detention, and expulsion. The government considered migrants intercepted by the LCG while attempting sea crossings on the Mediterranean to have violated the law and often sent them to migrant detention facilities in the west.  The FFM final report described an "ever-revolving door" of capture, release, recapture, escape, and interception.  Migrants who were able to pay a ransom to leave detention sites were often recaptured by the same actor or another group.

In January, a regional NGO reported the LNA expelled 600 migrants detained at the DCIM Al Kufra detention center, including Sundanese asylum seekers registered with UNHCR.

In June, local and international press reported the LNA expelled approximately 4,000 Egyptian migrants.  According to reports, LNA officials deported the migrants to Egypt on foot across the land border.

According to IOM, UNHCR, and UNSMIL, the country could not be considered a safe port for the return or disembarkation of migrants intercepted or rescued at sea.  Returns reportedly often violated the

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.304

principle of nonrefoulement, as migrants systematically and routinely faced the risk of death, disappearance, arbitrary detention, torture, mistreatment, gender-based violence, exploitation, and other human rights abuses by both state and nonstate actors.  UN agencies continued to express concern that thousands of migrants who remained unaccounted for after disembarkation had disappeared into informal detention by human trafficking networks.

**Access to Basic Services:**  Refugees registered with UNHCR could access basic protection and assistance from UNHCR and its partners, but the government did not provide refugees with reliable access to health care, education, or other services.

# f. Status and Treatment of Internally Displaced Persons (IDPs)

Previously internally displaced persons continued to return to their places of origin.  According to IOM, there were 125,802 IDPs in the country as of April; Storm Daniel displaced an additional 43,421 individuals in September.  Benghazi, Misrata, and Tripoli were the regions hosting the largest number of IDPs.  Limited access for local and international assistance organizations into areas affected by fighting among rival armed groups and to official and unofficial detention centers hampered efforts to account for and assist the displaced.

The government struggled to facilitate the safe, voluntary return of IDPs to

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.305

their place of origin.  While the government made nominal efforts to promote return in certain cases, the lack of adequate laws, policies, or government programs prompted international organizations and NGOs to assist IDPs in the form of cash payments and provision of health services, including to those with disabilities.

For further information about IDPs in the country, please see the materials of the Internal Displacement Monitoring Center:  https://www.internal-displacement.org/.

## g. Stateless Persons

The country contributed to statelessness, including through discrimination against women in nationality laws.  Women generally could not transmit citizenship to their children.  The law permitted women citizens to confer citizenship to their children only in certain exceptional circumstances, such as when fathers were unknown, stateless, or of unknown nationality.  In contrast, the law provided for automatic transmission of citizenship to children born of a citizen father, whether the child was born inside or outside the country, and regardless of the citizenship of the mother.

The former Gaddhafi regime revoked the citizenship of some inhabitants of the Saharan interior of the country, including minorities such as the Tebu and Tuareg, resulting in many nomadic and settled stateless persons in the country.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.306

According to some reports, up to 30 percent of the population in the south was of undetermined legal status, which fueled discrimination in employment and services.  Noncitizens without national identification numbers could not access basic services; register births, marriages, or deaths; hold certain jobs; receive state salaries; vote; or run for office.

Due to the lack of international monitoring and governmental capacity, there were no comprehensive data on the number of stateless persons.

# Section 3. Freedom to Participate in the Political Process

The 2011 Constitutional Declaration provided citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

## Elections and Political Participation

**Abuses or Irregularities in Recent Elections:**  The most recent national election took place in 2014.  Elections were scheduled for December 2021 but were not held.  A new date had not been set as of year's end.

**Participation of Women and Members of Marginalized or Vulnerable Groups:**  The 2011 Constitutional Declaration allowed for full participation of women and minorities in elections and the political process, but significant

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.307

social and cultural barriers – in addition to lack of security – prevented their proportionate political participation.

Ethnic minorities and Indigenous groups, including the Amazigh, Tebu, and Tuareg, expressed frustration with what they perceived as their deliberate marginalization from political institutions and processes.

## Section 4. Corruption in Government

The law provided criminal penalties for official corruption.  The government did not implement the law effectively.  There were numerous reports of government corruption.

There were many reports and accusations of official corruption due to the lack of transparency in the government's management of security forces, oil revenues, and the national economy.  There was no unified national budget.  As a result, the government carried out public spending with "limited accountability and transparency," according to the World Bank's Economic Monitor report.

Divisions in economic and oversight institutions between the east and the west, including the Central Bank of Libya and the Audit Bureau, limited transparency and capacity for institutional oversight.  Efforts continued to reunify institutions.  In August, the central bank announced its reunification, although operational and technical divisions remained between the Tripoli

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.308

headquarters and the Benghazi branch, which split off in 2014.

There were allegations that government officials sometimes misused the letter of credit system to gain access to government funds.

**Corruption:**  Internal conflict and the weakness of public institutions undermined implementation of the law.  According to reports by the government's Audit Bureau, the country's highest financial regulatory authority, officials frequently engaged with impunity in corrupt practices such as graft, bribery, and nepotism.  There were also numerous reports of government corruption, including involvement in money laundering, human smuggling, and other criminal activities.

In June, the Attorney General's Office launched an investigation into allegations government officials had misappropriated scholarships intended for Libyan students to study in Turkey.  A leaked list of scholarship recipients included numerous relatives of government officials, such as two brothers, ages 57 and 70, accompanied by 10 relatives and a woman, age 74, allegedly related to the leader of a Tripoli armed group, according to local media.  A formal investigation by the attorney general, which reportedly revealed that 757 scholarships were misappropriated, resulted in the suspension of several Ministry of Higher Education officials.

Slow progress in implementing decentralization legislation, particularly regarding management of revenues from oil and gas exports and

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.309

distribution of government funds, led to accusations of corruption and calls for greater transparency.  In July, the Presidential Council created the High Financial Committee composed of western and eastern representatives, to develop a budget and a process for equitable revenue distribution.

The Audit Bureau made efforts to improve transparency by publishing annual reports on government revenues and expenditures, national projects, and administrative corruption, but it did not have oversight of eastern-based institutions due to the government's limited ability to exert control in the east.

For additional information about corruption in the country, please see the Department of State's Investment Climate Statement for the country, and the Department of State's International Narcotics Strategy Control Report, which includes information on financial crimes.

# Section 5. Governmental Posture Towards International and Nongovernmental Monitoring and Investigation of Alleged Abuses of Human Rights

Several human rights groups operated in the country but encountered government restrictions when investigating alleged abuses of human rights. The government and affiliated nonstate armed groups used legal and nonlegal means to restrict some human rights organizations from operating,

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.310

particularly organizations with an international affiliation.

**Retribution against Human Rights Defenders:**  International and domestic human rights organizations claimed human rights defenders and activists faced continuing threats – including physical attacks, detention, threats, harassment, and disappearances – by armed groups, both those aligned with and those opposed to the government.

**The United Nations or Other International Bodies:**  UNSMIL maintained its headquarters and staff in Tripoli.  The government was unable to assure the safety of UN officials, particularly in areas of the country not under its control, but generally cooperated with UN representatives in arranging visits within the country.

The FFM final report documented numerous access problems as an obstacle to its work.  According to the FFM, the LNA denied its requests to visit areas in the south under LNA control.  The government reportedly also denied the FFM permission to depart from Tripoli to enter southern areas.  During its mandate, the FFM submitted several requests to the Presidential Council, Ministry of Interior, Ministry of Justice, Ministry of Social Affairs, and Ministry of Public Health to visit prisons and detention facilities but did not receive official responses.  The FFM added that a "climate of fear" among witnesses and civil society frequently hindered its ability to document potential human rights abuses.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.311

**Government Human Rights Bodies:**  The National Council for Civil Liberties and Human Rights was unable to operate fully in the country due primarily to political divisions between the east and west.  The council, which had offices around the country, maintained limited engagement with other human rights organizations and the UN Human Rights Council.  Its ability to advocate for human rights and investigate alleged abuses was unclear.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:**  The law criminalized rape, including of men, but did not address spousal rape.  The 2011 Constitutional Declaration prohibited domestic violence but did not contain reference to penalties for those convicted of violence against women.  Specialized courts in Tripoli and Benghazi addressed violence against women, men, and children.  As of December, sufficient information was not available to assess whether the government enforced the law effectively.

There were no reliable statistics on the extent of domestic violence.  Social and cultural barriers – including police and judicial reluctance to act and family reluctance to publicize an assault – contributed to lack of effective government enforcement.  Several domestic CSOs reported women continued to experience higher rates of domestic violence than men.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.312

By law a convicted rapist could avoid a 25-year prison sentence by marrying the survivor, regardless of her wishes, provided her family consented.  Rape survivors who could not meet high evidentiary standards could face charges of adultery.

Migrant women and girls remained particularly vulnerable to rape and sexual violence, including forced commercial sexual exploitation in conditions amounting to sexual slavery.  There were reports of egregious acts of sexual violence against women and girls in government and extralegal detention facilities.  Migrant women also reported being harassed when leaving their homes to search for work.  Many migrant women who had been abused reported they could not return to their countries of origin due to stigmatization.

**Other Forms of Gender-based Violence or Harassment:**  The law criminalized sexual harassment, but there were no reports on how or whether it was enforced.  According to CSOs, there was widespread harassment and intimidation of women by armed groups, including harassment and arbitrary detention based on accusations of "un-Islamic" behavior.

There were reports armed groups harassed women traveling without a male "guardian" and that armed groups asked men and women socializing in public venues to produce marriage certificates to verify their relationships.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.313

**Discrimination:**  The 2011 Constitutional Declaration stated citizens, regardless of gender, were equal under the law and enjoyed the same civil and political rights.  The government did not effectively enforce these declarations.

Women faced social discrimination that affected their ability to access employment, their workplaces, their mobility, and their personal freedom. Although the law prohibited discrimination based on gender, there was widespread cultural, economic, and societal discrimination against women.

The country lacked a unified family code.  Sharia (Islamic religious law) often governed family matters, including inheritance, divorce, and property rights. While civil law mandated equal rights in inheritance, women often received less due to interpretations of sharia that favored men.

In April, Libyan Women's Platform for Peace documented the arrests of sisters Ibtisam and Rabia Bin Omran, who ran an animal shelter in Benghazi. After their arrest, the eastern "Government of National Stability Deputy Minister of the Interior" reportedly posted a video on Facebook purporting to show evidence that the sisters had engaged in "suspicious activities," including "witchcraft."

**Reproductive Rights:**  There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

The UN Population Fund (UNFPA) noted family planning services were

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.314

significantly limited due to cultural and social norms favoring large families, as well as the absence of prioritization of the matter by the government. Access to information on reproductive health and contraception was also difficult for women to obtain due to social norms surrounding sexuality.

Women's access to maternal health-care services and contraceptive supplies remained limited due to continued political instability.  According to the World Health Organization (WHO), the large number of IDPs and access restrictions in certain areas significantly affected the provision of reproductive health services.  The WHO also reported lack of access to family planning services, obstetrical care, and treatment of sexually transmitted infections.  Reliable data on maternal mortality, menstruation, contraception rates, and sex education remained unavailable as of December, according to UNFPA.

The government generally did not effectively provide access to sexual and reproductive health services for survivors of sexual violence, including access to emergency contraception or postexposure prophylaxis.  Civil society actors provided limited legal assistance to survivors in the absence of the government.

## Systemic Racial or Ethnic Violence and Discrimination

The 2011 Constitutional Declaration provided equal protection for all Libyans before the law, without distinction on the grounds of tribal,

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.315

regional, or familiar adherence.  Nonetheless, there were multiple reports that marginalized racial or ethnic groups faced discriminations by government and nongovernmental actors.

Some members of the Tebu minority residing in the south reported their access to higher education was limited, since university campuses were in geographic areas controlled by Arab tribes that routinely harassed or denied them freedom of movement.  Universities reportedly did not provide offsite learning alternatives to these Tebu students.

The extent to which the government enforced official recognition of minority rights was unclear.  There were reports that teachers of minority languages faced discrimination in receiving accreditation and in being eligible for bonuses, training, and exchange opportunities provided by the Ministry of Education.

There were also reports individuals with non-Arabic names encountered difficulties registering these names in civil documents.

Ethnic minorities faced instances of societal discrimination and violence. Racial discrimination existed against dark-skinned citizens, including those of sub-Saharan African heritage.  Government officials and journalists often distinguished between "local" and "foreign" populations of Tebu and Tuareg in the south and advocated expulsion of minority groups affiliated with political rivals on the basis they were not truly "Libyan."

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.316

In August, the Cairo Institute for Human Rights Studies reported the LNA-affiliated TbZ Brigade detained hundreds of civilians, including members of the Tebu community, in "inhumane conditions" in the southern part of the country, at the LNA's Tamanhint military base, 120 miles away from their home of Umm al-Aranib. The TbZ Brigade reportedly released the women and children but prevented them from returning to their homes.

Several Tebu and Tuareg communities received substandard or no services from municipalities, lacked national identity numbers, faced widespread social discrimination, and suffered from hate speech and identity-based violence. In the south, if a member of one tribe or group attacked a member of another tribe or group, retribution against multiple members of the attacking group was not uncommon.

Some members of ethnic minority communities in the south and west reported being unwilling to enter certain courthouses and police stations due to intimidation and fear of reprisal.

There were numerous reports throughout the year of ethnic minorities being injured or killed in confrontations with other groups.

There were numerous reports migrants, particularly sub-Saharan Africans, experienced harassment or discrimination by citizens due to the perception that foreigners were transmitting communicable diseases.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.317

# Children

**Birth Registration:**  By law, children derived citizenship from a citizen father. The law permitted citizen mothers who marry foreign men to transmit citizenship to their children, although some contradictory provisions perpetuated discrimination against women married to foreign men.  There were also naturalization provisions for noncitizens.

**Education:**  The law granted the right for "all linguistic and cultural components to have the right to learn their language," and the government nominally recognized the right to teach minority languages in schools. Minority and indigenous groups complained their communities were often allowed to teach their languages only as an elective subject within the curriculum.

**Child Abuse:**  The penal code included provisions outlawing the mistreatment of minors and protected children's rights in cases concerning custody, guardianship, care, and juvenile justice.  The government did not enforce those laws effectively, particularly regarding migrant children.

The FFM final report found reasonable grounds to believe some members of the SDF and ISA East, among other armed groups, tortured child detainees and that "numerous" children were held at al-Kwaifiya prison in Benghazi. The FFM did not assign responsibility to specific elements within the SDF or ISA East.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.318

**Child, Early, and Forced Marriage:** The minimum age for marriage was 18 for both men and women, although judges could permit those younger than 18 to marry. LNA authorities reportedly continued to impose a minimum age of 20 for both men and women. Early marriages were relatively rare, according to the most recent information from UN Women in 2019, although comprehensive statistics were not available due to the lack of a centralized civil registry system and the continuing conflict.

There were anecdotal reports of child marriage occurring in some rural and desert areas where tribal customs were more prevalent. There were also unconfirmed reports that civil authorities could be bribed to permit underage marriage.

**Sexual Exploitation of Children:** There were no laws prohibiting or penalties for the commercial sexual exploitation of children or for child pornography, nor laws regulating the minimum age of consensual sex.

## Antisemitism

The majority of the country's once-thriving Jewish community departed between 1948 and 1967. No members of the Jewish community were believed to remain in the country.

After reports leaked in September regarding a meeting between then Foreign Minister Najla Mangoush and her Israeli counterpart, a Libyan social media influencer described Mangoush as "the dog of the Jews" in a

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.319

Facebook post.

Following the start of the Israel-Hamas conflict in October, the Government of National Unity minister of Islamic affairs and endowments (Awqaf) posted a statement on Facebook requesting the country's imams to deliver a Friday sermon warning Muslims that "the danger of Jews and those who help the Jews is not without consequences; they want to colonize and expand and won't surrender Jerusalem without force."  In the aftermath of Israeli airstrikes on Gaza in October, Government of National Unity-recognized Grand Mufti Sadiq al-Gharyani accused "the Jews and their allies" of knowingly "exterminating civilians."

For further information on incidents in the country of antisemitism, whether or not those incidents were motivated by religion, and for reporting on the ability of Jews to exercise freedom of religion or belief, please see the Department of State's International Religious Freedom Report at https://www.state.gov/religiousfreedomreport/.

## Trafficking in Persons

See the Department of State's Trafficking in Persons Report at https://www.state.gov/trafficking-in-persons-report/.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.320

## Sex Characteristics

**Criminalization:**  Same-sex sexual activity between consenting adults was criminalized with a penalty of three to five years' imprisonment.  The law was enforced.  Human Rights Watch reported punishment could include flogging in addition to imprisonment.

**Violence and Harassment:**  There were reports of physical violence, harassment (including by government agents), and blackmail based on sexual orientation and gender identity.  Armed groups often policed communities to enforce compliance with their commanders' understanding of "Islamic" behavior, harassing and threatening with impunity individuals believed to have lesbian, gay, bisexual, transgender, queer, or intersex (LGBTQI+) orientations, as well as their families.

The FFM final report documented the arbitrary arrest of two young men perceived to be gay.  Heavily armed men reportedly forced the individuals to unlock and provide access to their phones before transferring the individuals to SDF custody at the Mitiga airport prison complex.  According to the report, a man described as a "sheikh" tortured the young men and denigrated their perceived sexual orientation.  One of the men reported guards ordered him at gunpoint to strip and raped him, allegedly also asking him for information regarding other men perceived to be gay.

**Discrimination:**  The law did not prohibit discrimination by state and

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.321

nonstate actors based on sexual orientation, gender identity or expression, or sex characteristics.  Societal discrimination against LGBTQI+ persons was widespread, and official discrimination was codified in local interpretations of sharia.  Disproportionate enforcement of public order laws against LGBTQI+ persons reportedly served to justify arbitrary arrest.  Human rights groups reported punishment could include flogging and up to five years' imprisonment.

Little information existed on discrimination based on sexual orientation or gender identity in employment, housing, access to education, or health care. Observers noted the threat of possible violence or abuse could dissuade persons from reporting such discrimination.

**Availability of Legal Gender Recognition:**  Legal gender recognition was not available.

**Involuntary or Coercive Medical or Psychological Practices:**  Information on the existence or prevalence of the practice of so-called conversion therapy on adults or children to try to change a person's sexual orientation or gender identity or expression was not available by year's end.  Information on the practice of performing unnecessary surgeries on intersex persons was also not available.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** The penal code indirectly restricted freedom of expression, association, and

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.322

peaceful assembly.  According to civil society activists, the ISA West increasingly relied on laws reportedly intended to criminalize actions undermining traditional Libyan culture and values as a pretext for arresting and detaining suspected LGBTQI+ individuals.  According to UN bodies and human rights organizations, such individuals were subjected to intimidation, harassment, forced confessions, and torture.

## Persons with Disabilities

The 2011 Constitutional Declaration addressed the rights of persons with disabilities by providing for monetary and other types of social assistance for the "protection" of persons with "special needs" with respect to employment, education, access to health care, and the provision of other government services, but it did not explicitly prohibit discrimination.  The government did not effectively enforce these provisions.  IDPs, migrants, and refugees with disabilities were especially vulnerable to poor treatment in detention facilities.

Years of postrevolutionary conflict led to a high incidence of persons maimed by shelling or explosive war remnants.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.323

# Bargaining

The law did not provide for the right of workers to form and join independent unions.  It provided for the right of workers to bargain collectively and conduct legal strikes, with significant restrictions.  The penalties for violating these rights were less than those under other laws involving denials of civil rights.  Information on how regularly violators faced penalties was not available.  The law neither prohibited antiunion discrimination nor required reinstatement of workers fired for union activity.  The government did not effectively enforce laws protecting freedom of association, collective bargaining, and the right to strike for workers.

By law workers in the formal sector were automatically members of the General Trade Union Federation of Workers, although they could elect to withdraw from the union.  Only citizens could be union members, and regulations did not permit foreign workers to organize.  The government was limited in its ability to enforce applicable labor laws.  The requirement that all collective agreements conform to the "national economic interest" restricted collective bargaining.  Freedom House found security conditions and weaknesses in the legal system prevented unions from conducting normal collective-bargaining activity.  Workers could call strikes only after exhausting all conciliation and arbitration procedures.  The government or one of the parties could demand compulsory arbitration, thus severely

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.324

restricting strikes.  The government had the right to set and cut salaries without consulting workers.  Employees organized spontaneous strikes, boycotts, and sit-ins at a number of workplaces, generally to protest unpaid salaries.

According to a February report, more than two dozen union representatives from across the country told UNSMIL the political and security situation meant that they were regularly discriminated against through nonpayment of salaries, had problems with poor equipment, and sometimes faced harassment from armed groups.

## b. Prohibition of Forced or Compulsory Labor

See the Department of State's annual Trafficking in Persons Report at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

The law prohibited and criminalized the worst forms of child labor and provided for a minimum age of employment, prohibiting children younger than 18 from employment except in a form of apprenticeship.  The law stipulated employees, including those in apprenticeships, could not work more than 48 hours per week or more than 10 hours in a single day.  The law set occupational safety and health (OSH) restrictions for children.  The

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.325

government lacked the capacity to enforce the law.  No information was available to determine whether abuses of child labor laws incurred penalties commensurate with those for other analogous serious crimes, such as kidnapping.  There were reports of children forced into labor or military service by nonstate armed groups.  These accounts were difficult to verify due to the absence of independent monitoring organizations and the continuing hostilities.

## d. Discrimination (see section 6)

## e. Acceptable Conditions of Work

**Wage and Hour Laws:**  There was a national monthly minimum wage but no set official poverty income level.  According to a 2021 needs assessment conducted by the humanitarian initiative REACH, "little information exists about income, expenditure, and poverty within Libya.  Due to the fragmented governance system in Libya, income data is scarce and rarely covers all regions."  The law stipulated a workweek of 40 hours, standard working hours, night shift regulations, dismissal procedures, and training requirements.  The law did not specifically prohibit excessive compulsory overtime.

**Occupational Safety and Health:**  The Ministry of Labor was responsible for OSH issues, but no information was available on enforcement and compliance.  OSH standards were appropriate for the main industries, but

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.326

the government generally did not enforce them.  Certain industries, such as the petroleum sector, attempted to maintain standards set by foreign companies.  Responsibility for identifying unsafe situations remained with OSH experts and not the worker.  The law provided OSH standards and granted workers the right to court hearings regarding abuses of these standards.  The law did not provide workers the right to remove themselves from a hazardous workplace without jeopardizing their employment.

**Wage, Hour, and OSH Enforcement:**  The government did not effectively enforce minimum wage, overtime, and OSH laws.  Penalties were rarely applied against violators.

The Ministry of Labor was responsible by law for enforcing wage, hour, and OSH laws.  The number of labor inspectors was not sufficient to enforce compliance.  The law did not indicate whether inspectors had the authority to make unannounced inspections and initiate sanctions.

No accurate data on the size of the informal economy were available.  The law did not provide for OSH standards for workers in the informal economy.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.327

# Rwanda 2023 Human Rights Report

## Executive Summary

There were no significant changes in the human rights situation in Rwanda during the year.

Significant human rights issues included credible reports of arbitrary or unlawful killings, including extrajudicial killings; harsh and life-threatening prison conditions; arbitrary arrest or detention; political prisoners or detainees; transnational repression against individuals in another country; arbitrary or unlawful interference with privacy; punishment of family members for alleged offenses by a relative; serious abuses in a conflict, including reportedly unlawful or widespread civilian deaths or harm, enforced disappearances or abductions, forcible transfers of civilian populations, torture, physical abuses, and conflict-related sexual violence or punishment; unlawful recruitment or use of children in armed conflict by government-supported armed groups; serious restrictions on free expression and media freedom, including threats of violence against journalists, unjustified arrests or prosecutions of journalists, and censorship; serious restrictions on internet freedom; substantial interference with the freedom of peaceful assembly and freedom of association, including overly restrictive laws on the organization, funding, or operation of nongovernmental and civil society organizations; serious and unreasonable

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx328

restrictions on political participation; and serious government restrictions on or harassment of domestic and international human rights organizations.

The government took steps to identify and punish officials who may have committed human rights abuses, including within the security services, but impunity involving civilian officials and some members of the state security forces was a problem.

A nongovernmental armed group, the March 23 Movement, operated in the eastern part of the Democratic Republic of the Congo with government support and committed numerous human rights abuses including widespread civilian deaths or harm, enforced disappearances or abductions, forcible transfers of civilian populations, torture, physical abuses, and conflict-related sexual violence or punishment. The government did not investigate and prosecute such abuses.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were several reports the government committed arbitrary or unlawful killings, including extrajudicial killings, during the year.

There were local press and social media reports that police killed several

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.329

persons while attempting to resist arrest or escape police custody. Observers reported cases of police and military personnel killing individuals suspected of theft.  In October police shot and killed Vincent Nsengimana, a resident of Bugesera District suspected of stealing electrical wires while allegedly attempting to escape custody.  There were no public reports of investigations into this or other similar killings.

## b. Disappearance

There were no new reports of disappearances by or on behalf of government authorities, but the government did not take action to investigate past high-profile cases.

Domestic organizations cited a lack of independence and will for government officials to investigate security sector abuses effectively, including reported enforced disappearances.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

The constitution and law prohibited such practices and there were no new reports of abuse of detainees by police and corrections service officials.  The law prescribed 20 to 25 years' imprisonment for any person convicted of torture and lifetime imprisonment for public officials who committed torture in the course of their official duties.  In September, the government

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.330

charged nine prison officials including a prison director for torture in Rubavu prison. The case continued at the end of the year.

There were no reports of judges ordering an investigation into allegations of torture raised at trial regarding coerced confessions or dismissing evidence obtained under torture.

The government took some steps to prosecute or punish members of security services who committed abuses or for misconduct. Impunity, however, was a problem, particularly in cases where government opponents were the apparent victims of abuses. Human rights groups alleged intelligence officials acted with impunity. Security services maintained an influential role in the government. The National Commission for Human Rights (NCHR), a government-funded body mandated to investigate abuses, functioned as a National Preventive Mechanism mandated to monitor and implement the country's obligations under the UN Convention Against Torture, including through site visits to prisons and other detention facilities.

## Prison and Detention Center Conditions

Conditions at prisons and unofficial detention centers ranged widely among facilities but could be harsh and life-threatening due to gross overcrowding, food and water shortages, and inadequate sanitary conditions.

**Abusive Physical Conditions:** Reports indicated conditions were generally harsh and life threatening in unofficial or intelligence service-related

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.331

detention centers, where individuals suffered from limited access to food, water, and health care.  Conditions were also often harsh and life threatening due to overcrowding at regular prisons and National Rehabilitation Service-operated district transit centers holding street children, street vendors, suspected drug abusers, persons engaged in commercial sex work, homeless persons, and suspected petty criminals.

**Administration:**  The government investigated and prosecuted reported abuses by corrections officers in some limited cases, but generally failed to investigate reports of abuses from previous years.

**Independent Monitoring:**  The government restricted monitoring of prison conditions by independent nongovernmental observers.  In some cases, the government placed specific prisoners under additional access restrictions.  The government permitted monitoring of prison conditions and trials of individuals whom the UN International Residual Mechanism for Criminal Tribunals (IRMCT) had transferred to the country's jurisdiction for trials related to the 1994 genocide, per agreement with the IRMCT.  Journalists could access prisons with a valid press card but required permission from the prison service commissioner to take photographs or interview prisoners or guards.  Some civil society organizations were able to visit prisons for monitoring purposes, with the government's approval.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.332

# d. Arbitrary Arrest or Detention

The constitution and law prohibited arbitrary arrest and detention and provided for the right of any person to challenge in court the lawfulness of their arrest or detention, but in some cases the government did not observe these requirements. State security forces arrested and detained persons arbitrarily and without due process, and there were no reports of any detainees receiving compensation for unlawful detention.

## Arrest Procedures and Treatment of Detainees

The law required authorities to investigate and obtain a warrant before arresting a suspect. Authorities were required to serve arrest warrants during daylight hours, but there were reports of police conducting searches and arrests outside of these hours. Police could detain suspects for up to 72 hours without an arrest warrant. Prosecutors were required to submit formal charges within five days of arrest. Police could detain children a maximum of 15 days in pretrial detention but only for crimes that carried a penalty of five years or more imprisonment. Police and prosecutors frequently disregarded these provisions and held individuals, sometimes for months and often without charge, particularly in security-related cases.

The law permitted investigative detention if authorities believed public safety was threatened or the accused might flee, and judges interpreted these provisions broadly. A judge was required to review such a detention

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.333

every 30 days.  By law it could not extend beyond one year; however, authorities sometimes held suspects indefinitely at the behest of state prosecutors after the first authorization of investigative detention and did not always seek reauthorization every 30 days.

After prosecutors formally filed a charge, detention could be indefinite unless bail was granted.  Bail existed only for crimes for which the maximum sentence if convicted was five years' imprisonment or less, but authorities could release a suspect pending trial if satisfied the person would not flee or become a threat to public safety and order.  Detainees were generally allowed access to attorneys of their choice.  The government at times violated the right to habeas corpus.  Observers reported state security forces sometimes held individuals incommunicado and subjected them to interrogation and threats to curtail their exercise of freedoms of speech and association.

The law allowed judges to impose detention of equivalent duration and fines on state security forces and other government officials who unlawfully detained individuals, but there were no reports that judges exercised this authority.

**Arbitrary Arrest:**  There were reports of arbitrary arrests, at times accompanied by police beatings.  The government reportedly used arbitrary arrests (or the threat of arbitrary arrest) as a tool to intimidate government critics, independent voices, and political opposition members.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.334

Unregistered opposition political parties previously reported authorities detained their officials and supporters, including for lengthy periods (see also section 1.e, Political Prisoners). Christopher Kayumba, an opposition leader who was previously acquitted of charges of assault and rape, was convicted on appeal and was serving a suspended sentence. Kayumba previously claimed government officials threatened to "destroy" him criminally if he did not cease his political activities.

Human rights advocates reported police regularly rounded up homeless and other needy individuals and subjected them to abusive treatment and unsanitary detention conditions in transit centers before major international events or conferences in the country. Although there was no legal requirement for individuals to carry an identification document (ID), police and the District Administration Security Support Organ regularly detained street children, vendors, suspected petty criminals, and beggars without IDs and sometimes charged them with illegal street vending or vagrancy. Authorities released adults who could produce an ID and transported street children to their home districts, to shelters, or for processing into vocational and educational programs. As in previous years, authorities held detainees without charge at transit centers for weeks or months at a time before either transferring them to a National Rehabilitation Service rehabilitation center without judicial review or forcibly returning them to their home areas. Detainees held at transit or rehabilitation centers could contest their detentions before the centers' authorities but did not have the right to

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.335

appear before a judge.  Advocates raised concerns that detainees at transit centers were not adequately screened for human trafficking indicators.

**Pretrial Detention:**  Lengthy pretrial detention was a serious problem, and authorities often detained prisoners for months without arraignment, in large part due to administrative delays caused by case backlogs and prosecutors favoring imprisonment over alternatives, even if available in a case.  During the year, the government accelerated its use of alternative dispute resolution and plea bargaining, which helped reduce the backlog of cases in court and eased the burden of overcrowding in prisons.  The law permitted detention of genocide and terrorism suspects until trial.  The law provided pretrial detention, illegal detention, and administrative sanctions be fully deducted from sentences imposed.  There were reports of individuals being subjected to pretrial detention for periods exceeding the maximum sentence for the alleged offense.  The law did not provide for compensation to persons who were acquitted.

## e. Denial of Fair Public Trial

The constitution and law provided for an independent judiciary, and the government generally respected judicial independence and impartiality. Authorities generally respected court orders.  Domestic and international observers noted outcomes in high-profile genocide, security, and politically sensitive cases appeared predetermined.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.336

## Trial Procedures

The constitution and law provided for the right to a fair and public trial, and the judiciary generally enforced this right.

Defendants had the right to a trial without undue delay.  Human rights advocates and government officials noted shortages of judges, prosecutors, and defense attorneys as well as resource limitations within the criminal justice system resulted in delays for many defendants, particularly those awaiting pro bono government-provided legal aid.

By law detainees were allowed access to lawyers, but the expense and scarcity of lawyers limited access to legal representation.  Some lawyers were reluctant to work on politically sensitive cases, fearing harassment and threats by government officials, including monitoring of their communications.  Detainees in such cases reported prison authorities did not allow them to have confidential consultations with their lawyers.

Defendants had the right to communicate with an attorney of their choice, but many defendants could not afford private counsel.  The law provided for legal representation of juveniles.  The bar association and civil society provided legal assistance to some indigent defendants but lacked the resources to provide defense counsel to all in need.

The law provided for a right to free interpretation, although interpreters were more difficult to access in rural areas.  By law defendants could not be

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.337

compelled to testify or confess guilt.  Judges generally respected these rights during trial, but previous reports indicated state security forces coerced suspects into confessing guilt in security-related cases and judges tended to accept confessions allegedly obtained through torture, failing to order investigations of alleged torture.  The law provided for the right to appeal, and authorities respected this provision, although lack of access to computers necessary to file such appeals impeded defendants' ability to exercise that right.

In May, South African authorities arrested Fulgence Kayishema, a genocide fugitive subject to international tribunal indictments, and detained him on fraud and immigration charges.  The process to transfer Kayishema's case to the IRMCT continued at year's end.  The cases of the last two remaining genocide fugitives still wanted by the IRMCT were transferred to government jurisdiction.

## Political Prisoners and Detainees

Local officials and state security forces continued to detain and imprison individuals who had previously disagreed with government decisions or policies.  Numerous individuals affiliated with unregistered political opposition parties remained in detention without trial.  Six members of the unregistered Dalfa-Umurinzi party were arrested in 2021 for alleged "publication of rumors intended to cause uprising or unrest among the population" and remained in detention without trial at the end of the year.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.338

In December 2022 a court convicted Théophile Ntirutwa, another Dalfa-Umurinzi member, of "spreading false information or harmful propaganda with intent to cause a hostile international opinion of the Rwandan government" and sentenced him to seven years imprisonment.  Some government critics faced indictment under broadly applied charges of genocide incitement, genocide denial, inciting insurrection, rebellion, or attempting to overthrow the government.  Others faced apparently unrelated criminal charges.  Political prisoners were generally afforded the same protections as other detainees, including visitation rights, access to lawyers and doctors, and access to family members.  The government did not generally give human rights or humanitarian organizations access to specific political prisoners.

In March, the government commuted the sentence of Paul Rusesabagina and released him from prison (see the 2021 Country Report on Human Rights Practices).

## f. Transnational Repression

There were credible reports that the government – directly and through others – exhibited a pattern of intimidating or exacting reprisal against individuals outside its sovereign borders, including political opponents and members of the diaspora.

**Extraterritorial Killing, Kidnapping, Forced Returns, or Other Violence or**

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.339

**Threats of Violence:** The government was alleged to have killed or kidnapped persons, or used violence or threats of violence against individuals in other countries for politically motivated reprisal in previous years and did not publicize any investigations into such allegations.

**Threats, Harassment, Surveillance, and Coercion:** Advocates reported that citizens living overseas experienced digital threats, spyware attacks, and family and personal intimidation and harassment. Advocates claimed the government applied these measures to put pressure on individuals who threatened government interests.

Advocates continued to report the government used surveillance tools to target critics both at home and abroad. According to the NGO Pegasus Project, disappeared opposition figure Cassien Ntamuhanga's phone number was on a list of numbers selected for targeting through Pegasus spyware.

Human Rights Watch reported authorities regularly harassed and threatened family members of persons located outside the country to exert pressure or to exact reprisal for their relatives' political activities (see section 1.h.).

**Misuse of International Law Enforcement Tools:** There were credible reports the government attempted to misuse international law enforcement tools for politically motivated purposes against specific individuals located

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.340

outside the country.  Human Rights Watch reported Interpol confirmed in an August letter that it had withdrawn a 2020 Red Notice issued at government request seeking the arrest of Richard Eugene Gasana, a former government official turned opposition figure resident in the United States, on charges of rape and sexual harassment.  An Interpol commission reportedly found there was a predominant political dimension to the case and withdrew the request.

**Bilateral Pressure:**  There were credible reports that for politically motivated purposes, the government exerted bilateral pressure on another country to take adverse action against specific individuals and to pressure refugees to return home.

## g. Property Seizure and Restitution

Reports of expropriation of land for the construction of roads, government buildings, and other infrastructure projects without due process or adequate restitution were common, in each case the government was obligated to provide timely compensation.

The government forcibly evicted individuals from dwellings across the country (primarily in Kigali) deemed to be in swamp land or other zones at high risk of flooding or landslides.  Some of those who were evicted stated government officials said the dwellings should never have been constructed in those locations and therefore refused to offer them compensation.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.341

Others reported being offered compensation that was of inadequate value or not timely.

There were reports of irregular application of laws related to abandoned properties.  Some property owners (especially those based overseas who leased their land to others) reported the government declared their properties abandoned so it could seize and sell the property at auction to others.

# h. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The constitution and law prohibited such actions, but the government failed to respect these prohibitions.  The government continued to monitor homes, movements, telephone calls, email, internet chat rooms, as well as personal and institutional communications arbitrarily, unlawfully, or without appropriate legal authority.  Individuals and groups could engage in the peaceful expression of views online, including by email and social media, but were subject to monitoring.  The government continued to work within internet and telephone companies, international and local NGOs, religious organizations, media, and other social institutions, and used sophisticated technical tools to gain access to electronic devices.

The law required police to obtain authorization from a state prosecutor prior to entering and searching citizens' homes.  According to human rights

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.342

organizations, state security forces at times entered homes without obtaining the required authorization or did so outside the legal hours for conducting searches and arrests. Authorities punished family members for offenses allegedly committed by relatives (see section 1.f, Threats, Harassment, Surveillance, and Coercion).

## i. Conflict-related Abuses

Violence continued in the eastern Democratic Republic of the Congo (DRC) along the Rwandan and Ugandan border between the DRC armed forces (FARDC) and the March 23 Movement (M23). UN and credible independent analyses indicated Rwanda continued to support M23. There were reports the FARDC collaborated with the Democratic Forces for the Liberation of Rwanda (FDLR), an armed group which had previously carried out attacks against the country and had long been linked to 1994 genocide crimes.

There were reports of national army incursions into DRC territory ostensibly to take actions against the FDLR, although there were no indications of deliberate killings of civilians or noncombatants. Reports indicated during hostilities M23 deliberately targeted and summarily executed civilians and committed rape. (For additional details, see the Democratic Republic of the Congo report.)

**Child Soldiers:** The Secretary of State determined Rwanda provided support to the M23, an armed group that recruited or used child soldiers during the

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.343

reporting period of April 2022 to March 2023.  See the Department of State's annual Trafficking in Persons Report at https://www.state.gov/trafficking-in-persons-report/.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The constitution provided for freedom of expression, including for members of the press and other media "in conditions prescribed by the law," but the government severely restricted this right.  Journalists reported government officials questioned, threatened, and at times arrested journalists who expressed views deemed critical of the government on sensitive topics. Government failure to investigate or prosecute attacks on human rights defenders and journalists led to de facto restrictions on freedom of expression.

**Freedom of Expression:**  There were no official restrictions on individuals' right to criticize the government publicly or privately on policy implementation and other topics, but broad interpretation of provisions in the law had a chilling effect on such criticism.  The government generally did not tolerate criticism of the presidency and government policy on security, human rights, and other matters it deemed sensitive.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.344

Laws prohibiting divisionism, genocide ideology, and genocide denial were broadly applied and discouraged citizens, residents, and visitors to the country from expressing viewpoints that could be construed as promoting societal divisions.

The law prohibited making use of speech, writing, or any other act that divided the populace or might set them against each other or caused civil unrest because of discrimination. The crime of "instigating divisions" was punishable by five to seven years' imprisonment and a substantial monetary fine.

Authorities applied the laws broadly, including to silence political dissent and to shut down investigative journalism. The law also prohibited spreading "false information or harmful propaganda with intent to cause public disaffection against the government," which was punishable by seven to 10 years' imprisonment. The government generally investigated individuals accused of threatening or harming genocide survivors and witnesses or of espousing genocide ideology.

A revised law enacted in 2018 incorporated international definitions of genocide and outlined the scope of what constituted genocide ideology and related offenses. Specifically, the law provided any person convicted of denying, minimizing, or justifying the 1994 genocide was liable to a prison term of five to seven years and a substantial monetary fine. Authorities applied the statute broadly, and there were reports of its use to silence

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.345

persons critical of government policy.

In October, the government requested a 14-year sentence for a resident of Kangondo Village charged with divisionism and genocide minimization for claiming government efforts to compensate and move villagers from Kangondo to another location were a kind of "genocide." The trial continued at year's end.

**Violence and Harassment:** Media professionals reported the government continued to use lengthy interrogations and threats of arrests and physical violence to silence media outlets and journalists. Several journalists who fled in prior years remained outside the country. Failure to investigate or prosecute threats against journalists resulted in self-censorship.

On January 19, journalist John Williams Ntwali died in a late-night motorbike accident in Kigali. Ntwali had published articles and YouTube videos on topics perceived as sensitive including the jailing of YouTube journalists, disappearances, police abuse, and land expropriation. A court accepted a guilty plea from the driver involved in the crash to charges of manslaughter and unintentional bodily harm, but there were no independent monitors at the proceedings, which reportedly took place behind closed doors. Rights groups called for independent, impartial, and effective investigation into what they called the suspicious circumstances surrounding Ntwali's death. Another journalist, Nuhu Bihindi, went missing shortly after speaking to a press outlet regarding the circumstances of Ntwali's death. His

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.346

whereabouts remained unknown at year's end.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:** The law explicitly prohibited censorship of information, but observers reported censorship occurred.  The laws restricted these freedoms if journalists "jeopardize the general public order and good morals, an individual's right to honor and reputation in the public eye and to the right to inviolability of a person's private life and family." Observers stated the government used ambiguities in these statutes to threaten journalists and suppress reporting deemed critical of the government.  By law authorities could seize journalists' material and information if a "media offense" occurred, but only under a court order. Courts could compel journalists to reveal confidential sources in the event of an investigation or criminal proceeding.  Persons wanting to start a media outlet were required to apply with the "competent public organ."  All media rights and prohibitions applied to persons writing for websites.  Independent YouTube journalists reported the government used media laws and registration requirements to criminalize citizen reporting and threatened individuals producing content deemed sensitive or critical of the government.  The government refused to recognize as journalists unaccredited persons who conducted interviews and posted them on personal YouTube channels, denying them protections afforded accredited journalists under the law.  The law allowed the government to restrict access to some government documents and information, including

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.347

information on individual privacy and information or statements deemed to constitute defamation.

Observers reported harassment, suspicious disappearances, and the fear of prosecution pushed many journalists to engage in self-censorship. Journalists reported government officials frequently pressured them to produce news stories that presented the government favorably. Radio stations broadcast criticism of government policies, including on popular citizen call-in shows; however, criticism tended to focus on provincial leaders and local implementation of policies rather than on the president or ruling party leadership.

**Libel/Slander Laws:** The law did not criminalize the use of words, gestures, writings, or cartoons to humiliate members of parliament, members of the cabinet, security officers, or any other public servant, including the president. Defamation of foreign and international officials and dignitaries remained illegal under the law, with sentences, if convicted, of three to five years' imprisonment. The law did not contain provisions criminalizing public defamation and public insult in general. The law contained provisions that criminalized "humiliation" of religious rites, symbols, objects, or religious leaders, but there were no reports of prosecutions under these provisions during the year.

**National Security:** Under media laws, journalists were required to refrain from reporting items that violated "confidentiality in the national security

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.348

and national integrity" and "confidentiality of judicial proceedings, parliamentary sessions, and cabinet deliberations in camera."  Authorities in the past used these laws to intimidate critics of the government and journalists covering politically sensitive topics and matters under government investigation.

## Internet Freedom

The government restricted and censored online content.  The government cited genocide denial, divisionism, and incitement statutes in some cases while taking legal action against digital content creators, particularly YouTube users, whom it accused of promoting hatred and disrupting national unity.

The law included the right of all citizens to "receive, disseminate, or send information through the internet," including the right to start and maintain a website.  All provisions of media law applied to web-based publications.

According to a 2010 law relating to electronic messages, signatures, and transactions, intermediaries and service providers were not held liable for content transmitted through their networks.  Nonetheless, service providers were required to remove content when handed a takedown notice, and there were no avenues for appeal.

Government-run social media accounts were used to debate and at times intimidate individuals who posted online comments considered critical of

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.349

the government.  Advocates reported the government often enlisted purportedly independent individuals as proxies to harass government critics online.  In some cases, these proxies threatened critics' safety or called on the government to take law enforcement action against them.

The government blocked access within the country to several websites critical of its policies, including websites of diaspora communities.

## b. Freedoms of Peaceful Assembly and Association

The government restricted freedoms of peaceful assembly and association, and government failure to investigate or prosecute attacks on human rights defenders also acted as de facto restrictions.

### Freedom of Peaceful Assembly

The constitution and law provided for freedom of peaceful assembly, but the government did not always respect this right.  The law criminalized demonstrating in a public place without prior authorization.  Violating this provision was punishable by a prison sentence of eight days to six months or a substantial fine.  The penalties increased for illegal demonstrations deemed to have threatened security, public order, or health.  Although there were no reports of denial of meeting permits, the severe penalties for violating assembly rules deterred most persons from engaging in protests.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.350

## Freedom of Association

While the constitution provided for freedom of association, the government limited the right. The law required private organizations to register with the government. Civil society organizations collaborating with the government's political and development plans were able to act relatively freely while those that did not faced difficulties. Although the government generally granted licenses to private organizations, it delayed or denied registration to local and international NGOs seeking to work on human rights, media freedom, or political advocacy (see section 3). In addition, the government imposed burdensome NGO registration and renewal requirements, to include delays for groups which explicitly committed to work in human rights or other areas considered sensitive, and time-consuming requirements for annual financial and activity reports (see section 5). The law required faith-based organizations to obtain legal status from the government before beginning operations. It also called for their legal representatives and preachers with supervisory responsibilities to hold academic degrees.

## c. Freedom of Religion

See the Department of State's International Religious Freedom Report at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.351

## Country

The constitution and law provided for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these rights.  The government accepted former combatants who returned from conflict in the DRC.

**Exile:**  The government reportedly denied passports for travel to the country to some citizens living abroad (see section 1.f., Transnational Repression, Efforts to Control Mobility).

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to internally displaced persons, refugees, returning refugees, and asylum seekers, as well as other persons of concern.

**Access to Asylum:**  The law provided for the granting of asylum or refugee status, and the government had a system for providing protection to refugees.  An interagency committee convened to make individual status determinations on refugee's claims.  During the year, the government hosted thousands of newly arrived Congolese refugees at a transit center and other refugee camps but did not provide them with a refugee status determination.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.352

**Freedom of Movement:**  The law did not restrict freedom of movement of asylum seekers, and the government provided refugees with identity cards and travel documents, if required.

**Employment:**  No laws restricted refugee employment, and the government continued to support internationally funded employment programs and financial inclusion initiatives benefitting both refugees and their host communities.

**Durable Solutions:**  The government assisted the safe, voluntary return of refugees to their countries of origin and sought to improve local inclusion of refugees.  In 2019 the government, UNHCR, and the African Union signed a memorandum of understanding to set up an "Emergency Transit Mechanism" for evacuating refugees from Libya.  The mechanism provided a framework for the country to temporarily host these individuals, who would eventually be resettled in third countries, helped to return to countries where asylum had previously been granted, helped to return to their home countries, or granted permission to remain in Rwanda.  More than 1,300 refugees were in the country under the auspices of the transit mechanism as of December.  In cooperation with UNHCR and the government of Burundi, the government continued to facilitate the voluntary repatriation of refugees to Burundi.

**Temporary Protection:**  The government provided temporary protection to individuals who might not qualify as refugees.  For example, after the

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.353

Taliban seized control of Afghanistan, the government allowed some Afghans (notably scholars and educators) to temporarily relocate to the country.

## f. Status and Treatment of Internally Displaced Persons

Not applicable.

## g. Stateless Persons

The government cooperated with international organizations to provide services to stateless persons. The law permitted stateless persons to acquire citizenship, provided they did not pose a threat to national security.

# Section 3. Freedom to Participate in the Political Process

The constitution and law provided citizens the ability to choose their government through free and fair periodic elections based on universal and equal suffrage and conducted by a secret ballot in presidential and parliamentary – but not local – polling that provided for the free expression of the will of the citizens, but government restrictions on the formation of opposition parties and harassment of critics and political dissidents significantly limited that ability. The Rwandan Patriotic Front and allied parties controlled the government and legislature, and its candidates

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.354

dominated elections at all levels.

# Elections and Political Participation

**Abuses or Irregularities in Recent Elections:**  Observers noted irregularities and instances of ballot stuffing in the most recent national elections for parliament, conducted in 2018.  Election observers noted irregularities in vote tabulation and consolidation, and independent candidates struggled against bureaucratic hurdles to effectively pursue their candidacies.

**Political Parties and Political Participation:**  The constitution outlined a multiparty system but provided few rights for parties and their candidates. It was common for ruling party principles and values to receive prominent attention during civic activities, and government officials often privately encouraged citizens to join the party.  Political parties allied to the ruling party were largely able to operate freely, but members faced legal sanctions if found guilty of engaging in divisive acts, destabilizing national unity, threatening territorial integrity, or undermining national security.  Observers reported membership in the ruling party sometimes conferred advantages for obtaining certain types of employment and business opportunities, including obtaining government procurement contracts.  Some opposition parties remained unregistered, and there were reports the government harassed their leaders and members.  The government impeded the formation of political parties and restricted party activities.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.355

The law no longer required – but the government strongly encouraged – all registered political parties to join the National Consultative Forum for Political Organizations.  The forum sought to promote consensus among political parties and required member parties to support policy positions developed through dialogue.  At year's end all 11 registered parties were members of the organization.  Government officials praised it for promoting political unity, while critics argued it stifled political competition and public debate.

**Participation of Women and Members of Marginalized or Vulnerable Groups:**  Lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) organizations reported barriers to open participation in the political process, noting that candidates and government officials were unwilling to engage openly on LGBTQI+ concerns (see section 6).  Representatives of historically marginalized groups such as Batwa individuals reported prohibitions on the registration of civil society organizations to advocate for persons of a specific ethnicity had the effect of making it more difficult for persons in those groups to receive special recognition and inclusion in government and civil society activities.

# Section 4. Corruption in Government

The law provided criminal penalties for corruption by officials and private persons transacting business with the government that included

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.356

imprisonment and fines, and the government generally implemented the law effectively.  There were isolated reports of government corruption.

**Corruption:**  The government investigated and prosecuted reports of corruption among police and government officials.  The law also provided for citizens who reported requests for bribes by government officials to receive financial rewards when officials were prosecuted and convicted.  Police frequently conducted internal investigations of police corruption, including sting operations, and authorities punished a significant number of offenders.  The Office of the Auditor General submitted a report to parliament's Public Accounts Committee covering the office's anticorruption efforts.

The National Public Prosecution Authority prosecuted civil servants, police, and other officials for fraud, petty corruption, awarding of public tenders illegally, and mismanagement of public assets.  The law stated corruption offenses were not subject to any statute of limitations.  Specialized chambers at the intermediate court level handled corruption cases.  During the year former Minister of State for Youth and Culture Edouard Bamporiki was sentenced to five years in prison and a substantial fine for bribery and corruption.  The government continued to pursue cases that had been initiated in previous years.

For additional information concerning corruption in the country, please see the Department of State's Investment Climate Statement for the country,

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.357

and the Department of State's International Narcotics Control Strategy Report, which includes information on financial crimes.

# Section 5. Governmental Posture Towards International and Nongovernmental Monitoring and Investigation of Alleged Abuses of Human Rights

Several domestic human rights groups operated in the country, investigating and publishing their findings on human rights cases, and international groups also published reports on human rights abuses.  The government was often intolerant of public reports of human rights abuses and suspicious of local and international human rights observers, and it often impeded independent investigations and rejected criticism as biased and uninformed.  Human rights NGOs expressed fear of the government and reported that state security forces monitored NGO activities, and NGOs self-censored their comments.  NGOs working on human rights and deemed to be critical of the government experienced difficulties securing or renewing required legal registration.  For example, Human Rights Watch had no representatives operating in the country after the government refused to renew its lapsed memorandum of understanding.

Regulations required NGOs to participate in joint action and development forums at the district and sector levels, and local governments had broad

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.358

powers to regulate activities and bar organizations that did not comply from operating in their jurisdictions.

The NGO registration process remained difficult, in part because it required submission of a statement of objectives, plan of action, and detailed financial information for each district in which an NGO wished to operate. The government sometimes used the registration process to delay programming and pressure organizations to support government programs and policies.  During this process, officials often pressured organizations to change their proposed names or areas of work so they did not directly address topics such as human rights monitoring (see section 2.b., Freedom of Association).

**Retribution against Human Rights Defenders:**  Individuals who contributed to international reports on human rights reported living under constant fear that the government could arrest and prosecute them for the content of their work.

**The United Nations or Other International Bodies:**  The government sometimes cooperated with international organizations, but it criticized reports that portrayed it negatively as inaccurate and biased.  For example, the government and government-aligned media criticized the UN Group of Experts for the Democratic Republic of Congo, accusing it of bias and an anti-Rwanda agenda.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.359

In 2012 the International Criminal Tribunal for Rwanda, based in Tanzania, transferred its remaining genocide cases to the IRMCT, which maintained an office in Tanzania and continued to pursue genocide suspects. Two suspects remained fugitives as of December (see section 1.e.). The government cooperated with the IRMCT, but it remained concerned by the IRMCT's past practice of granting early release to convicts, especially when those released had not professed remorse for their actions.

**Government Human Rights Bodies:** The Office of the Ombudsman was empowered to act on cases of corruption and other abuses, including human rights cases. During the year the office did not, however, report carrying out any major human rights investigations.

The government funded and cooperated with the NCHR. According to many observers, the NCHR did not have adequate resources or independence to investigate and act on reported abuses and remained biased in favor of the government. The NCHR performed investigations on human rights matters and drafted annual reports with their findings, but these reports usually concluded the government met standards for human rights protections in various fields, even when other organizations disagreed.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.360

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:** The law criminalized rape of men and women and spousal rape, and the government handled rape cases as a judicial priority. Penalties for rape ranged from 10 years to life imprisonment with substantial fines. Penalties for physical and sexual violence against one's spouse ranged from three to five years' imprisonment.

Domestic violence against women and children remained common. Authorities encouraged reporting of domestic violence cases, although most incidents remained within the extended family and were not reported or prosecuted.

Police headquarters in Kigali maintained a hotline for domestic violence. Several other ministries also had free gender-based violence hotlines. Police stations nationwide had their own gender desks, multiple officers trained in handling domestic violence and gender-based violence cases, and a public outreach program. The government operated one-stop centers throughout the country, providing free medical, psychological, legal, and police assistance to survivors of domestic violence.

Twenty-one percent of Rwandan girls and women between the ages of 15 to 49 reported experiencing physical or sexual violence in the previous 12

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.361

months.  According to the 2020 Demographic and Health Survey (DHS), 46 percent of women who have ever been married in Rwanda experienced spousal physical, sexual, or emotional violence.

The government continued its whole-of-government, multistakeholder campaign against gender-based violence, child abuse, and other types of domestic violence.  Gender-based violence training was required for police and military at all levels including for troops and police preparing for deployment to peacekeeping missions.

**Other Forms of Gender-Based Violence or Harassment:**  The law prohibited sexual harassment, but advocacy organizations reported sexual harassment remained common, and enforcement was lax.

**Discrimination:**  Women had the same legal status and were entitled to the same rights as men, including under family, labor, nationality, and inheritance laws.  The law allowed women to inherit property from their fathers and husbands, and couples could make their own legal property arrangements.  Women experienced difficulties pursuing property claims due to lack of knowledge, procedural bias against women in inheritance matters, multiple spousal claims due to polygamy, and the threat of gender-based violence.  The law required equal pay for equal work and prohibited discrimination in hiring decisions.  Women generally enjoyed equal pay for the same work as men, although pay varied across occupations.  There were no known legal restrictions on women's working hours or employment in

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.362

the same occupations, tasks, and industries as men.  Studies in previous years indicated few persons reported gender-based discrimination in workplaces, and most individuals were either unaware of it or unwilling to discuss it.  Experts concluded gender-based discrimination remained underreported, in part because victims of discrimination feared losing their employment.

After the 1994 genocide left many women as heads of households, women assumed a larger role in the formal sector, and many operated their own businesses.  The law governing matrimonial regimes stipulated joint land title ownership for a husband and wife who were legally married.  Nevertheless, men owned the major assets of most households, particularly those at the lower end of the economic spectrum, making bank credit inaccessible to many women and rendering it difficult for them to start or expand a business.

**Reproductive Rights:**  There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

The government provided sexual and reproductive health services (including emergency contraceptives) for survivors of gender-based violence via the country's network of Isange One Stop Centers.

The country's most recent demographic health survey put the ratio at 203 maternal deaths per 100,000 live births.  Major factors influencing maternal

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.363

mortality included hemorrhaging during or after birth as the main cause, followed by hypertensive disorders, low clinical capacity of health providers, absence of equipment and commodities, and patients delaying seeking timely care. UN reporting indicated 94 percent of births were attended by skilled health personnel.

The most recent DHS reported 58 percent using modern methods of family planning. Among married women, 14 percent had an unmet need for contraception. Adolescent girls younger than age 18 could not legally access contraception without parental consent, a hurdle one civil society leader deemed insurmountable because adolescent girls in this culture would never ask their parents for help getting contraception. Among sexually active teenage girls, 17 percent used modern contraception, and 4 percent had given birth.

The country's adolescent birth rate was 32 births per 1,000 women between 15 and 19 years of age, according to UN sustainable development goal datasets. While there was no policy restricting reproductive health service access for LGBTQI+ persons, there were no protections, and LGBTQI+ persons and organizations reported societal discrimination as a barrier when seeking services.

Some women and girls missed classes at school due to poverty, which made it difficult for them to access menstrual hygiene products. By law schools were required to ensure pregnant girls continue their education.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.364

Nonetheless, some pregnant girls stopped attending school due to social stigma.

## Systemic Racial or Ethnic Violence and Discrimination

The constitution provided for the eradication of ethnic, regional, and other divisions in society and the promotion of national unity. Long-standing tensions in the country culminated in the 1994 state-orchestrated genocide in which approximately three-quarters of the Tutsi population was killed. The genocide perpetrators also killed moderate Hutus who opposed the genocide. Since 1994 the government called for national reconciliation and abolished the policies of the former government that created and deepened ethnic cleavages. The government removed all references to ethnicity in official discourse except for references to the genocide, which was officially termed "the genocide against the Tutsi in Rwanda" in the country and at the United Nations, and eliminated ethnic quotas for education, training, and government employment.

The law protected all citizens regardless of ethnic affiliation, and the government did not recognize any ethnic affiliation. Genocide denial and divisionism statutes criminalized efforts to minimize or deny genocide crimes against the Tutsi population in 1994. The law made it illegal to discriminate against anyone based on ethnicity or country of origin or otherwise create fissures in the society along ethnic lines.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.365

Some individuals claimed the government's reconciliation policies and programs failed to recognize Hutu victims of violence during the genocide or crimes committed by the ruling party after the end of the genocide, whereas others noted the government focused positive attention on Hutus who risked their lives to save Tutsis or members of mixed families during the genocide.

## Indigenous Peoples

After the 1994 genocide the government banned identity card references to Hutu, Tutsi, or Twa ethnicity and prohibited social or political organizations based on ethnic affiliation.  As a result, the Twa, who numbered approximately 34,000, lost their official designation as an ethnic group, and the government no longer recognized groups advocating specifically for Twa needs, although favorable policies remained in place to assist individuals in poverty, including some Twa.  Twa advocates believed this government policy denied them their rights as an Indigenous ethnic group in that it failed specifically to provide them with adequate economic and social protections (access to higher education opportunities, for example) commensurate with their historically marginalized status in society dating back to the precolonial period.

## Children

**Child Abuse:**  The law criminalized abuse, including violence against

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.366

children, child abandonment, and forced begging.  Officials enforced the law, and the president made public remarks regarding the importance of prosecuting offenders.  While statistics on child abuse were unreliable, such abuse was common within the family, in the village, and at school.

As in previous years, the government conducted a high-profile public awareness campaign against gender-based violence and child abuse.  The government supported a network of one-stop centers and hospital facilities that offered integrated police, legal, medical, and counseling services to victims of gender-based violence and child abuse.

**Child, Early, and Forced Marriage:**  The minimum age for marriage was 21; the government strictly enforced this requirement.  Anecdotal evidence suggested child marriage sometimes occurred in line with traditional norms in rural areas and refugee camps but rarely in urban areas and not with government recognition.

**Sexual Exploitation of Children:**  By law sexual relations with a child younger than 18 constituted child defilement (statutory rape), which was punishable by 20 years to life in prison, depending on the age of the victim.

The law prohibited sexual exploitation of children and child pornography, and the government enforced these laws.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.367

# Antisemitism

There was a very small Jewish population, consisting entirely of foreigners; there were no known reports of antisemitic incidents.

# Trafficking in Persons

See the Department of State's Trafficking in Persons Report at https://www.state.gov/trafficking-in-persons-report/.

# Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:**  No laws criminalized same-sex conduct between adults, cross-dressing, or identity based on sexual orientation, gender identity or expression, or sex characteristics.  LGBTQI+ individuals reported that authorities disproportionately accused LGBTQI+ persons of "deviant behaviors," and human rights monitors cited laws against prostitution, substance abuse, begging, informal street vending, and public drunkenness were disproportionately enforced against LGBTQI+ persons.

**Violence and Harassment:**  There were reports the government did not adequately respond to reports of abuses and violence against LGBTQI+ persons.  NGOs reported many LGBTQI+ individuals were afraid to report

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.368

abuses to authorities, either believing authorities would not take action or were complicit in the abuses.  Advocates previously reported police abused LGBTQI+ persons in transit centers, with transgender persons targeted for physical and sexual violence as well as hate speech.  There were no reports the government investigated such cases.

**Discrimination:**  The law did not prohibit discrimination by state or nonstate actors based on sexual orientation, gender identity or expression, or sex characteristics.  There was significant discrimination against LGBTQI+ persons, particularly in employment, housing, and access to government services such as health care.  The law did not recognize LGBTQI+ individuals, couples, or their families.

**Availability of Legal Gender Recognition:**  Legal gender recognition was not available.

**Involuntary or Coercive Medical or Psychological Practices:**  There were no reports of involuntary or coercive medical or psychological practices specifically targeting LBGTQI+ persons, but there was social pressure on individuals to conform to traditional gender norms.  There were no reports of surgeries performed on children or on nonconsenting adult intersex persons.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** LGBTQI+-focused civil society organizations reported barriers registering

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.369

with the government.  LGBTQI+ advocates commented government officials appeared reluctant to openly cooperate with LGBTQI+ organizations due to prevailing social stigma against LGBTQI+ persons.  Although LGBTQI+ persons could meet and held various events throughout the year, difficulty registering their own civil society organizations was a barrier to some activities.  LGBTQI+ groups conducted public activities in Kigali, including Pride festivities and a fashion show, indicating increasing tolerance and acceptance of LGBTQI+ persons in some parts of society.

## Persons with Disabilities

The law afforded persons with disabilities the right of access to education, health services, public buildings, and transportation on an equal basis with others, but the government did not always enforce the law.  Government information and communication was not usually available in accessible formats.

Despite a continuing campaign to create a barrier-free environment for persons with disabilities, accessibility remained a problem throughout the country, including in public buildings and public transport, although a limited number of public buses could accommodate persons with disabilities.

The law prohibited discrimination against persons with physical, sensory, intellectual, and mental disabilities, and the government sometimes enforced these provisions.  The law officially protected persons with

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.370

disabilities from employment discrimination, but they often faced discrimination in hiring and access to the workplace.

Many children with disabilities did not attend primary or secondary school. Few students with disabilities reached the university level because many primary and secondary schools did not provide reasonable accommodations.

Some citizens viewed disability as a curse or punishment that could result in social exclusion and sometimes abandoned or hid children with disabilities from the community.

There were no legal restrictions or extra registration steps for citizens with disabilities to vote, and registration could be completed online. Braille ballots were available for the 2018 parliamentary elections. Observers noted some polling stations were inaccessible to persons with disabilities and that some election volunteers appeared untrained on how to assist voters with disabilities.

**Institutionalized Children:** The country regulated and maintained facilities providing care for children with disabilities when needed. The government favored transferring orphans from institutional settings to host families for individual care.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.371

# Other Societal Violence or Discrimination

Laws protecting persons with disabilities applied to persons with albinism, but they continued to experience persistent societal discrimination.

The law provided for imprisonment of up to six months, a fine, or both for persons convicted of stigmatizing a sick person without the intention to protect the sick person or others. There were no reports of prosecutions under this statute. In 2020 the country completed a survey to assess HIV-related stigma and discrimination and inform advocacy efforts and adjustments to program design. The survey reported discrimination against persons with HIV and AIDS occurred, although such incidents remained rare. The government actively supported relevant public education campaigns, including by establishing HIV and AIDS awareness clubs in secondary schools and making public pronouncements against stigmatization of those with the disease.

The law also provided stiffer penalties for rape and defilement in cases of transmission of an incurable illness. In most cases of sexual violence, the survivor and alleged perpetrator both underwent HIV testing. According to government policy and in keeping with UN guidelines, the military did not permit members with HIV and AIDS to participate in peacekeeping missions abroad but allowed them to remain in the military.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.372

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provided for the right to form and join independent unions and employer associations, bargain collectively, and conduct legal strikes, but it placed restrictions on these rights. For example, a union seeking registration was required to prove that its representatives had never been sentenced to prison terms of six or more months. There was a 90-day waiting period before a union was fully registered. The government required any union seeking majority representation in each sector to submit to an inspection of their membership registry and property by the labor administration. Authorities prohibited military, police, and security personnel from joining unions. An employer could refuse a recognized union access to the workplace, although the union could appeal this to the labor inspector. A union had to include a majority of workers in the enterprise. The law protected the right to unionize but did not automatically provide for reinstatement of workers fired for union activity.

A ministerial order defined the implementation of the law and specified guidelines for labor inspections, provided the modalities of electing employee representatives, listed acts considered gross misconduct, determined the core elements of a written employment contract, and

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.373

defined essential services that could not be interrupted by a strike or lockout. Local and national labor inspectors mediated labor disputes before they could be referred to a court, which could refuse to hear the case. Labor officials encouraged dialogue between employees and employers before involving the labor inspectorate and courts. The law applied to all employees with contracts. The right to collective bargaining was recognized by the law but it was subject to restrictions. Collective bargaining was limited to fully registered unions that had published their articles of association in the official gazette before obtaining legal capacity. The law also gave the government authority to intervene in the settlement of collective labor disputes. In addition, in workplaces with multiple unions or employee organizations, authorities required all the available organizations to work jointly together to conduct collective bargaining. If they failed to agree, the union with the largest number of members automatically assumed the authority to collectively negotiate on behalf of all the workers.

The law and ministerial orders provided some workers the right to conduct strikes, subject to numerous restrictions. The law did not allow civil servants, military, police, and security officials to strike. The law stated that employees had the right to strike when the arbitration committee allowed more than 15 working days to pass without issuing a decision, the conciliation resolution on collective dispute was not implemented, or the court award was not enforced. The law further stated all strikes had to be preceded by a notice of four working days. The law stated that a strike or

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.374

lockout could not interrupt the continuity of "essential services" as defined by the Ministry of Public Service and Labor.  The ministry defined essential services more broadly than International Labor Organization guidelines to include all modes of transportation and fuel sales, security, health, education, water and sanitation, and all forms of telecommunications, which severely restricted the right to strike in these fields.  Employees and employers were prohibited from exercising a strike or lock-out within 10 days preceding or following elections in the country or during a state of national emergency.  The law did not address strikes in the informal sector.

Labor unions were organized into three confederations:  17 trade unions represented by the Rwanda Confederation of Trade Unions, six by the Labor and Worker's Brotherhood Congress, and 10 by the National Council of Free Trade Union Organizations in Rwanda.  All three federations were officially independent of the government, but some maintained close links with the government.

The right to collective bargaining generally was not respected by the government or employers.  The government and employers pressured employees to settle grievances on an individual rather than collective basis. The government did not enforce applicable laws effectively.  Penalties for violations were commensurate with those for similar offenses but were rarely applied.  Many private-sector businesses did not allow collective bargaining negotiations.  The government also controlled collective

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.375

bargaining with cooperatives and mandatory arbitration. No labor union had an established collective bargaining agreement with the government. Collective bargaining occasionally was practiced in the private sector, although there were few recent examples. The International Trade Union Confederation reported the government intervened in the settlement of collective bargaining disputes.

There were neither registered strikes nor reports of unlawful strikes; the most recent recorded strike was by textile workers in 2011. In some cases, the government acted to resolve labor disputes in workers' favor to avert the threat of a strike. National elections for trade union representatives occurred on regular cycles depending on the trade union. The government usually maintained a significant degree of influence with union leaders.

The law did not specifically protect workers from antiunion discrimination. There were no functioning labor courts or other formal mechanisms to resolve antiunion discrimination complaints, and labor disputes moved slowly through the civil courts.

## b. Prohibition of Forced or Compulsory Labor

See the Department of State's Trafficking in Persons Report at
https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.376

# Employment

Please see the Department of Labor's Findings on the Worst Forms of Child Labor at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

## d. Discrimination (see section 6)

## e. Acceptable Conditions of Work

**Wage and Hour Laws:**  There was no official minimum wage.  The law stated the Ministry of Labor could establish a minimum wage by ministerial order, but as of September the ministry had not issued such an order.

The law provided a standard workweek of 40 hours (although many persons worked up to 45 hours per week) and 18 to 21 days of paid annual leave, in addition to official holidays.  The same law, however, allowed employers to determine a work schedule depending on the nature of the work.  Most workers in the formal sector worked five or six days per week.  The law provided employers with the right to determine daily rest periods.  Most employees received a one-hour lunch break.  The law stated women employees who gave birth were entitled to a maternity leave of at least 12 consecutive weeks.  A ministerial order stated overtime was accrued after 45 hours worked per week and was compensated by a "rest period equal to the extra hours performed" within the following 30 days.  If employees were

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.377

not provided the rest period within 30 days, they were to be paid for hours worked.  The rate for overtime work was the worker's regular salary.

**Occupational Safety and Health:**  The law stated employers had to provide for the health, safety, and welfare of employees and visitors, and enterprises were to establish occupational safety and health (OSH) committees.  OSH standards were generally appropriate for the main industries in the country.  The government did not proactively identify unsafe conditions but at times responded to workers' OSH complaints. Authorities conducted public awareness campaigns to inform workers of their rights and highlight employers' obligation to register employees for social security and occupational health insurance and pay into those benefit systems.  Orders from the Ministry of Labor determined appropriate OSH conditions and the establishment and functioning of OSH committees. Workers' right to remove themselves from dangerous situations without jeopardy to their employment was protected by law, but enforcement was lax.

**Wage, Hour, and OSH Enforcement:**  The labor law did not include penalties for noncompliance with minimum wage laws.  Employers were required to enter contracts with their employees, and these contracts had to be written in a language the employee understands.  A ministerial order required employers to review their contracts with their employees to ensure those contracts complied with labor laws.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.378

Workers in the subcontractor and business-process-outsourcing sectors were especially vulnerable to hazardous or exploitative working conditions. Statistics on workplace fatalities and accidents were not available, but ministry officials singled out mining as a sector with significant problems in implementing OSH standards.  The Ministry of Labor maintained a list of dangerous professions subject to heightened safety scrutiny.

Wage, hour, and OSH laws applied both to the formal and informal sector and standards were generally appropriate for main industries in the country. The government did not effectively enforce the law.  The number of labor ministry inspectors was not sufficient to enforce labor standards effectively. Violations of overtime and OSH standards were common in both the formal and informal sectors.  Penalties for violations were commensurate with those for similar violations but were rarely applied against violators.

The law was seldom applied in the informal sector.  Families regularly supplemented their incomes by working in small businesses or subsistence agriculture in the informal sector, which included more than 75 percent of all workers, according to the National Institute of Statistics.  Employers in the informal sector frequently failed to register employees for social security or occupational health insurance and pay into those benefit systems.  The law that provided for the creation of trade unions and collective bargaining did not apply to informal sector workers with no employer.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.379

**Diplomatic Assurances**

**Statement for the Record**
**By**
**John B. Bellinger, III**
**Legal Advisor to the Secretary of State**

**Before the House Foreign Affairs Subcommittee on International Organizations, Human Rights, and Oversight**

**June 10, 2008**

Chairman Delahunt and distinguished members of the Committee, I welcome the opportunity to appear before you today to discuss the United States' use of diplomatic assurances to protect individuals against torture in other countries.

The use of diplomatic assurances in the practice of the Department of State arises in three different contexts: (1) in the surrender of fugitives by extradition from the United States; (2) in immigration removal proceedings initiated by the Department of Homeland Security, and (3) in the transfer of terrorist combatants from detention at the Department of Defense detention facility at Guantanamo Bay, Cuba. My testimony today will describe the use of diplomatic assurances in these contexts, and explain the reasons why we believe diplomatic assurances, in appropriate cases, can be an important tool for protecting individuals against torture.

Appx.380

**Article 3 and the Related Policy Against Transfers to Torture**

First, it is important to understand the United States' legal obligations and related policies with respect to the sending of individuals to countries where they there is a risk they may be tortured.  The touchstone of our legal obligations is Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, ("Convention" or "Convention Against Torture").  As a party to the Convention, the United States has undertaken an international legal obligation under Article 3 not to expel, return ("refouler") or extradite a person from the territory of the United States to a country where there are substantial grounds for believing that person would be subjected to torture. Pursuant to the formal treaty understanding approved by the Senate and included in the U.S. instrument of ratification, the United States interprets the phrase, "where there are substantial grounds for believing that he would be in danger of being subjected to torture," as used in Article 3 of the Convention Against Torture, to mean "if it is more likely than not that he would be tortured."  According to the August 30, 1990 Report from the U.S. Senate Committee on Foreign Relations, this understanding sought to apply the same legal standard under Article 3 that is used in determinations under the 1967 Protocol Relating to the Status of Refugees ("Refugee Protocol").  Under the Refugee Protocol,

2

Appx.381

an individual may not normally be expelled or returned if it is more likely than not that his life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion.  It is important to note that, by expressing the "more likely than not" standard as an Understanding to Article 3, the United States deemed it to be merely a clarification of the definitional scope of Article 3, rather than a standard that would modify or restrict the legal effect of Article 3 as it applied to the United States.

The non-refoulement obligations in Article 3 apply only with respect to individuals who are *in the territory of the United States*.  This accords with our interpretation of similar language in the Refugee Protocol.  Neither the text of the Convention, its negotiating history, nor the U.S. record of ratification supports a view that Article 3 of the Convention applies to persons outside the territory of the United States.  By its terms, Article 3 applies only to expulsion, to what is described as "returns ('refouler')", and to extradition.  "Expulsion" and "extradition" clearly describe conduct taken to remove individuals from a State Party's territory.

Likewise, the U.S. Supreme Court has concluded that the term "return ('refouler')," in the context of Article 33 of the Convention Relating to the Status of Refugees (incorporated by reference into the Refugee Protocol),

Appx.382

"was not intended to have extraterritorial effect."[1]  There is no basis for attaching a different meaning to "refouler" in Article 3 of the Convention Against Torture.  This reading is further supported by the Convention's negotiating record.[2]  In addition, the record of proceedings related to U.S. ratification of the Convention demonstrates that at the time of ratification in 1994, the United States did not interpret Article 3 to impose obligations with respect to individuals located outside of U.S. territory.

Although the reach of Article 3 itself is limited, it is nevertheless the policy of the United States not to send *any* person, no matter where located, to a country in which it is more likely than not that the person would be subjected to torture.  This policy applies to all components of the U.S. Government and applies with respect to individuals in U.S. custody or control regardless of where they may be detained.  It has been set forth in statute and articulated at the highest levels of the United States Government.

---

[1] *Sale* v. *Haitian Centers Council, Inc.*, 509 U.S. 155, 179 (1993).  In examining the text of Article 33, the Supreme Court found that the legal meaning of the term "return," as modified by reference to the French "refouler" (English translations of which included "repulse," "repel," "drive back," and "expel"), implied that "'return' means a defensive act of resistance or exclusion at a border rather than an act of transporting someone to a particular destination."

[2] The original Swedish proposal spoke only of expulsion or extradition, and did not employ the term "return ('refouler')."  However, when the draft was revised to expand the prohibition to include "return ('refouler')," considerable discussion ensued over the advisability of including the term, including references to ambiguity surrounding the extraterritorial reach of the provision.  At no point was there agreement that the term was intended to apply to individuals located outside the territory of a State Party.  Additionally, both the text and the negotiating history make clear that negotiators used explicit language applying certain provisions of the Convention extraterritorially when they intended those provisions to have extra-territorial effect (See, e.g. Articles 2(1), 5, 12, 13, and 16).  The negotiators' failure to do so in Article 3 further confirms that there was no express intent to apply Article 3 extraterritorially.

Appx.383

*See* Section 2242 of the 1998 Foreign Affairs Reform and Restructuring Act (PL 105-277).

I want to make clear that U.S. commitments under Article 3 and our related policy are absolute. There are no exceptions based on national security or the criminality of an individual, as there are regarding the non-refoulement obligation under the Refugee Protocol.  Nor is the likelihood that an individual will be tortured weighed against the threat he or she poses to the safety and security of the American people.

**The Role of Diplomatic Assurances**

Let me now explain where diplomatic assurances fit in the context of our obligations under Article 3 and related policies.  When confronted with a dangerous foreign national – such as a serious criminal or terrorist – our Article 3 obligations may seriously constrain our options for removing or extraditing that individual from the United States.  On the one hand, we may not have the ability to detain the individual.  For example, even though we have reliable information that the individual poses a terrorist threat, we might lack admissible evidence to support charging the individual with anything more than a minor crime or immigration violation.  Even if we could detain the individual under the laws of war or in immigration

5

detention, there are legal restrictions on holding the individual for an extended period of time.  A better option might therefore be to send the individual to his home country, or to a third country that is seeking to have him extradited for prosecution.  But as I have explained, the Article 3 prohibition is categorical: no matter how dangerous the individual, he cannot be sent from the United States to any country if it is more likely than not that the individual will face torture there.  In fact, it is often the case that very dangerous individuals may be nationals of, or sought for prosecution by, States with poor human rights records, giving rise to a concern about torture. This presents the United States – and all governments that, like ours, respect the rule of law – with a serious problem.

In such situations, diplomatic assurances can be a way to protect U.S. national security and public safety while still complying with relevant international law and policy not to send people to countries where they will be tortured.  Credible diplomatic assurances from the receiving state may *reduce the risk of torture* such that the individual can be safely and appropriately transferred consistent with our Article 3 obligations.  In other words, diplomatic assurances and the senior level communications with the foreign government on which they are based can be the vehicle by which the United States Government can reasonably find that it would not be more

6

likely than not that the individual would be tortured by the receiving country if transferred.

To reduce the risk of torture, it is of course essential that diplomatic assurances be credible. This requires direct engagement with the potential receiving country. In such cases, where appropriate, the U.S. Government can change the facts on the ground by directly engaging with the receiving country regarding the treatment that a particular individual will receive and securing explicit, credible assurances that the individual will not be tortured.[3]

The seeking of diplomatic assurances is, of course, not appropriate in all cases. We would not rely upon assurances unless we were able to conclude that with those assurances, an individual could be expelled, returned, extradited, or otherwise transferred consistent with our treaty obligations and stated policy. The efficacy of assurances must be assessed on a case-by-case basis and can depend on a number of factors related to the particular country involved, including the extent to which torture may be a pervasive aspect of its criminal justice, prison, military or other security

---

[3] Of course, the United States also engages in bilateral and multilateral efforts to assist other countries in improving their human rights records. This policy is fully consistent with longstanding U.S. human rights policy, which strives to encourage countries around the world to improve their human rights performance to protect a broad array of civil and political rights. While we hope that such efforts will produce sustainable improvements in the conditions in those countries over the long term, they are inadequate for addressing the immediate problem of removing a charged or convicted criminal or suspected terrorist alien who is unlawfully present in the United States.

Appx.386

system; the ability and willingness of that country's government to protect a potential returnee from torture; and the priority that government would place on complying with an assurance it would provide to the United States government (based on, among other things, its desire to maintain a positive bilateral relationship with the United States government). But in cases where credible assurances could be effective in permitting removal or extradition consistent with our non-refoulement obligations, such assurances are a critical and valuable tool.

### Procedures for Implementing Article 3 and the Related Policy

In 1999, the United States government promulgated regulations to implement its Article 3 obligations, including regulations addressing diplomatic assurances. In the extradition context, the Secretary of State is the U.S. official responsible for determining whether to surrender a fugitive to a foreign country and decisions on extradition where there is a potential issue of torture are presented to the Secretary (or, by delegation, to the Deputy Secretary) pursuant to regulations at 22 C.F.R. Part 95. The decision to surrender a fugitive occurs only after a fugitive has been found extraditable by a United States judicial officer. In order to implement our Article 3 obligations, in cases where the issue arises, the Secretary or Deputy

Appx.387

Secretary, in making the determination whether to surrender, considers the question of whether a person facing extradition from the U.S. `is more likely than not' to be tortured in the State requesting extradition.  In each case in which allegations relating to torture are made or the issue is otherwise brought to the Department's attention, appropriate policy and legal offices review and analyze information relevant to the case in preparing a recommendation to the Secretary or Deputy Secretary as to whether or not to sign the surrender warrant.  Based upon the analysis of the relevant information, surrender may be conditioned on the requesting State's provision of specific assurances relating to torture or aspects of the requesting State's criminal justice system that protect against mistreatment. In addition to assurances related to torture, such assurances may include, for example, that the fugitive will have regular access to counsel and the full protections afforded under that state's constitution or laws.  Assurances specifically against torture have been sought in only a small number of extradition cases. In this regard it is important to note that prior to negotiating new extradition treaties the United States undertakes a review of the potential treaty partner's human rights record to determine if they will respect both the rule of law and an extradited individuals human rights, including protections against torture. Consequently, extradition cases

Appx.388

generally do not pose legitimate concerns about torture and such claims are rare. The use of assurances, however, is part of a longstanding and effective international practice in the extradition context, and assurances are often directly referenced in extradition treaties themselves.

In the immigration context, regulations codified at 8 C.F.R. 208.18(c) and 8 C.F.R. 1208.18(c) provide that the Secretary of State may forward to the Secretary of Homeland Security assurances that the Secretary of State has obtained from the government of a specific country that an alien would not be tortured there if the alien were removed to that country.  In practice, the Department of State seeks assurances upon the request of the Department of Homeland Security and exercises discretion in deciding in particular cases whether or not to seek assurances upon receiving such a request.  Under these regulations, if the Secretary of State obtains and forwards such assurances to the Secretary of Homeland Security, the Secretary of Homeland Security shall determine, in consultation with the Secretary of State, whether the assurances are sufficiently reliable to allow the alien's removal to that country consistent with Article 3 of the Convention.  If the Secretary of Homeland Security determines that the assurances are sufficiently reliable, he or she may then terminate any deferral of removal the alien had been granted as to that country and the alien's torture claim

Appx.389

may not be considered further by an immigration judge, the Board of

Immigration appeals or an asylum officer.

Section 2242(c) of the 1998 Foreign Affairs Reform and

Restructuring Act, the statute pursuant to which these regulations were

promulgated, expressed Congress' concern with the possibility that terrorists,

persecutors, and serious criminals will be released on our streets, and

mandated that the regulations issued by the Executive Branch to implement

the Convention against Torture provide for the removal of such aliens to the

maximum extent possible consistent with our Art 3 obligations.  The

regulations regarding the use of diplomatic assurances in the immigration

context are a reasonable and permissible response to this congressional

mandate.

Since these regulations were promulgated in 1999, they have been

used in less than a handful of cases.  This is in contrast to the approximately

five thousand  individuals who have enjoyed protection in immigration

proceedings through the withholding or deferral of removal on grounds that

it was more likely than not that they would be tortured.  This is in addition to

the approximately 300,000 individuals who were granted asylum, either

affirmatively or defensively during that same time period.  This latter

number includes individuals who may have been eligible for Article 3

11

protection, but whose claims for protection on that basis were never reached because they were granted asylum. This is a point worthy of some emphasis: in the vast majority of immigration cases where our obligations under Article 3 of the CAT are implicated, diplomatic assurances are never even considered, let alone pursued.

The issue of diplomatic assurances also arises in the context of the transfer of enemy combatants from detention at the Department of Defense detention facility at Guantanamo Bay, Cuba. Although Article 3 of the CAT does not as a matter of treaty law apply to Guantanamo transfers, the United States government nevertheless adheres to a policy that we will not transfer individuals from Guantanamo to countries where we determine that it is more likely than not that they would be tortured. With regard to Guantanamo transfers, the Department of State is also involved in seeking diplomatic assurances from a potential receiving government as to the treatment the individual will receive if transferred or returned to that country. Specifically, the Department of State's Office of War Crimes Issues (which generally has responsibility to communicate on transfer-related matters, in the Guantanamo context, as between the United States and foreign governments) seeks those diplomatic assurances, including assurances that they will be treated humanely and in accordance with the

Appx.391

receiving country's international obligations when detention by the receiving government is foreseen.

In all contexts, evaluations as to the likelihood of torture require a particularized determination in each individual case. Generalizations about the overall human rights situation in a country or even a country's record with respect to torture do not necessarily provide a clear or obvious answer. Likewise, evaluations as to whether assurances should be sought and whether any assurances that are obtained are sufficiently reliable such that with such assurances it is more likely than not that the individual would not be tortured are also made on a case-by-case basis.  When evaluating assurances provided by another country, Department officials may consider many factors including, but not limited to, the identity, position or other relevant information concerning the official relaying the assurances; information concerning the judicial and penal conditions and practices of the country providing assurances; political or legal developments in that country that would provide context for the assurances provided; that country's track record in complying with similar assurances previously provided to the U.S. or another country; and that country's capacity and incentives to fulfill its assurances to the United States.

Appx.392

As part of an assurance we receive from a foreign government, the Department may obtain arrangements by which U.S. officials or an agreed upon third party will have physical access to the individual during any period in which he or she is in the custody of the foreign State for purposes of verifying the treatment he or she is receiving. In addition, in instances in which the United States extradites, removes, returns, or transfers an individual to another country subject to assurances, we have and will continue to pursue any credible report and take appropriate action if we have reason to believe that those assurances will not be, or have not been, honored.

In many cases, the Department's ability to seek and obtain assurances from a foreign government depends in part on the Department's ability to treat dealings with the foreign government with discretion. The very fact that the United States would not consider removing an individual in the absence of an assurance on torture can itself be an embarrassment to the country in question. The delicate diplomatic exchange that is often required in these contexts typically cannot occur effectively except in a confidential setting. In such cases, consistent with the sensitivities that surround the Department's official diplomatic communications, the Department typically does not make public the details of the communications involved. If such

Appx.393

details were regularly divulged, countries would likely prove far less willing to provide reliable assurances. In addition, making the details of these communications public would be inconsistent with the expectations of the government that have provided us assurances in the past, and would seriously undermine our ability to obtain similar assurances in the future.

**Criticisms**

Several criticisms have been made of our practice of obtaining assurances. Some have claimed that the confidentiality of assurances renders them suspect, or that assurances are inherently unreliable. Such challenges, to assurances *as such*, have been rejected by courts in the both the United States and in Europe. Rather, courts have found that, in appropriate circumstances, diplomatic assurances may be sufficient to enable a State to return an alien to a country, in compliance with its Article 3 obligations, even if that country has a recent history of human rights abuses. In this regard it should be noted that Article 3 of the European Convention for the Protection of Human Rights and Fundamental Freedoms subjects State Parties to a much broader non-refoulement obligation than the

Appx.394

Convention Against Torture.[4]    Faced with the additional challenges this broader obligation imposes, governments in Europe have utilized diplomatic assurances to reduce the risk that aliens will face not only torture but other abuses and conditions as well.

Another criticism often leveled against the practice of utilizing diplomatic assurances is that the practice undermines the international human rights framework.  We find the opposite to be true.  Seeking assurances does not mean ignoring or condoning torture.  On the contrary, when they seek assurances, countries signal the importance of, and their commitment to, their international human rights obligations and directly confront the country in question with their concerns.  These discussions serve to bolster, not undermine, the international human rights framework. If successful, they lead to renewed commitments to and compliance with international human rights obligations by the country from which assurances are sought.  In some cases, interest in reinforcing bilateral law enforcement relationships may serve as an incentive for receiving countries to improve their practices.  Bilateral discussions regarding assurances may also lead to improved access to detention facilities in the receiving country on the part of

---

[4] As interpreted by the European Court of Human Rights, State Parties are prohibited under Article 3 of the European Convention from sending an individual to a country where he or she would face a "real risk" of being subjected to torture or to inhuman or degrading treatment or punishment.  The scope of risks protected against under this non-refoulement obligation is greater than those protected against under the Convention Against Torture, and the standard of 'real risk' is substantively lower than 'more likely than not.'

Appx.395

the requesting state, or to a greater role for a particular domestic human rights institution and/or independent human rights group in the receiving country.

**Conclusion**

Diplomatically these are not easy discussions, but they are sometimes necessary and valuable in our efforts to protect our citizens from criminal and terrorist threats and, at the same time, to comply with our international human rights obligations.  Assurances, if properly used, are a means of fulfilling, not avoiding, non-refoulement obligations.  As such, those who categorically oppose the practice need to consider if they are content with the idea of dangerous criminals or unlawful aliens being released onto the streets of the United States, even though, with appropriate assurances, they could be sent to face justice in another country or otherwise expelled or removed consistent with U.S. treaty obligations.  For its part, the Department of State is not content with that idea.  Thus, the Department will continue to seek to utilize, where appropriate, assurances to assist in ensuring that we both protect our citizens and uphold our international legal obligations.

I thank the Committee for its interest in this issue and am happy to discuss with you any additional questions you may have.

Appx.396

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Greenbelt Division)

| | |
|---|---|
| KILMAR ARMANDO ABREGO GARCIA et al., | Civil No.: 8:25-cv-00951-PX |
| *Plaintiffs,* | |
| v. | **DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER** |
| KRISTI NOEM, Secretary of Homeland Security, et al., | |
| *Defendants.* | |

# Table of Contents

Introduction ................................................................................................. 1

Statement of Facts ....................................................................................... 2

Legal Standard ............................................................................................. 3

Argument ...................................................................................................... 5

    I.    Plaintiffs have not made a clear showing that they will likely
        prevail on the merits. ...................................................................... 5

        A.    This Court lacks jurisdiction because Abrego Garcia is not
            in United States custody. ................................................... 5

        B.    Plaintiffs cannot show redressability. ........................................ 8

        C.    8 U.S.C. § 1252(g) deprives this Court of jurisdiction............... 10

    II.    Plaintiffs have not clearly shown that irreparable harm is likely
        without the preliminary relief they seek.............................................. 13

    III.    Plaintiffs have not shown that the balance of the equities and
        public interest clearly weigh in their favor. ......................................... 15

Conclusion..................................................................................................... 19

## **INTRODUCTION**

Plaintiffs are a Salvadoran national removed to El Salvador and his two U.S. citizen family members who live in the United States. Compl., ECF No. 1, ¶¶ 4–6. They have sued Defendants, federal officials in their official capacities, seeking declaratory and injunctive relief. *Id.* ¶¶ 7–13; *id.* Request for Relief. The core allegation is that the lead Plaintiff, Abrego Garcia, was removed to El Salvador despite a grant of withholding of removal to that country.

Plaintiffs have moved for a temporary restraining order ("TRO") asking for a prohibitory injunction—an order that Defendants "immediately stop paying compensation to the Government of El Salvador for the detention of Plaintiff Abrego Garcia"—and a mandatory injunction—an order that the federal government "request that the Government of El Salvador return Plaintiff Abrego Garcia to [Defendants'] custody." TRO Mot., ECF No. 6, at 2–3.

This Court should deny the motion because Plaintiffs have not made the requisite showings for a TRO. First, Plaintiffs have not shown they are likely to succeed on the merits of the case. Indeed, they have not shown how this Court has jurisdiction even to issue a TRO in this case. Second, Plaintiffs have not shown a likelihood they will suffer an irreparable injury absent their requested TRO. Finally, Plaintiffs have not shown that the balance of the equities and the public interest weigh in their favor.

Appx.399

## STATEMENT OF FACTS[1]

Plaintiff Abrego Garcia is a citizen and native of El Salvador, and his coplaintiffs are his U.S. citizen wife and five-year-old child, who reside in Maryland. Compl. ¶¶ 4–6, 42. Both Abrego Garcia and his wife work full-time to support their family. *Id.* ¶ 44.

In March 2019, Abrego Garcia was served a notice to appear in removal proceedings, charging him as inadmissible as an "alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General." *Id.* ¶¶ 25–29 (quoting 8 U.S.C. § 1182(a)(6)(A)(i)). During a bond hearing, Immigration and Customs Enforcement ("ICE") stated that a confidential informant had advised that Abrego Garcia was an active member of the criminal gang MS-13. *Id.* ¶ 31. Bond was denied. *See id.* ¶¶ 34, 39; *see also* IJ Order, *infra* Ex. A, at 2–3 (finding that Abrego Garcia was a danger to the community); BIA Opinion, *infra* Ex. B, at 1–2 (adopting and affirming IJ Order, specifically finding no clear error in its dangerousness finding).

Abrego Garcia then filed an I-589 application for asylum, withholding of removal, and protection under the United Nations Convention Against Torture. Compl. ¶ 35. Although Abrego Garcia was found removable, the immigration judge granted him withholding of removal to El Salvador in an order dated October 10, 2019. *Id.* ¶ 41.

---

[1] As alleged in the complaint, except as to the exhibits attached to this memorandum.

Appx.400

Plaintiffs allege that, on March 12, 2025, Abrego Garcia was stopped by ICE officers, who informed him that his immigration status had changed. *Id.* ¶¶ 48–50; *see also* Cerna Decl., *infra* Ex. C, ¶ 11. After being detained, he was questioned about gang affiliations and transferred ultimately to a detention center in Texas. Compl. ¶¶ 53, 56; Cerna Decl. ¶¶ 2, 11. Plaintiffs allege Abrego Garcia was told he would be removed to El Salvador and detained at the CECOT prison there. Compl. ¶¶ 56–57 & n.1.

On March 15, although ICE was aware of his protection from removal to El Salvador, Abrego Garcia was removed to El Salvador because of an administrative error. Cerna Decl. ¶¶ 12–15. On March 16, a news article contained a photograph of individuals entering intake at CECOT. *Id.* ¶ 59. Abrego Garcia's wife identified one of the detainees depicted as her husband based on his tattoos and head scars. *Id.*

Plaintiffs allege, based on a news article, that the federal government "has paid or continues to pay the Government of El Salvador six million dollars in order for the Government of El Salvador to detain" individuals removed there from the United States, "including Plaintiff Abrego Garcia." *Id.* ¶ 65 & n.2.

## **LEGAL STANDARD**

Emergency injunctive relief is an extraordinary remedy requiring "a clear showing that the plaintiff is entitled to relief." *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, (2008)); *Seth v. McDonough*, 461 F. Supp. 3d 242, 257 (D. Md. 2020) ("[T]he standards for a temporary restraining order and a preliminary injunction are the

3

same." (citing *Int'l Longshoremen's Ass'n, Local 333 v. Int'l Longshoremen's Ass'n,*

*AFL-CIO*, Civil No. 15-813, 2015 WL 1402342, at *1 (D. Md. Mar. 25, 2015))).

Plaintiffs' motion asks this Court, "on an incomplete record, [to] order a party to act,

or refrain from acting, in a certain way." *Seth*, 461 F. Supp. 3d at 257. Thus, "[t]he

danger of a mistake in this setting is substantial." *Id.* (alteration in original)

(quoting *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691,

693 (4th Cir. 1994)). This Court must therefore exercise its discretion with caution.

*See id.* This concern is even greater when, as here, the "requested immediate

injunctive relief deeply intrudes into the core concerns of the executive branch."

*Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978); *see also Sampson v. Murray*,

415 U.S. 61, 83–84 (1974) (A court is "quite wrong in routinely applying . . . the

traditional standards governing more orthodox 'stays'" in an area to which "the

Government has traditionally been granted the widest latitude.").

    Additionally, the mandatory preliminary injunctive relief Plaintiffs request

"is disfavored, and warranted only in the most extraordinary circumstances." *Taylor*

*v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994). The standard for obtaining a

mandatory injunction is thus "even more searching" than the already "exacting

standard of review" for a prohibitory injunction. *Pashby v. Delia*, 709 F.3d 307, 319

(4th Cir. 2013).

    The factors this Court considers, as prescribed by *Winter*, are (1) whether the

party seeking the injunction is "likely to succeed on the merits," (2) whether that

party is "likely to suffer irreparable harm" absent the injunction, (3) whether "the

Appx.402

balance of hardships tips in [that party's] favor," and (4) whether the "injunction is

in the public interest." *Id.* at 320. This Court must ensure that each factor is

"satisfied as articulated" before an injunction may issue. *Stinnie v. Holcomb*,

77 F.4th 200, 208 (4th Cir. 2023) (en banc) (quoting *Real Truth About Obama, Inc.*

*v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089

(2010))). The latter two factors "merge when the Government is the opposing party."

*Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*,

556 U.S. 418, 435 (2009)).

## **ARGUMENT**

### I.    **Plaintiffs have not made a clear showing that they will likely prevail on the merits.**

#### A.    **This Court lacks jurisdiction because Abrego Garcia is not in United States custody.**

Plaintiffs' claims fall within the historical "core" of the writ of habeas corpus.

Because Plaintiffs' claims sound in habeas, they can proceed only in habeas. But

because Plaintiffs concede that Abrego Garcia is not in United States custody, this

Court cannot hear those claims.

Habeas corpus "is the appropriate remedy to ascertain . . . whether any

person is rightfully in confinement or not." *DHS v. Thuraissigiam*, 591 U.S. 103,

117 (2020) (quoting 3 Joseph Story, *Commentaries on the Constitution of the United*

*States* § 1333, p.206 (1833)). Thus, habeas requires as an essential element of

jurisdiction that the detainee be in the custody of the United States. *See, e.g.*,

*Carafas v. LaVallee*, 391 U.S. 234, 238 & n.9 (1968); *Smith v. Ashcroft*, 295 F.3d

Appx.403

425, 428 (4th Cir. 2002). And a person "is held 'in custody' by the United States when the United States official charged with his detention has 'the power to produce him.'" *Munaf v. Geren*, 553 U.S. 674, 686 (2008) (quoting *Wales v. Whitney*, 114 U.S. 564, 574 (1885)).

The Supreme Court and Fourth Circuit's case law confirms that core habeas claims like the ones Plaintiffs bring—claims that challenge the authority of the Executive to exercise a power that led to the detention—*must* be brought in habeas. *See, e.g.*, *Nance v. Ward*, 597 U.S. 159, 167 (2022) ("[A]n inmate must proceed in habeas when the relief he seeks would 'necessarily imply the invalidity of his conviction or sentence." (quoting *Heck v. Humphrey*, 512 U.S. 477, 480 (1994))); *Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973) (answering in the affirmative the question "whether the specific federal habeas corpus statute, explicitly and historically designed to provide the means for a state prisoner to attack the validity of his confinement, must be understood to be the exclusive remedy available" despite the broad language of 42 U.S.C. § 1983); *Plyler v. Moore*, 129 F.3d 728, 733 (4th Cir. 1997) (explaining that if "an action [i]s one challenging the legality of physical confinement . . . the only proper avenue for relief was a petition for a writ of habeas corpus").

Here, Plaintiffs seek review of the legality of the Executive's restraint of and removal of Abrego Garcia to El Salvador, leading to his present detention there. Compl. ¶ 63 (alleging Defendants "decided to deport Plaintiff Abrego Garcia without following the law"). Plaintiffs make it clear that the ultimate relief they seek is his

Appx.404

return to the United States to live at liberty with his family. *Id.* ¶¶ 76–77, 82–83, 88–89, 94–95 (alleging irreparable harm from separation from his family and asking "the Court to immediately order Defendants to take all steps reasonably available to them, proportionate to the gravity of the ongoing harm, to return Plaintiff Abrego Garcia to the United States.") Because Plaintiffs seek Abrego Garcia's release from allegedly unlawful detention on the grounds that it was effected illegally, they make a core habeas claim, and they must therefore bring it exclusively in habeas.

But there is no jurisdiction in habeas. Plaintiffs admit—as they must—that the United States does not have custody over Abrego Garcia. They acknowledge that there may be "difficult questions of redressability" in this case, reflecting their recognition that Defendants do not have "the power to produce" Abrego Garcia from CECOT in El Salvador. Mem. Supp. TRO Mot. 2. But even more, they concede that Abrego Garcia is not in Defendants' custody. *Id.* (asking the Court to order Defendants to "request that the government of El Salvador return Plaintiff to Defendants' custody"). Despite their allegations of continued payment for Abrego Garcia's detention, Plaintiffs do not argue that the United States can exercise its will over a foreign sovereign. The most they ask for is a court order that the United States entreat—or even cajole—a close ally in its fight against transnational cartels. This is not "custody" to which the great writ may run. This Court therefore lacks jurisdiction.

And even if the writ were to run to Abrego Garcia's custody in El Salvador, the fact remains that the writ acts not on the detainee but the custodian. 28 U.S.C. §§ 2242–43. Thus, a custodian with the power to produce Abrego Garcia must be physically within the jurisdiction of this Court for this Court to exercise jurisdiction in habeas. *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004). But the only Defendant alleged to be within the physical jurisdiction of this Court is Defendant Nikita Baker. Compl. ¶¶ 3, 10. And no allegation is made that Defendant Baker, the Baltimore Field Office Director for ICE, has the power to produce Abrego Garcia to this Court. *See id.* ¶¶ 3, 10, 63 (containing the only allegations in the complaint about Defendant Baker individually).

### B.    Plaintiffs cannot show redressability.

Plaintiffs cannot, as they must, show that it is "'likely,' as opposed to merely 'speculative,' that [their alleged] injury will be 'redressed by a favorable decision" in this Court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)); *see also id.* ("The party invoking federal jurisdiction bears the burden of establishing [redressability]."). A failure to do so means that the "irreducible constitutional minimum" of standing to sue in federal court is not met. *Id.* at 560. This Court thus lacks Article III jurisdiction, for there is no justiciable case or controversy.

When "[t]he existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume

8

either to control or to predict,' . . . it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to . . . permit redressability of injury." *Id.* at 562 (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (opinion of Kennedy, J.)). Here, "Plaintiffs' injury can only be redressed by [a] foreign nation[] not before the court." *Lin v. United States*, 690 F. App'x 7, 8–9 (D.C. Cir. 2017) (collecting cases) (dismissing claim for declaratory relief for lack of redressability because plaintiffs did not show "that a court ruling invalidating [certain] decrees would likely cause [other nations] to provide relief"). Plaintiffs concede that Abrego Garcia is in the custody of El Salvador, a foreign sovereign over which this Court "has no jurisdiction." TRO Mot. 2. Plaintiffs instead seek orders from this Court directing the United States to obtain Abrego Garcia's release from Salvadoran custody by financial pressure and diplomacy. *Id.* at 2–3. But they have made no showing that such measures are *likely*, not merely speculative, to obtain the ultimate relief they seek—Abrego Garcia's release. There is no showing that any payment made to El Salvador is yet to occur; no showing that El Salvador is likely to release CECOT detainees but for any such payment; no showing that El Salvador is even inclined to consider a request to release a detainee at the United States' request.

Although their motion and supporting memorandum contemplate the futility of this Court's order, Plaintiffs relegate the redressability requirement to a later time. *Id.* at 2 ("If those efforts are unsuccessful, the parties can brief any further remedial steps that may lie within this Court's jurisdiction."); Mem. Supp. TRO

Appx.407

Mot., ECF No. 10, at 2 ("This case may end up raising difficult questions of

redressability in a subsequent phase, but a preliminary injunction should issue

promptly."). To the contrary—if Plaintiffs cannot clearly show a likelihood of

satisfying redressability *now*, they cannot obtain the extraordinary remedy of a

TRO. *See Lujan*, 504 U.S. at 561 ("Since they are not mere pleading requirements

but rather an indispensable part of the plaintiff's case, each element must be

supported in the same way as any other matter on which the plaintiff bears the

burden of proof, *i.e.*, with the manner and degree of evidence required at the

successive stages of the litigation."). Even if Plaintiffs could surpass the lighter

burden of showing redressability for purposes of pleading, they have not met their

higher burden for purposes of preliminary equitable relief.

Because this Court has no power over a foreign sovereign and because

Plaintiffs have not clearly shown that enjoining Defendants as Plaintiffs ask will

likely redress their injuries, Plaintiffs lack standing for the relief they seek.

## C.    8 U.S.C. § 1252(g) deprives this Court of jurisdiction.

This Court lacks jurisdiction to review Defendants' removal of Abrego Garcia.

Section 1252(g) deprives district courts of jurisdiction to review "*any* cause or claim

by or on behalf of any alien arising from the decision or action by the Attorney

General to commence proceedings, adjudicate cases, or execute removal orders

against any alien" under the INA, notwithstanding any other provision of law,

except as otherwise provided in § 1252. 8 U.S.C. § 1252(g) (emphasis added).

Interpreting this provision, the Supreme Court has held the statute's plain

Appx.408

language bars any claim related to conduct falling within one of these three events—commencing proceedings, adjudicating cases, or executing removal orders. *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999). While section 1252(g) "does not sweep broadly," the provision's "narrow sweep is firm" and this Court cannot "entertain challenges to the enumerated executive branch decisions or actions." *E.F.L. v. Prim*, 986 F.3d 959, 964 (7th Cir. 2021). It "precludes judicial review of 'any' challenge to 'the decision or action by [DHS] to . . . execute removal orders'" which "includes challenges to DHS's 'legal authority' to do so." *Id.* at 965 (alteration in original); *see also Camarena v. Director, ICE*, 988 F.3d 1268, 1273–74 (11th Cir. 2021) ("No matter how [the plaintiffs] characterize their claims, they amount to an attack on the government's execution of their removal orders. That runs afoul of § 1252(g): If we held otherwise, any petitioner could frame his or her claim as an attack on the government's *authority* to execute a removal order rather than its *execution* of a removal order."). And, although authority exists permitting "substantive review of the underlying legal bases for" an execution of an order of removal,

Here, Plaintiffs' claims are challenges to the execution of his removal order, review of those claims is barred in the district courts under § 1252(g). Contrary to their assertion otherwise, *see* Mem. Supp. TRO Mot. 10, they specifically challenge the decision to execute Abrego Garcia's removal order. Compl. ¶ 63 (alleging Defendants "decided to deport Plaintiff Abrego Garcia without following the law"). Their bare assertion that "there was no removal order to execute," Mem. Supp. TRO

11

Appx.409

Mot. 10, is refuted by their own admission. Mem. Supp. TRO Mot. 1 ("The government could have chosen to remove Mr. Abrego Garcia to any *other* country on earth, but did not."). *See also* Compl., Ex. A, at 2 ("Based on [Abrego Garcia]'s admissions and concessions, the Court found his removability to be established by clear and convincing evidence as required by INA § 240(c)(3)."); *id.* at 14 (granting withholding of removal under INA § 241(b)(3)).

And Plaintiffs' claims for relief fall within the § 1252(g) prohibition because they each raise a challenge "by or on behalf of" Abrego Garcia to the decision to execute his removal order. *See* Compl. ¶¶ 74, 79, 85, 92; *see also Mapoy v. Carroll*, 185 F.3d 224, 228 (4th Cir. 1999) (where basis for claim is denial of stay of removal and continued detention in anticipation of removal, claim arises from decision to execute order of removal); *see also Duron v. Johnson*, 898 F.3d 644, 647–48 (5th Cir. 2018) (court must look at substance of complaint to determine whether claim is "by or on behalf of" alien; complaint of unlawful discrimination against U.S. citizen's alien father, styled as violating U.S. citizens' Fifth Amendment rights, is necessarily claim on behalf of father "to be free of such discrimination").

Here, Plaintiffs' contention that their challenge to the Executive's destination of removal does not fall within § 1252(g) because the destination is illegal under the INA, Mem. Supp. TRO Mot. 10, is circular and proves too much. Under their logic, this Court may assume jurisdiction to decide whether the order is legal, but if the order were determined legal, then jurisdiction would disappear again. Besides the fact that this Court must determine its own jurisdiction before reaching the merits

Appx.410

of a claim, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998), if

Plaintiffs were correct, then any challenge to the legality of a removal order would

avoid § 1252(g) altogether. But Congress added that provision precisely to avoid the

"deconstruction, fragmentation, and hence prolongation of removal proceedings,"

which such an interpretation of § 1252(g) would incentivize. *Reno*, 525 U.S. at 487.

Thus, because Plaintiffs' claims arise from Defendants' decision to execute

Abrego Garcia's removal order, those claims cannot be raised in this Court, and

preliminary relief cannot issue.[2]

## II. Plaintiffs have not clearly shown that irreparable harm is likely without the preliminary relief they seek.

Plaintiffs cannot meet the second *Winter* requirement, either. They point only

to two irreparable harms they say they will suffer: the separation of Plaintiffs'

family, and the alleged risk that Abrego Garcia will be tortured or killed in CECOT.

Mem. Supp. TRO Mot. 8.[3] But family separation is not an injury of the kind

---

[2] Abrego Garcia should have requested a stay of removal in connection to a motion to reopen directed to the immigration judge, 8 C.F.R. § 1003.23(b)(v), and then filed a petition for review in the Fourth Circuit if the immigration judge (and Board of Immigration Appeals on appeal) ultimately denied reopening. That was Congress's intent—to streamline all matters into review of a final order of removal. *See* 8 U.S.C. § 1252(a)(5) (petition for review exclusive means of judicial review), (b)(9) (judicial review of all questions of law and fact arising from "any action taken . . . to remove an alien from the United States under this subchapter" available only in petition for review); *Shaboyan v. Holder*, 652 F.3d 988, 990–91 (9th Cir. 2010) ("[T]he BIA's order denying Shaboyan's request for a stay would still be reviewable as part of a petition for review stemming from a final order of removal.").

And Plaintiffs could have taken these steps while Abrego Garcia was still in the United States—Plaintiffs allege he was able to talk to his wife by phone multiple times and that, the morning of March 15, he told his wife that there were plans to remove him to El Salvador. Compl. ¶¶ 52–57. Plaintiffs' failure to invoke the appropriate remedy when they had the chance does not mean there was no adequate remedy to review the impending removal action.

[3] Notably, Plaintiffs do not contend that Abrego Garcia is threatened by the reason he gave to get withholding of removal—alleged harm from the Barrios 18 gang's extortion of his family's pupusa shop. *See generally* Ex. 1 to Compl.

necessary to prevail on this factor in light of the Supreme Court's admonishment not to "routinely apply[] . . . the traditional standards governing more orthodox 'stays'" in an area to which "the Government has traditionally been granted the widest latitude." *Sampson*, 415 U.S. at 83–84.

And Plaintiffs have not clearly shown a likelihood that Abrego Garcia will be tortured or killed in CECOT. Plaintiffs point to little evidence about conditions in CECOT itself (focusing primarily on its capacity for detainees), instead extrapolating from allegations about conditions in different Salvadoran prisons. Goebertus Decl., Ex. B to Mem. Supp. TRO Mot., ¶¶ 2–4; Bishop Decl., Ex. C to Mem. Supp. TRO Mot., ¶¶ 24 & n.17, 30 & n.27. While there may be allegations of abuses in other Salvadoran prisons—very few in relation to the large number of detainees—there is no clear showing that Abrego Garcia himself is likely to be tortured or killed in CECOT.

More fundamentally, this Court should defer to the government's determination that Abrego Garcia will not likely be tortured or killed in El Salvador. "[S]eparation of powers principles . . . preclude the courts from second-guessing the Executive's assessment of the likelihood a detainee will be tortured by a foreign sovereign." *Kiyemba v. Obama*, 561 F.3d 509, 515 (D.C. Cir. 2009). The United States, as a signatory to the Convention Against Torture, is committed not to return a person to a country where that person is likely to be tortured. *See generally* 8 C.F.R. § 1208.18. And, as one of Plaintiffs' declarants concedes, "El Salvador is a signatory to both the Convention Against Torture and the

Appx.412

International Covenant on Civil and Political Rights." Bishop Decl. ¶ 32. Although the government erred in removing Abrego Garcia specifically to El Salvador, the government would not have removed *any* alien to El Salvador for detention in CECOT if it believed that doing so would violate the United States' obligations under the Convention. That judgment is therefore due respect under separation-of-powers principles. *See Kiyemba*, 561 F.3d at 515.

Thus, Plaintiffs cannot show the clear likelihood of irreparable harm necessary to satisfy the second *Winter* factor, especially in light of heightened burden necessitated by the intrusion of Plaintiffs' requested relief on the core of Executive foreign-affairs functions.

### III.    Plaintiffs have not shown that the balance of the equities and public interest clearly weigh in their favor.

Nor can Plaintiffs prevail on the remaining *Winter* factors. Abrego Garcia is a danger to the community—he is estopped from asserting otherwise—and there is a weighty public interest in ensuring the Executive can implement a unified course of conduct in foreign affairs. These interests tip the balance decisively against the Plaintiffs' asserted interests.

Abrego Garcia is barred from disputing that, as a member of the criminal gang MS-13, he is a danger to the community. This factual finding was made in his bond proceedings before the agency, IJ Order 2–3, and he appealed that finding to the Board of Immigration Appeals, which affirmed it as not clearly erroneous, BIA Opinion 1–2. Because he did not seek further review of the Board's decision, that decision is a final judgment precluding relitigation of the issues it resolved. *Hagan*

Appx.413

*v. McNallen* (*In re McNallen*), 62 F.3d 619, 624 (4th Cir. 1995) (noting that collateral estoppel may apply to administrative proceedings as well as judicial).

Collateral estoppel applies when "(1) the issue sought to be precluded [was] the same as that involved in the prior action, (2) that issue [was] actually litigated, (3) it [was] determined by a valid and final judgment, and (4) the determination [was] essential to the prior judgment." *Combs v. Richardson*, 838 F.2d 112, 115 (4th Cir. 1988) (quoting *In re Ross*, 602 F.2d 604, 607–08 (3d Cir. 1979)); *see also In re McNallen*, 62 F.3d at 624 (requiring that "the party against whom the prior decision was asserted enjoyed a full and fair opportunity to litigate that issue in an earlier proceedings").

Here, Abrego Garcia cannot now relitigate the finding that he is a danger to the community. That issue was actually litigated and decided in his bond hearing in 2019. IJ Order 2–3 ("Respondent failed to meet his burden of demonstrating that his release from custody would not pose a danger to others, as the evidence shows that he is a verified member of MS-13" and he "has failed to present evidence to rebut that assertion."). He appealed that decision to the appropriate administrative review body, the Board of Immigration Appeals, which adopted and affirmed the immigration judge's "danger ruling" notwithstanding Abrego Garcia's arguments. BIA Opinion 1–2. There is no evidence of further review by the Fourth Circuit, and the time for such review has passed, so the agency decision is a valid and final judgment. Moreover, because the Board affirmed the immigration judge solely on the ground that Abrego Garcia was a danger to the community, that ground is

Appx.414

essential to the judgment. Restatement (Second) of Judgments § 27 cmt. o (Am. L. Inst. 1982). Finally, Abrego Garcia had a full and fair opportunity to litigate the issue. He had the opportunity to give evidence tending to show he was not part of MS-13, which he did not proffer. IJ Order 2–3. And he had sufficient motivation to challenge the finding—he needed to prevail on it to obtain bond pending his removal proceedings. *See* Compl. ¶ 39 (discussing missing the birth of his son because he was detained); *accord* Restatement (Second) of Judgments § 28 cmt. j (discussing unfairness in applying preclusive effect to first judgment when "the amount in controversy in the first action [was] so small in relation to the amount in controversy in the second"). Thus, the finding of Abrego Garcia's danger to the community is conclusive, and he is estopped from challenging it now.

In light of Abrego Garcia's danger to the community, the balance of equities and the public interest tip against an injunction ordering Defendants to orchestrate his return to the United States. Although there is a "public interest in preventing aliens from being wrongfully removed," *Nken*, 556 U.S. at 435, there too is a strong public interest in not importing members of violent transnational gangs into the country. *See id.* at 436 (noting a heightened "interest in prompt removal" if an "alien is particularly dangerous"). And though the danger to the general public may be mitigated if Abrego Garcia were detained upon return to the United States, even while in detention, gang members may stoke violence against government officials and other detainees. *See* Michael E. Miller, Wash. Post, *"Vying for Control": How*

17

*MS-13 Uses Violence and Extortion in America's Jails* (Feb. 4, 2018).[4] And detainees may also escape.

Further, as discussed above, an injunction as Plaintiffs request would harm the public interest by preventing the Executive from implementing a unified course of conduct for the United States' foreign affairs. "[M]atters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Hernandez v. Mesa*, 589 U.S. 93, 103–04 (2020) (ellipsis in original) (quoting *Haig v. Agee*, 453 U.S. 280, 292 (1981)). "Between the two political branches, only the Executive has the characteristic of unity at all times," giving him the capability, which the other departments of government lack, "of engaging in the delicate and often secret diplomatic contacts" necessary in foreign affairs. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14–15 (2015). Thus, ordering the Executive to renege on any promise of payment that might exist would threaten the nation's credibility in any future negotiations or allow foreign negotiators to seek to leverage the disunity in foreign policy caused by this Court's order. *See id.*; *cf. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 ("[T]he President's maximum power to persuade rests on his capacity to bargain for the benefits of access to the entire national economy without exception for enclaves fenced off willy-nilly by inconsistent political tactics."). And ordering the Executive to request the release of

---

[4] *Available at* https://www.washingtonpost.com/local/vying-for-control-how-ms-13-uses-violence-and-extortion-in-americas-jails/2018/02/04/c8b8ab92-06c8-11e8-8777-2a059f168dd2_story.html.

Appx.416

a member of a gang responsible for violence and drug trafficking throughout the Americas threatens the country's national security. Such orders would therefore constitute "unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013).

The heavy interest in the President's primacy in foreign affairs outweigh the interests on the Plaintiffs' side of the scale. Although the Defendants recognize the financial and emotional hardships to Abrego Garcia's family, *see* Compl., Ex. 2, ¶ 47, the public interest in not returning a member of a violent criminal gang to the United States outweighs those individual interests. *See Nken*, 556 U.S. at 436. And to the extent that the Plaintiffs assert a general public interest in not perpetuating unlawful agency action, Mem. Supp. TRO Mot. 9, they have made no showing that the removal of Abrego Garcia to El Salvador was something other than an administrative error, *see* Cerna Decl. ¶¶ 12–15.

Because Plaintiffs have not made a clear showing that a TRO is warranted under these circumstances, their motion should be denied.

## CONCLUSION

The motion should be denied.

Respectfully submitted,

**Yaakov M. Roth**
Acting Assistant Attorney General
Civil Division

s/Erez Reuveni
**Erez Reuveni**
Acting Deputy Director
Office of Immigration Litigation

19

Appx.417

Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044-0878
(202) 307-4293

Dated: March 31, 2025

Erez.R.Reuveni@usdoj.gov

**Christopher Ian Pryby**
Trial Attorney
Office of Immigration Litigation

*Counsel for Defendants*

Appx.418

| From: | Trina Realmuto |
|---|---|
| To: | _ara_ers, Mary_._   V_; Seamon, Matthew_   V_; _q_al, Aysha T._   V_; _appelletti, Daniel_   V_; _ere_, Elianis_   V_; Sauter, Mar_   SAMA_ |
| Cc: | Matt Adams; _ristin Macleod-_all; Mary_enney; hughesa@humanrightsfirst.org |
| Subject: | _otential Meet and _onfer - DVD v DHS |
| Date: | Monday, March 31, 2025 4:10:00 _M |
| Attachments: | image002.png |

Counsel,

A few hours ago, Secretary of State Rubio reposted a tweet from Nayib Bukele indicating that 17 individuals were transferred from U.S custody to El Salvador. See https://x.com/SecRubio.  This followed a post from Secretary Rubio to similar effect on the same platform (https://x.com/SecRubio/status/1906684174020284784).  The State Department has also posted an announcement on its website titled  More Foreign Gang Terrorists Deported Out of America  (see https://www.state.gov/more-foreign-gang-terrorists-deported-out-of-america/).

Were all of these 17 people Salvadoran nationals, and if not, can you please provide more information, specifically whether any of them had final removal orders

In addition, can you confirm that no one is currently being removed pursuant to the March 30, 2025 Guidance

If any non-Salvadorans among the 17 individuals described in Secretary Rubio's statements had final removal orders, or if noncitizens are being subjected to removal under the Guidance, that would violate the TRO, and we immediately request a meet and confer.

We look forward to hearing back from you soon.

Trina



**Trina Realmuto**
**National Immigration Litigation Alliance**
617-819-4447 / trina@immigrationlitigation.org
www.immigrationlitigation.org
Facebook: NatIImmLitAlliance / LinkedIn

| From: | Larakers, Mary L. (CIV) |
|---|---|
| To: | Trina Realmuto |
| Cc: | Seamon, Matthew (CIV); Iqbal, Aysha T. (CIV); Cappelletti, Daniel (CIV); Perez, Elianis (CIV); Sauter, Mark (USAMA); matt@nwirp.org; Kristin Macleod-Ball; Mary Kenney; hughesa@humanrightsfirst.org |
| Subject: | Re: [EXTERNAL] Potential Meet and Confer - DVD v DHS |
| Date: | Monday, March 31, 2025 4:19:13 PM |
| Attachments: | image002.png |

Hi Trina,

Received. I am looking into this.

Thanks,
Mary

| From: | Matt Adams |
|-------|-----------|
| To: | Larakers, Mary L. (CIV) |
| Cc: | Trina Realmuto; Seamon, Matthew (CIV); Iqbal, Aysha T. (CIV); Cappelletti, Daniel (CIV); Perez, Elianis (CIV); Sauter, Mark (USAMA); Kristin Macleod-Ball; Mary Kenney; hughesa@humanrightsfirst.org |
| Subject: | Re: [EXTERNAL] Potential Meet and Confer - DVD v DHS |
| Date: | Tuesday, April 1, 2025 4:48:22 PM |

Good afternoon Mary,

I am writing to follow up regarding our inquiry as we have received information that at least one of the 17 individuals referred to by Secretary Rubio had a final order and was not a Salvadoran national.

Specifically, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. A# ▮▮▮▮▮▮. His family and counsel have reported that Mr. ▮▮▮▮▮ was first moved to Guantanamo the night of March 28, well after the district court entered its order in this case, and then removed to El Salvador, as Secretary Rubio reported, late in the night of March 30.

Can you please advise whether Defendants acknowledge his removal was in violation of the district court? If Defendants believe his removal did not violate the TRO, can you please advise if any of the information we have communicated in this email regarding Mr. ▮▮▮▮▮ is not correct or any other basis for asserting this does not violate the TRO?

In addition, we continue to wait for your responses regarding the other 16 individuals as well as confirmation that no one is currently being removed pursuant to the March 30, 2025 Guidance submitted by Defendants in this case.

Thank you for your prompt attention in this important matter. We look forward to following up with you and discussing next steps.

Matt

**From:**     _ara_ers, Mary _._   V_
**To:**     matt@nwirp.org
**Cc:**     Trina Realmuto; Seamon, Matthew     V ; _q_al, Aysha T.     V ; _appelletti, Daniel     V ; _ere_, Elianis     V ;
     Sauter, Mar___SAMA ; _ristin Macleod-_all; Mary__enney; hughesa@humanrightsfirst.org
**Subject:**     RE: E TERNA    otential Meet and   onfer - DVD v DHS
**Date:**     Wednesday, April 2, 2025 7:35:0   M

Good evening Matt,

I have no information to share at this time.

Best,
Mary

Appx.422

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| D.V.D.; M.M.; E.F.D.; and O.C.G., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY; Kristi NOEM, Secretary, U.S. Department of Homeland Security, in her official capacity; Pamela BONDI, U.S. Attorney General, in her official capacity; and Antone MONIZ, Superintendent, Plymouth County Correctional Facility, in his official capacity, <br><br> Defendants. | Civil Action No. 25-cv-10676 |

**INDEX OF EXHIBITS IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

Appx.423

| Exhibit | Description |
|---------|-------------|
| A | *Guerra-Castaneda v. Garland*, No. 19-1736, ECF 00117489280 (1st Cir. Sept. 14, 2019) and *Guerra-Castaneda v. Garland*, No. 19-1736, ECF 00117491683 (1st Cir. Sept. 19, 2019) |
| B | *Paye v. Garland*, No. 23-1426, ECF 00118167762 (1st Cir. July 17, 2024) |
| C | *W.G.A. v. Sessions*, No. 16-4193, ECF 65 (7th Cir. Mar. 19, 2018) |
| D | *Herrera-Meza v. Sessions*, No. 18-70117, ECF 17 (9th Cir. Sept. 18, 2018) |
| E | *Rodriguez Sutuc v. Att'y Gen.*, No. 15-2425, Dkt. 003111996172 (3d Cir. June 19, 2015) |
| F | *H.I.L. v. Barr*, No. 19-3053, ECF 25 (2d Cir. Oct. 2, 2019) |
| G | *Ramirez-Chavez v. Holder*, No. 11-72297, ECF 18 (9th Cir. Apr. 10, 2012) |
| H | *Singh v. Att'y Gen.*, No. 15-10136 (11th Cir. July 2, 2015) |
| I | Declaration of Paige Austin |
| J | Declaration of Aimee L. Mayer-Salins |
| K | Declaration of Kelsey Morales |
| L | Declaration of Katherine Gordon and attachment |
| M | Declaration of Mich P. Gonzalez and attachment |
| N | Declaration of Zoe Bowman |
| O | Declaration of Kathleen Malia Glynn |
| P | Declaration of Michelle Brané |
| Q | *Turnbull v. Ridge*, No. 1:04-cv-392 (E.D. Ohio Apr. 22, 2004) |

# United States Court of Appeals
## For the First Circuit

_____

No. 19-1736

JOSE DANIEL GUERRA-CASTANEDA

Petitioner

v.

WILLIAM P. BARR

Respondent

_____

Before

Thompson, Kayatta and Barron,
<u>Circuit Judges</u>.

_____

**ORDER OF COURT**

Entered: September 14, 2019

On Friday, September 13, 2019, this court received an after-hours filing from respondent stating that petitioner had been that same day removed to El Salvador, despite this court's September 11, 2019, order staying petitioner's removal from the United States, which remains in effect. The filing further states that DHS has "already begun exploring options for facilitating [p]etitioner's return[.]"

By no later than **5 p.m. on Monday, September 16, 2019**, respondent shall provide to the court, in detail, an explanation of how and why petitioner was removed to El Salvador in the face of this court's stay order and why respondent should not be held in contempt. Respondent shall also make all necessary inquiries and, at the same time, provide all information in its possession, custody, or control concerning (1) petitioner's current location and his condition, including whether he is presently detained by Salvadoran authorities or otherwise, and (2) the efforts being made to return him to this country forthwith. Respondent's submission to this court shall be made under the pains and penalties of perjury.

By the Court:

Maria R. Hamilton, Clerk

cc:    Nina Jane Froes; OIL OIL; Giovanni Di Maggio

# United States Court of Appeals
## For the First Circuit

———————————

No. 19-1736

JOSE DANIEL GUERRA-CASTANEDA,

Petitioner,

v.

WILLIAM P. BARR, Attorney General,

Respondent.

———————————

Before

Thompson, Kayatta, and Barron,
<u>Circuit Judges</u>.

———————————

**ORDER**

Entered: September 19, 2019

On Monday, September 16, 2019, this court received respondent's response to our September 14, 2019 Order directing respondent to "provide all information in its possession, custody, or control concerning (1) petitioner's current location and his condition, including whether he is presently detained by Salvadoran authorities or otherwise, and (2) the efforts being made to return him to this country forthwith."

Having reviewed respondent's September 14, 2019 submission, as well as petitioner's September 18, 2019 responsive filing, the court has determined that certain information requested remains outstanding, and further information is needed. Respondent is directed to provide information regarding petitioner's current condition and, further, the respondent shall describe in detail the efforts being made to ascertain information about petitioner's current condition and the means and resources at its disposal to do so. The court directs respondent to provide a detailed explanation of its efforts to locate petitioner and to secure his prompt return to the United States, as well as the means and resources at respondent's disposal to do so.

This court orders respondent to provide affidavits from the transferring and manifesting officers. Respondent also is ordered to provide more detail on the transfer and manifest processes.

In addition, respondent will provide to the court the steps it will take to ensure that such removals do not happen in the future in contravention of this court's stay-of-removal orders.

Respondent shall file its response by no later than September 26, 2019, and respondent is directed that its response shall include any other information in its possession, custody, or control relevant to the court's inquiries.  Respondent's submission to this court shall be made under the pains and penalties of perjury.

After reviewing respondent's submission, the court may consider directing a representative of respondent to appear and address these issues in person.  Status reports shall be filed whenever the events warrant an update, but respondent must file a status report at least every ten (10) days, beginning with the tenth day following the submission discussed above.

Counsel for the petitioner is invited to file with the court further responses to offer any additional information deemed relevant to the resolution of the matter.

With respect to the case on the merits, in order to minimize the period between petitioner's unauthorized removal and any ultimate disposition of his petition, briefing is hereby expedited as follows: Petitioner's brief shall be filed on or before September 23, 2019. Respondent's brief shall be filed on or before October 3, 2019. Petitioner's reply brief, if any, shall be filed on or before October 10, 2019.

The issue of contempt is reserved for the ultimate panel's consideration and resolution, and the parties should fully brief that issue.

The court's show-cause order is continued.

By the Court:

Maria Hamilton

cc:
Nina Jane Froes
OIL
Giovanni Di Maggio

# United States Court of Appeals
## For the First Circuit

No. 23-1426

PRINCE BELO PAYE,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

Before

Barron, Chief Judge,
Gelpí and Rikelman, Circuit Judges.

### ORDER OF COURT

Entered: July 17, 2024

On Wednesday, January 24, 2024, Petitioner filed a motion seeking an order to facilitate his return to the United States from Liberia at the Respondent's expense upon the Court's vacatur of the decision of the Board of Immigration Appeals ("BIA"). Petitioner explained in his motion that he was removed to Liberia on November 29, 2023 in violation of First Circuit Local Rule 18.0(1), which states that "[i]f the government has scheduled the removal of a petitioner, then the government will file with the Court a notice identifying the earliest date upon which removal may be made." In response, Respondent explained that Petitioner's removal in violation of Local Rule 18.0(1) was due to an unintentional oversight, that it will facilitate his return to the United States if he prevailed on his underlying petition, and that requiring it to pay for his travel expenses could implicate separation-of-powers concerns. On July 17, 2024, we issued our decision vacating in part the BIA's decision.

This is not the first time in which Respondent has removed a petitioner in violation of Local Rule 18.0(1). See Guerra-Castaneda v. Garland, No. 19-1736 (1st Cir. Sept. 14, 2019); Adewale v. Garland, No. 20-1540 (1st Cir. Oct. 24, 2020).

By no later than 5 p.m. on Friday, July 26, 2024, Respondent is ordered to provide to the Court, in detail, an explanation of how and why Petitioner was removed. Respondent shall also make all necessary inquiries and, at the same time, provide all information in its possession, custody, or control concerning (1) Petitioner's current location and his condition while in transit

back to the United States, including whether he is presently detained by authorities or otherwise, and (2) the expenses that Petitioner is expected to incur in returning to this country. Respondent's submission to this Court shall be made under the pains and penalties of perjury. Petitioner may, but is not required to, submit additional information documenting his travel expenses within 7 days of his return to the United States.

By the Court:

Maria R. Hamilton, Clerk

cc: Donna Carr, Chief Clerk, Board of Immigration Appeals, Gilles R. Bissonnette, SangYeob Kim, Margaret Moran, Joseph Anthony O'Connell, Andrew Nathan O'Malley, Oil, Daniel V. Ward, Colleen S. Roberts, Marianne Staniunas, Michelle Marie Mlacker, Abigail Sophie Alfaro

Appx.429

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## ORDER

March 19, 2018

### Before

DIANE S. SYKES, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

JOHN Z. LEE, *District Judge**

|  | W.G.A.,<br>Petitioner |
| --- | --- |
| No. 16-4193 | v. |
|  | JEFFERSON B. SESSIONS III, Attorney General of the United States,<br>Respondent |
| **Originating Case Information:** | |
| Agency Case No: A000-000-000<br>Board of Immigration Appeals | |

The following are before the court:

    1. **MOTION FOR STAY OF REMOVAL**, filed on March 15, 2018, by counsel for the petitioner.

    2. **RESPONDENT'S NON-OPPOSITION TO PETITIONER'S MOTION FOR A STAY OF REMOVAL**, filed on March 16, 2018, by counsel for the respondent.

    **IT IS ORDERED** that the motion is **GRANTED**. Petitioner W.G.A.'s removal is **STAYED** effective on his reentry to the United States pending resolution of his petition for review.

_____
*Of the Northern District of Illinois, sitting by designation.

form name: **c7_Order_3J**(form ID: **177**)

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

SEP 18 2018

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| JESUS EDUARDO HERRERA-MEZA, | No.   18-70117 |
| Petitioner, | Agency No. A072-153-846 |
| v. | |
| JEFFERSON B. SESSIONS III, Attorney General, | ORDER |
| Respondent. | |

Before:  THOMAS, Chief Judge, W. FLETCHER and CALLAHAN, Circuit Judges.

The motion to file a late motion for reconsideration (Docket Entry No. 13) is granted.  The motion for reconsideration of this court's May 23, 2018 order (Docket Entry No. 13) is granted.  Accordingly, this court's May 23, 2018 order is withdrawn.

The motion for a stay of removal (Docket Entry No. 1) is granted.  *See Nken v. Holder*, 556 U.S. 418 (2009); *Leiva-Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011).

Respondent is hereby directed to return petitioner to the United States under the same status he held prior to his removal.  Respondent is further directed to provide a status update on petitioner's return within 14 days after the date of this order.

KAM/MOATT

The previously established briefing schedule shall remain in effect.

Judge Callahan dissents.

Appx.432

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT
June 19, 2015
ECO-031-E

No. **15-2425**

Rodriguez Sutuc v. Attorney General
(A206-448-275)

Present:  MCKEE, Chief Judge

1)   Motion by Petitioners to Stay Removal

2)   Response by Respondent in Opposition to Motion to Stay Removal

---

The Court would have granted Petitioners a stay of removal, but was informed that Petitioners were removed earlier today.  The government is hereby ordered to use its best efforts to intercept Petitioners when they land tonight in Guatemala City and to return Petitioners to the United States immediately.  If the government is unable to intercept Petitioners at the airport, they must locate Petitioners in Guatemala and return them to the United States as quickly as possible.  Upon their return, Petitioners are granted a stay of removal pending disposition of their petition for review.  If, upon contact, Petitioners inform the government that they do not want to return to the United States, the government shall secure a written memorialization to that effect - even if that writing is in Spanish.

By the Court,

s/ Theodore A. McKee
Chief Judge

Dated:  June 19, 2015
JK/cc: Bridget Cambria, Esq.
        Bernard A. Joseph, Esq.

**A True Copy:**

*Marcia M. Waldron*

Marcia M. Waldron, Clerk

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 2nd day of October, two thousand nineteen.

Before:        Susan L. Carney,
                    *Circuit Judge.*

_____

H███ █ L█████████,

              Petitioner,

v.

William P. Barr, United States Attorney General

              Respondent.

_____

**ORDER**

Docket No. 19-3053

IT IS HEREBY ORDERED that the Respondent is ORDERED TO SHOW CAUSE why Petitioner was removed despite the filing of a motion for a stay of removal. Respondent is further ordered to inform the Court of Petitioner's current address, and to describe the efforts underway (as represented in the Government's letters dated September 27 and 30, 2019) to facilitate his return to the United States. The response is due within seven days of the date of this order, with updates on Petitioner's status to be filed thereafter at seven-day intervals.

It is further ordered that Luis Mancheno, Immigration Law Unit, The Legal Aid Society, 199 Water St. 3rd Fl., New York, NY, 10038, is appointed as *pro bono* counsel for the limited purpose of representing Petitioner's interests until his return is effected.

For the Court**:**

Catherine O'Hagan Wolfe,
Clerk of Court



EXHIBIT F

FILED

APR 10 2012

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| ALONSO RAMIREZ-CHAVEZ, | No. 11-72297 |
| Petitioner, | PRO BONO |
| v. | Agency No. A039-812-513 |
| ERIC H. HOLDER, Jr., Attorney General, | ORDER |
| Respondent. | |

Before:  CANBY and FISHER, Circuit Judges.

This petition for review was filed August 9, 2011, along with a motion for
stay of removal, which resulted in a temporary stay of removal as of that date.  *See*
Ninth Circuit General Orders 6.4(c).  Petitioner had filed a previous petition for
review in docket no. 11-71741, which petitioner voluntarily dismissed on
September 2, 2011.  Respondent was aware of the fact that two petitions for review
had been filed because it filed a motion on October 3, 2011 to file the
administrative record from the 11-71741 petition in this petition for review.
Respondent was further aware that there was a temporary stay of removal in this
docket no later than October 5, 2011, when this court granted the October 3, 2011
motion and directed respondent to file a response to the pending motion for stay of

sg/Pro Bono

removal in this docket.  This court granted the opposed motion for stay of removal on January 11, 2012.

Despite respondent's clear and unequivocal knowledge, no later than October 5, 2011, that a stay of removal was in effect in this docket, petitioner was removed on October 19, 2011.  Respondent states in its notice of such removal to this court, filed on January 24, 2012, that the Department of Homeland Security (DHS) was "understandably unaware" of this petition for review and the stay that was in effect at the time of petitioner's removal.  We disagree that DHS' violation of the stay of removal was understandable in light of respondent's actual knowledge of the pendency of this petition and the stay in place at the time of petitioner's removal.

Respondent is hereby directed to make substantial further attempts to locate petitioner and to return him to this country.  Within 28 days from the date of this order respondent shall file a status report that describes in detail all efforts made by respondent to locate and return petitioner, using every contact and address at their disposal.

Petitioner's counsel's motion to withdraw as pro bono counsel and all other proceedings in this petition for review are held in abeyance pending further order of this court.

sg/Pro Bono                                                                                         11-72297

Appx.436

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————

No. 15-10136-FF

————————————

GURBINDER SINGH,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

————————————

Petitions for Review of a Decision of the
Board of Immigration Appeals

————————————

Before: MARTIN, ROSENBAUM, and JILL PRYOR, Circuit Judges.

BY THE COURT:

On January 12, 2015, Gurbinder Singh filed a petition for review in this Court of the Board of Immigration Appeals' dismissal of his appeal of a final order of removal. In conjunction with his petition, Mr. Singh filed motions to proceed *in forma pauperis* ("IFP") and for a stay of removal. Three days later, a representative of the Office of Immigration Litigation ("OIL") notified the Court that Mr. Singh was in the custody of the U.S. Immigration and Customs Enforcement agency ("ICE") and represented that there were "no travel plans" for Mr. Singh.

This Court granted Mr. Singh's motion for leave to proceed IFP on April 9, 2015. On June 10, 2015, this Court granted Mr. Singh's motion for a stay of removal pending the outcome

of his petition for review. The Court issued a briefing schedule making Mr. Singh's initial brief due on June 23, 2015.

The following day, counsel for respondent U.S. Attorney General ("the government") telephoned to inform the Court that, when she contacted ICE to notify the agency of the stay of removal, she learned that ICE had removed Mr. Singh to India on April 15, 2015, without notifying the government, OIL, or this Court. The government subsequently filed an official Notice of Removal with the Court in which counsel stated that the agency was "taking steps to investigate this matter further with ICE and to ascertain what steps ICE may take to facilitate Petitioner's return to the United States." Included with the Notice of Removal was a declaration of ICE officer Orestes Cruz, who confirmed that, although ICE's Chief Counsel's office had asked that the Office of Enforcement and Removal Operations (also under ICE's agency umbrella) contact OIL with any changes in Mr. Singh's removal status, ICE's records did not reflect that the Chief Counsel's office had been so advised before Mr. Singh was removed.

On June 16, 2015, the government filed a Supplemental Notice of Removal in which counsel stated that ICE had begun the process of attempting to locate Mr. Singh to return him to the United States and represented that counsel would update the Court when she received additional information. As of the date of this order, the Court has received no update from the government, ICE, OIL, or Mr. Singh. Indeed, the Court is doubtful that Mr. Singh is aware his motion for stay of removal was granted and that he accordingly has a right to remain in the United States pending the outcome of his petition for review. Moreover, Mr. Singh's premature removal likely also prevented him from receiving notice of his briefing schedule in this case.

Recognizing that Mr. Singh was improperly removed more than two months ago and presumably is unaware of both his rights and obligations in this case, we deem it prudent to

2

appoint counsel to protect his interests, facilitate his return, and assist the Court in navigating his case. The Court hereby appoints Jay Bogan with the law firm of Kilpatrick Townsend & Stockton LLP to represent Mr. Singh throughout his proceedings before this Court.

Additionally, the government is hereby ordered to use its best efforts to locate Mr. Singh in India as quickly as possible and to make contact with him. Upon initiating contact, the government is hereby ORDERED to advise Mr. Singh of the following:

1. Mr. Singh has a right pursuant to this Court's stay of removal to be returned to the United States.

The government must advise Mr. Singh of his right to be returned to the United States pending the outcome of his petition for review and of this Court's appointment of counsel in his case. If, upon contact, Mr. Singh informs the government that he does not wish to return to the United States, the government shall secure a written memorialization to that effect, even if that writing is in Mr. Singh's native language. If Mr. Singh chooses to remain in India, his decision has no bearing on the pendency of his case or his entitlement to counsel, and the government must advise Mr. Singh accordingly.

2. The Court has appointed counsel for Mr. Singh at no cost

The government must advise Mr. Singh that, regardless of whether he wishes to be returned to the United States, his case remains under the Court's consideration. The government must inform Mr. Singh that the court has appointed him counsel at no cost to him. The government is ordered to facilitate Mr. Singh's contact with his appointed counsel, including by permitting Mr. Singh to telephone counsel at the government's expense and by providing translation services if necessary. If Mr. Singh informs the government that he does not wish to

Appx.439

be represented by counsel, the government shall secure a written memorialization to that effect as well.

Every fifteen days, the government shall notify this Court of the status of its efforts to locate Mr. Singh until he is contacted. The government shall also inform the Court promptly once Mr. Singh has been contacted and promptly upon his decisions regarding whether he will return to the United States and/or accept the appointment of counsel. At that time, the government shall file with the Court any written memorialization of his decisions as described above. If Mr. Singh wishes to be returned to the United States, the government is ORDERED to return him as soon as possible. All merits briefing in this case is hereby STAYED pending a determination by Mr. Singh within seven days of his being located by the United States government, of whether he wishes to proceed with his case, and, if he chooses to proceed and to return to the United States, until his return to the United States.

Finally, the government is DIRECTED to show cause within fifteen days why this Court should not impose sanctions upon the agencies and officers involved in Mr. Singh's improper removal.

**IT IS SO ORDERED.**

4

## DECLARATION OF PAIGE AUSTIN

I, Paige Austin, hereby affirm under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following statements are true, except those made on information and belief, which I believe to be true:

1. I am an attorney at Make the Road New York (MRNY), located at 301 Grove St. Brooklyn, NY 11237. MRNY is a nonprofit legal service provider with five offices in and around New York City. Since 2019, MRNY has been a part of a collaborative of organizations providing services to New Yorkers with final orders of removal who are either in ICE custody or at imminent risk of ICE enforcement action. The collaborative is called the Rapid Response Legal Collaborative (RRLC). I supervise our team that works under the auspices of RRLC in representing and providing legal advice to individuals with orders of removal.

2. Through this work, I have represented or supervised the representation of hundreds of individuals with final orders of removal, often although not always in seeking reopening.

3. The vast majority of individuals referred to RRLC are pro se. A large number of those referred by another service provider do not understand that they have a removal order; do not understand the implications of their removal order; and/or do not know how to reopen the removal order before the immigration court. For instance, many individuals are confused about the distinction between U.S. Immigration and Customs Enforcement (ICE) and the immigration court (e.g. believing they have attended their immigration court dates when in fact they were attending ICE check-ins) or believe that actions subsequent to a removal order have the effect of cancelling or undoing it (e.g. filing an asylum application or applying for employment authorization).

4. Preparation of a motion to reopen requires significant work by counsel that is nearly impossible for pro se clients to undertake on their own, particularly if they are detained. Motions to reopen require a sworn statement of new and relevant facts in English, often with reference to the person's prior removal proceedings; supporting evidence, which individuals in custody do not have access to; a relief application, completed in English; and proof of prima facie eligibility for relief, such as country conditions evidence, which is also unattainable in custody due to lack of consistent (or any) access to the internet, printers, copiers, and translation services.

5. This evidence takes time to gather, translate, and prepare for submission. Many clients and prospective clients do not have copies of relevant immigration-related documents. As a result, our first step in preparing motions to reopen is generally to request a complete Record of Proceeding from Executive Office of Immigration Review (EOIR), which is comprised of the immigration courts and the Board of Immigration Appeals, so that we can understand the procedural history of the case, see whether an application is on file, and identify any lack of notice claim. Individuals in custody have no way to access their Record of Proceeding.

6. Even when someone is not detained, preparation of a meritorious motion to reopen is extremely difficult to complete pro se. RRLC has received a large volume of referrals for individuals who attempted to do a pro se motion to reopen—often after being handed a pro se form at the window in immigration court—and had that motion denied. It is common for people to omit crucial details they do not know are relevant; omit supporting evidence; and/or face difficulty translating a statement into English.

7. Motions to reopen can be legally complex. Pro se individuals (like many attorneys) generally are not familiar with the relevant filing deadlines or the concept of equitable tolling for filing deadlines or the number bar; do not have the experience or knowledge to analyze and present certain legal claims, including lack of notice and changed-country-condition claims; and may fail to recognize relevant information to include. To the extent motions seek reopening sua sponte, these also may face additional legal barriers including the regulatory departure bar and a limitation on federal court review. A sua sponte filing also triggers the number bar on reopening—which may create an additional obstacle.

8. For motions to reopen, including requests to reopen *sua sponte*, that do not carry an automatic stay of removal, a movant generally can be deported during the pendency of that motion. The same is true during the appeal of a denied motion to reopen. A motion for a stay of removal requires legal argument and familiarity with stays from other legal contexts, as there are no published standards for the adjudication of motions to stay removal by immigration courts or the Board of Immigration Appeals.

9. Although counsel can generally file motions to reopen electronically, pro se individuals are forced to rely on paper filing. My team at MRNY files some motions to reopen by mail for nondetained clients for whom we are using a notice of limited appearance, and whose orders of removal are outside New York City, and we often see significant delays in delivery and docketing of those motions in immigration court. For instance, in recent years, we have seen delays of several weeks in docketing motions in the immigration courts in Orlando, Dallas, and Chicago. For someone in custody who faces imminent removal, it is unlikely based on my experience that they could even get a motion to reopen and/or motion for a stay filed and docketed prior to removal if relying on paper filing by mail to do so.

10. Communication with clients in ICE detention facing imminent removal is extremely difficult. Particularly since January 2025, we regularly see clients transferred between facilities repeatedly and within days of arrival in ICE custody. On multiple occasions, we have been unable to hold a legal call or obtain client signatures prior to a detained client's slated removal. This obstructs our ability to identify and document clients' reasons for seeking reopening and their claims to relief.

11. ICE ERO does not provide counsel or, in most cases, individuals with information about removal. For instance, on or about March 26, 2025, a post-order MRNY client from Venezuela was transferred from an ICE detention facility without prior notice and prior to a scheduled legal call to complete his intake. I repeatedly asked ICE ERO to confirm

whether ICE intended to remove him to Venezuela or El Salvador. Despite confirming our client was in the process of being transferred, ICE ERO would not provide this information.

12. Similarly, we have another post-order client from Venezuela who was in custody for several months and repeatedly faced near-removal in March 2025—including even being transported to the airport—without reliable notice or information on where he would be removed to.

13. Logistically, it would be impossible for legal service providers to prepare motions to reopen with respect to every possible country to which an individual may be removed—and certainly that is not possible for pro se individuals. For instance, MRNY currently represents a detained post-order client who is gay. He could theoretically assert a fear of removal to an enormous number of countries. We have also represented two detained, indigenous land rights activists from Honduras, both of them post-order. Latin America is widely considered to be the deadliest region in the world for land-rights activists, with several other countries including Colombia, Brazil, Guatemala and Mexico also posing lethal risks. In these types of cases, where individuals have fear-based claims to multiple countries, preparing and filing motions to reopen based on fears of deportation to multiple countries on the off-chance DHS might intend to deport a person to one of those countries is simply not feasible. Instead of a single motion and application, each client could now need the equivalent of potentially a dozen or more motions and applications—with no attorney capacity left to assist anyone else. It would also impose an extreme burden on the immigration court system, with judges asked to review and rule on numerous potentially unnecessary motions and claims.

14. It is difficult to substantiate fear claims to countries which clients know nothing about. MRNY represents another post-order client whose motion to reopen, filed while he was detained, was denied with respect to a possible third country of removal (El Salvador) with the IJ finding "the new claim advanced of a fear of removal to a country other than that designated as a country of removal in [the client's] case is too generalized and vague to establish prima facie eligibility for asylum or related relief absent further evidentiary support." Notably, our client's filing had included several articles and reports about the dangers posed by removal and incarceration in El Salvador—far more than a pro se individual in custody, particularly one who does not speak English, could possibly adduce. Yet his fear claim was still denied as "too generalized and vague."

15. Moreover, RRLC represents some clients who once detained *want* to be removed to their country of origin. A motion to reopen and stay interrupts this process and prolongs their detention. For instance, in the case of the MRNY for whom ICE ERO refused to provide information on *where* he would be removed, we filed a motion to reopen with respect to El Salvador, only to withdraw it after a TRO was issued in the instant litigation. In the interim, our client was returned to a detention facility where he now remains (despite the withdrawal of his motion) nearly two weeks after he could have been removed.

16. The only workable means of providing an opportunity to seek fear relief to a third country, in my view and based on my experience, would be to provide notice of an intended third country of removal with a concomitant and documented opportunity to express a fear of removal there. That expression of fear of removal to a third country should trigger a reopening of the removal proceeding, such that the full panoply of rights under Section 240 of the Immigration and Nationality Act is available.

17. In particular, I note that the use of a fear interview, along the lines of a credible or reasonable fear interview, as a gatekeeping mechanism to determine if the noncitizen merits the opportunity to present a full fear claim before an IJ would be grossly unfair. In my experience representing detained clients in reasonable fear interviews and reviewing such interviews, asylum officers seek to elicit detailed explanations of the interviewee's fear and reasons for believing the foreign government would not provide protection (or would acquiesce in torture). A lack of detailed information or knowledge, particularly as regards the government's role in any persecution or torture, is often fatal to the fear claim. Obviously, for a third country where the interviewee has never set foot, that information would be impossible for the noncitizen to provide on an accelerated timeline and while in detention.

DATED: April 8, 2025

_____
Paige Austin, Esq.
Make the Road New York
301 Grove St.
Brooklyn, NY 11237
Tel: (718) 565-8500 ext. 4139

## DECLARATION OF AIMEE L. MAYER-SALINS

I, Aimee L. Mayer-Salins, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I make this affidavit based upon my own personal knowledge in support of the Plaintiffs in *D.V.D. v. DHS*, No. 1:25-cv-10676-BEM (D. Mass), and would be competent to testify thereto.

2. I am an attorney licensed to practice law in the state of Massachusetts. I am also an associate member of the Virginia State Bar. In addition, I am admitted to practice before the United States Courts of Appeals for the First, Fourth, and Eleventh Circuits, as well as the United States Supreme Court. I was first admitted to the Virginia State Bar in 2013. I was admitted to the bar in Massachusetts in 2016.

3. I have practiced immigration law for my entire career. I began my career at the United States Department of Justice (DOJ), entering on duty through the Attorney General's Honors Program in 2013. At DOJ, I served at the Board of Immigration Appeals within the Executive Office for Immigration for Review. I then completed a fellowship at the Post-Deportation Human Rights Project at Boston College. After that, I was an associate attorney at Rubin Pomerleau, P.C. and then at Fragomen, Del Rey, Bernsen, & Loewy, LLP. I then worked at the Catholic Legal Immigration Network, Inc. (CLINIC) from 2019 through 2022, first as a staff attorney and then as a supervisory senior attorney. Since September of 2022, I have served as the managing appeals attorney at the Amica Center for Immigrant Rights.

4. As part of my responsibilities at CLINIC, I led a Remote Motions to Reopen Project. Through that project, I mentored attorneys across the country representing noncitizens with final order of removal who sought to reopen their proceedings. In addition, I created webinars, practice advisories, and other training materials for attorneys on complex issues surrounding motions to reopen. I also had my own caseload of motions to reopen cases, focusing on motions on behalf of people subjected to the Remain in Mexico and the Zero Tolerance Family Separation policies, as well as detained individuals who had been subjected to egregious harm in ICE detention, including victims of nonconsensual gynecological procedures.

5. The Amica Center for Immigrant Rights—formerly known as Capital Area Immigrants' Rights (CAIR) Coalition—engages in unwavering legal defense and strategic litigation for immigrant children and adults facing detention and deportation. The majority of our clients are currently detained in the custody of U.S. Immigration and Customs Enforcement (ICE).

6. Since joining the Amica Center for Immigrant Rights, I have trained attorneys on motion to reopen practice, supervised staff filing motions to reopen, and mentored staff handling complex motions.

*Most Noncitizens Are Unaware That a Motion to Reopen Is a Viable Option*

7. According to the Vera Institute the majority of noncitizens facing deportation are pro se. *See, e.g.,* Vera Immigration Court Legal Representation Dashboard, available at https://www.vera.org/ending-mass-incarceration/reducing-incarceration/detention-of-immigrants/advancing-universal-representation-initiative/immigration-court-legal-representation-dashboard. Even though removal may mean permanent family separation, persecution, torture, or even death, noncitizens in removal proceedings have no right to appointed counsel. Instead, noncitizens are only representation "at no expense to the government." 8 U.S.C. § 1229a(b)(4)(A); 8 C.F.R. § 1240.10(a)(1).

8. Pro se noncitizens usually are wholly unaware of the complicated procedural mechanisms that may allow a judge to consider new evidence after they have been ordered removed. *E.g., Lugo-Resendez v. Lynch,* 831 F.3d 337, 345 (5th Cir. 2016) (explaining that many noncitizens "are poor, uneducated, unskilled in the English language, and effectively unable to follow developments in the American legal system—much less read and digest complicated legal decisions.").

9. Even those pro se noncitizens savvy enough to figure out that a motion to reopen is available to present new evidence are unlikely to be able to present an approvable motion to reopen to the adjudicator. For most people, there are simply too many barriers placed in their way. A motion must be presented in English and, as further explained below, must address timeliness, prima facie eligibility for relief, and explain why evidence is material and previously unavailable. The evidence must be attached with the motion, along with any application for relief. For a detained noncitizen without an attorney, putting together such a motion is nearly impossible. This is especially true for those noncitizens with limited formal education, limited English proficiency, or mental health disabilities.

*General Legal Landscape Applicable to Motions to Reopen*

10. To understand why filing a motion to reopen is so difficult for a pro se noncitizen, and frankly, even for a noncitizen with counsel, it is important to understand the legal framework governing motions to reopen. After a final removal order has issued, a person can present evidence that is new and was unavailable at the prior removal hearing through a motion to reopen. Through 8 U.S.C. § 1229a(c)(7)(C)(i), Congress authorized the filing of motions within 90 days of a final administrative removal order, and courts of appeals have affirmed this deadline may be equitably tolled. *See, e.g., Mata-Reyes v. Lynch*, 576 U.S. 143, 147 n.1 (2015) (citing cases); *Lugo-Resendez v. Lynch*, 831 F.3d 337 (5th Cir. 2016). The 90-day deadline does not apply to individuals seeking protection from persecution and torture and whose motion is based on changed conditions *in the country to which removal was ordered.* 8 U.S.C. § 1229a(c)(7)(C)(ii). If an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA) grants reopening, the noncitizen is

2

not automatically granted protection from removal. Rather, the person still must demonstrate eligibility for such protection in an individual merits hearing before an immigration judge.

11. In general, the venue and process for filing motions to reopen is as follows:
    a. If the final order was issued by an IJ, and the noncitizen did not previously appeal that final order, then any motion to reopen must be filed with the immigration court that issued the order. If the IJ denies reopening, the noncitizen may appeal the denial to the BIA. If the BIA affirms the IJ's decision, the noncitizen may file a petition for review of the BIA's decision with the appropriate court of appeals.
    b. If the final order was issued by an IJ, the noncitizen previously appealed the IJ's decision to the BIA, and the BIA was the agency adjudicator to rule substantively in the case, then any motion to reopen must be filed with the BIA. This is true even if the person previously filed a petition for review of the BIA's decision to the court of appeals and the court of appeals ruled on the petition. However, if the BIA dismissed the appeal for lack of jurisdiction or untimeliness, the motion must be filed with the IJ. If the BIA denies reopening, the person may file a petition for review of the BIA's decision with the appropriate court of appeals. However, if the motion to reopen is based on the IJ's or BIA's *sua sponte* authority under the regulations, judicial review is either entirely unavailable or limited to legal and constitutional questions. If the BIA denies the motion solely in an exercise of discretion, no review is available, regardless of the basis of the individual's claim.

12. A motion to reopen must include "the appropriate application for relief and all supporting documentation." 8 C.F.R. § 1003.2(c)(1), 1003.23(b)(3). Additionally, to prevail on a motion to reopen, the individual must show prima facie eligibility for relief. *Matter of L-O-G-*, 21 I&N Dec. 413 (BIA 1996). In practical terms, this means that the pro se individual or an attorney must fill out a lengthy and detailed application form. Additionally, counsel usually will need to work with the client to draft a declaration as such declarations play a critical role in adjudicating fear-based claims. The individual or attorney will also need to gather other supporting evidence, which may include corroborating declarations from other individuals, medical records, psychological evaluations, newspaper articles, and reports from human rights organizations. Where relief is based on fear of persecution and/or torture, the application and evidence must be specific to the country to which the noncitizen may be removed.

*Competent preparation of a motion to reopen is a time-consuming task.*

13. Investigating the viability of a claim for reopening can be a complicated endeavor for a pro se individual or for an attorney, including gathering new and previously unavailable evidence.

14. For an attorney, the process must comply with the ethical obligation to fully and competently assess the merits of a claim which, for clients facing persecution and torture,

3

may make the difference between being sent to one's death and safety in this country. For example, where counsel did not represent the person previously, counsel needs to obtain the complete record of proceedings. Moreover, by statute and regulations, motions to reopen require substantial new evidence, which takes time to gather and assemble. *See generally* 8 U.S.C. § 1229a(c)(7)(B); 8 C.F.R. § 1003.2(c)(1). Additionally, the practical realities of representing people in ICE custody—including frequent transfers between distant facilities and communication barriers— make it substantially more difficult to gather necessary information and evidence.

15. Simply communicating with a person in ICE custody is a complex task. Attorneys must reach out to the facility where the person is detained to schedule privileged calls or virtual video visits. At some facilities, there is a process just to have an attorney's phone number listed as privileged that can take several days. Due to the overcrowding of most facilities housing ICE detainees and the limited space available for confidential communication, there is often a lengthy wait to be scheduled for a timeslot for a privileged call or video visit. Plus, the staff assigned to schedule such calls are often overwhelmed with requests and it can take a few days for them to even respond to the attorney's request for a call. Alternatively, an attorney might go visit the client in person, but that typically involves driving very long distances. Most ICE facilities are in rural areas far from most attorneys. For example, most clients served by the Amica Center for Immigrant Rights are housed in detention facilities that are between 2 and 5 hours driving from our office in Washington, DC. Attorneys also face significant delays communicating with detained clients by mail.

16. These steps to communicate with the client are necessary before an attorney can even really begin work on a case and start the process for obtaining the client's immigration file through the Freedom of Information Act, which requires a client's signature. All of these delays are exacerbated when ICE transfers individuals from one facility to another which happens frequently, in my experience.

17. Gathering evidence can also be a time-consuming endeavor when a client is detained. For example, working with a detained client to draft a declaration or obtaining a psychological evaluation on their behalf requires hours and hours of work. In addition to the time needed to actually do the declaration or psychological evaluation, often it takes many hours just to coordinate the logistics of getting interpreters, psychologists, or others approved by the facility and travel to the facility.

18. Every case is different, but it would not be unreasonable for obtaining and reviewing a client's record to require between 15-30 hours of work, even before research and writing can begin. Additional time also would be needed in circumstances where it is difficult for the attorney and client to communicate, for example, if the client is detained far from the attorney, is transferred multiple times, has a mental health disability or physical disability that makes communicating more challenging, or is not proficient in English.

19. Where a noncitizen is pro se, especially if they are detained, they must try to obtain evidence and connect with potential witnesses despite even more barriers. Even making a

4

simple phone call to a potential witness can be an unachievable task for a detained person. In overcrowded detention facilities, it can be difficult to have any privacy to discuss sensitive matters relevant to a person's fear of removal. Jail calls can be prohibitively expensive. *See, e.g.,* Wendy Fry, *ICE Detention: Where a day's work might buy you a 14-minute phone call,* CAL MATTERS, July 26, 2024, available at https://calmatters.org/newsletter/ice-detention-where-a-days-work-might-buy-you-one-14-minute-phone-call/#:~:text=According%20to%20the%20California%20Collaborative,a%20minute%20for%20international%20calls. Plus, detainees typically lack internet access and therefore cannot easily research country conditions in an unfamiliar country themselves. .

*Generally there is no automatic stay when a motion to reopen is filed.*

20. Despite all of the time-consuming work necessary to competently prepare a motion to reopen, attorneys and their clients also must race against the clock to get a motion to reopen filed as quickly as possible. This is not simply because there is a 90-day filing deadline applicable to most motions; it is also because a client with a final order of removal is at risk of being deported at any time.

21. Even the filing of the motion to reopen does not automatically stay removal in most instances. (Indeed, removal is *only* automatically stayed for motions to rescind and reopen in absentia orders. *See* 8 U.S.C. § 1229a(b)(5)(C); 8 C.F.R. § 1003.23(b)(4)(ii)). Instead, an attorney must also prepare a stay motion, often addressing the likelihood of success on the merits, irreparable harm, and the public interest / harm to government, although the BIA does not have a precedential decision indicating what factors it considers. The IJ or BIA has the sole discretion to decide whether to grant such a stay.

*Motions to Reopen are Not a Realistic Option Where ICE is Attempting to Remove Someone to a Third Country.*

22. As detailed above, preparing a motion to reopen is a complex and time-consuming process even in the normal course. Putting together a motion to reopen any time a person fears he might be removed to a random third country selected by the government with no notice whatsoever to the noncitizen is utterly unworkable. In addition to the practical difficulties of preparing a motion discussed above, the noncitizen or their representative would have the added burden of researching country conditions and the treatment of similarly situated individuals in a country that might be wholly unfamiliar to the noncitizen, even assuming that the noncitizen is informed of what country to which they may be removed. For example, a gay noncitizen may have no idea how people who are gay are treated in an unfamiliar country. But of course, their lack of familiarity does not mean that they would not be at risk. Similarly, a person belonging to a religious or ethnic minority group may have no idea how people belonging to that group are treated in an unfamiliar country, but again this lack of familiarity does not equate to lack of risk. Thus, the noncitizen or their counsel would need to do in depth research into country conditions on a totally unfamiliar country.

Appx.449

23. Moreover, requiring motions to reopen to multiple countries, without notice, or on a condensed timeline turns the process into motion to reopen whack-a-mole and is directly at odds with the motion to reopen statute, which generally permits the filing of only one motion to reopen. 8 U.S.C. § 1229a(c)(7)(A). Under this framework, the noncitizen may have to file a new motion to reopen every time the government suggests another country where they might be removed, necessarily exceeding the one motion limit.

24. In short, motions to reopen are not realistic where ICE is attempting to remove someone to a third country, especially where ICE does so without even providing notice of which country a person might be removed to and without an automatic stay.

Signed under penalty of perjury this 7th day of April, 2025 at Newton, Massachusetts.


_____
Aimee L. Mayer-Salins

Appx.450

## Declaration of Kelsey Morales

I, Kelsey Morales, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge:

1. I am an immigration attorney with the Immigration Representation Unit of the Alameda County Public Defender's Office, the first deportation defense unit to be housed in a county public defender office in California and anywhere outside of New York State. I have practiced federal litigation and removal defense for over eight years, with the last five years focused on representing noncitizens detained by the Department of Homeland Security ("DHS").

2. Our immigration unit represents indigent individuals, including detained individuals, who are facing removal from the United States. We have limited resources for  r representation and focus on cases of indigent noncitizens detained in California who have viable claims for relief.

3. I have represented noncitizens detained by DHS in immigration and custody proceedings before the Executive Office for Immigration Review ("EOIR"), on writs of habeas corpus before the U.S. District Court for the Northern District of California, and on petitions for review before the U.S. Court of Appeals for the Ninth Circuit. My representation before EOIR includes representing noncitizens detained by DHS in removal and withholding-only proceedings, including before immigration judges and on direct appeal before the Board of Immigration Appeals ("BIA"), and on motions to reopen ("MTR") before the BIA.

4. MTRs are a legal vehicle by which noncitizens can seek to reopen completed immigration proceedings.    8 U.S.C. § 1229a(c)(7). Successful MTRs must include new facts that are supported by affidavits or other evidence, such as expert reports or country conditions.    8 U.S.C. § 1229a(c)(7)(B). MTRs seeking the opportunity to pursue relief, including relief based on a fear of persecution or torture, must include a completed copy of the relevant application and evidence demonstrating  r    facie eligibility for relief.    8 C.F.R. §§ 1003.2(c)(1), 1003.23(b)(3).

5. Pursuing MTRs for noncitizens is a difficult and time-consuming process in the best of circumstances. Such motions involve gathering supporting evidence, preparing applications for relief (if relevant), and research and drafting the motion itself, which may include statutory and constitutional arguments. In addition, these motions require familiarity with the client's prior immigration proceedings and generally must be completed on an expedited timeline of 90 days or sooner if the movant is seeking to establish timeliness for the purposes of a statutory MTR. The statute only provides noncitizens with the opportunity to file one MTR, with a limited exception.    8 U.S.C. §  1229a(c)(7)(A), (c)(iv). Failure to make an argument or present relevant evidence may be prejudicial to the client. As such, it is imperative that all arguments and evidence challenging the initial removal order and preserving all potential immigration relief be included in the MTR.

Appx451

6. This is also the case for _____ MTRs filed more than 90 days after a final removal order. _____ MTRs similarly require knowledge of the client's prior immigration history and must contain supporting evidence and comply with agency filing requirements to have a chance of success. Moreover, _____ motions require gathering additional equity documents, because the standard for _____ motions is highly discretionary.

7. MTRs are even more challenging and time-consuming when the noncitizen is detained by DHS. This is because it is difficult to obtain timely access to noncitizens detained by DHS.

8. In my experience, the likelihood of promptly obtaining confidential legal calls is highly dependent on the detention facility. For instance, I recently submitted requests for legal calls with several clients who are detained at the Golden State Annex in McFarland, California and the soonest the facility would schedule a legal call was 10 days after I had submitted my requests; no earlier calls were available. Moreover, detained clients may not make it to scheduled legal calls for reasons outside of their control. For example, last week, one of my clients was unable to appear at a scheduled legal video call because the facility did not transport him to the legal visit room. Delays in timely processing requests for legal calls can also make it difficult to coordinate with expert witnesses who interview the client in order to prepare their report or evaluation.

9. Another challenge I frequently face is reliance on postal mail to obtain the evidence necessary for any MTR. In my experience, many detention centers do not have a reliable or transparent mechanism for attorneys to obtain electronic signatures from detained clients. This is a big hurdle in representation because executed release forms are necessary before I can request a copy of a client's immigration records via EOIR or a Freedom of Information Act ("FOIA") request. It is generally not feasible to obtain client signatures or other case documents in person due to the remote nature of the detention facilities. The closest facility at which one of my clients is detained is over 250 miles away from my office, which is over a four-hour drive one way.

10. Another obstacle is the DHS's practice of transferring noncitizens between detention facilities, without any prior warning to them or their counsel. I have had a client transferred without my knowledge as recently as February 2025. Another coworker had two clients transferred without prior warning within the past year, with one client transferred out of state. Such transfers generally cause further delay in obtaining necessary information, as they often necessitate resending documents and scheduling new confidential calls. For example, in the case of my colleague's client who was transferred out of state, the unannounced transfer interfered with a previously scheduled psychological evaluation.

11. To determine whether a client has a viable MTR, I need to do a consultation with the client and review their immigration records. Many noncitizens may not know that they can file MTRs or be aware of the statutory or constitutional arguments that can be raised

Appx.452

in such motions. This is particularly true for noncitizens who are unrepresented and detained. Moreover, MTRs are highly technical motions and subject to both agency and federal court case law. Even if a detained noncitizen has heard of the existence of MTRs as a vehicle for reopening, in my experience, they are typically unaware of the many specific requirements they entail, such as submitting the relevant application for relief, presenting new or previously unavailable evidence, and complying with the statutory deadline (or establishing equitable tolling of such deadline). Additionally, EOIR has various practice manuals and regulations that impose rules on page counts, presentation of evidence, and service that filers must follow or the motion will be rejected.

12. In my opinion, it is difficult for detained,   r      noncitizens to comply with these legal and technical requirements. Based on my experience working with detained clients for the past five years, it is particularly difficult for noncitizens detained by DHS to obtain the evidence they need to support reopening from outside of custody. This includes documentation to support any fear-based claim because, again, the motion must establish    r           eligibility for relief to be successful.

13. In addition, limited English proficiency will pose a major obstacle to   r      filings of MTRs, as all motions filed before EOIR must be filed in English (or accompanied by a certified English translation).   r      noncitizens who do not understand English, or do not know how to write in English, will find it nearly impossible to file MTRs without counsel.

14. MTRs for detained noncitizens are usually urgent endeavors. That is because, generally, not only must the noncitizen establish timeliness in filing their motion, but they are also under a final order of removal which DHS may execute at any moment. While reserving direct appeal to the BIA of an Immigration Judge's initial removal order automatically stays removal, no such mechanism exists with respect to MTRs except in very narrow circumstances.    8 U.S.C § 1229a(c)(7)(C)(iv). This means that DHS may remove a noncitizen while they are preparing to file a MTR, while the MTR is pending before EOIR, or even while an appeal of the Immigration Judge's denial of the MTR is pending with the Board of Immigration Appeals. That is because the stay process before the agency is discretionary and there is no published decision on setting forth stay factors. This is problematic because it means that noncitizens with viable MTRs may be removed before their motion can be adjudicated on the merits, even if they are seeking protection from persecution or torture in the country to which they are removed.

Signed under penalty of perjury this 8th day of April 2025 at Oakland, California.

_____
Kelsey Morales

Appx.453

## DECLARATION OF KATHARINE MARGARET GORDON

I, Katharine Margaret Gordon, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.  I am a practicing attorney licensed to practice in New York, I regularly practice before the Executive Office of Immigration Review. Since February 2020, I have been employed at Amica Center for Immigrant Rights (Amica Center). I am over the age of 18 and am competent to testify regarding the matters described below.

2.  I am a Senior Attorney with the Detained Adult Program (DAP) at Amica Center. Amica Center is a Washington, DC-based nonprofit organization dedicated to providing legal services to indigent immigrant men, women, and children who are detained by Immigration and Customs Enforcement (ICE) in Maryland, Pennsylvania, Virginia and other states. At Amica Center, a large part of my work consists of representing Maryland residents who have been detained by ICE or who are otherwise undergoing proceedings before the Executive Office of Immigration Review, at both the Immigration Court and Board of Immigration Appeals levels.

3.  In my position, I frequently represent non-citizens with final removal orders issued by an Immigration Judge (IJ) in removal proceedings under 8 U.S.C. § 1229a and non-citizens with reinstated removal orders issued by the Department of Homeland Security (DHS) pursuant to 8 U.S.C. § 1231(a)(5).

4.  I currently represent a Venezuelan citizen with a final removal designating only Venezuela as the country of removal. No alternate country was designated. I will refer to him as Guillermo. Guillermo is a young Venezuelan man with several tattoos, and he fears removal to El Salvador, a country he has never set foot in. He fears that if he is removed to El Salvador, he will be imprisoned and tortured, and will have no way to contact his family, his attorney, or diplomatic representatives of Venezuela.

5.  Guillermo entered the United States in July 2022 by crossing the Rio Grande River from Mexico to the United States and he immediately turned himself in to U.S. Customs and Border Patrol (CBP). After being held for a few days, he was paroled into the United States pursuant to 8 U.S.C. § 1182 (d)(3). At that time, he was not issued a Notice to Appear (NTA).

6.  He traveled from Texas to Virginia, and in approximately September 2022, checked in with ICE and provided ICE with a valid Virginia mailing address.

7.  In March 2023, ICE filed an NTA, placing him in proceedings under 8 U.S.C. § 1229a (Section 240 proceedings) with the Annandale Immigration Court, and ICE indicated that it mailed a copy of his NTA to his Virginia mailing address. Guillermo has no recollection of receiving this NTA or a subsequent hearing notice sent to this address.

8.  On November 14, 2023, Guillermo was ordered removed *in absentia*. He did not become aware of this removal order until approximately 2025.

9.  On March 4, 2025, in the U.S. District Court for the Western District of Texas, a criminal complaint was filed against Guillermo under 8 U.S.C. § 1325(a)(1), charging him with a misdemeanor count of improper entry into the United States based on his July 2022 entry.

10. A warrant was issued for his arrest, and, on March 10, 2025, CBP agents arrested him at his current home in College Park, Maryland. On March 12, 2025, he was brought before a Magistrate Judge at the US District Court for Maryland and ordered to be sent to the Western District of Texas to face the 8 U.S.C. § 1325(a)(1) criminal charge. From March 12 until approximately April 1, 2025, he was held at the Chesapeake Detention Facility in Baltimore, Maryland under the custody of the US Marshals Service.

11. On March 18, 2025, I was retained by Guillermo to represent him in his immigration matter, specifically to seek to reopen his case before the Immigration Court. Upon speaking with him, he indicated that he was afraid of removal to El Salvador and being confined at the CECOT (Centro de Confinamiento de Terrorismo) prison. He was afraid of this because of the news of Venezuelans with tattoos being sent to this prison several days before.

12. On March 25, 2025, I filed online a Motion to Rescind *in Absentia* Removal Order and Reopen Proceedings with the Annandale Immigration Court on several grounds including:

    a.  Rescission of the *in absentia* order due to lack of notice and reopening of proceedings;

    b.  Reopening proceedings due to changed country conditions in Venezuela after the 2024 presidential elections;

    c.  Reopening proceedings due to changed country conditions as a Venezuelan with fear of removal to El Salvador based on the removals of Venezuelans to El Salvador beginning on or about March 15, 2025; especially in light of *D.V.D. v. DHS*, Case No. 25-cv-10676 (D. Mass March 23, 2025) (case filed against DHS challenging the policy of third country removal without providing notice or opportunity to contest removal).

    d.  *Sua sponte* reopening to protect due process rights, especially considering ongoing federal litigation.

13. Along with my 18-page motion, I included a new I-589 Application for Asylum, Withholding of Removal and Protection under the Convention Against Torture articulating fear of removal to both Venezuela and El Salvador, and 207 pages of supplemental evidence.

14. On March 26, 2025, I received an order denying the Motion to Rescind *In Absentia* Removal Order and Reopen Proceedings. The order indicated that the IJ had denied the motion on March 25.

15. This March 25 order only made reference to the request for rescission of the removal order, and did not make any reference to the other three grounds for reopening proceedings.

16. On March 26, 2025, I emailed the immigration court clerk to request clarification as to whether I should expect a ruling on the other grounds for reopening which I had presented in the motion. The clerk indicated a further decision would be forthcoming.

17. On March 28, 2025, the IJ issued another order, denying on all grounds. In regard to the grounds based on a new fear of removal to El Salvador, which I have attached to this declaration, the IJ provided the following reasoning, provided here in its entirety:

> First, country conditions in El Salvador are not relevant to Respondent's case. Respondent was ordered removed by this court to his country of origin, Venezuela - not El Salvador.
>
> Second, Respondent's fear of removal to El Salvador as a 'Venezuelan national with Tattoos' is tentative and speculative, at best. Respondent has been ordered removed to Venezuela by this Court, not El Salvador. If the United States government were to remove Respondent to El Salvador under a separate authority, that is outside the jurisdiction of this Court to adjudicate and/or analyze. Respondent's relief would be sought in Federal court, not Immigration Court, when and if that issue became ripe for review.

18. I have informed my client of this decision and, specifically, that the IJ found that she did not have jurisdiction to consider his claim of persecution and torture in El Salvador. However, my client continues to express fear of persecution and torture in El Salvador.

19. On April 2, 2025, I notified the Chief Counsel of the Washington Field Office of the Office of the Principal Legal Advisor that my client is afraid of persecution and torture if removed to El Salvador, and that the Temporary Restraining Order issued in *D.V.D. v. DHS*, Case No. 25-cv-10676-BEM (D. Mass March 28, 2025) is applicable to my client.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 7th day of April 2025 at Takoma Park, Maryland

_____
Katharine Margaret Gordon



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**ANNANDALE IMMIGRATION COURT**

Respondent Name:

███████████████████████████

To:

Gordon, Katharine Margaret
1025 Connecticut Avenue NW
Suite 701
Washington, DC 20036

A-Number:

█████████████

Riders:
In Removal Proceedings
Initiated by the Department of Homeland Security
Date:
03/28/2025

## ORDER OF THE IMMIGRATION JUDGE

■ Respondent ☐ the Department of Homeland Security has filed a motion to reopen these proceedings. Upon reading and considering the motion, and any opposition from the non-moving party, the motion is ☐ granted ■ denied for the following reason(s):

☐ The motion is untimely and fails to meet any exceptions. *See* 8 C.F.R. § 1003.23(b)(1),(4).
☐ The motion is numerically barred and fails to meet any exceptions. *See* 8 C.F.R. § 1003.23(b)(1),(4).
☐ The moving party failed to provide evidence demonstrating changed circumstances that is material and that was unavailable or could not have been discovered or presented at the previous proceedings. *See* 8 C.F.R. § 1003.23(b)(4)(i).
☐ The moving party failed to submit the appropriate application for relief and any accompanying documents. *See* 8 C.F.R. § 1003.23(b)(3).
☐ The Respondent has been removed or otherwise departed from the United States. *See* 8 C.F.R. § 1003.23(b)(1).
■ Other:
Respondent has provided two additional bases to reopen his case in addition to notice failure of the scheduling order resulting in the in absentia order; They are: 1) change in country conditions in Venezuela and/or El Salvador and 2) fear of removal to El Salvador.

First, country conditions in El Salvador are not relevant to Respondent's case. Respondent was ordered removed by this court to his country of origin, Venezuela - not El Salvador.

Second, Respondent's fear of removal to El Salvador as a 'Venezuelan national with Tattoos' is tentative and speculative, at best. Respondent has been ordered removed to Venezuela by this Court, not El Salvador. If the United States government were to remove Respondent to El Salvador under a separate authority, that is outside the jurisdiction of this Court to adjudicate and / or analyze. Respondent's relief would be sought in Federal court, not Immigration Court, when and if that issue became ripe for review.

Lastly, Respondent left Venezuela in ██████. ████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

Respondent left his country and remains in power. Respondent has not met his burden to demonstrated that conditions have materially or substantively changed such that his case should be reopened based on new or changed conditions.



Immigration Judge: Campanella, Lorianne 03/28/2025

## Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Noncitizen | [ ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS

Respondent Name : ███████████████████████ | A-Number : ██████████

Riders:

Date: 03/28/2025 By: ████████████, Court Staff

**Declaration of Mich P. Gonzalez**

  I, Mich P. Gonzalez, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. My name is Mich P. Gonzalez and I am an immigration and civil rights attorney licensed to practice by the State of New York. I am a co-founding partner of Sanctuary of the South, LLC and our business address is 251 Valencia Avenue, Ste. 140, Coral Gables, FL 33134.

2. On February 20, 2025, an Immigration Judge ("IJ") sitting in the Immigration Court at the Krome Service Processing Center ("Krome") in Miami, Florida granted my client protection in the form of withholding of removal to Guatemala due to severe past persecution and threat of future persecution on account of her identity as a transgender woman and sexual minority. On this same date, our office contacted the relevant Department of Homeland Security ("DHS") Enforcement and Removal Operations ("ERO") officers overseeing her custody at the Krome facility to urge her release, attaching the IJ's order.

3. On February 24, 2025, DHS Supervisory Detention and Deportation Officer Jahmal Ervin ("SDDO Ervin") responded via electronic correspondence stating, "[y]our client is not being released at this time as his case is still being processed for removal efforts."

4. Our office immediately replied requesting the names of the country or countries to which DHS was seeking to remove our client.

5. Neither Officer Jahmal Ervin, nor the Miami ERO Acting Field Office Director nor the Acting Krome Assistant Field Office Director (collectively "ICE") ever responded substantively to this request.

6. Concerned about ICE's stated intention to remove our client and refusal to provide the names of any third country to which they were seeking removal, we filed a motion to reopen removal proceedings with the sitting IJ at Krome who had granted withholding on February 20, 2025. We filed the motion to reopen on February 25, 2025 and on March 1, 2025, the IJ denied on the grounds that it was premature as Respondent was not seeking protection from removal to any particular country. Please see attached order.

7. Our office followed up over a dozen times in the weeks that followed with emails to ICE seeking answers to ensure due process for our client. We informed ICE of the ongoing danger to our client by remaining in detention due to her status as a transgender woman and repeatedly requested information regarding ICE's intentions to remove her to a third country. These emails received no substantive response.

8. On or about March 24, 2025, our client informed us that the risks to her safety became a reality when she was sexually assaulted in the showers at Krome–an assault reportedly witnessed by officers at Krome in or about mid-March 2025.

9. We again contacted ICE, informing them of this assault and requesting information about ICE's investigation and responsibilities under the Prison Rape Elimination Act. We have yet to receive any substantive response to these requests.

10. On or about March 29, 2025, our client disappeared from Krome and could not be found on the ICE Locator for nearly three days. We again contacted ICE, requesting information as to our client's whereabouts. Again, these emails were ignored until finally her assigned deportation officer Kristy Zamir wrote back simply stating that "[client's name and immigration number] is located at Eloy, AZ, Service Processing Center."

11. We were finally able to make contact with our client, who confirmed that she had inexplicably been transferred to the Eloy Service Processing Center ("Eloy") in Arizona. She also informed us that she was not provided any information about her transfer or any attempts ICE is making to remove her to a third country.

12. We contacted ICE once again, by email, requesting they please confirm the reason for her transfer and whether ICE was attempting to deport her to a third country. This information, once again, was not provided.

13. As of today, our client allegedly remains at Eloy. However, she is no longer reflected in the ICE detainee locator website and we fear for her imminent and unlawful deportation to a third country without notice or opportunity to present arguments that such deportation places her at risk.

I affirm under penalty of perjury that the aforementioned is true and correct to the best of my knowledge.

Dated: April 3, 2025

Mich P. Gonzalez, Esq.



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**MIAMI KROME IMMIGRATION COURT**

Respondent Name:

To:

Blankenship, Katherine Holloway
6355 NW 36th Street
Suit 609
Virginia Gardens, FL 33166

A-Number:

Riders:
In Withholding Only Proceedings
Initiated by the Department of Homeland Security
Date:
03/01/2025

### ORDER OF THE IMMIGRATION JUDGE

Respondent's Motion to Reopen

**Order:**

The motion to reopen is denied as premature. At this time, Respondent is not seeking protection
from removal to any particular country.

Immigration Judge: LERNER, ROMY 03/01/2025

Appeal: Department of Homeland Security: ☑ waived ☐ reserved

Respondent: ☐ waived ☑ reserved

Appeal Due: 04/02/2025

## Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Noncitizen | [ ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS

Respondent Name : ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | A-Number : ▮▮▮▮▮▮

Riders:

Date: 03/02/2025 By: Murgado, Letty, Court Staff

**Declaration of Zoe Bowman**

1.   My name is Zoe Bowman and I am an attorney at Las Americas Immigrant Advocacy Center ("Las Americas"), a non-profit organization in El Paso, Texas.

2.   Las Americas first met with Maiker Alejandro Espinoza Escalona ("Mr. Espinoza Escalona") on August 27, 2024. I represented him for purposes of requesting his release from custody in front of Immigration and Customs Enforcement ("ICE"). Mr. Espinoza Escalona was in ICE detention since May 22, 2024, shortly after arriving to the United States to seek asylum. He was detained at the El Paso Service Processing Center until recently.

3.   From meetings with myself and other Las Americas staff, I learned that Mr. Espinoza Escalona is a citizen of Venezuela and he came to the U.S. with his partner and their young child. I believe Mr. Espinoza Escalona was ordered removed to Venezuela on July 8, 2024 because that is his country of origin. I did not represent him in immigration court, but after I received a copy of his A-file, it confirmed that the immigration judge had designated Venezuela as the country of removal in July 2024.

4.   On Monday, March 10, 2025, at 12:43 a.m.ET I received an email from Pedro Perez, Acting Supervisory Detention and Deportation Officer, alerting me that ICE was about to transfer Mr. Espinoza Escalona to the El Valle Detention Facility. Shortly thereafter he was transferred to that facility.

5.   On Saturday, March 29, 2025, I received a message from Mr. Espinoza Escalona's sister. She informed me that Mr. Espinoza Escalona had called her Friday night at 11:44 p.m. ET to tell her officers told him to collect his belongings. He believed he would imminently be transferred to a different facility, but was not told where.

6.   On Monday, March 31, 2025, I received another call from Mr. Espinoza Escalona's sister. She told me that she recognized her brother in images that were posted on social media by Salvadoran President Nayib Bukele of men who were sent to El Salvador from the U.S. via the naval base at Guantánamo Bay, Cuba, and imprisoned there. When I checked the ICE detainee locator website that Monday morning, it listed his location as Camp 6 in Florida, indicating that he had recently been detained in Guantánamo Bay, Cuba.

7.   Based on this information, it is now clear to me that when Mr. Espinoza Escalona called his sister on the night of March 29th to tell her that he was being imminently transferred, that transfer was to Guantánamo Bay, Cuba, and must have occurred that night or the following morning.  Also, based on Secretary of State Rubio's statement that a flight left Guantanamo for El Salvador Sunday night March 30, this must have been the flight that Mr. Espinoza Escalona was on.  This is further confirmed by the fact that when I checked the ICE detainee locator Monday morning, his location was still listed as Guantánamo Bay.

8.   I never received notification from ICE that they transferred or intended to transfer Mr. Espinoza Escalona from the El Valle Detention Facility.

9. In the evening of April 6, 2025, I spoke with Mr. Espinoza Escalona's sister. She said that she and her family have not been able to speak with him since Friday, March 28, when he was transferred out of El Valle Detention Facility and eventually removed to El Salvador.

I, Zoe Bowman, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746(1), that the foregoing is true and correct to the best of my knowledge.

_____          4/8/2025
Signature                                                   Date

2

Appx.465

## DECLARATION OF KATHLEEN MALIA GLYNN

I, Kathleen Malia Glynn, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.    I am a practicing attorney licensed to practice before the State of Colorado. My business address is 12596 W. Bayaud Ave., Ste. 390, Lakewood, CO 80228. I have been employed as a Senior Associate Attorney at Grob & Eirich, LLC since February 1, 2015. Prior to joining Grob & Eirich, LLC, I was a staff and managing attorney in the Children's Program at the Rocky Mountain Immigrant Advocacy Network (RMIAN) during the years 2008-2010 and 2011-2014. I am over the age of 18 and am competent to testify regarding the matters described below.

2.    I have practiced in immigration law since October of 2007, representing hundreds of noncitizens in removal proceedings before the Executive Office for Immigration Review (EOIR) and the Board of Immigration Appeals (BIA), as well as noncitizens with applications and petitions for immigration benefits or relief filed with U.S. Citizenship and Immigration Services (USCIS). Since 2015, my practice has also included the representation of immigrant children and their caregivers in Colorado state guardianship, custody, and adoption proceedings. My areas of expertise include Special Immigrant Juvenile Status (SIJS), removal (deportation) defense of children, children's asylum claims, and the intersection of immigration law and adoption.

3.    Since 2007, I have represented dozens of noncitizens with final removal orders in removal proceedings pursuant to Immigration and Nationality Act (INA) § 240, 8 U.S.C. § 1229a (Section 240 proceedings).

4.    In October 2024, a local non-profit organization approached me about representing, on a *pro bono* basis, the mother of four children in her petition for custody and her motion for Special Immigrant Juvenile Status (SIJS) findings as to her children. After an initial consultation with the mother, I agreed to file her custody petition and SIJS motion as to the younger three children (the fourth, oldest child being too old to benefit). All of the children suffered extreme abuse, neglect, and abandonment from their father. The custody petition and motion for SIJS findings were filed with the Denver County District Court in December 2024. This case remains pending. The mother is set for an initial status conference in May 2025.

5.    One of the children included in the custody petition and SIJS motion is Nixon Jose Azuaje Perez. Nixon is a 20-year-old native and citizen of Venezuela.

6.    Nixon, his mother, his older brother, and his two younger brothers left Venezuela in May of 2018. Nixon has not lived in Venezuela since May of 2018, when he was thirteen (13) years of age.

1

7.  Nixon resided with his mother and siblings in Peru before entering the United States in August 2023. Nixon and his family members were paroled into the United States after having made an appointment to request asylum through the "CBP One" application. The entire family was placed in removal proceedings.

8.  Nixon's mother filed for asylum on June 25, 2024, with Nixon and his brothers included as derivative beneficiaries. The asylum application expresses and documents the family's fear of return to Venezuela and to Peru.

9.  Nixon and his older brother were arrested in Aurora, Colorado in or around late July 2024, in relation to a shooting at the apartment complex in which they then resided. After the shooting, in which Nixon and his brother deny any involvement, they swept up shell casings outside their apartment door. Nixon and his brother were charged with tampering with evidence. They were released from Adams County jail after paying minimal bonds and placed on ankle monitors. Nixon's criminal case, as well as his brother's, remain pending in Adams County District Court.

10. On or around September 6, 2024, Nixon and his brother went to have their ankle monitors adjusted. At that appointment, U.S. Immigration and Customs Enforcement (ICE) agents took Nixon and his brother into immigration custody and detained both at the GEO/ICE Aurora Detention Center in Aurora, Colorado. Section 240 removal proceedings continued on the Aurora Immigration Court's detained docket.

11. From approximately September 6, 2024 until March 11, 2025, Nixon remained detained at the GEO/ICE Detention Center in Aurora, Colorado. Nixon was *pro se* throughout his Section 240 removal proceedings. His family could not afford an immigration attorney, and the local non-profit organization was not successful in locating *pro bono* counsel for him.

12. On February 13, 2025, Nixon was ordered deported by an Immigration Judge at the Aurora Immigration Court. Nixon reported to his mother that the Immigration Judge said something to the effect that "SIJS will take too long." Nixon, already struggling emotionally with being detained, stated to his mother that he could not wait in detention, and thus chose not to appeal. Because the Immigration Judge designated Venezuela as the country of removal, he assumed that, if removed, it would be to Venezuela.

13. Nixon was moved by ICE from the GEO/ICE Detention Center in Aurora, Colorado to the Rio Grande Processing Center in Laredo, Texas on March 11, 2025. Nixon was able to call his mother to inform her of his transfer.

14. On March 14, 2025, Nixon called his mother and told her that ICE agents said he was going to Mexico. No one has heard from Nixon since that March 14, 2025 call.

15. On March 18, 2025, Nixon's mother called and texted me asking for help in locating Nixon. On that date, I searched the online ICE Detainee locator. Nixon did not appear.

2

16. On March 19, 2025, Nixon's mother reached by telephone an ICE official at the local Denver Field Office who confirmed that Nixon was on one of the March 15, 2025 flights to El Salvador.

17. On March 20, 2025, Nixon's name appeared on the list of Venezuelans sent to CECOT in El Salvador as reported by CBS news. *See* https://www.cbsnews.com/news/venezuelans-deported-el-salvador-names/ (last visited April 7, 2025). I saw Nixon's name on this list on the date of publication.

18. Nixon's mother believes she has seen Nixon on the videos released from CECOT. He is easily distinguished because of his unique hair.

19. Nixon has no criminal history in Venezuela or Peru. His mother has obtained criminal clearance reports from both countries. Nixon's sole contact with law enforcement in the United States is the still pending tampering with evidence charge. He now has an arrest warrant for failing to appear at his March 11, 2025 criminal hearing, a hearing he was unable to attend because, on that date, he was in ICE detention, being moved by ICE from Aurora, Colorado to Texas.

20. Nixon is not, and has never been, a member of Tren de Aragua or any other criminal organization.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 8th day of April, 2025 in Lakewood, Colorado, by:

Kathleen M. Glynn

3

Appx.468

## DECLARATION OF MICHELLE BRANE

I, Michelle Brané, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.    I am a non-resident migration and human rights fellow at Cornell Law and the Executive Director of Together and Free. I hold a J.D. from Georgetown University Law Center.  I am over the age of 18 and am competent to testify regarding the matters described below.

2.    I have more than 25 years of experience working on immigration and human rights issues. Prior to my work at Together and Free, I served for three years as the Executive Director for the Department of Homeland Security's Family Reunification Task Force, and then as DHS's Ombudsman for Immigration Detention. Before that, I was the Director of the Migrant Rights and Justice program at the Women's Refugee Commission for almost 15 years, where I worked on projects related to immigration custody, family detention and separation, and access to asylum at the U.S. border.

3.    I have authored and overseen numerous landmark reports on migration and asylum issues, including *Locking Up Family Values*, on family detention; *Halfway Home*, on unaccompanied migrant children; *Forced From Home: The Lost Boys and Girls of Central America*; *Prison for Survivors: The Detention of Women Seeking Asylum in the United States*; *Detained or Deported: What About My Children?*, a guide for detained and deported immigrant and undocumented parents; and *Betraying Family Values: How Immigration Policy at the United States Border is Separating Families*.

4.    I have testified before Congress and the Inter-American Commission for Human Rights, and I present regularly as an expert at conferences, briefings, and professional trainings, including before the Human Rights Council and the United Nations High Commission for Refugees in Geneva.

5.    Together and Free is a nonprofit organization that provides emergency and ongoing support services to asylum seeking families impacted by federal immigration policies.

6.    My staff and I have received outreach from families of individuals removed to El Salvador by the United States government, including the families of 5 Venezuelan citizens believed to have been removed to El Salvador on Sunday, March 30, 2025.

7.    I first learned of the March 30 flight when it was announced on social media by Secretary of State Marco Rubio on Monday, March 31, 2025. On Monday March 31, I was contacted by an attorney who believed her client was on the flight based on a family member who had seen him in a video posted by Secretary of State Rubio. Over the next week, four additional families reached out to Together and Free with concerns that a family member had been removed on the March 30th flight.

8.    On April 2, 2025, an article in the Orinoco Tribune entitled "Seven More Venezuelans Migrants Abducted in El Salvador" included the names of 7 Venezuelan nationals who were removed on the March 30, flight to El Salvador. All 5 of the names that had been provided to us by family members appeared on that list.

9.    The first of these cases involves Victor Andres Ortega Burbano, a 24-year-old Venezuelan citizen with muscular dystrophy which affects his right arm. His wife reported to Together and Free that he arrived in the United States in 2022. We are not aware of any criminal record. Victor applied for Temporary Protective Status (TPS) on December 28, 2023 and was granted this status on June 20, 2024.

10.    Records reflect that an immigration judge ordered Victor removed to Venezuela on October 22, 2024.

11.    Victor was released from detention following his removal order. His family told us that on March 11, 2025, while checking his mailbox at his home at 11:30 a.m., he was surrounded by Immigration and Customs Enforcement (ICE) agents and arrested. His family was able to track his detention locations thereafter through the on-line ICE detainee tracker and by occasionally speaking to him by phone. He was first taken to and detained at a facility in Alvarado, Texas. The following day he was removed to the El Valle ICE detention facility in Raymondville, Texas, where he was detained for a little over two weeks.

12.    On Friday, March 28, at about 11 p.m., his wife spoke to him while he was still detained in El Valle, Texas. He told her that ICE agents had informed him that he was to be deported to Venezuela. He then called her on Sunday, March 30, 2025, indicating that he was now detained at Guantanamo. He told her that he did not know where he was to be taken next, or if he would be kept at Guantanamo. That was the last contact that his wife had with him. On March 31, 2025, his family learned that he was on the March 30 flight to El Salvador through a social media post.

13.    Together and Free is currently investigating the cases of an additional 3 Venezuelan men, all of whom we believe had final removal orders to Venezuela and we have reason to suspect were removed to Guantanamo and then El Salvador on the evening of March 30, 2025.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge.

Executed this 8th day of April 2025 at Ithaca, NY.

Michelle Brané

Appx.470

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DON H. TURNBULL, | ) | CASE NO.  1:04 CV 392 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| TOM RIDGE, Secretary of the | ) | |
| Department of Homeland Security, et al., | ) | |
| | ) | |
| Defendant. | ) | ORDER |

This matter came before the Court upon Petitioner's Motion to Return Petitioner To The

United States, And Restore His Status *Nunc Pro Tunc*, Pending The Resolution Of These

Proceedings.  The Court, having considered arguments of Counsel for the Parties, finds that the

Respondents knowingly, willfully and surreptitiously deported Petitioner from the United States

in direct contravention of the representations made to this Court, and to counsel for Petitioner, by

the Respondents.  Further, Respondents' actions in deporting Petitioner were in direct violation

of this Court's express Stay Order issued on April 16, 2004 at 10:19 a.m.

For the foregoing reasons and in the interests of justice, Petitioner's Motion is

GRANTED and, the Court orders Respondents to forthwith return Petitioner from Jamaica to the

United States and to the Northern District of Ohio as soon as possible and without undue delay. The Court further restores Petitioner's status *nunc pro tunc* pending resolution of these proceedings. Petitioner's release status is to be determined by the Court after a full hearing.

Respondents shall file a status report on or before April 30, 2004 detailing efforts to execute this Order.

Failure to execute this Order in a timely manner may result in appropriate sanctions.


IT IS SO ORDERED.

Donald C. Nugent

DONALD C. NUGENT
United States District Judge


DATED: April 22, 2004