No. 25-1393

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

———————————

D.V.D., M.M., E.F.D., O.C.G.,

*Plaintiffs-Appellees,*

v.

U.S. Department of Homeland Security, Krisit Noem, Secretary, U.S. Department of Homeland Security (DHS); Pamela Bondi, United States Attorney General, Antone Moniz, Superintendent of the Plymouth County Correctional Facility,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the District of Massachusetts

———————————

## BRIEF FOR APPELLANTS

———————————

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

ELIANIS N. PEREZ
*Assistant Director*

MATTHEW P. SEAMON
MARY L. LARAKERS
*Senior Litigation Counsel*
U.S. Department of
Justice, Civil Division
Office of Immigration
Litigation
P.O. Box 868,
Ben Franklin Station
Washington, DC 20044

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF THE ISSUES ........................................................... 1

STATEMENT OF THE CASE .............................................................. 2

I.     Procedural History ................................................................... 5

II.    Legal Background ................................................................... 8

SUMMARY OF THE ARGUMENT .................................................... 17

ARGUMENT. .................................................................................... 23

I.     The District Court Flouted Three Independent
       Jurisdictional Bars ............................................................... 23

       A.     The Injunction Violates 8 U.S.C. § 1252(f)(1) ............... 23

       B.     The Injunction Violates the Foreign Affairs Reform
              and Restructuring Act and Section 1252(a)(4). ........... 32

       C.     The Injunction Runs Afoul of Section 1252(a)(5), (b)(9),
              and (g) ..................................................................... 35

II.    Plaintiffs' Claims Are Meritless In Any Event ...................... 44

III.   The Non-Merits Factors Likewise Support The
       Government, Not Plaintiffs ................................................... 57

CONCLUSION .................................................................................. 62

CERTIFICATE OF COMPLIANCE ..................................................... 64

# TABLE OF AUTHORITIES

## CASE LAW

*A.A.R.P. v. Trump,*
No. 24A1007, 2025 WL 1417281 (May 16, 2025) .................................55

*Arizona v. Biden,*
40 F.4th 375 (6th Cir. 2022) ......................................................................29

*Camarena v. Dir., ICE,*
988 F.3d 1268 (11th Cir. 2021) .................................................................38

*Del Carmen Amaya-De Sicaran v. Barr,*
979 F.3d 210 (4th Cir. 2020) .....................................................................12

*DHS v. D.V.D.,*
2025 WL 1732103 (June 23, 2025) ...............................................57, 58, 59

*DHS v. Thuraissigiam,*
591 U.S. 103 (2020)..................................... 10, 21, 52, 53, 55, 56

*E.F.L., v. Prim,*
986 F.3d 959 (7th Cir. 2021)......................................................................39

*Fiallo v. Bell,*
430 U.S. 787 (1977)....................................................................................60

*Foster v. Townsley,*
243 F.3d 210 (2001) ...................................................................................39

*Galvan v. Press,*
347 U.S. 522 (1954)....................................................................................59

*Garland v. Aleman Gonzalez,*
596 U.S. 543 (2022)................................18, 19, 23, 24, 26, 28, 29, 30, 40

*Haaland v. Brackeen,*
599 U.S. 255 (2023)................................................................... 49

*Hamama v. Adducci*
912 F.3d 874 (6th Cir. 2018)..................................................... 39

*Hollingsworth v. Perry,*
558 U.S. 183 (2010).................................................................. 57

*INS v. Cardoza-Fonseca,*
480 U.S. 421 (1987).................................................................. 12

*Jama v. ICE,*
543 U.S. 335 (2005).................................................................. 10

*Jennings v. Rodriguez,*
583 U.S. 281 (2018)..................................................... 34, 35, 41

*Johnson v. Guzman Chavez,*
594 U.S. 523 (2021).................................................................. 13

*Kaplan v. Tod,*
267 U.S. 228 (1925).................................................................. 53

*Kiyemba v. Obama,*
561 F.3d 509 (D.C. Cir. 2009)............................................. 46, 47

*Landon v. Plasencia,*
459 U.S. 21 (1982) ................................................................... 54

*Ludecke v. Watkins,*
335 U.S. 160 (1948).................................................................. 55

*Mapoy v. Carroll,*
185 F.3d 224 (4th Cir. 1999)..................................................... 36

*Maryland v. King,*
567 U.S. 1301 (2012)................................................................ 59

*Munaf v. Geren,*
    553 U.S. 674 (2008).................................................. 20, 46, 47

*Nasrallah v. Barr,*
    590 U.S. 573 (2020)............................................................ 12

*Nielsen v. Preap,*
    586 U.S. 392 (2019) ............................................................ 9

*Nishimura Ekiu v. United States,*
    142 U.S. 651 (1892)...................................................... 52, 57

*Nken v. Holder,*
    556 U.S. 418 (2009)........................................................... 62

*Noem v. Doe,*
    145 S. Ct. 1524 (2025) ...................................................... 59

*Noem v. Nat'l TPS Alliance,*
    No. 24A1059, 2025 WL 1427560 (U.S. May 19, 2025) ......................... 59

*Rauda v. Jennings,*
    55 F.4th 773 (9th Cir. 2022) ................................................ 38

*Reno v. American-Arab Anti-Discrimination Committee,*
    525 U.S. 471 (1999)................................... 19, 36, 37, 38, 40, 48

*Reno v. Flores,*
    507 U.S. 292 (1993)........................................................... 48

*Riley v. Bondi,*
    606 U.S. --, 2025 WL 1758502 (2025)..................................... 34, 41, 42

*Shaughnessy v. United States ex rel. Mezei,*
    345 U.S. 206 (1953).......................................................... 53

*Silva v. United States,*
    866 F.3d 938 (8th Cir. 2017)............................................... 39

*Tazu v. Att'y Gen. U.S.*,
  975 F.3d 292 (3d Cir. 2020) ..................................................... 39

*Trump v. CASA, Inc.*,
  2025 WL 1773631 (U.S. June 27, 2025) .............................. 59

*Trump v. J.G.G.*,
  145 S. Ct. 1003 (2025) ............................................................. 55

*Tsering v. U.S. Imm. & Customs Enf't.*,
  403 F. App'x. 339 (10th Cir. 2010) .................................. 39, 40

*United States ex rel. Turner v. Williams*,
  194 U.S. 279 (1904) ................................................................. 54

*United States v. Fausto*,
  484 U.S. 439 (1988) ................................................................. 34

*Wong Yang Sung v. McGrath*,
  339 U.S. 33 (1950) ................................................................... 54

*Yamataya v. Fisher*,
  189 U.S. 86 (1903) ............................................................. 54, 57

## ADMINISTRATIVE DECISION

*Matter of I-S- & C-S-*,
  24 I. & N. Dec. 432 (BIA 2008) .......................................... 13

## STATUTES LAW

8 U.S.C. § 1158 ............................................................................. 8

8 U.S.C. § 1225(a)(1) .................................................................. 54

8 U.S.C. § 1225(b) ...................................................................... 50

8 U.S.C. § 1225(b)(1)(A)(i) ................................................................ 10

8 U.S.C. § 1225(b)(1)(A)(iii) ............................................................. 10

8 U.S.C. § 1225(b)(1)(B)(i) ................................................................ 50

8 U.S.C. § 1225(b)(1)(B)(iii)(III) ................................................. 10, 50

8 U.S.C. § 1225(b)(1)(C) ................................................................... 10

8 U.S.C. § 1226(e) ............................................................................ 37

8 U.S.C. § 1228(b) ............................................................................ 16

8 U.S.C. § 1229a ................................................................... 8, 12, 16

8 U.S.C. § 1229a(c)(7) ..................................................................... 43

8 U.S.C. § 1229b(a) ....................................................................... 8, 9

8 U.S.C. § 1229b(b) ........................................................................... 9

8 U.S.C. § 1231 ................................................... 15, 19, 23, 57

8 U.S.C. § 1231(a)(5) ..................................................................... 9, 16

8 U.S.C. § 1231(b) ............................................................................ 15

8 U.S.C. § 1231(b)(1) ....................................................................... 10

8 U.S.C. § 1231(b)(1)(C)(iv) ............................................................. 11

8 U.S.C. § 1231(b)(2) ................................................................... 10, 11

8 U.S.C. § 1231(b)(2)(A)-(E) ........................................................... 51

8 U.S.C. § 1231(b)(3) ................................................................... 9, 12

8 U.S.C. § 1252(a)(4) ................................ 1, 13, 19, 32

8 U.S.C. § 1252(a)(5) ..................................... 1, 19, 36

8 U.S.C. § 1252(b)(9) ................... 1, 19, 35, 36, 41, 42

8 U.S.C. § 1252(f)(1) ............... 1, 2, 7, 8, 17, 23, 24

8 U.S.C. § 1252(g) .................. 1, 19, 36, 37, 38, 42

8 U.S.C. § 1331 ........................................................ 1

8 U.S.C. § 2242(d) ............................................. 1, 32

28 U.S.C. § 1292(a)(1) ........................................... 1

50 U.S.C. § 21 ...................................................... 55

## FEDERAL REGULATIONS

8 C.F.R. § 208.18(a)(1) ........................................ 12

8 C.F.R. § 208.18(a)(2) ........................................ 12

8 C.F.R. § 208.18(c) ........................................ 51, 58

8 C.F.R. § 208.18(e) ............................................ 32

8 C.F.R. § 208.31 ................................................ 11

8 C.F.R. § 241.8(e) .............................................. 11

8 C.F.R. § 235.3(b)(4) ......................................... 13

8 C.F.R § 1003.2(c) ............................................. 43

8 C.F.R § 1003.42(e) ........................................... 50

8 C.F.R. § 1208.18(c)(1) ...................................................... 47

8 C.F.R. § 1208.30(g)(2)(iv)(A)........................................ 47

8 C.F.R. § 1240.1(a)(1)(iii) ........................................ 12, 13

8 C.F.R. § 1240.10(f ) ...................................................... 43

8 C.F.R. § 1240.11(c) ...................................................... 43

8 C.F.R. § 1240.12(c) ...................................................... 13

## FEDERAL RULES FOR APPELLATE PROCEDURE

Fed. R. App. P. 27(d)(1)(E) ...................................................... 64

## PUBLIC LAW

Pub. L. No. 105-277 ...................................................... 11

## EXECUTIVE ORDER

Exec. Order No. 14165 (Jan. 20, 2025) ...................................................... 13

## JURISDICTIONAL STATEMENT

The district court asserted jurisdiction under 8 U.S.C. § 1331. As explained below, however, the court lacked jurisdiction over the claims in the complaint due to 8 U.S.C. § 1252(a)(5), (a)(4), (b)(9), (g), and Section 2242(d) of the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA). Further, the district court lacked jurisdiction to issue a classwide preliminary injunction under 8 U.S.C. § 1252(f)(1).

The district court issued its injunction on April 18, 2025. Appx. 473. Defendants-Appellants timely filed a notice of appeal on April 22, 2025. ECF No. 69. This Court has jurisdiction over this appeal under 28 U.S.C. § 1292(a)(1) because this is an appeal of an order granting a preliminary injunction.

## STATEMENT OF THE ISSUES

I. Whether the district court lacked jurisdiction under 8 U.S.C. § 1252(a)(5), (a)(4), (b)(9), (g), and Section 2242(d) of the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA) to enjoin the removal of a class of aliens with final orders of removal to a country other than was designated in removal proceedings.

II.     Whether the district court lacked jurisdiction under 8 U.S.C.
        § 1252(f)(1) to issue a classwide injunction enjoining the removal
        of aliens with final orders of removal to third countries.

III.    Whether Plaintiffs, who all have final orders of removal, are
        entitled to additional procedures under the Due Process Clause
        prior to their removal to a country not previously designated in
        removal proceedings notwithstanding the Department of
        Homeland Security's (DHS) March 30, 2025 Guidance Regarding
        Third Country Removals.

## STATEMENT OF THE CASE

This case is about a remarkable injunction issued by the district court that prevented the Executive Branch from removing some of the worst of the worst illegal aliens in this country. That injunction had no basis in law. It has been stayed by the Supreme Court. And it should now be vacated by this Court.

When illegal aliens commit crimes in this country, they are typically ordered removed. When an alien's crimes are especially heinous—for example, here, an alien was convicted of sexually abusing a seven-year-old, another was convicted of sexually abusing a woman with

the mental capacity of a three-year-old, and at least two more have been convicted of murder—their countries of origin are often unwilling to take them back. *See* Appx. 752-62. As a result, criminal aliens often stay in the United States for years on end, victimizing law-abiding Americans in the meantime—for example, here, an alien ordered removed 25 years ago has been convicted, since being ordered removed, of armed robbery and kidnapping, and an alien ordered removed 12 years ago has been convicted, since being ordered removed, of attempted first-degree murder. *Id.*

The Executive Branch has taken steps to resolve this problem, as permitted by statute, by removing aliens to third countries that have agreed to accept them. Convincing third countries to accept some of the most undesirable aliens requires sensitive diplomacy, which involves negotiation and the balancing of other foreign-policy interests.

In the decision below, the district court stalled those efforts nationwide, issuing a preliminary injunction that restrains DHS from exercising its statutory authority to remove an alien to a country not specifically identified in his removal order (a "third country"), unless DHS first completes an onerous set of procedures invented by the district

court. Yet all these aliens have already received extensive legal process in their removal proceedings. The law does not demand more process than the government already provides.

The Supreme Court has stayed the district court's injunction, and this Court should now reverse. The district court has managed to defy all three branches of government in the short time since this case was filed. Before the Supreme Court stayed the district court's injunction, the injunction usurped the Executive's authority over immigration policy, disrupted sensitive diplomatic, foreign-policy, and national-security efforts, and created a diplomatic and logistical morass emphasized in declarations submitted by the Secretaries of State and Defense. Appx. 763-93. Instead of permitting the Executive Branch to formulate the Nation's immigration policy, the district court invoked its own "sense" of "fairness" to promulgate procedures for third-country removals. Add. 49. The district court's injunction also rejected *three* different sets of jurisdictional bars that Congress enacted, exercising its control over lower courts' jurisdiction, to prevent the judiciary from invading the primacy of the Executive Branch in carrying out the core sovereign function of removing aliens from the country. And the district court

defied the Supreme Court by purporting to continue to enforce its injunction after the Supreme Court stayed it. Add. 94.

The Supreme Court concluded just last week that the Government is likely to succeed on the merits and that the remaining considerations favor the Government, not Plaintiffs. Appx. 821. This Court should respect that ruling—unlike the district court—and reverse.

## I.    Procedural History

The named Plaintiffs are four aliens with final orders of removal resulting from proceedings in which they were notified that they could be removed to a designated country of removal or, potentially, a third country of removal. *See generally* Appx. 1-50. On March 23, 2025, Plaintiffs sued on behalf of a putative class, alleging that DHS violates the Immigration and Nationality Act (INA), its regulations, and the Due Process Clause of the Fifth Amendment by removing, or seeking to remove, the aliens to a third country without first providing them with notice or an opportunity to assert a claim that they fear persecution or torture if removed to that third country. *See generally id*. On that same date, Plaintiffs moved for a temporary restraining order, preliminary injunction, and class certification. ECF Nos. 4, 7.

On March 28, the Court granted Plaintiffs' Motion and issued a temporary restraining order. ECF No. 34. Hours later, Defendants moved for an emergency stay of this order in this Court. On April 7, this Court denied a stay, citing concerns about its jurisdiction. *D.V.D. v. DHS,* No. 25-1311, Stay Order (April 7, 2025).

On April 18, 2025, the district court certified a class and issued a classwide preliminary injunction. Appx. 473. On May 21, 2025, the court clarified the preliminary injunction. Appx. 747. The court certified a class consisting of:

> All individuals who have a final order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA (including withholding-only proceedings) whom DHS has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceeding as a country to which the individual would be removed.

Appx. 23. The court's preliminary injunction, as clarified, provides that all removals to a country other than the country or countries designated during immigration proceedings must be preceded by

> written notice to both the non-citizen and the non-citizen's counsel in a language the non-citizen can understand. Following notice, the individual must be given a meaningful opportunity, **and a minimum of ten days,** to raise a fear-based claim for CAT protection prior to removal. If the non-

citizen demonstrates "reasonable fear" of removal to the third country, Defendants must move to reopen the non-citizen's immigration proceedings. If the non-citizen is not found to have demonstrated a "reasonable fear" of removal to the third country, Defendants must provide a meaningful opportunity, and a minimum of fifteen days, for the non-citizen to seek reopening of their immigration proceedings.

Appx. 748 (cleaned up).

Defendants immediately appealed and moved for a stay of the district court's illegal injunction in this Court. ECF No. 69. This Court denied Defendants' motion on May 16, 2025. In doing so, the Court directed the Parties to address the following questions related to 8 U.S.C. § 1252(f)(1):

(1) "[D]oes the class-based injunction 'enjoin or restrain the operation of' covered INA provisions insofar as it requires compliance with the terms of such provisions or the terms of removal orders previously generated pursuant to those provisions?"

(2) "[D]oes 8 U.S.C. § 1252(f)(1) presume the availability of individualized judicial review to individuals subject to third-country removals and therefore does not bar class-wide injunctive relief where such relief is necessary to make individualized review available?"

(3) "[D]o the APA/due process claims stated in Counts I to III of the complaint have a sufficiently attenuated connection to the statutory removal provisions covered by § 1252(f)(1) that they do not fall within its sweep?"

Order at 2.

On May 27, 2025, Defendants applied for a stay of the injunction in the Supreme Court. *DHS v. D.V.D.*, Application for a Stay, 24A1153A (May 2, 2025). On June 23, 2025, the Supreme Court granted the stay. Appx. 821. That same day, despite the Supreme Court's stay, the district court purported nonetheless to enforce its since-stayed injunction as to eight class members—all convicted of heinous crimes—in DHS custody in Djibouti. ECF No. 176. It ordered Defendants to carry out the procedures the Supreme Court found the district court was precluded from requiring. *Id.* Defendants immediately moved to clarify the Supreme Court's stay. *DHS v. D.V.D.*, Motion for Clarification, 24A1153A (June 24, 2025).

## II.   Legal Background

1.      The INA authorizes the removal of classes of aliens from the United States. 8 U.S.C. § 1182, 1227. The removal process can include a hearing before an immigration judge, an appeal to the Board of Immigration Appeals, and review in a court of appeals. 8 U.S.C. § 1229a, 1252. Many aliens facing removal have an opportunity to apply for relief or protection from removal. *See*, *e.g.*, 8 U.S.C. § 1158 (asylum); 8

U.S.C. § 1229b(a) (cancellation of removal); 8 U.S.C. § 1229b(b) (adjustment of status); 8 U.S.C. § 1231(b)(3) (withholding of removal).

Congress has established a streamlined process for removing aliens who, having previously been removed from the United States under a final order of removal, have reentered the country unlawfully. If DHS "finds that an alien has reentered the United States illegally after having been removed . . . under an order of removal, the prior order of removal is reinstated from its original date." 8 U.S.C. § 1231(a)(5); *see Nielsen v. Preap*, 586 U.S. 392, 397 n.2 (2019) (explaining Congress transferred enforcement of certain provisions from Attorney General to DHS Secretary). DHS may "at any time" effectuate removal "under the prior order." 8 U.S.C. § 1231(a)(5). The reinstated order "is not subject to being reopened or reviewed," and the alien "is not eligible and may not apply for any relief" from that order. *Id.*

Congress has further established a process for the expedited removal of certain aliens, regardless of whether they have received a prior final order of removal. Expedited-removal procedures may be applied to defined categories of aliens who have not been admitted into the United States, including those who, lacking valid entry documents,

are either arriving in the United States or unable to adequately show that they have been continuously present in the United States for the two years immediately prior. *See* 8 U.S.C. § 1225(b)(1)(A)(i) and (iii). Under that expedited removal process, inadmissible aliens are entitled to speedy administrative review (typically within days) of any asserted fears of persecution in the country to which they will be removed; they are not entitled to judicial review of an adverse administrative determination. *See DHS v. Thuraissigiam*, 591 U.S. 103, 109-13 (2020) (citing provisions); 8 U.S.C. § 1225(b)(1)(B)(iii)(III), (C).

2. In the INA, Congress has enacted provisions governing the determination of the country to which an alien is to be removed. *See* 8 U.S.C. § 1231(b)(1), (2); *Jama v. ICE*, 543 U.S. 335, 338-341 (2005). For certain aliens arriving in the United States (Section 1231(b)(1)) and then all other aliens (Section 1231(b)(2)), the statute establishes sequences of countries where an alien shall be removed, subject to certain disqualifying conditions (e.g., the receiving country will not accept the alien). For instance, under Section 1231(b)(2), possible countries of removal can include a country designated by the alien, the alien's country of citizenship, the alien's previous country of residence, the alien's

country of birth, and the country from which the alien departed for the United States. *See* 8 U.S.C. § 1231(b)(2). Importantly, under both Section 1231(b)(1) and (b)(2), Congress provided a fail-safe option in the event that other options do not work: An alien may be removed to any country willing and able to accept him. *See* 8 U.S.C. § 1231(b)(1)(C)(iv), (2)(E)(vii).

3. Congress has also provided means for an alien to challenge removal to a particular country where he may face persecution or torture. As relevant here, the alien may seek withholding or deferral of removal under regulations implementing the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), adopted Dec. 10, 1984, S. Treaty Doc. No. 20, 100th Cong., 2d Sess. (1988), 1465 U.N.T.S. 85—a treaty concerned with the prevention of torture through domestic measures by each Member State. *See* Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, § 2242(b), 112 Stat. 2681-822; 8 C.F.R. 208.31, 241.8(e). "Torture" is defined as an "extreme form of cruel and inhuman treatment," which intentionally inflicts "severe pain or suffering" on another for an improper purpose, and is performed "at the instigation of or with the consent or acquiescence of a public official acting in an official

capacity or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1), (a)(2); *see, e.g.*, *Del Carmen Amaya-De Sicaran v. Barr,* 979 F.3d 210, 218-19 (4th Cir. 2020) (torture is a "high bar").[1]

CAT protection does not alter whether an alien may be removed or their underlying removal order; it affects only where an alien may be removed. That is, a grant of CAT protection "means only that notwithstanding the order of removal, the noncitizen may not be removed to the designated country of removal, at least until conditions change in that country." *Nasrallah v. Barr*, 590 U.S. 573, 582 (2020). The United States remains free to remove that alien "at any time to another country where he or she is not likely to be tortured." *Id.* (citation omitted); *see INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987).

Ordinarily, an alien raises a CAT claim during removal proceedings under 8 U.S.C. § 1229a, where the immigration court decides both the alien's removability and CAT claim together. *See, e.g.*, 8 C.F.R. § 1240.1(a)(1)(iii), 1240.12(c); *Matter of I-S- & C-S-*, 24 I. & N. Dec.

---

[1] An alien may also seek "withholding of removal" under 8 U.S.C. § 1231(b)(3), which prohibits the removal of an alien to a country where he would face persecution because of a protected trait. *Id*. This form of protection is not at issue in this appeal, because the district court limited its injunction to the procedures for raising CAT claims. Add. 27.

432, 433-434 (BIA 2008). But sometimes, CAT claims arise outside of those removal proceedings. For instance, aliens subject to a reinstated order of removal—where the prior order of removal is restored—may nonetheless seek CAT protection in "withholding-only" proceedings. *See Johnson v. Guzman Chavez*, 594 U.S. 523, 530 (2021). Likewise, aliens placed in expedited-removal proceedings are still able to raise CAT claims, and receive administrative procedures, the extent of which depends on the claim's credibility. *See, e.g.*, 8 C.F.R. § 235.3(b)(4).

An alien may seek judicial review of his CAT claim only under defined circumstances. Specifically, Congress directed that the "sole and exclusive means for judicial review of any cause or claim under [CAT]" must be "a petition for review filed with an appropriate court of appeals in accordance with [Section 1252]." 8 U.S.C. § 1252(a)(4); *see* FARRA § 2242(d), 112 Stat. 2681-822 (same for "any other determination made with respect to the application of [CAT]").

On his first day in office, President Trump declared that the millions of aliens who have illegally crossed the border pose a serious threat to national security. *Securing Our Borders*, Exec. Order No. 14165 (Jan. 20, 2025). To combat this, the President directed DHS to take "all

appropriate actions" to detain and remove aliens who had been ordered removed, but who had nonetheless been "released into the United States." *Id.* § 5.

Following this order, on February 18, DHS issued internal guidance that directed the Enforcement and Removal Operations directorate (ERO) of U.S. Immigration and Customs Enforcement (ICE) to review cases of aliens who had been ordered removed, but for whom CAT protection had impeded their removal to a particular country. ECF No. 1-4, at 2. DHS directed ERO to "determine the viability of removal to a third country" for such aliens, especially "in light of the Administration's significant gains with regard to previously recalcitrant countries." *Id.*

Third-country removals—again, removals to a country other than the ones designated on an alien's order of removal—are often the only viable option for removing certain aliens. At times, the country (or countries) specified in an immigration judge's removal order are no longer possible destinations by the time DHS is prepared to actually remove the alien. In other cases, an alien may obtain CAT protection from the only location listed on his removal order, either in his original proceedings or later ones (as with reinstated orders). Thus, to effectuate

a removal, the government often needs to remove an alien to a country other than the ones specifically designated on his removal order. As a practical matter, that third country often falls within Section 1231(b)'s catch-all provisions for any country willing and able to accept the alien.

While the INA provides for third-country removals, it does not delineate a particular process for carrying out those removals. *See* 8 U.S.C. § 1231(b). More specifically, Congress did not provide a particular process for ensuring that third-country removals remain consistent with the United States's obligations under CAT. Instead, it delegated to the Executive Branch the responsibility for developing such procedures. *See* 8 U.S.C. § 1231 note (providing that the "heads of the appropriate agencies shall prescribe regulations to implement" the United States's CAT obligations).

On March 30, DHS issued guidance clarifying its "policy regarding the removal of aliens with final orders of removal pursuant to sections 240, 241(a)(5), or 238(b) of the [INA] to countries other than those designated for removal in those removal orders." Appx. 120-21 (March

Guidance).[2] The Guidance distinguishes between removals to countries that have provided credible assurances that any aliens removed there will not be tortured, and removals to those countries that have not done so. *Id.*

For countries that have provided such an assurance, "the alien may be removed without the need for further procedures." Appx. 120-21. For countries that have not, DHS must first inform the alien of removal to the country, and give him an opportunity to "affirmatively express a fear of persecution or torture" there. *Id.* at 121. If he does so, an immigration officer will conduct a prompt screening to determine whether he "would more likely than not be" tortured in the country of removal. *Id.* If the alien fails to satisfy this standard, he "will be removed." *Id.* If he does satisfy it, he will be put into additional administrative procedures, consistent with how CAT claims are typically handled. *See id.* "Alternatively, ICE may choose to designate another country for removal," and start the process afresh. *Id.*

---

[2] Section 240 corresponds with 8 U.S.C. § 1229a ("Removal proceedings"); Section 241(a)(5) corresponds with 8 U.S.C. § 1231(a)(5) ("Reinstatement of removal orders against aliens illegally reentering"); and Section 238(b) corresponds with 8 U.S.C. § 1228(b) ("Removal of aliens who are not permanent residents").

## SUMMARY OF THE ARGUMENT

In the INA, Congress vested the Executive Branch with broad authority over the removal of aliens and narrowly circumscribed the authority of the Judiciary to superintend those functions. The injunction below inverts that distribution of power. It sets aside the chosen policy of DHS to effectuate third country removals, replaces that policy with one of the district court's own devising, and invites continued judicial micromanagement of such removals going forward, contrary to Congress's instruction. As the Supreme Court recognized in staying the district court's injunction, the injunction exceeds the district court's lawful authority several times over.

I.     The Supreme Court concluded that Defendants are likely to succeed on the merits of this appeal. This Court should therefore reverse and vacate the district court's already stayed injunction.

At the outset, the injunction runs afoul of multiple independent jurisdictional bars. *First*, 8 U.S.C. § 1252(f)(1) prohibits lower federal courts from issuing classwide relief that "enjoin[s] or restrain[s] the operation of [specified] provisions" in the INA. Specifically, Section 1252(f)(1) prohibits classwide "injunctions that order federal officials to

17

take or refrain from taking actions to enforce, implement, or otherwise carry out" their statutory authority to conduct third-country removals. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022).

Contrary to the district court's holding, it makes no difference that Plaintiffs' claim is "based on" CAT, which is not one of the statutory provisions specified in Section 1252(f)(1). *See* Add. 27. The injunction unquestionably restrains the operation of a provision that is specified in Section 1252(f)(1)—namely, DHS's implementation of Section 1231(b)'s authorization of third-country removals—because it bars DHS from exercising its authority to conduct third-country removals unless it first meets various conditions. *See Aleman Gonzalez*, 596 U.S. at 552-54 and n.4. That conclusion cannot be avoided by an argument that the injunction merely requires compliance with the INA or removal orders: The Supreme Court has already specifically rejected that too-narrow view of the statute. *Id.*

Nor does Section 1252(f)(1) permit an exception for classwide relief in order to make individualized review available. Its text recognizes just two exceptions: one for the Supreme Court, and the other for the application of the provisions to an individual alien. The Supreme Court

has "stated on more than one occasion that [§ 1252(f)(1)] bars class-wide relief," without creating a new, atextual exception. *Aleman Gonzalez*, 596 U.S. at 554-55.

In addition, the immigration laws specifically strip district courts of jurisdiction to review claims challenging the government's implementation of CAT, and generally strip them of jurisdiction to adjudicate freestanding suits arising from actions taken to execute removals. Such claims may be brought, *if at all*, only in a petition for review of a final removal order filed in a court of appeals. *See* 8 U.S.C. § 1252(a)(4) and (5), (b)(9), and (g); *see also* 8 U.S.C. § 1231 note. Both sets of bars apply here in full: Plaintiffs demand greater process for their CAT claims, and they seek to prevent the execution of their removal orders until they get that process. The district court held itself above these limits, largely by ignoring the statutory text and emphasizing the importance of judicial review. That is no way to read any statute, but especially not these. The INA reflects a comprehensive effort by Congress to restrict judicial review to "protect[] the Executive's discretion from the courts." *Reno v. American-Arab Anti-Discrimination Committee* (*AADC*), 525 U.S. 471, 486 (1999). Congress intentionally drafted these provisions

to bar legal challenges and challenges to the Executive Branch's core discretionary decisions. Indeed, any other interpretation would effectively nullify them. The district court's injunction intrudes upon the core executive functions that Congress sought to shield.

II.    Even assuming the district court had jurisdiction to issue its sweeping injunction, the district court's analysis of the merits is also fatally flawed. Without any mooring in law, the district court revised the government's policy to better comport with the court's "sense" of "fairness." Add. 49. It rejected the government's approach to utilizing country-wide assurances as to the treatment of removed aliens, instead insisting that "individualized assessment[s]" are required. *Id.* at 45. But as the Supreme Court has made clear, the "Judiciary is not suited to second-guess such determinations," in either substance or scope, given their "foreign policy" ramifications. *Munaf v. Geren*, 553 U.S. 674, 702 (2008). The district court also crafted new timelines, ordering that aliens must be given at least 10 days to raise a CAT-based fear claim, and another 15 days to seek to reopen immigration proceedings after an adverse finding as to that claim. Add. 59. But it typically takes "minutes," not weeks, for an alien to express a fear of being tortured in a country.

ECF No. 130-2 ¶ 11. These arbitrary deadlines are also out of step with analogous immigration law, which tolerates far more efficient proceedings.

All of this is particularly unjustifiable because many class members are aliens who have never been admitted into the United States. Thus, they do not have due process rights to any additional removal procedures beyond the ones the political branches have provided. *See Thuraissigiam*, 591 U.S. at 138-140. The district court thus lacked authority to create new procedural requirements under the Due Process Clause for them. *See id.*

III.   The remaining considerations favor the government, not Plaintiffs, as the Supreme Court concluded in granting a stay. *See* Appx. 821. Plaintiffs have not established irreparable harm: Plaintiffs have not identified any irreparable harm from the government's ability to obtain assurances that an alien will not be tortured categorically rather than one-by-one, and the March Guidance, in the absence of assurances, already provides Plaintiffs with notice and an opportunity to raise a fear of removal. Add. 2-3. By contrast, the government suffers irreparable harm from the district court's decision to take the reins on immigration

policy and override the Executive Branch's conduct of foreign policy. Appx. 790-803. Those effects are particularly obvious here because of the district court's avowed intent to continue revising the procedures it requires the government to follow and the serious practical consequences, including diplomatic consequences, of the injunction.

The Court should follow the Supreme Court's lead and vacate the injunction.

**ARGUMENT**

## I. The District Court Flouted Three Independent Jurisdictional Bars.

### A. The Injunction Violates 8 U.S.C. § 1252(f)(1).

The district court's injunction ran roughshod over *three* independent sets of jurisdictional bars. To start, the district court's injunction is prohibited by 8 U.S.C. § 1252(f)(1), which deprives lower federal courts of jurisdiction to issue classwide injunctions that restrain the operation of third-country removals pursuant to 8 U.S.C. § 1231. Section 1252(f)(1) provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter ... other than with respect to the application of such provisions to an individual alien against whom proceedings ... have been initiated.

8 U.S.C. § 1252(f)(1).

The district court's injunction clearly violates Section 1252(f)(1). It runs to "an entire class of aliens," *Aleman Gonzalez*, 596 U.S. at 550-51, rather than an "individual alien," 8 U.S.C. § 1252(f)(1). And it concerns one of the covered statutory provisions: Section 1231(b)—which authorizes the Executive to remove aliens to third countries, when

appropriate—is within the "provisions" covered by Section § 1252(f)(1). *See Aleman Gonzalez*, 596 U.S. at 551 (holding injunction restraining the operation of Section 1231(a) was covered by Section 1252(f)(1)).

There is also no doubt that the injunction below "restrain[s] the operation" of Section 1231(b). 8 U.S.C. § 1252(f)(1). That was the whole point. The district court enjoined DHS from "removing any alien to a third country" until the mandated procedures are followed. Add. 49. That is, the court ordered the government to "refrain" from "carry[ing] out" its third-country removal authority under Section 1231(b) unless certain conditions are satisfied. *Aleman Gonzalez*, 596 U.S. at 550.

That is exactly the type of injunction that *Aleman Gonzalez* held that Section 1252(f)(1) forbids. There, as here, the district court enjoined the government, classwide, from taking action under a specified provision (detaining aliens under Section 1231(a)(6 for more than 180 days)) until it provided additional process to those aliens (a bond hearing). *Aleman Gonzalez*, 596 U.S. at 547. The Supreme Court held that such an injunction was "barred" by Section 1252(f)(1), because an injunction that stops the government from implementing a statutory provision until certain conditions are satisfied is one that "enjoin[s] or restrain[s]" the

operation of that provision. *Id.* at 551.

That same reasoning is controlling here: The injunction below "'enjoin[s] or restrain[s] the operation' of [Section 1231(b)] because [it] require[s] officials to take actions that (in the Government's view) are not required by [Section 1231(b)] and to refrain from actions that (again in the Government's view) are allowed by [Section 1231(b)]." *Id.* It is the precise type of injunction that cannot run to an entire class of aliens under Section 1252(f)(1).

Notwithstanding the Supreme Court's holding in *Aleman Gonzalez*, the district court held that Section 1252(f)(1) "simply does not apply." Add. 27. It observed that Plaintiffs' claim "concerning the availability of CAT protection" is "based on" FARRA, which is "a different statute" and is not covered by Section 1252(f)(1). *Id.* Additionally, the district court reasoned the injunction has a mere "collateral[]" effect on "covered parts of the INA." *Id.* at 28.

That reasoning does not work. Section 1252(f)(1) asks whether the injunction enjoins or restrains "the operation of" a covered provision. It does not ask—as the district court did—whether the plaintiffs' arguments are based on a covered provision, as the district court

evidently reasoned. For purposes of Section 1252(f)(1), all that matters is whether the action that the injunction restrains is taken to enforce or implement one of the covered statutory provisions (i.e., those "governing the inspection, apprehension, examination, and removal of aliens"). *Aleman Gonzalez*, 596 U.S. at 549-50. It does not matter whether that action is in fact "what the statute allows or commands." *Id.* at 552. And it does not matter whether that action violates some external legal limit, be it "constitutional" or "statutory." *Id.* at 553-54 and n.4. So long as the governmental conduct at issue is taken pursuant to a covered provision, Section 1252(f)(1) bars classwide injunctive relief to stop it. *Id.* at 554-55.

Indeed, *every* Justice in *Aleman Gonzalez* rejected the district court's reading of Section 1252(f)(1). While members of the Court disagreed over whether Section 1252(f)(1) reaches injunctions correcting the government's misapplication of a covered provision itself, the full Court agreed that Section 1252(f)(1) would forbid an injunction premised on the government's application of a covered provision violating some *external* legal limit. *See* 596 U.S. at 553-554 and n.4. In other words, while members of the Court disagreed about whether Section 1252(f)(1) reached claims *internal* to a covered provision, all Justices agreed that,

at minimum, it would "prohibit injunctive relief" against the operation of a covered provision based on "claims that arise from any statutes external to the covered INA provisions (for example, a claim that a covered provision violates [RFRA])." *Id.* at 567 (Sotomayor, J., concurring in the judgment in part and dissenting in part). As the Court's opinion noted, even the respondents in that case agreed that Section 1252(f )(1) would bar "injunctive relief against the enforcement of one of the covered immigration provisions" for violating some "statute not specified in § 1252(f)(1)." *Id.* at 553 n.4. is That is the precise situation here, so classwide relief restraining DHS's operation of third-country removals pursuant to Section 1231(b) is barred, notwithstanding that Plaintiffs' claims are "based on a different statute" than Section 1231(b). Add. 27.

Following this reasoning, D.C. Circuit recently rejected a similar argument attempting to justify a classwide injunction as merely "relate[d] to" a non-covered provision governing warrantless arrests. *N.S. v. Dixon*, No. 21-5275 (D.C. Cir. June 27, 2025), slip op. at 16. As that court correctly explained, the injunction was barred by § 1252(f)(1) because it has the effect of "restrain[ing] the Government from carrying out an arrest and detention of a criminal defendant pursuant to an I-200

form," so it "clearly affects provisions to which § 1252(f)(1) applies." *Id.* at 17.

Likewise, the injunction's "impact" on DHS's operations pursuant to Section 1231(b) is far more than "collateral[]" or "attenuated." Add. 28; Stay Order at 2. This is nothing like cases where an injunction restrains the "operation of a provision that is not specified in § 1252(f)(1)," which then has a downstream "collateral effect on the operation of a covered provision." *Aleman Gonzalez*, 596 U.S. at 553 n.4. Rather, the injunction itself bears directly on Section 1231(b), and expressly restrains DHS's operation of third-country removals under that specified provision; *see also N.S.*, No. 21-5275, slip op. at 18 (rejecting a similar "collateral effect" argument when the injunction "directly and substantially restricts the ability of … federal officials to 'carry out' provisions covered by § 1252(f)(1)").

The answers to the Court's three questions regarding Section 1252(f)(1) support this conclusion.

*First*, the Supreme Court has already rejected an argument that Section 1252(f)(1) does not bar class-wide relief that merely orders the Government to comply with the law as properly understood. *Aleman*

*Gonzalez*, 596 U.S. at 552. The Court explained the word "operation" in the statute is a reference 'not just to the statute itself *but to the way that it is being carried out.*" *Id.* at 550 (emphasis added). Orders that "require officials to take actions that (*in the Government's view*) are not required . . . and refrain from actions that (*again in the Government's view*) are allowed" . . . interfere with the Government's efforts to operate." *Id.* at 551 (emphasis added).

The Court did not stop there. Apart from this ordinary meaning of the word "operate," the Court gave three reasons for rejecting the argument that "'the operation' of the covered immigration provisions" for purposes of § 1252(f)(1) "means the operation of those provisions 'as properly interpreted.'" *Id.* at 552. The interpretation (1) would conflict with Section 1252(f)(1)'s prefatory clause "[r]egardless of the nature of the action or claim"; (2) would limit Section 1252(f)(1)'s restriction to constitutional claims; and (3) would make the court's jurisdiction dependent on the merits of the claim. *Id.* at 552-54. In sum, "§ 1252(f)(1) has the same force even when the National Government allegedly enforces the relevant statutes unlawfully." *Arizona v. Biden*, 40 F.4th 375, 394 (6th Cir. 2022) (Sutton, C.J., concurring).

*Second*, Section 1252(f)(1) does not presume the availability of individual relief. Instead, it applies notwithstanding the availability of individual relief. Nothing in the statute contemplates or otherwise suggests any other reading. The statute's use of the word "individual" denotes just "one exception," and the Supreme Court "has already commented on the meaning of this exception." *Aleman Gonzalez,* 596 U.S. at 550. It means nothing more and nothing less than that Section 1252(f)(1) "does not extend to individual cases." *Id.* The "individual alien" phrase in the statute is an exception—not a condition.

*Third*, the district court's injunction, based on Plaintiffs' APA and due process claims, is not attenuated from the provisions covered by Section 1252(f)(1). As explained, the injunction prohibits the government from removing aliens until it complies with the additional procedures ordered by the district court. Again, Section 1252(f)(1)'s reach "does not depend on the nature of the claim in question," but instead turns on the injunction's effect on the INA's removal provisions. *Id.* at 554. Here, that effect is clear: Defendants cannot, without complying with the district court's "sense of fairness," Add. 49, remove aliens—even those who have committed the most heinous crimes—to third countries. That injunction

has a direct effect on the government's implementation of its third-country removal authority, and the Supreme Court has made it abundantly clear that Section 1252(f)(1) prohibits such an injunction.

In sum, district courts do not have jurisdiction to "improve" immigration processes as they see fit. *See* H.R. Rep. No. 469, 104th Cong., 2d Sess. Pt. 1, at 161 (1996) (House Report) ("[S]ingle district courts or courts of appeal do not have authority to enjoin procedures established by Congress to reform the process of removing illegal aliens from the U.S."). Congress permissibly chose to bar courts from interfering with the Executive's enforcement of certain immigration statutes until the Supreme Court has spoken on the issue. Even if the district court otherwise had jurisdiction over Plaintiffs' claims (it does not) and was correct on the merits of those claims (it is not), the nationwide preliminary injunction clearly violates § 1252(f)(1). For that reason, as the Supreme Court has already recognized, it should be immediately vacated.

## B. The Injunction Violates the Foreign Affairs Reform and Restructuring Act and Section 1252(a)(4).

The second jurisdictional problem with the district court's injunction is the CAT-specific bars in the INA and FARRA.

The INA provides that "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of any cause or claim under [CAT]." 8 U.S.C. § 1252(a)(4). Likewise, FARRA confirms that "no court shall have jurisdiction to review . . . any . . . determination made with respect to the application of [CAT] . . . except as part of the review of a final order of removal." § 2242(d), 112 Stat. 2681-822; *see* 8 C.F.R. § 208.18(e). FARRA also bars judicial review of the "regulations adopted to implement [CAT]," and assigns to the Executive alone the duty to design procedures to "implement the obligations of the United States" under that treaty. § 2242(d), 112 Stat. 2681-822.

The injunction runs afoul of these limits. Plaintiffs' suit—which challenges DHS's existing procedures for certain CAT claims—both concerns the "application" of CAT and is a "cause or claim under [CAT]." Add. 27 (recognizing the "class-wide injunctive relief Plaintiffs seek" is "based on" FARRA). And there is no doubt that this action arises outside

of a petition for review from a final order of removal. Thus, the district court lacked jurisdiction: The sorts of claims raised here can only be reviewed, *if at all*, in an appellate court through a petition for review.

For its part, the district court largely ignored FARRA. *See generally* 4-48. It never explained how it had authority to issue an injunction regarding the "application" of CAT here. § 2242(d), 112 Stat. 2681-822. Nor did it try to justify how it had "jurisdiction to review" the procedures that the Executive Branch has adopted to "implement" CAT. *Id.* By definition, in augmenting the procedures that the Executive Branch has crafted for CAT claims in this context, the district court "review[ed]"— and held inadequate—those that the Executive "implemented." *Id.*

As for Section 1252(a)(4), the district court held the provision applies only to matters that could have been raised in a petition for review of a final order of removal. Add. 22. And because Plaintiffs' CAT objections arose after the final removal order was issued, the court reasoned they fell outside Section 1252(a)(4). *Id.*

That rationale is flawed at multiple levels. To start, the premise is wrong: CAT claims like those here can be raised in the administrative process. *Infra* at 43. But more fundamentally, the conclusion does not

follow. Section 1252(a)(4) identifies a type of action—"any cause or claim under [CAT]"—and specifies the "sole and exclusive" way that such a claim can be reviewed in court: a petition for review filed in a court of appeals. To the extent an action does not fit within that means for review, the result is that judicial review is not available. That is the nature of exclusive review. *See, e.g.*, *United States v. Fausto*, 484 U.S. 439, 454-455 (1988) (holding that the comprehensive framework of the CSRA precluded review of certain claims); *Riley v. Bondi,* 606 U.S. --, 2025 WL 1758502 *7 (2025) (rejecting an argument that the majority's interpretation could deprive an alien of any judicial review because the Court "must nevertheless follow the statutory text"). And that holds particular force in the context of CAT, which is a non-self-executing treaty that Congress implemented through FARRA, by giving the Executive broad discretion over setting its procedures. *See* § 2242(b) and (d), 112 Stat. 2681-822.

Concluding otherwise, the district court invoked the Supreme Court's decision in *Jennings v. Rodriguez* to argue that the INA's channeling provisions "cannot be read to strip jurisdiction over claims that could not have been raised in the removal proceedings." Add. 22

(citing 583 U.S. 281, 293 (2018)). But *Jennings* did not adopt such a categorical rule. Instead, the Court read a specific statutory term narrowly ("arising from") to limit the reach of a different jurisdiction-stripping provision. 583 U.S. at 293 (interpreting 8 U.S.C. § 1252(b)(9)). There is a world of difference between adopting the narrower reading of an open-ended phrase and ignoring the plain text of a limitation entirely. The district court did the latter here. When Congress specifies the "sole and exclusive" means for judicial review over a claim, there is only one way for the federal courts to review that claim. Anything more involves rewriting the statute, not interpreting it. *Riley,* 2025 WL 1758502 *7 (noting that though "an alien may thus be deprived of any judicial review" "we must nevertheless follow the statutory text and our prior precedents").

This Court should accordingly vacate the injunction because by requiring additional procedures than those already provided by the CAT, the district court's injunction violated the FARRA.

## C.    The Injunction Runs Afoul of Section 1252(a)(5), (b)(9), and (g).

In addition to those two independent jurisdictional problems, the injunction also violates the INA's provisions that prohibit district courts

from exercising jurisdiction over suits challenging actions taken to execute removal orders. Congress has explicitly and unambiguously stripped district courts of jurisdiction over "any cause or claim by or on behalf of any alien arising from the decision or action . . . to commence proceedings, adjudicate cases, or execute removal orders." 8 U.S.C § 1252(g). To the extent claims arising from these distinct actions are reviewable at all, they are only reviewable along with any other "questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien"—in a petition for review of a "final order" of removal. 8 U.S.C. § 1252(b)(9). And that petition, again, is the "sole and exclusive means for judicial review" of such claims. 8 U.S.C § 1252(a)(5).

Together, these provisions strictly limit judicial review over certain "stages in the deportation process." *AADC,* 525 U.S. at 483-484. One such stage is the execution of a removal order. *Id.* If an alien wishes to challenge that discrete act in court, his sole and exclusive means of doing so is a petition for review; if that means is unavailable, then nothing in the INA "provides for jurisdiction" for the federal courts to intervene. *Id.* at 487; *Mapoy v. Carroll,* 185 F.3d 224, 229-30 (4th Cir. 1999) (holding that Section 1252(g) has a singular exception to the general rule in

§ 1252(g) that jurisdiction is stripped from the enumerated claims" and that is for claims "specifically provided for by § 1252.").

Once more, that principle precludes the injunction below. Plaintiffs' claims arise entirely from actions taken to "execute removal orders," 8 U.S.C. § 1252(g)—namely, to remove Plaintiffs to third countries without the additional process demanded by the district court—and thus those claims "fall[] squarely within" the INA's jurisdictional bar, *AADC*, 525 U.S. at 487. The district court lacked the authority to enjoin the government from removing Plaintiffs to third countries without additional process—i.e., from executing those aliens' removal orders in a particular way.

The district court's attempts to avoid these jurisdictional bars again fail. As for Section 1252(g), the court read that bar to cover "only discretionary decisions." Add. 23-24. And it held the actions here were thus not covered, because the government lacks discretion to remove an alien contrary to law. *Id.*

That misreads Section 1252(g). Nothing in that provision's text is limited to acts of "discretion"—a kind of limitation Congress knows how to create. *See, e.g.*, 8 U.S.C. § 1226(e) ("The [Secretary's] discretionary

judgment regarding the application of this section shall not be subject to review."). Rather, the text reaches "*any* cause or claim . . . arising from the decision or action by the [Secretary] to commence proceedings, adjudicate cases, or execute removal orders." 8 U.S.C. § 1252(g) (emphases added).

To be sure, those actions often involve "discretion" on the part of the Executive Branch, and Congress sought to protect that discretion from judicial review. *AADC*, 525 U.S. at 486. But nothing in Section 1252(g) limits its sweep to only the discretionary aspects of the specified actions; rather, its text reaches "any" "action" taken to "execute removal orders."

For that reason, this Court's sister circuits have widely rejected the argument that this bar is limited to discretionary actions, even when an alien pressing a constitutional claim seeks to pause removal while the alien seeks other immigration relief. *See*, *e.g.*, *Rauda v. Jennings*, 55 F.4th 773, 778 (9th Cir. 2022) (holding that Section 1252(g) barred plaintiff's constitutional claim seeking a stay of removal until he could obtain judicial review of his motion to reopen based on new threats from actors in his country of citizenship); *Camarena v. Dir., ICE*, 988 F.3d 1268, 1274 (11th Cir. 2021) ("[W]e do not have jurisdiction to consider

'any' cause or claim brought by an alien arising from the government's decision to execute a removal order. If we held otherwise, any petitioner could frame his or her claim as an attack on the government's authority to execute a removal order rather than its execution of a removal order."); *E.F.L.*, *v. Prim,* 986 F.3d 959, 964-965 (7th Cir. 2021) (rejecting the argument that jurisdiction remained in similar circumstances because petitioner was challenging DHS's legal authority as opposed to its "discretionary decisions"); *Tazu v. Att'y Gen. U.S.*, 975 F.3d 292, 297 (3d Cir. 2020) (observing that "the discretion to decide *whether* to execute a removal order includes the discretion to decide *when* to do it" and that "[b]oth are covered by the statute") (emphasis in original); *Hamama*, 912 F.3d at 874-77 (vacating district court's injunction staying removal, concluding that § 1252(g) stripped district court of jurisdiction over removal-based claims and remanding with instructions to dismiss those claims); *Silva v. United States*, 866 F.3d 938, 941 (8th Cir. 2017) (Section 1252(g) applies to constitutional claims arising from the execution of a final order of removal, and language barring "any cause or claim" made it "unnecessary for Congress to enumerate every possible cause or claim."); *Foster v. Townsley*, 243 F.3d 210, 214 (2001); *Tsering v. U.S.*

*Imm. & Customs Enf't.*, 403 F. App'x. 339, 342-43 (10th Cir. 2010). This Court should join these courts in holding as much.

Moreover, Congress had good reason to sweep more broadly. A jurisdictional bar that turns on the merits of the underlying action is no bar at all. *See Aleman Gonzalez*, 596 U.S. at 554. Nor would it do much for Section 1252(g)'s goal of curbing the "prolongation of removal proceedings." *AADC*, 525 U.S. at 487. Any plaintiff can style a claim as a challenge to legal authority instead of a challenge to an exercise of discretion. The straightforward reading of Section 1252(g) is the more sensible one: If a claim challenges the execution of a removal order, it must be brought via a petition for review or not at all.

Compounding the error, the district court dismissed Sections 1252(a)(5) and (b)(9) on the ground that they only cover actions that "could have been raised in [an alien's] removal proceedings." Add. 16. And because Plaintiffs' objections to third-country removal arose after their final removal orders were entered, the court reasoned that they were not barred.

That reasoning, however, fares no better than it did under the CAT-specific bars. Again, when a statutory scheme creates an exclusive

mechanism for reviewing a type of grievance, the fact that a subset of those claims cannot satisfy that mechanism is not a license for a federal court to create another one. *See Riley,* 2025 WL 1758502 *7 (rejecting an interpretation of Section 1252(b)(1) that would have provided greater access to judicial review because it was inconsistent with the statutory text). That role of revising statutes to create new avenues of judicial review beyond the exclusive ones that already exist is reserved to Congress. *See id.*

Here too, the district court relied heavily on its misunderstanding of *Jennings*. Add. 17. But again, there, the Supreme Court declined to interpret Section 1252(b)(9) so broadly as to cover categories of claims that either had nothing to do with removal (*e.g.*, assault) or could never be "effectively" reviewable in any form (*e.g.*, prolonged detention). 583 U.S. at 293. None of that bears on the allegations here, which inescapably—indeed, exclusively—target an "action taken . . . to remove an alien from the United States." 8 U.S.C. § 1252(b)(9).

Tellingly, the district court never attempted to square its ruling with the actual text of the INA. Nowhere did it say how a suit seeking to impose conditions on third country removals does not challenge an

"action" to "execute removal." 8 U.S.C. § 1252(g). Nor did it explain how a case objecting to the process for third-country removals was not one "arising from" "action[s] taken" to "remove an alien." 8 U.S.C. § 1252(b)(9). Its sole response was to insist that these sorts of claims must be reviewable at some point, by some court—and working from that premise, the district court held that those jurisdictional bars did not control, because they could not apply.

That is no way to read a statute. Indeed, that logic undermines the whole point of jurisdictional bars, which is, after all, to create at least some situations where judicial review is actually barred. And it is especially misguided here, because many aliens can raise CAT objections to third-country removals in the administrative process—and, in turn, before a court of appeals. On the front end, aliens can raise in their initial removal proceedings the list of countries where they fear removal. *See* U.S. Citizenship & Immigration Servs., DHS, Form I-589: Application for Asylum and for Withholding of Removal (Edition: Jan. 20, 2025) (asking

alien to list and explain "any" country "to which [he] may be returned" where he fears "torture"); *see also* 8 C.F.R §§ 1240.10(f ), 1240.11(c).

And on the back end, aliens can move to reopen proceedings to assert new fear claims regarding removal to a third country. *See*, *e.g.*, 8 U.S.C. § 1229a(c)(7) (allowing a motion to reopen within 90 days after removal order becomes administratively final); 8 C.F.R § 1003.2(c), 1003.23(b) (allowing a motion to reopen after 90 days under immigration court or BIA's sua sponte authority).

The district court found those options inadequate. Add. 43. It maintained, for instance, that forcing an alien to affirmatively list where he might "have a reasonable fear" would be "impractical." *Id*. But that, at bottom, is a policy objection to the scheme Congress designed. And it is a weak one at that. There is little to recommend a system where the government is forced to go country-by-country until the alien acquiesces to removal without further, lengthy process. *See* Appx. 785 (detailing "time consuming" and "operationally burdensome" process of finding viable third countries for removal).

Nor is it unreasonable to place the burden on the alien to proactively identify where he fears he may be "tortured," as defined

under CAT. CAT protection is an extraordinary remedy reserved for the "extreme" scenario when an alien faces a specific threat of severe pain or suffering intentionally inflicted by the hand or with the consent or acquiescence of a government official in the receiving country. *See supra* 11. It does not, as the district court seemed to suggest, extend to whenever an alien is removed to a country with a high crime rate, civil unrest, or other risk of private violence. *See* Add. 58. Given that demanding standard, it is far from unreasonable to expect that an alien with a bona fide CAT claim will be able to identify all the countries where he would have a valid CAT claim—especially aliens like the class members, who have already "gone through a removal process" and would have been "advised" as to the scope of CAT. Appx. 782. This Court should therefore immediately vacate the injunction because it violates these clear statutory provisions, consistent with the Supreme Court's conclusion, in staying the preliminary injunction, that the government is likely to succeed on the merits in this appeal.

## II.  Plaintiffs' Claims Are Meritless In Any Event.

Even setting aside the injunction's many jurisdictional defects, Plaintiffs are not likely to succeed even on the underlying merits. The

44

government's procedures for implementing CAT in this context are fully consistent with due process, and the district court had no legal basis to order that those procedures be supplemented with ones it preferred.

Notably, all class members here have final orders of removal. All have had the opportunity to raise CAT claims in prior proceedings, voice fears as to any potential countries of removal, and move to reopen past proceedings as new fears have arisen.

The March Guidance explains that the government provides these aliens with additional process, before any one of them is removed to a third country. Add. 2-3. That process, as detailed below, ensures that an alien will either be sent to a country where the United States has received adequate assurance the alien will not be persecuted or tortured, or that the alien will be given notice and an opportunity to be heard regarding any fear as to his country of removal. *Id*. The district court erred in second-guessing the details of these procedures under the guise of constitutional due-process analysis.

1.     As noted, the March Guidance provides that an alien may be removed to a "country [that] has provided diplomatic assurances that aliens removed from the United States will not be persecuted or

tortured." Add. 2-3. If the State Department finds that country's assurances credible, "the alien may be removed without the need for further procedures." *Id.*

The Constitution requires nothing further. The Supreme Court has already held that when the Executive determines a country will not torture a person on his removal, that is conclusive. *Munaf v. Geren*, 553 U.S. 674, 702-703 (2008). Indeed, "[u]nder *Munaf* … the district court may not question the Government's determination that a potential recipient country is not likely to torture a detainee." *Kiyemba v. Obama*, 561 F.3d 509, 514 (D.C. Cir. 2009), *cert. denied*, 559 U.S. 1005 (2010).

The "*Munaf* decision applies here a fortiori: That case involved transfer of American citizens, whereas this case involves transfer of alien detainees with no constitutional or statutory right to enter the United States." *Id.* at 517-18 (Kavanaugh, J., concurring). When the Executive decides an alien will not be tortured abroad, courts may not "second-guess [that] assessment," at least unless Congress has specifically authorized judicial review of that decision. *Id.* at 517 (citation omitted); *see Munaf*, 553 U.S. at 703 n.6.

The district court disagreed, but it gave no sound reason for doing so. It mainly insisted that the Executive Branch must make an "individualized assessment" to satisfy due process. Add. 49. But courts may not "second-guess" the scope of the Executive's conclusion any more than its substance. *See Kiyemba*, 561 F.3d at 517-18 (Kavanaugh, J., concurring). The decision that a foreign government's categorial assurance against torture is sufficient to be accepted for all aliens is itself a "foreign policy" judgment the Judiciary "is not suited" to question. *Munaf*, 553 U.S. at 702.[3]

Relatedly, the district court's objection does not sound in procedural due process at all. It is a substantive objection that an assurance alone provides insufficient basis for the government to find that an alien is not likely to be tortured. The Supreme Court has rejected attempts to "recast

---

[3] The district court also stated that an individualized determination was required under CAT regulations. Add. 49. Of course, that has no bearing on what the Constitution might require. Anyway, the court was wrong. While the regulations say that an assurance must be limited to a "specific country," nothing requires an alien-by-alien determination as to what will likely happen in that country. 8 C.F.R. § 1208.18(c)(1). The Secretary is free to conclude that "an alien" would not be tortured upon removal, on the ground that no alien would be treated that way in light of the strength and reliability of the assurance provided by that country. *Id.*

in 'procedural due process' terms" what is really a challenge to the "'substantive'" criteria that the government has adopted. *Reno v. Flores*, 507 U.S. 292, 308 (1993) (rejecting similar argument for "individual[ized]" procedure). For good reason: It makes no sense to require the government to provide additional process with respect to potential evidence that is immaterial under the substantive standard the government has adopted. When the government is satisfied based on foreign assurances that no alien will be tortured in the receiving country, a further "individualized" assessment serves no rational purpose.

The district court also held that the March Guidance was insufficient because it did not provide for judicial review before removal. Add. 46. But that too is irreconcilable with *Munaf's* recognition that certain determinations by the political branches are conclusive in this context. Moreover, the district court never explained why judicial review would be required here, but not for the many other provisions in the INA that make the Executive's decisions conclusive and unreviewable. *See*, *e.g.*, *AADC*, 525 U.S. at 486-487 (collecting examples); *cf.* 8 C.F.R. § 1208.30(g)(2)(iv)(A) (barring judicial review over adverse fear determination in expedited-removal proceedings). The court just

provided an overwrought citation to *Marbury v. Madison* for the notion that every right must have a remedy. Add. 43. But it never provided a coherent legal rationale why a judicial remedy is necessary in these circumstances, yet not elsewhere across the INA where an administrative remedy is sufficient. *See Haaland v. Brackeen*, 599 U.S. 255, 279 (2023). (It also bears noting that Mr. Marbury never received his commission to service as a justice of the peace.)

2.　For aliens being removed to a third country not covered by an adequate assurance, the March Guidance states that DHS will first inform the alien of removal to that country, and then the alien has the opportunity to affirmatively state that he fears removal there. Add. 3. If the alien does so, immigration officials will generally screen the alien within 24 hours to determine whether he "would more likely than not" be persecuted or tortured if sent to that country. *Id*. If not, the alien will be removed; if so, the alien will be placed in further administrative proceedings—or, if appropriate, the government "may choose to designate another country for removal." *Id*.

The district court deemed those procedures unconstitutional too. According to the court, the Constitution requires (i) not just that an alien

be given a "meaningful opportunity" to simply express a fear of return, but that he be given a "minimum of ten days" to do so; (ii) the government must use a "reasonable fear" standard, rather than a "more likely than not" standard, in evaluating that asserted fear; and (iii) an alien must have "a minimum of 15 days" to "move to reopen" immigration proceedings if he fails to establish a reasonable fear. Add. 59.

The district court offered no basis in law for those supposed constitutional dictates and instead simply invented them wholecloth according to its personal sense of fairness. Add. 49. Those judicial creations are further inconsistent with established immigration law. Most analogous, in expedited-removal proceedings, aliens are expected to raise fears of removal "almost immediately," and are often processed in a matter of hours. ECF No. 130-2 ¶¶ 11, 13; *see*, *e.g.*, 8 U.S.C. § 1225(b)(1)(B)(i). If the asylum officer determines the alien does not have a credible fear, any review by an immigration judge must be completed within seven days after that finding was made. 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R § 1003.42(e). The expedited-removal statute does not limit the countries to which an alien can be removed pursuant to Section 1231(b), *see* 8 U.S.C. § 1225(b), so its

expedited procedures for raising and assessing fear claims apply even when an alien is removed somewhere other than the country he designates or his home country, *see*, *e.g.*, 8 U.S.C. § 1231(b)(2)(A)-(E).

The district court did not explain why those sorts of procedures are adequate for expedited removal, but not here—where, again, the entire class comprises aliens who already have valid removal orders, and who already have had a prior opportunity to raise claims under CAT. The court underscored that the additional measures it imposed tracked its "sense of what fairness requires," Add. 49; but that is an improper basis to displace DHS's judgment about the best way to carry out the core executive power of removing aliens consistent with our treaty obligations.

Nor does the district court's preferred policy even make sense on its own terms. The injunction requires that all class members receive at least 15 days to move to reopen proceedings after an adverse "reasonable fear" finding. Add. 59. But when the government makes a decision to accept an individualized assurance from a foreign nation that an alien would not be tortured upon removal—as even the district court acknowledged could be permissible, *see id*. at 46—that determination is conclusive for the Executive Branch. *See* 8 C.F.R. § 208.18(c). Yet if the

government opts to take that course as to a particular alien, the court's injunction still requires two plus weeks for that alien to file a futile motion to reopen. Add. 59. While aliens in that position may welcome the manufactured delay, such judicial policymaking only further burdens an immigration system already plagued by protraction.

3. The district court's creation of novel due-process requirements is particularly misguided here because, for many aliens included in the class, the Due Process Clause requires no more process than what the political branches provide. This Supreme Court has held that "the due process rights of an alien seeking initial entry" are no greater than "[w]hatever the procedure[s] authorized by Congress." *Thuraissigiam*, 591 U.S. at 139 (citation omitted). For aliens who have never been admitted—a group which undoubtedly includes many class members here—"the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law." *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892) (emphasis added); *accord Thuraissigiam*, 591 U.S. at 138-40.

To this end, the Supreme Court has also long applied the so-called "entry fiction" that all "aliens who arrive at ports of entry . . . are treated

for due process purposes as if stopped at the border." *Thuraissigiam*, 591 U.S. at 139 (citation omitted). Indeed, that is so "even [for] those paroled elsewhere in the country for years pending removal." *Id*. The Supreme Court has applied the entry fiction to aliens with highly sympathetic claims to having "entered" and developed significant ties to this country. *See, e.g.*, *Kaplan v. Tod*, 267 U.S. 228, 230 (1925) (holding that a mentally disabled girl paroled into the care of relatives for nine years must be "regarded as stopped at the boundary line" and "had gained no foothold in the United States"); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 214-15 (1953) (holding that an alien with 25 years' of lawful presence who sought to reenter enjoyed "no additional rights" beyond those granted by "legislative grace"). Compared to these cases, it follows *a fortiori* that an unlawful entrant who violates our laws and evades detection must, once found, be "treated as if stopped at the border." *Mezei*, 345 U.S. at 215.

Accordingly, the Supreme Court's precedents indicate that illegal aliens who evade detection in crossing the border should be treated the same as those who are stopped at the border in the first place. *See Thuraissigiam*, 591 U.S. at 138-40. While aliens who have been admitted

may claim due-process protections beyond what Congress has provided, even when their legal status changes (e.g., an alien who overstays a visa, or is later determined to have been admitted in error), *see Wong Yang Sung v. McGrath*, 339 U.S. 33, 49-50 (1950), the Supreme Court has never held that aliens who have "entered the country clandestinely" are entitled to such additional rights, *The Japanese Immigrant Case*, 189 U.S. 86, 100 (1903). Put differently, "once an alien gains admission to our country and begins to develop the ties that go with permanent residence"—a status that, by definition, unlawful entrants are legally barred from obtaining—"his constitutional status changes accordingly." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982). But before then, an alien who clandestinely enters "does not become one of the people to whom these things are secured by our Constitution by an attempt to enter, forbidden by law." *United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904); accord *Wong Yang Sung*, 339 U.S. at 49-50.

Congress has codified that distinction by treating all aliens who have not been admitted—including unlawful entrants who evade detection for years—as "applicants for admission." 8 U.S.C. § 1225(a)(1) ("An alien present in the United States who has not been

admitted . . . shall be deemed for purposes of [the INA] an applicant for admission."). That rule comports with the Constitution. The Due Process Clause does not offer a windfall for those who successfully circumvent our laws and evade detection. For constitutional purposes, it should not matter whether an alien was apprehended "25 yards into U.S. territory" or 25 miles; nor should it matter whether he was here unlawfully and evades detection for 25 minutes or 25 years. *See Thuraissigiam*, 591 U.S. at 139. When an illegal alien has never been admitted to this country by immigration officers, his constitutional status for due-process objections to removal is no different from an alien stopped at the border.[4]

---

[4] This conclusion is consistent with the Supreme Court's recent rulings that aliens detained and subject to removal under the Alien Enemies Act (AEA), 50 U.S.C. 21 et seq., are entitled to judicial review, including notice and opportunity to be heard regarding their AEA status. *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (per curiam); *A.A.R.P. v. Trump*, No. 24A1007, 2025 WL 1417281, at *2 (May 16, 2025) (per curiam). As noted in the government's application in *J.G.G.*, Gov't Br. at 18-20, *Trump v. J.G.G.*, 145 S. Ct. 1003 (2025) (No. 24A931), the Supreme Court in *Ludecke v. Watkins*, 335 U.S. 160 (1948), interpreted the AEA and the habeas corpus statute to provide for limited but significant judicial review of the Executive's AEA determinations, including review of "questions of interpretation and constitutionality," *id.* at 163, and "[t]he additional question as to whether the person restrained is in fact an alien enemy," *id.* at 171 n.17. In those cases, therefore, Congress has provided procedures by statute that comport with due process, and they apply regardless of whether the AEA-designated alien is an applicant for

*Continued on next page.*

That principle is fatal to the classwide relief granted below. The class covers "[a]ll individuals who have a final order of removal issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA." Add. 26. That includes aliens who were apprehended at the border reentering after having been removed. It includes aliens deemed inadmissible at the border but then released into the country for removal proceedings. And it includes aliens who were able to clandestinely enter the country illegally, only to be apprehended later.

The Due Process Clause does not give such aliens a constitutional entitlement to any extra removal procedures beyond what the political branches have provided. *See Thuraissigiam*, 591 U.S. at 138-40. But that is precisely what the district court's injunction does. Again, the INA is silent as to any specific process that aliens must be afforded under CAT before they are removed to a third country, and FARRA delegates that

admission who lacks due-process removal rights beyond what Congress provides. Here, by contrast, the district court created an entirely new process without any statutory basis, based on its subjective "sense of what fairness requires"; Add. 49, superimposed that process upon the more limited (but still constitutionally adequate) procedures adopted by the political branches; and then applied that judge-manufactured process to many aliens who lack due-process removal rights beyond what Congress provides. Add. 59.

decision to the Executive Branch. *See* 8 U.S.C. § 1231 note. The March Guidance thus constitutes the political branches' reasoned judgment as to what that process should be in these circumstances, for aliens who have a final order of removal. For aliens who were never admitted to the United States, the Executive's policies and decisions made under FARRA "are due process of law." *Nishimura Ekiu*, 142 U.S. at 660 (emphasis added). And as detailed, far from some exercise of "arbitrary power," *Japanese Immigrant*, 189 U.S. at 101, that Guidance is exceedingly reasonable, and provides aliens with more than ample process to effectuate their responsible removal. As the Supreme Court has already recognized, the Constitution requires nothing further. This Court should reverse.

## III.  The Non-Merits Factors Likewise Support The Government, Not Plaintiffs.

The district court likewise erred in concluding that the remaining considerations favor Plaintiffs. The Supreme Court concluded, in granting relief, that the government will be irreparably harmed by the preliminary injunction and—to the extent it considered this a close case—that the balance of equities tips in favor of the government, not Plaintiffs. *See Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010); *DHS v.*

*D.V.D.*, 2025 WL 1732103, at *6 (June 23, 2025) (Sotomayor, J., dissenting) (criticizing majority's conclusions regarding the non-merits factors).

Plaintiffs have not established irreparable harm that warrants extraordinary relief. The Secretary of State already has the authority to obtain "assurances" from a foreign country that an alien will not be tortured if removed there, and those assurances are already dispositive with regard to CAT protection. 8 C.F.R. § 208.18(c). Neither the district court nor Plaintiffs have identified any sort of imminent or irreparable harm from the government's ability to obtain these assurances categorically versus one-by-one. Nor could they: Because either decision would rest on the same basis (i.e., that no alien will be tortured), any requirement for an "individualized" determination would amount to a paperwork demand. Likewise, as for aliens set to be removed to a country who has not provided assurances, the March Guidance already provides them notice and an eminently reasonable opportunity to raise a fear of removal. *See* Appx. 2-3. And Plaintiffs have never justified why the district court's added measures—which, as noted, go well beyond the typical timeframe in expedited removal—are necessary to forestall

irreparable harm here. That is especially so given the lack of any realistic risk that they will be tortured with the concurrence of foreign governments in third countries where they have little or no preexisting connection, particularly given that the Executive Branch has determined those countries are acceptable places of removal.

By contrast, as underscored by the Supreme Court's recent trio of stays in similar cases involving immigration policy, the government suffers irreparable harm when the Executive Branch is barred from implementing its immigration policies. *See Noem v. Nat'l TPS Alliance*, No. 24A1059, 2025 WL 1427560 (U.S. May 19, 2025); *Noem v. Doe*, 145 S. Ct. 1524 (2025); *D.V.D.*, 2025 WL 1732103. The government suffers an irreparable sovereign harm whenever its policy is blocked by a court order. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *cf. Trump v. CASA, Inc.*, 2025 WL 1773631at * 24 (holding that the Executive Branch is irreparably harmed by an injunction that exceeds a district court's power and improperly intrudes on executive prerogatives). That harm is even more acute in the immigration context, where the Constitution assigns preeminent power to the political branches. *See Galvan v. Press*, 347 U.S. 522, 531 (1954).

Those harms are particularly pronounced in this case. While the Constitution envisions that "the Government's political departments [will be] largely immune from judicial control" in the immigration sphere, *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (citation omitted), the district court's injunction portends the opposite, with that court generally superintending third-country removals so long as its injunction is in effect. As the episode with South Sudan confirms, the injunction's open-ended terms allow the district court to continually revise its invented removal policy. *See* Add. 59 (purporting to "clarify" that "meaningful opportunity" means at least "ten days"). And indeed, the court has indicated that further revisions are to come—with those details fleshed out over the course of "experience," which in practice could only mean seriatim contempt hearings. *Id.* at 57. That is unworkable. It was problematic enough for the court to write its own procedures, but it is simply untenable for that project to be a work-in-progress in which the goalposts continuously move. *See id.*

The practical consequences of the district court's injunction only underscore why the Constitution assigns immigration policy to the political branches. As noted, the court's policy allows for at least 25 days'

worth of delay for every alien being removed to a third country who decides to voice a fear under CAT—regardless of how frivolous his claim. Add. 59. Because ICE "often has only a short window to remove an alien"—including because travel documents are not "valid indefinitely"— this unfounded delay can scuttle an alien's "entire" removal process, forcing ICE to start anew. Appx. 788. And because ICE has both limited legal authority and practical ability to detain aliens, the result may be that ICE must "release these dangerous criminals once again" while it restarts removal. *Id.* Those operational burdens from the injunction will weigh heavily on an already strained immigration system.

Worse, the injunction has harmed—and will continue to harm— American foreign policy and national security, as Secretaries Rubio and Hegseth explained below. Arranging removal to a third country is a delicate diplomatic endeavor, which is the product of a carefully negotiated process. *See* Appx. 776 (Rubio) (describing diplomatic consequences of disrupting possible removals to Libya). When a court upends those efforts, it visits "significant and irreparable harm to U.S. foreign policy." *Id.* at 776. And that is exactly what happened here. By interrupting the transfer of aliens to South Sudan, the district court's

injunction "derail[ed]" our efforts to "quietly rebuild a productive working relationship" with that country, and to gain South Sudan's "cooperation" in broader regional priorities. Appx. 777.

Nor are these severe costs in service of any public benefit. As noted, the United States relies on third countries to facilitate the removal of criminal aliens who are difficult to otherwise remove. Appx. 785. Absent an effective third-country removal policy, the United States is forced to retain (and often, release) vicious criminals who have already harmed our communities. Appx. 788. The aliens sent to South Sudan—a group of convicted sex offenders and murderers, among others—are illustrative of a broader problem. The March Guidance marks a long overdue solution, and the public is not served by an order that hollows its efficacy. *See Nken v. Holder*, 556 U.S. 418, 436 (2009) (recognizing the "public interest in prompt execution of removal orders").

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court vacate the district court's injunction.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney
General

ELIANIS N. PEREZ
Assistant Director

MATTHEW P. SEAMON
Senior Litigation Counsel

/s/ *Mary L. Larakers*
MARY L. LARAKERS
(Texas Bar # 24093943)
Senior Litigation Counsel
U.S. Department of Justice, Civil
Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin
Station
Washington, DC 20044
(202) 353-4419
(202) 305-7000 (facsimile)
mary.l.larakers@usdoj.gov

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,981 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) and First Circuit Rule 32(a)(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Mary L. Larakers*
MARY L. LARAKERS

No. 25-1393

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

———————————————

D.V.D., M.M., E.F.D., O.C.G.,

*Plaintiffs-Appellees*,

v.

U.S. Department of Homeland Security, Krisit Noem, Secretary, U.S. Department of Homeland Security (DHS); Pamela Bondi, United States Attorney General, Antone Moniz, Superintendent of the Plymouth County Correctional Facility,

*Defendants-Appellants.*

———————————————

On Appeal from the United States District Court
for the District of Massachusetts

———————————————

# ADDENDUM FOR APPELLANTS

———————————————

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

ELIANIS N. PEREZ
*Assistant Director*

MATTHEW P. SEAMON
MARY L. LARAKERS
*Senior Litigation Counsel*
U.S. Department of
Justice, Civil Division
Office of Immigration
Litigation
P.O. Box 868,
Ben Franklin Station
Washington, DC 20044

# TABLE OF CONTENTS

Department of Homeland Security Guidance Regarding Third Country Removals (ECF No. 43-1) ............................................................................... 1

Memorandum and Order Granting Class Certification and Preliminary Injunction (ECF No. 64)........................................................................................ 4

Electronic Order Amending Preliminary Injunction (ECF No. 86) ............. 52

Memorandum and Order on Plaintiffs' Motion for Emergency Relief (ECF No. 91) ...................................................................................................... 54

Order on Maintaining Custody (ECF No. 116) ........................................... 56

Order Clarifying Preliminary Injunction (ECF No. 118) ............................ 58

Order on Remedy for Violation of Preliminary Injunction (ECF No. 119) ...................................................................................................... 61

Memorandum and Order on Plaintiffs' Motion for Preliminary Injunction Regarding O.C.G. (ECF No. 132).................................................................. 63

Memorandum and Order on Defendants' Motions for Reconsideration and Stay (ECF No. 135)............................................................................................ 77

Memorandum and Order on Plaintiffs' Motion to Enforce (ECF No. 176) ...................................................................................................... 94

# EXHIBIT A



*Office of the Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

March 30, 2025

MEMORANDUM FOR:     Kika Scott
                              Senior Official Performing the Duties of the Director
                              U.S. Citizenship and Immigration Services

                              Pete R. Flores
                              Senior Official Performing the Duties of the Commissioner
                              U.S. Customs and Border Protection

                              Todd Lyons
                              Acting Director
                              U.S. Immigration and Customs Enforcement

FROM:                  Kristi Noem
                              Secretary of Homeland Security

SUBJECT:           **Guidance Regarding Third Country Removals**

## Purpose

This memorandum clarifies DHS policy regarding the removal of aliens with final orders of removal pursuant to sections 240, 241(a)(5), or 238(b) of the Immigration and Nationality Act (INA) to countries other than those designated for removal in those removal orders (third country removals).[1]  DHS has used similar processes before, including with respect to Title 42 expulsions and the Migrant Protection Protocols.

## Process Regarding Third Country Removals[2]

*Written Notice to the Alien & Fear Screening*

Prior to the alien's removal to a country that had not previously been designated as the country of removal, DHS must determine whether that country has provided diplomatic assurances that aliens removed from the United States will not be persecuted or tortured.  If the United States has received such assurances, and if the Department of State believes those assurances to be credible, the alien

---

[1] This memorandum does not address expedited removals pursuant to INA § 235(b)(1).
[2] These procedures only apply to aliens who have no ongoing proceeding in which to raise a claim under INA § 241(b)(3) or the Convention Against Torture.  For aliens who have such proceedings, DHS will follow existing procedures.

Add.002

may be removed without the need for further procedures.  If the United States has not received those assurances, or if the Department of State does not believe them to be credible, DHS must follow the procedures below.

DHS will first inform the alien of removal to that country.  Immigration officers will not affirmatively ask whether the alien is afraid of being removed to that country.  DHS is taking this approach in line with its determination in mid-2024 that such questioning may be suggestive and that asking them leads to false claims rendering the immigration system as a whole less efficient. *Securing the Border*, 89 Fed. Reg. 48710, 48743 (June 7, 2024) (noting that aliens are "more likely to respond in the affirmative, even if they do not in fact have a fear of return or intention of seeking asylum" when asked affirmative fear questions); *Securing the Border*, 89 Fed. Reg. 81156, 81235 (Oct. 7, 2024).  The allegation that a foreign country's government will torture an alien or allow an alien to be persecuted, particularly a government with which the United States has a diplomatic relationship, is a serious one.  It is not unreasonable for an alien in that circumstance to be expected to affirmatively express a fear of persecution or torture.

Immigration officers will refer any alien who affirmatively states a fear of removal to U.S. Citizenship and Immigration Services (USCIS) for a screening for eligibility for protection under INA § 241(b)(3) and the Convention Against Torture (CAT) for the country of removal.

*Where the Alien Affirmatively States a Fear*

In cases where the alien affirmatively states a fear, USCIS will generally screen the alien within 24 hours of referral from the immigration officer.  This screening may be done remotely.  USCIS will determine whether the alien would more likely than not be persecuted on a statutorily protected ground or tortured in the country of removal.  If USCIS determines that the alien has not met this standard, the alien will be removed.

If USCIS determines that the alien has met this standard and the alien was not previously in proceedings before the Immigration Court, USCIS will refer the matter to the Immigration Court in the first instance.  In cases where the alien was previously in proceedings before the Immigration Court, USCIS will notify the referring immigration officer of its finding, and the immigration officer will inform U.S. Immigration and Customs Enforcement (ICE).  ICE OPLA may file a motion to reopen with the Immigration Court or the Board of Immigration Appeals, as appropriate, for further proceedings for the sole purpose of determining eligibility for protection under INA § 241(b)(3) and CAT for the country of removal.  Alternatively, ICE may choose to designate another country for removal.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| D.V.D., *et al.*,<br>individually and on behalf of all others<br>similarly situated,<br><br>   Plaintiffs,<br><br>  v.<br><br>U.S. Department of Homeland Security,<br>*et al.*,<br><br>   Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

        Civil Action No.
        25-10676-BEM

**MEMORANDUM AND ORDER ON PLAINTIFFS'**
**<u>MOTIONS FOR CLASS CERTIFICATION AND PRELIMINARY INJUNCTION</u>**

**MURPHY, J.**

  This case presents a simple question: before the United States forcibly sends someone to a country other than their country of origin, must that person be told where they are going and be given a chance to tell the United States that they might be killed if sent there?  Defendants argue that the United States may send a deportable alien to a country not of their origin, not where an immigration judge has ordered, where they may be immediately tortured and killed, without providing that person any opportunity to tell the deporting authorities that they face grave danger or death because of such a deportation.  All nine sitting justices of the Supreme Court of the United

States,[1] the Assistant Solicitor General of the United States,[2] Congress,[3] common sense,[4] basic decency, and this Court all disagree.  Plaintiffs are seeking a limited and measured remedy—one Defendants have conceded in other proceedings is the minimum that comports with due process.[5]  Plaintiffs are simply asking to be told they are going to be deported to a new country before they are taken to such a country, and be given an opportunity to explain why such a deportation will likely result in their persecution, torture, and/or death.  This small modicum of process is mandated by the Constitution of the United States, and for this reason, the motion for class certification is GRANTED, and the motion for preliminary injunction is GRANTED in part.

---

[1] *Trump v. J.G.G.*, 604 U.S. —, 2025 WL 1024097, at *2 (Apr. 7, 2025) (*per curiam*) ("[N]otice must be afforded within a reasonable time and in such a manner as will allow [deportable aliens] to actually seek . . . relief in the proper venue before such removal occurs."); *see also id.* (Kavanaugh, J., concurring) ("[A]ll nine Members of the Court agree that judicial review is available.").

[2] Transcript of Oral Argument at 32–33, *Bondi v. Riley*, No. 23-1270 (S. Ct. Mar. 24, 2025) ("JUSTICE KAGAN: . . . [W]hen you have the order of removal but the [Convention Against Torture] proceedings have not yet been concluded, what does the government feel itself free to do with the alien? . . . [ASSISTANT TO THE SOLICITOR GENERAL]: We do think we have the legal authority to [send the non-citizen to some other country, assuming no pending claim under the Convention Against Torture as to that other country], with the following caveat: We would have to give the person notice of the third country and give them the opportunity to raise a reasonable fear of torture or persecution in that third country."); Transcript of Oral Argument at 20–21, *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021) ("JUSTICE KAGAN: So that's what it would depend on, right?  That -- that you would have to provide [an individual being removed] notice [of what country he is being sent to], and if he had a fear of persecution or torture in that country, he would be given an opportunity to contest his removal to that country. Isn't that right?  ASSISTANT TO THE SOLICITOR GENERAL: Yes, that's right.").

[3] *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 348 (2005) (explaining that individuals who "face persecution or other mistreatment in the country designated" as their place of removal "have a number of available remedies," by statute, regulation, and under international law, to "ensur[e] their humane treatment"); Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681–822 (1998) (codified as Note to 8 U.S.C. § 1231) (codifying protections under the Convention Against Torture and prohibiting the removal of an alien to any country where they would likely be tortured); 8 U.S.C. § 1231(b)(3)(A); *see also* 8 C.F.R. §§ 208.16–18, 238.1, 241.8, 1208.16–18, 1240.11; 28 C.F.R. § 200.1 ("A removal order under Title V of the Act shall not be executed in circumstances that would violate Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.").

[4] "[C]ommon sense often makes good law."  *Peak v. United States*, 353 U.S. 43, 46 (1957).

[5] *Supra* note 2.

Add.005

I.      **Background**

      A.      **Legal Background**

            1.      **Removal Proceedings**

When the Government wants to remove an individual, the normal path is through removal proceedings, requiring an evidentiary hearing before an Immigration Judge ("IJ").  8 U.S.C. § 1229a.  Removal proceedings determine not only *whether* an individual may be removed from the United States but also to *where* he may be removed.  In the first instance, the alien is entitled to select a country of removal.  *Id.*; 8 U.S.C. § 1231(b)(2)(A); 8 C.F.R. § 1240.10(f).  If the alien does not do so, the IJ will designate the country of removal and may also designate alternative countries.  8 C.F.R. § 1240.10(f).

Meanwhile, the alien is also entitled to seek various protections, including asylum, withholding of removal, and Convention Against Torture ("CAT") protections.  8 C.F.R. § 1240.11(c)(1).[6]  Some of these protections are discretionary.[7]  Others are mandatory, meaning that protection must be given if the conditions are met.  Withholding of removal is a mandatory form of protection preventing deportation to the country or countries where an IJ finds that the individual is more than likely to be persecuted.  *See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16; *see also Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013) ("[T]he Attorney General has no discretion to deny relief to a noncitizen who establishes his eligibility [for withholding of removal or CAT protections].").  CAT protection is a mandatory protection against deportation to a country where the IJ finds that the individual is likely to be tortured.  *See* Foreign Affairs Reform and

---

[6] Technically, CAT protections can be a form of withholding.  *See Guzman Chavez*, 594 U.S. at 530.  The Court uses the phrase "withholding of removal" to refer to what has been called "statutory withholding."  *Id.*

[7] For example, asylum, which protects against deportation generally to any country, is discretionary absent certain exceptions.  *See generally* 8 U.S.C. § 1158; 8 C.F.R § 208.2.

Add.006

Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681–822 (1998) (codified as Note to 8 U.S.C. § 1231); 8 C.F.R. §§ 208.16–18, 1208.16–18; 28 C.F.R. § 200.1; *see also Moncrieffe*, 569 U.S. at 187 n.1.

### 2.    Reinstatement or Withholding-Only Proceedings

Alternatively, the U.S. Department of Homeland Security ("DHS") may reinstate a prior order of removal for an alien it finds "has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal." 8 U.S.C. § 1231(a)(5). When DHS reinstates a removal order, the "prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed." *Id.* DHS may also issue administrative removal orders to individuals whom DHS determines are not lawful permanent residents and who have an aggravated felony conviction. *See* 8 U.S.C. § 1228(b); 8 C.F.R. § 238.1.

While in both processes aliens are barred from pursuing nearly all avenues of relief from removal, aliens may still seek protection through withholding of removal under 8 U.S.C. § 1231(b)(3) and CAT. 8 C.F.R. §§ 238.1(f)(3), 241.8(e). If the alien demonstrates a reasonable fear of persecution or torture, the alien is placed in "withholding-only proceedings" before an IJ where they can only seek withholding of removal and/or CAT protection. 8 C.F.R. §§ 208.31(b), (e); *see also* 8 U.S.C. § 1231(a)(5) (providing that an alien subject to reinstatement "is not eligible and may not apply for any relief under [the Immigration and Nationality Act ("INA")]"); 8 C.F.R. § 1208.2(c)(3)(i) ("The scope of review in [withholding-only] proceedings . . . shall be limited to a determination of whether the alien is eligible for withholding or deferral of removal."[8]).

---

[8] Deferral of removal provides CAT protections to aliens who are mandatorily ineligible for withholding of removal. *See* 8 C.F.R. § 208.17(a).

Withholding of removal and CAT protection only affect to *where* the alien may be removed, rather than *whether* the alien may be removed; thus, even if an alien prevails on his withholding or CAT claim, the removal order remains valid and enforceable, albeit not executable to the specific country as to which the alien has demonstrated a likelihood of persecution or death. *See* 8 U.S.C. § 1231(b)(2)(E); 8 C.F.R. § 1208.16(f); *Johnson v. Guzman Chavez*, 594 U.S. 523, 536 (2021); *Lanza v. Ashcroft*, 389 F.3d 917, 933 (9th Cir. 2004) (stating that a grant of withholding "only prohibits removal of the petitioner to the country of risk, but does not prohibit removal to a non-risk country").

### 3.    Third-Country Removals

Because the removal proceedings happen on one track, while withholding and CAT proceedings happen on another track, a situation may arise where the Government has an order of removal but no country that an IJ has authorized for that removal.

In certain circumstances, where the Government may not remove an alien to any country covered by that alien's order of removal, the Government may still remove the alien to any "country whose government will accept the alien into that country." 8 U.S.C. § 1231(b)(2)(E)(vii). These are called "third-country removals." As relevant here, a specific carve-out prohibits deportation to countries in which the alien would face persecution or torture:

> Notwithstanding paragraphs [b](1) and [b](2), the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1231(b)(3)(A). Similarly, under FARRA,[9] which codified CAT protections, an alien may not be removed to any country where they would be tortured. *See* 28 C.F.R. § 200.1; 8 C.F.R.

---

[9] *See supra* note 3.

Add.008

§§ 208.16–18, 1208.16–18.  In other words, third-country removals are subject to the same mandatory protections that exist in removal or withholding-only proceedings.

**B.**    **Factual Background**

**1.**    **The February 18, 2025 Directive and March 30, 2025 Guidance**

On January 20, 2025, President Donald J. Trump issued Executive Order 14165, entitled "Securing our Borders."  90 Fed. Reg. 8467.  As relevant here, on or about February 18, 2025, DHS issued a directive to the Enforcement and Removal Operations ("ERO") division of Immigration and Customs Enforcement ("ICE").  Dkt. 1-4 (the "February Directive").  The February Directive instructs ERO officers to review the cases of aliens granted withholding of removal or protection under CAT "to determine the viability of removal to a third country and accordingly whether the alien should be re-detained" and, in case of persons who previously could not be removed because the designated countries were unwilling to receive them, "review for re-detention . . . in light of the Administration's significant gains with regard to previously recalcitrant countries and the potential for third country removals."  *Id.* at 2.

On March 23, 2025, Plaintiffs filed this lawsuit challenging, in part, the February Directive.  Dkt. 1 ("Compl.").  Plaintiffs seek an order guaranteeing them the opportunity to show—before being removed to countries not included on their removal orders—that they will suffer persecution, torture, and/or death in those countries.  They are challenging Defendants' policy or practice of designating aliens for removal to any country other than the country or alternative country of removal designated and identified in writing in their prior immigration proceedings without first providing notice and an opportunity to apply for protection from removal to that "third" country.

On March 28, 2025, the Court entered a temporary restraining order after hearing oral arguments from both parties.[10]  Dkt. 34.

On March 30, 2025, DHS issued an updated guidance (the "March Guidance") on removals to third countries.  Dkt. 43-1.  This guidance dictates that aliens may be removed to a third country without notice if the United States has received assurances from that country that aliens removed from the United States will not be persecuted or tortured.  *Id.* at 2–3.  Importantly, these assurances are not individualized, and the March Guidance provides for no review, meaning that deportations to a third country can occur without any consideration of the individual risks facing a particular alien.  *Id.*  According to the March Guidance, DHS will provide the alien with notice of the third country (and an opportunity to affirmatively assert a fear of return to that third country) only if the United States has not received assurances, or if the Department of State does not believe those assurances to be credible.  *Id.* at 3.

### 2.    **Plaintiffs' Cases**

Plaintiffs are individuals subject to final orders of removal, allegedly at imminent risk of deportation to countries other than those authorized by their respective orders.  Compl. ¶ 1.[11]

Plaintiff D.V.D.[12] is a citizen of Cuba who entered the United States from Mexico.  *Id.* ¶¶ 10, 62.  In February 2017, in removal proceedings, he was ordered removed.  *Id.* ¶ 62.  His removal order specified only Cuba as the country of removal.  *Id.*  He was released from detention on an Order of Supervision in May of 2017.  *Id.*  Plaintiffs allege that on March 10, 2025, ICE instructed D.V.D.'s attorney that D.V.D. needed to report for an in-person check-in on March 28,

---

[10] The Court extended the temporary restraining order after hearing further oral arguments from both parties on April 10, 2025.  Dkt. 62.

[11] Except where indicated, the relevant facts are largely undisputed.

[12] The Court has allowed Plaintiffs to proceed under pseudonyms.  Dkt. 13.

Add.010

2025, and that the ICE officer later explained that ICE was requiring all people to report in person and more frequently on a case-by-case basis. *Id.* ¶¶ 64–66. If deported to a third country, D.V.D. alleges that he is at risk of persecution due to his mental health conditions or possible imprisonment in certain countries. *Id.* ¶ 67. At oral argument on March 28, 2025, counsel indicated that D.V.D. had not been detained at that day's check-in and had been given another check-in date in September 2025. Dkt. 44 ("March 28, 2025 Tr.") at 4:24–25.

Plaintiff M.M. is a citizen of Honduras who fled due to severe domestic violence. Compl. ¶¶ 11, 68. In 2014, because she had previously been ordered removed from the United States, DHS issued a reinstatement order. *Id.* ¶ 69. In withholding-only proceedings before an IJ in 2021, she was granted withholding of removal to Honduras. *Id.* ¶¶ 69–70. M.M. is not in ICE custody, but she alleges that on March 7, 2025, an ICE officer informed her that she was on a list of people who would be deported imminently. *Id.* ¶ 71. If deported to a third country, M.M. alleges that she is at risk of being sent back to Honduras or another country where she would again face severe domestic violence. *Id.* ¶ 73. At oral argument on April 10, 2025, counsel indicated that M.M.'s check-in had been cancelled by ICE after the initiation of this suit. April 10, 2025 Rough Tr. at 1:19–21.

Plaintiff E.F.D. is a citizen of Ecuador. Compl. ¶¶ 12, 74. In October 2015, he was placed in removal proceedings after entering the United States and raising a credible fear of return. *Id.* In 2018, in removal proceedings, an IJ granted E.F.D.'s application for CAT protection. *Id.* ¶ 75. On March 18, 2025, ICE re-detained him. *Id.* ¶¶ 12, 76. He has not yet been told when his removal might happen or to where. *Id.* ¶¶ 76–77. E.F.D. alleges that he will be deported to a third country without the opportunity to apply for protection, which could include countries that will deport him

Add.011

back to Ecuador, from which he was awarded CAT protection, or to countries where he has had prior dangerous experiences.  *Id.* ¶ 77.

Plaintiff O.C.G. is a native of Guatemala who was issued an expedited removal order pursuant to 8 U.S.C. § 1225(b) and deported to Guatemala in March 2024, without a credible fear interview.  *Id.* ¶¶ 13, 78.  In May of 2024, he reentered the United States, through Mexico, after experiencing violence in Mexico.  *Id.* ¶¶ 79–80.  His removal order was reinstated by DHS, but he was referred to an asylum officer based on his expressed fear of returning to Guatemala.  *Id.* ¶ 80. He was then placed in withholding-only proceedings before an IJ and was granted withholding of removal to Guatemala under 8 U.S.C. § 1231(b)(3).  *Id.* ¶¶ 80–82.  Plaintiffs allege that the IJ did not designate Mexico as a country of removal and that, when DHS tried to add Mexico during the withholding-only proceedings, the IJ told DHS that it was "too late" to do so.  *Id.* ¶¶ 81–83.  DHS waived appeal.  *Id.* ¶ 84.  Despite this success, O.C.G. remained in detention and was quickly deported to Mexico.  *Id.* ¶¶ 85–86.  The parties dispute whether he was provided an opportunity to express fear prior to being deported to Mexico.  *Compare id.* ¶¶ 85–86 (complaint alleging that no notice or opportunity to be heard was provided), *and* Dkt. 8-4 ¶¶ 8–10 (declaration of O.C.G. asserting same), *with* Dkt. 31-1 ¶ 13 (declaration of Brian Ortega, Assistant Field Office Director of ICE's ERO Phoenix Field Office, asserting that notice was provided on the day of his removal, and fear of removal to Mexico was expressly denied).  Plaintiffs allege that O.C.G. was taken to Mexico by bus and that, once he was placed in detention in Mexico, he was informed by Mexican authorities that he could apply for asylum in Mexico—and remain incarcerated for an unknown period of time while that application was pending—or be returned to Guatemala.  Compl. ¶¶ 87–88.  Plaintiffs allege that, on February 25, 2025, O.C.G. returned to Guatemala, where he remains in hiding today.  *Id.* ¶ 89.

Each Plaintiff alleges that he or she has valid reasons to fear removal to specific countries that were not included in their removal orders.  *Id.* ¶¶ 67, 73, 77, 88.  Plaintiffs challenge Defendants' policy or practice of failing to provide notice and an opportunity to be heard prior to removal to a country that was not designated in their removal orders, which Plaintiffs allege violates the INA, FARRA, regulations implementing the two statutes, and the Due Process Clause of the Fifth Amendment.  *Id.* ¶¶ 99–138.

### 3.     Current Motions

Before the Court now are Plaintiffs' Motion for Class Certification, Dkt. 4, and Motion for a Preliminary Injunction, Dkt. 6,[13] through which Plaintiffs seek: (1) to prevent Defendants from removing certain of the named Plaintiffs to a "third" country without notice and an opportunity to assert fear of persecution or torture; (2) to prevent Defendants from removing any class member to a "third" country without notice and an opportunity to assert fear of torture; and (3) an order directing Defendants to facilitate the immediate return of O.C.G. to the United States.  For the reasons set forth below, Plaintiffs' motion for class certification is GRANTED, and Plaintiffs' motion for a preliminary injunction is GRANTED in part.

---

[13] The Court has already ruled on the motion to the extent it sought a temporary restraining order, and as stated on the record in the March 28, 2025 hearing, the Court denies the motion to the extent it seeks an administrative stay of the February Guidance.

## II.    **Jurisdiction**

Several subsections of 8 U.S.C. § 1252 limit judicial review of claims and questions that relate to removal proceedings or existing orders of removal. Defendants argue that sections 1252(a), (b), and (g) strip this Court of jurisdiction.[14]

### A.    **Sections 1252(a) and (b)**

In the REAL ID Act of 2005, Congress amended the INA to limit the ways by which an individual might challenge his order of removal. *Singh v. Gonzales*, 499 F.3d 969, 977 (9th Cir. 2007) (citing 8 U.S.C. § 1252(a)(5)).[15] In turn, section 1252(b)(9) limits the forum for those challenges to courts of appeals. *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016).[16]

Accordingly, actions that do not challenge final orders of removal are not subject to this channeling scheme. *J.E.F.M.*, 837 F.3d at 1032. "[A] suit brought against immigration authorities

---

[14] Defendants also argue that section 1252(f)(1) limits this Court's jurisdiction with respect to class-wide relief. However, in *Biden v. Texas*, 597 U.S. 785 (2022), the Supreme Court explicitly confirmed that section 1252(f)(1) concerns the availability of relief, not subject matter jurisdiction. *Id.* at 800–01. As the Court explained, "the question whether a court has jurisdiction to grant a particular remedy is different from the question whether it has subject matter jurisdiction over a particular class of claims." *Id.* at 801. While the provision may "withdraw[ ] a district court's 'jurisdiction or authority' to grant a particular form of relief[,] [i]t does not deprive the lower courts of all subject matter jurisdiction over claims brought under sections 1221 through 1232 of the INA." *Id.* at 798; *see also Nielsen v. Preap*, 586 U.S. 392, 402 (2019) (addressing the merits of the suit because "[w]hether the [District] [C]ourt had jurisdiction to enter such an injunction [under section 1252(f)(1)] is irrelevant because the District Court had jurisdiction to entertain the plaintiffs' [class-wide] request for declaratory relief"). As discussed below, the Court has jurisdiction to grant both the class-wide declaratory and injunctive relief sought in this case. *See infra* at 23–27.

[15] In pertinent part, section 1252(a)(5) states:

[A] petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter[.]

[16] Section 1252(b)(9) states:

Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

Add.014

is not *per se* a challenge to a removal order." *Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011).

The Supreme Court has expressly affirmed this proposition, explaining that the phrase "arising from" in section 1252(b)(9) does not encompass all claims that merely result from the fact of or potential for removal, which reading the Court said would have "staggering results." *Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018). Because the respondents in *Jennings* were "not asking for review of an order of removal," "not challenging the decision to detain them in the first place or to seek removal," and "not even challenging any part of the process by which their removability will be determined," the Court concluded that the restriction in section 1252(b)(9) did not apply. *Id.* Notably, under *Jennings*, an individual is not required to "cram[]" claims into the judicial review of a removal order where doing so would be unnatural.[17] *Id.*

The First Circuit has had further opportunity to clarify that the scope of section 1252(b)(9) is limited to claims that specifically arise out of what happens in the removal proceeding:

> [R]emoval proceedings are confined to determining whether a particular alien should be deported. *See* [8 U.S.C.] § 1229a(c)(1)(A). While legal and factual issues relating to that question can be raised in removal proceedings and eventually brought to the court of appeals for judicial review, certain claims, by reason of the nature of the right asserted, cannot be raised efficaciously within the administrative proceedings delineated in the INA. *See, e.g.*, *McNary* [*v. Haitian Refugee Ctr., Inc.*], 498 U.S. [479,] 496, 111 S.Ct. 888 [(1991)]; *Jupiter v. Ashcroft*, 396 F.3d 487, 492 (1st Cir. 2005). Requiring the exhaustion of those claims would foreclose them from any meaningful judicial review. Given Congress's clear intention to channel, rather than bar, judicial review through the mechanism of

---

[17] Even if an individual raised claims related to the risk of torture in a third country, the IJ would not normally consider or address such claims unless that country had already been designated as a country of removal. *See infra* at 16–17 & note 24; *see also, e.g.*, Compl. ¶¶ 81–83 (alleging that, when DHS sought to add Mexico during O.C.G.'s withholding-only proceedings, the IJ told DHS that it was "too late" to do so); Dkt. 8-4 ¶¶ 5–7 (declaration of O.C.G. that the IJ did not designate Mexico as a country of removal and that the IJ informed DHS that Mexico was not a country for removal during the withholding-only proceedings); Dkt. 8-11 at 5–6 (motion to reopen denied despite third country identified for removal); Dkt. 59-12 at 4 (motion to reopen denied where removal to third country was speculative, and indicating that even if third country were identified for removal, relief would need to be sought in federal court rather than in immigration proceedings); Dkt. 59-13 at 4 (motion to reopen denied as premature where "Respondent was not seeking protection from removal to any particular country").

Add.015

section 1252(b)(9), reading "arising from" as used in that statute to encompass those claims would be perverse.

*Aguilar v. U.S. Immigr. & Customs Enf't*, 510 F.3d 1, 11 (1st Cir. 2007). As such, "claims which cannot be raised in removal proceedings and eventually brought to the court of appeals on a petition for review are 'independent of, or wholly collateral to, the removal process,' not 'arising from' it." *Gicharu v. Carr*, 983 F.3d 13, 16 (1st Cir. 2020) (quoting *Aguilar*, 510 F.3d at 11).[18]

In examining Plaintiffs' requested relief, the issues in this case extend beyond those that could have been raised in their removal proceedings. This largely follows from the simple fact that Plaintiffs are no longer in removal proceedings and complain only of actions that post-date their removal proceedings. Plaintiffs neither challenge the IJs' determinations that they are removable nor claim any deficiency in the removal orders themselves. *Cf. Delgado*, 643 F.3d at 55 (challenging adjustment of status, which would necessarily render removal order "invalid"); *Aguilar*, 510 F.3d at 13–14 (challenging right to counsel in removal proceedings). Rather, Plaintiffs' claims do quite the opposite of challenge their orders of removal—they seek to hold Defendants to the terms of those orders and to receive notice and an opportunity to be heard before Defendants explicitly exceed those orders. *See Aden v. Nielsen*, 409 F. Supp. 3d 998, 1006 (W.D. Wash. 2019) (finding claims that "challenge[d] DHS's attempts, *outside* of removal proceedings, to designate [a third country] without reopening his proceedings so that an IJ could make the designation in the first instance and/or determine whether petitioner's life or freedom would be

---

[18] In reaching its decision in *Aguilar*, the First Circuit cited and relied upon decades of Supreme Court precedent that is "hostil[e] toward requiring exhaustion when adequate relief could not feasibly be obtained through the prescribed administrative proceedings." *Aguilar*, 510 F.3d at 12 (citing *Leedom v. Kyne*, 358 U.S. 184, 190 (1958), *Matthews v. Eldridge*, 424 U.S. 319, 330–31 (1976), *Bowen v. City of New York*, 476 U.S. 467, 482–83 (1986), and *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994)).

Add.016

threatened in that country" independent of removal order and thus not barred by section 1252(a)(5)).[19]

Defendants propose that Plaintiffs can "cram," *Jennings*, 583 U.S. at 294, their fear-based claims into the removal proceedings (thereby placing those claims into section 1252's jurisdictional funneling scheme) by filing motions to reopen their immigration proceedings. Dkt. 51 ("PI Opp.") at 8–9. But this Court finds that remedy to be both legally insufficient and logistically impossible, effectively "foreclos[ing] all meaningful judicial review." *See Aguilar*, 510 F.3d at 12 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994)).[20]

For most aliens, directly moving to reopen is simply not an option. "With a few narrow exceptions, the Immigration and Nationality Act limits petitioners to a single motion to reopen

---

[19] Although this case involves sensitive subject matter and complex statutory schemes, its underlying principles are surprisingly familiar. Courts routinely consider whether jurisdiction is barred based on a prior court's order. *See, e.g.*, *Verogna v. Johnstone*, 583 F. Supp. 3d 331, 336–37 (D.N.H. 2022), *aff'd*, 2022 WL 19795808 (1st Cir. Nov. 14, 2022). Under sections 1252(a)(5) and (b)(9), district courts are precluded from revisiting orders made by immigration judges. It would not make sense, however, to offer that same protection for acts that go beyond those orders' preclusive scope.

[20] Defendants claim that an alien can raise fear-based concerns through reopening IJ proceedings or petitioning the court of appeals for review. *E.g.*, April 10, 2025 Rough Tr. at 9:24–10:5 ("MR. ENSIGN: Your Honor, they would have needed to raise it earlier or -- and if we were in the second part of the [March] guidance, they also could manifest fear at that point and then it would go to screening. So there's that potentially available as well. But, you know, to the extent they have awareness of that now, they should go back before the IJ and BIA."); *id.* at 10:19–22 ("MR. ENSIGN: Your Honor, they would have needed to go to the BIA before [they are notified of third-country removal plans]. There's nothing under the [March] guidance that would require additional notice or an opportunity to challenge it at that moment."); *id.* at 27:10–13 ("[MR. ENSIGN:] There is -- the typical way it . . . would be raised is a motion to reopen if you haven't raised it already, and then you can raise it to the Court of Appeals."); *id.* at 44:2–11 ("THE COURT: So it happens Saturday morning, the person raises a fear that department disagrees -- they make it through the first screening, the department disagrees. That person is then going to be deported on Sunday morning. As a practical matter, there's no judicial review of that decision, right? MR. ENSIGN: There would be administrative review potentially in the IJ. THE COURT: How would they do that? It's Saturday. MR. ENSIGN: Your Honor, I don't know the specifics of the IJ proceedings."). This claim is either an effort to prevaricate or is deeply disingenuous. The suggestion that an alien must—or even can—reopen an immigration proceeding at 6:00 a.m. on a Saturday prior to being removed that same weekend is preposterous on its face. *See, e.g.*, Exec. Office for Immigr. Rev., *Boston Immigration Court*, U.S. Dep't of Just., https://www.justice.gov/eoir/boston-immigration-court (last updated Apr. 9, 2025) ("The immigration court is open Monday to Friday except for federal holidays."). Further, Defendants have provided no evidence or authority—only their own argument—that there is a way for Plaintiffs to *successfully* reopen their immigration proceedings as of right and do not address Plaintiffs' well-supported contention that motions to reopen to assert fear of removal to a country not designated in their removal order are routinely denied as speculative. *See* PI Opp. at 8–9 (discussing only sua sponte motions to reopen process). Defendants' contention is belied by both the evidence in the record and clear case law on the limits of sua sponte motions to reopen. *See infra* at 14–18.

filed within ninety days of a removal order." *Charles v. Garland*, 113 F.4th 20, 23 (1st Cir. 2024) (citing 8 U.S.C. § 1229a(c)(7)(A), (c)(7)(C)(i); 8 C.F.R. § 1003.2(c)(2)).  In the absence of any right to reopen the underlying immigration case, the petitioner can only ask the immigration court to reopen "sua sponte."  *Id.*  Immigration courts have nearly unfettered "discretion to decide whether to grant or deny sua sponte reopening."  *Id.*; *see also Phimmady v. Bondi*, 128 F.4th 18, 23 (1st Cir. 2025) (holding that judicial review of immigration court's decision not to reopen sua sponte is limited and that there is no legal error in declining to reopen where plaintiff could not establish settled practice of reopening cases sua sponte in similar circumstances).  Consistent with this, Plaintiffs have provided sworn declarations indicating that their various attempts at reopening proceedings to seek CAT protections have been denied by IJs.  *See* Dkt. 8-8 ¶ 9 (explaining that an IJ denied motion to reopen); Dkt. 8-18 ¶ 5 (same); Dkt. 8-11 at 5–6 (IJ order denying motion to reopen and noting that neither "Immigration Judges nor the Board of Immigration Appeals ha[s] jurisdiction to review any determination by officers of the DHS under 8 C.F.R. § 241.15 regarding the country of removal.  Nothing in this order forbids DHS from acting on its own authority to designate a country, or forbids the parties from litigating that issue in any forum outside of the Executive Office of Immigration Review" (citations omitted)); Dkt. 59-12 ¶¶ 12–18 ("If the United States government were to remove Respondent to El Salvador under a separate authority, that is outside the jurisdiction of this Court to adjudicate and/or analyze.  Respondent's relief would be

Add.018

sought in Federal court, not Immigration Court.");[21] Dkt. 59-13 at 4 (IJ order denying motion to reopen as premature where "Respondent was not seeking protection from removal to any particular country").[22]  *But see* Dkt. 8-14 ¶ 7 (noting that an IJ granted a motion to reopen proceedings for an alien currently in detention).[23]

Even where an alien may move as of right, or in the unlikely event that the immigration court reopens the case sua sponte, there is no reason to believe that the court will entertain such preemptive CAT and withholding claims.  "[A]n applicant is not entitled to have the agency adjudicate claims of relief that relate 'to a country that nobody is trying to send them to.'" *Sadychov v. Holder*, 565 F. App'x 648, 651 (9th Cir. 2014) (quoting *She v. Holder*, 629 F.3d 958, 965 (9th Cir. 2010), *superseded on other grounds by statute as stated in Dai v. Sessions*, 884 F.3d

---

[21] The full reasoning for the IJ's denial states:

First, country conditions in El Salvador are not relevant to Respondent's case.  Respondent was ordered removed by this court to his country of origin, Venezuela - not El Salvador.

Second, Respondent's fear of removal to El Salvador as a 'Venezuelan national with Tattoos' is tentative and speculative, at best.  Respondent has been ordered removed to Venezuela by this Court, not El Salvador.  If the United States government were to remove Respondent to El Salvador under a separate authority, that is outside the jurisdiction of this Court to adjudicate and/or analyze.  Respondent's relief would be sought in Federal court, not Immigration Court, when and if that issue became ripe for review.

Dkt. 59-12 at 4.

[22] There are further substantive and logistical barriers to filing motions to reopen, especially for pro se and detained aliens and those with limited English proficiency, and particularly where removals are executed unexpectedly and with great haste.  *See* Dkt. 59-9 (describing procedural, evidentiary, and substantive barriers to filing motions to reopen, especially for pro se and detained noncitizens given limitations on communication and mail access in immigration detention, as well as the impossibility of seeking reopening without knowledge of the country to which someone will be deported); Dkt. 59-10 (same, and highlighting that pro se individuals are unlikely to be aware of the availability of motions to reopen as a procedural mechanism); Dkt. 59-11 (same, and highlighting difficulties for detained individuals with limited English proficiency and the likelihood of deportation while a motion to reopen is pending).

[23] Moreover, as a practical matter, even if Plaintiffs could viably seek to reopen their immigration proceedings without knowing where the Government intends to send them, Plaintiffs would then need to make separate cases for each and every potential country for which they might have a fear-based claim to avoid removal.  It is hard to imagine that this solution, which would dramatically clog the immigration courts—and would seem to pose an even greater hindrance to Defendants' removal efforts than providing the sought-after notice in the first place—is what Congress intended.

858, 867 n.8 (9th Cir. 2018)) (explaining that "should circumstances change such that Azerbaijan is the designated country of removal, the agency must provide [plaintiff] with notice and an opportunity to reopen his case for full adjudication of his claim of withholding of removal from Azerbaijan"). Until an individual receives notice of the country to which he is being deported, he has no basis for reopening his immigration case and no merits basis to seek withholding from a hypothetical third country.[24]

The inability to effectively raise preemptive CAT and/or withholdings claims before an IJ precludes meaningful review in courts of appeals. That is so because courts of appeals are limited to the administrative record, 8 U.S.C. § 1252(b)(4)(A), and are thus, at most, able to review the IJ's discretionary decision not to reopen the case or adjudicate hypothetical claims, which—when the motion or request concerns "a country that nobody is trying to send them to," *Sadychov*, 565 F. App'x at 651—is not wrongly decided. *See id.* But even that may overstate the review available to petitioners. Multiple circuits have held that courts of appeals lack *any* jurisdiction to review discretionary decisions to reopen. *See, e.g.*, *Manyary v. Bondi*, 129 F.4th 473, 479 (8th Cir. 2025) (calling due-process argument raised through request to reopen sua sponte "'an abuse of discretion argument in constitutional garb'" (quoting *Tamenut v. Mukasey*, 521 F.3d 1000, 1005 (8th Cir. 2008))); *Mosere v. Mukasey*, 552 F.3d 397, 400 (4th Cir. 2009); *see also Tamenut*, 521 F.3d at

---

[24] For this reason, the Court has declined to distinguish between those whose removal or withholding-only proceedings conclude before versus after entrance of this Court's Order. *See* April 10, 2025 Rough Tr. at 16:5–23 (considering the idea). Whichever countries or fear-based claims an alien may attempt to raise during proceedings, IJs are under no obligation to make findings about countries not previously identified as "proposed countr[ies] of removal." *See* 8 C.F.R. § 1208.16(b) (defining eligibility with respect to that limited subset); *id.* § 1240.11(c)(1) (instructing IJs to advise aliens that they may apply to that subset (citing 8 C.F.R. § 1240.10)). Imposing a before-and-after distinction would require crafting a new, burdensome system for how immigration courts identify countries of removal and adjudicate related claims.

Add.020

1004 (citing cases from ten circuits).[25]  Indeed, just over two months ago, the First Circuit openly doubted (and declined to resolve) whether it had jurisdiction to review the denial of a request to reopen involving consideration of factual circumstances.  *Phimmady*, 128 F.4th at 22 & n.2 (highlighting that the "Supreme Court has 'express[ed] no opinion on whether federal courts may review [a] decision not to reopen removal proceedings.'" (quoting *Kucana v. Holder*, 558 U.S. 233, 251 n.18 (2010)) (first alteration in *Phimmady*)).[26]  Accordingly, such preemptive CAT and/or withholding claims, including the due-process issues raised in this case, are precisely the type of "claims which cannot be raised in removal proceedings and eventually brought to the court of appeals on a petition for review" that the First Circuit has held are "'independent of, or wholly collateral to, the removal process,' not 'arising from' it."  *See Gicharu*, 983 F.3d at 16 (quoting *Aguilar*, 510 F.3d at 11).

Finally, Defendants argue that "Congress, in its discretion, implemented [CAT] by directing the issuance of regulations, expressly depriving courts of jurisdiction to review those regulations, and channeling all review of individual CAT claims into review of final orders of

---

[25] Several of these cases appear to have since been superseded, *see, e.g.*, *Thompson v. Barr*, 959 F.3d 476 (1st Cir. 2020), or qualified in later decisions, *see, e.g.*, *Arzu-Robledo v. Garland*, 2023 WL 6532649, at *2 (5th Cir. Oct. 6, 2023).

[26] Even assuming jurisdiction, *Phimmady* gives a strong sense of just how unreviewable, on the merits, these motions to reopen really are.  In *Phimmady*, an alien sought to reopen his immigration case after the conviction that had rendered him removable was overturned.  128 F.4th at 20.  The Board of Immigration Appeals ("BIA") denied the motion to reopen, and the First Circuit affirmed.  *Id.* at 25.  Although prior BIA decisions had established that reopening was "'an extraordinary remedy reserved for truly exceptional situations,'" *id.* at 22 (quoting *In re G-D-*, 22 I. & N. Dec. 1132, 1133-34 (BIA 1999)), nothing required reopening, "[e]ven in truly exceptional situations," *id.* (citing *Charles*, 113 F.4th at 23).  As such, the First Circuit held that there is no legal error in the denial of a sua sponte motion to reopen unless a plaintiff shows that the BIA violated an established practice of granting similar sua sponte motions.  *Id.* at 23.

removal."[27]  PI Opp. at 10 (citing FARRA § 2242(d); 8 U.S.C. § 1252(a)(4)).  But this argument

runs squarely up against the overall problem with Defendants' reading of the statute—there can

be no meaningful "review" of an issue that was not *and could not* have been raised in the first

place.  As the Supreme Court held in *Jennings* and the First Circuit confirmed in *Aguilar*,

section 1252(a)(4) cannot be read to strip jurisdiction over claims that could not have been raised

in the removal proceedings.  *See also E.O.H.C. v. Sec'y U.S. Dep't of Homeland Sec.*, 950 F.3d

177, 188–90 (3d Cir. 2020) (holding that section 1252(a)(4) does not bar review "[w]hen a

detained alien seeks relief that a court of appeals cannot meaningfully provide on petition for

review of a final order of removal").  As Defendants initiated the third-country-removal process

at issue *after* the conclusion of removal proceedings—and because Plaintiffs have no opportunity

to raise these issues before an IJ without some type of advance notice—there can be no judicial

review as contemplated in the channeling provisions of section 1252(a)(4).  *See also Compere v.*

*Nielsen*, 358 F. Supp. 3d 170, 177 n.8 (D.N.H. 2019) (finding section 1252(a)(4) "plainly

inapplicable" where the petitioner was not seeking review of CAT claim's denial).  As such,

neither section 1252(a) nor section 1252(b) bars this Court's jurisdiction.

---

[27] Defendants also highlight that CAT "is not self-executing."  PI Opp. at 10.  But CAT "has been implemented in the United States through FARRA and the subsequent regulations."  *See Saint Fort v. Ashcroft*, 329 F.3d 191, 195–96 (1st Cir. 2003) (explaining how the Convention Against Torture was domesticated into federal law), *superseded by statute on other grounds as stated in Hamid v. Gonzales*, 417 F.3d 642, 647 (7th Cir. 2005); *see also Nasrallah v. Barr*, 590 U.S. 573, 580 (2020).  As courts do, this Court uses "CAT" to refer to the processes and protections as embodied in the law.  *See, e.g., Guzman Chavez*, 594 U.S. at 530–31.

**B.**    **Section 1252(g)**

The Supreme Court has explained that 8 U.S.C. § 1252(g)[28] is "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 485 & n.9 (1999) [hereinafter *AADC*] ("Section 1252(g) seems clearly designed to give some measure of protection to . . . discretionary determinations.").    In *AADC*, the Supreme Court emphasized that the provision does not encompass the universe of all possible acts and events arising from removal proceedings, but rather instructs courts to read it as a narrow provision that "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'"    *Id.* at 482 (emphases in original) (quoting section 1252(g) and declining to read it so expansively as to say, "no judicial review in deportation cases unless this section provides judicial review").    Accordingly, section 1252(g) does not refer to "all claims arising from deportation proceedings."    *Id.*

Following *AADC*, the First Circuit has held that section 1252(g) does not bar review of the "lawfulness" of a removal-related action because such claims are "collateral" to the discretionary decisions immunized by section 1252(g).    *Kong v. United States*, 62 F.4th 608, 617 (1st Cir. 2023); *accord United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (*en banc*) ("The district court may consider a purely legal question that does not challenge the Attorney General's discretionary authority, even if the answer to that legal question—a description of the relevant law—forms the backdrop against which the Attorney General later will exercise discretionary

---

[28] 8 U.S.C. § 1252(g) states, in pertinent part:

Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

authority."); *Madu v. U.S. Att'y Gen.*, 470 F.3d 1362, 1368 (11th Cir. 2006) ("While this provision bars courts from reviewing certain exercises of discretion by the attorney general, it does not proscribe substantive review of the underlying legal bases for those discretionary decisions and actions."); *Bowrin v. U.S. INS*, 194 F.3d 483, 488 (4th Cir. 1999) (holding that section 1252 "does not apply" to Government's interpretations of law); *see also Texas v. United States*, 809 F.3d 134, 164 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ("The [Supreme] Court [in *AADC*] emphasized that § 1252(g) is not 'a general jurisdictional limitation,' but rather 'applies only to three discrete actions.'" (quoting *AADC*, 525 U.S. at 482)), *affirmed by an equally divided court sub nom. United States v. Texas*, 579 U.S. 547 (2016); *cf. Camarena v. Dir., Immigr. & Customs Enf't*, 988 F.3d 1268, 1271, 1272–73 & n.2 (11th Cir. 2021) (confirming its narrow reading of section 1252(g) in *Madu*, based on *AADC*, but finding that section 1252(g) barred review of decision to remove pending *discretionary* waiver process).

Hewing close to the Supreme Court's guidance in *AADC* and the First Circuit's holding in *Kong*, this Court will not construe section 1252(g) to immunize an unlawful practice from judicial review. *See also Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 671–72 (1986) ("[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review."). Here, Plaintiffs' claims do not arise from Defendants' discretionary decisions to execute their removal orders. Nor do Plaintiffs challenge their removability. What Plaintiffs challenge is Defendants' authority to effectively depart from the removal orders by designating new countries for removal outside of the immigration proceedings and, in doing so, circumvent Plaintiffs' due-process rights and the carefully crafted

scheme that Congress has set forth.[29]  *See Tazu v. Att'y Gen. U.S.*, 975 F.3d 292, 298 (3d Cir. 2020) ("[W]hen the Act deprives the Attorney General of the discretion to act, a challenge to that lack of statutory authority is not barred as a challenge to the exercise of discretion.").  These assertions are collateral to Defendants' decision to execute Plaintiffs' removal, and thus not subject to section 1252(g)'s jurisdictional bar.  *See Kong*, 62 F.4th at 617.

This Court's decision is in accord with numerous sister courts around the country that have recognized that section 1252(g) shields only discretionary decisions concerning the three stages of the deportation process.  *See, e.g.*, *Abrego Garcia v. Noem*, — F. Supp. 3d —, 2025 WL 1014261, at *7–8 (D. Md. Apr. 6, 2025), *aff'd*, No. 25-1345, 2025 WL 1021113 (4th Cir. Apr. 7, 2025) [hereinafter *Abrego Garcia II*], *aff'd in relevant part sub nom. Noem v. Abrego Garcia*, 604 U.S. —, 2025 WL 1077101 (Apr. 10, 2025) (*per curiam*) [hereinafter *Abrego Garcia III*]; *Gondal v. U.S. Dep't of Homeland Sec.*, 343 F. Supp. 3d 83, 92 (E.D.N.Y. 2018); *Coyotl v. Kelly*, 261 F. Supp. 3d 1328, 1339–41 (N.D. Ga. 2017); *Hovsepian*, 359 F.3d at 1155; *Bowrin*, 194 F.3d at 488.  *But see Silva v. United States*, 866 F.3d 938, 941 (8th Cir. 2017) (openly disagreeing with the Supreme Court's reading of the statute, as articulated in *AADC*).  This Court may review the purely

---

[29] During the March 28, 2025 oral argument, Defendants agreed that, in designating additional countries of removal, the Government drew its authority from statute.  March 28, 2025 Tr. at 6:12–7:4.  That implies something beyond mere "execut[ion]" of an order.  *Cf.* 8 U.S.C. 1252(g).  This plain reading of the statute is supported by the relevant regulations, which state that "the order of the immigration judge *does not limit* the authority of the Department of Homeland Security to remove [an] alien to any other country as permitted by section 241(b) of the Act."  8 C.F.R. § 1240.12(d) (emphasis added).  That such authority is not "limit[ed]" by an order does not suggest that the authority is still *pursuant to* that order.

Add.025

legal question of whether the Constitution and relevant statutes require notice and an opportunity to be heard prior to removal of an alien to a third country.[30]

There is no question that, if eligibility is demonstrated, withholding of removal and CAT protections are mandatory and removal to that country cannot occur.  *See* 8 C.F.R. §§ 1208.16(c) (withholding under CAT), 1208.17(a) (deferral of removal under CAT).  The only question is what right individuals have, under the Constitution and relevant statutes, to make that showing.  This Court has jurisdiction to hear that question.

## III.    **Motion for Class Certification**

Plaintiffs seek to certify a class, which they define as:

> All individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA (including withholding-only proceedings) whom DHS has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed.

Dkt. 4 at 1.

As a threshold matter, limitations on certain class-wide injunctive relief under 8 U.S.C. § 1252(f)(1) do not preclude class certification or otherwise limit the Court's ability to grant Plaintiffs' requested class-wide relief.  *See* Dkt. 52 ("Class Cert. Opp.") at 7–10.

---

[30] Defendants' out-of-circuit citations stand, at most, for the proposition that courts cannot indefinitely guarantee the pre-removal completion of certain review processes.  *See Rauda v. Jennings*, 55 F.4th 773, 777–78 (9th Cir. 2022) (finding no jurisdiction to halt removal pending appeal of motion to reopen removal proceedings); *Camarena*, 988 F.3d at 1273 (finding no jurisdiction to halt removal pending adjudication of discretionary applications for provisional unlawful presence waivers); *E.F.L. v. Prim*, 986 F.3d 959, 964–65 (7th Cir. 2021) (finding no jurisdiction to halt removal pending adjudication of a petition under the Violence Against Women Act, for which there was no mandate, statutory or otherwise, that adjudication occur prior to removal).  Defendants also cite *Foster v. Townsley*, in which the Fifth Circuit held that that section 1252(g) extends to non-discretionary decisions.  PI Opp. at 6 (citing *Foster v. Townsley*, 243 F.3d 210, 214 (5th Cir. 2001)).  But as Plaintiffs correctly note, the Fifth Circuit subsequently decided *Flores-Ledezma v. Gonzales*, 415 F.3d 375, 380 (5th Cir. 2005), in which the court held that section 1252(g) does not preclude jurisdiction over a challenge to the constitutionality of the statutory scheme, as opposed to a discretionary determination.  Insofar as *Tsering v. U.S. Immigr. & Customs Enf't*, 403 F. App'x. 339, 342–43 (10th Cir. 2010), an unpublished decision, relies on *Foster* and its interpretation of *AADC*, this Court views it as an outlier among the circuit courts and will not follow its reasoning.

Plaintiffs seek, among other relief, declaratory judgment. Compl. ¶¶ 118–22. "[S]ection 1252(f)(1) does not strip the lower courts of the power to grant declaratory relief." *Brito v. Garland*, 22 F.4th 240, 250 n.7 (1st Cir. 2021) (citing *Nielsen v. Preap*, 586 U.S. 392, 402 (2019) (addressing the merits of the suit because "[w]hether the [District] [C]ourt had jurisdiction to enter such an injunction [under section 1252(f)(1)] is irrelevant because the District Court had jurisdiction to entertain the plaintiffs' [class-wide] request for declaratory relief")); *accord Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F.4th 606, 625 (9th Cir. 2024); *Make The Road New York v. Wolf*, 962 F.3d 612, 635 (D.C. Cir. 2020); *Alli v. Decker*, 650 F.3d 1007, 1010–13 (3d Cir. 2011); *Gonzalez v. Sessions*, 325 F.R.D. 616, 626 (N.D. Cal. 2018); *Reid v. Donelan*, 297 F.R.D. 185, 193 (D. Mass. 2014), *rev'd on other grounds*, 819 F.3d 486 (1st Cir. 2016), *opinion withdrawn on reconsideration*, 2018 WL 4000993, at *1 (1st Cir. May 11, 2018) (citing *Jennings*, 583 U.S. 281). *But see Hamama v. Adducci*, 912 F.3d 869, 880 n.8 (6th Cir. 2018) (treating the issue as unsettled but suggesting that declaratory relief might be unavailable). Accordingly, certification is proper at least toward that relief.

As to the requested injunctive relief, section 1252(f)(1) simply does not apply. Section 1252(f)(1) generally prohibits lower courts from ordering federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out "the specified statutory provisions," other than on a case-by-case basis. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549–50 (2022). But the class-wide injunctive relief Plaintiffs seek—concerning the availability of CAT protection, *see* Dkt. 6-1—is based on a different statute, the Foreign Affairs Reform and Restructuring Act ("FARRA"). *See Saint Fort v. Ashcroft*, 329 F.3d 191, 195–96 (1st Cir. 2003)

(explaining how the Convention Against Torture was domesticated into federal law), *superseded by statute on other grounds as stated in Hamid v. Gonzales*, 417 F.3d 642, 647 (7th Cir. 2005).[31]

Defendants would have the Court go beyond the plain meaning of the statute to imply a bar to actions that collaterally impact covered parts of the INA. PI Opp. at 5–6. However, section 1252(f)(1) cannot be read so broadly. Starting from first principles, "[t]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." *Yates v. United States*, 574 U.S. 528, 540 (2015) (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998)). Here, the title of the section is "Judicial Review of Orders of Removal." 110 Stat. 3009–607 (codified in 8 U.S.C. § 1252). Thus, the text of the statute itself implies that the limitation applies only to cases arising out of such review. *Texas v. United States*, 524 F. Supp. 3d 598, 640–41, 667–68 (S.D. Tex. 2021) ("Section 1252 concerns '[j]udicial review of orders of removal.'" (quoting the title of 8 U.S.C. § 1252)) (reading section 1252 as a whole as "deal[ing] with . . . judicial review of orders of removal" and rejecting the argument that the INA's various limiting provisions collectively "establish Congress's overall intent to preclude judicial review of *most if not all* of DHS's policy decisions with respect to immigration enforcement") (enjoining pause of removals). Other subsections of 1252 concerning review of removal orders are interpreted narrowly to exclude collateral claims. *See Jennings*, 583 U.S. at 294; *Aguilar*, 510 F.3d at 11. The Court sees no basis to graft on Defendants' proposed, additional meaning.

---

[31] It is admittedly confusing that FARRA's provisions are intermingled with the INA's in the U.S. Code. *See generally* 8 U.S.C. § 1231. However, the Ninth Circuit has helpfully clarified that section 1252(f)(1), in its authoritative Statutes at Large version, refers only to "the provisions of chapter 4 of title II [of the INA], as amended by" the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. *Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022). Further, because CAT protections were codified in FARRA in 1998, CAT protections are not covered by section 1252(f)(1)'s bar related only to INA provisions as amended in 1996. *See* FARRA, § 2242(a); *Galvez*, 52 F.4th at 830.

Add.028

Defendants cite *Aleman Gonzalez* for the proposition that section 1252(f)(1) applies not just to the explicitly covered parts of the statute but to "*the way that [those parts] [are] being carried out.*"  PI Opp. at 5 (quoting *Aleman Gonzalez*, 596 U.S. at 550 (emphasis added)) (brackets added).  But this puts words into the Supreme Court's mouth—that part of the *Aleman Gonzalez* opinion dealt with an entirely different issue.[32]  Indeed, the *Aleman Gonzalez* Court not only explicitly limited its discussion to the "covered immigration provisions," *Aleman Gonzalez*, 596 U.S. at 552,[33] but suggested in dicta that "a court may enjoin the unlawful operation of a provision that is not specified in § 1252(f)(1) even if that injunction has some collateral effect on the operation of a covered provision."  *Id.* at 553 n.4 (emphasis removed) (citing *Gonzales v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007)).

The Fifth Circuit put it well and plainly in *Texas v. United States Department of Homeland Security*, 123 F.4th 186, 209–10 (5th Cir. 2024):

> Texas does not seek to enjoin the operation of any of the provisions listed in § 1252(f)(1).  It seeks an injunction only against conduct—namely, cutting or other destruction of its c-wire—unauthorized by § 1357(a)(3).  Accordingly, because § 1357(a)(3) is not one of the statutes referenced in § 1252(f)(1), the injunction Texas seeks is not barred.  Such an injunction would, at most, have only a "collateral effect on the operation" of the covered statutes (specifically, §§ 1225 and 1226).  *Aleman Gonzalez*, 596 U.S. at 553 n.4, 142 S.Ct. 2057.  That is especially the case here, where the district court found Defendants were cutting c-wire neither to detain aliens nor to respond to emergencies.

> Defendants respond that, in essence, they are the ultimate judges of whether § 1252(f)(1)'s bar applies.  They argue *Aleman Gonzalez* prohibits injunctions of *uncovered* statutes that "in the Government's view" impact its ability to enforce the *covered* sections listed in § 1252(f)(1).  That is badly mistaken.  Congress legislated which sections are covered by § 1252(f)(1).  The Executive Branch does not get to

---

[32] *See Aleman Gonzalez*, 596 U.S. 543, 551–52 (2022) (considering whether section 1252(f)(1) applies only to "the covered immigration provisions . . . 'as properly interpreted'" or as "operat[ed]" in practice by the Government).

[33] *See also id.* at 551 ("The respondents in both cases were detained pursuant to § 1231(a)(6), and no one disputes that § 1231(a)(6) is among the provisions the 'operation' of which cannot be 'enjoined or restrained' under § 1252(f)(1).").

Add.029

propose additions.  *See* U.S. Const. art. I, § 1 (vesting "All legislative Powers" in Congress).

*See also Gonzalez v. ICE*, 975 F.3d 788, 814 (9th Cir. 2020) (holding that "§ 1357(d) is not located in Part IV [of the INA], and thus § 1252(f)(1)'s limitations do not apply"); *O.A. v. Trump*, 404 F. Supp. 3d 109, 158 (D.D.C. 2019) (holding that section 1252(f)(1) does not bar an injunction based on 8 U.S.C. § 1158(b)(1) since it is not a covered provision); *Doe v. Wolf*, 424 F. Supp. 3d 1028, 1044–45 (S.D. Cal. 2020) (finding that section 1252(f)(1) did not bar class-wide injunctive relief with regards to access to counsel during non-refoulement interviews because the relief was not governed by sections 1221–32); *Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, — F. Supp. 3d —, 2025 WL 585768, at *13 (D. Md. Feb. 24, 2025) ("Moreover, § 1252(f)(1) does not bar injunctions affecting DHS's authority pursuant to provisions of the INA outside of §§ 1221–1232 'simply because of collateral effects on a covered provision.'" (quoting *Al Otro Lado*, 120 F.4th at 627)).  Thus, the requested class-wide relief, limited only to otherwise removable aliens with potential CAT protection claims, falls outside of section 1252(f)(1)'s bar.

### A.   <u>Legal Standard</u>

Class actions serve as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation and internal quotations omitted).  A court may certify a class only if it finds that the proposed class satisfies all the requirements of Fed R. Civ. P. 23(a) ("Rule 23(a)") and that class-wide adjudication is appropriate for one of the reasons set forth in the relevant subsection of Fed. R. Civ. P. 23(b) ("Rule 23(b)").  *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003).  "Rule 23(a) requires that (1) there be numerosity, (2) there be common questions of law or fact, (3) the class representative's claims be typical of the class, and (4) the representative's

Add.030

representation of the class be adequate." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 18 (1st Cir. 2008) (citing Fed. R. Civ. P. 23(a)).  Plaintiffs seek certification under Rule 23(b)(2), Dkt. 4, which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," Fed R. Civ. P. 23(b)(2).  For both Rule 23(a) and 23(b), Plaintiffs must establish each of the elements; failure to establish any element will defeat class certification.  *See Smilow*, 323 F.3d at 38.

      **B.**    **Discussion**

          **1.**    **23(a)(1) Numerosity**

To satisfy the numerosity requirement, a plaintiff must demonstrate that the class is so numerous that joinder would be "impracticable."  Fed. R. Civ. P. 23(a)(1).   The requirement presents a "low hurdle," *S. States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 87 (D. Mass. 2007), but "mere speculation as to the number of parties involved is not sufficient to satisfy Rule 23(a)(1)," *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 258 (D. Mass. 2005).  "[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."  *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir. 2009) (citation omitted); *see also Connor B. ex rel. Vigurs v. Patrick*, 272 F.R.D. 288, 292 (D. Mass. 2011).   The numerosity requirement imposes only a "low threshold," *Garcia-Rubiera*, 570 F.3d at 460, particularly where, as here, Plaintiffs seek only injunctive or declaratory relief, *Reid*, 297 F.R.D. at 189 ("[T]he threshold may be relaxed when a party seeks only declaratory or injunctive relief, since the inclusion of future members increases the impracticability of joinder." (citation omitted)); *see also Gomes v. Acting Sec'y, U.S. Dep't of Homeland Sec.*, 561 F. Supp. 3d 93, 99 (D.N.H. 2021) (certifying a class where "the number of current *and future members* of the putative class exceeds 40 persons" (emphasis added)).

Add.031

Defendants do not dispute that Plaintiffs have met the numerosity requirement, *see generally* Class. Cert. Opp., and the Court finds this requirement met by Plaintiffs' identification of hundreds of potential class members, Dkts. 8-4, 8-8–23 (identifying individuals with final removal orders who were removed under the challenged policies and practices or are similarly at risk of unnoticed removal).

### 2.    23(a)(2) Commonality

Satisfying the commonality requirement in the instant case is simple and straightforward: Plaintiffs seek a single, common order that Defendants comply with the strictures of due process before deporting them to a county not covered by their final orders of removal.  Defendants' arguments to the contrary are uncompelling.

The commonality requirement is met when "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  To satisfy this requirement, a plaintiff must demonstrate that the proposed class's claims "depend upon a common contention," the resolution of which is "central to the validity" of each of the class's claims.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *see also Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13, 28–29 (1st Cir. 2019).  The commonality requirement is a "low bar."  *In Re New Motor Vehicles*, 522 F.3d at 19.  Courts have found that "a single common question is sufficient to satisfy the requirements of Rule 23(a)(2)."  *Gomes*, 561 F. Supp. 3d at 99; *see also Reid*, 297 F.R.D. at 189.

Defendants argue that the proposed class is overly broad, includes "clear dissimilarities between the proposed class and its proposed representatives," and includes aliens with "different processes and pathways for relief."  Class. Cert. Opp. at 11–14.  As such, Defendants argue class certification is not appropriate.  *Id.*

The commonality requirement is met, notwithstanding purported or actual dissimilarities among named and potential class members, based on the common due-process issue. Due process adheres regardless of the removal context. *See Khouzam v. Att'y Gen.*, 549 F.3d 235, 256–57 (3d Cir. 2008) ("In fact, the basic dictates of due process must be met whether an alien facing removal overstayed a visa, . . . entered the country undetected, . . . or became a legal resident but then committed an enumerated crime." (citations omitted)). That specific circumstances may differ among the various putative class members does not undermine that they all seek notice and an opportunity to be heard, and the opportunity to challenge a policy or practice which allegedly denies it. *See, e.g.*, *Gomes*, 561 F. Supp. 3d at 101 ("[T]he existence of individual differences among putative class members does not foreclose a finding of commonality so long as least one common issue is raised.").

Likewise, that some members may present additional, individualized issues, *e.g.*, return to the United States if unlawfully removed,[34] does not affect commonality. *See Tassinari v. Salvation Army*, — F.R.D. —, 2025 WL 972724, at *7 n.12 (D. Mass. Mar. 26, 2025) ("Defendant's

---

[34] Defendants acknowledge that there are procedures to compel the return of illegally removal individuals. *See* March 28, 2025 Tr. at 17:12–13 ("Yes, Your Honor. There are procedures for that."); *see also* ICE Policy Directive No. 11061.1, § 1, Facilitating the Return to the United States of Certain Lawfully Removed Aliens (Feb. 24, 2012), perma.cc/95AT-VN72 (describing process for facilitating return of certain lawfully removed aliens whose petitions for review are granted after their removal). Courts regularly order the return of wrongfully removed individuals. *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 435 (2009) (discussing how removed individuals "can be afforded effective relief by facilitation of their return"); *Abrego Garcia III*, 2025 WL 1077101, at *1 (denying application to stay requirement that the Government "facilitate" plaintiff's return after wrongful removal); *Abrego Garcia II*, 2025 WL 1021113, at *2–3 (Thacker, J., concurring) (holding that the court retained jurisdiction because the decision to remove plaintiff to a country for which he had withholding of removal "was not one that was within [the Attorney General's] lawful discretion" and "was not the enforcement of a valid order of removal"); *id.* at *6 ("Nor can the Government be permitted to disclaim any ability to return those it has wrongfully removed by citing their physical presence in a foreign jurisdiction."); *Ramirez v. Sessions*, 887 F.3d 693, 707 (4th Cir. 2018) (directing the Government "to facilitate [plaintiff's] return to the United States" from El Salvador); *Gordon v. Barr*, 965 F.3d 252, 261 (4th Cir. 2020) (similar); *Nunez-Vasquez v. Barr*, 965 F.3d 272, 287 (4th Cir. 2020) (directing the Government "to return [plaintiff] to the United States"); *Orabi v. Att'y Gen.*, 738 F.3d 535, 543 (3d Cir. 2014) (similar). Here, the putative class members *already* have been awarded withholding of removal, and as discussed below, *infra* Section IV(B)(1), Plaintiffs are likely to succeed on the merits that they are and were entitled to due process in order to assert their statutory rights to seek CAT protections prior to removal, making such removals without due process wrongful.

Add.033

identified individualized issues really boil down to one common question."). "Ultimately, the gravamen of Defendant[s'] challenges on commonality really goes not to whether common issues exist but rather to whether common issues predominate over individual ones; this is not a concern for a 23(b)(2) class [seeking injunctive or declaratory relief], as predominance is a requirement for certifying a class only under 23(b)(3)." *Id.* at *7 (citing *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 11 (D. Mass. 2010) (reviewing First Circuit case law)).

"Plaintiffs in this case have identified a single alleged practice"—Defendants' system-wide policy or practice of designating aliens for removal to a third country without first providing those aliens notice and an opportunity to apply for protection from removal to that country—"that provides the basis for every class member's injury." *Ramirez v. ICE*, 338 F. Supp. 3d 1, 42–50 (D.D.C. 2018) (certifying class of immigrant teens challenging transfers to ICE custody). Regardless of differences in the removal procedures applicable to each class member, they all seek to establish their right to due process.[35] *See Savino v. Souza*, 453 F. Supp. 3d 441, 451 (D. Mass. 2020) (determining "that the admittedly significant variation among the Detainees does not defeat commonality"); *Quadrelli v. Moniz*, 2020 WL 3051778, at *5 (D. Mass. June 8, 2020) (following courts that have certified classes of individuals "who have alleged a general risk of harm due to a

---

[35] The Court rejects Defendants' implicit argument that allegations of due-process violations cannot ever sustain a class action. Class. Cert. Opp. at 14. While "due process is flexible" and can vary depending on the situation, *Matthews*, 424 U.S. at 321, the basics are clear: "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner," *id.* at 333; *see also id.* at 348 ("The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'" (citation omitted)); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."). As such, courts have certified classes asserting due-process claims under Rule 23(b), without raising commonality concerns. *See* Charles Alan Wright & Arthur R. Miller, 7AA *Federal Practice and Procedure* § 1776.1 (3d ed.) (collecting cases); *Garcia-Rubiera*, 570 F.3d at 456–58, 461 (remanding with instructions to certify, under Rule 23(b)(2), a class challenging, among other things, a lack of notice under the Due Process Clause).

Add.034

policy or practice, even if there might additionally be a unique or distinct impact as to an individual putative class member").

Since Plaintiffs have identified a single, common question at the heart of the claims, commonality has been satisfied. *See Gomes*, 561 F. Supp. 3d at 99 ("[A] single common question is sufficient to satisfy the requirements of Rule 23(a)(2)."). Answering the common legal question of whether Defendants must afford aliens with due process (and of what that due process consists) prior to removal to a third country will "drive the resolution of the litigation." *Ramirez*, 338 F. Supp. 3d at 45 (cleaned up).

Thus, the Court finds that Plaintiffs have satisfied the commonality requirement under Rule 23(a)(2).

### 3.    23(a)(3) Typicality

The typicality requirement mandates that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality does not require that all putative class members share identical claims or defenses. *In re Credit Suisse-AOL Secs. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008) (citing *Swack*, 230 F.R.D. at 260); *see also DaSilva v. Border Transfer of MA, Inc.*, 296 F. Supp. 3d 389, 405 (D. Mass. 2017) ("Even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." (quotation omitted)). Instead, typicality is established if the claims of the class representative "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members, and . . . are based on the same legal theory." *Garcia-Rubiera*, 570 F.3d at 460 (citation omitted).

Defendants argue that "[t]he proposed class lacks typicality for the same reasons it lacks commonality" and that "the class representatives are *not* part of the proposed class and do *not*

possess the same interest or suffer the same injury as the proposed class members because they cannot demonstrate they will be removed absent any notice or opportunity to assert a fear-based claim." Class Cert. Opp. at 15–16 (emphases in original).[36]

Typicality is satisfied here for largely the same reasons that commonality is satisfied. The named Plaintiffs and putative class members all share an identical interest in an injunction mandating due-process protections prior to their removal to a third country. Defendants have taken the position that there is *no* due process entitled to any alien, under any method of removal, prior to removal to a third country regardless of any potentiality that such an alien will be tortured or murdered upon arrival. *See* March 28, 2025 Tr. at 10:17–11:1 ("THE COURT: In this posture, where it is the discretionary decision of the department that's changing the third-party designation, does the person who's going to be deported have a right to be informed and be given an opportunity to be heard as to the dangerousness of that third country designation? MS. LARAKERS: DHS's position is no. THE COURT: They don't have to be told anything and given no opportunity to be heard? MS. LARAKERS: DHS's position is no."). Between Defendants' representations to the Court and the Court's ultimate finding that the procedures outlined in the March Guidance do not provide adequate due process, *see infra* at 42–43, the Court finds that the named and unnamed Plaintiffs alike share an identical interest in challenging Defendants' alleged practice of removing individuals to third countries without notice and an opportunity to be heard, and, as such, satisfy the typicality requirement under Rule 23(a)(2).

---

[36] Defendants also argue that "Plaintiffs[] attempt to meet typicality by expanding the description of their class" to apply the class to "to any alien with a final order of removal under the three named removal statutes regardless of what procedures DHS applied to their removal to a third country." Class Cert. Opp. at 15. However, Plaintiffs have asserted a consistent class definition throughout this case, and by its plain language, the class definition applies only to those aliens who have been or will be attempted removed to a third country *without meaningful notice and opportunity to contest the removal*. Thus, whether an alien is a part of the class inherently depends on whether the alien received said notice and opportunity to be heard, *i.e.*, on the Government's own inaction and inaction.

Add.036

### 4.    23(a)(4) Adequacy of Representation

The adequacy requirement is met when the representative parties will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Adequacy is satisfied if (1) there is no conflict between the interest of the named Plaintiffs and the class members and (2) counsel chosen by the named Plaintiffs are qualified and able to litigate the claims vigorously.[37] *S. States Police*, 241 F.R.D. at 88 (citing *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985)). Merely lacking identical interest, however, is not enough for a representative party to be found inadequate. *Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 345–46 (1st Cir. 2022) (citing *Cohen v. Brown Univ.*, 16 F.4th 935, 945 (1st Cir. 2021)).

Defendants argue that "Plaintiffs fail to meet the adequacy requirement for the same reasons Plaintiffs fail to meet the commonality and typicality requirements." Class Cert. Opp. at 16. But the adequacy requirement looks to whether the named Plaintiffs will fairly and adequately protect the interests of the proposed class. *See S. States Police*, 241 F.R.D. at 88. There is nothing in the record to suggest that the named Plaintiffs seek any unique or additional benefit from this litigation that may make their interests different from or adverse to those of absent class members. *Cf. Amchem*, 521 U.S. at 626–27 (holding that adequacy requirement was not met where named plaintiffs stood to benefit disproportionately and at the expense of other potential class members). Thus, the Court finds that Plaintiffs have satisfied the adequacy requirement under Rule 23(a)(2).

---

[37] Defendants do not contest the adequacy of Plaintiffs' counsel. *See* Class Cert. Opp. at 16.

Add.037

**5.**    **23(b)(2) Injunctive or Declaratory Class**

Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Wal-Mart Stores*, 564 U.S. at 360 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). "[C]ivil rights actions . . . where a party charges that another has engaged in unlawful behavior towards a defined group, are prime examples of Rule 23(b)(2) classes." *Reid*, 297 F.R.D. at 193 (quotation omitted).

Defendants' first set of arguments goes mainly to whether the named Plaintiffs have valid claims. *See* Class Cert. Opp. at 17 (arguing that O.C.G. received notice of his removal and had an opportunity to assert fear-based claims); *id.* (arguing that E.F.D. and M.M. have an adequate remedy in a motion to reopen); *id.* at 17–18 (arguing that the claims of D.V.D. and M.M. are speculative and unripe). But these arguments, which go to the merits of the individual claims, are inappropriate to consider on a motion for class certification. "Although . . . a court's class-certification analysis . . . may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (quoting *Wal-Mart Stores*, 564 U.S. at 351). To the extent Defendants' implied argument is that these individual infirmities bespeak some sort of "fatal similarity" common to the whole

Add.038

proposed class, "[s]uch a contention is properly addressed at trial or in a ruling on a summary-judgment motion." *Id.* at 470.[38]

More broadly, Defendants argue that, "[t]o the extent Plaintiffs are entitled to some additional procedures under the Due Process Clause, those procedures would be different for each alien depending on the underlying facts and circumstances of their case." Class Cert. Opp. at 18. But Defendants have not provided the Court with a single example of how an "underlying fact" and/or "circumstance" might lead to different procedural minima for one individual versus another. *Cf. Reid v. Donelan*, 17 F.4th 1, 9 (1st Cir. 2021) (finding certification improper where district court recognized that "relief must be adjudicated on an individual basis"). Defendants' own contention that—if due process applies to third-country removals—the March Guidance is sufficient, PI Opp. at 8, recognizes that it is possible to establish a baseline for all putative class members. The Court does not find that the claims here "hinge on the individual circumstances of each class member." *Reid*, 17 F.4th at 11. Rather, Defendants have taken a broad position, subject to class-wide challenge.

In sum, Plaintiffs challenge a policy or practice that impacts all putative class members: failing to provide meaningful notice and opportunity to present a fear-based claim before executing removal to a third country. In doing so, Plaintiffs seek injunctive and declaratory relief that applies to the class as a whole, satisfying Rule 23(b)(2).

---

[38] The Court instead addresses these arguments in its analysis of Plaintiffs' motion for a preliminary injunction. *See infra* Section IV(B)(1).

Add.039

IV.    **Preliminary Injunction**

A.    **Legal Standard**

"[T]he issuance of preliminary injunctive relief is 'an extraordinary and drastic remedy that is never awarded as of right.'"  *Howe v. U.S. Bank Nat'l Ass'n as Tr. for RMAC Tr. Series 2016-CTT*, 440 F. Supp. 3d 99, 102 (D. Mass. 2020) (quoting *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012)).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  Of the four factors, likelihood of success "weighs most heavily" in the analysis. *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020).

In deciding a motion for preliminary injunction, "[t]he court may accept as true 'well-pleaded allegations [in the complaint] and uncontroverted affidavits.'"  *C&W Facility Servs. Inc. v. Mercado*, 2018 WL 4854630, at *2 (D. Mass. Oct. 5, 2018) (quoting *Rohm & Haas Elec. Materials, LLC v. Elec. Cirs. Supplies, Inc.*, 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010)).  "The Court may also rely on otherwise inadmissible evidence, including hearsay, in deciding a motion for preliminary injunction." *Bos. Taxi Owners Ass'n, Inc. v. City of Bos.*, 84 F. Supp. 3d 72, 78 (D. Mass. 2015) (citing *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).

B.    **Discussion**

1.    **Likelihood of Success**

Plaintiffs have established that they are likely to succeed in showing that Defendants have a policy or practice of executing third-country removals without providing notice and a meaningful

opportunity to present fear-based claims, and that such policy or practice constitutes a deprivation of procedural due process.

"To establish a procedural due process violation, the plaintiff 'must identify a protected liberty or property interest and allege that the defendants, acting under color of state law, deprived [him] of that interest without constitutionally adequate process.'" *Gonzalez-Droz v. Gonzalez-Colon*, 660 F.3d 1, 13 (1st Cir. 2011) (quoting *Aponte–Torres v. Univ. of P.R.*, 445 F.3d 50, 56 (1st Cir. 2006)). "The basic purport of the constitutional requirement is that, before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir. 1990) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

Congress clearly established the right to deferral or withholding of removal based on a legitimate fear-based claim. *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 348 (2005) (explaining that individuals who "face persecution or other mistreatment in the country designated" as their place of removal "have a number of available remedies," by statute, regulation, and under international law, to "ensur[e] their humane treatment").

More generally speaking, "'[i]t is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." *Trump v. J.G.G.*, 604 U.S. —, 2025 WL 1024097, at *2 (Apr. 7, 2025) (*per curiam*) [hereinafter *J.G.G. III*] (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). As all nine Supreme Court justices agreed less than two weeks ago, this means that "notice must be afforded within a reasonable time and in such a manner as will allow them to actually seek . . . relief in the proper venue before such removal occurs." *Id.*; *see also id.* (Kavanaugh, J., concurring) ("[A]ll nine Members of the Court agree that judicial review

is available."); *id.* at *6 (Sotomayor, J., dissenting) ("That means, of course, that the Government cannot usher any detainees . . . onto planes in a shroud of secrecy.").

Likewise, there can be no disagreement that the same constitutional guarantees apply to withholding-only relief. *Guzman Chavez*, 594 U.S. at 557 (Breyer, J., dissenting) ("And all here agree that the aliens are legally entitled to seek . . . withholding-only relief." (citing *Fernandez-Vargas v. Gonzalez*, 548 U.S. 30, 35 n. 4 (2006))); *Abrego Garcia III*, 2025 WL 1077101, at *2 (Sotomayor, J., concurring) (explaining that the Government has an "obligation to provide [the plaintiff who was subject to an order of removal] . . . notice and an opportunity to be heard"  and ensure compliance with its "obligations under [CAT]" prior to removal); *see also Andriasian v. I.N.S.*, 180 F.3d 1033, 1041 (9th Cir. 1999)  (finding that "last minute designation" of removal country during formal proceedings "violated a basic tenet of constitutional due process: that individuals whose rights are being determined are entitled to notice of the issues to be adjudicated, so that they will have the opportunity to prepare and present relevant arguments and evidence"); *Kossov v. INS*, 132 F.3d 405 (7th Cir. 1998) (due-process violation to order deportation to Russia after a claim of asylum as to Latvia where uncounseled noncitizen was provided insufficient notice of Russia possibility).

The Court rejects Defendants' argument that aliens have already received, during their initial removal proceedings, all the process to which they are entitled, so as to justify providing no additional process prior to third-country removal.  *See* April 10, 2025 Rough Tr. at 11:1–4 ("MR. ENSIGN: Your Honor, where they could have raised it previously and did not do so, the Due Process Clause does not require an additional procedural opportunity to raise [it] in . . . that context.").  Defendants argue that aliens could have brought up, during their initial removal proceedings, all the countries where they have concerns that they will be tortured.  *See, e.g.*,

Add.042

April 10, 2025 Rough Tr. at 4:13–16 ("[MR. ENSIGN:] They also previously would have had an opportunity to raise it during their initial removal proceedings and they would be asked on their [I-589] form if they have fear of returning anywhere."). This is both impossible as a practical matter, since the immigration court does not normally consider claims about countries not proposed as a country of removal,[39] and fails to consider that conditions change in countries change over time.[40] Listing all the countries in the world as to which an individual might have a reasonable fear is also impractical: doing so would potentially require, for example, a person with a same-sex sexual orientation to list, at least, all 64 countries where such an orientation is illegal such that the individual fears torture. *See Homosexuality: The countries where it is illegal to be gay*, BBC (Mar. 31, 2023), https://perma.cc/32KN-RH6Q. Indeed, the Assistant to the Solicitor General, arguing before the Supreme Court on the topic of third-country removals less than a month ago, affirmatively stated that "[w]e would have to give the person notice of the third country and give them the opportunity to raise a reasonable fear of torture or persecution in that third country," even where that individual was already subject to an order of removal.[41]

Even without that statement, the claims at issue concern removal to countries that were *not ruled upon* in the initial proceedings and are therefore not covered by the removal order. As discussed above, the Court disagrees with Defendants' assertion that the theoretical option of a motion to reopen provides a sufficient remedy. *See supra* at 14–18; *see also Sadychov*, 565 F.

---

[39] *See supra* at 16–17 & notes 17, 24 (discussing the non-viability of preemptive claims).

[40] An alien can remain in the United States on an Order of Supervision for decades after being granted withholding. *See* April 10, 2025 Rough Tr. at 15:24–16:1 ("THE COURT: But some people have been granted withholding for 20 years, right? MS. REALMUTO: Exactly."); *see also* Compl. ¶¶ 75–76 (alleging that E.F.D. was granted CAT protection in 2018 and had been released from immigration custody until he was re-detained in March 2025). Country conditions can change dramatically, especially over decades. *See, e.g.*, Designation of Afghanistan for Temporary Protected Status, 87 Fed. Reg. 30976 (May 20, 2022) (providing Temporary Protected Status designation to Afghanistan in May 2022, after Taliban returned to power in August 2021).

[41] *Supra* note 2.

App'x at 651 ("[A]n applicant is not entitled to have the agency adjudicate claims of relief that relate 'to a country that nobody is trying to send them to.'" (quoting *She*, 629 F.3d at 962)); Dkt. 59-12 at 4–5 ("If the United States government were to remove Respondent to El Salvador under a separate authority, that is outside the jurisdiction of this Court to adjudicate and/or analyze. Respondent's relief would be sought in Federal court, not Immigration Court.").[42]

The Court finds it likely that Defendants have applied and will continue to apply the alleged policy of removing aliens to third countries without notice and an opportunity to be heard on fear-based claims—in other words, without due process. Defendants have repeatedly argued that they have no obligation to provide any process whatsoever when newly designating a third country for removal. *See, e.g.*, March 28, 2025 Tr. at 10:17–11:1; April 10, 2025 Rough Tr. at 9:5–8, 10:19–11:4. Defendants' own avowed position and the numerous declarations Plaintiffs have

---

[42] *See also* Dkt. 8-8 ¶ 9 (motion to reopen denied); Dkt. 8-18 ¶ 5 (same); Dkt. 8-11 at 5–6 (same); Dkt. 59-12 ¶¶ 12–18 (same); Dkt. 59-13 at 4 (same).

Add.044

provided[43] substantiate both the prior and future use of Defendants' policy of providing no notice prior to third-country removal.[44]

Nor do the procedures outlined in DHS's March Guidance satisfy due process. The March Guidance provides no process whatsoever to individuals whom DHS plans to remove to a country from which the United States has received blanket diplomatic assurances. Dkt. 43-1 at 1–2. Defendants are, of course, correct that the Court may not question the substance of diplomatic assurances endorsed by the Executive. *See* PI Opp. at 11. However, the Court may inquire into the overall process and whether such assurances, on their own terms, satisfy the Constitution. *See Khouzam*, 549 F.3d at 259 (finding that lack of individualized determination violated due process, notwithstanding diplomatic assurance).

Blanket diplomatic assurances do not address DHS's obligation to undertake an individualized assessment as to the sufficiency of the assurances, as required under the statutory

---

[43] Notably, the parties contest whether O.C.G. received any substantial notice or a meaningful opportunity to present a fear-based claim prior to his removal to Mexico. *Compare* Compl. ¶¶ 85–86 (alleging that no notice or opportunity to be heard was provided), *and* Dkt. 8-4 ¶¶ 8–10 (declaration of O.C.G. asserting same), *with* Dkt. 31-1 ¶ 13 (declaration of Brian Ortega, Assistant Field Office Director of the ICE ERO Phoenix Field Office, asserting based on hearsay that notice was provided on February 21, 2025, by "ERO" and that O.C.G. denied fear of removal). Given O.C.G.'s sworn declaration—rebutted only by a hearsay declaration—the Court finds it likely that O.C.G. was not provided sufficient process prior to removal.

[44] Defendants argue that the claims of D.V.D. and M.M. are speculative and unripe because D.V.D. and M.M. have not yet been detained or notified of any impending third-country removal. Class. Cert. Opp. at 17–18. *But see* Compl. ¶ 71 (alleging that M.M. was informed by an ICE official that she would be deported in the immediate future). There, so to speak, lies the rub—according to Defendants, an individual must await notice of removal before his claim is ripe, even where the claim is that there is no notice. But once an individual is removed, Defendants argue, there is no jurisdiction. *See* Class Cert. Opp. at 11–12.

Having granted class certification, the individual cases of D.V.D. and M.M. are less dispositive as to the issue of likelihood of success. Nevertheless, insofar as they may represent some portion of the class, the Court notes that it does not find such cases unripe. Ripeness concerns both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017) (citing *Texas v. United States*, 523 U.S. 296, 300–01 (1998)). Here, both tests indicate justiciability. As Plaintiffs challenge Defendants' policy and practices, rather than the putative class members' individual removability, no further facts are necessary for judicial review. *See Pustell v. Lynn Pub. Scs.*, 18 F.3d 50, 52 (1st. Cir. 1994) (finding claim ripe where "[n]o further factual development is necessary for us to resolve the question at issue, namely, whether the policy . . . is constitutional"). Likewise, Plaintiffs "suffer the harm of substantial uncertainty if we put off resolving their constitutional claims." *Id.*

and regulatory framework. *See* 8 C.F.R. § 1208.18(c)(1) ("The Secretary of State may forward to the Attorney General assurances that the Secretary has obtained from the government of a specific country that ***an*** alien would not be tortured there if ***the*** alien were removed to that country." (emphases added));[45] *see also Niz-Chavez v. Garland*, 593 U.S. 155, 161 (2021) (examining the "ordinary meaning" of statutory text and finding that "[t]o an ordinary reader—both in 1996 and today—'a' notice would seem to suggest just that: 'a' single document").

Moreover, blanket assurances offer no protection against either torture by non-state actors or chain refoulement, whereby the third country proceeds to return an individual to his country of origin. *See, e.g.*, Compl. ¶¶ 68–69 (detailing domestic violence concerns that led to withholding of removal designation); Dkt. 8-2 ¶¶ 3–4, 7–8, 13 (same). Yet these circumstances can trigger protections under CAT no less than threats coming from state actors. 8 C.F.R. § 1208.18(a)(1); *see also Murillo Morocho v. Garland*, 80 F.4th 61, 71 (1st Cir. 2023) (vacating decision denying CAT protection where the Board of Immigration Appeals failed to properly consider risk of torture by non-state actors).

Even if such blanket assurances might, in some individual cases, satisfy due process, the March Guidance precludes any further review prior to removal. Dkt. 43-1 at 1–2 (providing noncitizens "will be removed without the need for further procedures"). There can be no right without a remedy. *Marbury v. Madison*, 5 U.S. 137, 163 (1803). Without meaningful review, the rights Congress has provided are little more than dead letter.

---

[45] The Department of Justice has previously recognized its obligation to provide a case-by-case, individualized process for seeking and assessing the reliability of diplomatic assurance determinations. *See Oversight of the USA PATRIOT Act: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. 10 (2005) ("LEAHY: What do you think that the assurances we get from countries that are known to be torturers, when they say, 'Well, we won't torture this person you're sending back' – do you really think those assurances are credible? GONZALES: I think, Senator, that's a difficult question that requires, sort of, a case-by-case analysis. . . . Well, again, Senator, we take this obligation very, very seriously. And we know what our legal obligations are. We know what the directive of the president is. And each case is very fact-specific.").

It simply cannot be, as Defendants contend, that the Government can "decide right now that someone who is in [] custody is getting deported to a third country, give them no notice and no opportunity to say, 'I will be killed the moment I arrive there,' and, as long as the [Government] doesn't already know that there's someone standing there waiting to shoot him, that's [] fine." *See* March 28, 2025 Tr. at 29:12–18 ("In short, yes."). Defendants' obligations under CAT and the Due Process Clause require more. Plaintiffs have demonstrated a likelihood of success on the merits.

### 2.    Irreparable Harm

"'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 381 (D. Mass. 2020) (quoting *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004)). "It 'most often exists where a party has no adequate remedy at law.'" *Id.* (quoting *Charlesbank Equity Fund II*, 370 F.3d at 162).

The irreparable harm factor likewise weighs in Plaintiffs' favor. Here, the threatened harm is clear and simple: persecution, torture, and death. It is hard to imagine harm more irreparable.

Defendants' argument that this Court has no jurisdiction over already-removed aliens only bolsters Plaintiffs' argument toward finding irreparable harm. *See* Class Cert. Opp. at 11–12. Defendants contend that they may remove aliens to third countries with no possibility for review. *Id.* It is undoubtedly "irreparable injury to reduce to a shell game the basic lifeline of due process

Add.047

before an unprecedented and potentially irreversible removal occurs." *J.G.G. II*, 2025 WL 914682, at *30 (Millett, J., concurring).

Thus, Plaintiffs have demonstrated a likelihood of irreparable harm.

### 3.    Balance of Equities and Public Interest

Finally, the Court considers the balance of the equities and the public interest. "These two inquiries merge in a case like this one, where the Government is the party opposing the preliminary injunction." *Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). In cases implicating removal, "there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436. However, there is also "a public interest in prompt execution of removal orders." *Id.*

"To begin with, the Plaintiffs' likelihood of success on the merits lightens [Defendants'] stated interests." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022). The Supreme Court has confirmed that "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021); *see also NFIB v. Dep't of Labor*, 595 U.S. 109, 120–21 (2022) (staying an illegal vaccine mandate even though the Government said the mandate would save more than 6,500 lives); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952) (affirming district court's preliminary injunction of an illegal executive order even though a wartime president said his order was "necessary to avert a national catastrophe").

Here, the Court has found it likely that these deportations have or will be wrongfully executed and that there has at least been no opportunity for Plaintiffs to demonstrate the substantial harms they might face. The Court finds that these circumstances countervail the public's normal

Add.048

and meaningful "interest in prompt execution." *See Nken*, 556 U.S. at 436. Thus, the final two factors support issuance of relief.

### 4.     **Limitations of Relief**

"[An] injunction should issue only where [it is] essential in order effectually to protect . . . rights against injuries otherwise irremediable." *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)). Here, the "irremediable" injury would be deportation without meaningful opportunity to present a claim based on fear of persecution, torture, or death.

Accordingly, the Court circumscribes its remedy and declines, at this time, to require the full extent of process Plaintiffs propose. Instead, the Court orders that, prior to removing any alien to a third country, *i.e.*, any country not explicitly provided for on the alien's order of removal, Defendants must: (1) provide written notice[46] to the alien—and the alien's immigration counsel, if any[47]—of the third country to which the alien may be removed, in a language the alien can understand; (2) provide meaningful opportunity for the alien to raise a fear of return for eligibility

---

[46] Written notice comports with the traditional standards of due process. *See Matthews*, 424 U.S. at 348 ("The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'" (citation omitted)); *Mullane*, 339 U.S. at 313, 315 ("Personal service of written notice within the jurisdiction is the classic form of notice always adequate in any type of proceeding. . . . [W]hen notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected."). The Court's sense of what fairness requires is further supported by the Government's own internal documents. *See* Dkts. 1-2 (2001 draft Form 1-913 that would provide written notice prior to third-country removal and require motion to reopen to be filed within fifteen days of being served with notice), 1-3 (2020 draft model notice that would provide written notice prior to removal to country other than designated country of removal and that provided that "DHS w[ould] not oppose [the alien's] filing of a motion to reopen with the Immigration Court" within fifteen days of being served with such notice).

[47] *See* 8 C.F.R. § 292.5 ("Whenever a person is required by any of the provisions of this chapter to give or be given notice; to serve or be served with any paper other than a warrant of arrest or a subpoena; to make a motion; to file or submit an application or other document; or to perform or waive the performance of any act, such notice, service, motion, filing, submission, performance, or waiver shall be given by or to, served by or upon, made by, or requested of the attorney or representative of record, or the person himself if unrepresented.").

Add.049

for CAT protections; (3) move to reopen the proceedings if the alien demonstrates "reasonable fear";[48] and (4) if the alien is not found to have demonstrated "reasonable fear," provide meaningful opportunity, and a minimum of 15 days,[49] for that alien to seek to move to reopen immigration proceedings to challenge the potential third-country removal.

With respect to the return of O.C.G.,[50] the Court recognizes that whether he received notice at all, let alone meaningful notice, is hotly contested.  Until the factual dispute of whether he received notice is resolved, the Court will not order the return of O.C.G.  A mandatory injunction, as would be required, "alters rather than preserves the status quo," and is thus subject to an even more heightened level of legal and factual scrutiny.  *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) (citing *Massachusetts Coal. of Citizens with Disabilities v. Civ. Def. Agency & Off. of Emergency Preparedness of Mass.*, 649 F.2d 71, 76 n.7 (1st Cir. 1981)).  Instead, Plaintiffs may renew their motion with regards to the return of O.C.G.

---

[48] "Reasonable fear" is the most stringent standard for screenings applied in the initial removal context, meaning the alien must show the highest and most credible level of fear required at the screening stage to garner relief. *Compare* 8 CFR § 208.31 (using "reasonable fear" as the screening standard for aliens removeable under certain INA provisions), *with* 8 CFR § 208.16 (using "credible fear" as the screening standard for aliens removeable under other INA provisions); *see also Reasonable Fear Screenings*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/reasonable-fear-screenings (last updated Jan. 24, 2025) ("Those who are found to have a reasonable fear of persecution or torture are then given an opportunity to seek withholding of removal or deferral of removal before an Immigration Judge.").  While Defendants propose applying the "more likely than not" standard, *see* April 10, 2025 Rough Tr. at 33:2–4, that would require an alien to demonstrate full entitlement to CAT protections at merely the screening stage. *See* 8 C.F.R. § 208.17(a).

[49] The Court has been forced to decide on an appropriate time limit because Defendants were unable, unwilling, or incapable of meaningfully engaging in a discussion about what process was required to provide aliens with a meaningful opportunity to contest a finding that their fear was reasonable. *See* April 10, 2025 Rough Tr. at 48:10–13 ("THE COURT: What's an appropriate number of days?  MR. ENSIGN: Your Honor, our -- we think it should be shorter than [21 days].  I'm not prepared to say exactly what that period is.").  To tailor its preliminary injunction as narrowly as possible, the Court has chosen to use the timeframe that Defendants proposed when developing their own forms for this scenario. *Supra* note 46.  Though these forms may never have been formally adopted, they would appear to, at a minimum, reflect the agencies' determination—on two separate occasions spanning a period of nearly 20 years—of an appropriate period of time during which an alien should be permitted to object to an adverse determination.

[50] It is clear that courts can still "grant relief once a deportee crosses the border." *Abrego Garcia III*, 2025 WL 1077101, at *2 (Sotomayor, J., concurring) (citing *Rumsfeld v. Padilla*, 542 U. S. 426, 447, n. 16 (2004); *Boumediene v. Bush*, 553 U. S. 723, 732 (2008)).

after discovery.  The Court orders the parties to conduct expedited discovery on this issue and file

a status update addressing a proposed discovery plan by April 25, 2025.[51]

###    C.    Bond

The Court exercises its discretion to waive the requirement to post a bond under Rule 65(c).

*See, e.g.*, *Int'l Assoc. of Machinists and Aerospace Workers v. Eastern Airlines*, 925 F.2d 6, 9 (1st

Cir. 1991) (finding "ample authority for the proposition that the provisions of Rule 65(c) are not

mandatory and that a district court retains substantial discretion to dictate the terms of an injunction

bond"); *see also da Silva Medeiros v. Martin*, 458 F. Supp. 3d 122, 130 (D.R.I. 2020) (waiving

the bond requirement where it would pose a hardship on petitioners and unduly restrict the federal

rights at issue); *Pineda v. Skinner Services, Inc.*, 22 F.4th 47, 57 (1st Cir. 2021) (concluding that

district court did not abuse its discretion when it did not require low-wage laborers to post a bond).

## V.    Conclusion

For the foregoing reasons, Plaintiffs' motion for class certification (Dkt. 4) is GRANTED

and motion for a preliminary injunction (Dkt. 6) is GRANTED in part.

**So Ordered.**

|  |  |
|---|---|
|  | /s/ Brian E. Murphy |
|  | Brian E. Murphy |
| Dated:  April 18, 2025 | Judge, United States District Court |

---

[51] The Court notes that Plaintiffs have not requested injunctive relief based on the right to make claims under 8 U.S.C. § 1231(b)(3)(A) beyond the named Plaintiffs.  This is consistent with the limitation on certain relief under 8 U.S.C. § 1252(f)(1).  *See Galvez*, 52 F.4th at 829–30.  The Court thus limits its Order as to statutory claims to apply only to the named Plaintiffs while ensuring CAT protection to all similarly situated individuals.

Add.051

| | |
|---|---|
| **From:** | ECFnotice@mad.uscourts.gov |
| **To:** | CourtCopy@mad.uscourts.gov |
| **Subject:** | Activity in Case 1:25-cv-10676-BEM D.V.D. et al v. U.S. Department of Homeland Security et al Order |
| **Date:** | Wednesday, April 30, 2025 12:52:39 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## United States District Court

### District of Massachusetts

**Notice of Electronic Filing**

The following transaction was entered on 4/30/2025 at 12:51 PM EDT and filed on 4/30/2025
**Case Name:** D.V.D. et al v. U.S. Department of Homeland Security et al
**Case Number:** 1:25-cv-10676-BEM
**Filer:**
**Document Number:** 86(No document attached)

**Docket Text:**
**Judge Brian E. Murphy: ELECTRONIC ORDER - AMENDED PRELIMINARY INJUNCTION: In light of the issues raised during the April 28, 2025 hearing, this Court modifies a portion of its April 18, 2025 preliminary injunction [64]. This modification preserves the status quo as outlined in this Court's preliminary injunction. *See Sec. & Exch. Comm'n v. Xia,* 2024 WL 3447849, at \*6-7 (E.D.N.Y. July 9, 2024) (collecting cases modifying preliminary injunctions pending appeal in order to preserve the status quo). Defendants have represented to this court that that removals from Guantanamo Bay to third countries have been executed by the Department of Defense without the Department of Homeland Security's direction or knowledge, *see* Dkt 72, and the Court makes no finding on the accuracy of this assignment of responsibility but, in an abundance of caution, ORDERS that, prior to removing, or allowing or permitting another agency to remove, an alien from Guantanamo Bay to a third country, Defendants must comport with the terms of the April 18, 2025 preliminary injunction by providing the due-process guarantees set forth in Dkt. 64 at 46-47. At the April 28, 2025 hearing, the status of the Guantanamo Bay Detention Center was debated. The Court declines to resolve if transportation to this base is a deportation to a third country despite the United States' exercise of jurisdiction and control over the base. Given the position taken by the Government that the deportation from Guantanamo to third countries was not at the direction, behest or control of the Department of Homeland Security,**

Add.052

**a debated issue to be resolved once preliminary discovery has been conducted, this Court ORDERS that, after taking custody of an alien, Defendants may not cede custody or control in any manner that prevents an alien from receiving the due-process guarantees outlined in the April 18, 2025 preliminary injunction.**
**(BIB)**

**1:25-cv-10676-BEM Notice has been electronically mailed to:**

Elianis N. Perez    elianis.perez@usdoj.gov

Trina Realmuto    trina@immigrationlitigation.org

Mary Larakers    mary.l.larakers@usdoj.gov, maria.n.latimer@usdoj.gov

Kristin Macleod-Ball    kristin@immigrationlitigation.org

Mark Sauter    mark.sauter@usdoj.gov, CaseView.ECF@usdoj.gov, USAMA.ECF@usdoj.gov, susanne.husted@usdoj.gov

Mary Kenney    mary@immigrationlitigation.org

Matthew Patrick Seamon    matthew.seamon2@usdoj.gov

Tomas Arango    tomas@immigrationlitigation.org

Leila Kang    leila@nwirp.org

Aaron Korthuis    aaron@nwirp.org

Anwen Hughes    hughesa@humanrightsfirst.org

Glenda M. Aldana Madrid    glenda@nwirp.org

Matt Adams    matt@nwirp.org, sydney@nwirp.org

**1:25-cv-10676-BEM Notice will not be electronically mailed to:**

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ——————————————— | ) | |
| D.V.D., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **Civil Action No.** |
| v. | ) | **25-10676-BEM** |
| | ) | |
| U.S. DEPARTMENT OF HOMELAND | ) | |
| SECURITY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————— | ) | |

## MEMORANDUM AND ORDER ON
## <u>PLAINTIFFS' MOTION FOR EMERGENCY RELIEF</u>

**MURPHY, J.**

Plaintiffs have moved for a temporary restraining order to prevent non-citizen removals to third countries, including but not limited to Libya and Saudia Arabia, without prior written notice and a meaningful opportunity to raise fear-based claims.  Dkt. 89.  The Court agrees with Plaintiffs that this motion should not be required, *see id.* at 2, as the relief sought is already provided by the Preliminary Injunction entered in this case, Dkts. 64, 86.  Accordingly, the Court construes Plaintiffs' motion as one for clarification.

The April 18, 2025 Preliminary Injunction requires all third-country removals to be preceded, *inter alia*, by written notice to both the non-citizen and the non-citizen's counsel in a language the non-citizen can understand as well as a meaningful opportunity for the non-citizen to raise a fear-based claim for CAT protection.  Dkt. 64 at 46–47.  The April 30, 2025 Amendment to the Preliminary Injunction further clarifies that the Department of Homeland Security may not evade this injunction by ceding control over non-citizens or the enforcement of its immigration responsibilities to any other agency, including but not limited to the Department of Defense.

Dkt. 86.  If there is any doubt—the Court sees none—the allegedly imminent removals, as reported by news agencies and as Plaintiffs seek to corroborate with class-member accounts and public information, would clearly violate this Court's Order.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated:  May 7, 2025                    Judge, United States District Court

Add.055

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **D.V.D., et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Civil Action No.** |
| **v.** ) | **25-10676-BEM** |
| ) | |
| **U.S. DEPARTMENT OF HOMELAND** ) | |
| **SECURITY, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## <u>ORDER</u>

**MURPHY, J.**

At today's emergency hearing, the Court ordered Defendants to maintain custody and control of class members currently being removed to South Sudan or to any other third country, to ensure the practical feasibility of return if the Court finds that such removals were unlawful. While the Court leaves the practicalities of compliance to Defendants' discretion, Defendants have ensured, and the Court expects, that class members will be treated humanely.

The Court has further ordered that Defendants be prepared at tomorrow's prescheduled hearing to identify by name the affected class members and to address: (1) the time and manner of notice each individual received as to their third-country removal; and (2) what opportunity each individual had to raise a fear-based claim. In the event that Defendants determine that N.M. is not a class member, or was otherwise removed to any country other than South Sudan, Defendants must nonetheless be prepared to address the details of his removal, including when and to where he was removed, the names of individuals personally involved in executing his removal, and any information currently in Defendants' possession regarding his current whereabouts.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated:  May 20, 2025                    Judge, United States District Court

Add.057

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **D.V.D., et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Civil Action No.** |
| **v.** ) | **25-10676-BEM** |
| ) | |
| **U.S. DEPARTMENT OF HOMELAND** ) | |
| **SECURITY, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM ON PRELIMINARY INJUNCTION

**MURPHY, J.**

At today's hearing, the Court found that Defendants violated the Preliminary Injunction entered in this case by failing to provide six non-citizen class members a "meaningful opportunity" to assert claims for protection under the Convention Against Torture before initiating removal to a third country. *See* Dkt. 64 at 46–47.

Defendants maintain that ambiguity in the phrase "meaningful opportunity" precipitated this controversy. Indeed, when the Court issued the Preliminary Injunction, it declined to elaborate on what constitutes a "meaningful opportunity," preferring instead to let experience show through hard cases the finer points of what is required under the Due Process Clause.

To be clear, this is not one of those hard cases. Giving every credit to Defendants' account, the non-citizens at issue had fewer than 24 hours' notice, and zero business hours' notice, before being put on a plane and sent to a country as to which the U.S. Department of State issues the following warning: "Do not travel to South Sudan due to **crime**, **kidnapping**, and **armed conflict**." *South Sudan Travel Advisory*, U.S. DEPARTMENT OF STATE, Mar. 8, 2025, https://perma.cc/XQN7-VXHV (emphasis in original). As detailed on the record during today's

hearing, further facts regarding the unavailability of information, the hurried and confused notice that the individuals received, language barriers, and attorney access compound and confirm this Court's finding that no reasonable interpretation of the Court's Preliminary Injunction could endorse yesterday's events.

Nevertheless, given Defendants' position that further detail would help Defendants comply, the Court offers the following summary and clarification of its Preliminary Injunction:

All removals to third countries, *i.e.*, removal to a country other than the country or countries designated during immigration proceedings as the country of removal on the non-citizen's order of removal, *see* 8 U.S.C. § 1231(b)(1)(C), must be preceded by written notice to both the non-citizen and the non-citizen's counsel in a language the non-citizen can understand. Dkt. 64 at 46–47. Following notice, the individual must be given a meaningful opportunity, **and a minimum of ten days**, to raise a fear-based claim for CAT protection prior to removal. *See id.* If the non-citizen demonstrates "reasonable fear" of removal to the third country, Defendants must move to reopen the non-citizen's immigration proceedings. *Id.* If the non-citizen is not found to have demonstrated a "reasonable fear" of removal to the third country, Defendants must provide a meaningful opportunity, and a minimum of fifteen days, for the non-citizen to seek reopening of their immigration proceedings. *Id.*

This Preliminary Injunction applies to the Defendants, including the Department of Homeland Security, as well as their officers, agents, servants, employees, attorneys, any person acting in concert, and any person with notice of the Preliminary Injunction. Fed. R. Civ. P. 65(d)(2); *see also* Dkts. 86, 91. Accordingly, no Defendant may avoid their duty to follow the Preliminary Injunction by involving or ceding responsibility to any other person. *See* Dkt. 86.

Add.059

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated:  May 21, 2025                              Judge, United States District Court

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| D.V.D., et al., ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Civil Action No.** |
| **v.** ) | **25-10676-BEM** |
| ) | |
| U.S. DEPARTMENT OF HOMELAND ) | |
| SECURITY, et al., ) | |
| ) | |
| **Defendants.** ) | |

## ORDER ON REMEDY FOR VIOLATION OF PRELIMINARY INJUNCTION

**MURPHY, J.**

As set forth in today's hearing and at Dkt. 118, the Court found that Defendants violated the Court's Preliminary Injunction.  Having considered the arguments of counsel, the Court ORDERS the following remedy for Defendants' violations of the Preliminary Injunction:

Each of the six individuals must be given a reasonable fear interview in private, with the opportunity for the individual to have counsel of their choosing present during the interview, either in-person or remotely, at the individual's choosing.  Each individual must be afforded access to counsel that is commensurate with the access that they would have received had these procedures occurred within the United States prior to their deportation, including remote access where in-person access would otherwise be available.  Each individual must also be afforded the name and telephone number of class counsel, as well as access to a phone, interpreter, and technology for the confidential transfer of documents that is commensurate with the access they would receive were they in DHS custody within United States borders.

Each individual, along with class counsel, must be given no fewer than 72-hours' notice of the scheduled time for each reasonable fear interview.  Should any individual raise a fear with

Add.061

respect to deportation to the third country that DHS determines falls short of "reasonable fear," the individual must be provided meaningful opportunity, and a minimum of 15 days, to seek to move to reopen immigration proceedings to challenge the potential third-country removal. During that 15-day period, the individual must remain within the custody or control of DHS, and must be afforded access to counsel that is commensurate with the access they would be afforded if they were seeking to move to reopen from within the United States' borders. Defendants must provide status reports every seven days as to all six individuals. Should any individual move to reopen, the parties must also immediately provide a status report, and continue providing status reports every seven days thereafter, on the status of the motion to reopen.

DHS, in its discretion, may elect to provide this process to the six individuals either within the United States—should it choose to return them to the United States—or abroad, if at all relevant times DHS retains custody and control over the individuals in conditions commensurate to those the individuals would be housed in were they still in DHS's custody within the United States.

This Order reflects a remedy, in light of the Court's finding of a violation of its Preliminary Injunction, that has been narrowly tailored in accordance with principles of equity. The Court cautions Defendants that this remedy should not be construed as setting forth a course of conduct that would constitute compliance with the Preliminary Injunction, and the Court is not—in ordering this remedy—making any findings or conclusions that compliance with these processes before deportation would have satisfied the requirements of its Preliminary Injunction in the first instance.

**So Ordered.**

/s/ Brian E. Murphy
_____

Brian E. Murphy

Dated:  May 21, 2025                    Judge, United States District Court

Add.062

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ——————————————— | ) |  |
| D.V.D, et al., | ) |  |
|  | ) |  |
| **Plaintiffs,** | ) |  |
|  | ) | **Civil Action No.** |
| v. | ) | **25-10676-BEM** |
|  | ) |  |
| U.S. DEPARTMENT OF HOMELAND | ) |  |
| SECURITY, et al., | ) |  |
|  | ) |  |
| **Defendants.** | ) |  |
| ——————————————— | ) |  |

## MEMORANDUM AND ORDER
## ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**MURPHY, J.**

Plaintiff O.C.G. has no known criminal history. After suffering multiple violent attacks, O.C.G. sought protection in the United States, where an immigration judge granted him withholding of removal from his native country, Guatemala. This means that the immigration judge found it more likely than not that O.C.G. would suffer serious harm if sent back to Guatemala. Two days later, and without any notice, O.C.G. was placed on a bus and sent to *Mexico*, a country where he was previously held for ransom and raped. O.C.G. had said during his immigration proceedings that he was afraid of being sent to Mexico, and even presented evidence of the violence he had experienced there. But the immigration judge told O.C.G.— consistent with this Court's understanding of the law—that he could not be removed to a country other than his native Guatemala, at least not without some additional steps in the process. Those necessary steps, and O.C.G.'s pleas for help, were ignored. As a result, O.C.G. was given up to Mexico, which then sent him back to Guatemala, where he remains in hiding today.

This is the second time Plaintiffs have asked this Court to order the return of O.C.G. The first time, the Court declined to do so because the facts were in dispute—Defendants had submitted a declaration, made under oath, that O.C.G., prior to removal, affirmatively stated that he had no fear of being sent to Mexico. Dkt. 31-1 ¶ 3. O.C.G. adamantly contested this fact, submitting his own declaration stating that he was only told about Mexico essentially as it was happening and that he begged to speak to his attorney but was denied. Dkt. 8-4 ¶ 9. Because of this factual disagreement, the Court declined to conclusively credit O.C.G.'s account and instead ordered discovery of additional evidence. Dkt. 64 at 47–48; Dkt. 80.

Last week, on May 16, 2025, Defendants acknowledged an "error" in their previous filings and statements to the Court. Dkt. 103 at 2. Defendants admitted, hours before the scheduled deposition of the witness who could allegedly verify the facts included in the prior declaration made under oath, that, in fact, there was no such witness and therefore no reliable basis for the statements put forward by Defendants. Defendants apparently cannot find a witness to support their claim that O.C.G. ever said that he was unafraid of being sent to Mexico. The only evidence before the Court therefore is O.C.G.'s uncontroverted assertion that he was given no notice of his transfer to Mexico and no opportunity to explain why it would be dangerous to send him there. Defendants' retraction of their prior sworn statement makes inexorable the already-strong conclusion that O.C.G. is likely to succeed in showing that his removal lacked any semblance of due process, *see* Dkt. 40 at 6; Dkt. 64 at 42 n.43, and it otherwise alleviates concern about the appropriateness of relief. Accordingly, Plaintiffs' motion for a preliminary injunction is GRANTED.

Although a preliminary injunction is always an exceptional remedy, never awarded as of right, *Peoples Federal Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012), the

Court notes that this result is not otherwise so extraordinary.  Courts, including district courts, regularly find that return is the appropriate remedy when a removal is found to be unlawful.  *See, e.g.*, *Grace v. Whitaker*, 344 F. Supp. 3d 96, 144–45 (D.D.C. 2018) (ordering return of non-citizen plaintiffs entitled to further process prior to removal), *aff'd in relevant part, rev'd in part and remanded sub nom. Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020); *L. v. U.S. Immigr. & Customs Enf't*, 403 F. Supp. 3d 853, 860–61, 863–68 (S.D. Cal. 2019) (ordering government to allow return of parents wrongfully prevented from petitioning for asylum); *see also Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025) (denying stay of district court order to facilitate return of non-citizen wrongfully removed); *J.O.P. v. United States Dep't of Homeland Sec.*, 2025 WL 1431263, at *1 (4th Cir. May 19, 2025) (denying stay of district court order to facilitate return of non-citizens removed in violation of a settlement agreement).  Defendants acknowledge that there are procedures in place for facilitating return upon a court's order.  *See* Dkt. 64 at 30 n.34.  No one has ever suggested that O.C.G. poses any sort of security threat.  In general, this case presents no special facts or legal circumstances, only the banal horror of a man being wrongfully loaded onto a bus and sent back to a country where he was allegedly just raped and kidnapped.

Finally, it must be said that, while mistakes obviously happen, the events leading up to this decision are troubling.  The Court was given false information, upon which it relied, twice, to the detriment of a party at risk of serious and irreparable harm.  Defendants then exacerbated that risk by placing O.C.G.'s full name on the public docket, in violation of this Court's Order, Dkt. 13.[1] *See* Dkt. 105 at 8.  The Court has ordered discovery, including depositions of the individuals involved in the false declaration and underlying data entries, to better understand how this happened.

---

[1] The Court accepts Defendants' apology, Dkt. 113 at 1 n.1, and finds no further action necessary.

Add.065

## I.     <u>Factual Background</u>

O.C.G. is a native and citizen of Guatemala.[2]  Dkt. 31-1 ¶ 4.  In March 2024, O.C.G. entered the United States without prior authorization.  *Id.* ¶ 5.  O.C.G. alleges that he presented himself for asylum at the border and was denied an interview.  Dkt. 8-4 ¶ 2.  In any event, he was deported shortly thereafter to Guatemala.  *Id.*

In April 2024, O.C.G. decided to try again and crossed Mexico on his way to the United States.  *Id.* ¶ 3.  There, he was raped and held hostage until a family member paid ransom.  *Id.*  In May 2024, O.C.G. again arrived at the United States and was arrested by Border Patrol.  Dkt. 31-1 ¶ 5.  This time, however, he was referred to an asylum officer after expressing fear of return to Guatemala.  *Id.* ¶¶ 8–9.  That officer determined that O.C.G. had a credible fear of persecution or torture and initiated withholding-only proceedings, *id.* ¶ 10, where an immigration judge agreed and determined that it was more likely than not that O.C.G. would be persecuted or tortured if sent back to Guatemala, *see id.* ¶ 11.[3]  Accordingly, O.C.G. was granted withholding of removal from Guatemala.  *Id.*

During the withholding-only proceedings, O.C.G. asked if he might be sent to Mexico—because he was afraid of being sent to Mexico—and the immigration judge told him, "we cannot send you back to Mexico, sir, because you're a native of Guatemala."  Tr. of June 17, 2024 H'rg at 10:37–13:12.[4]  During another hearing before the immigration court, O.C.G. described in detail the violence he experienced while in Mexico.  Tr. of Feb. 19, 2025 H'rg at

---

[2] The Court has "broad discretion in deciding what evidence to consider in connection with a motion for preliminary injunction."  *Rice v. Wells Fargo Bank, N.A.*, 2 F. Supp. 3d 25, 31 (D. Mass. 2014).  Generally speaking, the relevant facts here do not appear to substantially be in dispute.

[3] *See* 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 208.16.

[4] The Court has been provided with audio and partial transcripts of O.C.G.'s hearings in immigration court.

Add.066

28:48–33:40.    At the close of that hearing, the government's attorney clarified with the immigration judge that, because Guatemala was the country of removal designated on O.C.G.'s order of removal, that was the only relevant country for purposes of the withholding-only proceedings, and the immigration judge agreed.  *Id.* at 1:23:37–1:25:07.

Two days after being granted withholding of removal, and with no advanced warning, O.C.G. was put on a bus and sent to Mexico.  Dkt. 8-1 ¶¶ 8–9.  According to O.C.G., he begged the officers to let him call his attorney but was refused.  *Id.* ¶ 9.  Until one week ago, Defendants maintained that O.C.G. verbally stated that he was not afraid of being sent to Mexico, based on data entries made by immigration officers.  *See* Dkt. 31 at 4.  However, after speaking with those officers, Defendants no longer make that claim.  Dkt. 103 at 2.

In Mexico, O.C.G. was given the option of being detained indefinitely while trying to obtain asylum there—a country where he has consistently maintained that he faces a significant risk of violence—or of being sent back to Guatemala—the very country from which an immigration judge awarded him withholding from removal due to the risk of persecution that he faced.  Dkt. 8-1 ¶ 10.  O.C.G. chose Guatemala.  *Id.*  He remains there today.  *Id.* ¶ 1.

Just yesterday, O.C.G. submitted a declaration informing the Court of his current status.  Dkt. 123.  He reports living in constant fear of his attackers, *id.* ¶ 4, being unable to leave the place where he is staying, *id.* ¶ 6, not being able to rely on the police to protect him, *id.* ¶ 7, and not being able to see his mother for fear of exposing her to violence, *id.* ¶ 8, among other hardships.

## II.    <u>Legal Background</u>

On March 23, 2025, Plaintiffs filed this action and sought a temporary restraining order and preliminary injunction, in part, for the return of Plaintiff O.C.G.  Dkts. 1, 6–8.  The Court

Add.067

denied this part of Plaintiffs' request, recognizing that there was a factual dispute as to the circumstances surrounding O.C.G.'s removal, Dkt. 64 at 47–48, and ordering discovery, Dkt. 80.

On May 18, 2025, in the course of that discovery, Defendants filed their "Notice of Errata," "correcting" their previous declaration, Dkt. 31-1, regarding the removal of O.C.G. Dkt. 103 at 2. The original version of the Errata filing included an exhibit that publicly revealed O.C.G.'s full name and other identifying information, *see* Dkt. 105 at 8, contrary to this Court's prior order concerning the use of pseudonyms, Dkt. 13.

Shortly thereafter, Plaintiffs moved again for a temporary restraining order and preliminary injunction. Dkt. 104. Following briefing by both parties, Dkts. 105, 113, the Court heard oral argument, Dkt. 117, and took the motion under advisement.

## III.    **Legal Standard**

"[A] preliminary injunction preserve[s] the status quo during the pendency of trial-court proceedings." *Berge v. Sch. Comm. of Gloucester*, 107 F.4th 33, 37 (1st Cir. 2024). The "status quo" refers to "the last uncontested status which preceded the pending controversy." *Baillargeon v. CSX Transportation Corp.*, 463 F. Supp. 3d 76, 82–83 (D. Mass. 2020) (quoting *United Steelworkers of Am., ALF-CIO v. Textron, Inc.*, 836 F.2d 6, 10 (1st Cir. 1987)). Here, the "status quo" is properly viewed as the pre-February 21, 2025 status, before O.C.G.'s removal, *i.e.*, "the last uncontested status . . . preced[ing] the pending controversy." *Id.*[5]

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Together*

---

[5] Accordingly, as a purely academic matter, the Court corrects itself and agrees with Plaintiffs that this is not technically a "mandatory" injunction. *See Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 n.5 (1st Cir. 2010). Nevertheless, for the reasons stated below, the Court has applied heightened scrutiny.

*Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  The last two factors "merge in a case like this one, where the Government is the party opposing the preliminary injunction." *Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Likelihood of success "weighs most heavily" in the preliminary injunction analysis.  *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020).

"[T]he more drastic the effect of the injunction, the more carefully the district court should consider staying its hand."  *A-Copy, Inc. v. Michaelson*, 599 F.2d 450, 451 (1st Cir. 1978); *see also Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995) (requiring the movant to meet a higher standard where "an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits").  "But the denial of preliminary relief may in some situations be as fraught with adverse consequences to plaintiff as the granting of relief is fraught with consequences to defendant.  In such cases, a court may have no choice but to act even though its decision has the effect of providing most or even all of the ultimate relief in dispute."  *A-Copy*, 599 F.2d at 451. Here, the preliminary injunction grants "most or even all," *id.*, of the ultimate relief sought by O.C.G. individually.  It is not obvious that this relief could be undone.  *See Tom Doherty*, 60 F.3d at 33–34.  Accordingly, the Court has exercised caution and held Plaintiffs to a stringent standard, as appropriate under the circumstances.  *See* Dkt. 40 at 6, 8; Dkt. 64 at 9, 47–48.

IV.   **Discussion**

   A.   **Likelihood of Success**

O.C.G. is likely to succeed in showing that his due-process rights were violated.  This Court has jurisdiction to hear those claims, and the appropriate remedy is return.

Add.069

1.    **Jurisdiction**

The Court has already addressed most of Defendants' jurisdictional arguments in the context of Plaintiffs' first motion for a preliminary injunction. *See* Dkt. 64 at 10–27. The Court finds the remainder unpersuasive.

Defendants argue that O.C.G.'s case defies the underlying motivation behind 8 U.S.C. § 1252(g), apparently more so than the class claims. Dkt. 113 at 2 (quoting *Reno v. American-Arab Anti-Discrimination*, 525 U.S. 471, 482 (1999) [hereinafter, "*AADC*"]). The Court reads *AADC* differently, *see* Dkt. 64 at 20 (quoting *AADC* at 485 & n.9), but in any event, Defendants' gestalt argument cannot supersede the plain text of the statute as interpreted by authority binding on this Court. *See id.* at 20–21 (citing *Kong v. United States*, 62 F.4th 608 (1st Cir. 2023)).

Next, Defendants claim that O.C.G. received "specific warning[s]" of the possibility of third-country removal during his withholding-only proceedings. Dkt. 113 at 3–4. According to Defendants, these warnings were sufficient to effectively push any claims O.C.G. might have regarding third-country removal into the claim-channeling function of 8 U.S.C. §§ 1252(a)(5) and (b)(9). But the Court has already found that such general warnings are meaningless when the non-citizen has not received notice of removal as to any particular third country. Dkt. 64 at 17 & n.24. O.C.G. is, in fact, the perfect example of why this is correct—he *did* present evidence of his fear of return to Mexico during his withholding-only proceedings, Tr. of Feb. 19, 2025 H'rg at 28:48–33:40, and even asked the immigration court whether he needed to seek protection from Mexico as well, Tr. of June 17, 2024 H'rg at 10:37–13:12. To that, the immigration judge told him—correctly in this Court's estimation—that he only needed to worry about the country of removal already identified on his removal order. *Id.*

Still looking toward sections 1252(a)(5) and (b)(9), Defendants' next argument does highlight one difference between O.C.G.'s circumstances and those of class members not yet

Add.070

removed—once O.C.G. was removed, he obviously had notice of his third-country removal. Dkt. 113 at 4–5. With that notice, Defendants argue, O.C.G. could have moved to reopen his administrative case. *Id.*; *see also* Dkt. 64 at 14–17 (explaining motions to reopen).[6] This would, according to Defendants, make O.C.G.'s claim subject to the channeling provisions.

In reality, O.C.G.'s post factum notice is a distinction without a difference. As an initial matter, O.C.G. could not have moved to reopen his immigration case, as he was subject to a reinstated order of removal. *See Garcia Sarmiento v. Garland*, 45 F.4th 560, 564 (1st Cir. 2022) ("[P]ersons subject to reinstated removal orders following unlawful reentry are barred from reopening their orders of removal." (citing *Cuenca v. Barr*, 956 F.3d 1079, 1088 (9th Cir. 2020))). Even if O.C.G. could have moved to reopen, it is unclear what precisely that motion would have said—motions to reopen must be based on evidence that was "not available and could not have been discovered or presented at the former hearing," *Escobar v. Garland*, 122 F.4th 465, 472 (1st Cir. 2024) (quoting *Rivera-Medrano v. Garland*, 47 F.4th 29, 35 (1st Cir. 2022)). Here, there was no new evidence to discover or present; O.C.G. had already testified about the violence he experienced in Mexico. The awkwardness of trying to imagine how this issue might theoretically be shoehorned into a motion to reopen only confirms that this is not the type of claim one is expected to "cram[]" into judicial review of a final order of removal. *See Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018).

More fundamentally, Defendants confuse O.C.G.'s claim for the remedy he seeks. As with every other Plaintiff in this case, O.C.G.'s claim arose the moment he was denied notice and a meaningful opportunity to present his fear-based claim. For the same reasons as every other

---

[6] Defendants also point out that O.C.G. could still ask the immigration court to reopen sua sponte. Dkt. 113 at 4–5. However, the Court has explained how the theoretical possibility of sua sponte reopening provides no meaningful relief. Dkt. 64 at 14–16.

Add.071

plaintiff, that claim could not have been raised in the immigration proceedings, substantially because it occurred outside of, and following the conclusion of, those proceedings. Defendants seem to say that O.C.G. might be able to get his fear-based claims adjudicated some other way. The Court thinks that is dead wrong, but, *even if he could*, that would not alter the fact that his rights were violated in the first place. That wrong calls for a remedy, and the most obvious remedy is to go back and do it over, with proper notice and an opportunity to be heard.

Finally, Defendants argue that the Court implicitly "review[s]" the regulations implementing the Convention Against Torture through its due-process finding. Dkt. 113 at 5 (quoting FARRA § 2242(d)). Defendants point to no regulation that they contend this Court contradicts, nor do they cite any authority for their expansive understanding of what it means to "review" regulations. *Cf. Khouzam v. Att'y Gen. of U.S.*, 549 F.3d 235, 258–59 & n.14 (3d Cir. 2008) (finding FARRA § 2242(d) inapplicable where the regulation itself is non-problematic); *Harrington v. Chao*, 372 F.3d 52, 59 (1st Cir. 2004) (in agency context, holding that inconsistency does not arise where a regulation is silent as to a particular issue).

### 2.    <u>Merits</u>

The Court has already found it likely that O.C.G.'s removal lacked due process. *See* Dkt. 40 at 6; Dkt. 64 at 42 n.43. Indeed, at no point in this litigation have Defendants put forth an account of O.C.G.'s removal that would comport with what this Court has found due process requires. *Compare* Dkt. 31-1 (March 25, 2025 Declaration of Brian Ortega) ¶ 13 (indicating that O.C.G. was verbally notified on the day of his removal), *with* Dkt. 64 (requiring written notice to both non-citizen and counsel); *see also A. A. R. P. v. Trump*, 605 U.S. —, 2025 WL 1417281, at *2 (May 16, 2025) ("Under these circumstances, notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not

pass muster.").  Accordingly, the likelihood that O.C.G. is correct in asserting that his due-process rights were violated, in this Court's view, has long hovered near certainty.

It is therefore somewhat of a misnomer to say that O.C.G.'s likelihood of success has "increased" on account of Defendants' new admission of "error" in its Notice of Errata, Dkt. 103 at 2.  Due process is, in some sense, a binary—one either receives what the Constitution requires, or one does not.  It has been clear that O.C.G. did not receive what the Constitution requires.

Nevertheless, O.C.G. seeks injunctive relief, and injunctions require consideration of equity and prudence.  *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).  Until recently, Defendants have maintained that O.C.G. verbally "stated he was not afraid of returning to Mexico" on the day of his removal.  *See* Dkt. 31-1 ¶ 13.  Of course, Plaintiffs have always disputed this fact.[7]  Nevertheless, the Court felt that the possibility that O.C.G. acquiesced in his own third-country removal warranted further factfinding before the Court engaged its equitable powers.  Dkt. 64 at 47–48.

Now, Defendants admit that they "cannot identify any officer who asked O.C.G. whether he had a fear of return to Mexico."  Dkt. 103 at 2 ("advis[ing] the Court of an error in the March 25, 2025, declaration of Brian Ortega" and submitting a "correct[ed]" declaration).  Setting aside concerns about how this "error," *id.*, came to be a central tenet of Defendants' case, its renunciation relieves the Court of fear that it might be overextending itself in granting this remedy.

---

[7] Dkt. 8-4 ¶ 9 (Declaration of O.C.G.):

> After I was taken out of the prison the immigration officer told me that I was being deported to Mexico.  I was so scared and surprised.  I told him that I had won my case and showed him the order the judge gave me.  But the immigration officer said the order had expired. I begged him to let me call my attorney but he said it was too late to call anyone now.

Add.073

*See also Grace*, 344 F. Supp. 3d at 144–45; *L. v. U.S. Immigr. & Customs Enf't*, 403 F. Supp. 3d at 860–61, 863–68; *Abrego Garcia*, 145 S. Ct. at 1018; *J.O.P.*, 2025 WL 1431263, at \*1.

### B.   Irreparable Harm

The Court has no reason to doubt the immigration judge's finding that O.C.G. is more likely than not to be persecuted if he stays in Guatemala.[8]  Nor does the Court question the sincerity of O.C.G.'s sworn declarations, endorsed by counsel.  *See* Dkts. 8-4, 123.

Defendants make no specific argument regarding irreparable harm in their brief.  Dkt. 113 at 6–7.  At oral argument, in response to inquiry from the Court, Defendants stated only that this case calls for heightened scrutiny and that the Court should consider O.C.G.'s "choice" to go back to Guatemala over indefinite detention in Mexico, a country where he has consistently maintained that he faces a significant risk of violence, *see* Dkt. 8-4 ¶¶ 3, 9–10.  The Court does take this fact into account but finds that it likely says more about O.C.G.'s options than his preferences.

O.C.G. daily risks not only loss of life but "of all that makes life worth living."  *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922) (J., Brandeis).  This factor militates strongly in favor of granting the injunction.

### C.   Balance of Equities and Public Interest

The Court recognizes that the public has an interest both in preventing wrongful removals, *Nken v. Holder*, 556 U.S. 418, 436 (2009), and in the prompt execution of removal orders, *id.* "There is, of course, a strong public interest in the protection of constitutional rights."  *Harris v. Adams*, 757 F. Supp. 3d 111, 144 (D. Mass. 2024).

---

[8] Defendants' inadvertent exposure of O.C.G.'s identity, while now remedied on the docket, only heightens concern as a bell that perhaps cannot be un-rung given the permanent nature of the internet.  It is of little comfort that Plaintiffs appear to have done a thorough and diligent job of getting the information removed as fast as possible from major sources.  *See* Dkt. 105 at 3, 8, 17–18 & n.8.

Add.074

As with irreparable harm, Defendants make no argument that an injunction would go against the public interest or otherwise be unduly burdensome.  Dkt. 113 at 6–7.  On balance, the Court finds that the public benefits from living in a country where rules are followed and where promises are kept.  Rules are tedious and frustrating, but they also keep us fair and honest.  At oral argument, Defendants' counsel confirmed that it is "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." FARRA § 2242(a).  The return of O.C.G. poses a vanishingly small cost to make sure we can still claim to live up to that ideal.

## V.    <u>Conclusion</u>

The Court finds that all four preliminary injunction factors weigh in favor of granting the injunction.  Accordingly, Plaintiffs' motion for preliminary injunction is GRANTED.[9]

Defendants are hereby ORDERED to take all immediate steps, including coordinating with Plaintiffs' counsel, to facilitate[10] the return of O.C.G. to the United States.  Defendants shall file a status report within five days of this Order updating the Court as to the status of O.C.G.'s return.

The Court exercises its discretion to waive the requirement to post a bond under Rule 65(c). *See, e.g., Int'l Assoc. of Machinists and Aerospace Workers v. Eastern Airlines*, 925 F.2d 6, 9 (1st Cir. 1991) (finding "ample authority for the proposition that the provisions of Rule 65(c) are not

---

[9] Plaintiffs' motion for a temporary restraining order is therefore denied as moot.

[10] The Court notes that "facilitate" in this context should carry less baggage than in several other notable cases.  O.C.G. is not held by any foreign government.  Defendants have declined to make any argument that facilitating his return would be costly, burdensome, or otherwise impede the government's objectives.  The Court anticipates that Defendants will take at least the same level of action as is routine to return *lawfully* removed aliens.  *See* ICE Policy Directive No. 11061.1, § 3.1, Facilitating the Return to the United States of Certain Lawfully Removed Aliens (Feb. 24, 2012).  Given that this Court has found that Plaintiffs are likely to succeed in showing that O.C.G.'s removal was *not* lawful, there is no reason for Defendants to take *less* action than they would when returning a lawfully removed alien.

Add.075

mandatory and that a district court retains substantial discretion to dictate the terms of an injunction

bond").

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated:  May 23, 2025                        Judge, United States District Court

Add.076

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| D.V.D, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. |
| v. ) | 25-10676-BEM |
| ) | |
| U.S. DEPARTMENT OF HOMELAND ) | |
| SECURITY, et al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTIONS FOR RECONSIDERATION AND STAY

MURPHY, J.

Defendants have mischaracterized this Court's order, while at the same time manufacturing the very chaos they decry. By racing to get six class members onto a plane to unstable South Sudan, clearly in breach of the law and this Court's order, Defendants gave this Court no choice but to find that they were in violation of the Preliminary Injunction.

Even after finding that violation, however, the Court stayed its hand and did not require Defendants to bring the individuals back to the United States, as requested by Plaintiffs. Instead, the Court accepted *Defendants' own suggestion* that they be allowed to keep the individuals out of the country and finish their process abroad. In the interest of full transparency, the Court quotes at length from the hearing transcript:

Add.077

**THE COURT**: [Plaintiffs' counsel] is suggesting that the only remedy is for the plane to return here so that these individuals be given an opportunity to raise any objections they have to being sent to South Sudan. Do you have another suggestion as to what a remedy that would allow these people to have the process that they are due might be?

**MR. ENSIGN**: If I may, we think any remedy should be narrowly tailored to the violation. And so, you know, if Your Honor believes they weren't given a meaningful opportunity to express a fear under CAT [Convention Against Torture], that **the remedy should first be limited to giving them such a meaningful opportunity. If they were to do so, then they would be given that reasonable fear interview.** But bringing them back would be a much broader remedy than necessary because this Court only requires compliance with procedures and, to the extent that Your Honor believes those procedures were not followed, the Government should be allowed to provide those procedures, and that should satisfy the due process as interpreted by this Court.

**THE COURT**: Thank you, Mr. Ensign. So let's say that -- I agree with you that I want to make the most narrowly tailored order to address the violation of my preliminary injunction that is possible. **What you're suggesting is that they can have a reasonable fear interview where they are now.** Is that a practical possibility?

**MR. ENSIGN**: Your Honor, I don't know. I'd have to speak to my client, but **I think that would need to be at least one of the compliance options that's presented, because that would be a much more narrowly tailored remedy that is actually tailored to the violation that Your Honor has found.**[1]

After this exchange, Defendants spent several hours conferring internally as to the feasibility of this option, ultimately deciding that it was doable:[2]

**THE COURT**: I'm very much considering this, but, if this is the route we go, **my inclination would be to say, if you want to do all of these [interviews] where they are, you have to do them appropriately; if you don't want to, you can always bring them home of your own volition and do it there. And so I'm not going to mandate that the Department do anything overseas, but in an effort to craft as circumscribed a remedy as possible, I'm inclined to say if the Department wants to figure that out, I'm inclined to let them.**

---

[1] Tr. of May 21, 2025 H'rg at 44:8–45:14 (emphases added).

[2] Tr. of May 21, 2025 H'rg at 119:10–21. ("[I.C.E. Assistant Director Charles]: I know it's possible and the Department can work it out. We've been working on it for the last couple of hours to make sure that we can do it, and it is possible to do it.").

2

Add.078

**MR. ENSIGN**: <u>**And we appreciate that, Your Honor.**</u>  And, you know, to the extent that it poses challenges that are not -- that would be insurmountable, we would quickly inform the Court and figure out -- use one of the options to comply with the Court's orders.[3]

Since that hearing, merely five days ago, Defendants have changed their tune.  It turns out that having immigration proceedings on another continent is harder and more logistically cumbersome than Defendants anticipated.  However, the Court never said that Defendants *had* to convert their foreign military base into an immigration facility; it only left that as an option, again, *at Defendants' request*.  The other option, of course, has always been to simply return to the status quo of roughly one week ago, or else choose any other location to complete the required process.

To be clear, the Court recognizes that the class members at issue here have criminal histories.  But that does not change due process.  "The history of American freedom is, in no small measure, the history of procedure."  *Malinski v. New York*, 324 U.S. 401, 414 (1945) (Frankfurter, J., concurring).  "It is procedure that spells much of the difference between rule by law and rule by whim or caprice.  Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal justice under law."  *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 179 (1951) (Douglas, J., concurring).  The Court treats its obligation to these principles with the seriousness that anyone committed to the rule of law should understand.

It continues to be this Court's sincere hope that reason can get the better of rhetoric.  The orders put in place here are sensible and conservative.  Accordingly, and for the reasons stated herein, Defendants' motions for reconsideration and for stay pending appeal are DENIED.

---

[3] Tr. of May 21, 2025 H'rg at 112:1–25 (emphases added).

Add.079

I.      **Background**

    A.      **General Background**

This action concerns the procedures that the Government must take before removing non-citizens to "third" countries.  The Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, determines the country or countries to which an individual can be removed.  *Id.* § 1231(b).  In the first instance, the Government generally must remove a non-citizen to their country of origin or to the country designated on their Order of Removal.  *See id.* § 1231(b)(2)(A)–(D).  If those options prove "impracticable, inadvisable, or impossible," the Government may remove the non-citizen to any other country whose government will accept them, *i.e.*, to a "third" country.  *Id.* § 1231(b)(2)(E)(vii).  The Government's power to designate third countries for removal is subject to certain limitations set by Congress.  *Id.* § 1231(b)(2).  In particular, the Government may not remove a non-citizen to a country where they are likely to be tortured.  *See* note to 8 U.S.C. § 1231 (codifying the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA")).  A non-citizen's claim that he or she qualifies for this type of protection is called a "CAT" claim, referring to the Convention Against Torture, an international agreement implemented by Congress through FARRA.  *See id.*

    B.      **Case Background**

On March 23, 2025, Plaintiffs filed this action, claiming that Defendants were removing people to third countries without giving any opportunity to show that they were at risk of persecution or torture.  *See generally* Dkts. 1, 6–8.  On April 18, 2025, the Court issued a Preliminary Injunction, which required Defendants to tell class members about their third-country removals in advance and to give them a "meaningful opportunity" to show or explain why they qualify for CAT protection.  *See* Dkt. 64 at 46–47.

Add.080

Twice, well-founded allegations of non-compliance or imminent non-compliance led this Court to amend or clarify the Preliminary Injunction. *See* Dkts. 86, 91. Neither of those changed the substance of the Preliminary Injunction, which continued to require Defendants to give written notice of the third-country removal and a meaningful opportunity to make a CAT claim. *See id.*

### C. <u>Present Issues</u>

On May 21, 2025, Plaintiffs again moved for a temporary restraining order and preliminary injunction, alleging that Defendants were violating or had already violated the Preliminary Injunction by removing an unknown number of individuals to South Sudan without advanced notice and without an opportunity to demonstrate CAT eligibility. *See generally* Dkts. 111–12. Shortly thereafter, the Court called a hearing by remote videoconference. Dkt. 115. Defendants' attorneys had very little information, and the Court ordered Defendants to maintain custody of the individuals while everybody figured out what was happening. Dkt. 116.

The Court held an in-person hearing the next day, May 21, 2025. Dkts. 114, 117. An hour prior, Defendants held a press conference where they revealed the names and criminal histories of the individuals on the plane, at least six of whom turned out to be class member Plaintiffs in this case.[4] At the hearing, the Court learned that these individuals were being held at a foreign military base in Djibouti.[5] The Court heard sworn testimony from the I.C.E. Acting Assistant Director for

---

[4] *See Immigration and Customs Enforcement Officials Hold News Conference*, CSPAN (May 21, 2025), https://www.c-span.org/program/news-conference/immigration-and-customs-enforcement-officials-hold-news-conference/660241; *see also* Press Release, Department of Homeland Security, DHS Reacts to Activist Judge Ruling to Halt the Deportation of Barbaric Criminal Illegal Aliens Including Murderers, Rapists, and Pedophiles, (May 21, 2025), https://perma.cc/ZAR7-8KWE.

[5] Defendants requested that the country location of the individuals be kept under seal but have since made that information public. *See* Dkt 131-1; *see also* Haley Britzky, et al., *Deported migrant detainees are holding at a US Naval base in Djibouti amid court fight, officials say*, CNN (May 22, 2025 2:12 PM), https://perma.cc/W2FN-C6X8.

Add.081

Field Operations at Enforcement and Removal Operations, Marcos Charles, and acting General Counsel of Department of Homeland Security, Joseph Mazzara.  Dkt. 117.

Based on that testimony, Plaintiffs' submissions, and Defendants' submissions in connection with the instant motion, the Court has made factual findings, substantially reflecting its understanding of the events immediately following the May 21, 2025, hearing:

Sometime on May 19, 2025, Defendants informed eight individuals in I.C.E. detention that they were being removed to South Africa.  *See* Dkt. 112-1 at 4–5; Dkt. 112-3 at 4.  Later that day, no earlier than 5:46 p.m., Defendants told them instead that they were being removed to South Sudan.  *Id.*; Dkt. 130-2 ¶ 10.[6]

The U.S. Government has issued stark warnings regarding South Sudan, advising its citizens not to travel to there because of "**crime**, **kidnapping**, and **armed conflict**."  *South Sudan Travel Advisory*, U.S. DEPARTMENT OF STATE, Mar. 8, 2025, https://perma.cc/XQN7-VXHV (emphases in original).  The U.S. Department of State further warns that "[v]iolent crime, such as carjackings, shootings, ambushes, assaults, robberies, and kidnappings are common throughout South Sudan, including [its capital,] Juba.  Foreign nationals have been the victims of rape, sexual assault, armed robberies, and other violent crimes."  *Id.*

The following day, no later than 9:35 a.m., the class members left detention and were brought to a nearby airport.[7]  Tr. of May 21, 2025 Hr'g at 39:17.  After leaving the detention center, class members definitively had no communication access.  *Id.* at 19:10–18.  Thus, these individuals received fewer than 16 hours' notice before being removed, most of which were non-waking hours, none within the business day.  During the interim, they had limited, if any, ability to communicate

---

[6] All refused to sign their notices of removal.  Dkt. 130-2 ¶ 10.

[7] One attorney was told by I.C.E. at 8:27 a.m. that her client had already been removed.  Dkt. 112-1 ¶¶ 8–10.

6

with family or legal representatives and little, if any, opportunity to access information that would have allowed them to determine for themselves the repercussions of being removed to South Sudan.[8] The plane was in the air by noon. *Id.* at 17:2–3.

Based on this information, the Court found that Defendants had violated the Preliminary Injunction and crafted a remedy based on Defendants' requests made during the hearing. *See* Dkt. 119.[9] The Court further issued a clarification as to the Preliminary Injunction, Dkt. 118, based on Defendants' representations that the initial iteration of the Preliminary Injunction "wasn't specific enough." *See, e.g.*, Tr. of May 21, 2025 Hr'g at 37:23–38:3 ("I just wanted to highlight, Your Honor, that I think that part of any misunderstanding on the -- from the Department of Homeland Security may have had to do with the fact that the Court's preliminary injunction motion wasn't specific enough, and so we ask that the Court please take that into consideration when issuing its order.").

### D.     Procedural Posture

On May 23, 2025, at 9:03 p.m., Defendants moved the Court to reconsider its finding that Defendants violated the Preliminary Injunction and to vacate its orders accordingly.[10] Dkt. 130 at 2. In the alternative, Defendants seek a stay of those orders pending appeal. *Id.*

The removals at issue were brought to this Court's attention originally via Plaintiffs' May 20, 2025, motion for temporary restraining order and preliminary injunction. Dkt. 111. Had

---

[8] Acting Director Charles testified that detainees generally have access to a telephone or tablet for communication purposes while in custody. Tr. of May 21, 2025 Hr'g at 20:4–17. However, he could not confirm whether these specific individuals did or at what time their access was cut off. *Id.* As stated, at least one attorney attempted but was unable to meet with her client during the short window. *See generally* Dkt. 112-1.

[9] The Court reserved ruling on whether such a violation warranted a finding of contempt. *See* Tr. of May 21, 2025 Hr'g at 35:12–17.

[10] Defendants characterize Dkt. 118 as an order. The Court believes it is more properly a clarification but need not muddy the waters.

the Court not found that Defendants' actions were already covered by the Preliminary Injunction, *see* Dkt. 64, it would have issued the same remedy in the form of a new temporary restraining order or preliminary injunction.  In other words, the Court believes that it already ruled prospectively that Defendants' May 20, 2025, actions were unlawful, but even if not, the Court would find them unlawful now, to the same effect.  Accordingly, the Court will supplement its analysis to address those factors as necessary below.

## II.    Legal Standard

### A.    Motion for Reconsideration

A district court "has the inherent power to reconsider its interlocutory orders." *Fernández–Vargas v. Pfizer*, 522 F.3d 55, 61 n.2 (1st Cir. 2008).  A motion for reconsideration is allowed where "the original decision was based on a manifest error of law or was clearly unjust." *United States v. Allen*, 573 F.3d 42, 53 (1st Cir. 2009).  However, "[u]nless the court has misapprehended some material fact or point of law," a motion for reconsideration "is normally not a promising vehicle for revisiting a party's case and rearguing theories previously advanced and rejected." *Palmer v. Champion Mortg.*, 465 F.3d 24, 30 (1st Cir. 2006).

### B.    Motion for Stay Pending Appeal

"Deciding a motion for a stay pending appeal requires an exercise of the court's equitable discretion." *Arkansas Tchr. Ret. Sys. v. State St. Bank & Tr. Co.*, 527 F. Supp. 3d 40, 58 (D. Mass. 2021) (citing *Common Cause Rhode Island v. Gorbea*, 970 F.3d 11, 15–16 (1st Cir. 2020)).  The Court considers the following factors, substantially like those considered on a motion for preliminary injunction: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

Likelihood of success is the essential element. *Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 16 (1st Cir. 2002) (calling it the "sine qua non" for a stay pending appeal).

### C.  Motion for Temporary Restraining Order or Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The last two factors "merge in a case like this one, where the Government is the party opposing the preliminary injunction." *Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Likelihood of success "weighs most heavily" in the preliminary injunction analysis. *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020). "The standard for issuing a TRO is 'the same as for a preliminary injunction.'" *Orkin v. Albert*, 557 F. Supp. 3d 252, 256 (D. Mass. 2021) (quoting *Bourgoin v. Sebelius*, 928 F. Supp. 2d 258, 267 (D. Me. 2013)).

### III.  Discussion

### A.  Motion for Reconsideration

### 1.  Defendants Violated the Preliminary Injunction

Defendants characterize this last week's events as a big misunderstanding, brought on by the Court's failure to specify what constitutes a "meaningful opportunity" to present fear-based claims. Dkt. 130 at 3–4. Indeed, at the March 28, 2025, hearing, Defendants' counsel did raise the issue and, by way of example, pointed out that Defendants would likely consider the opportunity Plaintiff O.C.G. received to have been "meaningful." *See id.* Defendants now argue that the parties and the Court were essentially on notice that Defendants might apply that same standard prospectively, as a way of complying with the Preliminary Injunction. *Id.* at 4. The fatal

Add.085

flaw with this argument is that, prior to May 20, 2025, the Court had already twice found that O.C.G.'s process was likely insufficient.[11] Dkt. 40 at 6; Dkt. 64 at 42 n.43. Moreover, as of March 28, 2025, Defendants were claiming that O.C.G. was notified of his removal in *January*, roughly *three weeks prior* to his actual removal in February. Dkt. 31 at 4.[12] It is therefore impossible to justify Defendants' position that O.C.G.'s case reasonably stood as a benchmark of compliance with the due process protections this Court has determined to be required.

Defendants effectively tell this Court that it should have at least tried to micromanage the Department of Homeland Security as it fulfills its required obligations, but that is not the role of the courts. *See Martinez v. Bondi*, 132 F.4th 74, 84 (1st Cir. 2025) (explaining that the appropriate remedy for improper agency action, "except in rare circumstances, is to remand to the agency for additional investigation or explanation"). Rather, this Court has strived to give Defendants as much flexibility as possible within legal bounds. At the end of the March 28, 2025, hearing, the Court presented Defendants with a good-faith opportunity to define the process provided under the Preliminary Injunction:

> **THE COURT**: . . . In the meantime, I take your point about the Court ordering what "meaningful" means to heart. And so I would consider a motion to reconsider, if you wanted to narrow what that procedure looked like, or you wanted [to] come to an agreement about what it looked like, or you wanted to tell me, [t]his is what we're defining as meaningful, and I would like you to reconsider and adopt this. I'm open to all of those things because you raise a very good point. And so, to the extent that the guidance that the Court is giving you is nothing more than a meaningful opportunity and you want some more direction or you want to narrow that with some more specificity, I would welcome a motion to consider.

---

[11] At those times, the Court declined to order O.C.G.'s return based on Defendants' then-assertion that O.C.G. disavowed any fear of his removal. Dkt. 40 at 6 & n.11; Dkt. 64 at 47–48. That factual dispute has since been resolved in O.C.G.'s favor, and the Court has accordingly ordered Defendants to facilitate his return. Dkt. 132.

[12] Defendants' brief states that O.C.G. was asked whether he had a fear of being sent to Mexico in January. Dkt. 31 at 4. The declaration cited states that O.C.G.'s removal was scheduled on or about January 31, 2025, and that O.C.G. was asked whether he had a fear of being sent to Mexico on or around February 21, 2025, the day of his removal. Dkt. 31-1 ¶¶ 12–13. While inconsistent either way, a natural reading is that O.C.G. was at least notified of his removal at time of scheduling.

Add.086

> If you file a motion to consider, I can hear you. I think you're in D.C.; so I can hear you, even by Zoom, within 24 hours.

Tr. of Mar. 28, 2025 H'rg at 68:13–69:3. Defendants' counsel thanked the Court for that opportunity, *id.* at 69:4–5, but then declined to take it.[13]

Consistent with this approach, the Court has repeatedly asked Defendants to weigh in on the particulars of its remedies, and Defendants have consistently refused. *See* Dkt. 64 at 47 n.49 ("The Court has been forced to decide on an appropriate time limit because Defendants were unable, unwilling, or incapable of meaningfully engaging in a discussion about what process was required to provide aliens with a meaningful opportunity to contest a finding that their fear was reasonable."). Even in this latest round of back-and-forth, nearly two months later, the Court again asked Defendants for input on the appropriate length of time to raise a fear-based claim—Defendants again refused to engage.[14] Tr. of May 21, 2025 Hr'g at 48:14–49:10 ("[Mr. Ensign]: Certainly, our position is that 24 hours is sufficient. We recognize you disagree, but we don't have a specific proposal in light of this Court's disagreement with that position.").[15] The Court then suggested that Defendants could provide additional authority after the hearing, *id.* at 50:21–51:10—Defendants did not. From this course of conduct, it is hard to come to any conclusion other than that Defendants invite lack of clarity as a means of evasion.

---

[13] Defendants moved for an indicative ruling as to whether the Court would find that subsequent guidance issued by the Department of Homeland Security mooted Plaintiffs' claims. Dkt. 43. That guidance did not address or attempt to clarify the substance of what constitutes a meaningful opportunity—indeed, its thrust was that, in certain circumstances where the United States has received diplomatic assurances, no opportunity would be had at all. *Id.* at 2–3; *see also* Dkt. 64 at 42–43 (finding that the procedures outlined in the guidance were insufficient). For the remainder, Defendants offered no clarity as to what "opportunity" they would propose as acceptable.

[14] Tellingly, Defendants still do not propose any suggestion for how to define what constitutes a meaningful opportunity. *See* Dkt. 130 at 4–5. Defendants say that the Court "did not heed the Government's warning" that it should be allowed to draft a proposal for the Court's review. *Id.* at 5. That is incorrect; the Court expressly welcomed such a proposal. *See* Tr. of Mar. 28, 2025 H'rg at 68:13–69:3. The Government did not submit any proposal.

[15] Of course, the individuals here had fewer than 24 hours; they had, at most, sixteen. *See* Tr. of May 21, 2025 Hr'g at 12:20–22.

Add.087

Defendants' argument might be stronger if this were at all close, but the Court breaks no new ground in finding that the events of May 20, 2025, did not include a meaningful opportunity for the class members to present fear-based claims. Defendants' own submission shows that it is I.C.E.'s general practice to provide 24 hours' notice prior to removal.[16] Dkt. 130-2 ¶ 7. Here, the class members "had fewer than 24 hours' notice, and zero business hours' notice, before being put on a plane" to South Sudan. Dkt. 118 at 1. Class members appear not to have had any access to counsel—indeed, a declaration submitted by Plaintiffs alleges that I.C.E. *canceled* at least one attorney's pre-scheduled meeting with her client.[17] Dkt. 112-1 ¶¶ 8–10. Class members likewise had no opportunity to learn anything about South Sudan, a nascent, unstable country to which the United States has recently told its citizens not to travel because of "**crime**, **kidnapping**, and **armed conflict**."[18] The Court notes that class members were flown out on chartered flights, which Defendants state can take "30 days or more to coordinate." Dkt. 130-2 ¶ 24. Then the Court is left to consider, why were these individuals told less than sixteen hours in advance? *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."); *see also A.A.R.P. v. Trump*, 605 U.S. —, 2025 WL 1417281, at *2 (May 16, 2025) ("Under these circumstances, notice roughly 24

---

[16] Indeed Mr. Ensign, Deputy Assistant Attorney General for the Office of Immigration Litigation of the Department of Justice's Civil Division, suggested 24 hours was sufficient, apparently before realizing the notice here was significantly short of even this proffered minimum. Tr. of May 21, 2025 Hr'g at 49:8 ("Certainly, our position is that 24 hours is sufficient.").

[17] One attorney states that, at 8:27 a.m., she was informed that her client had already been removed to South Sudan. Dkt. 112-1 ¶ 8–10. But Defendants claim that the class members did not leave detention until 9:35 a.m. Tr. of May 21, 2025 Hr'g at 39:17.

[18] *South Sudan Travel Advisory*, U.S. Department of State, Mar. 8, 2025, https://perma.cc/XQN7-VXHV (emphases in original).

hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster.").  Given the totality of the circumstances, it is hard to take seriously the idea that Defendants intended these individuals to have any real opportunity to make a valid claim.

Defendants' comparison to expedited removal is a red herring.[19]  Plaintiffs' class excludes non-citizens removed pursuant to expedited removal.  *See* Dkt. 64 at 23 (defining the class to include "individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA").  Expedited removal usually involves individuals "apprehended at or near the border" or who are denied admission at ports of entry, before due-process rights attach. *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 106–08 (2020).  By contrast, CAT claims emerging from standard removal proceedings, reinstatements of prior removal orders, and administrative removals, *see* Dkt. 64 at 23, have greater protections, including judicial review.  *See* 8 U.S.C. §§ 1229a, 1231, 1228, 1252; 8 CFR §§ 208.31, 1208.31, 1208.16.[20]  The comparison is thus inapposite.[21]

---

[19] It also goes more toward the merits of the case than the question of whether Defendants violated the Preliminary Injunction.  Nevertheless, the Court addresses the argument insofar as it informs what a reasonable person could understand a meaningful opportunity to be and insofar as it bears on the Court's findings in the alternative regarding Plaintiffs' motion for preliminary relief.

[20] The Court notes, as have scholars in this area of the law, that it is somewhat of an anomaly that reinstated removal orders are subject to judicial review, while expedited removal orders—which may form the basis for reinstatement—are not.  *See* Jennifer Lee Koh, *When Shadow Removals Collide: Searching for Solutions to the Legal Black Holes Created by Expedited Removal and Reinstatement*, 96 WASH. U.L. REV. 337, 368–72 (2018).  Nevertheless, that is how it works.

[21] Even applying the law of expedited removals, however, the events of May 20, 2025, would have been unlawful.  On May 9, 2025, the District Court for the District of Columbia struck down the final agency rule that required non-citizens to affirmatively manifest fear of return or removal in order to be given a fear-screening interview, as opposed to the previous rule which "required officials to provide individual advisals to each noncitizen [and] affirmatively ask questions designed to determine if the noncitizen qualifies for a credible fear interview." *Las Americas Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec.*, — F.Supp.3d —, 2025 WL 1403811, at *16–17 (D.D.C. May 9, 2025).  By Defendants' own admission, these class members were not affirmatively asked any questions regarding their fear of removal.  Tr of May 21, 2025 Hr'g at 21:5–9.  Accordingly, insofar as Defendants contend that the law of expedited removals informed their understanding of what constitutes a meaningful opportunity, that analogy fails them on its face.

### 2.    The Court's Remedy Was Flexible and Narrow

Despite Defendants contention to the contrary, this Court has never "direct[ed] the Executive Branch to conduct foreign relations in a particular way, or engage with a foreign sovereign in a given manner." Dkt. 130 at 6. Rather, this Court's order, remedying Defendants' flagrant violation of the Preliminary Injunction, merely outlines the procedural rights owed to class members, Dkt. 119 at 1, and grants Defendants full flexibility about how and where it can accomplish that:

> DHS, in its discretion, may elect to provide this process to the six individuals either within the United States—should it choose to return them to the United States—or abroad, if at all relevant times DHS retains custody and control over the individuals in conditions commensurate to those the individuals would be housed in were they still in DHS's custody within the United States.

*Id.* at 2.

It cannot be said enough that this is the result Defendants asked for. *See, e.g.*, Tr. of May 21, 2025 H'rg at 103:18–21 ("I think we certainly agree that any remedy should be narrowly tailored. I don't know that return to the United States would be required to carry those [interviews] out. You know, I think that those could potentially be conducted abroad."). This Court sought to fashion a remedy to address the constitutionally inadequate nature of the class members' removals, while not limiting Defendants' ability to effectuate those removals in the most expeditious manner possible—subject, of course, to constitutional requirements. In doing so, the Court offered Defendants a method of compliance that both guaranteed the procedural rights due to the class members but was less exacting than having to turn around a chartered plane. The Court considered Defendants' prerogative in the sensitive and political areas of immigration and foreign policy and offered Defendants complete discretion to provide these interviews in the time and manner they deemed best.

Add.090

Defendants describe the hardship of having to carry out impromptu immigration proceedings on foreign soil. Dkt. 130 at 7–9. But that was—and continues to be—Defendants' daily choice. "To say more would be to paint the lily." *Rodríguez v. Encompass Health Rehab. Hosp. of San Juan, Inc.*, 126 F.4th 773, 783 (1st Cir. 2025) (Selya, J.).

**B.** **Motion for Stay Pending Appeal**

As a threshold matter, the Court finds this request for a stay perplexing. The order remedying Defendants' violation of the Preliminary Injunction is as flexible as possible, leaving the details of when, where, and how entirely in Defendants' hands. *See* Dkt. 119 at 1–2 ("Each of the six individuals must be given a reasonable fear interview . . . DHS, in its discretion, may elect to provide this process to the six individuals either within the United States—should it choose to return them to the United States—or abroad."). It is the narrow remedy Defendants requested.[22] In short, there is very little to stay, absent completely blessing Defendants' violation.

As to the clarification to the Preliminary Injunction, Dkt. 118, that addresses a problem *raised by Defendants*. *See* Dkt. 130 at 4–5; Tr. of May 21, 2025 Hr'g at 37:23–38:3 ("[T]he Court's preliminary injunction [] wasn't specific enough."). Defendants ask this Court to reverse its clarification but offer nothing to put in its place. That would do little more than return us to the same spot as before.

As to the request itself, for the reasons stated on the record and further outlined in Dkt. 118 and in Section A, *supra*, Defendants have not "made a strong showing that [they] [are] likely to succeed" in demonstrating that there was no violation of the Preliminary Injunction or in

---

[22] See *supra* at 2.

Add.091

challenging the appropriateness of the Court's relief.  *See Hilton*, 481 U.S. at 776.  Accordingly, Defendants' motion for stay pending appeal is DENIED.  *See Acevedo-Garcia*, 296 F.3d at 16.[23]

### C.    Motion for Temporary Restraining Order or Preliminary Injunction

In the alternative, the Court finds that it would grant Plaintiffs' motion for temporary restraining order or preliminary injunction.  Likelihood of success and irreparable harm clearly weigh in Plaintiffs' favor, although Defendants raise serious concerns regarding the public interest, which justify the Court's limited remedy.

### 1.    Likelihood of Success

For the reasons stated on the record and further outlined in Dkt. 118 and in Section A, *supra*, the Court finds that Plaintiffs are likely to succeed in showing that the May 20, 2025, attempted removals were unlawful.

### 2.    Irreparable Harm

The Court further finds that the class members at issue were, and continue to be, at risk of irreparable harm in the absence of injunctive relief.  The Court has already outlined the risks faced by class members generally.  *See* Dkt. 64 at 44–45.  Here, that risk becomes tangible as class members were nearly dropped off in a war-torn country where the Government states that "[f]oreign nationals have been the victims of rape, sexual assault, armed robberies, and other violent crimes."[24]

---

[23] The Court notes an additional reason to deny this motion.  Stays are tools of equity, *Common Cause*, 970 F.3d at 15–16, and are thus subject to equitable doctrines.  Here, the unclean hands doctrine bars equitable relief.  *See Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 241, 245 (1933) ("He who comes into equity must come with clean hands.").  Discretion cautions against granting preliminary, extraordinary relief where a party has, at best, sought to get around an injunction through clever compliance.

[24] *South Sudan Travel Advisory*, U.S. DEPARTMENT OF STATE, Mar. 8, 2025, https://perma.cc/XQN7-VXHV.

Add.092

**3.    Balance of Equities and Public Interest**

Defendants' last set of arguments, Dkt. 130 at 6–9, when stripped of rhetoric, sound primarily in the public interest and in the hardship that the government faces in complying with Congress's immigration laws.  This Court shares Defendants' concerns about the limited role courts should play in directing the Executive Branch and continues to be open to solutions for how to craft narrow and effective relief.  This Court has also taken into consideration Defendants' determination that the class members at issue pose a security threat and has withheld action accordingly.  For example, against Plaintiffs' requests, the Court did not dictate the terms of the class members' detention, respecting safety concerns raised by Defendants.  *See* Dkt. 116; Tr. of May 20, 2025 Hr'g at 43:23–44:8.  Likewise, the Court did not order the class members' return to the United States and otherwise gave Defendants remarkable flexibility with minimal oversight. Dkt. 119 (ordering weekly status reports).  All of this is to say that the Court has reviewed the totality of the situation, including the criminal histories of the individuals and the undoubted operational costs, and has weighed those factors in ordering as narrow relief as the Constitution will tolerate.

**IV.    Conclusion**

For the foregoing reasons, Defendants' motions for reconsideration and for stay pending appeal are DENIED.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated:  May 26, 2025                    Judge, United States District Court

Add.093

| From: | ECFnotice@mad.uscourts.gov |
|-------|---------------------------|
| To: | CourtCopy@mad.uscourts.gov |
| Subject: | Activity in Case 1:25-cv-10676-BEM D.V.D. et al v. U.S. Department of Homeland Security et al Order on Motion to Enforce Judgment |
| Date: | Monday, June 23, 2025 9:58:28 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### United States District Court

### District of Massachusetts

## Notice of Electronic Filing

The following transaction was entered on 06/23/2025 at 7:58:50 PM EDT and filed on 06/23/2025

**Case Name:** D.V.D. et al v. U.S. Department of Homeland Security et al
**Case Number:** 1:25-cv-10676-BEM
**Filer:**
**Document Number:** 176 (No document attached)

**Docket Text:**
Judge Brian E. Murphy: ELECTRONIC ORDER ENTERED. Plaintiffs' Emergency Motion, Dkt. 174, is DENIED as unnecessary, subject to the below. The Court's May 21, 2025 Order on Remedy, Dkt. 119, remains in full force and effect, notwithstanding today's stay of the Preliminary Injunction. *DHS v. D.V.D.*, No. 24A1153, slip op. at 12 (S. Ct. Jun. 23, 2025) (Sotomayor, J., dissenting) ("[T]he District Court's remedial orders [were] not properly before [the Supreme] Court because the Government has not appealed them, nor sought a stay pending a forthcoming appeal."). For the avoidance of doubt, and to the extent Plaintiffs N.M. and D.D. are indeed subject to third-country removal, *see* Dkt. 175 at 5-7, N.M. and D.D. are included among the individuals referenced in the May 21, 2025 Order. (BAH) Modified on 6/23/2025 (PK).

**1:25-cv-10676-BEM Notice has been electronically mailed to:**

Elianis N. Perez    elianis.perez@usdoj.gov

Trina Realmuto    trina@immigrationlitigation.org

Mary Larakers    mary.l.larakers@usdoj.gov, maria.n.latimer@usdoj.gov

Add.094

Christopher A. Hatfield    hatfieldc@ballardspahr.com, LitDocket_East@ballardspahr.com,
LitigationLegalAdministrativeAssistantsDC@ballardspahr.com

Kristin Macleod-Ball    kristin@immigrationlitigation.org

Mark Sauter    mark.sauter@usdoj.gov, CaseView.ECF@usdoj.gov,
USAMA.ECF@usdoj.gov, andrew.bell2@usdoj.gov, susanne.husted@usdoj.gov

Mary Kenney    mary@immigrationlitigation.org

Matthew Patrick Seamon    matthew.seamon2@usdoj.gov

Leila Kang    leila@nwirp.org

Aaron Korthuis    aaron@nwirp.org

Anwen Hughes    HughesA@humanrightsfirst.org

Glenda M. Aldana Madrid    glenda@nwirp.org

Matt Adams    matt@nwirp.org, sydney@nwirp.org

Inyoung Hwang    HwangS@humanrightsfirst.org

Maxwell Mishkin    mishkinm@ballardspahr.com

Isabella Salomao Nascimento    salomaonascimentoi@ballardspahr.com

**1:25-cv-10676-BEM Notice will not be electronically mailed to:**

The following document(s) are associated with this transaction:

*This is a re-generated NEF. Created on 6/23/2025 at 9:57 PM EDT*