No. 25-1393

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

———————————————

D.V.D., M.M., E.F.D., O.C.G.,

*Plaintiffs-Appellees*,

v.

U.S. Department of Homeland Security, Krisit Noem, Secretary, U.S. Department of Homeland Security (DHS); Pamela Bondi, United States Attorney General, Antone Moniz, Superintendent of the Plymouth County Correctional Facility,

*Defendants-Appellants*.

———————————————

On Appeal from the United States District Court
for the District of Massachusetts

———————————————

## JOINT APPENDIX VOLUME II

———————————————

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

ELIANIS N. PEREZ
*Assistant Director*

MATTHEW P. SEAMON
MARY L. LARAKERS
*Senior Litigation Counsel*
U.S. Department of
Justice, Civil Division
Office of Immigration
Litigation
P.O. Box 868,
Ben Franklin Station
Washington, DC 20044

# TABLE OF CONTENTS

### I.  <u>Documents</u>

Memorandum and Order Granting Class Certification and Preliminary Injunction (ECF No. 64) .............................................................................................. 473

Electronic Order Amending Preliminary Injunction (ECF No. 86) ........... 521

Authenticating Declaration of Trina Realmuto in Support of Plaintiffs' Emergency Motion for a Temporary Restraining Order (ECF Nos. 90—90-6)............ 523

Memorandum and Order on Plaintiffs' Motion for Emergency Relief (ECF No. 91) .............................................................................................................. 642

Index and Exhibits in Support of Plaintiffs' Brief in Support of Joinder of the Department of Defense (ECF Nos. 99—99-4) .......................................... 644

Notice of Errata (ECF No. 103)................................................................. 666

Exhibits in Support of Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction on Behalf of Class Members N.M. and T.T.P and All Other Similarly Situated Class Members (ECF Nos. 112-1—112-2) .. 675

Order on Maintaining Custody (ECF No. 116) .......................................... 745

Order Clarifying Preliminary Injunction (ECF No. 118) ........................... 747

Order on Remedy for Violation of Preliminary Injunction (ECF No. 119) .............................................................................................................. 750

Defendants' Amended Declaration In Response to ECF No. 121 (ECF No. 129) .............................................................................................................. 752

Defendants' Motion for Reconsideration & Exhibits (ECF No. 130)........ 763

Memorandum and Order on Plaintiffs' Motion for Preliminary Injunction (ECF No. 132)...................................................................................... 790

Memorandum and Order on Defendants' Motions for Reconsideration and Stay (ECF No. 135)............................................................................. 804

Supreme Court Order Granting Stay of Preliminary Injunction................. 821

## I.    <u>Transcripts</u>

Transcript Excerpts from May 21, 2025 Emergency Hearing.................... 840

Transcript Excerpts from April 10, 2025 Class Certification and Preliminary Injunction Hearing ...................................................................... 853

Transcript Excerpts from March 28, 2025 Temporary Restraining Order Hearing (D. Mass.) - – These are in the attached Supp. Ct. App. ............................ 867

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| D.V.D., *et al.*,<br>individually and on behalf of all others<br>similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. Department of Homeland Security,<br>*et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     **Civil Action No.**<br>    **25-10676-BEM** |

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION AND PRELIMINARY INJUNCTION

**MURPHY, J.**

This case presents a simple question: before the United States forcibly sends someone to a country other than their country of origin, must that person be told where they are going and be given a chance to tell the United States that they might be killed if sent there? Defendants argue that the United States may send a deportable alien to a country not of their origin, not where an immigration judge has ordered, where they may be immediately tortured and killed, without providing that person any opportunity to tell the deporting authorities that they face grave danger or death because of such a deportation. All nine sitting justices of the Supreme Court of the United

States,[1] the Assistant Solicitor General of the United States,[2] Congress,[3] common sense,[4] basic decency, and this Court all disagree.  Plaintiffs are seeking a limited and measured remedy—one Defendants have conceded in other proceedings is the minimum that comports with due process.[5]  Plaintiffs are simply asking to be told they are going to be deported to a new country before they are taken to such a country, and be given an opportunity to explain why such a deportation will likely result in their persecution, torture, and/or death.  This small modicum of process is mandated by the Constitution of the United States, and for this reason, the motion for class certification is GRANTED, and the motion for preliminary injunction is GRANTED in part.

---

[1] *Trump v. J.G.G.*, 604 U.S. —, 2025 WL 1024097, at *2 (Apr. 7, 2025) (*per curiam*) ("[N]otice must be afforded within a reasonable time and in such a manner as will allow [deportable aliens] to actually seek . . . relief in the proper venue before such removal occurs."); *see also id.* (Kavanaugh, J., concurring) ("[A]ll nine Members of the Court agree that judicial review is available.").

[2] Transcript of Oral Argument at 32–33, *Bondi v. Riley*, No. 23-1270 (S. Ct. Mar. 24, 2025) ("JUSTICE KAGAN: . . . [W]hen you have the order of removal but the [Convention Against Torture] proceedings have not yet been concluded, what does the government feel itself free to do with the alien? . . . [ASSISTANT TO THE SOLICITOR GENERAL]: We do think we have the legal authority to [send the non-citizen to some other country, assuming no pending claim under the Convention Against Torture as to that other country], with the following caveat: We would have to give the person notice of the third country and give them the opportunity to raise a reasonable fear of torture or persecution in that third country."); Transcript of Oral Argument at 20–21, *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021) ("JUSTICE KAGAN: So that's what it would depend on, right?  That -- that you would have to provide [an individual being removed] notice [of what country he is being sent to], and if he had a fear of persecution or torture in that country, he would be given an opportunity to contest his removal to that country. Isn't that right?  ASSISTANT TO THE SOLICITOR GENERAL: Yes, that's right.").

[3] *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 348 (2005) (explaining that individuals who "face persecution or other mistreatment in the country designated" as their place of removal "have a number of available remedies," by statute, regulation, and under international law, to "ensur[e] their humane treatment"); Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681–822 (1998) (codified as Note to 8 U.S.C. § 1231) (codifying protections under the Convention Against Torture and prohibiting the removal of an alien to any country where they would likely be tortured); 8 U.S.C. § 1231(b)(3)(A); *see also* 8 C.F.R. §§ 208.16–18, 238.1, 241.8, 1208.16–18, 1240.11; 28 C.F.R. § 200.1 ("A removal order under Title V of the Act shall not be executed in circumstances that would violate Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.").

[4] "[C]ommon sense often makes good law."  *Peak v. United States*, 353 U.S. 43, 46 (1957).

[5] *Supra* note 2.

2

# I. Background

## A. Legal Background

### 1. Removal Proceedings

When the Government wants to remove an individual, the normal path is through removal proceedings, requiring an evidentiary hearing before an Immigration Judge ("IJ"). 8 U.S.C. § 1229a. Removal proceedings determine not only *whether* an individual may be removed from the United States but also to *where* he may be removed. In the first instance, the alien is entitled to select a country of removal. *Id.*; 8 U.S.C. § 1231(b)(2)(A); 8 C.F.R. § 1240.10(f). If the alien does not do so, the IJ will designate the country of removal and may also designate alternative countries. 8 C.F.R. § 1240.10(f).

Meanwhile, the alien is also entitled to seek various protections, including asylum, withholding of removal, and Convention Against Torture ("CAT") protections. 8 C.F.R. § 1240.11(c)(1).[6] Some of these protections are discretionary.[7] Others are mandatory, meaning that protection must be given if the conditions are met. Withholding of removal is a mandatory form of protection preventing deportation to the country or countries where an IJ finds that the individual is more than likely to be persecuted. *See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16; *see also Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013) ("[T]he Attorney General has no discretion to deny relief to a noncitizen who establishes his eligibility [for withholding of removal or CAT protections]."). CAT protection is a mandatory protection against deportation to a country where the IJ finds that the individual is likely to be tortured. *See* Foreign Affairs Reform and

---

[6] Technically, CAT protections can be a form of withholding. *See Guzman Chavez*, 594 U.S. at 530. The Court uses the phrase "withholding of removal" to refer to what has been called "statutory withholding." *Id.*

[7] For example, asylum, which protects against deportation generally to any country, is discretionary absent certain exceptions. *See generally* 8 U.S.C. § 1158; 8 C.F.R § 208.2.

Appx.475

Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681–822 (1998) (codified as Note to 8 U.S.C. § 1231); 8 C.F.R. §§ 208.16–18, 1208.16–18; 28 C.F.R. § 200.1; *see also Moncrieffe*, 569 U.S. at 187 n.1.

## 2.    Reinstatement or Withholding-Only Proceedings

Alternatively, the U.S. Department of Homeland Security ("DHS") may reinstate a prior order of removal for an alien it finds "has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal." 8 U.S.C. § 1231(a)(5). When DHS reinstates a removal order, the "prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed." *Id.* DHS may also issue administrative removal orders to individuals whom DHS determines are not lawful permanent residents and who have an aggravated felony conviction. *See* 8 U.S.C. § 1228(b); 8 C.F.R. § 238.1.

While in both processes aliens are barred from pursuing nearly all avenues of relief from removal, aliens may still seek protection through withholding of removal under 8 U.S.C. § 1231(b)(3) and CAT. 8 C.F.R. §§ 238.1(f)(3), 241.8(e). If the alien demonstrates a reasonable fear of persecution or torture, the alien is placed in "withholding-only proceedings" before an IJ where they can only seek withholding of removal and/or CAT protection. 8 C.F.R. §§ 208.31(b), (e); *see also* 8 U.S.C. § 1231(a)(5) (providing that an alien subject to reinstatement "is not eligible and may not apply for any relief under [the Immigration and Nationality Act ("INA")]"); 8 C.F.R. § 1208.2(c)(3)(i) ("The scope of review in [withholding-only] proceedings . . . shall be limited to a determination of whether the alien is eligible for withholding or deferral of removal."[8]).

---

[8] Deferral of removal provides CAT protections to aliens who are mandatorily ineligible for withholding of removal. *See* 8 C.F.R. § 208.17(a).

Withholding of removal and CAT protection only affect to *where* the alien may be removed, rather than *whether* the alien may be removed; thus, even if an alien prevails on his withholding or CAT claim, the removal order remains valid and enforceable, albeit not executable to the specific country as to which the alien has demonstrated a likelihood of persecution or death. *See* 8 U.S.C. § 1231(b)(2)(E); 8 C.F.R. § 1208.16(f); *Johnson v. Guzman Chavez*, 594 U.S. 523, 536 (2021); *Lanza v. Ashcroft*, 389 F.3d 917, 933 (9th Cir. 2004) (stating that a grant of withholding "only prohibits removal of the petitioner to the country of risk, but does not prohibit removal to a non-risk country").

### 3. <u>Third-Country Removals</u>

Because the removal proceedings happen on one track, while withholding and CAT proceedings happen on another track, a situation may arise where the Government has an order of removal but no country that an IJ has authorized for that removal.

In certain circumstances, where the Government may not remove an alien to any country covered by that alien's order of removal, the Government may still remove the alien to any "country whose government will accept the alien into that country." 8 U.S.C. § 1231(b)(2)(E)(vii). These are called "third-country removals." As relevant here, a specific carve-out prohibits deportation to countries in which the alien would face persecution or torture:

> Notwithstanding paragraphs [b](1) and [b](2), the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1231(b)(3)(A). Similarly, under FARRA,[9] which codified CAT protections, an alien may not be removed to any country where they would be tortured. *See* 28 C.F.R. § 200.1; 8 C.F.R.

---

[9] *See supra* note 3.

§§ 208.16–18, 1208.16–18.  In other words, third-country removals are subject to the same mandatory protections that exist in removal or withholding-only proceedings.

### B.   Factual Background

#### 1.   The February 18, 2025 Directive and March 30, 2025 Guidance

On January 20, 2025, President Donald J. Trump issued Executive Order 14165, entitled "Securing our Borders."  90 Fed. Reg. 8467.  As relevant here, on or about February 18, 2025, DHS issued a directive to the Enforcement and Removal Operations ("ERO") division of Immigration and Customs Enforcement ("ICE").  Dkt. 1-4 (the "February Directive").  The February Directive instructs ERO officers to review the cases of aliens granted withholding of removal or protection under CAT "to determine the viability of removal to a third country and accordingly whether the alien should be re-detained" and, in case of persons who previously could not be removed because the designated countries were unwilling to receive them, "review for re-detention . . . in light of the Administration's significant gains with regard to previously recalcitrant countries and the potential for third country removals."  *Id.* at 2.

On March 23, 2025, Plaintiffs filed this lawsuit challenging, in part, the February Directive. Dkt. 1 ("Compl.").  Plaintiffs seek an order guaranteeing them the opportunity to show—before being removed to countries not included on their removal orders—that they will suffer persecution, torture, and/or death in those countries.  They are challenging Defendants' policy or practice of designating aliens for removal to any country other than the country or alternative country of removal designated and identified in writing in their prior immigration proceedings without first providing notice and an opportunity to apply for protection from removal to that "third" country.

6

On March 28, 2025, the Court entered a temporary restraining order after hearing oral arguments from both parties.[10]  Dkt. 34.

On March 30, 2025, DHS issued an updated guidance (the "March Guidance") on removals to third countries.  Dkt. 43-1.  This guidance dictates that aliens may be removed to a third country without notice if the United States has received assurances from that country that aliens removed from the United States will not be persecuted or tortured.  *Id.* at 2–3.  Importantly, these assurances are not individualized, and the March Guidance provides for no review, meaning that deportations to a third country can occur without any consideration of the individual risks facing a particular alien.  *Id.*  According to the March Guidance, DHS will provide the alien with notice of the third country (and an opportunity to affirmatively assert a fear of return to that third country) only if the United States has not received assurances, or if the Department of State does not believe those assurances to be credible.  *Id.* at 3.

### 2. <u>Plaintiffs' Cases</u>

Plaintiffs are individuals subject to final orders of removal, allegedly at imminent risk of deportation to countries other than those authorized by their respective orders.  Compl. ¶ 1.[11]

Plaintiff D.V.D.[12] is a citizen of Cuba who entered the United States from Mexico.  *Id.* ¶¶ 10, 62.  In February 2017, in removal proceedings, he was ordered removed.  *Id.* ¶ 62.  His removal order specified only Cuba as the country of removal.  *Id.*  He was released from detention on an Order of Supervision in May of 2017.  *Id.*  Plaintiffs allege that on March 10, 2025, ICE instructed D.V.D.'s attorney that D.V.D. needed to report for an in-person check-in on March 28,

---

[10] The Court extended the temporary restraining order after hearing further oral arguments from both parties on April 10, 2025.  Dkt. 62.

[11] Except where indicated, the relevant facts are largely undisputed.

[12] The Court has allowed Plaintiffs to proceed under pseudonyms.  Dkt. 13.

Appx.479

2025, and that the ICE officer later explained that ICE was requiring all people to report in person and more frequently on a case-by-case basis.  *Id.* ¶¶ 64–66.  If deported to a third country, D.V.D. alleges that he is at risk of persecution due to his mental health conditions or possible imprisonment in certain countries.  *Id.* ¶ 67.  At oral argument on March 28, 2025, counsel indicated that D.V.D. had not been detained at that day's check-in and had been given another check-in date in September 2025.  Dkt. 44 ("March 28, 2025 Tr.") at 4:24–25.

Plaintiff M.M. is a citizen of Honduras who fled due to severe domestic violence.  Compl. ¶¶ 11, 68.  In 2014, because she had previously been ordered removed from the United States, DHS issued a reinstatement order.  *Id.* ¶ 69.  In withholding-only proceedings before an IJ in 2021, she was granted withholding of removal to Honduras.  *Id.* ¶¶ 69–70.  M.M. is not in ICE custody, but she alleges that on March 7, 2025, an ICE officer informed her that she was on a list of people who would be deported imminently.  *Id.* ¶ 71.  If deported to a third country, M.M. alleges that she is at risk of being sent back to Honduras or another country where she would again face severe domestic violence.  *Id.* ¶ 73.  At oral argument on April 10, 2025, counsel indicated that M.M.'s check-in had been cancelled by ICE after the initiation of this suit.  April 10, 2025 Rough Tr. at 1:19–21.

Plaintiff E.F.D. is a citizen of Ecuador.  Compl. ¶¶ 12, 74.  In October 2015, he was placed in removal proceedings after entering the United States and raising a credible fear of return.  *Id.* In 2018, in removal proceedings, an IJ granted E.F.D.'s application for CAT protection.  *Id.* ¶ 75.  On March 18, 2025, ICE re-detained him.  *Id.* ¶¶ 12, 76.  He has not yet been told when his removal might happen or to where.  *Id.* ¶¶ 76–77.  E.F.D. alleges that he will be deported to a third country without the opportunity to apply for protection, which could include countries that will deport him

Appx.480

back to Ecuador, from which he was awarded CAT protection, or to countries where he has had prior dangerous experiences. *Id.* ¶ 77.

Plaintiff O.C.G. is a native of Guatemala who was issued an expedited removal order pursuant to 8 U.S.C. § 1225(b) and deported to Guatemala in March 2024, without a credible fear interview. *Id.* ¶¶ 13, 78. In May of 2024, he reentered the United States, through Mexico, after experiencing violence in Mexico. *Id.* ¶¶ 79–80. His removal order was reinstated by DHS, but he was referred to an asylum officer based on his expressed fear of returning to Guatemala. *Id.* ¶ 80. He was then placed in withholding-only proceedings before an IJ and was granted withholding of removal to Guatemala under 8 U.S.C. § 1231(b)(3). *Id.* ¶¶ 80–82. Plaintiffs allege that the IJ did not designate Mexico as a country of removal and that, when DHS tried to add Mexico during the withholding-only proceedings, the IJ told DHS that it was "too late" to do so. *Id.* ¶¶ 81–83. DHS waived appeal. *Id.* ¶ 84. Despite this success, O.C.G. remained in detention and was quickly deported to Mexico. *Id.* ¶¶ 85–86. The parties dispute whether he was provided an opportunity to express fear prior to being deported to Mexico. *Compare id.* ¶¶ 85–86 (complaint alleging that no notice or opportunity to be heard was provided), *and* Dkt. 8-4 ¶¶ 8–10 (declaration of O.C.G. asserting same), *with* Dkt. 31-1 ¶ 13 (declaration of Brian Ortega, Assistant Field Office Director of ICE's ERO Phoenix Field Office, asserting that notice was provided on the day of his removal, and fear of removal to Mexico was expressly denied). Plaintiffs allege that O.C.G. was taken to Mexico by bus and that, once he was placed in detention in Mexico, he was informed by Mexican authorities that he could apply for asylum in Mexico—and remain incarcerated for an unknown period of time while that application was pending—or be returned to Guatemala. Compl. ¶¶ 87–88. Plaintiffs allege that, on February 25, 2025, O.C.G. returned to Guatemala, where he remains in hiding today. *Id.* ¶ 89.

Each Plaintiff alleges that he or she has valid reasons to fear removal to specific countries that were not included in their removal orders. *Id.* ¶¶ 67, 73, 77, 88. Plaintiffs challenge Defendants' policy or practice of failing to provide notice and an opportunity to be heard prior to removal to a country that was not designated in their removal orders, which Plaintiffs allege violates the INA, FARRA, regulations implementing the two statutes, and the Due Process Clause of the Fifth Amendment. *Id.* ¶¶ 99–138.

### 3. Current Motions

Before the Court now are Plaintiffs' Motion for Class Certification, Dkt. 4, and Motion for a Preliminary Injunction, Dkt. 6,[13] through which Plaintiffs seek: (1) to prevent Defendants from removing certain of the named Plaintiffs to a "third" country without notice and an opportunity to assert fear of persecution or torture; (2) to prevent Defendants from removing any class member to a "third" country without notice and an opportunity to assert fear of torture; and (3) an order directing Defendants to facilitate the immediate return of O.C.G. to the United States. For the reasons set forth below, Plaintiffs' motion for class certification is GRANTED, and Plaintiffs' motion for a preliminary injunction is GRANTED in part.

---

[13] The Court has already ruled on the motion to the extent it sought a temporary restraining order, and as stated on the record in the March 28, 2025 hearing, the Court denies the motion to the extent it seeks an administrative stay of the February Guidance.

Appx.482

## II.  **Jurisdiction**

Several subsections of 8 U.S.C. § 1252 limit judicial review of claims and questions that relate to removal proceedings or existing orders of removal.  Defendants argue that sections 1252(a), (b), and (g) strip this Court of jurisdiction.[14]

### A.  **Sections 1252(a) and (b)**

In the REAL ID Act of 2005, Congress amended the INA to limit the ways by which an individual might challenge his order of removal.  *Singh v. Gonzales*, 499 F.3d 969, 977 (9th Cir. 2007) (citing 8 U.S.C. § 1252(a)(5)).[15]  In turn, section 1252(b)(9) limits the forum for those challenges to courts of appeals.  *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016).[16]

Accordingly, actions that do not challenge final orders of removal are not subject to this channeling scheme.  *J.E.F.M.*, 837 F.3d at 1032.  "[A] suit brought against immigration authorities

---

[14] Defendants also argue that section 1252(f)(1) limits this Court's jurisdiction with respect to class-wide relief.  However, in *Biden v. Texas*, 597 U.S. 785 (2022), the Supreme Court explicitly confirmed that section 1252(f)(1) concerns the availability of relief, not subject matter jurisdiction. *Id.* at 800–01. As the Court explained, "the question whether a court has jurisdiction to grant a particular remedy is different from the question whether it has subject matter jurisdiction over a particular class of claims." *Id.* at 801. While the provision may "withdraw[ ] a district court's 'jurisdiction or authority' to grant a particular form of relief[,] [i]t does not deprive the lower courts of all subject matter jurisdiction over claims brought under sections 1221 through 1232 of the INA." *Id.* at 798; *see also Nielsen v. Preap*, 586 U.S. 392, 402 (2019) (addressing the merits of the suit because "[w]hether the [District] [C]ourt had jurisdiction to enter such an injunction [under section 1252(f)(1)] is irrelevant because the District Court had jurisdiction to entertain the plaintiffs' [class-wide] request for declaratory relief"). As discussed below, the Court has jurisdiction to grant both the class-wide declaratory and injunctive relief sought in this case.  *See infra* at 23–27.

[15] In pertinent part, section 1252(a)(5) states:

[A] petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter[.]

[16] Section 1252(b)(9) states:

Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

Appx.483

is not *per se* a challenge to a removal order." *Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011).

The Supreme Court has expressly affirmed this proposition, explaining that the phrase "arising from" in section 1252(b)(9) does not encompass all claims that merely result from the fact of or potential for removal, which reading the Court said would have "staggering results." *Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018). Because the respondents in *Jennings* were "not asking for review of an order of removal," "not challenging the decision to detain them in the first place or to seek removal," and "not even challenging any part of the process by which their removability will be determined," the Court concluded that the restriction in section 1252(b)(9) did not apply. *Id.* Notably, under *Jennings*, an individual is not required to "cram[]" claims into the judicial review of a removal order where doing so would be unnatural.[17] *Id.*

The First Circuit has had further opportunity to clarify that the scope of section 1252(b)(9) is limited to claims that specifically arise out of what happens in the removal proceeding:

> [R]emoval proceedings are confined to determining whether a particular alien should be deported. *See* [8 U.S.C.] § 1229a(c)(1)(A). While legal and factual issues relating to that question can be raised in removal proceedings and eventually brought to the court of appeals for judicial review, certain claims, by reason of the nature of the right asserted, cannot be raised efficaciously within the administrative proceedings delineated in the INA. *See, e.g., McNary* [*v. Haitian Refugee Ctr., Inc.*], 498 U.S. [479,] 496, 111 S.Ct. 888 [(1991)]; *Jupiter v. Ashcroft*, 396 F.3d 487, 492 (1st Cir. 2005). Requiring the exhaustion of those claims would foreclose them from any meaningful judicial review. Given Congress's clear intention to channel, rather than bar, judicial review through the mechanism of

---

[17] Even if an individual raised claims related to the risk of torture in a third country, the IJ would not normally consider or address such claims unless that country had already been designated as a country of removal. *See infra* at 16–17 & note 24; *see also, e.g.*, Compl. ¶¶ 81–83 (alleging that, when DHS sought to add Mexico during O.C.G.'s withholding-only proceedings, the IJ told DHS that it was "too late" to do so); Dkt. 8-4 ¶¶ 5–7 (declaration of O.C.G. that the IJ did not designate Mexico as a country of removal and that the IJ informed DHS that Mexico was not a country for removal during the withholding-only proceedings); Dkt. 8-11 at 5–6 (motion to reopen denied despite third country identified for removal); Dkt. 59-12 at 4 (motion to reopen denied where removal to third country was speculative, and indicating that even if third country were identified for removal, relief would need to be sought in federal court rather than in immigration proceedings); Dkt. 59-13 at 4 (motion to reopen denied as premature where "Respondent was not seeking protection from removal to any particular country").

Appx.484

section 1252(b)(9), reading "arising from" as used in that statute to encompass
those claims would be perverse.

*Aguilar v. U.S. Immigr. & Customs Enf't*, 510 F.3d 1, 11 (1st Cir. 2007). As such, "claims which

cannot be raised in removal proceedings and eventually brought to the court of appeals on a petition

for review are 'independent of, or wholly collateral to, the removal process,' not 'arising from' it."

*Gicharu v. Carr*, 983 F.3d 13, 16 (1st Cir. 2020) (quoting *Aguilar*, 510 F.3d at 11).[18]

In examining Plaintiffs' requested relief, the issues in this case extend beyond those that

could have been raised in their removal proceedings. This largely follows from the simple fact

that Plaintiffs are no longer in removal proceedings and complain only of actions that post-date

their removal proceedings. Plaintiffs neither challenge the IJs' determinations that they are

removable nor claim any deficiency in the removal orders themselves. *Cf. Delgado*, 643 F.3d at

55 (challenging adjustment of status, which would necessarily render removal order "invalid");

*Aguilar*, 510 F.3d at 13–14 (challenging right to counsel in removal proceedings). Rather,

Plaintiffs' claims do quite the opposite of challenge their orders of removal—they seek to hold

Defendants to the terms of those orders and to receive notice and an opportunity to be heard before

Defendants explicitly exceed those orders. *See Aden v. Nielsen*, 409 F. Supp. 3d 998, 1006 (W.D.

Wash. 2019) (finding claims that "challenge[d] DHS's attempts, *outside* of removal proceedings,

to designate [a third country] without reopening his proceedings so that an IJ could make the

designation in the first instance and/or determine whether petitioner's life or freedom would be

---

[18] In reaching its decision in *Aguilar*, the First Circuit cited and relied upon decades of Supreme Court
precedent that is "hostil[e] toward requiring exhaustion when adequate relief could not feasibly be obtained through
the prescribed administrative proceedings." *Aguilar*, 510 F.3d at 12 (citing *Leedom v. Kyne*, 358 U.S. 184, 190 (1958),
*Matthews v. Eldridge*, 424 U.S. 319, 330–31 (1976), *Bowen v. City of New York*, 476 U.S. 467, 482–83 (1986), and
*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994)).

threatened in that country" independent of removal order and thus not barred by section 1252(a)(5)).[19]

Defendants propose that Plaintiffs can "cram," *Jennings*, 583 U.S. at 294, their fear-based claims into the removal proceedings (thereby placing those claims into section 1252's jurisdictional funneling scheme) by filing motions to reopen their immigration proceedings. Dkt. 51 ("PI Opp.") at 8–9. But this Court finds that remedy to be both legally insufficient and logistically impossible, effectively "foreclos[ing] all meaningful judicial review." *See Aguilar*, 510 F.3d at 12 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994)).[20]

For most aliens, directly moving to reopen is simply not an option. "With a few narrow exceptions, the Immigration and Nationality Act limits petitioners to a single motion to reopen

---

[19] Although this case involves sensitive subject matter and complex statutory schemes, its underlying principles are surprisingly familiar. Courts routinely consider whether jurisdiction is barred based on a prior court's order. *See, e.g.*, *Verogna v. Johnstone*, 583 F. Supp. 3d 331, 336–37 (D.N.H. 2022), *aff'd*, 2022 WL 19795808 (1st Cir. Nov. 14, 2022). Under sections 1252(a)(5) and (b)(9), district courts are precluded from revisiting orders made by immigration judges. It would not make sense, however, to offer that same protection for acts that go beyond those orders' preclusive scope.

[20] Defendants claim that an alien can raise fear-based concerns through reopening IJ proceedings or petitioning the court of appeals for review. *E.g.*, April 10, 2025 Rough Tr. at 9:24–10:5 ("MR. ENSIGN: Your Honor, they would have needed to raise it earlier or -- and if we were in the second part of the [March] guidance, they also could manifest fear at that point and then it would go to screening. So there's that potentially available as well. But, you know, to the extent they have awareness of that now, they should go back before the IJ and BIA."); *id.* at 10:19–22 ("MR. ENSIGN: Your Honor, they would have needed to go to the BIA before [they are notified of third-country removal plans]. There's nothing under the [March] guidance that would require additional notice or an opportunity to challenge it at that moment."); *id.* at 27:10–13 ("[MR. ENSIGN:] There is -- the typical way it . . . would be raised is a motion to reopen if you haven't raised it already, and then you can raise it to the Court of Appeals."); *id.* at 44:2–11 ("THE COURT: So it happens Saturday morning, the person raises a fear that department disagrees -- they make it through the first screening, the department disagrees. That person is then going to be deported on Sunday morning. As a practical matter, there's no judicial review of that decision, right? MR. ENSIGN: There would be administrative review potentially in the IJ. THE COURT: How would they do that? It's Saturday. MR. ENSIGN: Your Honor, I don't know the specifics of the IJ proceedings."). This claim is either an effort to prevaricate or is deeply disingenuous. The suggestion that an alien must—or even can—reopen an immigration proceeding at 6:00 a.m. on a Saturday prior to being removed that same weekend is preposterous on its face. *See, e.g.*, Exec. Office for Immigr. Rev., *Boston Immigration Court*, U.S. Dep't of Just., https://www.justice.gov/eoir/boston-immigration-court (last updated Apr. 9, 2025) ("The immigration court is open Monday to Friday except for federal holidays."). Further, Defendants have provided no evidence or authority—only their own argument—that there is a way for Plaintiffs to *successfully* reopen their immigration proceedings as of right and do not address Plaintiffs' well-supported contention that motions to reopen to assert fear of removal to a country not designated in their removal order are routinely denied as speculative. *See* PI Opp. at 8–9 (discussing only sua sponte motions to reopen process). Defendants' contention is belied by both the evidence in the record and clear case law on the limits of sua sponte motions to reopen. *See infra* at 14–18.

filed within ninety days of a removal order." *Charles v. Garland*, 113 F.4th 20, 23 (1st Cir. 2024) (citing 8 U.S.C. § 1229a(c)(7)(A), (c)(7)(C)(i); 8 C.F.R. § 1003.2(c)(2)). In the absence of any right to reopen the underlying immigration case, the petitioner can only ask the immigration court to reopen "sua sponte." *Id.* Immigration courts have nearly unfettered "discretion to decide whether to grant or deny sua sponte reopening." *Id.*; *see also Phimmady v. Bondi*, 128 F.4th 18, 23 (1st Cir. 2025) (holding that judicial review of immigration court's decision not to reopen sua sponte is limited and that there is no legal error in declining to reopen where plaintiff could not establish settled practice of reopening cases sua sponte in similar circumstances). Consistent with this, Plaintiffs have provided sworn declarations indicating that their various attempts at reopening proceedings to seek CAT protections have been denied by IJs. *See* Dkt. 8-8 ¶ 9 (explaining that an IJ denied motion to reopen); Dkt. 8-18 ¶ 5 (same); Dkt. 8-11 at 5–6 (IJ order denying motion to reopen and noting that neither "Immigration Judges nor the Board of Immigration Appeals ha[s] jurisdiction to review any determination by officers of the DHS under 8 C.F.R. § 241.15 regarding the country of removal. Nothing in this order forbids DHS from acting on its own authority to designate a country, or forbids the parties from litigating that issue in any forum outside of the Executive Office of Immigration Review" (citations omitted)); Dkt. 59-12 ¶¶ 12–18 ("If the United States government were to remove Respondent to El Salvador under a separate authority, that is outside the jurisdiction of this Court to adjudicate and/or analyze. Respondent's relief would be

Appx.487

sought in Federal court, not Immigration Court.");[21] Dkt. 59-13 at 4 (IJ order denying motion to reopen as premature where "Respondent was not seeking protection from removal to any particular country").[22] *But see* Dkt. 8-14 ¶ 7 (noting that an IJ granted a motion to reopen proceedings for an alien currently in detention).[23]

Even where an alien may move as of right, or in the unlikely event that the immigration court reopens the case sua sponte, there is no reason to believe that the court will entertain such preemptive CAT and withholding claims. "[A]n applicant is not entitled to have the agency adjudicate claims of relief that relate 'to a country that nobody is trying to send them to.'" *Sadychov v. Holder*, 565 F. App'x 648, 651 (9th Cir. 2014) (quoting *She v. Holder*, 629 F.3d 958, 965 (9th Cir. 2010), *superseded on other grounds by statute as stated in Dai v. Sessions*, 884 F.3d

---

[21] The full reasoning for the IJ's denial states:

First, country conditions in El Salvador are not relevant to Respondent's case. Respondent was ordered removed by this court to his country of origin, Venezuela - not El Salvador.

Second, Respondent's fear of removal to El Salvador as a 'Venezuelan national with Tattoos' is tentative and speculative, at best. Respondent has been ordered removed to Venezuela by this Court, not El Salvador. If the United States government were to remove Respondent to El Salvador under a separate authority, that is outside the jurisdiction of this Court to adjudicate and/or analyze. Respondent's relief would be sought in Federal court, not Immigration Court, when and if that issue became ripe for review.

Dkt. 59-12 at 4.

[22] There are further substantive and logistical barriers to filing motions to reopen, especially for pro se and detained aliens and those with limited English proficiency, and particularly where removals are executed unexpectedly and with great haste. *See* Dkt. 59-9 (describing procedural, evidentiary, and substantive barriers to filing motions to reopen, especially for pro se and detained noncitizens given limitations on communication and mail access in immigration detention, as well as the impossibility of seeking reopening without knowledge of the country to which someone will be deported); Dkt. 59-10 (same, and highlighting that pro se individuals are unlikely to be aware of the availability of motions to reopen as a procedural mechanism); Dkt. 59-11 (same, and highlighting difficulties for detained individuals with limited English proficiency and the likelihood of deportation while a motion to reopen is pending).

[23] Moreover, as a practical matter, even if Plaintiffs could viably seek to reopen their immigration proceedings without knowing where the Government intends to send them, Plaintiffs would then need to make separate cases for each and every potential country for which they might have a fear-based claim to avoid removal. It is hard to imagine that this solution, which would dramatically clog the immigration courts—and would seem to pose an even greater hindrance to Defendants' removal efforts than providing the sought-after notice in the first place—is what Congress intended.

858, 867 n.8 (9th Cir. 2018)) (explaining that "should circumstances change such that Azerbaijan is the designated country of removal, the agency must provide [plaintiff] with notice and an opportunity to reopen his case for full adjudication of his claim of withholding of removal from Azerbaijan"). Until an individual receives notice of the country to which he is being deported, he has no basis for reopening his immigration case and no merits basis to seek withholding from a hypothetical third country.[24]

The inability to effectively raise preemptive CAT and/or withholdings claims before an IJ precludes meaningful review in courts of appeals. That is so because courts of appeals are limited to the administrative record, 8 U.S.C. § 1252(b)(4)(A), and are thus, at most, able to review the IJ's discretionary decision not to reopen the case or adjudicate hypothetical claims, which—when the motion or request concerns "a country that nobody is trying to send them to," *Sadychov*, 565 F. App'x at 651—is not wrongly decided. *See id.* But even that may overstate the review available to petitioners. Multiple circuits have held that courts of appeals lack *any* jurisdiction to review discretionary decisions to reopen. *See, e.g.*, *Manyary v. Bondi*, 129 F.4th 473, 479 (8th Cir. 2025) (calling due-process argument raised through request to reopen sua sponte "'an abuse of discretion argument in constitutional garb'" (quoting *Tamenut v. Mukasey*, 521 F.3d 1000, 1005 (8th Cir. 2008))); *Mosere v. Mukasey*, 552 F.3d 397, 400 (4th Cir. 2009); *see also Tamenut*, 521 F.3d at

---

[24] For this reason, the Court has declined to distinguish between those whose removal or withholding-only proceedings conclude before versus after entrance of this Court's Order. *See* April 10, 2025 Rough Tr. at 16:5–23 (considering the idea). Whichever countries or fear-based claims an alien may attempt to raise during proceedings, IJs are under no obligation to make findings about countries not previously identified as "proposed countr[ies] of removal." *See* 8 C.F.R. § 1208.16(b) (defining eligibility with respect to that limited subset); *id.* § 1240.11(c)(1) (instructing IJs to advise aliens that they may apply to that subset (citing 8 C.F.R. § 1240.10)). Imposing a before-and-after distinction would require crafting a new, burdensome system for how immigration courts identify countries of removal and adjudicate related claims.

1004 (citing cases from ten circuits).[25]  Indeed, just over two months ago, the First Circuit openly doubted (and declined to resolve) whether it had jurisdiction to review the denial of a request to reopen involving consideration of factual circumstances.  *Phimmady*, 128 F.4th at 22 & n.2 (highlighting that the "Supreme Court has 'express[ed] no opinion on whether federal courts may review [a] decision not to reopen removal proceedings.'" (quoting *Kucana v. Holder*, 558 U.S. 233, 251 n.18 (2010)) (first alteration in *Phimmady*)).[26]  Accordingly, such preemptive CAT and/or withholding claims, including the due-process issues raised in this case, are precisely the type of "claims which cannot be raised in removal proceedings and eventually brought to the court of appeals on a petition for review" that the First Circuit has held are "'independent of, or wholly collateral to, the removal process,' not 'arising from' it."  *See Gicharu*, 983 F.3d at 16 (quoting *Aguilar*, 510 F.3d at 11).

Finally, Defendants argue that "Congress, in its discretion, implemented [CAT] by directing the issuance of regulations, expressly depriving courts of jurisdiction to review those regulations, and channeling all review of individual CAT claims into review of final orders of

---

[25] Several of these cases appear to have since been superseded, *see, e.g.*, *Thompson v. Barr*, 959 F.3d 476 (1st Cir. 2020), or qualified in later decisions, *see, e.g.*, *Arzu-Robledo v. Garland*, 2023 WL 6532649, at *2 (5th Cir. Oct. 6, 2023).

[26] Even assuming jurisdiction, *Phimmady* gives a strong sense of just how unreviewable, on the merits, these motions to reopen really are.  In *Phimmady*, an alien sought to reopen his immigration case after the conviction that had rendered him removable was overturned.  128 F.4th at 20.  The Board of Immigration Appeals ("BIA") denied the motion to reopen, and the First Circuit affirmed.  *Id.* at 25.  Although prior BIA decisions had established that reopening was "'an extraordinary remedy reserved for truly exceptional situations,'" *id.* at 22 (quoting *In re G-D-*, 22 I. & N. Dec. 1132, 1133-34 (BIA 1999)), nothing required reopening, "[e]ven in truly exceptional situations," *id.* (citing *Charles*, 113 F.4th at 23).  As such, the First Circuit held that there is no legal error in the denial of a sua sponte motion to reopen unless a plaintiff shows that the BIA violated an established practice of granting similar sua sponte motions.  *Id.* at 23.

Appx.490

removal."[27]  PI Opp. at 10 (citing FARRA § 2242(d); 8 U.S.C. § 1252(a)(4)).  But this argument

runs squarely up against the overall problem with Defendants' reading of the statute—there can

be no meaningful "review" of an issue that was not *and could not* have been raised in the first

place.  As the Supreme Court held in *Jennings* and the First Circuit confirmed in *Aguilar*,

section 1252(a)(4) cannot be read to strip jurisdiction over claims that could not have been raised

in the removal proceedings.  *See also E.O.H.C. v. Sec'y U.S. Dep't of Homeland Sec.*, 950 F.3d

177, 188–90 (3d Cir. 2020) (holding that section 1252(a)(4) does not bar review "[w]hen a

detained alien seeks relief that a court of appeals cannot meaningfully provide on petition for

review of a final order of removal").  As Defendants initiated the third-country-removal process

at issue *after* the conclusion of removal proceedings—and because Plaintiffs have no opportunity

to raise these issues before an IJ without some type of advance notice—there can be no judicial

review as contemplated in the channeling provisions of section 1252(a)(4).  *See also Compere v.

Nielsen*, 358 F. Supp. 3d 170, 177 n.8 (D.N.H. 2019) (finding section 1252(a)(4) "plainly

inapplicable" where the petitioner was not seeking review of CAT claim's denial).  As such,

neither section 1252(a) nor section 1252(b) bars this Court's jurisdiction.

---

[27] Defendants also highlight that CAT "is not self-executing."  PI Opp. at 10.  But CAT "has been implemented in the United States through FARRA and the subsequent regulations."  *See Saint Fort v. Ashcroft*, 329 F.3d 191, 195–96 (1st Cir. 2003) (explaining how the Convention Against Torture was domesticated into federal law), *superseded by statute on other grounds as stated in Hamid v. Gonzales*, 417 F.3d 642, 647 (7th Cir. 2005); *see also Nasrallah v. Barr*, 590 U.S. 573, 580 (2020).  As courts do, this Court uses "CAT" to refer to the processes and protections as embodied in the law.  *See, e.g.*, *Guzman Chavez*, 594 U.S. at 530–31.

B.    __Section 1252(g)__

The Supreme Court has explained that 8 U.S.C. § 1252(g)[28] is "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 485 & n.9 (1999) [hereinafter *AADC*] ("Section 1252(g) seems clearly designed to give some measure of protection to . . . discretionary determinations."). In *AADC*, the Supreme Court emphasized that the provision does not encompass the universe of all possible acts and events arising from removal proceedings, but rather instructs courts to read it as a narrow provision that "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Id.* at 482 (emphases in original) (quoting section 1252(g) and declining to read it so expansively as to say, "no judicial review in deportation cases unless this section provides judicial review"). Accordingly, section 1252(g) does not refer to "all claims arising from deportation proceedings." *Id.*

Following *AADC*, the First Circuit has held that section 1252(g) does not bar review of the "lawfulness" of a removal-related action because such claims are "collateral" to the discretionary decisions immunized by section 1252(g). *Kong v. United States*, 62 F.4th 608, 617 (1st Cir. 2023); *accord United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (*en banc*) ("The district court may consider a purely legal question that does not challenge the Attorney General's discretionary authority, even if the answer to that legal question—a description of the relevant law—forms the backdrop against which the Attorney General later will exercise discretionary

---

[28] 8 U.S.C. § 1252(g) states, in pertinent part:

Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

authority."); *Madu v. U.S. Att'y Gen.*, 470 F.3d 1362, 1368 (11th Cir. 2006) ("While this provision

bars courts from reviewing certain exercises of discretion by the attorney general, it does not

proscribe substantive review of the underlying legal bases for those discretionary decisions and

actions."); *Bowrin v. U.S. INS*, 194 F.3d 483, 488 (4th Cir. 1999) (holding that section 1252 "does

not apply" to Government's interpretations of law); *see also Texas v. United States*, 809 F.3d 134,

164 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ("The [Supreme] Court [in *AADC*] emphasized

that § 1252(g) is not 'a general jurisdictional limitation,' but rather 'applies only to three discrete

actions.'" (quoting *AADC*, 525 U.S. at 482)), *affirmed by an equally divided court sub nom. United

States v. Texas*, 579 U.S. 547 (2016); *cf. Camarena v. Dir., Immig. & Customs Enf't*, 988 F.3d

1268, 1271, 1272–73 & n.2 (11th Cir. 2021) (confirming its narrow reading of section 1252(g) in

*Madu*, based on *AADC*, but finding that section 1252(g) barred review of decision to remove

pending *discretionary* waiver process).

   Hewing close to the Supreme Court's guidance in *AADC* and the First Circuit's holding in

*Kong*, this Court will not construe section 1252(g) to immunize an unlawful practice from judicial

review.  *See also Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 671–72

(1986) ("[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent

should the courts restrict access to judicial review.").  Here, Plaintiffs' claims do not arise from

Defendants' discretionary decisions to execute their removal orders.  Nor do Plaintiffs challenge

their removability.  What Plaintiffs challenge is Defendants' authority to effectively depart from

the removal orders by designating new countries for removal outside of the immigration

proceedings and, in doing so, circumvent Plaintiffs' due-process rights and the carefully crafted

2r52.22

scheme that Congress has set forth.[29]  *See Tazu v. Att'y Gen. U.S.*, 975 F.3d 292, 298 (3d Cir. 2020) ("[W]hen the Act deprives the Attorney General of the discretion to act, a challenge to that lack of statutory authority is not barred as a challenge to the exercise of discretion.").  These assertions are collateral to Defendants' decision to execute Plaintiffs' removal, and thus not subject to section 1252(g)'s jurisdictional bar.  *See Kong*, 62 F.4th at 617.

This Court's decision is in accord with numerous sister courts around the country that have recognized that section 1252(g) shields only discretionary decisions concerning the three stages of the deportation process.  *See, e.g.*, *Abrego Garcia v. Noem*, — F. Supp. 3d —, 2025 WL 1014261, at *7–8 (D. Md. Apr. 6, 2025), *aff'd*, No. 25-1345, 2025 WL 1021113 (4th Cir. Apr. 7, 2025) [hereinafter *Abrego Garcia II*], *aff'd in relevant part sub nom. Noem v. Abrego Garcia*, 604 U.S. —, 2025 WL 1077101 (Apr. 10, 2025) (*per curiam*) [hereinafter *Abrego Garcia III*]; *Gondal v. U.S. Dep't of Homeland Sec.*, 343 F. Supp. 3d 83, 92 (E.D.N.Y. 2018); *Coyotl v. Kelly*, 261 F. Supp. 3d 1328, 1339–41 (N.D. Ga. 2017); *Hovsepian*, 359 F.3d at 1155; *Bowrin*, 194 F.3d at 488. *But see Silva v. United States*, 866 F.3d 938, 941 (8th Cir. 2017) (openly disagreeing with the Supreme Court's reading of the statute, as articulated in *AADC*).  This Court may review the purely

---

[29] During the March 28, 2025 oral argument, Defendants agreed that, in designating additional countries of removal, the Government drew its authority from statute.  March 28, 2025 Tr. at 6:12–7:4.  That implies something beyond mere "execut[ion]" of an order.  *Cf.* 8 U.S.C. 1252(g).  This plain reading of the statute is supported by the relevant regulations, which state that "the order of the immigration judge *does not limit* the authority of the Department of Homeland Security to remove [an] alien to any other country as permitted by section 241(b) of the Act."  8 C.F.R. § 1240.12(d) (emphasis added).  That such authority is not "limit[ed]" by an order does not suggest that the authority is still *pursuant to* that order.

legal question of whether the Constitution and relevant statutes require notice and an opportunity to be heard prior to removal of an alien to a third country.[30]

There is no question that, if eligibility is demonstrated, withholding of removal and CAT protections are mandatory and removal to that country cannot occur. *See* 8 C.F.R. §§ 1208.16(c) (withholding under CAT), 1208.17(a) (deferral of removal under CAT). The only question is what right individuals have, under the Constitution and relevant statutes, to make that showing. This Court has jurisdiction to hear that question.

## III. <u>Motion for Class Certification</u>

Plaintiffs seek to certify a class, which they define as:

> All individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA (including withholding-only proceedings) whom DHS has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed.

Dkt. 4 at 1.

As a threshold matter, limitations on certain class-wide injunctive relief under 8 U.S.C. § 1252(f)(1) do not preclude class certification or otherwise limit the Court's ability to grant Plaintiffs' requested class-wide relief. *See* Dkt. 52 ("Class Cert. Opp.") at 7–10.

---

[30] Defendants' out-of-circuit citations stand, at most, for the proposition that courts cannot indefinitely guarantee the pre-removal completion of certain review processes. *See Rauda v. Jennings*, 55 F.4th 773, 777–78 (9th Cir. 2022) (finding no jurisdiction to halt removal pending appeal of motion to reopen removal proceedings); *Camarena*, 988 F.3d at 1273 (finding no jurisdiction to halt removal pending adjudication of discretionary applications for provisional unlawful presence waivers); *E.F.L. v. Prim*, 986 F.3d 959, 964–65 (7th Cir. 2021) (finding no jurisdiction to halt removal pending adjudication of a petition under the Violence Against Women Act, for which there was no mandate, statutory or otherwise, that adjudication occur prior to removal). Defendants also cite *Foster v. Townsley*, in which the Fifth Circuit held that that section 1252(g) extends to non-discretionary decisions. PI Opp. at 6 (citing *Foster v. Townsley*, 243 F.3d 210, 214 (5th Cir. 2001)). But as Plaintiffs correctly note, the Fifth Circuit subsequently decided *Flores-Ledezma v. Gonzales*, 415 F.3d 375, 380 (5th Cir. 2005), in which the court held that section 1252(g) does not preclude jurisdiction over a challenge to the constitutionality of the statutory scheme, as opposed to a discretionary determination. Insofar as *Tsering v. U.S. Immigr. & Customs Enf't*, 403 F. App'x. 339, 342–43 (10th Cir. 2010), an unpublished decision, relies on *Foster* and its interpretation of *AADC*, this Court views it as an outlier among the circuit courts and will not follow its reasoning.

Plaintiffs seek, among other relief, declaratory judgment. Compl. ¶¶ 118–22. "[S]ection 1252(f)(1) does not strip the lower courts of the power to grant declaratory relief." *Brito v. Garland*, 22 F.4th 240, 250 n.7 (1st Cir. 2021) (citing *Nielsen v. Preap*, 586 U.S. 392, 402 (2019) (addressing the merits of the suit because "[w]hether the [District] [C]ourt had jurisdiction to enter such an injunction [under section 1252(f)(1)] is irrelevant because the District Court had jurisdiction to entertain the plaintiffs' [class-wide] request for declaratory relief")); *accord Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F.4th 606, 625 (9th Cir. 2024); *Make The Road New York v. Wolf*, 962 F.3d 612, 635 (D.C. Cir. 2020); *Alli v. Decker*, 650 F.3d 1007, 1010–13 (3d Cir. 2011); *Gonzalez v. Sessions*, 325 F.R.D. 616, 626 (N.D. Cal. 2018); *Reid v. Donelan*, 297 F.R.D. 185, 193 (D. Mass. 2014), *rev'd on other grounds*, 819 F.3d 486 (1st Cir. 2016), *opinion withdrawn on reconsideration*, 2018 WL 4000993, at *1 (1st Cir. May 11, 2018) (citing *Jennings*, 583 U.S. 281). *But see Hamama v. Adducci*, 912 F.3d 869, 880 n.8 (6th Cir. 2018) (treating the issue as unsettled but suggesting that declaratory relief might be unavailable). Accordingly, certification is proper at least toward that relief.

As to the requested injunctive relief, section 1252(f)(1) simply does not apply. Section 1252(f)(1) generally prohibits lower courts from ordering federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out "the specified statutory provisions," other than on a case-by-case basis. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549–50 (2022). But the class-wide injunctive relief Plaintiffs seek—concerning the availability of CAT protection, *see* Dkt. 6-1—is based on a different statute, the Foreign Affairs Reform and Restructuring Act ("FARRA"). *See Saint Fort v. Ashcroft*, 329 F.3d 191, 195–96 (1st Cir. 2003)

24

(explaining how the Convention Against Torture was domesticated into federal law), *superseded by statute on other grounds as stated in Hamid v. Gonzales*, 417 F.3d 642, 647 (7th Cir. 2005).[31]

Defendants would have the Court go beyond the plain meaning of the statute to imply a bar to actions that collaterally impact covered parts of the INA. PI Opp. at 5–6. However, section 1252(f)(1) cannot be read so broadly. Starting from first principles, "[t]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." *Yates v. United States*, 574 U.S. 528, 540 (2015) (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998)). Here, the title of the section is "Judicial Review of Orders of Removal." 110 Stat. 3009–607 (codified in 8 U.S.C. § 1252). Thus, the text of the statute itself implies that the limitation applies only to cases arising out of such review. *Texas v. United States*, 524 F. Supp. 3d 598, 640–41, 667–68 (S.D. Tex. 2021) ("Section 1252 concerns '[j]udicial review of orders of removal.'" (quoting the title of 8 U.S.C. § 1252)) (reading section 1252 as a whole as "deal[ing] with . . . judicial review of orders of removal" and rejecting the argument that the INA's various limiting provisions collectively "establish Congress's overall intent to preclude judicial review of *most if not all* of DHS's policy decisions with respect to immigration enforcement")) (enjoining pause of removals). Other subsections of 1252 concerning review of removal orders are interpreted narrowly to exclude collateral claims. *See Jennings*, 583 U.S. at 294; *Aguilar*, 510 F.3d at 11. The Court sees no basis to graft on Defendants' proposed, additional meaning.

---

[31] It is admittedly confusing that FARRA's provisions are intermingled with the INA's in the U.S. Code. *See generally* 8 U.S.C. § 1231. However, the Ninth Circuit has helpfully clarified that section 1252(f)(1), in its authoritative Statutes at Large version, refers only to "the provisions of chapter 4 of title II [of the INA], as amended by" the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. *Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022). Further, because CAT protections were codified in FARRA in 1998, CAT protections are not covered by section 1252(f)(1)'s bar related only to INA provisions as amended in 1996. *See* FARRA, § 2242(a); *Galvez*, 52 F.4th at 830.

Appx.497

Defendants cite *Aleman Gonzalez* for the proposition that section 1252(f)(1) applies not just to the explicitly covered parts of the statute but to "*the way that [those parts] [are] being carried out.*" PI Opp. at 5 (quoting *Aleman Gonzalez*, 596 U.S. at 550 (emphasis added)) (brackets added). But this puts words into the Supreme Court's mouth—that part of the *Aleman Gonzalez* opinion dealt with an entirely different issue.[32] Indeed, the *Aleman Gonzalez* Court not only explicitly limited its discussion to the "covered immigration provisions," *Aleman Gonzalez*, 596 U.S. at 552,[33] but suggested in dicta that "a court may enjoin the unlawful operation of a provision that is not specified in § 1252(f)(1) even if that injunction has some collateral effect on the operation of a covered provision." *Id.* at 553 n.4 (emphasis removed) (citing *Gonzales v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007)).

The Fifth Circuit put it well and plainly in *Texas v. United States Department of Homeland Security*, 123 F.4th 186, 209–10 (5th Cir. 2024):

> Texas does not seek to enjoin the operation of any of the provisions listed in § 1252(f)(1). It seeks an injunction only against conduct—namely, cutting or other destruction of its c-wire—unauthorized by § 1357(a)(3). Accordingly, because § 1357(a)(3) is not one of the statutes referenced in § 1252(f)(1), the injunction Texas seeks is not barred. Such an injunction would, at most, have only a "collateral effect on the operation" of the covered statutes (specifically, §§ 1225 and 1226). *Aleman Gonzalez*, 596 U.S. at 553 n.4, 142 S.Ct. 2057. That is especially the case here, where the district court found Defendants were cutting c-wire neither to detain aliens nor to respond to emergencies.
>
> Defendants respond that, in essence, they are the ultimate judges of whether § 1252(f)(1)'s bar applies. They argue *Aleman Gonzalez* prohibits injunctions of *uncovered* statutes that "in the Government's view" impact its ability to enforce the *covered* sections listed in § 1252(f)(1). That is badly mistaken. Congress legislated which sections are covered by § 1252(f)(1). The Executive Branch does not get to

---

[32] *See Aleman Gonzalez*, 596 U.S. 543, 551–52 (2022) (considering whether section 1252(f)(1) applies only to "the covered immigration provisions . . . 'as properly interpreted'" or as "operat[ed]" in practice by the Government).

[33] *See also id.* at 551 ("The respondents in both cases were detained pursuant to § 1231(a)(6), and no one disputes that § 1231(a)(6) is among the provisions the 'operation' of which cannot be 'enjoined or restrained' under § 1252(f)(1).").

propose additions.  *See* U.S. Const. art. I, § 1 (vesting "All legislative Powers" in Congress).

*See also Gonzalez v. ICE*, 975 F.3d 788, 814 (9th Cir. 2020) (holding that "§ 1357(d) is not located in Part IV [of the INA], and thus § 1252(f)(1)'s limitations do not apply"); *O.A. v. Trump*, 404 F. Supp. 3d 109, 158 (D.D.C. 2019) (holding that section 1252(f)(1) does not bar an injunction based on 8 U.S.C. § 1158(b)(1) since it is not a covered provision); *Doe v. Wolf*, 424 F. Supp. 3d 1028, 1044–45 (S.D. Cal. 2020) (finding that section 1252(f)(1) did not bar class-wide injunctive relief with regards to access to counsel during non-refoulement interviews because the relief was not governed by sections 1221–32); *Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, — F. Supp. 3d —, 2025 WL 585768, at *13 (D. Md. Feb. 24, 2025) ("Moreover, § 1252(f)(1) does not bar injunctions affecting DHS's authority pursuant to provisions of the INA outside of §§ 1221–1232 'simply because of collateral effects on a covered provision.'" (quoting *Al Otro Lado*, 120 F.4th at 627)).  Thus, the requested class-wide relief, limited only to otherwise removable aliens with potential CAT protection claims, falls outside of section 1252(f)(1)'s bar.

### A.   <u>Legal Standard</u>

Class actions serve as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation and internal quotations omitted).  A court may certify a class only if it finds that the proposed class satisfies all the requirements of Fed R. Civ. P. 23(a) ("Rule 23(a)") and that class-wide adjudication is appropriate for one of the reasons set forth in the relevant subsection of Fed. R. Civ. P. 23(b) ("Rule 23(b)").  *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003).  "Rule 23(a) requires that (1) there be numerosity, (2) there be common questions of law or fact, (3) the class representative's claims be typical of the class, and (4) the representative's

representation of the class be adequate." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 18 (1st Cir. 2008) (citing Fed. R. Civ. P. 23(a)). Plaintiffs seek certification under Rule 23(b)(2), Dkt. 4, which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," Fed R. Civ. P. 23(b)(2). For both Rule 23(a) and 23(b), Plaintiffs must establish each of the elements; failure to establish any element will defeat class certification. *See Smilow*, 323 F.3d at 38.

**B.**     **Discussion**

**1.**     **23(a)(1) Numerosity**

To satisfy the numerosity requirement, a plaintiff must demonstrate that the class is so numerous that joinder would be "impracticable." Fed. R. Civ. P. 23(a)(1). The requirement presents a "low hurdle," *S. States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 87 (D. Mass. 2007), but "mere speculation as to the number of parties involved is not sufficient to satisfy Rule 23(a)(1)," *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 258 (D. Mass. 2005). "[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir. 2009) (citation omitted); *see also Connor B. ex rel. Vigurs v. Patrick*, 272 F.R.D. 288, 292 (D. Mass. 2011). The numerosity requirement imposes only a "low threshold," *Garcia-Rubiera*, 570 F.3d at 460, particularly where, as here, Plaintiffs seek only injunctive or declaratory relief, *Reid*, 297 F.R.D. at 189 ("[T]he threshold may be relaxed when a party seeks only declaratory or injunctive relief, since the inclusion of future members increases the impracticability of joinder." (citation omitted)); *see also Gomes v. Acting Sec'y, U.S. Dep't of Homeland Sec.*, 561 F. Supp. 3d 93, 99 (D.N.H. 2021) (certifying a class where "the number of current *and future members* of the putative class exceeds 40 persons" (emphasis added)).

Defendants do not dispute that Plaintiffs have met the numerosity requirement, *see generally* Class. Cert. Opp., and the Court finds this requirement met by Plaintiffs' identification of hundreds of potential class members, Dkts. 8-4, 8-8–23 (identifying individuals with final removal orders who were removed under the challenged policies and practices or are similarly at risk of unnoticed removal).

### 2.    23(a)(2) Commonality

Satisfying the commonality requirement in the instant case is simple and straightforward: Plaintiffs seek a single, common order that Defendants comply with the strictures of due process before deporting them to a county not covered by their final orders of removal.  Defendants' arguments to the contrary are uncompelling.

The commonality requirement is met when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  To satisfy this requirement, a plaintiff must demonstrate that the proposed class's claims "depend upon a common contention," the resolution of which is "central to the validity" of each of the class's claims.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *see also Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13, 28–29 (1st Cir. 2019).  The commonality requirement is a "low bar." *In Re New Motor Vehicles*, 522 F.3d at 19.  Courts have found that "a single common question is sufficient to satisfy the requirements of Rule 23(a)(2)." *Gomes*, 561 F. Supp. 3d at 99; *see also Reid*, 297 F.R.D. at 189.

Defendants argue that the proposed class is overly broad, includes "clear dissimilarities between the proposed class and its proposed representatives," and includes aliens with "different processes and pathways for relief." Class. Cert. Opp. at 11–14.  As such, Defendants argue class certification is not appropriate. *Id.*

Appx.501

The commonality requirement is met, notwithstanding purported or actual dissimilarities among named and potential class members, based on the common due-process issue. Due process adheres regardless of the removal context. *See Khouzam v. Att'y Gen.*, 549 F.3d 235, 256–57 (3d Cir. 2008) ("In fact, the basic dictates of due process must be met whether an alien facing removal overstayed a visa, . . . entered the country undetected, . . . or became a legal resident but then committed an enumerated crime." (citations omitted)). That specific circumstances may differ among the various putative class members does not undermine that they all seek notice and an opportunity to be heard, and the opportunity to challenge a policy or practice which allegedly denies it. *See, e.g.*, *Gomes*, 561 F. Supp. 3d at 101 ("[T]he existence of individual differences among putative class members does not foreclose a finding of commonality so long as least one common issue is raised.").

Likewise, that some members may present additional, individualized issues, *e.g.*, return to the United States if unlawfully removed,[34] does not affect commonality. *See Tassinari v. Salvation Army*, — F.R.D. —, 2025 WL 972724, at *7 n.12 (D. Mass. Mar. 26, 2025) ("Defendant's

---

[34] Defendants acknowledge that there are procedures to compel the return of illegally removal individuals. *See* March 28, 2025 Tr. at 17:12–13 ("Yes, Your Honor. There are procedures for that."); *see also* ICE Policy Directive No. 11061.1, § 1, Facilitating the Return to the United States of Certain Lawfully Removed Aliens (Feb. 24, 2012), perma.cc/95AT-VN72 (describing process for facilitating return of certain lawfully removed aliens whose petitions for review are granted after their removal). Courts regularly order the return of wrongfully removed individuals. *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 435 (2009) (discussing how removed individuals "can be afforded effective relief by facilitation of their return"); *Abrego Garcia III*, 2025 WL 1077101, at *1 (denying application to stay requirement that the Government "facilitate" plaintiff's return after wrongful removal); *Abrego Garcia II*, 2025 WL 1021113, at *2–3 (Thacker, J., concurring) (holding that the court retained jurisdiction because the decision to remove plaintiff to a country for which he had withholding of removal "was not one that was within [the Attorney General's] lawful discretion" and "was not the enforcement of a valid order of removal"); *id.* at *6 ("Nor can the Government be permitted to disclaim any ability to return those it has wrongfully removed by citing their physical presence in a foreign jurisdiction."); *Ramirez v. Sessions*, 887 F.3d 693, 707 (4th Cir. 2018) (directing the Government "to facilitate [plaintiff's] return to the United States" from El Salvador); *Gordon v. Barr*, 965 F.3d 252, 261 (4th Cir. 2020) (similar); *Nunez-Vasquez v. Barr*, 965 F.3d 272, 287 (4th Cir. 2020) (directing the Government "to return [plaintiff] to the United States"); *Orabi v. Att'y Gen.*, 738 F.3d 535, 543 (3d Cir. 2014) (similar). Here, the putative class members *already* have been awarded withholding of removal, and as discussed below, *infra* Section IV(B)(1), Plaintiffs are likely to succeed on the merits that they are and were entitled to due process in order to assert their statutory rights to seek CAT protections prior to removal, making such removals without due process wrongful.

30

identified individualized issues really boil down to one common question.").  "Ultimately, the gravamen of Defendant[s'] challenges on commonality really goes not to whether common issues exist but rather to whether common issues predominate over individual ones; this is not a concern for a 23(b)(2) class [seeking injunctive or declaratory relief], as predominance is a requirement for certifying a class only under 23(b)(3)."  *Id.* at *7 (citing *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 11 (D. Mass. 2010) (reviewing First Circuit case law)).

"Plaintiffs in this case have identified a single alleged practice"—Defendants' system-wide policy or practice of designating aliens for removal to a third country without first providing those aliens notice and an opportunity to apply for protection from removal to that country—"that provides the basis for every class member's injury." *Ramirez v. ICE*, 338 F. Supp. 3d 1, 42–50 (D.D.C. 2018) (certifying class of immigrant teens challenging transfers to ICE custody). Regardless of differences in the removal procedures applicable to each class member, they all seek to establish their right to due process.[35]  *See Savino v. Souza*, 453 F. Supp. 3d 441, 451 (D. Mass. 2020) (determining "that the admittedly significant variation among the Detainees does not defeat commonality"); *Quadrelli v. Moniz*, 2020 WL 3051778, at *5 (D. Mass. June 8, 2020) (following courts that have certified classes of individuals "who have alleged a general risk of harm due to a

---

[35] The Court rejects Defendants' implicit argument that allegations of due-process violations cannot ever sustain a class action.  Class. Cert. Opp. at 14.  While "due process is flexible" and can vary depending on the situation, *Matthews*, 424 U.S. at 321, the basics are clear: "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner," *id.* at 333; *see also id.* at 348 ("The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'" (citation omitted)); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.").  As such, courts have certified classes asserting due-process claims under Rule 23(b), without raising commonality concerns.  *See* Charles Alan Wright & Arthur R. Miller, 7AA *Federal Practice and Procedure* § 1776.1 (3d ed.) (collecting cases); *Garcia-Rubiera*, 570 F.3d at 456–58, 461 (remanding with instructions to certify, under Rule 23(b)(2), a class challenging, among other things, a lack of notice under the Due Process Clause).

Appx.503

policy or practice, even if there might additionally be a unique or distinct impact as to an individual putative class member").

Since Plaintiffs have identified a single, common question at the heart of the claims, commonality has been satisfied. *See Gomes*, 561 F. Supp. 3d at 99 ("[A] single common question is sufficient to satisfy the requirements of Rule 23(a)(2)."). Answering the common legal question of whether Defendants must afford aliens with due process (and of what that due process consists) prior to removal to a third country will "drive the resolution of the litigation." *Ramirez*, 338 F. Supp. 3d at 45 (cleaned up).

Thus, the Court finds that Plaintiffs have satisfied the commonality requirement under Rule 23(a)(2).

### 3.    23(a)(3) Typicality

The typicality requirement mandates that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality does not require that all putative class members share identical claims or defenses. *In re Credit Suisse-AOL Secs. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008) (citing *Swack*, 230 F.R.D. at 260); *see also DaSilva v. Border Transfer of MA, Inc.*, 296 F. Supp. 3d 389, 405 (D. Mass. 2017) ("Even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." (quotation omitted)). Instead, typicality is established if the claims of the class representative "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members, and . . . are based on the same legal theory." *Garcia-Rubiera*, 570 F.3d at 460 (citation omitted).

Defendants argue that "[t]he proposed class lacks typicality for the same reasons it lacks commonality" and that "the class representatives are *not* part of the proposed class and do *not*

possess the same interest or suffer the same injury as the proposed class members because they cannot demonstrate they will be removed absent any notice or opportunity to assert a fear-based claim." Class Cert. Opp. at 15–16 (emphases in original).[36]

       Typicality is satisfied here for largely the same reasons that commonality is satisfied. The named Plaintiffs and putative class members all share an identical interest in an injunction mandating due-process protections prior to their removal to a third country. Defendants have taken the position that there is *no* due process entitled to any alien, under any method of removal, prior to removal to a third country regardless of any potentiality that such an alien will be tortured or murdered upon arrival. *See* March 28, 2025 Tr. at 10:17–11:1 ("THE COURT: In this posture, where it is the discretionary decision of the department that's changing the third-party designation, does the person who's going to be deported have a right to be informed and be given an opportunity to be heard as to the dangerousness of that third country designation? MS. LARAKERS: DHS's position is no. THE COURT: They don't have to be told anything and given no opportunity to be heard? MS. LARAKERS: DHS's position is no."). Between Defendants' representations to the Court and the Court's ultimate finding that the procedures outlined in the March Guidance do not provide adequate due process, *see infra* at 42–43, the Court finds that the named and unnamed Plaintiffs alike share an identical interest in challenging Defendants' alleged practice of removing individuals to third countries without notice and an opportunity to be heard, and, as such, satisfy the typicality requirement under Rule 23(a)(2).

---

[36] Defendants also argue that "Plaintiffs[] attempt to meet typicality by expanding the description of their class" to apply the class to "to any alien with a final order of removal under the three named removal statutes regardless of what procedures DHS applied to their removal to a third country." Class Cert. Opp. at 15. However, Plaintiffs have asserted a consistent class definition throughout this case, and by its plain language, the class definition applies only to those aliens who have been or will be attempted removed to a third country *without meaningful notice and opportunity to contest the removal*. Thus, whether an alien is a part of the class inherently depends on whether the alien received said notice and opportunity to be heard, *i.e.*, on the Government's own inaction and inaction.

### 4.    23(a)(4) Adequacy of Representation

The adequacy requirement is met when the representative parties will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  Adequacy is satisfied if (1) there is no conflict between the interest of the named Plaintiffs and the class members and (2) counsel chosen by the named Plaintiffs are qualified and able to litigate the claims vigorously.[37] *S. States Police*, 241 F.R.D. at 88 (citing *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985)).  Merely lacking identical interest, however, is not enough for a representative party to be found inadequate.  *Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 345–46 (1st Cir. 2022) (citing *Cohen v. Brown Univ.*, 16 F.4th 935, 945 (1st Cir. 2021)).

Defendants argue that "Plaintiffs fail to meet the adequacy requirement for the same reasons Plaintiffs fail to meet the commonality and typicality requirements." Class Cert. Opp. at 16.  But the adequacy requirement looks to whether the named Plaintiffs will fairly and adequately protect the interests of the proposed class.  *See S. States Police*, 241 F.R.D. at 88.  There is nothing in the record to suggest that the named Plaintiffs seek any unique or additional benefit from this litigation that may make their interests different from or adverse to those of absent class members.  *Cf. Amchem*, 521 U.S. at 626–27 (holding that adequacy requirement was not met where named plaintiffs stood to benefit disproportionately and at the expense of other potential class members).  Thus, the Court finds that Plaintiffs have satisfied the adequacy requirement under Rule 23(a)(2).

---

[37] Defendants do not contest the adequacy of Plaintiffs' counsel.  *See* Class Cert. Opp. at 16.

Appx.506

### 5.    23(b)(2) Injunctive or Declaratory Class

Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'"  *Wal-Mart Stores*, 564 U.S. at 360 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)). "[C]ivil rights actions . . . where a party charges that another has engaged in unlawful behavior towards a defined group, are prime examples of Rule 23(b)(2) classes."  *Reid*, 297 F.R.D. at 193 (quotation omitted).

Defendants' first set of arguments goes mainly to whether the named Plaintiffs have valid claims.  *See* Class Cert. Opp. at 17 (arguing that O.C.G. received notice of his removal and had an opportunity to assert fear-based claims); *id.* (arguing that E.F.D. and M.M. have an adequate remedy in a motion to reopen); *id.* at 17–18 (arguing that the claims of D.V.D. and M.M. are speculative and unripe).  But these arguments, which go to the merits of the individual claims, are inappropriate to consider on a motion for class certification.  "Although . . . a court's class-certification analysis . . . may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."  *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (quoting *Wal-Mart Stores*, 564 U.S. at 351).  To the extent Defendants' implied argument is that these individual infirmities bespeak some sort of "fatal similarity" common to the whole

Appx.507

proposed class, "[s]uch a contention is properly addressed at trial or in a ruling on a summary-judgment motion."  *Id.* at 470.[38]

More broadly, Defendants argue that, "[t]o the extent Plaintiffs are entitled to some additional procedures under the Due Process Clause, those procedures would be different for each alien depending on the underlying facts and circumstances of their case."  Class Cert. Opp. at 18.  But Defendants have not provided the Court with a single example of how an "underlying fact" and/or "circumstance" might lead to different procedural minima for one individual versus another.  *Cf. Reid v. Donelan*, 17 F.4th 1, 9 (1st Cir. 2021) (finding certification improper where district court recognized that "relief must be adjudicated on an individual basis").  Defendants' own contention that—if due process applies to third-country removals—the March Guidance is sufficient, PI Opp. at 8, recognizes that it is possible to establish a baseline for all putative class members.  The Court does not find that the claims here "hinge on the individual circumstances of each class member."  *Reid*, 17 F.4th at 11.  Rather, Defendants have taken a broad position, subject to class-wide challenge.

In sum, Plaintiffs challenge a policy or practice that impacts all putative class members: failing to provide meaningful notice and opportunity to present a fear-based claim before executing removal to a third country.  In doing so, Plaintiffs seek injunctive and declaratory relief that applies to the class as a whole, satisfying Rule 23(b)(2).

---

[38] The Court instead addresses these arguments in its analysis of Plaintiffs' motion for a preliminary injunction.  *See infra* Section IV(B)(1).

Appx.508

IV.    **Preliminary Injunction**

    A.    **Legal Standard**

"[T]he issuance of preliminary injunctive relief is 'an extraordinary and drastic remedy that is never awarded as of right.'" *Howe v. U.S. Bank Nat'l Ass'n as Tr. for RMAC Tr. Series 2016-CTT*, 440 F. Supp. 3d 99, 102 (D. Mass. 2020) (quoting *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Of the four factors, likelihood of success "weighs most heavily" in the analysis. *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020).

In deciding a motion for preliminary injunction, "[t]he court may accept as true 'well-pleaded allegations [in the complaint] and uncontroverted affidavits.'" *C&W Facility Servs. Inc. v. Mercado*, 2018 WL 4854630, at *2 (D. Mass. Oct. 5, 2018) (quoting *Rohm & Haas Elec. Materials, LLC v. Elec. Cirs. Supplies, Inc.*, 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010)). "The Court may also rely on otherwise inadmissible evidence, including hearsay, in deciding a motion for preliminary injunction." *Bos. Taxi Owners Ass'n, Inc. v. City of Bos.*, 84 F. Supp. 3d 72, 78 (D. Mass. 2015) (citing *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).

    B.    **Discussion**

        1.    **Likelihood of Success**

Plaintiffs have established that they are likely to succeed in showing that Defendants have a policy or practice of executing third-country removals without providing notice and a meaningful

opportunity to present fear-based claims, and that such policy or practice constitutes a deprivation of procedural due process.

"To establish a procedural due process violation, the plaintiff 'must identify a protected liberty or property interest and allege that the defendants, acting under color of state law, deprived [him] of that interest without constitutionally adequate process.'" *Gonzalez-Droz v. Gonzalez-Colon*, 660 F.3d 1, 13 (1st Cir. 2011) (quoting *Aponte–Torres v. Univ. of P.R.*, 445 F.3d 50, 56 (1st Cir. 2006)). "The basic purport of the constitutional requirement is that, before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir. 1990) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

Congress clearly established the right to deferral or withholding of removal based on a legitimate fear-based claim. *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 348 (2005) (explaining that individuals who "face persecution or other mistreatment in the country designated" as their place of removal "have a number of available remedies," by statute, regulation, and under international law, to "ensur[e] their humane treatment").

More generally speaking, "'[i]t is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." *Trump v. J.G.G.*, 604 U.S. —, 2025 WL 1024097, at *2 (Apr. 7, 2025) (*per curiam*) [hereinafter *J.G.G. III*] (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). As all nine Supreme Court justices agreed less than two weeks ago, this means that "notice must be afforded within a reasonable time and in such a manner as will allow them to actually seek . . . relief in the proper venue before such removal occurs." *Id.*; *see also id.* (Kavanaugh, J., concurring) ("[A]ll nine Members of the Court agree that judicial review

Appx.510

is available."); *id.* at *6 (Sotomayor, J., dissenting) ("That means, of course, that the Government cannot usher any detainees . . . onto planes in a shroud of secrecy.").

Likewise, there can be no disagreement that the same constitutional guarantees apply to withholding-only relief. *Guzman Chavez*, 594 U.S. at 557 (Breyer, J., dissenting) ("And all here agree that the aliens are legally entitled to seek . . . withholding-only relief." (citing *Fernandez-Vargas v. Gonzalez*, 548 U.S. 30, 35 n. 4 (2006))); *Abrego Garcia III*, 2025 WL 1077101, at *2 (Sotomayor, J., concurring) (explaining that the Government has an "obligation to provide [the plaintiff who was subject to an order of removal] . . . notice and an opportunity to be heard"  and ensure compliance with its "obligations under [CAT]" prior to removal); *see also Andriasian v. I.N.S.*, 180 F.3d 1033, 1041 (9th Cir. 1999)  (finding that "last minute designation" of removal country during formal proceedings "violated a basic tenet of constitutional due process: that individuals whose rights are being determined are entitled to notice of the issues to be adjudicated, so that they will have the opportunity to prepare and present relevant arguments and evidence"); *Kossov v. INS*, 132 F.3d 405 (7th Cir. 1998) (due-process violation to order deportation to Russia after a claim of asylum as to Latvia where uncounseled noncitizen was provided insufficient notice of Russia possibility).

The Court rejects Defendants' argument that aliens have already received, during their initial removal proceedings, all the process to which they are entitled, so as to justify providing no additional process prior to third-country removal.  *See* April 10, 2025 Rough Tr. at 11:1–4 ("MR. ENSIGN: Your Honor, where they could have raised it previously and did not do so, the Due Process Clause does not require an additional procedural opportunity to raise [it] in . . . that context.").  Defendants argue that aliens could have brought up, during their initial removal proceedings, all the countries where they have concerns that they will be tortured.  *See, e.g.*,

April 10, 2025 Rough Tr. at 4:13–16 ("[MR. ENSIGN:] They also previously would have had an opportunity to raise it during their initial removal proceedings and they would be asked on their [I-589] form if they have fear of returning anywhere."). This is both impossible as a practical matter, since the immigration court does not normally consider claims about countries not proposed as a country of removal,[39] and fails to consider that conditions change in countries change over time.[40] Listing all the countries in the world as to which an individual might have a reasonable fear is also impractical: doing so would potentially require, for example, a person with a same-sex sexual orientation to list, at least, all 64 countries where such an orientation is illegal such that the individual fears torture. *See Homosexuality: The countries where it is illegal to be gay*, BBC (Mar. 31, 2023), https://perma.cc/32KN-RH6Q. Indeed, the Assistant to the Solicitor General, arguing before the Supreme Court on the topic of third-country removals less than a month ago, affirmatively stated that "[w]e would have to give the person notice of the third country and give them the opportunity to raise a reasonable fear of torture or persecution in that third country," even where that individual was already subject to an order of removal.[41]

Even without that statement, the claims at issue concern removal to countries that were *not ruled upon* in the initial proceedings and are therefore not covered by the removal order. As discussed above, the Court disagrees with Defendants' assertion that the theoretical option of a motion to reopen provides a sufficient remedy. *See supra* at 14–18; *see also Sadychov*, 565 F.

---

[39] *See supra* at 16–17 & notes 17, 24 (discussing the non-viability of preemptive claims).

[40] An alien can remain in the United States on an Order of Supervision for decades after being granted withholding. *See* April 10, 2025 Rough Tr. at 15:24–16:1 ("THE COURT: But some people have been granted withholding for 20 years, right? MS. REALMUTO: Exactly."); *see also* Compl. ¶¶ 75–76 (alleging that E.F.D. was granted CAT protection in 2018 and had been released from immigration custody until he was re-detained in March 2025). Country conditions can change dramatically, especially over decades. *See, e.g.*, Designation of Afghanistan for Temporary Protected Status, 87 Fed. Reg. 30976 (May 20, 2022) (providing Temporary Protected Status designation to Afghanistan in May 2022, after Taliban returned to power in August 2021).

[41] *Supra* note 2.

App'x at 651 ("[A]n applicant is not entitled to have the agency adjudicate claims of relief that relate 'to a country that nobody is trying to send them to.'" (quoting *She*, 629 F.3d at 962)); Dkt. 59-12 at 4–5 ("If the United States government were to remove Respondent to El Salvador under a separate authority, that is outside the jurisdiction of this Court to adjudicate and/or analyze. Respondent's relief would be sought in Federal court, not Immigration Court.").[42]

The Court finds it likely that Defendants have applied and will continue to apply the alleged policy of removing aliens to third countries without notice and an opportunity to be heard on fear-based claims—in other words, without due process. Defendants have repeatedly argued that they have no obligation to provide any process whatsoever when newly designating a third country for removal. *See, e.g.*, March 28, 2025 Tr. at 10:17–11:1; April 10, 2025 Rough Tr. at 9:5–8, 10:19–11:4. Defendants' own avowed position and the numerous declarations Plaintiffs have

---

[42] *See also* Dkt. 8-8 ¶ 9 (motion to reopen denied); Dkt. 8-18 ¶ 5 (same); Dkt. 8-11 at 5–6 (same); Dkt. 59-12 ¶¶ 12–18 (same); Dkt. 59-13 at 4 (same).

Appx.513

provided[43] substantiate both the prior and future use of Defendants' policy of providing no notice prior to third-country removal.[44]

Nor do the procedures outlined in DHS's March Guidance satisfy due process. The March Guidance provides no process whatsoever to individuals whom DHS plans to remove to a country from which the United States has received blanket diplomatic assurances. Dkt. 43-1 at 1–2. Defendants are, of course, correct that the Court may not question the substance of diplomatic assurances endorsed by the Executive. *See* PI Opp. at 11. However, the Court may inquire into the overall process and whether such assurances, on their own terms, satisfy the Constitution. *See Khouzam*, 549 F.3d at 259 (finding that lack of individualized determination violated due process, notwithstanding diplomatic assurance).

Blanket diplomatic assurances do not address DHS's obligation to undertake an individualized assessment as to the sufficiency of the assurances, as required under the statutory

---

[43] Notably, the parties contest whether O.C.G. received any substantial notice or a meaningful opportunity to present a fear-based claim prior to his removal to Mexico. *Compare* Compl. ¶¶ 85–86 (alleging that no notice or opportunity to be heard was provided), *and* Dkt. 8-4 ¶¶ 8–10 (declaration of O.C.G. asserting same), *with* Dkt. 31-1 ¶ 13 (declaration of Brian Ortega, Assistant Field Office Director of the ICE ERO Phoenix Field Office, asserting based on hearsay that notice was provided on February 21, 2025, by "ERO" and that O.C.G. denied fear of removal). Given O.C.G.'s sworn declaration—rebutted only by a hearsay declaration—the Court finds it likely that O.C.G. was not provided sufficient process prior to removal.

[44] Defendants argue that the claims of D.V.D. and M.M. are speculative and unripe because D.V.D. and M.M. have not yet been detained or notified of any impending third-country removal. Class. Cert. Opp. at 17–18. *But see* Compl. ¶ 71 (alleging that M.M. was informed by an ICE official that she would be deported in the immediate future). There, so to speak, lies the rub—according to Defendants, an individual must await notice of removal before his claim is ripe, even where the claim is that there is no notice. But once an individual is removed, Defendants argue, there is no jurisdiction. *See* Class Cert. Opp. at 11–12.

Having granted class certification, the individual cases of D.V.D. and M.M. are less dispositive as to the issue of likelihood of success. Nevertheless, insofar as they may represent some portion of the class, the Court notes that it does not find such cases unripe. Ripeness concerns both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017) (citing *Texas v. United States*, 523 U.S. 296, 300–01 (1998)). Here, both tests indicate justiciability. As Plaintiffs challenge Defendants' policy and practices, rather than the putative class members' individual removability, no further facts are necessary for judicial review. *See Pustell v. Lynn Pub. Scs.*, 18 F.3d 50, 52 (1st. Cir. 1994) (finding claim ripe where "[n]o further factual development is necessary for us to resolve the question at issue, namely, whether the policy . . . is constitutional"). Likewise, Plaintiffs "suffer the harm of substantial uncertainty if we put off resolving their constitutional claims." *Id.*

and regulatory framework. *See* 8 C.F.R. § 1208.18(c)(1) ("The Secretary of State may forward to the Attorney General assurances that the Secretary has obtained from the government of a specific country that ***an*** alien would not be tortured there if ***the*** alien were removed to that country." (emphases added));[45] *see also Niz-Chavez v. Garland*, 593 U.S. 155, 161 (2021) (examining the "ordinary meaning" of statutory text and finding that "[t]o an ordinary reader—both in 1996 and today—'a' notice would seem to suggest just that: 'a' single document").

Moreover, blanket assurances offer no protection against either torture by non-state actors or chain refoulement, whereby the third country proceeds to return an individual to his country of origin. *See, e.g.*, Compl. ¶¶ 68–69 (detailing domestic violence concerns that led to withholding of removal designation); Dkt. 8-2 ¶¶ 3–4, 7–8, 13 (same). Yet these circumstances can trigger protections under CAT no less than threats coming from state actors. 8 C.F.R. § 1208.18(a)(1); *see also Murillo Morocho v. Garland*, 80 F.4th 61, 71 (1st Cir. 2023) (vacating decision denying CAT protection where the Board of Immigration Appeals failed to properly consider risk of torture by non-state actors).

Even if such blanket assurances might, in some individual cases, satisfy due process, the March Guidance precludes any further review prior to removal. Dkt. 43-1 at 1–2 (providing noncitizens "will be removed without the need for further procedures"). There can be no right without a remedy. *Marbury v. Madison*, 5 U.S. 137, 163 (1803). Without meaningful review, the rights Congress has provided are little more than dead letter.

---

[45] The Department of Justice has previously recognized its obligation to provide a case-by-case, individualized process for seeking and assessing the reliability of diplomatic assurance determinations. *See Oversight of the USA PATRIOT Act: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. 10 (2005) ("LEAHY: What do you think that the assurances we get from countries that are known to be torturers, when they say, 'Well, we won't torture this person you're sending back' – do you really think those assurances are credible? GONZALES: I think, Senator, that's a difficult question that requires, sort of, a case-by-case analysis. . . . Well, again, Senator, we take this obligation very, very seriously. And we know what our legal obligations are. We know what the directive of the president is. And each case is very fact-specific.").

Appx.515

It simply cannot be, as Defendants contend, that the Government can "decide right now that someone who is in [] custody is getting deported to a third country, give them no notice and no opportunity to say, 'I will be killed the moment I arrive there,' and, as long as the [Government] doesn't already know that there's someone standing there waiting to shoot him, that's [] fine." *See* March 28, 2025 Tr. at 29:12–18 ("In short, yes."). Defendants' obligations under CAT and the Due Process Clause require more. Plaintiffs have demonstrated a likelihood of success on the merits.

### 2. Irreparable Harm

"'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 381 (D. Mass. 2020) (quoting *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004)). "It 'most often exists where a party has no adequate remedy at law.'" *Id.* (quoting *Charlesbank Equity Fund II*, 370 F.3d at 162).

The irreparable harm factor likewise weighs in Plaintiffs' favor. Here, the threatened harm is clear and simple: persecution, torture, and death. It is hard to imagine harm more irreparable.

Defendants' argument that this Court has no jurisdiction over already-removed aliens only bolsters Plaintiffs' argument toward finding irreparable harm. *See* Class Cert. Opp. at 11–12. Defendants contend that they may remove aliens to third countries with no possibility for review. *Id.* It is undoubtedly "irreparable injury to reduce to a shell game the basic lifeline of due process

Appx.516

before an unprecedented and potentially irreversible removal occurs." *J.G.G. II*, 2025 WL 914682, at *30 (Millett, J., concurring).

Thus, Plaintiffs have demonstrated a likelihood of irreparable harm.

### 3. Balance of Equities and Public Interest

Finally, the Court considers the balance of the equities and the public interest. "These two inquiries merge in a case like this one, where the Government is the party opposing the preliminary injunction." *Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). In cases implicating removal, "there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436. However, there is also "a public interest in prompt execution of removal orders." *Id.*

"To begin with, the Plaintiffs' likelihood of success on the merits lightens [Defendants'] stated interests." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022). The Supreme Court has confirmed that "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021); *see also NFIB v. Dep't of Labor*, 595 U.S. 109, 120–21 (2022) (staying an illegal vaccine mandate even though the Government said the mandate would save more than 6,500 lives); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952) (affirming district court's preliminary injunction of an illegal executive order even though a wartime president said his order was "necessary to avert a national catastrophe").

Here, the Court has found it likely that these deportations have or will be wrongfully executed and that there has at least been no opportunity for Plaintiffs to demonstrate the substantial harms they might face. The Court finds that these circumstances countervail the public's normal

Appx.517

and meaningful "interest in prompt execution."  *See Nken*, 556 U.S. at 436.  Thus, the final two

factors support issuance of relief.

### 4.    Limitations of Relief

"[An] injunction should issue only where [it is] essential in order effectually to protect . . .

rights against injuries otherwise irremediable."  *See Weinberger v. Romero-Barcelo*, 456 U.S. 305,

312 (1982) (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)).  Here, the "irremediable"

injury would be deportation without meaningful opportunity to present a claim based on fear of

persecution, torture, or death.

Accordingly, the Court circumscribes its remedy and declines, at this time, to require the

full extent of process Plaintiffs propose.  Instead, the Court orders that, prior to removing any alien

to a third country, *i.e.*, any country not explicitly provided for on the alien's order of removal,

Defendants must: (1) provide written notice[46] to the alien—and the alien's immigration counsel,

if any[47]—of the third country to which the alien may be removed, in a language the alien can

understand; (2) provide meaningful opportunity for the alien to raise a fear of return for eligibility

---

[46] Written notice comports with the traditional standards of due process.  *See Matthews*, 424 U.S. at 348 ("The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'" (citation omitted)); *Mullane*, 339 U.S. at 313, 315 ("Personal service of written notice within the jurisdiction is the classic form of notice always adequate in any type of proceeding. . . . [W]hen notice is a person's due, process which is a mere gesture is not due process.  The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.  The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected.").  The Court's sense of what fairness requires is further supported by the Government's own internal documents.  *See* Dkts. 1-2 (2001 draft Form 1-913 that would provide written notice prior to third-country removal and require motion to reopen to be filed within fifteen days of being served with notice), 1-3 (2020 draft model notice that would provide written notice prior to removal to country other than designated country of removal and that provided that "DHS w[ould] not oppose [the alien's] filing of a motion to reopen with the Immigration Court" within fifteen days of being served with such notice).

[47] *See* 8 C.F.R. § 292.5 ("Whenever a person is required by any of the provisions of this chapter to give or be given notice; to serve or be served with any paper other than a warrant of arrest or a subpoena; to make a motion; to file or submit an application or other document; or to perform or waive the performance of any act, such notice, service, motion, filing, submission, performance, or waiver shall be given by or to, served by or upon, made by or, requested of the attorney or representative of record, or the person himself if unrepresented.").

Appx.518

for CAT protections; (3) move to reopen the proceedings if the alien demonstrates "reasonable fear";[48] and (4) if the alien is not found to have demonstrated "reasonable fear," provide meaningful opportunity, and a minimum of 15 days,[49] for that alien to seek to move to reopen immigration proceedings to challenge the potential third-country removal.

With respect to the return of O.C.G.,[50] the Court recognizes that whether he received notice at all, let alone meaningful notice, is hotly contested. Until the factual dispute of whether he received notice is resolved, the Court will not order the return of O.C.G. A mandatory injunction, as would be required, "alters rather than preserves the status quo," and is thus subject to an even more heightened level of legal and factual scrutiny. *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) (citing *Massachusetts Coal. of Citizens with Disabilities v. Civ. Def. Agency & Off. of Emergency Preparedness of Mass.*, 649 F.2d 71, 76 n.7 (1st Cir. 1981)). Instead, Plaintiffs may renew their motion with regards to the return of O.C.G.

---

[48] "Reasonable fear" is the most stringent standard for screenings applied in the initial removal context, meaning the alien must show the highest and most credible level of fear required at the screening stage to garner relief. *Compare* 8 CFR § 208.31 (using "reasonable fear" as the screening standard for aliens removeable under certain INA provisions), *with* 8 CFR § 208.16 (using "credible fear" as the screening standard for aliens removeable under other INA provisions); *see also Reasonable Fear Screenings*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/reasonable-fear-screenings (last updated Jan. 24, 2025) ("Those who are found to have a reasonable fear of persecution or torture are then given an opportunity to seek withholding of removal or deferral of removal before an Immigration Judge."). While Defendants propose applying the "more likely than not" standard, *see* April 10, 2025 Rough Tr. at 33:2–4, that would require an alien to demonstrate full entitlement to CAT protections at merely the screening stage. *See* 8 C.F.R. § 208.17(a).

[49] The Court has been forced to decide on an appropriate time limit because Defendants were unable, unwilling, or incapable of meaningfully engaging in a discussion about what process was required to provide aliens with a meaningful opportunity to contest a finding that their fear was reasonable. *See* April 10, 2025 Rough Tr. at 48:10–13 ("THE COURT: What's an appropriate number of days? MR. ENSIGN: Your Honor, our -- we think it should be shorter than [21 days]. I'm not prepared to say exactly what that period is."). To tailor its preliminary injunction as narrowly as possible, the Court has chosen to use the timeframe that Defendants proposed when developing their own forms for this scenario. *Supra* note 46. Though these forms may never have been formally adopted, they would appear to, at a minimum, reflect the agencies' determination—on two separate occasions spanning a period of nearly 20 years—of an appropriate period of time during which an alien should be permitted to object to an adverse determination.

[50] It is clear that courts can still "grant relief once a deportee crosses the border." *Abrego Garcia III*, 2025 WL 1077101, at *2 (Sotomayor, J., concurring) (citing *Rumsfeld v. Padilla*, 542 U. S. 426, 447, n. 16 (2004); *Boumediene v. Bush*, 553 U. S. 723, 732 (2008)).

after discovery.  The Court orders the parties to conduct expedited discovery on this issue and file a status update addressing a proposed discovery plan by April 25, 2025.[51]

### C.    Bond

The Court exercises its discretion to waive the requirement to post a bond under Rule 65(c). *See, e.g.*, *Int'l Assoc. of Machinists and Aerospace Workers v. Eastern Airlines*, 925 F.2d 6, 9 (1st Cir. 1991) (finding "ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond"); *see also da Silva Medeiros v. Martin*, 458 F. Supp. 3d 122, 130 (D.R.I. 2020) (waiving the bond requirement where it would pose a hardship on petitioners and unduly restrict the federal rights at issue); *Pineda v. Skinner Services, Inc.*, 22 F.4th 47, 57 (1st Cir. 2021) (concluding that district court did not abuse its discretion when it did not require low-wage laborers to post a bond).

## V.    Conclusion

For the foregoing reasons, Plaintiffs' motion for class certification (Dkt. 4) is GRANTED and motion for a preliminary injunction (Dkt. 6) is GRANTED in part.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated:  April 18, 2025                    Judge, United States District Court

---

[51] The Court notes that Plaintiffs have not requested injunctive relief based on the right to make claims under 8 U.S.C. § 1231(b)(3)(A) beyond the named Plaintiffs.  This is consistent with the limitation on certain relief under 8 U.S.C. § 1252(f)(1).  *See Galvez*, 52 F.4th at 829–30.  The Court thus limits its Order as to statutory claims to apply only to the named Plaintiffs while ensuring CAT protection to all similarly situated individuals.

Appx.520

| From: | ECFnotice@mad.uscourts.gov |
|---|---|
| To: | CourtCopy@mad.uscourts.gov |
| Subject: | Activity in Case 1:25-cv-10676-BEM D.V.D. et al v. U.S. Department of Homeland Security et al Order |
| Date: | Wednesday, April 30, 2025 12:52:39 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## United States District Court

## District of Massachusetts

### Notice of Electronic Filing

The following transaction was entered on 4/30/2025 at 12:51 PM EDT and filed on 4/30/2025
**Case Name:**      D.V.D. et al v. U.S. Department of Homeland Security et al
**Case Number:**   1:25-cv-10676-BEM
**Filer:**
**Document Number:** 86(No document attached)

**Docket Text:**
**Judge Brian E. Murphy: ELECTRONIC ORDER - AMENDED PRELIMINARY INJUNCTION: In light of the issues raised during the April 28, 2025 hearing, this Court modifies a portion of its April 18, 2025 preliminary injunction [64]. This modification preserves the status quo as outlined in this Court's preliminary injunction. *See Sec. & Exch. Comm'n v. Xia,* 2024 WL 3447849, at \*6-7 (E.D.N.Y. July 9, 2024) (collecting cases modifying preliminary injunctions pending appeal in order to preserve the status quo). Defendants have represented to this court that that removals from Guantanamo Bay to third countries have been executed by the Department of Defense without the Department of Homeland Security's direction or knowledge, *see* Dkt 72, and the Court makes no finding on the accuracy of this assignment of responsibility but, in an abundance of caution, ORDERS that, prior to removing, or allowing or permitting another agency to remove, an alien from Guantanamo Bay to a third country, Defendants must comport with the terms of the April 18, 2025 preliminary injunction by providing the due-process guarantees set forth in Dkt. 64 at 46-47. At the April 28, 2025 hearing, the status of the Guantanamo Bay Detention Center was debated. The Court declines to resolve if transportation to this base is a deportation to a third country despite the United States' exercise of jurisdiction and control over the base. Given the position taken by the Government that the deportation from Guantanamo to third countries was not at the direction, behest or control of the Department of Homeland Security,**

**a debated issue to be resolved once preliminary discovery has been conducted, this Court ORDERS that, after taking custody of an alien, Defendants may not cede custody or control in any manner that prevents an alien from receiving the due-process guarantees outlined in the April 18, 2025 preliminary injunction.**
**(BIB)**

**1:25-cv-10676-BEM Notice has been electronically mailed to:**

Elianis N. Perez     elianis.perez@usdoj.gov

Trina Realmuto     trina@immigrationlitigation.org

Mary Larakers     mary.l.larakers@usdoj.gov, maria.n.latimer@usdoj.gov

Kristin Macleod-Ball     kristin@immigrationlitigation.org

Mark Sauter     mark.sauter@usdoj.gov, CaseView.ECF@usdoj.gov, USAMA.ECF@usdoj.gov, susanne.husted@usdoj.gov

Mary Kenney     mary@immigrationlitigation.org

Matthew Patrick Seamon     matthew.seamon2@usdoj.gov

Tomas Arango     tomas@immigrationlitigation.org

Leila Kang     leila@nwirp.org

Aaron Korthuis     aaron@nwirp.org

Anwen Hughes     hughesa@humanrightsfirst.org

Glenda M. Aldana Madrid     glenda@nwirp.org

Matt Adams     matt@nwirp.org, sydney@nwirp.org

**1:25-cv-10676-BEM Notice will not be electronically mailed to:**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

D.V.D.; M.M.; E.F.D.; and O.C.G.,

      Plaintiffs,

      v.

U.S. DEPARTMENT OF HOMELAND SECURITY;
Kristi NOEM, Secretary, U.S. Department of
Homeland Security, in her official capacity; Pamela
BONDI, U.S. Attorney General, in her official
capacity; and Antone MONIZ, Superintendent,
Plymouth County Correctional Facility, in his official
capacity,

      Defendants.

Civil Action No. 25-cv-10676-BEM

## AUTHENTICATING DECLARATION OF TRINA REALMUTO
## IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY
## RESTRAINING ORDER

Pursuant to 28 U.S.C. § 1746, I hereby declare:

1.      I am the executive director of the National Immigration Litigation Alliance. I am one of the counsel for Plaintiffs and class members in the above-captioned case. I submit this declaration in support of Plaintiffs' Emergency Motion for a Temporary Restraining Order.

2.      I have personal knowledge of the facts set forth herein, and, if called as a witness, I could and would testify completely as set forth below.

3.      Accompanying Plaintiffs' Motion as **Exhibits A1 – A8** are true and correct copies of media reporting regarding military flights to Libya, including a May 6, 2025 New York Times Article entitled "*Trump Administration Plans to Send Migrants to Libya on a Military Flight*"; a May 7, 2025 Reuters article entitled "*Exclusive: US may soon deport migrants to Libya on military flight, sources say*"; a May 7, 2025 BBC article entitled *"US may soon deport migrants to Libya - reports"*; a May 7, 2025 CNN article entitled *"Trump admin moving forward with plans to transport undocumented immigrants to Libya"*; a May 7, 2025 Independent article entitled *"Trump administration plans to send migrants to Libya's 'horrific' detention centers"*; a May 7, 2025 The Guardian article entitled *"US planning to deport migrants to Libya despite 'hellish' conditions - reports"*; a May 7, 2025 Newsweek article entitled *"Donald Trump Planning to Send Migrants to Libya: What We Know"*; and a May 6, 2025 CBS New article entitled "*Trump administration may soon deport migrants to Libya*." **Exhibit A9** is a true and correct copy of an article regarding President Trump's upcoming travel to Saudi Arabia, an April 22, 2025 Politico article entitled "*Trump to visit Saudi Arabia, Qatar and UAE in May.*"

4.      Accompanying Plaintiffs' Motion as **Exhibit B** is a true and correct copy of an email exchange between Plaintiffs' counsel and Jacqueline Dan, a Public Defender with the Orange County, California Public Defender and Tin Thanh Nguyen, Attorney with the Law Office of Tin

1

Thanh Nguyen, PLLC, indicating that "[U.S. Immigration and Customs Officers (ICE)] officers at the South Texas Detention Facility gathered 1 Vietnamese detainee, along with 5 others (including 1 from Laos) into a room and told them that they needed to sign a document agreeing to be deported to Libya. When they all refused, they were each put in a separate room and cuffed in (basically, solitary) in order to get them to sign it." The email indicates that a Vietnamese man threatened with removal to Libya was moved from the facility today (May 7, 2025) at 7:00 am Eastern Time.

5.      Accompanying Plaintiffs' Motion as **Exhibit C** is a true and correct copy of an email exchange between Plaintiffs' counsel and attorneys at Texas RioGrande Legal Aid regarding a Laotian man at risk of deportation to Libya or Saudi Arabia who already had been moved out of the Pearsall Detention Center in South Texas before counsel could meet with him.

6.      Accompanying Plaintiffs' Motion as **Exhibit D** is a true and correct copy of an email exchange between Plaintiffs' counsel and Johnny Sinodis of Van Der Hout LLP in San Francisco regarding a Filipino client who was informed by ICE that he would be deported to Libya and whose counsel has not been provided written notice as required by the injunction. Email communications with ICE officers in San Antonio, Texas from Mr. Sinodis are attached to that email exchange.

7.      Accompanying Plaintiffs' Motion as **Exhibit E** is true and correct copy of an email exchange dated May 7, 2025 between Plaintiffs' counsel and Defendants' counsel seeking information about the flights to Libya and rumored flight to Saudia Arabia, expressing counsel about compliance with this Court's preliminary injunction, and advising of the instant motion for a temporary restraining order.

8.    Accompanying Plaintiffs' Motion as **Exhibit F** is true and correct copy of a May 7, 2025 post to the social media platform X by user @IntelWalrus.

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge. Executed this 7th day of May 2025 at Brookline, Massachusetts.

By:       s/ *Trina Realmuto*
          Trina Realmuto

Appx.526

# Trump Administration Plans to Send Migrants to Libya on a Military Flight

Human rights groups have called conditions in the country's network of migrant detention centers "horrific" and "deplorable."

 ▶ **Listen to this article · 5:52 min**    Learn more

   

By Eric Schmitt, Hamed Aleaziz, Maggie Haberman and Michael Crowley

Reporting from Washington

May 6, 2025

The Trump administration is planning to transport a group of immigrants to Libya on a U.S. military plane, according to U.S. officials, another sharp escalation in a deportation program that has sparked widespread legal challenges and intense political debate.

The nationalities of the migrants were not immediately clear, but a flight to Libya carrying the deportees could leave as soon as Wednesday, according to the officials, who spoke on the condition of anonymity because they were not authorized to discuss the operation.

The decision to send deportees to Libya was striking. The country is racked with conflict, and human rights groups have called conditions in its network of migrant detention centers "horrific" and "deplorable."

The Libya operation falls in line with the Trump administration's effort to not only deter migrants from trying to enter the country illegally but also to send a strong message to those in the country illegally that they can be deported to countries

EXHIBIT 27

where they could face brutal conditions. Reuters earlier reported the possibility of a U.S. deportation flight to Libya.

The planning for the flight to Libya has been tightly held, and could still be derailed by logistical, legal or diplomatic obstacles.

---

**What you should know.** The Times makes a careful decision any time it uses an anonymous source. The information the source supplies must be newsworthy and give readers genuine insight.

Learn more about our process.

---

The White House declined to comment. The State Department and Defense Department did not immediately respond to requests for comment.

The potential use of Libya as a destination comes after the administration set off an earlier furor by deporting a group of Venezuelans to El Salvador, where they are being held in a maximum-security prison designed for terrorists.

President Trump and his aides labeled those men violent gang members and cited a rarely used wartime law in their expulsions, a move that has been challenged in the courts.

The State Department warns against traveling to Libya "due to crime, terrorism, unexploded land mines, civil unrest, kidnapping and armed conflict." The country remains divided after years of civil war following the 2011 overthrow of its longtime dictator, Muammar Gaddafi. A United Nations-recognized government in Tripoli rules western Libya, and another in Benghazi, led by the warlord Khalifa Haftar, controls the east.

The United States has formal relations only with the Tripoli government. But Mr. Haftar's son, Saddam, was in Washington last week, and met with several Trump administration officials. Mr. Trump had friendly dealings in his first term with Mr. Haftar, who controls most of Libya's lucrative oil fields.

Appx.528

A major transit point for Europe-bound migrants, Libya operates numerous detention facilities for refugees and migrants. Amnesty International branded those sites "horrific" and "a hellscape" in a 2021 report, which found evidence of "sexual violence, against men, women and children." The Global Detention Project says detained migrants in Libya endure "physical mistreatment and torture," forced labor and even slavery.

In its annual report on human rights practices last year, the State Department cited "harsh and life-threatening" conditions in Libya's detention centers and found that migrants in those facilities, including children, had "no access to immigration courts or due process."

Human rights groups say that European governments have been complicit in such treatment by working with Libya to intercept migrants bound for the continent and send them to the detention centers.

"I have been in those migrant prisons and it's no place for migrants," said Frederic Wehrey, a Libya expert at the Carnegie Endowment for International Peace. "It's just a horrific place to dump any vulnerable person."

Earlier this year, the Trump administration deported several hundred people to Panama from countries in the Eastern Hemisphere, including Iran and China. The migrants, who said they did not know where they were going, were detained in a hotel for several days before being taken to a camp near the jungle. Some of the migrants were later released from Panamanian custody.

Around the same time, U.S. officials also deported a group of around 200 migrants to Costa Rica from countries in the Eastern Hemisphere, including Iran. A lawsuit filed against the country argued that the deportations and subsequent detention in Costa Rica "could cause irreparable harm" for a group of children sent to the country.

After the United States struck a deal with El Salvador to take Venezuelan migrants and imprison them, Secretary of State Marco Rubio said he was working to secure similar agreements with additional nations.

Appx.529

"I intend to continue to try and identify other countries willing to accept and jail as many gang members as we can send them," Mr. Rubio told The New York Times.

The planned use of a military plane for the flight to Libya comes after the Defense Department has assisted in transporting migrants to locations such as India, Guatemala and Ecuador.

In late March, Defense Department officials flew a group of Venezuelan migrants to El Salvador without any staff from the Department of Homeland Security on the plane, according to court records. The flight took off from Guantánamo Bay, Cuba, to El Salvador and included four Venezuelans. A government filing indicated that the Department of Homeland Security did not "direct" the plane to take off for El Salvador.

Zolan Kanno-Youngs contributed reporting.

**Eric Schmitt** is a national security correspondent for The Times, focusing on U.S. military affairs and counterterrorism issues overseas, topics he has reported on for more than three decades.

**Hamed Aleaziz** covers the Department of Homeland Security and immigration policy for The Times.

**Maggie Haberman** is a White House correspondent for The Times, reporting on President Trump.

**Michael Crowley** covers the State Department and U.S. foreign policy for The Times. He has reported from nearly three dozen countries and often travels with the secretary of state.

Appx.530

Learn more about  **LSEG**



My News

# Exclusive: US may soon deport migrants to Libya on military flight, sources say

By **Phil Stewart**, **Idrees Ali** and **Humeyra Pamuk**

May 7, 2025 12:19 PM EDT · Updated 24 min ago

  



Venezuelan migrants arrive after being deported from the United States, at Simon Bolivar International Airport, in Maiquetia, Venezuela April 23, 2025.
REUTERS/Leonardo Fernandez Viloria/File... Purchase Licensing Rights ⬗ **Read more**

## Summary

U.S. may deport migrants to Libya despite past rights criticism, say sources

First deportation flights may leave Wednesday

U.S. seeks more deportation destinations

EXHIBIT 32
Appx532

WASHINGTON, May 6 (Reuters) - U.S. President Donald Trump's administration may deport migrants to Libya for the first time this week, three U.S. officials said on Tuesday, as part of his immigration crackdown and despite Washington's past condemnation of Libya's harsh treatment of detainees.

Two of the officials said the U.S. military could fly the migrants to the North African country as soon as Wednesday, but stressed that plans could change.

The Reuters Tariff Watch newsletter is your daily guide to the latest global trade and tariff news. Sign up here.

The Pentagon referred queries to the White House. The White House and Department of Homeland Security did not immediately respond to requests for comment.

A State Department spokesperson said: "We do not discuss the details of our diplomatic communications with other governments."

Reuters could not determine how many migrants would be sent to Libya or the nationalities of the individuals that the administration is eyeing for deportation.

Libya's Government of National Unity said on Wednesday it rejected the use of Libyan territory as a destination for deporting migrants without its knowledge or consent. It also said there was no coordination with the United States regarding the reception of migrants.

Khalifa Haftar's Libyan National Army, which controls eastern Libya, also rejected in a statement the idea of the country taking migrants deported from the United States, saying it "violates the sovereignty of the homeland".

Trump, who made immigration a major issue during his election campaign, has launched aggressive enforcement action since taking office, surging troops to the southern border and pledging to deport millions of immigrants in the United States illegally.

As of Monday, the Trump administration has deported 152,000 people, according to DHS.

The administration has tried to encourage migrants to leave voluntarily by threatening steep fines, trying to strip away legal status, and deporting migrants to notorious prisons in Guantanamo Bay and El Salvador.

**LIFE-THREATENING**

In its annual human rights report released last year, the U.S. State Department criticized Libya's "harsh and life-threatening prison conditions" and "arbitrary arrest or detention."

In its travel advisory, the Department advises U.S. citizens against visiting the country due to "crime, civil unrest, kidnapping and armed conflict."

Libya's west is overseen by the GNU under Prime Minister Abdulhamid al-Dbeibah, who was installed in Tripoli through a U.N.-backed process in 2021. Eastern Libya has a parallel administration and is controlled by commander Khalifa Haftar's Libyan National Army.

Major fighting ended with a truce in 2020 but the underlying political dispute between the sides remains and there are sporadic clashes between rival factions.

U.S. Secretary of State Marco Rubio last week said the United States was not satisfied only with sending migrants to El Salvador, and hinted that Washington was looking to expand the number of countries that it may deport people to.

"We are working with other countries to say: We want to send you some of the most despicable human beings, will you do this as a favor to us," Rubio said at a cabinet meeting at the White House last Wednesday.

"And the further away from America, the better."

A fourth U.S. official said the administration has for several weeks been looking at a number of countries to send migrants to, including Libya.

It wasn't immediately clear if the administration had struck an agreement with the Libyan authorities to accept deportees of other nationalities.

On April 19 the Supreme Court justices temporarily barred the Trump administration from deporting a group of Venezuelan migrants it accused of being gang members. Trump's administration, which has invoked a rarely used wartime law, has urged the justices to lift or narrow their order.

It is unclear what kind of due process might be underway ahead of any Libya deportations.

Libya has had little peace since a 2011 NATO-backed uprising, and it split in 2014 between eastern and western factions, with rival administrations governing in each area.

A Tripoli-based Government of National Unity under Prime Minister Abdulhamid al-Dbeibah was installed through a U.N.-backed process in 2021 but the Benghazi-based House of Representatives no longer recognizes its legitimacy.

Reporting by Humeyra Pamuk, Idrees Ali and Phil Stewart; Additional reporting by Hani Amara in Istanbul, Ayman al-Werfali in Benghazi, Gram Slattery and Ted Hesson; Editing by Michael Perry and Chizu Nomiyama

Our Standards: **The Thomson Reuters Trust Principles.** ⧉

Suggested Topics:

United States     Human Rights

Purchase Licensing Rights



**Phil Stewart**
Thomson Reuters

Phil Stewart has reported from more than 60 countries, including Afghanistan, Ukraine, Syria, Iraq, Pakistan, Russia, Saudi Arabia, China and South Sudan. An award-winning Washington-based national security reporter, Phil has appeared on NPR, PBS NewsHour, Fox News and other programs and moderated national security events, including at the Reagan National Defense Forum and the German Marshall Fund. He is a recipient of the Edwin M. Hood Award for Diplomatic Correspondence and the Joe Galloway Award.

  



**Idrees Ali**
Thomson Reuters

National security correspondent focusing on the Pentagon in Washington D.C. Reports on U.S. military activity and operations throughout the world and the impact that they have. Has reported from over two dozen countries to include Iraq, Afghanistan, and much of the Middle East, Asia and Europe. From Karachi, Pakistan.

**Humeyra Pamuk**
Thomson Reuters

Humeyra Pamuk is a senior foreign policy correspondent based in Washington DC. She covers the U.S. State Department, regularly traveling with U.S. Secretary of State. During her 20 years with Reuters, she has had postings in London, Dubai, Cairo and Turkey, covering everything from the Arab Spring and Syria's civil war to numerous Turkish elections and the Kurdish insurgency in the southeast. In 2017, she won the Knight-Bagehot fellowship program at Columbia University's School of Journalism. She holds a BA in International Relations and an MA on European Union studies.



## Read Next

**Right-wing One America News to provide newsfeed to Voice of America**
ago

---

Healthcare & Pharmaceuticals
**US health chief Kennedy launches autism project using Medicare and Medicaid data**
3:16 PM UTC

---

United States
**Tufts student challenging immigration detention must be sent to Vermont, court rules**
3:44 PM UTC

---

United States
**US, China to hold ice-breaker trade talks in Geneva on Saturday**
11:29 AM UTC

Appx.534

Sponsored Content

Dianomi ▷

World >

Appx.535

# Judge in Sean 'Diddy' Combs trial admonishes lawyer for racial remarks

Legal · May 7, 2025 · 12:38 PM EDT · 5 min ago

The judge overseeing Sean "Diddy" Combs' sex trafficking trial admonished a lawyer close to the hip-hop mogul's defense team for referring to the prosecutors in the case as a "six-pack of white women" in comments on a podcast.

---

World

**Conclave Updates: Cardinals meet to elect a successor to Pope Francis**

9 min ago

---

Asia Pacific

**India strikes Pakistan over tourist killings, Pakistan says it will retaliate**

6 min ago

---

Healthcare & Pharmaceuticals

**Europe reviews Valneva's chikungunya vaccine after reports of serious side effects**

11 min ago

---

Europe

**Cardinals begin conclave to elect new pope in majesty of Sistine Chapel**

15 min ago

---

Appx.536

US may soon deport migrants to Libya on military flight, sources say | Reuters

Latest

Home

Authors

Topic Sitemap

Archive

Article Sitemap

Media

📹  Videos

Browse

World

Business

Markets

Sustainability

Legal

Breakingviews

Technology

Investigations

Appx.537

Pictures

Graphics

Podcasts

Sports

Science

Lifestyle


About Reuters

About Reuters ⧉

Advertise with Us ⧉

Careers ⧉

Reuters News Agency ⧉

Brand Attribution Guidelines ⧉

Reuters and AI ⧉

Reuters Leadership ⧉

Reuters Fact Check

Reuters Diversity Report ⧉

Stay Informed

Download the App (iOS) ⧉

Download the App (Android) ⧉

Newsletters

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us

LSEG Products

**Workspace** ⧉

Access unmatched financial data, news and content in a highly-customised workflow experience on desktop, web and mobile.

**Data Catalogue** ⧉

Browse an unrivalled portfolio of real-time and historical market data and insights from worldwide sources and experts.

**World-Check** ⧉

Screen for heightened risk individual and entities globally to help uncover hidden risks in business relationships and human networks.

Appx.538

**Advertise With Us** ↗   **Advertising Guidelines**   **Purchase Licensing Rights** ↗

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

**Cookies** ↗   **Terms of Use**   **Privacy** ↗   **Digital Accessibility** ↗   **Corrections**   **Site Feedback** ↗

© 2025 Reuters. All rights reserved

Case 1:25-cv-10676-BEM   Document 97-1   Filed 05/07/25   Page 10 of 16

5/7/25, 2:44 PM US may soon deport migrants to Libya on military flight, sources say | Reuters

ADVERTISEM

# US may soon deport migrants to Libya - reports

5 hours ago

Share <    Save 🔖

**Wedaeli Chibelushi**
BBC News



Bloomberg via Getty Images

Donald Trump promised voters "mass deportations"

The US may soon start deporting migrants to Libya as part of its crackdown on immigration, two US officials have told BBC partner CBS News.

The officials, who requested anonymity, said the US military could fly migrants to the North African country as early as this week.

The move is likely to spark controversy - Libya has been mired in conflict for more than a decade and the US state department advises Americans not to travel there due to factors like crime, terrorism and civil unrest.

The BBC has approached the US state department for comment.

EXHIBIT 47
Appx1547

1/4

ADVERTISEMENT



**Become a Citizen of Saint Kitts & Nevis**

*H&P* Henley & Partners - Sponsored                    Learn More

 ⏺ Watch Live                                Register    Sign In

Home    News    Sport    Business    Innovation    Culture    Arts    Travel    Earth    Audio    Video    Live

This week Rwanda confirmed it was in the "early stage" of talks with the US, while Benin, Angola, Equatorial Guinea, Eswatini, and Moldova have all been named in media reports.

- Migrants on edge as Trump administration ramps up raids and arrests

- Trump's first 100 days - in numbers

It is not clear how many people the US hopes to deport to Libya, or which part of Libya the migrants would be sent to.

Since the overthrow of former ruler Muammar Gaddafi in 2011, the country has been divided into two - the west is ruled by a UN-backed government, while military strongman Gen Khalifa Haftar controls the east.

Haftar's son met US officials in Washington last Monday, but the US state department and a Libyan spokesperson said the meeting was not about deportations.

Since returning to office in January, President Trump has launched a mass deportation campaign - at times relying on controversial tactics such as the invocation of a centuries-old wartime law.

Earlier this week, the government offered migrants who are in the US illegally a sum worth $1,000 (£751) to leave the country.

## You may also be interested in:

- Why is Libya so lawless?

- Joe Biden on Trump: 'What president ever talks like that? That's not who we are'

- How much has Elon Musk's Doge cut from US government spending?



Getty Images/BBC

*Go to* **BBCAfrica.com** *for more news from the African continent.*

Appx.548

*Follow us on Twitter @BBCAfrica, on Facebook at BBC Africa or on Instagram at bbcafrica*

## BBC Africa podcasts

**Africa Daily**
**Focus on Africa**

Immigration    Libya    Africa    United States

**RELATED**

| What we know about Kilmar Abrego Garcia and MS-13 allegations | Trump administration reverses termination of foreign students' visas | Indian restaurant shut after illegal workers found |
|---|---|---|
| 7 days ago    World | 25 Apr 2025    US & Canada | 25 Apr 2025    England |

**MORE**

1 hr ago

### Watch: Massive waterspout spotted in the Gulf of California

Social media users captured the huge vortex that formed near the town of Puerto Peñasco.



1 hr ago    World

2 hrs ago

### Gang who smuggled thousands of queen ants sentenced in Kenya

The four suspects – two Belgians, a Vietnamese and a Kenyan – were arrested last month with 5,000 ants.



2 hrs ago    Africa

3 hrs ago

### Trump appeasing Putin with pressure on Ukraine, Biden tells BBC

In his first interview since leaving office, the 82-year-old criticises his successor's handling of the war and is challenged on his own record.



3 hrs ago    World

4 hrs ago

### Second US fighter jet falls overboard from Truman aircraft carrier

Two pilots sustained minor injuries after the latest mishap involving the carrier in the Middle East.



4 hrs ago    US & Canada

5 hrs ago

### Houthis say US 'backed down' and Israel not covered by ceasefire

A senior official rejects US President Donald Trump's claim the Yemeni group "capitulated" when agreeing a ceasefire deal.



5 hrs ago    World



Home    News    Sport    Business    Innovation    Culture    Arts    Travel    Earth    Audio    Video    Live    Weather    BBC Shop    BritBox

BBC in other languages ▾

Follow BBC on:    X    f    Instagram    TikTok    in    YouTube

Terms of Use    About the BBC    Privacy Policy    Cookies    Accessibility Help    Contact the BBC    Advertise with us    Do not share or sell my info    Contact technical support

Copyright 2025 BBC. All rights reserved.  The *BBC* is *not responsible for the content of external sites.* **Read about our approach to external linking.**

Appx.550

Subscribe   **Sign in**

**FOLLOW LIVE**

Waiting for the white smoke: The vote for a new pope is underway

# Trump admin moving forward with plans to transport undocumented immigrants to Libya

By Alayna Treene, CNN

🕐 2 minute read · Updated 12:23 PM EDT, Wed May 7, 2025



EX. Appx1554



In this January 30 photo, migrants are deported using a US military plane in El Paso, Texas. Christian Torres/Anadolu/Getty Images/File

---

**(CNN) —** The Trump administration is moving forward with plans to transport a group of undocumented immigrants to Libya on a US military plane, an administration official told CNN.

It is unclear when the plane would leave and whether other groups of migrants would also be sent to Libya — a country engaged in an ongoing civil conflict — in the future, the official said.

Flight trackers show that a US Air Force C-17 has filed a plan to fly on Wednesday from Kelly Field in San Antonio to Misrata Airport in Libya. The US has repeatedly used the large C-17s to transport migrants in recent months.

ADVERTISING



**Discover Italy in spring!**
ITA Airways - Sponsored

**Learn more**

The White House declined to comment. CNN first reported the administration was communicating with Libya to have the country take migrants from the United States. Reuters first reported on the potential military flight this week.

The decision to send migrants to Libya, which the UN has previously criticized for

The decision to send migrants to Libya, which the UN has previously criticized for its harsh treatment of migrants, is a further escalation of the president's deportation policies — which have faced widespread political and legal backlash.

The State Department's website has a Level 4 travel advisory for Libya. "Do not travel to Libya due to crime, terrorism, unexploded landmines, civil unrest, kidnapping, and armed conflict," the site reads.

Conversations about sending migrants to other countries in Africa, such as Rwanda, continue. But there are no confirmed plans for flights to those other countries right now, sources familiar with those discussions said.

*Natasha Bertrand and Kylie Atwood contributed to this report.*

## Up next

Trump administration weighs sending migrants to Libya and Rwanda, sources say
4 minute read


Trump judges pump brakes so far on Alien Enemies Act deportations to El Salvador
5 minute read


Trump asks Supreme Court to end deportation protections for Venezuelans in the US
2 minute read


Trump says he 'could' bring Abrego Garcia back from El Salvador, but won't
7 minute read


## Most read

**1**  Second US Navy jet is lost at sea from Truman aircraft carrier

**2**  Trump's Oval Office meeting with Carney didn't reach Zelensky-level tension. But it wasn't all neighborliness

**3**  India and Pakistan are on the brink of wider conflict. Here's what we know

**4**  India strikes deep inside Pakistan, Pakistan claims 5 Indian jets shot down, in major escalation

**5**  REAL ID is now required for air travel in America. Here's what's happening at airports across the US

**6**  GOP push to formalize Trump's 'Gulf of America' runs into resistance in House

**7**  Stop worrying, America. Just keep watching The Trump Show

**8**  The next superbug threat is already here. It's going to be even harder to overcome

**9**  Big changes are coming to Netflix

**10**  The first boats carrying Chinese goods with 145% tariffs are arriving in LA. Shipments are cut in half. Expect shortages soon

## MORE FROM CNN

 Trump administration weighs sending migrants to Libya and Rwanda, ...

 Trump judges pump brakes so far on Alien Enemies Act deportations to El Salvador

## NEWS & BUZZ

 Second US Navy jet is lost at sea from Truman aircraft carrier

 Trump's Oval Office meeting with



Carney didn't reach
Zelensky-level
tension. But it ...



India and Pakistan
are on the brink of
wider conflict.
Here's what we
know

Search CNN...

Subscribe

Sign in

Live TV

Listen

Watch

US

World

Politics

Business

Markets

Health

Entertainment

Tech

Style

Travel

Sports

Science

Climate

Weather

Ukraine-Russia War

Israel-Hamas War

Watch

Listen

CNN Underscored

Games

About CNN

## Politics

**FOLLOW CNN POLITICS**

   

Terms of Use    Privacy Policy    Cookie Settings    Ad Choices    Accessibility & CC    About    Subscribe    Newsletters

Transcripts    Help Center

© 2025 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.

CNN Sans ™ & © 2016 Cable News Network.

Appx.557

Case 1:25-cv-10676-BEM   Document 99-1   Filed 05/07/25   Page 325 of 91

Appx.558

Case 1:25-cv-10676-BEM    Document 90-1    Filed 05/07/25    Page 345 of 91    ID: 6749229

Appx.560

  

NEWS    SPORTS    VOICES    CULTURE    LIFESTYLE    TRAVEL    CLIMATE    PREMIUM

News > World > Americas > US politics

# Trump administration plans to send migrants to Libya's 'horrific' detention centers

Libya serves as a hub for migrants trying to get to Europe, and the country has several detention facilities for refugees and migrants

**Gustaf Kilander** in Washington D.C.  •  Wednesday 07 May 2025 05:26 BST  •   Comments

   



Related video: Attorney General leaves abruptly after being confronted over deported migrants' lack of criminal records

### Your support helps us to tell the story

Read more ⌄

**SUPPORT NOW**

 PayPal  Pay

Read more ⌄

The Trump administration has developed plans to send migrants to detention centers in Libya on a military flight, according to *Reuters*.



The flight could depart as soon as Wednesday, officials told *The New York Times*. The nationalities of those set to be on the flight were not immediately apparent.

Libya is in the middle of severe conflict, and human rights groups have called its migrant detention centers "horrific" and "deplorable."

The effort comes as the Trump administration is working to deter migrants from entering the U.S., as well as send a message to those in the country unlawfully that they can be sent to countries with difficult conditions.

The flight may still not occur due to legal, logistical, or diplomatic restrictions. The administration has already faced pushback for sending a group of Venezuelans to El Salvador, where they are being detained in a prison designated for terrorists.

**RECOMMENDED**


**US has $21T underground city for rich to hide in a 'near-extinction event': official**


**Trump administration abruptly removes the vice chair of the National Transportation Safety Board**


**President Trump's childhood home in Queens sells for under $1 million**
Sponsored | Homes.com

**New York Student Sentenced To Year In Dubai Prison After Touching Airport Security Guard During**

Appx.563

Powered by Taboola

The State Department advises the American public against going to Libya "due to crime, terrorism, unexploded land mines, civil unrest, kidnapping, and armed conflict."

The country has faced years of civil war since the 2011 overthrow of Muammar Gaddafi, its longtime dictator. The country remains divided – a UN-recognized government governs western Libya from Tripoli. At the same time, the east is ruled by a government led by the warlord Khalifa Haftar, who controls most of the country's oil fields.

5/23/25, 2:35 PM   Case Document on Trump's plan to send migrants to Libya as their future remains uncertain | The Independent



Libyans walk around in Tripoli's Martyrs Square on April 28, 2025. The Trump administration plans to send migrants to the divided country *(AFP via Getty Images)*

The U.S. only has a formal relationship with the government in Tripoli, but that didn't stop Haftar's son, Saddam, from visiting Washington last week, meeting with several Trump officials. Trump had a friendly relationship with Haftar during his first term in the White House.

Libya serves as a hub for migrants trying to get to Europe, and the country has several detention facilities for refugees and migrants. In a 2021 report, Amnesty International said those facilities made up a "horrific" "hellscape" with evidence of "sexual violence against men, women and children."

Meanwhile, the Global Detention Project said migrants held in Libya may be the subject of "physical mistreatment and torture," as well as forced labor and slavery.

The State Department pointed to "harsh and life-threatening" conditions in the detention centers in the country in its annual report last year. It found that migrants had "no access to immigration courts or due process."

**RECOMMENDED**


**Bella Ramsey feels 'remorse' for 'humiliating' Game of Thrones co-star**


**Trump declares two new 'national holidays' – but Americans won't get time off**


**US Issues New 'Do Not Travel' Alert For 21 Countries Including Russia And North Korea**
Sponsored | Travel Noire

Appx.566


**AI Bot Flips Wall Street on Its Head: Turns $1K into $50K in Record 30 Days**
Sponsored | FX Market Insights

Powered by Taboola

A Libya expert at the Carnegie Endowment for International Peace, Frederic Wehrey, told *The Times:* "I have been in those migrant prisons and it's no place for migrants."

He added: "It's just a horrific place to dump any vulnerable person."

More about: Libya  El Salvador  Khalifa Haftar  Muammar Gaddafi  Amnesty International  Europe  Washington  UN  Tripoli  Trump

 **Join our commenting forum**
Join thought-provoking conversations, follow other Independent readers and see their replies

 Comments ↓

**Promoted stories**

## Farmers Trust This Simple Trick to Keep Mice Away—Now You Can Too
Sponsored | VAMOOSE

## Massachusetts New Policy for Cars Driven Less Than 50 Miles/day
Sponsored | FINANCE ADVISORS

Appx.567

## 8 tips for improving construction efficiency

Find out how top residential builders are winning back hours every single day.

Sponsored | BUILDERTREND

Learn more

## Amazon Is Losing Money as Massachusetts Shoppers Are Canceling Prime for This Clever Hack

This simple trick can save tons of money on Amazon, but most Prime members are ignoring it.

Sponsored | ONLINE SHOPPING TOOLS

## Explore Trading Tools

With TradeStation's advanced platform built for self-directed traders.

Sponsored | TRADESTATION

## Shia Labeouf's Conversion

Hear the Whole Story

Sponsored | WORD ON FIRE CATHOLIC MINISTRIES

## Seniors Can Now Fly Business Class For the Price Of Economy

Americans, you'll want to check this out ASAP

Sponsored | INSIDER | TRAVEL DEALS

## U.S. Cardiologist Warns Aging Seniors About Blueberries For Breakfast

Heart doctor urges aging seniors to be careful

Sponsored | GUNDRY MD

NEWS

White House caught off guard by Hegseth's request to cancel weapons supply to Ukraine

'He needs to resign': Democrats react with quiet shock to damning Fetterman profile

CULTURE

Kanye West branded 'sniveling little coward' as he storms off Piers Morgan interview

## Bandit Heeler is having a midlife crisis, and 'Bluey' wants you to notice

What if 'Bluey' isn't really about Bluey? Holly Baxter presents the case for Bandit and Chilli as the show's real protagonists

Sponsored | PROMOTED BY INDEPENDENT PREMIUM

Appx.568



**Read More Comments**

## Walgreens Faces Worst Nightmare as 87¢ ED Pill Takes Over

Case 2:25-m 1393ase Document 00641B587548ceRage:001 PateDFG709/08/2005 44 Entry ID: 6749229

### Massachusetts: Gov May Cover Your Cost To Install Solar If You Live In These Zip Codes

Savvy homeowners are taking advantage of government incentives to install solar panels...

Sponsored | SUNVALUE

**NEWS**

MAGA justifies turning n-word woman into folk hero by blaming Texas stabbing suspect

El Salvador president orders arrest of of bus company heads for defying free transport order

### Why New Zealanders are emigrating in record numbers

The government may not be able to reverse the trend

Sponsored | THE ECONOMIST

**VOICES**

Reform's desire to ban Ukrainian flags is a stark reminder of who Farage really is



**GET IN TOUCH**

Contact us

 

**OUR PRODUCTS**

Register

Newsletters

Donate

Today's Edition

Install our app

Archive

**OTHER PUBLICATIONS**

International editions

Independent en Español

Independent Arabia

Independent Turkish

Independent Persian

Independent Urdu

The Standard

**LEGAL**

Code of conduct and complaints

Contributors

Cookie policy

Donations Terms & Conditions

Privacy policy

**EXTRAS**

Puzzles

All topics

Betting Offers

Voucher codes

Competitions and offers

Appx.570

Modern Slavery Statement

Independent Ignite

Syndication

Working at The Independent

**Libya**

# US planning to deport migrants to Libya despite 'hellish' conditions – reports

**Libya's provisional government has denied claims flight could happen as soon as this week**



📷 A vessel rescuing people in the central Mediterranean off Libya last year. Human rights organisations have documented how migrants trapped in the country are at the mercy of militias and smugglers. Photograph: Anadolu/Getty Images

**Lorenzo Tondo** *in Palermo and* **Edward Helmore** *in New York*

Wed 7 May 2025 12.03 EDT

The Trump administration is planning to deport a group of migrants to Libya, according to reports, despite the state department's previous condemnation of the "life-threatening" prison conditions in the country.

Libya's provisional government has denied the reports.

Reuters cited three unnamed US officials as saying the deportations could happen this week. Two of the officials said the individuals, whose nationalities are not known, could fly to the north African country as soon as Wednesday, but they added the plans could still change. The New York Times also cited a US official confirming the deportation plans.

It was not clear what Libya would be getting in return for taking any deportees.

Human rights groups condemned the reported plans, noting the country's poor record on human rights practices and harsh treatment of detainees.

"Migrants have long been trafficked, tortured and ransomed in Libya. The country is in a civil war. It is not a safe place to send anyone," Sarah Leah Whitson, the executive director of Democracy for the Arab World Now (Dawn), wrote on X.

Aaron Reichlin-Melnick, senior fellow at the American Immigration Council, wrote on the platform alongside a picture of a Libyan detention facility:

EXHIBIT 72

1/5

"Don't look away. This is what Libya's migrant detention facilities look like. This is what Trump is doing."

Reichlin-Melnick added: "Amnesty International called these places a 'hellscape' where beatings are common and sexual violence are rampant. There are reports of human trafficking and even slavery."

Claudia Lodesani, head of programs for Médecins Sans Frontières (MSF), said the group was "very concerned" about the possible consequences of such a plan, saying reports by media outlets and human rights organisations showed that "Libya is not a safe country for migrants"

Lodesani pointed to a 2023 United Nations report which documented "widespread practices of arbitrary detention, torture, rape and slavery and concluding there were grounds to believe a wide array of crimes against humanity have been committed against migrants in Libya".

Government agencies, including the defense department, the White House, state department and department of homeland security did not immediately respond to the Guardian's requests for comment. The defense department later directed inquiries to the White House.

Reports of planned deportations to Libya come as the Trump administration is expanding its efforts to negotiate the deportations of US migrants to third-party countries, including Angola, Benin, Eswatini, Moldova and Rwanda. This is alongside the at least 238 Venezuelan immigrants already deported to a prison in El Salvador.

Libya is a major transit point for Europe-bound asylum seekers. For years, human rights organisations have documented how migrants trapped in the country are at the mercy of militias and smugglers. Tens of thousands of people from sub-Saharan Africa are kept indefinitely in overcrowded refugee detention centres where they are subjected to abuses and torture.

In its annual human rights report released last year, the US state department criticised Libya's "harsh and life-threatening prison conditions" and "arbitrary arrest or detention", citing how migrants , including children, had "no access to immigration courts or due process".

The news has prompted condemnation from aid agencies and NGOs that operate in the central Mediterranean, which have long warned about the harsh conditions faced by asylum seekers in Libya. They have also accused European governments of being complicit in such treatment by working with Libya to intercept migrants.

"For 10 years now since our foundation, as a search and rescue organisation, we have continuously highlighted that Libya is not a safe place for migrants and refugees," said Mirka Schäfer, a political expert for the German search-and-rescue organisation SOS Humanity. "Evidence from survivors onboard our vessel Humanity 1, includes refugees with traces of torture on their bodies, gunshot wounds, pain caused by beatings, physical and psychological wounds while in transit, in detention camps in Libya, or fleeing Libya across the Mediterranean."

One person onboard the Humanity 1 ship said criminal groups operating in Libya "sell people like they would sell bread".

Luca Casarini, the Italian founder of the NGO Mediterranea Saving Humans, said the reported move by Trump was "an endorsement of the horror that has characterised his administration's policies since the very beginning".

"Libya is one of the most hellish places on Earth, where mafias and smugglers operate with the complicity of the European Union. But Trump goes a step further. The American president claims ownership of this horror by deporting people to a hell that is Libya, flaunting his power. It is a move that drags our civilisation toward the abyss."

Appx.573

Case 25-1393, Document 120, 05/07/2025, 3617549, Page 105 of 181
Case 1:25-cv-10676-BEM Document 54 Doc 9051 Filed 05/07/25 Page 48 of 81
5/7/25, 1:05 PM                    US planning to deport migrants to Libya despite 'hellish' conditions – reports | US news | The Guardian
5/7/25, 1:05 PM    Case ID: 6749229

Libya's government of national unity said on Wednesday it rejected the use of its territory as a destination for deporting migrants without its knowledge or consent. The government added there was no coordination with the US regarding the reception of migrants.

Trump, who made immigration a major issue during his election campaign, has launched aggressive enforcement action since taking office, increasing troops to the southern border and pledging to deport millions of undocumented immigrants from the US.

As of Monday, the Trump administration had deported 152,000 people, according to the Department of Homeland Security. Trump's administration has tried to encourage migrants to leave voluntarily by threatening steep fines, trying to strip away legal status, and sending migrants to notorious prisons in Guantánamo Bay and El Salvador.

The US secretary of state, Marco Rubio, last week said the US was not satisfied with sending migrants only to El Salvador, and hinted that Washington was looking to expand the number of countries to which it could deport people.

"We are working with other countries to say: we want to send you some of the most despicable human beings; will you do this as a favour to us?" Rubio said at a cabinet meeting at the White House last Wednesday. "And the further away from America, the better."

A fourth US official said the administration had for several weeks been looking at a number of countries where it might be able to send migrants, including Libya.

On 19 April the supreme court temporarily barred the Trump administration from deporting a group of Venezuelans it accused of being gang members.

Trump's administration, which has invoked a rarely used wartime law, has urged the justices to lift or narrow their order.

*Reuters contributed to this report*

---

*You've read 5 articles in the last year*                                        Article count on

**Can you help us hit our support goal?**

**0** of 50,000 readers

### Why you can rely on the Guardian not to bow to Trump – or anyone

I hope you appreciated this article. Before you move on, I wanted to ask whether you could support the Guardian's journalism as we face the unprecedented challenges of covering this administration.

As Trump himself observed: "The first term, everybody was fighting me. In this term, everybody wants to be my friend."

He's not entirely wrong. Already, several large corporate-owned news organizations have settled multimillion-dollar lawsuits with the president in order to protect their business interests. Meanwhile, billionaires have intervened editorially in the news outlets they own to limit potentially unfavorable coverage of the president.

The Guardian is different: we have no interest in being Donald Trump's – or any politician's – friend. Our allegiance as independent journalists is not to those in power but to the public. Whatever happens in the coming months and years, you can rely on the Guardian never to bow down to power, nor back down from truth.

How are we able to stand firm in the face of intimidation and threats? As journalists say: follow the money. The Guardian has neither a self-interested billionaire owner nor profit-seeking corporate henchmen pressuring us to appease the rich and powerful. We are funded by our readers and owned by the Scott Trust – whose only financial obligation is to preserve our journalistic mission in perpetuity.

What's more, in a time of rising, democracy-threatening misinformation, we make our fiercely independent journalism free to all, with no paywall – so that everyone in the US can have access to responsible, fact-based news.

**With the administration already cracking down on free speech, banning reporters from the Oval Office, and the president and his allies pursuing lawsuits against news outlets whose stories they don't like, it has never been more urgent, or more perilous, to pursue fair, accurate reporting. Can you support the Guardian today?**

We value whatever you can spare, but a recurring contribution makes the most impact, enabling greater investment in our most crucial, fearless journalism. As our thanks to you, we can offer you some great benefits – including seeing far fewer fundraising messages like this. We've made it very quick to set up, so we hope you'll consider it. Thank you.



**Betsy Reed**
*Editor, Guardian US*

◯ Support $5/month

Recommended

◯ **Support $15/month**

Unlock **All-access digital** benefits:
- ⬤ Unlimited access to the Guardian app
- ⬤ Unlimited access to our new Feast App
- ⬤ Ad-free reading on all your devices
- ⬤ Exclusive newsletter for supporters, sent every week from the Guardian newsroom
- ⬤ Far fewer asks for support

◯ Support once from just $1

Continue → | Remind me in June |   

---

## More on this story

| Critic of Italy-Libya migration pact told he was target of Israeli spyware | Trump orders reopening of Alcatraz prison for 'most ruthless offenders' | Libyan PM resists Russia's move to reinforce military bases in country |
|---|---|---|
| 3 Feb 2025 | 2d ago | 20 Dec 2024 |





Case: 25-1393    Case: 25-cv-10676-RFM-754    Doc: Page: 9071    Filed: 05/07/25 09/2025    50-5191    ID: 6749229

**Most viewed**

Case: 25-1393    Document: 00761857548    Page: 108    Date Filed: 05/08/2025    Entry ID: 6749229



GO AD-FREE     Login



**U.S.** | Donald Trump    Immigrants    Immigration    Deportation

# Donald Trump Planning to Send Migrants to Libya: What We Know

**Published** May 07, 2025 at 2:38 AM EDT



EXHIBIT A7



GO AD-FREE

By **Khaleda Rahman**
National Correspondent

Newsweek Is A Trust Project Member

FOLLOW

News Article | 50 ⌄

**P**resident <u>Donald Trump</u>'s administration is planning to deport migrants to Libya, according to reports.

The <u>U.S. military</u> could fly deportees to the country as soon as Wednesday, *The New York Times* and Reuters reported, citing officials who spoke on the condition of anonymity.

It was not immediately known how many migrants could be sent to Libya or the nationality of the individuals the administration may deport.

*Newsweek* has contacted the White House, State Department and Department of Homeland Security for comment outside regular business hours.



Appx.578

**Newsweek**    GO AD-FREE

LATEST    Watch Live Chimney Cam: Conclave To Elect New Pope Underway



President Donald Trump speaking in the Oval Office of the White House on Tuesday.    **ANNA MONEYMAKER/GETTY IMAGES**

## Why It Matters

Libya has become notorious for its network of migrant detention centers, which human rights groups have described as inhumane.

In a 2021 report, Amnesty International called the facilities a "hellscape," where detainees suffer torture, sexual violence, forced labor, and even slavery.

In an annual report on human rights practices in Libya released last year, the State Department described the conditions in the country's detention centers as "harsh and life-threatening."



GO AD-FREE

LATEST   Watch Live Chimney Cam: Conclave To Elect New Pope Underway



**Your sequel will b**
**better. Hurry, lock**
**Pass before price**

Ad By **Epic Pass**

It added that migrants in these facilities, including children, had "no access to immigration courts or due process."

## What To Know

Trump, who made [immigration a centerpiece of his campaign](#), has launched a major crackdown since returning to office in January. His administration has detained and deported thousands of people, including sending alleged gang members to notorious prisons in Guantanamo Bay and El Salvador.

One official told Reuters that the Trump administration had been looking at a number of countries to send migrants to, including Libya. But it was not immediately clear if the administration had reached an agreement with Libyan authorities to accept deportees of other nationalities.

The State Department has issued a Level 4 travel advisory for Libya, warning Americans against traveling there due to "crime, terrorism, unexploded landmines, civil unrest, kidnapping, and armed conflict."

 **Newsweek**    GO AD-FREE

**Your sequel will b
better. Hurry, lock
Pass before price**

Ad By **Epic Pass**

It was previously reported that the administration was also considering sending migrants to Rwanda.

## What People Are Saying

**Secretary of State Marco Rubio** said at a Cabinet meeting in the White House last week: "We are actively searching for other countries to take people from third countries... not just El Salvador. We are working with other countries to say: 'we want to send you some of the most despicable human beings to your countries, will you do that as a favor to us'. And the further away from America, the better so they can't come back across the border."

**Sarah Leah Whitson**, the executive director of Democracy for the Arab World Now, a nonprofit organization, wrote on X, formerly Twitter: "Migrants have long been trafficked, tortured and ransomed in Libya. The country is in a civil war. It is not a safe place to send anyone."

**Aaron Reichlin-Melnick**, senior fellow at the American Immigration Council, wrote on X, alongside a picture of a detention facility in Libya: "Don't look away. This is what Libya's migrant detention facilities look like. This is what Trump is doing.

Appx.581


Case: 25-1393 Document 00761883754 Page: 103 Date Filed: 05/08/2025 Entry ID: 6749229



## Your sequel will b
### better. Hurry, lock
### Pass before price

Ad By **Epic Pass**

"Amnesty International called these places a 'hellscape' where beatings are common and sexual violence are rampant. There are reports of human trafficking and even slavery."

---

READ MORE

- Trump-voting parents "feel betrayed" after ICE agents detain their son

- Florida's plan to replace migrant workers with children falls apart

- Trump says US doesn't need to sign trade deals

---

## What Happens Next

The legal path forward remains uncertain. A Supreme Court order in April temporarily barred the deportation of a group of Venezuelans that the administration had labeled as gang members. It remains unclear if any similar legal action will be taken ahead of any deportations to Libya.

Meanwhile, the Trump administration is reportedly exploring agreements with more countries willing to accept deportees.

Case: 25-1393    Document: 00618237548    Page: 114    Date Filed: 05/08/2025    Entry ID: 6749229



five data types effectively?

Read the report

virtusa

Only 14% of firms use data effectively. Are...

Virtusa - Sponsored

CLICK HERE

Request Reprint & Licensing

Submit Correction

View Editorial & AI Guidelines

Recommended For You

Case: 25-1393 Document: 00618237548 Page: 105 Date Filed: 05/08/2025 Entry ID: 6749229




**Man detained at green card appointment after over 25 years in US**



**Trump administration issues another warning to green card holders**

Case: 25-1393    Document: 00618287548    Page: 106    Date Filed: 05/08/2025    Entry ID: 6749229




ICE Agents raid home, force family out in their underwear: "Traumatized"



Defiant China fires warning at Donald Trump

Newsweek GO AD-FREE

LATEST Watch Live Chimney Cam: Conclave To Elect New Pope Underway



**Donald Trump rails against judges despite Justice Jackson's new warning**



**Trump administration shares second abuse claim by Abrego Garcia's wife**

Appx.586

**Newsweek** GO AD-FREE

LATEST    Watch Live Chimney Cam: Conclave To Elect New Pope Underway



**Anti-Trump 'May Day' protesters issue urgent alert on executive orders**



**Donald Trump's approval rating takes unexpected turn**


GO AD-FREE

LATEST    Watch Live Chimney Cam: Conclave To Elect New Pope Underway



## Kilmar Abrego Garcia's wife responds to second abuse report



## Republicans vote against move to stop ICE deporting US citizens


GO AD-FREE

**LATEST**  Watch Live Chimney Cam: Conclave To Elect New Pope Underway



## Over 100 migrants, service members arrested in major illegal nightclub raid



## Two more countries could take deported U.S. migrants: Report

SPONSORED CONTENT




GO AD-FREE

LATEST    Watch Live Chimney Cam: Conclave To Elect New Pope Underway



**Here's What A 12-Hours Gutter Guards Upgrade Should Cost You**
LeafFilter



**Top 5 Wealth Management Firms In The United States**
Smart Asset



**Here's How Much A 1-Day Walk In Shower Costs In Massachusetts**
Jacuzzi



**WARNING: Over 4 Million Devices Compromised By A Stealth Virus**
TotalAV



**Massachusetts: Reduce Your Home Insurance Bill If You Live In Brookline**
Insure Com



**Here's What A 1-Day Gutter Upgrade Should Cost You**
LeafFilter

## RELATED PODCASTS



**Newsweek** GO AD-FREE

LATEST    Watch Live Chimney Cam: Conclave To Elect New Pope Underway

### Newsweek Radio

Trump Flunks Civics 101, Wants to Reopen Alcatraz, Collect on Student Loans

### For Justice! With Rakim...

100 Days of Chaos: Trump's Attacks on Democracy and the Road Ahead for Democrats

### The Josh Hammer Show

Kristen Welker Gaslights the American People on Illegal Alien Due Process

## Top Stories



### They Helped Deliver Miami–Dade for Trump. Now They're Having Regrets

Case: 25-1393   Document: 00761837548   Page: 123   Date Filed: 05/08/2025   Entry ID: 6749229

LATEST    Watch Live Chimney Cam: Conclave To Elect New Pope Underway



## India, Pakistan War Fears After Strikes: Live Updates

5/7/25, 2:25 PM  Donald Trump Planning to Send Migrants to Libya: What We Know - Newsweek

**Newsweek**  GO AD-FREE



## Brother of American Detained in China Tells US: 'Don't Just Talk About It'

Appx.593

Case: 25-1393    Document: 00618637548    Page: 125    Date Filed: 05/08/2025    Entry ID: 6749229




## Appeals Court Orders ICE To Send Detained Tufts Student to Vermont

---

### About the writer

#### Khaleda Rahman

FOLLOW

Khaleda Rahman is Newsweek's National Correspondent based in London, UK. Her focus is reporting on education and national news. Khaleda ... read more

Microsoft 365 Copilot
Construct a resume that sticks
Which skills fit this job post.docx?
Try Chat now

## Trending

**Newsweek**    GO AD-FREE

LATEST    Watch Live Chimney Cam: Conclave To Elect New Pope Underway



**01**    **More Than 50,000 People Told To Stay Indoors in Nevada**

3 comments

**02**    **Marriage On Brink After Wife Finds Baby Formula Tampered With: 'Filing For Divorce'**

0 comments

**03**    **Donald Trump Reacts to India's Airstrikes on Pakistan: 'A Shame'**

124 comments

**04**    **Woman Thinks She's Filming Dog Training, Then Sees What's in the Background**

0 comments

**05**    **Texas Residents Given Minutes to 'Take Cover Now!' Amid Tornado Threat**

3 comments

← Back To Homepage

 **GO AD-FREE**

LATEST    Watch Live Chimney                                    ay

THE DEBATE

## The Next Pope Should Heal Divides in the Catholic Church | Opinion

By Tim Busch



## VS



## What the Next Pope Can Learn From Francis: A Muslim's Reflection | Opinion

By Faisal Kutty

OPINION

## Trump's Big, Bloated Defense Budget | Opinion

By Daniel R. Depetris



## The States Aren't the Answer. They're the Problem | Opinion

By Stephen Legomsky



Case: 25-1393 Document: 00618287548 Page: 129 Date Filed: 05/08/2025 Entry ID: 6749229



**LATEST** Watch Live Chimney Cam: Conclave To Elect New Pope Underway

---

## A Papal Conclave Is Not a U.S. Presidential Election | Opinion

By Christopher Hale



---

## What the Next Pope Can Learn From Francis: A Muslim's Reflection | Opinion

By Faisal Kutty



---

## The Next Pope Should Heal Divides in the Catholic Church | Opinion

By Tim Busch



---

## UPS Is Failing To Protect Desert Drivers From the Heat | Opinion

By Viviana Gonzalez



---

## America Must Fix Its Crumbling Water Infrastructure | Opinion

By John Griffith



---

## If Trump Gets His Way, Could You 'Fall' Out a Window? | Opinion

By Thomas G. Moukawsher



---

## Google Makes a Face Turn On User Privacy | Opinion

By Joel Thayer



---

## New York Must Not Legalize Assisted Suicide | Opinion

By Michele Sterlace accorsi



---

## Rethinking Development Finance in a Geoeconomic World Order | Opinion

Case: 25-1393    Document: 00618287548    Page: 130    Date Filed: 05/08/2025    Entry ID: 6749229

U.S. ›

World ›

Science ›

Health ›

Rankings ›

Opinion ›

Entertainment ›

Fact Check ›

My Turn ›

Education ›

Events ›

Sports ›

Podcasts ›

Better Planet ›

Better Workplaces ›

Vault ›

Mightier ›

Autos ›

Newsletters ›

Unconventional ›

Vantage ›

Experts ›

Voices ›

Subscriptions

Digital+ Monthly $4.99

Digital+ Yearly $49.00

Premium Monthly $9.99

Premium Yearly $99

Trending

Israel at War        Vladimir Putin        Russia Ukraine War

Case: 25-1393   Document: 00618237548   Page: 131   Date Filed: 05/08/2025   Entry ID: 6749229

LATEST   Watch Live Chimney Cam: Conclave To Elect New Pope Underway

Newsletters in your inbox See all

- ☐ The Bulletin (Daily)
  See Sample
- ☐ Geoscape (Twice a Week)
- ☐ Inside Trump Policy (Weekly)
- ☐ The Josh Hammer Report (Weekly)
  See Sample
- ☐ Discoveries (3 Times a Week)
- ☐ Breaking News (As it Breaks)
- ☐ Pawsitively (Daily)
- ☐ The Good Life (Weekly)

- ☐ The Gist of It (Daily)
- ☐ The 1600 (Daily)
- ☐ Sports Daily (Daily)
- ☐ For The Culture (Three Times a Week)
  See Sample
- ☐ Like & Subscribe (Daily)
- ☐ The Debate (Twice a Week)
- ☐ Better Planet (Weekly)
- ☐ Newsweek Pulse (2x3 Times a Month)

**Email address**      **Sign up now**

You can unsubscribe at any time. By signing up you are agreeing to our Terms of Service and Privacy Policy

In The Magazine



May 16
2025 Issue

**Company**

About Us

Masthead

Diversity

**Editions:**

U.S. Edition

日本

Polska

**Contact**

Advertise

Careers

Contact Us

Appx.600

**Newsweek**   GO AD-FREE

LATEST    Watch Live Chimney Cam: Conclave To Elect New Pope Underway

Mission Statement

Leadership

Newsletters

Press Center

**Terms of Use**

Cookie Policy

Copyright

Privacy Policy

Terms & Conditions

Terms of Sale

Privacy Settings

© 2025 NEWSWEEK DIGITAL LLC

5/8/25, 2:5 AM    Trump administration may soon deport migrants to Libya, U.S. officials say - CBS News

POLITICS

# Trump administration may soon deport migrants to Libya, U.S. officials say

By **Camilo Montoya-Galvez**, **Eleanor Watson**
May 6, 2025 / 11 24 PM EDT / CBS News



U.S. SEEKING DEPORTATION DEALS WITH NATIONS ACROSS THE GLOBE

⬢CBS NEWS The Papal Conclave  |  COVERAGE STARTS WEDNESDAY

The Trump administration may soon start deporting migrants to Libya, expanding its mass deportation campaign to the troubled North African country, two U.S. officials told CBS News Tuesday.

The deportations, expected to be operated by the U.S. military, could start as early as this week, the officials said, requesting anonymity to discuss internal government plans.

Libya <u>is one of several</u> far-flung nations the U.S. government has been asking to accept deportations of migrants from third

EXHIBIT 602
Appx1602

5/8/25, 2:55 PM    Trump administration may soon deport migrants to Libya - CBS News

The possibility of U.S. deportations to Libya, reported earlier Tuesday by Reuters, is a stunning proposition given the deep political and social turmoil the North African country finds itself in, as well as its human rights record.

Since a civil war erupted in 2011, Libya has been plagued by armed conflict and political tumult. The country, itself a corridor for desperate migrants hoping to reach Europe by crossing the Mediterranean Sea, is divided into two factions. The western part of the country is overseen by a United Nations-backed government in Tripoli, while the east is controlled by a strongman.

The State Department has a Level 4 travel advisory for Libya, warning Americans not to travel there because of "crime, terrorism, unexploded landmines, civil unrest, kidnapping, and armed conflict."

Appx.603



MAHMUD TURKIA/AFP VIA GETTY IMAGES

Libya has also gained infamy over its treatment of migrants seeking to reach Europe, with both underlined advocates and underlined U.S. officials finding that detainees in the North African country face brutal conditions, due process violations and even torture in immigration detention centers.

It's unclear who exactly would be deported to Libya under the plans being considered by the Trump administration and whether they would be detained by authorities there upon arrival.

Appx.604

5/5/25, 2:35 PM    Trump administration may soon deport migrants to Libya - CBS News

As part of its aggressive efforts to deter migrants from entering or staying in the U.S. illegally, the Trump administration has mounted an intense diplomatic campaign to forge deportations agreements that allow the U.S. to send migrants to countries that are not their own.

It has already persuaded several Latin America countries to accept third country nationals, sending Asian and African migrants to Costa Rica and Panama, as well as a group of Venezuelan men accused of gang membership to El Salvador, which transferred them to a notorious mega prison.

But the Trump administration has also sought to broker deportation agreements with countries in other continents, including Africa and Europe.

The other countries U.S. officials have approached for potential third country deportation arrangements include Angola, Benin, Eswatini, Moldova and Rwanda, according to internal U.S. government documents and officials.

It's unclear whether any of those countries will finalize agreements with the U.S. After CBS News identified Angola as

Appx.605

5/5/25, 2:34 AM    Trump administration may soon deport migrants to Libya - CBS News

Washington said the West African country would not accept deportees from third countries.

## Immigration

### Second judge blocks Trump administration's use of Alien Enemies Act



### Appeals court considers whether detained students should be moved



### U.S. offers migrants free airline tickets and $1,000 stipend if they self-deport



### U.S. seeking deportation deals with Angola, Equatorial Guinea



More >

In:   **Deportation**    **Mass Deportation**    **Trump Administration**    **Libya**

### Camilo Montoya-Galvez

Camilo Montoya-Galvez is the immigration reporter at CBS News. Based in Washington, he covers immigration policy and politics.

 Twitter

Appx.606

## Here's What a 6-Hour Gutter Upgrade Should Co...

PAID   HOMEBUDDY

## Donald Trump picks the wrong trade fight with...

PAID   THE ECONOMIST

Learn More

## Seniors Could Find Unsold Cruise Cabins at...

PAID   ONLINE SHOPPING TOOLS

## Here's What New Siding Should Cost in 2025

PAID   HOMEBUDDY.COM

Learn More

## Trump is a revolutionary. Will he succeed?

PAID   THE ECONOMIST

Learn More

## Judge dismisses charges against man accused by attorney general, FBI director of being MS-13...

## Here's What Gutter Guards Should Cost You In...

PAID   HOMEBUDDY

Learn More

## Amazon Is Losing Millions as Shoppers Cancel...

PAID   KARMA SHOPPING

Read More

Appx.607

to traditional healer is convicted in South Africa

## Actress Spills Hollywood Trick For Slim Body:...

PAID   PROGRESS HEALTH                                    Learn More

## J.P. Morgan Says a Recession Is Coming, Here's How Smart People Are Prepping

PAID   BETTERBUCK                                         Read More

## Wisconsin judge suspended by state high court after arrest in immigration case

## Here's What a 6-Hour Gutter Upgrade Should Co...

PAID   HOMEBUDDY

## Donald Trump picks the wrong trade fight with...

PAID   THE ECONOMIST                                      Learn More

## Judge dismisses charges against man accused by attorney general, FBI director of being MS-13...

5/6/25, 2:35 PM    Trump administration may soon deport migrants to Libya - CBS News



Appx.609

5/13/25, 2:35 PM    Trump administration may soon deport migrants to Libya - CBS News



5/6/25, 2:51 PM    Trump administration may soon deport migrants to Libya - CBS News



Appx.611



Copyright ©2025 CBS Interactive Inc  All rights reserved

About

Advertise

Closed Captioning

CBS News Store

Site Map

Contact Us

Help

https //www.cbsnews com/amp/news/trump administration may soon deport migrants to libya/

Case 2:25-cv-10076 Document 100-1 Filed 05/08/2025 Trump to visit Saudi Arabia, Qatar and UAE in May | Date Filed 07/08/2025 88 Entry ID: 6749229





## Trump to visit Saudi Arabia, Qatar and UAE in May

The president's trip aims to "strengthen ties" with these countries, White House press secretary Karoline Leavitt said.



President Donald Trump walks off the plane at the Philadelphia International Airport on June 22, 2024, in Philadelphia, Pennsylvania. | Anna Moneymaker/Getty Images

By **AMANDA FRIEDMAN**
04/22/2025 02:55 PM EDT

   

EXHIBIT 614
Appx.614

President Donald Trump will travel to Saudi Arabia, Qatar and the United Arab Emirates next month, White House press secretary Karoline Leavitt said on Tuesday.

Leavitt announced during a White House press briefing that he'll visit the Middle Eastern nations from May 13 to May 16.



The three-country tour will be Trump's second foreign trip since returning to office. The president announced plans on Monday to travel to Italy later this

Leavitt said the trip is intended to help "strengthen ties" with the Middle Eastern countries. Saudi Arabia, Qatar and the United Arab Emirates have provided diplomatic support to the Trump administration in recent months, including assisting with ceasefire negotiations for the ongoing conflicts in Ukraine and Gaza.

"He will have many bilateral meetings and talks and we look forward to the trip," Leavitt said.

FILED UNDER: MIDDLE EAST, SAUDI ARABIA, FOREIGN AFFAIRS, DONALD TRUMP, QATAR, ⋯



SPONSORED CONTENT



**GOP's Private Luncheon Rocked by Trump's Tariff Twist**

Puck



**Sleep Apnea: Ingenious Pillow Takes The US By Storm**

myhealthyhabit.co



**MassachusettsLaunches New Policy for Cars Used Less Than 49 Miles/Day**

Are you being overcharged by your insurance company? Take two minutes out...

Comparisons.org



**How Wall Street got Donald Trump wrong**

Financial Times



**AI Imagines the 'Average' American in Every State — Some Are Spot-On,...**

Entertainment

Twist Digital



**Massachusetts High Earners: Explore These 7 Tax Reduction Strategies**

Evergreen Wealth

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

https://www.politico.com/news/2025/04/22/trump-middle-east-trip-00303616

Appx.616

3/4

Terms of Service

Privacy Policy

———————

© 2025 POLITICO LLC

| From: | Dan, Jacqueline |
|---|---|
| To: | Trina Realmuto |
| Cc: | matt@nwirp.org; Anwen Hughes; Tin Nguyen |
| Subject: | RE: DVD v. DHS - notice of third country removal |
| Date: | Wednesday, May 7, 2025 11:39:43 AM |
| Attachments: | image001.png |

Thanks for your quick response, Trina.

I'm looping in the other attorney organizer, Tin Nguyen, who just filed the G-28 for the Vietnamese person that I was supposed to have a VAV appointment with later today. Early this morning a little after 4 a.m. PST (so 6 a.m. CST where the facility is), I received a cancellation e-mail from the facility, with their reason being that he is no longer in custody there.

Unfortunately, neither of us has been able to speak directly to this detainee. Tin spoke to his partner about what he told her happened two days ago. Also, given that this detainee isn't fluent in English, I'm curious as to how the facility fulfilled the requirement that notice be provided to him in a language that he understood.

**From:** Trina Realmuto <trina@immigrationlitigation.org>
**Sent:** Wednesday, May 7, 2025 7:48 AM
**To:** Dan, Jacqueline <Jacqueline.Dan@ocpubdef.com>
**Cc:** matt@nwirp.org; Anwen Hughes <hughesa@humanrightsfirst.org>
**Subject:** RE: DVD v. DHS - notice of third country removal

Jacqueline –

There is some media interest (Reuters & CNN) in the potential flights to Libya. Are you interested in speaking with them about how DHS is "notifying" DVD class members of potential third country deports to Libya?

Trina



**Trina Realmuto**
**National Immigration Litigation Alliance**
617-819-4447 / trina@immigrationlitigation.org
www.immigrationlitigation.org
Facebook: NatlImmLitAlliance / LinkedIn

**From:** Trina Realmuto
**Sent:** Wednesday, May 7, 2025 8:01 AM
**To:** Dan, Jacqueline <Jacqueline.Dan@ocpubdef.com>
**Cc:** matt@nwirp.org; Anwen Hughes <hughesa@humanrightsfirst.org>
**Subject:** RE: DVD v. DHS - notice of third country removal

Hi Jacqueline,

Thank you for reaching out. We heard about the Laotian man and reached out to American Gateways and we heard the same rumor of deportation to Saudia Arabia (in his case) or Libya (in another), consistent with NY Times reporting.

We are concerned about this situation and potential violations of the court order in DVD.

FYI, as you probably know, on April 18, 2025, the district court certified a nationwide class as defined as:

All individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA (including withholding-only proceedings) whom DHS has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed.

As to this class, the Court issued the following preliminary injunctive relief:

Prior to removing any [noncitizen] to a third country, *i.e.*, any country not explicitly provided for on the [noncitizen]'s order of removal, Defendants must:
(1) provide **written** notice to the noncitizen —**and the noncitizen's immigration counsel**, if any—of the third country to which the noncitizen may be removed, **in a language the noncitizen can understand**;
(2) provide meaningful opportunity for the noncitizen to raise a fear of return for eligibility for CAT protections;
(3) move to reopen the proceedings if the noncitizen demonstrates "reasonable fear"; **and**
(4) if the noncitizen is not found to have demonstrated "reasonable fear," provide meaningful opportunity, and a minimum of 15 days, for that noncitizen to seek to move to reopen immigration proceedings to challenge the potential third-country removal.

The government appealed the preliminary injunction and moved for an emergency stay to prevent it from remaining in effect. Briefing was completed on May 1 and we expect a decision from the First Circuit any day now.

On April 30, 2025, the court amended the PI to mandate the provision of class protections prior to any removal from Guantanamo Bay or ceding custody or control in a manner that prevents provision of those protections.

I am attaching both the class cert and PI order and the modification to the PI.

Would it be possible for someone on your staff to send ICE a copy of the P.I. and amendment

to it? In answer to your question, yes, the filing of the G-28 should trigger the obligation to notify counsel. Importantly, we have concerns about the notice. Will you please send us a redacted copy of any notice the volunteer attorney receives so we can raise concerns with opposing counsel and the court if need be.

Thank you,

Trina



**Trina Realmuto**
**National Immigration Litigation Alliance**
617-819-4447 / trina@immigrationlitigation.org
www.immigrationlitigation.org
Facebook: NatlImmLitAlliance / LinkedIn

**From:** Dan, Jacqueline <Jacqueline.Dan@ocpubdef.com>
**Sent:** Wednesday, May 7, 2025 2:36 AM
**To:** Trina Realmuto <trina@immigrationlitigation.org>
**Subject:** RE: DVD v. DHS - notice of third country removal

Hi Trina,

I'm working with a collective of Vietnamese American attorneys and organizers through a project housed by CCIJ to assist with Vietnamese immigrants with really old final orders of removal who were recently detained by ICE.

What we're hearing from relatives is that, yesterday, ICE officers at the South Texas Detention Facility gathered 1 Vietnamese detainee, along with 5 others (including 1 from Laos) into a room and told them that they needed to sign a document agreeing to be deported to Libya. When they all refused, they were each put in a separate room and cuffed in (basically, solitary) in order to get them to sign it.

This particular Vietnamese detainee was told that he'd be deported to Libya anyway next week, and another Vietnamese detainee was told that he'd be deported to Libya this Saturday. We are pretty sure that ICE requested travel documents from Vietnam around 3/25 for a group of detainees that included these men, and my guess is that Vietnam told they U.S. that they denied travel documents to these men within the 30-day period required for a response.

I have an appointment scheduled to speak with the first detainee on video tomorrow evening, and will schedule another appointment with the other Vietnamese detainee as soon as possible.

We have a volunteer attorney who can file G-28's for each detainee if they agree. **Question – per your e-mail, as soon as he files the G-28, ICE is supposed to serve him with this 1-page notice?**

**Please let me know if there's any other important information that you recommend gathering.**

And thank you for all your very important work.

Jacqueline

**From:** padilla-case-review@ILRC.groups.io <padilla-case-review@ILRC.groups.io> **On Behalf Of** Holly Cooper via groups.io
**Sent:** Thursday, May 1, 2025 12:11 PM
**To:** padilla-case-review@ILRC.groups.io
**Subject:** [padilla-case-review] Fw: DVD v. DHS - notice of third country removal

---

**From:** detentionaccountability@googlegroups.com <detentionaccountability@googlegroups.com> on behalf of Trina Realmuto <trina@immigrationlitigation.org>
**Sent:** Thursday, May 1, 2025 11:22 AM
**To:** detentionaccountability@googlegroups.com <detentionaccountability@googlegroups.com>
**Subject:** DVD v. DHS - notice of third country removal

The DVD team believes that DHS has begun notice of removal to a third country using a one-page notice and, in some cases, a 2001 form advising of the RF process.

If you have received one of these notices (counsel is supposed to be served with them under the injunction), please could you email me a redacted copy of the notice.

Thanks, Trina



**Trina Realmuto**
**National Immigration Litigation Alliance**
617-819-4447 / trina@immigrationlitigation.org
www.immigrationlitigation.org
Facebook: NatlImmLitAlliance / LinkedIn

--
You received this message because you are subscribed to the Google Groups "DetentionAccountability" group.
To unsubscribe from this group and stop receiving emails from it, send an email to detentionaccountability+unsubscribe@googlegroups.com.
To view this discussion visit
https://groups.google.com/d/msgid/detentionaccountability/BL0PR12MB4898350BF2ADBFB025F1F FC8A4822%40BL0PR12MB4898.namprd12.prod.outlook.com.

---

Groups.io Links:

You receive all messages sent to this group.

---

CONFIDENTIAL EMAIL: The information contained in this email is confidential and may also be attorney-client privileged and constitute attorney work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify sender immediately.

---

CONFIDENTIAL EMAIL: The information contained in this email is confidential and may also be attorney-client privileged and constitute attorney work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify sender immediately.

| From: | Adrian Rennix(DIL) |
| --- | --- |
| To: | Allison Herre (SAT); Naveen Flores-Dixit (SAT); Asylum Defense Project; Anwen Hughes; Laura Flores Dixit; Elizabeth Almanza; Trina Realmuto; matt@nwirp.org |
| Subject: | Re: [EXTERNAL EMAIL] possible third-country removals to Saudi Arabia (and possibly Libya) tomorrow |
| Date: | Wednesday, May 7, 2025 12:09:08 PM |
| Attachments: | image001.png |
| | image002.png |

Hello all – Allison went to Pearsall this morning to meet with the individuals flagged here but they have already been moved out of Pearsall. She is still in the center now trying to warn some other folks there who might be at risk of future flights. I am going to send ICE an email regarding the people you flagged with the PI and amendment now, but I don't know if they will accept the communication from me without a G28. I don't know if it might carry more weight coming from the litigation team? Let me know if you have other ideas on how to proceed.

**From:** Allison Herre (SAT) <AHerre@trla.org>
**Date:** Wednesday, May 7, 2025 at 8:19 AM
**To:** Naveen Flores-Dixit (SAT) <NFloresDixit@trla.org>, Asylum Defense Project <ADP@trla.org>, Anwen Hughes <hughesa@humanrightsfirst.org>, Laura Flores Dixit <laurafd@americangateways.org>, Elizabeth Almanza <elizabetha@americangateways.org>, Trina Realmuto <trina@immigrationlitigation.org>, matt@nwirp.org <matt@nwirp.org>
**Subject:** Re: [EXTERNAL EMAIL] possible third-country removals to Saudi Arabia (and poss b L bya) tomorrow

Good morning all,

Our friends at American Gateways shared the urgent request to meet with the Laotian man who may be sent to Libya or Saudi Arabia imminently. I am leaving shortly to visit the detention center in Pearsall and can meet with Mr. ███████ hopefully before he's sent to intake for transfer processing.

Beyond sharing the DVD materials, I cannot promise that our team would be able to do much more for Mr. ███████ but I can share what we learn from meeting with him if he consents. Are there any questions or other messages you have for Mr. ███████?

Thanks!

In solidarity,

Allison

Allison E. Herre, Esq.*
Team Manager
Asylum Defense Project
Texas RioGrande Legal Aid
aherre@trla.org

**To apply for ADP services or to refer a case for consideration, please email our team at ADP@trla.org.**

Confidentiality:  The information in this correspondence constitutes client communication between an attorney and client and/or contains privileged client information. It is intended only for the named recipient(s) and is protected by attorney/client privilege. If you think you have received this communication in error, please notify the sender and permanently delete the communication from your files.

*Admitted to practice law in Ohio, practicing exclusively in the area of federal immigration law.

**From:** Naveen Flores-Dixit (SAT) <NFloresDixit@trla.org>
**Date:** Wednesday, May 7, 2025 at 7:03 AM
**To:** Asylum Defense Project <ADP@trla.org>
**Subject:** Fw: [EXTERNAL EMAIL] possible third-country removals to Saudi Arabia (and possibly Libya) tomorrow

American gateways can't help. Not sure if we can...

Get Outlook for iOS

**From:** Laura Flores Dixit <laurafd@americangateways.org>
**Sent:** Wednesday, May 7, 2025 6:56:51 AM
**To:** Naveen Flores-Dixit (SAT) <NFloresDixit@trla.org>
**Subject:** Fw: [EXTERNAL EMAIL] possible third-country removals to Saudi Arabia (and possibly Libya) tomorrow

Sending to you individually bc it bounced back from the group

*Laura Flores-Dixit (she/hers/ella)*
*Managing Attorney*

**American Gateways - Legal Advocacy for Immigrant Survivors**
2300 W. Commerce St. | Suite 313 |San Antonio | TX | 78207 | P: 210.864.2918 | F: 210.625.6797
www.americangateways.org | Facebook | Twitter | Instagram | YouTube
American Gateways depends on support from our community to fulfill our mission. To donate, click here.

***This email and any files attached and confidential, and is/are intended only for the individual named. If you are not the intended recipient or otherwise have reason to believe that you have received this message in error, please notify the sender by email and delete this message immediately from your computer. Any other use, retention, dissemination, forwarding, printing, or copying of this message and any attachments is strictly prohibited.



*Admitted to practice in California, practicing exclusively in the area of (federal) immigration law.

**From:** Anwen Hughes <HughesA@humanrightsfirst.org>
**Sent:** Tuesday, May 6, 2025 10:06:33 PM
**To:** laurafd@americangateways.org <laurafd@americangateways org>; elizabetha@americangateways.org <elizabetha@americangateways.org>
**Cc:** Trina Realmuto <trina@immigrationlitigation org>; Matt Adams <matt@nwirp org>
**Subject:** possible third-country removals to Saudi Arabia (and possibly Libya) tomorrow

Dear Laura and Elizabeth,

I am writing on behalf of the team litigating DVD v. DHS, the case challenging DHS's removal of people to third countries without an opportunity to raise fear claims, in which there is now a preliminary injunction (attached), to which the court recently made a slight modification at our request to prevent DHS from ducking out from under his order by first shipping people to Guantanamo (modification to the PI is pasted in at the end of this e-mail).  There is a rumor that the U.S. is planning to send two military planes from Texas to Saudi Arabia tomorrow, and that a Laotian man currently detained at Pearsall has been told that he is going to be on one of them.  The New York Times is also reporting that the U.S. is imminently planning to send a military flight to Libya for the same purpose, imminently meaning as early as tomorrow.

The identifying information we have on the Laotian man is as follows:



South Texas Detention

We are getting this thirdhand and have not spoken with this Laotian national, but are urgently concerned that his removal would be in violation of the court order in DVD, and given Saudi Arabia's human rights record in general, and its treatment of migrants specifically, we want to make sure this man gets a consult and an opportunity to raise any CAT claim he may have.

Would it be possible for someone on your staff to talk with him and send ICE a copy of the P.I. and amendment to it?  If you have any questions about this or I can be helpful in any way I'll be reachable most of the day tomorrow at (212) 845-5244, and all day by e-mail.

Thanks so much,

Anwen

Amendment to P.I.:

Judge Brian E. Murphy: ELECTRONIC ORDER - AMENDED PRELIMINARY INJUNCTION: In light of the issues raised during the April 28, 2025 hearing, this Court modifies a portion of its April 18, 2025 preliminary injunction 64 . This modification preserves the status quo as outlined in this Court's preliminary injunction. *See Sec. & Exch. Comm'n v. Xia,* 2024 WL 3447849, at *6-7 (E.D.N.Y. July 9, 2024) (collecting cases modifying preliminary injunctions pending appeal in order to preserve the status quo). Defendants have represented to this court that removals from Guantanamo Bay to third countries have been executed by the Department of Defense without the Department of Homeland Security's direction or knowledge, *see* Dkt 72, and the Court makes no finding on the accuracy of this assignment of responsibility but, in an abundance of caution, ORDERS that, prior to removing, or allowing or permitting another agency to remove, an alien from Guantanamo Bay to a third country, Defendants must comport with the terms of the April 18, 2025 preliminary injunction by providing the due-process guarantees set forth in Dkt. 64 at 46-47. At the April 28, 2025 hearing, the status of the Guantanamo Bay Detention Center was debated. The Court declines to resolve if transportation to this base is a deportation to a third country despite the United States' exercise of jurisdiction and control over the base. Given the position taken by the Department that the deportation from Guantanamo to third countries was not at the direction, behest or control of the Department of Homeland Security, a debated issue to be resolved once preliminary discovery has been conducted, this Court ORDERS that, after taking custody of an alien, Defendants may not cede custody or control in any manner that prevents an alien from receiving the due-process guarantees outlined in the April 18, 2025 preliminary injunction.
(BIB) (Entered: 04/30/2025)

Anwen Hughes
Senior Director of Legal Strategy, Refugee Programs

## Human Rights First

Mailing Address: 121 W. 36th St., PMB 520, New York, NY 10018
Office Tel: 212-845-5244  Email: HughesA@humanrightsfirst.org
humanrightsfirst.org    Twitter: @HumanRights1st    Instagram: @humanrightsfirst

*Admitted in NJ, practice in NY limited to immigration matters.*

| From: | Johnny Sinodis |
| To: | Trina Realmuto |
| Subject: | Re: Notice to your Filipino client |
| Date: | Wednesday, May 7, 2025 11:57:50 AM |
| Attachments: | image001.png |
| | image002.png |

No, I haven't been able to get the document. I have sent several emails and spoke with a frontline officer last night and this morning. They are now saying that I need to speak with Tacoma because Tacoma still has docket control. I am LAO being told that HQ has not confirmed any removal flights at all and that my client is not scheduled to be removed. It's the classic bureaucratic bullshit. I'm trying to reach Tacoma now.

Johnny Sinodis
Partner

Van Der Hout LLP
360 Post St., Suite 800
San Francisco, California 94108

Sent from my iPhone

**De:** Trina Realmuto <trina@immigrationlitigation.org>
**Enviado:** Wednesday, May 7, 2025 7:51:04 AM
**Para:** Johnny Sinodis <jsin@vblaw.com>
**Asunto:** RE: Notice to your Filipino client

Johnny –

Any luck obtaining the notice your client was asked to sign?

Where is your client detained?

This Libya situation is concerning, and we are assessing next steps.

Thanks, Trina



**Trina Realmuto**
**National Immigration Litigation Alliance**
617-819-4447 / trina@immigrationlitigation.org
www.immigrationlitigation.org
Facebook: NatlImmLitAlliance / LinkedIn

**From:** Johnny Sinodis <jsin@vblaw.com>
**Sent:** Tuesday, May 6, 2025 1:10 PM
**To:** Trina Realmuto <trina@immigrationlitigation.org>

**Subject:** RE: Notice to your Filipino client

Thanks, Trina! My client was asked to sign a one-page document that he says did not inform him of his right to apply for CAT. ICE did not give him a copy, saying it would be in his materials upon removal. I am trying to get in touch with someone at the detention facility right now.

Also, apparently ICE is sending some Mexican nationals to Libya as well. Per my client, those individuals have removal orders to Mexico and want to return to Mexico. This is clearly punitive and meant to serve as a deterrent, in my view.

Johnny Sinodis
Partner

New address effective January 1, 2023:
360 Post Street, Suite 800
San Francisco CA 94108

*Van Der Hout LLP is available and accessible. We are still fully operational both in-office and remotely, and continue to provide all services with little or no delay.*



This email may contain confidential and privileged material for the sole use of the intended recipient. Any review or distribution by others is prohibited. If you are not the intended recipient, please contact me and delete all copies. Thank you.

---

**From:** Trina Realmuto <trina@immigrationlitigation.org>
**Sent:** Tuesday, May 6, 2025 8:50 AM
**To:** Johnny Sinodis <jsin@vblaw.com>
**Subject:** Notice to your Filipino client

Johnny - more info below per your text last night. We think the notice is deficient and want to raise it with opposing counsel but need examples. If you receive notice (as you should) please can you send the redacted notice so we can raise deficiencies? Fwiw, you should also send ICE a copy of the PI order and amendment to the PI (can't hurt!).

Certified nationwide class (Dkt. 64 at 23):

All individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA (including withholding-only proceedings) whom DHS has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would

be removed.

As to this class, the Court issued the following preliminary injunctive relief:

Prior to removing any [noncitizen] to a third country, *i.e.*, any country not explicitly provided for on the [noncitizen]'s order of removal, Defendants must:

(1) provide written notice to the [noncitizen] —**and the [noncitizen]'s immigration counsel**, if any—of the third country to which the [noncitizen] may be removed, in a language the [noncitizen] can understand;
(2) provide meaningful opportunity for the [noncitizen] to raise a fear of return for eligibility for CAT protections;
(3) move to reopen the proceedings if the [noncitizen] demonstrates "reasonable fear"; **and**
(4) if the [noncitizen] is not found to have demonstrated "reasonable fear," provide meaningful opportunity, and a minimum of 15 days, for that [noncitizen] to seek to move to reopen immigration proceedings to challenge the potential third-country removal.

Dkt. 64 at 46-47

Amendment to PI:

In light of the issues raised during the April 28, 2025 hearing, this Court modifies a portion of its April 18, 2025 preliminary injunction [64]. This modification preserves the status quo as outlined in this Court's preliminary injunction. See Sec. & Exch. Comm'n v. Xia, 2024 WL 3447849, at *6-7 (E.D.N.Y. July 9, 2024) (collecting cases modifying preliminary injunctions pending appeal in order to preserve the status quo). Defendants have represented to this court that that removals from Guantanamo Bay to third countries have been executed by the Department of Defense without the Department of Homeland Security's direction or knowledge, see Dkt 72, and the Court makes no finding on the accuracy of this assignment of responsibility but, in an abundance of caution, **ORDERS that, prior to removing, or allowing or permitting another agency to remove, an alien from Guantanamo Bay to a third country, Defendants must comport with the terms of the April 18, 2025 preliminary injunction by providing the due-process guarantees set forth in Dkt. 64 at 46-47**. At the April 28, 2025 hearing, the status of the Guantanamo Bay Detention Center was debated. The Court declines to resolve if transportation to this base is a deportation to a third country despite the United States' exercise of jurisdiction and control over the base. Given the position taken by the Government that the deportation from Guantanamo to third countries was not at the direction, behest or control of the Department of Homeland Security, a debated issue to be resolved once preliminary discovery has been conducted, this Court **ORDERS that, after taking custody of an alien, Defendants may not cede custody or control in any manner that prevents an alien from receiving the due-process guarantees outlined in the April 18, 2025 preliminary injunction.**

Dkt. 86 (Text).



**Trina Realmuto**
**National Immigration Litigation Alliance**
617-819-4447 / trina@immigrationlitigation.org
www.immigrationlitigation.org
Facebook: NatlImmLitAlliance / LinkedIn

| | |
|---|---|
| **From:** | Johnny Sinodis |
| **To:** | Trina Realmuto; matt@nwirp.org; Kristin Macleod-Ball |
| **Subject:** | FW: URGENT ▇▇▇▇▇▇ - ▇▇▇▇▇▇ // Request for Reasonable Fear Interview Pursuant to Nationwide Preliminary Injunction Issued in DVD v. DHS, et al. // Client Just Advised ICE Intends to Remove to Libya & Counsel Not Provided Any Documentation |
| **Date:** | Wednesday, May 7, 2025 12:45:25 PM |
| **Attachments:** | image001.png |

Johnny Sinodis
Partner

New address effective January 1, 2023:
360 Post Street, Suite 800
San Francisco CA 94108

*Van Der Hout LLP is available and accessible. We are still fully operational both in-office and remotely, and continue to provide all services with little or no delay.*



This email may contain confidential and privileged material for the sole use of the intended recipient. Any review or distribution by others is prohibited. If you are not the intended recipient, please contact me and delete all copies. Thank you.

---

**From:** Johnny Sinodis
**Sent:** Tuesday, May 6, 2025 7:43 PM
**To:** SanAntonio.Outreach@ice.dhs.gov
**Cc:** Oona Cahill <ocah@vblaw.com>
**Subject:** RE: URGENT ▇▇▇▇▇▇ - ▇▇▇▇▇▇ // Request for Reasonable Fear Interview Pursuant to Nationwide Preliminary Injunction Issued in DVD v. DHS, et al. // Client Just Advised ICE Intends to Remove to Libya & Counsel Not Provided Any Documentation

We have now called and spoken with Deportation Officer Bou Agrigan and let him know that Mr. ▇▇ fears being removed to Libya. We explained why to Officer Agrigan, who assured us Mr. ▇▇ would not be removed. Officer Agrigan also asked us to call back in the morning to speak with Mr. ▇▇'s assigned deportation officer. We will call first thing in the morning.

Johnny Sinodis
Partner

New address effective January 1, 2023:
360 Post Street, Suite 800
San Francisco CA 94108

*Van Der Hout LLP is available and accessible. We are still fully operational both in-office and remotely, and continue to provide all services with little or no delay.*



This email may contain confidential and privileged material for the sole use of the intended recipient. Any review or distribution by others is prohibited. If you are not the intended recipient, please contact me and delete all copies. Thank you.

---

**From:** Johnny Sinodis
**Sent:** Tuesday, May 6, 2025 7:18 PM
**To:** SanAntonio.Outreach@ice.dhs.gov
**Cc:** Oona Cahill <ocah@vblaw.com>
**Subject:** RE: URGENT ███████ - ████████ // Request for Reasonable Fear Interview Pursuant to Nationwide Preliminary Injunction Issued in DVD v. DHS, et al. // Client Just Advised ICE Intends to Remove to Libya & Counsel Not Provided Any Documentation

Further to the below, there are now news reports that ICE is intending to remove people to Libya on a military plane as early as tomorrow. If Mr. ████ is currently scheduled to be on that flight, he must be pulled off and provided a reasonable fear interview, in compliance with the court's nationwide injunction in DVD. I look forward to hearing from you by email or phone soon—(415) 821-8820.

Johnny Sinodis
Partner

New address effective January 1, 2023:
360 Post Street, Suite 800
San Francisco CA 94108

*Van Der Hout LLP is available and accessible. We are still fully operational both in-office and remotely, and continue to provide all services with little or no delay.*



This email may contain confidential and privileged material for the sole use of the intended recipient. Any review or distribution by others is prohibited. If you are not the intended recipient, please contact me and delete all copies. Thank you.

---

**From:** Johnny Sinodis
**Sent:** Tuesday, May 6, 2025 5:38 PM

**To:** SanAntonio.Outreach@ice.dhs.gov
**Cc:** Oona Cahill <ocah@vblaw.com>
**Subject:** URGENT ████████ - ████████ // Request for Reasonable Fear Interview Pursuant to Nationwide Preliminary Injunction Issued in DVD v. DHS, et al. // Client Just Advised ICE Intends to Remove to Libya & Counsel Not Provided Any Documentation

Good Evening,

On behalf of my client, Mr. ████████, ████████, I am writing with an urgent request that he be scheduled for a reasonable fear interview, which is required as a result of a nationwide injunction issued in *DVD v. DHS, et al.*, No. 1:25-cv-10676-BEM (Dist. Ma.). A copy of my executed Form g-28 is attached.

Late last night, Mr. ████ learned that ICE intends to remove him to Libya even though he is Filipino and has provided ICE with a valid Filipino passport. ICE did not advise him that he has a right to request a reasonable fear interview, nor did ICE provide me with any notice of their intention to remove him to Libya, in clear violation of the district court's orders. Mr. ████ fears being removed to Libya and must therefore be provided with an interview before any removal occurs.

Attached are the two relevant orders from *DVD*. They state, in pertinent part:

Certified nationwide class (Dkt. 64 at 23):

*All individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA (including withholding-only proceedings) whom DHS has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed.*

Mr. ████ is a covered class member because ICE is intending to remove him to a third country—Libya—that was not identified in writing in his prior removal proceedings, which were pending before the Tacoma Immigration Court. As to this class (of which Mr. ████ is a part), the Court issued the following preliminary injunctive relief:

*Prior to removing any [noncitizen] to a third country, i.e., any country not explicitly provided for on the [noncitizen]'s order of removal, Defendants must:*

*(1) provide written notice to the [noncitizen] —and the [noncitizen]'s immigration counsel, if any—of the third country to which the [noncitizen] may be removed, in a language the [noncitizen] can understand;*
*(2) provide meaningful opportunity for the [noncitizen] to raise a fear of return for eligibility for CAT protections;*
*(3) move to reopen the proceedings if the [noncitizen] demonstrates "reasonable fear"; and*

Appx.631

*(4) if the [noncitizen] is not found to have demonstrated "reasonable fear," provide meaningful opportunity, and a minimum of 15 days, for that [noncitizen] to seek to move to reopen immigration proceedings to challenge the potential third-country removal.*

Dkt. 64 at 46-47. The Court subsequently ordered:

*In light of the issues raised during the April 28, 2025 hearing, this Court modifies a portion of its April 18, 2025 preliminary injunction [64]. This modification preserves the status quo as outlined in this Court's preliminary injunction. See Sec. & Exch. Comm'n v. Xia, 2024 WL 3447849, at \*6-7 (E.D.N.Y. July 9, 2024) (collecting cases modifying preliminary injunctions pending appeal in order to preserve the status quo). Defendants have represented to this court that that removals from Guantanamo Bay to third countries have been executed by the Department of Defense without the Department of Homeland Security's direction or knowledge, see Dkt 72, and the Court makes no finding on the accuracy of this assignment of responsibility but, in an abundance of caution, **ORDERS that, prior to removing, or allowing or permitting another agency to remove, an alien from Guantanamo Bay to a third country, Defendants must comport with the terms of the April 18, 2025 preliminary injunction by providing the due-process guarantees set forth in Dkt. 64 at 46-47**. At the April 28, 2025 hearing, the status of the Guantanamo Bay Detention Center was debated. The Court declines to resolve if transportation to this base is a deportation to a third country despite the United States' exercise of jurisdiction and control over the base. Given the position taken by the Government that the deportation from Guantanamo to third countries was not at the direction, behest or control of the Department of Homeland Security, a debated issue to be resolved once preliminary discovery has been conducted, this Court **ORDERS that, after taking custody of an alien, Defendants may not cede custody or control in any manner that prevents an alien from receiving the due-process guarantees outlined in the April 18, 2025 preliminary injunction.***

Dkt. 86 (Text).

Because Mr. ▇▇▇ is a class member of the DVD nationwide injunction, ICE must provide him with a reasonable fear interview before removing him to Libya, a country that he fears being removed to. Furthermore, in compliance with the court's order and the INA's statutes and regulations, please provide me with any and all documentation at to ICE's intention to remove him to Libya instead of the Philippines, a country that would repatriate him without any issues. Please also ensure that I am present for his reasonable fear interview, as Mr. ▇▇▇ would like to be represented during the interview. My direct line is (415) 821-8820. I am available to speak at any time.

Johnny

Johnny Sinodis
Partner

New address effective January 1, 2023:

360 Post Street, Suite 800
San Francisco CA 94108

*Van Der Hout LLP is available and accessible. We are still fully operational both in-office and remotely, and continue to provide all services with little or no delay.*



This email may contain confidential and privileged material for the sole use of the intended recipient. Any review or distribution by others is prohibited. If you are not the intended recipient, please contact me and delete all copies. Thank you.

| | |
|---|---|
| **From:** | Trina Realmuto |
| **To:** | _ara ers, Mary . V ; Seamon, Matthew V ; ere , Elianis V_ |
| **Cc:** | matt@nwirp.org; Anwen Hughes; _ristin Macleod- all_ |
| **Subject:** | RE: DVD v. DHS - ompliance |
| **Date:** | Wednesday, May 7, 2025 2:00:0 M |
| **Attachments:** | image001.png |

Hi Mary,

We have not heard back from you and have reason to believe our class members are at imminent risk of deportation, or have been deported, in violation of the preliminary injunction in this case. I am writing to notify you that we will be filing an emergency motion for a temporary restraining order shortly.

Thank you,
Trina



**Trina Realmuto**
**National Immigration Litigation Alliance**
617-819-4447 / trina@immigrationlitigation.org
www.immigrationlitigation.org
Facebook: NatImmLitAlliance / LinkedIn

---

**From:** Larakers, Mary L. (CIV) <Mary.L.Larakers@usdoj.gov>
**Sent:** Wednesday, May 7, 2025 10:10 AM
**To:** Trina Realmuto <trina@immigrationlitigation.org>; Seamon, Matthew (CIV) <Matthew.Seamon2@usdoj.gov>; Perez, Elianis (CIV) <Elianis.Perez@usdoj.gov>
**Cc:** matt@nwirp.org; Anwen Hughes <hughesa@humanrightsfirst.org>; Kristin Macleod-Ball <Kristin@immigrationlitigation.org>
**Subject:** RE: DVD v. DHS - PI Compliance

Hi Trina,

I will raise these concerns.

The protective order is with DHS; I expect to get it back today.

Thanks,
Mary

---

**From:** Trina Realmuto <trina@immigrationlitigation.org>
**Sent:** Wednesday, May 07, 2025 9:55 AM
**To:** Larakers, Mary L. (CIV) <Mary.L.Larakers@usdoj.gov>; Seamon, Matthew (CIV) <Matthew.Seamon2@usdoj.gov>; Perez, Elianis (CIV) <Elianis.Perez@usdoj.gov>
**Cc:** matt@nwirp.org; Anwen Hughes <hughesa@humanrightsfirst.org>; Kristin Macleod-Ball <Kristin@immigrationlitigation.org>
**Subject:** [EXTERNAL] DVD v. DHS - PI Compliance

Counsel,

As you may be aware, the media is reporting that the US intends to deport noncitizens to Libya using military flights.  ee Trump Administration Live Updates: U.S. Plans to Send Migrants to Libya, Officials Say, https://www.nytimes.com/live/2025/05/07/us/trump-news#trump-libya-migrants. We are also hearing rumors of military flights from Texas to Saudia Arabia.

If any DVD class members are slated to be on those flights, we ask that they be removed from the manifest and not deported to a third country unless and until we assess the written notices that were provided regarding notice and an opportunity to ask for a reasonable fear interview.

We are gravely concerned that Defendants are NOT affording DVD class members the protections to which they are entitled under the injunction.  Attached are two notices of third country removal that we have received. Both are deficient.

 First, the notice identifying the country of removal is only provided in English even though the court specified that it must be in a language that the noncitizen can understand.

Second, there is no indication on the form the person can request a reasonable fear interview (RFI) and thus no meaningful opportunity to raise a fear of return.  Unlike prior government documents (referenced in n. 46 of the court's order), there is no language indicating how the person can raise that fear. We believe the form requires an advisal that they may request an RFI and information about how to go about doing so.

Finally, attaching the 2001 reasonable fear form is misleading and contains inaccurate information for DVD class members. In at least 3 places, the form addresses the need for the individual to explain their fear of persecution or torture in their country of origin.  Additionally, the form advises that passing a reasonable fear interview will allow the person to appear before an immigration judge. However, the injunction requires that OPLA move to reopen proceedings in that situation.

Please raise our concerns with your clients and let us know if they are willing to address our concerns to ensure compliance with the injunction, as we do not believe the forms attached comply with the Court's order.

In the interim, we request that DHS stop using this form(s) until it is corrected and, again, that any DVD class member is not deported to a third country until we can assess compliance with the preliminary injunction.

We hope to avoid taking this matter to the Court and would appreciate an expeditious response to this email.

Separately, we will send a draft protective order later today for release of the O.C.G. discovery on Monday, May 12. Please advise if you already have prepared a draft

and, if so, when you expect to send it.

Thanks,

Trina



**U.S. DEPARTMENT OF HOMELAND SECURITY**
**U.S. Immigration and Customs Enforcement**

Alien Name: 

## NOTICE OF REMOVAL

This letter is to inform you that U.S. Immigration and Customs Enforcement (ICE) intends to

remove you to ___Mexico___ .

---

CERTIFICATE OF SERVICE

~~~~~~~~~ s of this notice were read to
___Spanish___ language, and I served
the alien a copy of this notice in person.

_Subject refused to sign_            ___4/30/2025___
Signature of Alien                    Date of Service

_T. Becker D08407_                   ___1305___
Title and Signature of ICE Official   Time of Service

___N/A___
Name or Number of Interpreter (if applicable)

**Departamento de Justicia de los EE.UU.**
Servicio de Inmigración y Naturalización          **Información sobre la entrevista relativa al temor razonable**

**Propósito de este aviso**

El propósito de este aviso es explicar qué pasará mientras se resuelve su caso y qué puede ocurrirle como resultado de las declaraciones que haga. Es importante que entienda cuáles son sus derechos y qué pasará.

## LEA ESTE AVISO DETENIDAMENTE

Se ha dado la orden de su deportación porque el Servicio de Inmigración y Naturalización de los EE.UU. (INS) considera que usted no tiene derecho a permanecer en los Estados Unidos. Usted ha indicado que tiene la intención de pedir que no sea deportado, o ha expresado su temor a la persecución, la tortura o el regreso a su país. Usted será entrevistado por un funcionario especialmente capacitado en cuestiones de asilo para determinar si su "temor de persecución o de tortura es razonable". Usted puede ser detenido antes y después de la entrevista si el INS decide que conviene detenerlo.

**Derecho a consultar con otras personas**

Generalmente, un funcionario de asuntos de asilo lo orientará poco después de su orden de deportación. Ese funcionario le explicará a usted el procedimiento de temor razonable y le dirá cuándo será entrevistado. La entrevista suele tener lugar después de que han transcurrido 48 horas a partir de la orientación. Usted puede dedicar ese tiempo para encontrar un abogado o un representante acreditado para que lo represente. Si necesita más tiempo, debe hacérselo saber a un funcionario del INS. Usted puede solicitar que la entrevista se haga antes si está preparado a hablar sobre sus temores o petición inmediatamente.

Uste puede consultar con un abogado o un representante de su elección, siempre y cuando esa consulta no corra por cuenta del gobierno y no atrase el procedimiento. Su representante puede estar con used durante la entrevista, o puede participar por teléfono. Se adjunta a este aviso una lista de represenantes que pueden hablar con usted sin cargo alguno. Durante su detención, usted puede telefonear a un representante, amigo o familiar en los Estados Unidos, con llamada a cobro revertido o pagada por usted. Si desea llamar a alguien, puede pedir ayuda a un funcionario del INS. Asimismo, usted puede comunicarse con la Oficina de los Estados Unidos del Alto Comisionado de las Naciones Unidas para los Refugiados al teléfono (202) 296-5191 de 9:00 a.m. a 5:00 p.m. (hora oficial del Este), de lunes a viernes.

**Descripción de la entrevista relativa al temor razonable**

El propósito de esta entrevista consiste en determinar si usted reúne o no los requisitos para pedir que no lo deporten o para otro tipo de protección ante un juez de inmigración. Esta entrevista no es una audiencia oficial para que no lo deporten. Simplemente nos ayuda a determinar si usted no tiene que ser deportado y, por consiguiente, permitirle que presente su caso ante un juez de inmigración.

Durante la entrevista, tendrá la oportunidad de explicar al funcionario de asuntos de asilo por qué usted considera que no debe ser deportado a su país de origen. Si usted desea pedir que no lo deporten o cree que le pueden hacer daño, perseguir o torturar si regresa a su país de origen, usted debe demostrar al funcionario de asuntos de asilo que es razonable su temor a que le hagan daño o lo persigan por su raza, religión, nacionalidad, afiliación a un grupo social en particular o por sus opiniones políticas, o que existe la posibilidad razonable de que sea torturado. El funcionario tomará notas por escrito.

Si el funcionario determina que es razonable su miedo a la persecución o la tortura en el país donde va a ser deportado, usted podrá pedir al juez de inmigración que no lo deporten o que pospongan su deportación a ese país, mediante el Formulario I-589 (Solicitud de Asilo y No Deportación) que deberá llenar y presentar ante el Tribunal de Inmigración.

Form M-488 ( Rev. 9-19-01)N

Es muy importante que usted le diga al funcionario de asuntos de asilo por qué le preocupa la orden de deportación al país en cuestión. La ley estadounidense prohíbe estrictamente que se divulguen las razones que usted le haya dado al funcionario y por las cuales siente temor a que le hagan daño. La información que proporcione sobre las razones de su temor no se divulgarán a su gobierno, salvo en circunstancias excepcionales.

También es muy importante que diga la verdad durante su entrevista. Si bien el propósito de la entrevista no es el de obtener pruebas en su contra, el hecho de que no diga la verdad podría ser usado en su contra en este procedimiento de inmigración o en cualquier otro en el futuro.

**Necesidad de intérprete o consideración especial**

Si no habla bien inglés o si prefiere que lo entrevisten en su propio idioma, el INS pondrá a su disposición un intérprete durante la entrevista. El intérprete tiene instrucciones de tratar con carácter confidencial la información que usted proporcione. Si el intérprete no está interpretando correctamente o si usted no se siente a gusto con él, usted puede pedir otro intérprete.

Usted puede solicitar que el funcionario o el intérprete, o ambos, sean de sexo masculino o femenino, si con ello le sería más fácil dar al funcionario de asuntos de asilo información que es muy personal o difícil de abordar. El INS cumplirá con su pedido siempre y cuando haya personal disponible. Asimismo, usted tendrá la oportunidad de hablar con el funcionario de asuntos de asilo en privado, sin que su familia esté presente, si así lo desea.

**Las consecuencias si no se establece que hay temor razonable y examen de la decisión**

Si el funcionario de asuntos de asilo decide que su temor de persecución o tortura no es razonable, usted puede pedir que un juez de inmigración examine esa decisión. Si no pide ese examen, usted será deportado. Si pide que se examine el caso, el juez de inmigración lo hará personalmente o por teléfono o videoconexión. Generalmente, el examen tiene lugar en unos pocos días. Usted puede consultar con su representante antes de ese examen, siempre y cuando no produzca ningún atraso indebido. Usted recibirá una copia del registro de la decisión del funcionario de asuntos de asilo antes del examen que haga el juez de inmigración. Si parte de la información es incorrecta, usted debe notificar al juez de inmigración, quién puede decidir que en efecto su temor es razonable y que reúne los requisitos para una audiencia en la que solicitará que no lo deporten. Si el juez de inmigración está de acuerdo con la decisión de que su temor de persecución o tortura no es razonable, se le podrá deportar de los Estados Unidos.

---

Certificación del intérprete

El suscrito _____ (nombre del intérprete) certifica que domina el
_____ y el inglés, que ha interpretado fielmente toda la información anterior del
inglés al _____ y que el entrevistado parece haber entendido la interpretación.

_____
Firma del intérprete

_____
Fecha

---

Acuse de recibo del extranjero

He recibido el aviso sobre mi entrevista relativa al temor razonable. Tengo entendido que puedo consultar con un abogado o un representante acreditado de mi elección antes de la entrevista, siempre y cuando no atrase indebidamente el procedimiento ni constituya gastos para el gobierno.

_____
Firma de la persona referida al
funcionario de asuntos de asilo
4/30/2025
_____
Fecha

Form M-488 (Rev. 9-19-01)N Page 2

U.S. DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

Alien Name: ████████████████████

Alien Number (A #): ████████████

Date: 05/02/2025

## NOTICE OF REMOVAL

This letter is to inform you that U.S. Immigration and Customs Enforcement (ICE) intends to

remove you to ___MEXICO___.

---

### CERTIFICATE OF SERVICE

I certify that, on today's date, the contents of this notice were read to
████████████ in the SPANISH language, and I served the alien
a copy of this notice in person.

REFUSED TO SIGN
WITNESSED BY _____

Signature of Alien

_____
Title and Signature of ICE Official

_____
Name or Number of Interpreter (if applicable)

05/02/2025
Date of Service

9:30 am
Time of Service

Appx.640


**IntelWalrus**
@IntelWalrus

Case: 25-1393   Document: 00118337548   Page: 172   Date Filed: 09/08/2025   Entry ID: 6749229



A US Air Force C-17 (03-3127) has filed a plan as RCH260 to depart from Kelly Field (KSKF) in San Antonio and fly to Misrata Airport (HLMS) in Libya today. This is possibly the military deportation flight reported on below by the NYTimes. (Data from @thebaldgeek's website).

| | | |
|---|---|---|
| L-98W | 10 | tbg_map |


**Farnaz Fassihi** ✓ @farnazfassihi · 13h

NEWS: Trump administration plans to send migrants to war ravaged unstable Libya on a military flight as soon as Wednesday. The deal was brokered by Saddam. Can't make this up.

nytimes.com/2025/05/06/us/...

7:25 AM · May 7, 2025 · **19.5K** Views

EXHIBIT F

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

```
_____
                                    )
D.V.D., et al.,                     )
                                    )
        Plaintiffs,                 )
                                    )        Civil Action No.
    v.                              )        25-10676-BEM
                                    )
U.S. DEPARTMENT OF HOMELAND         )
SECURITY, et al.,                   )
                                    )
        Defendants.                 )
_____)
```

## MEMORANDUM AND ORDER ON
## <u>PLAINTIFFS' MOTION FOR EMERGENCY RELIEF</u>

**MURPHY, J.**

Plaintiffs have moved for a temporary restraining order to prevent non-citizen removals to third countries, including but not limited to Libya and Saudia Arabia, without prior written notice and a meaningful opportunity to raise fear-based claims. Dkt. 89. The Court agrees with Plaintiffs that this motion should not be required, *see id.* at 2, as the relief sought is already provided by the Preliminary Injunction entered in this case, Dkts. 64, 86. Accordingly, the Court construes Plaintiffs' motion as one for clarification.

The April 18, 2025 Preliminary Injunction requires all third-country removals to be preceded, *inter alia*, by written notice to both the non-citizen and the non-citizen's counsel in a language the non-citizen can understand as well as a meaningful opportunity for the non-citizen to raise a fear-based claim for CAT protection. Dkt. 64 at 46–47. The April 30, 2025 Amendment to the Preliminary Injunction further clarifies that the Department of Homeland Security may not evade this injunction by ceding control over non-citizens or the enforcement of its immigration responsibilities to any other agency, including but not limited to the Department of Defense.

Dkt. 86. If there is any doubt—the Court sees none—the allegedly imminent removals, as reported by news agencies and as Plaintiffs seek to corroborate with class-member accounts and public information, would clearly violate this Court's Order.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated:  May 7, 2025                    Judge, United States District Court

Appx.643

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| D.V.D.; M.M.; E.F.D.; and O.C.G., | |
| Plaintiffs, | Civil Action No. 25-cv-10676-BEM |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY; Kristi NOEM, Secretary, U.S. Department of Homeland Security, in her official capacity; Pamela BONDI, U.S. Attorney General, in her official capacity; and Antone MONIZ, Superintendent, Plymouth County Correctional Facility, in his official capacity, | |
| Defendants. | |

**INDEX OF EXHIBITS IN SUPPORT OF PLAINTIFFS' BRIEF IN SUPPORT OF JOINDER OF THE DEPARTMENT OF DEFENSE (DKT. 93)**

| Exhibit | Description |
|---------|-------------|
| A | Memorandum of Understanding Between the U.S. Dep't of Homeland Sec. & the U.S. Dep't of Def. for DoD Support at Naval Station Guantanamo Bay to U.S. Immigr. & Customs Enf't for DHS/ICE Detention of Illegal Aliens Subject to Final Orders of Removal (Mar. 7, 2025) |
| B | Declaration of Johnny Sinodis |
| C | Declaration of Tin Thanh Nguyen |
| D | Declaration of Kristin Macleod-Ball |

Appx.645

MEMORANDUM OF UNDERSTANDING BETWEEN

THE U.S. DEPARTMENT OF HOMELAND SECURITY (DHS)

AND

THE U.S. DEPARTMENT OF DEFENSE (DOD)

FOR

DOD SUPPORT AT NAVAL STATION GUANTANAMO BAY (NSGB) TO U.S.
IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) FOR DHS/ICE DETENTION OF
ILLEGAL ALIENS SUBJECT TO FINAL ORDERS OF REMOVAL

This is a memorandum of understanding (MOU) between DHS, through ICE, and DoD. When referred to
collectively, DHS and DoD are referred to as the "Parties."

1. BACKGROUND: On January 20, 2025, the President, in Executive Order (EO) 14165, "Securing Our
Borders," directed the Secretary of Homeland Security to "take all appropriate actions to detain, to the
fullest extent permitted by law, aliens apprehended for violations of immigration law until their successful
removal from the United States."[1] On January 29, 2025, President Trump directed the Secretary of
Defense and the Secretary of Homeland Security to take all appropriate actions to expand the Migrant
Operations Center at NSGB to full capacity to provide additional detention space for high-priority
criminal aliens unlawfully present in the United States.

2. AUTHORITIES AND REFERENCES: 8 U.S.C. § 1231(g); EO 14165, "Securing Our Borders,"
January 20, 2025; EO 14159, "Protecting the American People Against Invasion," January 20, 2025;
Memorandum for the Secretary of Defense and the Secretary of Homeland Security, "Expanding Migrant
Operations Center at Naval Station Guantanamo Bay to Full Capacity," January 29, 2025.

3. PURPOSE: This MOU clarifies the Parties' respective roles and responsibilities related to custody and
detention at NSGB of illegal aliens with final orders of removal (NSGB IAs). Consistent with DoD's
authority to provide base of operations support for the purpose of facilitating counterdrug activities or
activities to counter transnational organized crime of any Federal law enforcement agency within or
outside the United States (10 U.S.C. § 284(b)(4)), DHS/ICE will detain at NSGB illegal aliens with a
nexus to a transnational criminal organization (TCO) or criminal drug activity. This nexus can be
satisfied by an alien being a member of a TCO or paying a TCO to be smuggled into the United States.
Aliens subject to a final order but for whom no clear connection or nexus to TCOs or criminal drug
activity exists (e.g., those who overstay their visa) will not be moved to NSGB. When the nature of an

---

[1] Additionally, Executive Order 14159 provides:

In Section 9: "[T]he Secretary of Homeland Security shall promptly take appropriate action to use all other
provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of
the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United
States."

In Section 10: "Detention Facilities. The Secretary of Homeland Security shall promptly take all appropriate action
and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to
detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the
detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings
or their removal from the country, to the extent permitted by law."

alien's entry into the United States is uncertain, DHS/ICE may assert a nexus where DHS/ICE reasonably believes the alien to have paid a TCO to be smuggled into the United States if the alien is from a country where the preponderance of aliens from that country enter the United States in that fashion.

## 4. UNDERSTANDINGS OF THE PARTIES:

### 4.1. DHS/ICE——

4.1.1. Consistent with the Immigration and Nationality Act (INA), has legal custody of NSGB IAs and is responsible for the custody of detained aliens for administrative purposes related to immigration law violations and will fulfill these responsibilities through the direction of DHS personnel and DHS contractor personnel. This includes ensuring custody conditions for NSGB IAs are appropriate and determining which NSGB IAs are considered "high threat" for housing at Camp VI.

4.1.2. Accepts the conditions at NSGB detention sites (JTF Building VI and the Migrant Operations Center) as adequate for holding and DHS/ICE exercising legal custody and detention of NSGB IAs. (ICE representatives have assessed these sites as suitable for adults only; minors will not be moved to NSGB at any point).

4.1.3. Will provide necessary DHS/ICE guidance and training to DoD personnel at NSGB assisting DHS/ICE in fulfilling DHS/ICE's responsibility to exercise legal custody and detention of NSGB IAs.

4.1.4. Understands that DoD will use as standards, as an interim solution, for support to DHS/ICE detention of NSGB IAs as contained in DoD Instruction 1325.07, "Administration of Military Correctional Facilities and Clemency and Parole Programs," and Army Regulation 190-47, "The Army Corrections System," with appropriate exceptions, and adjusted by USSOUTHCOM's Joint Task Force Southern Guard (JTF-SG) based on capabilities and assets currently present. Within 15 days from the effective date of this MOU, the Parties will agree to standards for detention under DHS/ICE legal custody, to be set forth in an addendum to this MOU. The interim standards shall not apply to the following topics: (1) in person visitation; (2) mandatory work for detained aliens; (3) vocational, training, or other prisoner rehabilitate activities; and (4) public affairs, public access, media relations, requests for information and photography. ICE shall provide guidance related to these topics as needed, consistent with section 4.1.19 and other provisions of this MOU.

4.1.5. Will provide an appropriate ratio of DHS/ICE officers to NSGB IAs as mutually determined between the Parties to achieve the responsibilities indicated in this memorandum, and at a minimum, will provide at least two DHS/ICE law enforcement officers or contractors in accordance with DHS/ICE standard operating procedures at the Camp VI detention facility on a 24/7 basis and will provide an appropriate number of DHS/ICE law enforcement officers and interior security in accordance with DHS/ICE standard operating procedures at the hard-sided Migrant Operations Center facility on the leeward side on a 24/7 basis depending on the size of the NSGB IA population.

4.1.6. Will conduct any necessary searches of NSGB IAs while recognizing DoD personnel may also undertake searches and other necessary actions for the safety of DoD personnel or facility integrity.

4.1.7. Will maintain custody of NSGB IAs' funds, valuables, and other personal property.

4.1.8. Will be responsible for providing internal security of NGSB IA holding areas, including determining whether to use restraints on NSGB IAs and placing restraints on NSGB IAs, while recognizing that DoD personnel also may take actions necessary for the safety of DoD personnel, for

2

facility integrity, or to prevent the detainee from harming self or others, or from causing serious property damage.

4.1.9.   Will be responsible for the physical custody and directing the movements of NSGB IAs, including movement between detention sites, medical facilities, and airfield/port facilities.

4.1.10.  Will be responsible for any necessary questioning of NSGB IAs related to immigration matters or offenses not committed on NSGB.  Will be responsible for determining and imposing disciplinary actions.

4.1.11.  Will be responsible for translation, interpretation, and language access for NSGB IAs with limited English proficiency.

4.1.12.  Will be responsible for NSGB IA transfers, releases, and removals, as well as NSGB IA tracking and records (i.e., will provide a DHS/ICE Operations Center on the leeward side of NSGB for reception, processing, tracking of detention duration, legal status, medical status, and repatriation), and will ensure transfer from NSGB no later than 180 days from the date of final order of removal. This includes transfer for ordered court appearances related to immigration or federal court litigation.

4.1.13.  Will be responsible for inspection of and restrictions on NSGB IAs' correspondence.

4.1.14.  Understands DoD will use DoD rules for the use of force unless the Parties agree to another standard.  Applicable and agreed-upon rules for the use of force will be shared between the Parties, to ensure DHS/ICE awareness of DoD operational rules.

4.1.15.  Will be responsible for any involuntary medical treatment, including in response to hunger strikes, or similar measures.

4.1.16.  Will provide a full-time liaison officer (capable of accepting and responding to ICE/Enforcement and Removal Operations (ERO) standards reporting and decision-making requirements) to JTF-SG.

4.1.17.  Will be responsible for having contingency plans, coordinated with JTF-SG, for medical evacuation and follow-on care for detainees who require a higher level of care than is available at NSGB.

4.1.18.  Will promptly provide information to DoD concerning inquiries from relevant congressional committees.

4.1.19.  Will approve and coordinate any press access subject to concurrence of the JTF-SG commander and taking into account appropriate security protocols. Due to security and legal concerns, there will be no press access to Camp VI.

4.1.20.  Will determine the appropriate level of access by NSGB IAs to legal representation, including when, to whom, and under what circumstances such access is granted, in consultation with the JTF-SG commander and taking into account NSGB physical security protocols.

4.1.21.  Will assign a DHS/ICE officer to collect and communicate grievances and requests from NSGB IAs. DHS/ICE and JTF-SG will concurrently agree upon resolution of grievances and requests, taking into account DHS/ICE policies, procedures, and JTF-SG security protocols.

3

4.1.22. Will coordinate with DoD before deployment of contractor personnel to execute any portion of this MOU.

4.1.23. Will provide JTF-SG with a daily update on the number of NSGB IAs, including the number received, the number repatriated, a 72-hour repatriation schedule as feasible, and duration information (total days in DHS/ICE custody/detention and total days since arrival at NSGB).

4.1.24. Will provide select services to NSGB IAs (e.g., recreation, religious services) in accordance with DHS/ICE policy and as practicable within the existing infrastructure at NSGB.

**4.2. DoD, through U.S. Southern Command (USSOUTHCOM)—**

4.2.1. Will provide an existing secure facility on the windward side of NSGB to DHS/ICE for holding "high threat" NSGB IAs ("Camp VI").

4.2.2. Will provide DHS/ICE with soft structures (tents) to hold other NSGB IAs. These tents do not have power, lighting, or heating/air conditioning. DoD will provide lighting in the common areas outside the tents and at appropriate locations near perimeter fencing. Climate control requirements will be developed as agreed upon by the Parties.

4.2.3. Will provide preventative health services and first aid along with additional emergency medical care, as appropriate and subject to capability and availability, for DHS and ICE personnel and NSGB IAs.

4.2.4. Will provide perimeter security and facility access/security.

4.2.5. Will be responsible for determining the maximum number of NSGB IAs who can be accommodated at all locations on NSGB, taking into account DHS/ICE legal custody requirements.

4.2.6. Will provide a sufficient number of toilets and hygiene facilities to ensure the clean, safe, and sanitary operation of camps depending on the number of NSGB IAs.

4.2.7. Will make adequate facilities and access to such facilities available, as agreed to in an addendum to this memorandum, for the transportation of DHS/ICE personnel and contractors supporting execution of this memorandum to and from NSGB, and make available lodging/berthing for DHS/ICE personnel and contractors once at NSGB.

4.2.8. Will support DHS/ICE in the provision of an appropriate level of access by NSGB IAs to legal representation as determined by DHS/ICE in coordination with DoD under 4.1.20.

5. PERSONNEL: Each Party is responsible for all personnel costs, including pay and benefits, support, and travel. Each Party is also responsible for supervising and managing its personnel, except as necessary for DHS/ICE to provide guidance to DoD personnel as part of DHS/ICE's responsibility to exercise legal custody and detention of NSGB IAs.

6. GENERAL PROVISIONS:

6.1. POINTS OF CONTACT (POCs). The Parties will use the following POCs to communicate matters concerning this MOU. Each Party may change its POC upon reasonable notice to the other Party.

6.1.1. For DHS/ICE—

4

6.1.1.1  Position, office identification, phone number, and email of primary POC: ▮▮▮▮▮ Deputy Under Secretary, DHS Office of Strategy, Policy, and Plans, ▮▮▮▮▮

6.1.1.2.  Position, office identification, phone number, and email of alternate POC: ▮▮▮▮▮ Acting Deputy Assistant Secretary for Border and Immigration Policy, DHS Office of Strategy, Policy, and Plans, ▮▮▮▮▮

6.1.2.  For DoD—

6.1.2.1  Position, office identification, phone number, and email of primary POC: ▮▮▮▮▮, Performing the Duties of the Assistant Secretary of Defense for Homeland Defense and Hemispheric Affairs, ▮▮▮▮▮

6.1.2.2.  Position, office identification, phone number, and email of alternate POC: ▮▮▮▮▮ Acting Principal Deputy Assistant Secretary of Defense for Homeland Defense and Hemispheric Affairs, ▮▮▮▮▮

6.2.  CORRESPONDENCE.  All correspondence to be sent and notices to be given pursuant to this MOU will be addressed, if to the ICE, to—

6.2.1.  ▮▮▮▮▮ and, if to the DHS POLICY, to—

6.2.2.  ▮▮▮▮▮

6.3.  FUNDS AND MANPOWER.  This MOU neither documents nor provides for the exchange of funds or manpower between the Parties, nor does it commit funds or resources.  No provision in this MOU will be interpreted to require obligation or payment of funds.  Reimbursable expenses will be addressed separately.  No provision of this MOU shall be interpreted to require obligation or payment of funds in violation of the Anti-deficiency Act, 31 U.S.C. § 1341, or any other applicable law.  All activities contemplated by this MOU are subject to the availability of funds.

6.4.  MODIFICATION OF MOU.  This MOU may be modified at any time in response to a written request from authorized representatives of one of the Parties.  Otherwise, it will be reviewed no less often than every six months of its effective date in its entirety.  For DoD, the Under Secretary of Defense for Policy may approve modifications to, addendums to, and extensions of this MOU. For DHS, the Under Secretary of Strategy, Policy, and Plan may approve modifications to, addendums to, and extensions of this MOU.

6.5.  DISPUTES.  Any disputes relating to this MOU will subject to any applicable law, Executive Order, or DoD issuances, and will be resolved by consultation between the Parties.

6.6.  TERMINATION OF UNDERSTANDING.  This MOU may be terminated in writing by mutual agreement of the Parties or with 90 days' advance written notice by either Party.

6.7.  TRANSFERABILITY.  This MOU is not transferable except with the written consent of the Parties.

6.8.  EFFECTIVE DATE.  This MOU takes effect on the day after the last Party signs.

6.9.  EXPIRATION DATE.  This MOU expires on March 15, 2026.

6.10.  NO THIRD-PARTY BENEFICIARIES.  Nothing in this MOU, express or implied, is intended to

5

give to, or will be construed to confer upon, any person, not a party, any remedy or claim under or because of this MOU, and this MOU will be for the sole and exclusive benefit of the Parties.

## 7. DEFINITIONS:

7.1. "High threat" is a security category determined by DHS and is synonymous with other terms such as Maximum security, High-risk.

7.2 Detention Sites

7.2.1. "Hard Structure" detention facility on the Windward side is referred to as Camp VI.

7.2.2. The Migrant Operations Center is a DHS "Hard Structure" facility, not designed for high threat detention, on the Leeward side.

7.2.3. "Soft structure" detention facilities refer to Philips, Macalla, and Golf Course Camps and respective sub-camps.

**APPROVED:**

FOR DHS—

Signature

FOR DoD—

Signature

Troy D. Edgar, Deputy Secretary of Homeland Security
The U.S. Department of Homeland Security

Robert G. Salesses, Performing the Duties of
Deputy Secretary of Defense

7 March 2025 (Date)

7 March 2025 (Date)

6

## DECLARATION OF JOHNNY SINODIS

I, Johnny Sinodis, hereby declare as follows:

1.  I am a partner at Van Der Hout LLP, which is located at 360 Post Street, Suite 800, San Francisco, CA 94108. I have personal knowledge of the matters stated herein.

2.  I represent the person identified in the email correspondence filed on May 7, 2025, with the Court. Dkt. 90-4. I can confirm that my client has a final order of removal to the Philippines, which was issued on March 11, 2025.

3.  The information in this declaration is based on (1) notes that I took during two phone calls with my client on May 7, 2025, at approximately 1:00 p.m. Pacific Standard Time (the first call lasted about ten minutes before the call ended due to time limits, and my client called me back a few minutes later) and (2) calls I have had with various U.S. Immigration and Customs Enforcement (ICE) officers.

4.  As background, my client is currently detained at the South Texas ICE Processing Center, a facility run by The GEO Group. He was previously detained at the Northwest ICE Processing Center (NWIPC) in Tacoma, Washington. While at NWIPC, he was issued an order of removal on March 11, 2025. He thereafter was told by his deportation officer (DO) that he was scheduled to be on a removal flight to the Philippines on either April 27 or 28, 2025.

5.  Approximately two weeks before April 27, my client was transferred to Texas. He was told by an ICE officer in Tacoma that the decision to transfer him came from "headquarters." He has been detained at the South Texas ICE Processing Center for about three weeks, and he spent some amount of time (he is unsure as to the total number of days) in another facility in Texas prior to being transferred to the South Texas ICE Processing Center. Contrary to what he was told by the ICE officer in Tacoma, he was not put on a flight to the Philippines on April 27 or

Appx.652

April 28.

6.  On May 5, 2025, my client called me in the middle of the day to say that he was scheduled to be interviewed by ICE. That night, around 7:00 p.m. Pacific Standard Time, my client called me and said that two ICE officers informed him during his interview that he would be removed to Libya. The officers at some point showed him a one-page document saying he would be removed to Libya, which shocked my client. The officers said it would be the quickest way for him to get out of custody. My client asked whether he had a choice, and the officers told him that he did not. The officers then took the one-page document and said it would be in my client's possessions, which would be returned to him once removed from the United States.

7.  To date, I have not received any notification from ICE regarding the decision to send my client to Libya.

8.  On May 6, 2025, my client called me in the middle of the day to say that the money in his commissary account had been "zeroed out," which usually occurs before someone is transferred from the facility and/or prior to removal from the United States.

9.  On the evening of May 6, 2025, at around 6:00 p.m., I, along with another attorney at my office, contacted the South Texas ICE Processing Facility by phone to request a copy of the notice that my client had received informing him he would be removed to Libya and to request that he be provided a reasonable fear interview. We were told by a front-line ICE officer that my client's assigned DO was not present at the facility, and that he was unable to access complete information about him on the computer system. He informed us, however, that there was no notation that my client was scheduled to be removed to Libya. The officer claimed to be surprised to hear that my client had been informed he would be removed to Libya and repeatedly stressed that, because my client is Filipino, he should be removed to the Philippines. The officer

assured me that my client would not be removed to Libya or anywhere else before the following day (May 7), and said he was not scheduled for any "commercial" or "chartered" flight. He used the words "commercial" and "chartered."

10. Before and after this phone call on May 6, 2025, I sent a series of emails to ICE, which were filed with the Court on May 7, 2025.

11. On May 7, 2025, in the morning, I along with my colleague again contacted the South Texas ICE Processing Center. The officer we spoke with said that the South Texas facility had no control over my client's removal, and that those decisions were made by ICE in Tacoma. He stated that we needed to contact ICE in Tacoma to request a reasonable fear interview. He further informed me that my client was not scheduled for removal on May 7, 2025. He stated several times that he had no idea why our client was informed he would be removed to Libya, and that he was Filipino and set to be removed to the Philippines.

12. At this point, I emailed counsel in the instant matter to provide them an update as to my communications with ICE.

13. I, along with my colleague, then contacted the Tacoma ICE Processing Center and requested to speak to the officers assigned to my client's case. The officer we spoke with was not the officer assigned to my client. This officer was also shocked to hear that our client had been informed he would be removed to Libya. When we requested to speak to a supervisor and the officer assigned to my client given the emergency situation, the officer replied "I can assure you this is not an emergency because that emergency does not exist," referring to the potential of a flight to Libya. The officer then transferred the call to the officer assigned to my client, who did not answer the phone. We repeatedly attempted to contact the officer assigned to my client and the supervisor at the facility between 9:00 a.m. and 12:30 p.m. Pacific Standard Time but

Appx.654

received no response.

14. During this period of time, I emailed the Office of the Principal Legal Advisor in Tacoma, Washington, and asked (1) that my client be provided with a reasonable fear interview and (2) that I be provided notice of the decision to remove him to Libya. A true and correct copy of that email is attached hereto.

15. Just before 12:30 p.m. Pacific Standard Time on May 7, 2025, Supervisory Deportation and Detention Officer Garza from San Antonio ICE called me. He told me that he had received my emails and was looking into the situation. He stated that he had "no explanation" for what my client had been told and said something along the lines of "I cannot guarantee that did not happen" but that it "is not right and it makes no sense." Officer Garza then told me that he would give me another call, hopefully by the end of the day. I have not heard from Officer Garza since that time.

16. Several minutes before 1:00 p.m. on May 7, 2025, my client called me from the South Texas ICE Processing Center. He stated that he was woken up by officers at around 2 a.m. on May 7, 2025. Shortly thereafter, GEO Group Correctional Emergency Response Team (CERT) members dressed in full riot gear entered his pod and told him that he would be leaving in five minutes.

17. Between 2:40-2:50 a.m., the CERT Team members returned to transfer him and twelve other individuals out of his pod.

18. At one point, my client heard a GEO employee say, out loud, "Really, CERT?," as if in disbelief of the display of force.

19. The CERT Team took my client to the facility's intake space, where he was held for around thirty minutes to an hour.

20. The facility did not allow him to change into his regular clothes, which they normally would do when removing someone from the facility for any reason, including for a deportation flight. Instead, he and the twelve other individuals were processed out of the facility in jumpsuits.

21. My client states that one other individual is Mexican, and another is Bolivian. My client informed me that both of these individuals have removal orders to their home countries and had been told that their countries will accept them.

22. As to the Mexican national, my client told me that, after he was informed that he would be removed to Libya, he called the Mexican Consulate to explain what was happening. The Mexican consul responded that ICE could not send him to Libya.

23. During the process of being processed out of the facility, my client recognized that the two ICE officers who had interviewed him on Monday were present for his transfer.

24. My client's belongings were packed for him, as if the CERT Team and ICE officers were trying to move him out of the facility quickly.

25. My client asked one of the ICE officers if the group was still going to Libya and the officer said yes.

26. While being processed out of the facility, my client and the rest of the group were placed in shackles. The shackles were fixed around their ankles and waist.

27. My client was then placed on to a bus outside the facility with the twelve other members of the group. The bus resembled a school bus. It was all white and had an image of a bird on it.

28. My client observed that two people on the bus had logos that read "G4S." One of the characters in the logo is red. On information and belief, G4S is a British multinational private security firm.

29. When my client and the other individuals asked these G4S employees for information as to what was happening, the G4S employees said that they did not know and did not have any information.

30. On the bus, my client and the rest of the group remained shackled at the ankles and waist.

31. ICE officers did not board the bus with my client. Instead, ICE vehicles served as an escort for the bus.

32. My client states that the bus was driven to what appeared to be a military airport where a large military plane was waiting.

33. My client and the rest of the group were never taken off the bus. They remained on the bus, sitting next to the large military plane, for approximately three to four hours.

34. At some point in the morning, rather than being shuffled off the bus and onto the large military plane, the bus drove back to the South Texas ICE Processing Facility. My client says that they arrived back at the facility around 11:00 a.m. Central Standard Time on May 7.

35. My client and the rest of the group were taken off the bus and placed into the Special Housing Unit (SHU—also known as solitary confinement). Officers informed the group that they were not in trouble but that they could be held in SHU for twenty-four hours.

36. My client added that, if he had to interpret how the officers were acting once the bus returned to the facility, he would say they looked "peeved," as if they were disappointed by what was occurring.

37. My client has since been returned to the dorm where he was housed prior to being woken up abruptly and transferred out of the facility in the early morning hours of May 7. Nobody at the facility has communicated to my client whether they will attempt to remove him to Libya again or at any point in the future. I also have not received any further correspondence from ICE.

I declare under penalty of perjury that the foregoing statement is true and correct to the best of my own personal knowledge.  Executed this 12th day of May 2025 at San Francisco, California.

_____
Johnny Sinodis
Declarant

## DECLARATION OF TIN THANH NGUYEN

I, Tin Thanh Nguyen, hereby declare as follows:

1. I am an attorney in private practice at the Law Office of Tin Thanh Nguyen, PLLC, which is located at 6769 Albermarle Rd, Suite B, Charlotte, NC 28212. I have personal knowledge of the matters stated herein.

2. I represent a person identified in the email correspondence filed on May 7, 2025, with the Court. Dkt. 90-2. I can confirm that my client has a final order of removal to Vietnam, which was issued by the San Francisco Immigration Court in May 2014. He has been reporting regularly to U.S. Immigration and Customs Enforcement (ICE) on an Order of Supervision since about July 2014.

3. The information in this declaration is based on telephone calls I had with my client on May 8 and May 9, 2025, in which he informed me about what had happened to him earlier in the week and also confirmed information I learned from attorneys and advocates who spoke to my client's partner on or about May 6 and May 7. I also directly spoke to his partner on May 7, 2025.

4. As background, my client is currently detained at the South Texas ICE Processing Center, a facility run by GEO Group. Immigration officers took him into custody when he appeared at a yearly ICE check-in in Los Angeles, California, on March 20, 2025. He spent a night in Los Angeles and then ICE transferred him to Adelanto Detention Center where he was detained for about three weeks. ICE then transferred him to Phoenix, Arizona via a van where he then took a flight to Seattle, WA so that ICE could pick up other detainees. Then ICE flew him to Texas and detained him in a county jail for 3-4 days before transporting him to San Antonio, Texas before finally arriving at the South Texas ICE Processing Center on or about April 18, 2025.

5. On Monday, May 5, 2025, ICE officers brought my client and approximately 22 other men to an office area within the South Texas ICE Processing Center, and then the men were brought into an office one by one to meet with approximately three immigration officers. My client believes he was the first of the men to be brought into the office. My client speaks some

Declaration of Tin Thanh Nguyen     1     Case No. 1:25-cv-10676-BEM

English but does not understand technical and legal jargon and is not comfortable reading or writing in English. He was given a document, written only in English, which the officers told him would allow him to become a free man, but then they told him that he would be free in Libya. My client did not understand the form itself or how he could be free in a country that he knew nothing about and had no permission to reside in. As a result, he refused to sign the document. The ICE officers kept trying to convince him to sign the paper and told him that he would be deported to Libya no matter what he did. However, he never signed the paper. He still has the document. He was forced by ICE officers to sign another paper, which had his photograph and fingerprints on it, while he was handcuffed. They grabbed his hand and moved it with the pen so that he would sign the document. The officers never told him that he could raise a claim that he was afraid to go to Libya because he would be tortured there. He did not have a lawyer at this time.

6. After he continued to refuse to sign the document referencing deportation to Libya, the ICE officers handcuffed him and brought him into a different room, which appeared to be a medical office. He believes that they checked his blood pressure at this point. After all of the men had been interviewed, he was placed in solitary confinement for approximately 24 hours. He believes that some of the other men who did not sign the paperwork were also placed in solitary confinement after their interviews.

7. My client called his partner to inform her what had occurred. I learned about the situation after my client's partner contacted a community organization who contacted attorneys, including me. One of the attorneys attempted to schedule a time to meet with my client on May 7, 2025, at 7 pm CST, but was told by an administrator at 6 am on May 7 that he was no longer at the detention facility.

8. At approximately 2:30 am on May 7, 2025, my client was abruptly woken up by guards in camouflage tactical gear, who told him to put his hands through the food slot in the cell door and handcuffed him. The guards had on their backpacks and client said that they appeared like they were going to war. He, along with 12 other men, were placed in a containment cell together. They all remained in the detention center jumpsuits and their feet were shackled and hands

Appx.660

cuffed. My client believes he saw between 20 to 30 guards in riot gear, and there were about four officers involved with moving each person. He stated that the guards treated him roughly, like he was a military enemy or an animal. If any of the men spoke, the guards yelled aggressively at them to shut up.

9. My client and the other men were moved from the containment cell to a white bus with metal screens on the windows. There was a bus driver and one other individual on the bus with the men, neither of whom appeared to be wearing DHS uniforms.

10. Soon after they boarded the bus, the bus left the detention center and drove for what he believes was more than one hour. They arrived at a military base, which my client believes was Lackland Air Force Base in San Antonio. Throughout the base, there were people in military uniform and military vehicles. My client and the other men on the bus were silent; my client was extremely scared and unsure of what was happening.

11. The bus stopped next to a large airplane, which appeared large enough to transport tanks and military vehicles. The hatch or cargo door of the C-17 airplane was open so he could see military personnel loading the airplane. At some point, the bus moved to a different side of the airplane, and my client saw what appeared to be a military vehicle fueling up the airplane. In addition to the military personnel, my client also saw people, who he thinks were ICE officers, standing outside of the airplane and bus. Additionally, he saw someone setting up to take pictures near the plane.

12. Approximately 3 or 4 hours later, the bus left the military base and returned to the South Texas ICE Processing Center. My client and the other men were released from the bus in the same way that they boarded: with approximately 20 to 30 military soldiers in riot gear removing them from the bus. My client and the other men were brought to segregated cells in the detention center and left there for approximately 24 hours; while in the cells they could not talk to each other, make telephone calls, or shower. Subsequently, all of the men were released into another housing unit at the detention. At this point, they could again make telephone calls, and he contacted his partner to inform her what had happened to him.

Declaration of Tin Thanh Nguyen          3          Case No. 1:25-cv-10676-BEM

13. On May 7, 2025, I submitted a notice of entry of appearance as counsel (Form G-28) electronically on behalf of my client and was able to speak with him about his experiences by telephone both after he returned to the detention facility on May 8 and 9 and via video conference on May 12.

I declare under penalty of perjury that the foregoing statement is true and correct to the best of my own personal knowledge. Executed this 13th day of May 2025 at Charlotte, North Carolina.

Tin Thanh Nguyen
Declarant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

D.V.D.; M.M.; E.F.D.; and O.C.G.,

       Plaintiffs,

       v.

U.S. DEPARTMENT OF HOMELAND SECURITY; Kristi NOEM, Secretary, U.S. Department of Homeland Security, in her official capacity; Pamela BONDI, U.S. Attorney General, in her official capacity; and Antone MONIZ, Superintendent, Plymouth County Correctional Facility, in his official capacity,

       Defendants.

Civil Action No. 25-cv-10676-BEM

## DECLARATION OF KRISTIN MACLEOD-BALL

Pursuant to 28 U.S.C. § 1746, I hereby declare:

1.      I am a senior staff attorney at the National Immigration Litigation Alliance. I am one of the counsel for Plaintiffs and class members in the above-captioned case. I submit this declaration in support of Plaintiffs' Brief in Support of Joinder of the Department of Defense.

2.      I have personal knowledge of the facts set forth herein, and, if called as a witness, I could and would testify completely as set forth below.

3.      Late in the evening of May 6, 2025 and during the morning of May 7, 2025, Plaintiffs' counsel in this case learned from immigration attorneys and press reports that individuals who fit the description of class members in the above-captioned case were being scheduled for imminent removal to Libya.

4.      From subsequent communications with attorneys, including attorneys representing some

1

of these individuals in immigration proceedings, I learned that there were thirteen individuals in this group as well as their names, A-numbers, and countries of origin. Libya is not the country of origin of any of them. Instead, their countries of origin include Laos, Vietnam, Myanmar, Mali, Burundi, Cuba, Bolivia, Mexico, and the Philippines.

5.      I entered the A-numbers into the EOIR Automated Case Information System, https://acis.eoir.justice.gov/en/caseInformation, which provides immigration court information, including the date and location of prior removal orders. Based on my use of this system, I was able to ascertain that a minimum of eleven of the men have final removal orders issued by an immigration court and are members of the certified class in this case.

6.      One individual was ordered removed by the Tacoma, WA Immigration Court in 2022.

7.      One individual was ordered removed by the Los Angeles, CA Immigration Court in 2006.

8.      One individual was ordered removed by the Chicago, IL Immigration Court in 2008.

9.      One individual was ordered removed by the Omaha, NE Immigration Court in 2023.

10.     One individual was ordered removed by the Dallas, TX Immigration Court in 2023.

11.     One individual was ordered removed by the Philadelphia, PA Immigration Court in 2013.

12.     One individual was ordered removed by the Tacoma, WA Immigration Court in 2009.

13.     One individual was ordered removed by the San Francisco, CA Immigration Court in 2014.

14.     One individual was ordered removed by the Adelanto, CA Immigration Court in 2021.

15.     One individual was ordered removed by the Miami, FL Immigration Court in 2011.

16.     One individual was ordered removed by the Tacoma, WA Immigration Court in March 2025.

Appx.664

I declare under penalty of perjury that the above information is true and correct to the best of my knowledge. Executed this 14th day of May 2025 at Brookline, Massachusetts.

By:    *s/ Kristin Macleod-Ball*
Kristin Macleod-Ball

Appx.665

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| D.V.D., *et al.*, | ) | |
| | ) | |
| Individually and on behalf of all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:25-cv-10676-BEM |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. Department of Homeland Security, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' NOTICE OF ERRATA

Appx.666

Defendants hereby advise the Court of an error in the March 25, 2025, declaration of Brian Ortega. *See* Declaration of Brian Ortega, ECF No 31-1. The declaration represented, based on internal database information, that Immigrations and Customs Enforcement, Enforcement and Removal Operations, (ICE ERO) "verbally asked O.C.G. if he was afraid of being returned to Mexico. At this time O.C.G. stated he was not afraid of returning to Mexico." *Id.* at ¶¶ 2, 13; Ex. A, Declaration of Brian Ortega at ¶ 5. Defendants have relied on this declaration to make corresponding statements to the Court. *See e.g.,* ECF No. 31 at 19. 21. Upon further investigation, Defendants cannot identify any officer who asked O.C.G. whether he had a fear of return to Mexico. Nor can Defendants identify the officer who O.C.G. states "told [him] that he was being deported to Mexico." Declaration of O.C.G., ECF No. 8-4 at ¶ 9. Accordingly, Defendants submit the attached declaration correcting Mr. Ortega's March 25, 2025 declaration. *See id.* However, Defendants maintain that—pursuant to O.C.G.'s own admission—he received notice of his removal to Mexico. ECF No. 8-4 at ¶ 9.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

ELIANIS N. PEREZ
Assistant Director

/s/*Mary L. Larakers*
MARY L. LARAKERS
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 353-4419
(202) 305-7000 (facsimile)
mary.l.larakers@usdoj.gov

1

## CERTIFICATE OF SERVICE

       I, Mary Larakers, Senior Litigation Counsel, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

<div align="right">

/s/ *Mary L. Larakers*
Mary L. Larakers
Senior Litigation Counsel

</div>

Dated: May 16, 2025

Appx.668

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **D.V.D**, *et al.* | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | CIVIL NO.: 2:25-cv-10676-BEM |
| | : | |
| **U.S. Department of Homeland Security,** *et al.* | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## DECLARATION OF BRIAN ORTEGA

I, Brian Ortega, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

1. I am employed by U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), as the Assistant Field Office Director (AFOD) for the ERO Phoenix Field Office. I have held this position since January 2022. Included in my official duties as an AFOD in the ERO Phoenix Field Office is the responsibility of assisting in and the managing, monitoring, scheduling, and executing removal orders for aliens in ICE custody at the Eloy Detention Center in Eloy, Arizona.

1

2. I provide this declaration based on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

3. I am aware of the above captioned litigation. While preparing this declaration, I reviewed information contained in the official records and databases maintained by ICE regarding the immigration and custody status of the named Plaintiff (O.C.G.).

4. On March 25, 2025, I signed a declaration that stated: "On or about February 21, 2025, prior to O.C.G being removed to Mexico, ERO verbally asked O.C.G. if he was afraid of being returned to Mexico. At this time, O.C.G. stated he was not afraid of returning to Mexico." ECF No. 31-1 at ¶ 13.

5. This statement was based on ICE's ENFORCE Alien Removal Module[1] entries indicating that O.C.G. did not fear return to Mexico. *See* Ex. 1.

6. Upon further investigation conducted pursuant to the Court's discovery order, ICE was unable to identify an officer or officers who asked O.C.G. if he feared a return to Mexico.

7. At the time I signed my declaration on May 25, 2025, I believed the EARM

---

[1] ICE's ENFORCE Alien Removal Module (EARM) is a software tool that provides an integrated and comprehensive view of an alien's detention and removal status. The software permits staff to place comments into each alien's record regarding the status of their case, any court updates, or other relevant case information.

2

Appx.670

entries to be accurate.

I declare, under penalty of perjury that the foregoing is true and correct to the best

of my knowledge, information, and belief, as of the time of signature.

Executed this 16th day of May, 2025.

BRIAN A ORTEGA    Digitally signed by BRIAN A
                  ORTEGA
                  Date: 2025.05.16 14:40:40 -07'00'

Brian Ortega
Assistant Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

Appx.671

# Exhibit 1



All of the following comments are related to Case # ▮▮▮▮▮▮
Results: 25 total

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
ICE O.C.G. 000573
Appx573

1/2

| Date Entered | Entered By | Type | Comments |
|---|---|---|---|
| 02/21/2025 09:44 AM | ■■■■ | EARM | Non citizen was positively identified for removal; 2 print via a biometric capturing device, face to photo comparison, and verbal confirmation of various I 213 biographical data points Subject does not have fear of returning to Mexico |
| 02/20/2025 05:17 PM | ■■■■ | EARM | SDDO Subject is a Final Order No pending appeals No pending stays or filings with 9th CCA No impediments to removal Concur with Officers departure checks Subject meets criteria for Mexico and will be asked about fear prior to transport |
| 02/20/2025 05:10 PM | ■■■■ | EARM | WHO GRANTED FOR GUATEMALA SUBJECT MEETS CRITERIA FOR OTM TO MEXICO |
| 02/20/2025 05:09 PM | ■■■■ | EARM | Per the mandatory EAZ pre departure checklist the following checks were completed prior to removal SQ11, NN13, NN16, PCQS, BIA, EARM, PACER, PLANET, CIS, CLAIMS, DACA, KST Query, and medical BIA cleared no pending appeals A file forwarded to SDDO for review and concurrence of pre departure checks |
| 02/20/2025 04 26 PM | ■■■■ | EARM | WHO granted to Guatemala Removal packet created Subject to be considered for OTM to Mexico |
| 02/12/2025 03 36 PM | ■■■■ | EARM | Attorney Mario Alvarez successfully filed an electronic G 28 through ERO eFile on 2025 02 12 15 35 00 on behalf of subject Contact info is 602 345 1305 malvarez@firrp org The G 28 is available in the Supporting Information tab for download and placement in the A file |
| 01/21/2025 11 00 AM | ■■■■ | EARM | Case follow up merits 02/19/2025 |
| NON RESPONSIVE | ■■ | ■■ | ■■■■■■■ |
| ■■■■■■ | ■■ | ■■ | ■■■■ |
| ■■■■■■ | ■■ | ■■ | ■■■■■■ |
| ■■■■■■ | ■■ | ■■ | ■■■■ |
| ■■■■■■ | ■■ | ■■ | ■■ |
| ■■■■■■ | ■■ | ■■ | ■■■■ |
| ■■■■■■ | ■■ | ■■ | ■■■ |
| ■■■■■■ | ■■ | ■■ | ■■ |
| ■■■■■■ | ■■ | ■■ | ■■■ |
| ■■■■■■ | ■■ | ■■ | ■■ |
| ■■■■■■ | ■■ | ■■ | ■■■■■ |
| ■■■■■■ | ■■ | ■■ | ■■■■■■ |
| ■■■■■■ | ■■ | ■■ | ■■■ |
| ■■■■■■ | ■■ | ■■ | ■■■■■■ |

**Comment Type Legend**
EARM: Case comments entered in the EARM system.
EADM: Detention comments entered in the EADM system.
ATD: Alternatives to Detention comments entered in the EARM system.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# DECLARATION OF JACQUELINE BROWN

I, Jaqueline Brown, hereby declare as follows:

1.      I am the Director & Associate Professor Immigration & Deportation Defense Clinic University of San Francisco School of Law in San Francisco, CA as well as the Legal Director of the Sonoma Secure Families Collaborative in Healdsburg, CA. I make this declaration in support of Plaintiffs' Emergency Motion for a Temporary Restraining Order and Preliminary Injunction. I have personal knowledge of the matters stated herein.

2.      I represent N.M., who is the person identified in the email correspondence attached hereto. N.M. is from Myanmar. He has a final removal order from Omaha, Nebraska issued in August 2023. N.M. is a member of the certified class in *D.V.D. v. DHS*, No. 1:25-cv-10676-BEM (D. Mass). He was one of the men whom the Department of Homeland Security (DHS) previously attempted to deport to Libya on May 7, 2025.

3.      My representation of N.M. began after he was initially informed by DHS that we would be deported to Libya. I, along with a group of other attorneys agreed to take on representation of the Libya group. Because one of those attorneys, Jonathan Ryan, is based in Texas, he filed a Notice of Appearance (Form G-28) on behalf of the men so that he could meet with them in person.

4.      Mr. Ryan met with N.M. on Friday May 16, 2025. At that meeting, Mr. Ryan explained to N.M. my willingness to represent him pro bono and he agreed. Mr. Ryan has told me that N.M. has limited English proficiency and that his best language is Karen. Mr. Ryan also told me that he explained to the group that they had the right to express a fear of return to a third country.

5.      On May 17, 2025 at 4:49 PM CT, Mr. Ryan received a notification via ICE's e-File Portal that N.M. had been transferred from the South Texas Detention Center to the Port Isabel

Detention Center, in Port Isabel, Texas. On May 19, 2025 at 4:44 CT, Mr. Ryan received an email from a Supervisory Detention and Deportation Officer at the Harlingen Field Office, Port Isabel Detention Center providing a document that the officer alleged had been served on N.M. The document stated that it was a "Notice of Removal" to inform N.M. that ICE intended to remove him to South Africa. The certificate of service stated that the contents of the notice were read to N.M. in English without an interpreter at 10:59 and that N.M. refused to sign the document.

6.      Mr. Ryan has informed me that, approximately ten minutes later he received a notification that the sender sought to recall the email message attaching the notice of removal to South Africa.

7.      Later that day, at 6:35 PM CT, Mr. Ryan received a second email from the Supervisory Detention and Deportation Officer, with a document that the officer alleged had been served on N.M. The attachment, utilizing the same form as was used for the notice to South Africa, stated that it was a "Notice of Removal" to inform N.M. that ICE intended to remove him to *South Sudan*. The certificate of service stated that the contents of the notice were read to N.M. in English without an interpreter at "1748" and that N.M. refused to sign the document.

8.      On the evening of May 19, 2025, I contacted Plaintiffs' counsel to inform them that N.M. received the notice of removal to South Sudan. At that point, I had scheduled a video meeting with N.M. at 9 a.m. CT the next day (May 20).

9.      Today, I checked the online ICE detainee locator and saw that N.M. was no longer in the ICE detainee locator. I then emailed the Port Isabel Detention Center Law Visit email address to confirm whether N.M. was located at the facility.

10.     At 8:27 AM PT, a Port Isabel Detention Center Detention Officer responded that N.M. had been removed "this morning." I emailed to ask to which country N.M. was removed, and the officer responded, at 8:36 AM PT, "South Sudan."

I declare under penalty of perjury that the foregoing statement is true and correct to the best of my own personal knowledge. Executed this 20th day of May 2025 at San Francisco, California.

Jaqueline Brown
Declarant

| From: | Jonathan Ryan |
| To: | Kristin Macleod-Ball |
| Subject: | Fwd: Service of Documents |
| Date: | Tuesday, May 20, 2025 12:22:10 PM |
| Attachments: | Notice of Removal to Third Country.pdf |

FYI

From: ▮▮▮▮▮▮▮▮ <▮▮▮▮▮▮@ice.dhs.gov>
Date: Mon, May 19, 2025 at 4:44 PM
Subject: Service of Documents
To: jdr@jonathandryanlaw.com <jdr@jonathandryanlaw.com>
Cc: ▮▮▮▮▮ <▮▮▮▮▮▮@ice.dhs.gov>, ▮▮▮▮▮▮
<▮▮▮▮▮@ice.dhs.gov>


Good afternoon,


This email is intended to notify to the Law Office of Jonathan Ryan of the attached document
served to your client ▮▮▮▮▮ .



Thank you,


▮▮▮▮▮▮

Supervisory Detention and Deportation Officer

Harlingen Field Office, Port Isabel Detention Center

Enforcement Removal Operations

U.S. Immigration and Customs Enforcement
Office: ▮▮▮▮▮ Cell: ▮▮▮▮▮

**U.S. DEPARTMENT OF HOMELAND SECURITY**
**U.S. Immigration and Customs Enforcement**

Alien Name: ███████████

Alien Number (A #): ███████████

Date: **May 19, 2025**

**NOTICE OF REMOVAL**

This letter is to inform you that U.S. Immigration and Customs Enforcement (ICE) intends to

remove you to   South Africa

---

### CERTIFICATE OF SERVICE

I certify that, on today's date, the contents of this notice were read to
███████████ in the   English   language, and I served
the alien a copy of this notice in person.

Refused to sign
Signature of Alien

5-19-25
Date of Service

Title and Signature of ICE Official

1059
Time of Service

N/A
Name or Number of Interpreter (if applicable)

| From: | Jonathan Ryan |
|---|---|
| To: | Kristin Macleod-Ball |
| Subject: | Fwd: Recall: Service of Documents |
| Date: | Tuesday, May 20, 2025 12:21:42 PM |

FYI

---------- Forwarded message ---------
From: ████████████ < ████████████ @ice.dhs.gov>
Date: Mon, May 19, 2025 at 4:55 PM
Subject: Recall: Service of Documents
To: jdr@jonathandryanlaw.com <jdr@jonathandryanlaw.com>
Cc: ████████████ < ████████████ @ice.dhs.gov>, ████████████
< ████████████ @ice.dhs.gov>


████████████ would like to recall the message, "Service of Documents".

| From: | Jonathan Ryan |
|---|---|
| To: | Kristin Macleod-Ball |
| Subject: | Fwd: Service of Documents |
| Date: | Tuesday, May 20, 2025 12:22:16 PM |
| Attachments: | Notice of Third Country Removal.pdf |

FYI

---------- Forwarded message ---------
From: ███████████ <███████████@ice.dhs.gov>
Date: Mon, May 19, 2025 at 6:35 PM
Subject: Service of Documents
To: jdr@jonathandryanlaw.com <jdr@jonathandryanlaw.com>
Cc: ███████████ <███████████@ice.dhs.gov>, ███████████
<███████████@ice.dhs.gov>


Good afternoon,


This email is intended to notify to the Law Office of Jonathan Ryan of the attached document
served to your client ███████████ .


Any questions/concerns please email or call me.



Thank you,



███████████

Supervisory Detention and Deportation Officer

Harlingen Field Office, Port Isabel Detention Center

Enforcement Removal Operations

U.S. Immigration and Customs Enforcement
Office:███████████ Cell:███████████

**U.S. DEPARTMENT OF HOMELAND SECURITY**
**U.S. Immigration and Customs Enforcement**

Alien Name: ▪▪▪▪▪▪▪▪

Alien Number (A #): ▪▪▪▪▪▪▪▪

Date: **May 19, 2025**

## NOTICE OF REMOVAL

This letter is to inform you that U.S. Immigration and Customs Enforcement (ICE) intends to

remove you to **South Sudan**_____.

---

### CERTIFICATE OF SERVICE

I certify that, on today's date, the contents of this notice were read to
▪▪▪▪▪_____ in the English_____ language, and I served
the alien a copy of this notice in person.

**REFUSED TO SIGN**_____
Signature of Alien

5/19/2025
Date of Service

SDPO_____
Title and Signature of ICE Official

1748
Time of Service

N/A_____
Name or Number of Interpreter (if applicable)

| From: | Jacqueline Brown |
|---|---|
| To: | matt@nwirp.org |
| Cc: | Kristin Macleod-Ball; Trina Realmuto |
| Subject: | Re: Libya now South Sudan (Libya 13) |
| Date: | Tuesday, May 20, 2025 11:39:38 AM |

Yes



## Re: [EXTERNAL] VTC/VAV
## meeting with client

**External**   **Inbox**

**PIDC, LawVisit**   8:36 AM
to me

South Sudan

**Thank you,**

**Detention Officer**
**Port Isabel Detention Center**
**1-**

**From:** Jacqueline Brown <jmbrown@usfca.edu>
**Sent:** Tuesday, May 20, 2025 10:33 AM

**To:** PIDC, LawVisit <<u>lawvisit.pidc@akimaip.com</u>>
**Subject:** Re: [EXTERNAL] VTC/VAV meeting with client ███████████

To which country?

On Tue, May 20, 2025 at 8:27 AM PIDC, LawVisit <<u>LawVisit.PIDC@akimaip.com</u>> wrote:

> He was removed this monrning
>
> **Thank you,**
>
> ████████████████████

On Tue, May 20, 2025 at 8:35 AM Matt Adams <<u>matt@nwirp.org</u>> wrote:
Do we have your permission to include this email chain to opposing counsel?

On Tue, May 20, 2025 at 8:34 AM Jacqueline Brown <<u>jmbrown@usfca.edu</u>> wrote:
Yes I already did

On Tue, May 20, 2025 at 8:33 AM Matt Adams <<u>matt@nwirp.org</u>> wrote:
Can you respond and ask for confirmation to where he was removed to?

On Tue, May 20, 2025 at 8:31 AM Jacqueline Brown <<u>jmbrown@usfca.edu</u>> wrote:
Replied to the email, did not receive a response and I learned that ████ was removed this morning!

8:29



# Re: [EXTERNAL] VTC/VAV meeting with client ☆

**External** **Inbox**

**PIDC, LawVisit** 8:27 AM
to me ⌄

He was removed this monrning

**Thank you,**

**Detention Officer**
**Port Isabel Detention Center**
**1-**

---

**From:** Jacqueline Brown <jmbrown@usfca.edu>
**Sent:** Tuesday, May 20, 2025 10:19 AM
**To:** PIDC, LawVisit
<LawVisit.PIDC@akimaip.com>
**Subject:** Re: [EXTERNAL] VTC/VAV meeting with
client

Can you confirm that Mr. ___ is still in
Port Isabel? He is no longer in the detainee
locator system.
Jacqueline M. Brown
Director & Associate Professor
Immigration & Deportation Defense Clinic
University of San Francisco School of Law
2130 Fulton Street | San Francisco, CA 94117

On Mon, May 19, 2025 at 6:43 PM Matt Adams <matt@nwirp.org> wrote:



On Mon, May 19, 2025 at 6:36 PM Jacqueline Brown <jmbrown@usfca.edu> wrote:

Good evening,
Wanted to let you all know that ▮▮▮▮▮▮ received a notice today (which he refused to sign and is attached) that he would be sent to South Sudan. Email was sent to Jonathan Ryan because he had filed his G28 first and visited the whole group in person last week. ▮▮▮▮ was moved this weekend to Port Isabel. I am meeting with him on Wednesday 9am video. Notice came from:

I will respond to the email requesting an RFI, but is there anything else I should be stating at this point?

Thank you-
Jacqueline
Jacqueline M. Brown
Director & Associate Professor
Immigration & Deportation Defense Clinic
University of San Francisco School of Law
2130 Fulton Street | San Francisco, CA 94117
Legal Director, Sonoma Secure Families Collaborative
449 Hudson Street | Healdsburg, CA 95448
direct phs. 415-422-3330 |707-473-8932

--
Northwest Immigrant Rights Project
615 Second Ave., Ste. 400
Seattle, WA 98104
(206) 957-8611
(206) 587-4025 fax

--
Northwest Immigrant Rights Project
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611
(206) 587-4025 fax


--
Northwest Immigrant Rights Project
615 Second Ave., Ste. 400
Seattle, WA  98104
(206) 957-8611
(206) 587-4025 fax

# South Sudan 2023 Human Rights Report

## Executive Summary

There were no changes in the human rights situation in South Sudan during the year.

Significant human rights issues included credible reports of: arbitrary or unlawful killings, including extrajudicial killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment by security forces, opposition forces, armed militias affiliated with the government and the opposition, and ethnically based groups; harsh and life-threatening prison conditions; arbitrary detention; serious problems with the independence of the judiciary; political prisoners or detainees; transnational repression against individuals in other countries; arbitrary or unlawful interference with privacy; serious abuses in a conflict, including unlawful civilian deaths, enforced disappearances or abductions, torture, physical abuses, and conflict-related sexual violence or punishment; unlawful recruitment or use of children in armed conflict by the government and nongovernment armed groups; serious restrictions on freedom of expression and media freedom, including violence against journalists, unjustified arrests or prosecutions of journalists, and censorship; serious restrictions on internet freedom; substantial interference with the freedom of peaceful assembly and freedom of association, including overly restrictive

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.688

laws on the organization, funding, or operation of nongovernmental and civil society organizations; inability of citizens to change their government peacefully through free and fair elections; serious and unreasonable restrictions on political participation; serious government corruption; serious government restrictions on or harassment of domestic and international human rights organizations; extensive gender-based violence, including domestic or intimate partner violence, child, early, and forced marriage, female genital mutilation/cutting, and other forms of gender-based violence; trafficking in persons, including forced labor; laws criminalizing consensual same-sex sexual conduct between adults, although these laws were largely not enforced; crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons; and existence of any of the worst forms of child labor.

The government did not take credible steps to identify and punish officials who may have committed human rights abuses, despite isolated examples of prosecution for human rights abuses.

Nongovernment armed groups, including the forces of peace-agreement signatories and other opposition armed groups alike, perpetrated serious human rights abuses, which, according to the UN Commission on Human Rights in South Sudan, included unlawful killings, abduction, rape, sexual slavery, and forced recruitment of children and adults into combat and noncombat roles.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.689

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were numerous reports that the government or its agents committed arbitrary or unlawful killings, including extrajudicial killings, during the year. Security forces, opposition forces, armed militias affiliated with the government and the opposition, and ethnically based groups were responsible for widespread extrajudicial killings. The security services sometimes investigated alleged abuses by members of their respective forces, although impunity remained endemic and prosecutions were infrequent.

According to a Small Arms Survey report, the governor of Warrap State, Manhiem Bol Malek, was responsible for approximately 20 extrajudicial killings during the year. The report stated that members of the South Sudan People's Defense Forces (SSPDF) extrajudicially killed a man on September 23 for a crime he allegedly committed on September 18.

In January armed youth from the White Army, composed of ethnic Lou Nuer and Bor Dinka groups, assaulted Murle villages in the Greater Pibor Administrative Area (GPAA), resulting in the abduction and deaths of Murle women and children. The assailants reportedly targeted Gumuruk and

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.690

Lekyangole in GPAA in response to intermittent raids that also included abductions at Lou Nuer and Bor Dinka villages by armed Murle youth. The Jonglei State governor reportedly organized the rescue of some women and children, reuniting them with their families. Health facilities, civilian property, and humanitarian warehouses were looted and destroyed. The state and national governments had not arrested any perpetrators of the attacks by year's end.

On February 2, at least 27 persons were killed in Kajo-Keji County, Central Equatoria State, when members of a Bor Dinka clan launched a revenge attack on villages they accused of attacking cattle camps and killing humans and animals. President Kiir condemned the raid and appointed a committee to investigate the incident. The committee had not published its findings, and no one had been held accountable by year's end.

In January the UN Panel of Experts collected testimony of apparent extrajudicial killings in Lakes State, including the killing of a local chief. The UN reported an increase in the number of extrajudicial killings and unlawful detentions in Lakes State under Governor Rin Tueny Mabor, whose strategy encouraged local officials to use lethal force and the death penalty to subdue violence. Some local county commissioners considered this strategy an endorsement of extrajudicial killings.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.691

## b. Disappearance

There were reports of disappearances by or on behalf of government authorities.

Security and opposition forces, armed militias affiliated with the government or the opposition, and ethnically based groups abducted an unknown number of persons, including women and children.

In August the International Committee of the Red Cross reported it tracked more than 5,900 cases of missing persons since the conflict began.

The government did not make efforts to prevent, investigate, and punish disappearances.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

Although prohibited under law, security forces mutilated, tortured, beat, and harassed political opponents, journalists, and human rights activists. Government and opposition forces, armed militia groups affiliated with both, and fighting ethnic groups committed torture and abuses in conflict zones.

According to the UN Security Council Panel of Experts and several independent human rights advocates, the National Security Service (NSS)

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.692

Operations Division maintained at least three facilities where it detained, interrogated, and sometimes tortured civilians. At least one detainee reportedly died due to injuries sustained in NSS detention. Most NSS facilities were not publicly known. According to the panel, there were numerous reported abuses at NSS-run sites, including gender-based violence, beating and torture of detainees, and harassment and intimidation of human rights defenders and humanitarian workers. The Small Arms Survey documented that International Monetary Fund assistance to the transitional government went to pay NSS salaries. Human Rights Watch, the United Nations, and other organizations documented cases of torture and other mistreatment during arrest and while in NSS custody. Detainees described being beaten with sticks, whips, pipes, and wires; subjected to electric shocks; burned with melted plastic; raped; and subjected to other forms of sexual violence.

Impunity within the security services remained a serious problem. Although the NSS created an internal disciplinary tribunal to conduct investigations of alleged abuses by its members, neither the results of such investigations nor any disciplinary actions taken were made public. The UN Commission on Human Rights in South Sudan reported the existence of police special protection units to investigate gender-based violence, operating with financial and logistical support from the United Nations. Some members of the army and police were investigated for misconduct.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.693

## Prison and Detention Center Conditions

Prison conditions were harsh and life threatening.  Overcrowding and inadequate medical care at times resulted in illness and death.  There were reports of abuse by prison guards.

**Abusive Physical Conditions:**  Significant prison problems included gross overcrowding and inadequate access to food, potable water, sanitation, heating, ventilation, lighting, or medical care.  Authorities sometimes kept prisoners confined in cells for long periods without an opportunity for movement, exercise, or use of showers or sanitary facilities.

**Administration:**  The South Sudan National Police Service (SSNPS) allowed prisoners to submit complaints to judicial authorities without censorship and to request investigation of allegations of inhuman conditions.  Prison authorities sometimes investigated such allegations, although they seldom acted on complaints.

**Independent Monitoring:**  The SSNPS and National Prison Service of South Sudan permitted visits to police and prison detention facilities by independent human rights observers.  Authorities sometimes permitted monitors to visit military detention facilities operated by the SSPDF.  International monitors were denied permission to visit facilities operated by the NSS, which held both military prisoners and civilians without legal authority.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.694

# d. Arbitrary Arrest or Detention

The transitional constitution prohibited arbitrary arrest and detention and provided the right of any person to challenge the lawfulness of their arrest or detention in court.  The government did not observe these requirements.

## Arrest Procedures and Treatment of Detainees

While the law required police to present arrested persons before a public prosecutor, magistrate, or court within 24 hours, judges assigned to statutory courts were not always present, and poor coordination with other justice officials contributed to case backlogs.  Court dockets often were overwhelmed, and cases faced long delays before coming before a judge.  Police could detain individuals for 24 hours without charge.  A public prosecutor could authorize an extension of up to one week, and a magistrate could authorize extensions of up to two weeks.  Authorities did not always inform detainees of charges against them and regularly held them past the statutory limit without explanation.  Police sometimes ignored court orders to take arrested persons before the court.  Police, prosecutors, defense lawyers, and judges were often unaware of the statutory requirement that detainees appear before a judge as quickly as possible.  The UN Mission in South Sudan (UNMISS) reported cases taking months or even years to be brought to court.

Police commonly conducted arrests without warrants, and warrants were

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.695

often irregular, handwritten documents.  Warrants were commonly drafted in the absence of investigation or evidence.  There were multiple reports of arrests, including of foreigners, in civil cases where a complainant exerted influence upon police to arrest someone as a negotiation tactic.  The government routinely failed to notify embassies when detaining citizens of other countries, even when the detainee requested a consular visit.

According to Human Rights Watch, the NSS effectively operated outside the law and without proper legal authority.  Detainees were held at sites not designated as detention facilities under the law.  They did not conduct arrests based on warrants or court orders and routinely held detainees for long periods without charge and without access to lawyers or visitors.  Detention periods lasted from hours to years.

The law allowed bail, but this provision was widely unknown or ignored by authorities, and they rarely informed detainees of this possibility.  Because pretrial appearances before judges often were delayed far past statutory limits, authorities rarely had the opportunity to adjudicate bail requests before trial.  Those arrested had a right to an attorney, but the country had few lawyers, and detainees were rarely informed of this right.  The transitional constitution mandated access to legal representation without charge for the indigent, but defendants rarely received legal assistance if they did not pay for it.  Authorities sometimes held detainees incommunicado.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.696

**Arbitrary Arrest:**  Security forces arbitrarily arrested opposition leaders, civil society activists, businesspersons, journalists, and other civilians due to possible affiliation with opposition forces.  Many citizens were arbitrarily arrested for being in the vicinity when crimes occurred, being of a certain ethnicity, or being relatives of suspects.

**Pretrial Detention:**  Lengthy pretrial detention was a problem, due largely to the lack of lawyers and judges; the difficulty of locating witnesses; misunderstanding of constitutional and legal requirements by police, prosecutors, and judges; and the absence of a strong mechanism to compel witness attendance in court.  The length of pretrial detention commonly equaled or exceeded the sentence for the alleged crime.

## e. Denial of Fair Public Trial

The transitional constitution provided for an independent judiciary and recognized customary law.  The government did not generally respect judicial independence and impartiality.  While the law required the government to maintain courts at federal, state, and county levels, lack of infrastructure and trained personnel made this impossible, and few statutory courts existed below the state level.  The formal justice sector remained weak and concentrated in a few urban centers.

In many communities, customary courts remained the principal providers of judicial services, adjudicating most criminal cases other than murder.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.697

Customary courts could deal with certain aspects of murder cases if judges remitted the cases to them. Government courts heard cases of violent crime and acted as appellate courts for verdicts issued by customary bodies. Legal systems employed by customary courts varied, with most emphasizing restorative dispute resolution and some borrowing elements of sharia (Islamic law).

During the year, the United Nations supported a joint special mobile court with South Sudanese professionals to adjudicate serious crimes and mitigate cattle-migration-related violence in Western Bahr el-Ghazal State. The courts included traditional leaders and addressed compensation claims according to local customs. During the year, the United Nations continued to support civilian and military mobile courts, trying rape, robbery, and assault cases, among others, in Upper Nile, Western Bahr el-Ghazal, and Central Equatoria States.

Political pressure, corruption, discrimination toward women, and the lack of a competent investigative police service undermined both statutory and customary courts. Patronage priorities or political allegiances of traditional elders or chiefs commonly influenced verdicts in customary courts.

**Trial Procedures**

The transitional constitution provided for the right to a fair and public trial, but the judiciary generally did not enforce this right.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.698

Despite protections provided under the transitional constitution, law enforcement officers and statutory and customary court authorities commonly presumed suspects' guilt, and suspects faced serious infringements of their rights. Free interpretation was rarely offered, and when it was, it was of low quality. Most detainees were not promptly informed of the charges against them. Prolonged detentions often occurred, and defendants generally did not have adequate access to facilities to prepare a defense. While court dates were set without regard for providing adequate time to prepare a defense, long remands often meant detainees with access to a lawyer had sufficient time to prepare. Magistrates frequently compelled defendants to testify, and the absence of lawyers at many judicial proceedings often left defendants without recourse.

Public trials were the norm both in customary courts, which usually took place outdoors, and in statutory courts. Some high-level court officials opposed media access to courts and asserted media should not comment on pending cases. The right to be present at trial and to confront witnesses was sometimes respected, but in statutory courts, the difficulty of summoning witnesses often precluded exercise of these rights. No government legal aid structure existed.

Defendants did not necessarily have access to counsel or the right of appeal, and discrimination against women was common.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.699

Defendants accused of crimes against the state were usually denied these rights.

## Political Prisoners and Detainees

There were reports of political prisoners and detainees held by authorities from a few hours to several weeks without access to a judge or clearly spelled out charges.  The number of political prisoners was unknown.

# f. Transnational Repression

**Extraterritorial Killing, Kidnapping, Forced Returns, or Other Violence or Threats of Violence:**  There were credible reports of persons killed and kidnapped in other countries, and persons forcibly returned from other countries, for purposes of politically motivated reprisal.  Individuals in other countries continued to receive threats of violence during the year.  Civil society reported South Sudanese intelligence officials were active in neighboring countries and harassed critics there.

On February 4, Morris Mabior Awikjok, a South Sudanese human rights defender and government critic, reportedly was forcibly returned from his home in Nairobi, Kenya.  According to reporting by Amnesty International and Human Rights Watch, as well as a letter written by the UN special rapporteur on human rights defenders and other UN experts, five armed persons wearing Kenyan police uniforms and a plain-clothed South

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.700

Sudanese man forcibly entered Awikjok's home, took laptops and phones, and took him away without disclosing his next location.  He was allegedly being held without charges at an NSS detention center.

**Threats, Harassment, Surveillance, and Coercion:**  There were credible reports the government continued to target specific individuals for politically motivated reprisal outside the country, including in Kenya and Uganda.  The UN Commission on Human Rights in South Sudan reported on the "ongoing pervasiveness of extra-territorial operations by State security forces," targeting journalists, civil society members and advocates, and their family members, as well as other critics and opponents of the government.

## g. Property Seizure and Restitution

The government rarely provided proportionate and timely restitution for the government's confiscation of property.  Human rights organizations documented instances of government forces systematically looting abandoned property in conflict areas where the population was perceived to be antigovernment.

## h. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The transitional constitution prohibited interference with private life, family, home, and correspondence, but the law did not provide for the right to

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.701

privacy. Authorities, however, reportedly disregarded these prohibitions. To induce suspects to surrender, officials at times held family members in detention centers. The law gave the NSS sweeping powers outside the constitutional mandate of arrest, detention, surveillance, search, and seizure. The NSS utilized surveillance tools, at times requiring telecommunications companies to hand over user data that could be used to tap telephone numbers or make arrests. The UN Panel of Experts recommended to the Security Council in April that, "In the context of threats to journalists and civil society actors, including growing cyberthreats, the Security Council consider adding the supply of digital surveillance tools and other offensive cybertools, including training in their use, to the scope of the arms embargo"; the Security Council rejected the recommendation. The NSS monitored social media posts. Widespread surveillance led many human rights defenders to avoid discussing sensitive topics over the telephone. The NSS carried out physical surveillance and embedded agents in organizations and media houses and at events. Some individuals were subject to physical and telephonic surveillance prior to arrest and detention without warrants, with such surveillance continuing after detainees were released.

## i. Conflict-related Abuses

According to the United Nations and international NGOs, security forces, opposition forces, armed militias affiliated with the government and the

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.702

opposition, and nongovernmental armed groups, including signatories and nonsignatories to the peace agreement, were responsible for a significant range of conflict-related abuses. Government and opposition forces harassed civilians and looted and destroyed property during military operations against the National Salvation Front.

**Killings:** Government forces and armed militias affiliated with the government, frequently prompted by opposition ambushes of government soldiers, engaged in a pattern of collective punishment of civilians perceived to be opposition supporters, often based on ethnicity.

UN agencies and international NGOs that interviewed victims reported widespread killings, mutilations, and sexual violence committed by government forces, rebel groups, and irregular militias.

Remnants of war led to the killing and maiming of civilians. Military items such as grenades were often left behind in schools used by government and opposition forces and by armed actors affiliated with both.

In December a UN investigation found fighting between armed groups that split from the Sudan People's Liberation Army-In-Opposition (SPLA-IO) in the Greater Upper Nile region between August and December 2022 – mainly the Kitgwang faction and Agwelek forces – led to at least 884 civilian casualties, of which 594 were killed, 290 injured, 258 abducted, and 75 women and girls subjected to sexual violence, engendering a humanitarian crisis that

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.703

displaced more than 62,000 civilians and led to significant destruction of civilian property.

**Abductions:** The United Nations and international NGOs reported multiple accounts of government soldiers or other security service members arbitrarily detaining or arresting civilians, sometimes leading to unlawful killings.

SSPDF Major General James Nando was responsible for at least 64 instances of rape and sexual slavery against civilians between June and September 2021, and he directly or through his subordinates oversaw the abduction of at least 505 women and 63 girls during attacks. Forces under Western Equatoria Governor Alfred Futuyo, affiliated with the Sudan People's Liberation Movement-in-Opposition (SPLM-IO), carried out numerous attacks in Western Equatoria that resulted in the abduction of 887 civilians, of which at least 43 were raped or gang-raped.

Between February and April 2022, government-aligned forces and allied militias under the command of Koch County Commissioner Gordon Koang Biel and Mayendit County Commissioner Gatluak Nyang Hoth used sexual slavery, including rape and gang rape, of abducted women and girls as an incentive and reward for combatants, actions often accompanied by other human rights violations perpetrated against women and girls during armed attacks in Leer County of Unity State. Unity State Governor Joseph Mantiel Wajang appointed Biel and Hoth as county commissioners and was aware of

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.704

the attacks but did not prevent, discourage, or institute any form of sanction against Biel and Hoth for their role in crimes committed.

**Physical Abuse, Punishment, and Torture:**  Government forces, opposition forces, other armed groups and armed militias affiliated with the government and the opposition tortured, raped, and otherwise abused civilians in conflict areas.  Gender-based violence, including rape, gang rape, sexual slavery, and forced marriage, was a common tactic of conflict employed by all parties.  A lack of accountability continued for five officials responsible for systemic rape of women and girls during attacks in Leer County.

**Child Soldiers:**  There were reports government and nongovernment forces continued to recruit forcibly and use child soldiers, although reports of government recruitment dropped considerably from prior years.  Since 2013 the United Nations had verified more than 13,000 serious violations that included 6,300 cases of recruitment and use of children.  During the same period, more than 3,700 children associated with armed forces and armed groups were released.

The 2018 peace agreement mandated specialized international agencies work with all warring parties to demobilize and reintegrate child soldiers from the SSPDF, the SPLA-IO, elements of the South Sudan Opposition Alliance, the Nuer White Army, and other groups, usually those involved in community defense.  There were reports of child soldier recruitment

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.705

associated with intercommunal and intertribal violence carried out by splinter groups and smaller factions of larger, well-established groups.

The Secretary of State determined South Sudan had governmental armed forces, police, or other security forces that recruited or used child soldiers from April 2022 to March 2023.  See the Department of State's annual *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

**Other Conflict-related Abuse:**  According to media reports, SSPDF and allied armed youth militias attacked a SPLA-IO outpost in Leer county (Unity State) in November, resulting in the alleged displacement of more than 100,000 civilians.  The late November clashes followed an outbreak of fighting in October between rival factions of the SPLA-IO (Kitgwang) and Agwelek militia, reportedly supported by SSPDF, in Tonga, Panyikang County in Upper Nile State.

There were also human rights abuses reported in the Abyei Administrative Area, a region that Sudan and South Sudan both claimed.  These abuses generally stemmed from intercommunal clashes between the Ngok Dinka and Misseriya Indigenous groups regarding cattle and land.  In December, the United Nations issued a statement of grave concern over retaliatory violence between Twic Dinka and Ngok Dinka groups that claimed 75 lives in southern Abyei and in Warrap State in November, and 10 lives in Abyei in early December, and which reportedly involved SSPDF elements.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.706

Throughout the year, the environment for humanitarian operations remained difficult and dangerous. Armed actors, including government, opposition forces, and other armed groups, continued to restrict the ability of the United Nations, other international organizations, and NGOs to deliver humanitarian assistance safely and effectively to populations in need. Access was impeded by direct denials, bureaucratic barriers, occupation of humanitarian spaces including education centers, and renewed fighting in areas of the country where humanitarian needs were highest. Despite repeated safety assurances, armed elements harassed and killed relief workers, looted, and destroyed humanitarian assets and facilities, and government and rebel authorities imposed bureaucratic and economic impediments on relief organizations. Government and SPLA-IO forces continued to occupy civilian structures.

On multiple occasions, fighting between government and opposition forces and other violence put the safety and security of humanitarian workers at risk, prevented travel, forced the evacuation of relief workers, and jeopardized humanitarian operations, including forcing organizations to suspend lifesaving operations entirely in areas of active conflict. Delayed flight safety assurances, insecurity, and movement restrictions often prevented relief workers from traveling to conflict and nonconflict areas. Humanitarian personnel, independently or through the UN Office for the Coordination of Humanitarian Affairs Access Working Group, negotiated with government and SPLA-IO forces as well as other armed groups to

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.707

address access problems; however, these negotiations were often protracted and caused significant delays in the delivery of assistance.

The humanitarian operating environment remained volatile despite improvements in some areas of the country, and the country remained very dangerous for aid workers. The most common forms of violence against humanitarian workers included robbery and looting, harassment, armed attacks, commandeering of vehicles, and physical detention. On multiple occasions, insecurity prevented travel and jeopardized relief operations. In almost all cases, investigations were limited, and perpetrators were not held accountable. A Small Arms Survey report highlighted, "In 2023, 120 metric tons of food aid were taken in only three incidents (though around 30 metric tons were recovered by the government). These attacks often use dozens of motorbikes and rapidly remove the looted items from the area of the attack." The same report emphasized that, "At every opportunity the government attempts to divert funds into its patrimonial system." On September 23, two trucks contracted by UNICEF were attacked while returning to Juba after delivering aid supplies for children and their families in need in Yei, Central Equatoria State. Two contracted drivers were killed and another injured. Both empty trucks were burned and destroyed. A total of 143 humanitarian workers were killed since 2013.

The United Nations reported, "South Sudan continues to be the deadliest place for aid workers, with in total 24 aid workers killed since the beginning

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.708

of 2023."

Restrictions on humanitarian operations took other forms as well. Authorities operating at Juba International Airport arbitrarily denied humanitarian workers permission to travel for a constantly changing variety of reasons, including for lack of work permits, permission from the Ministry of Foreign Affairs, travel approval from the South Sudan Relief and Rehabilitation Commission, or failure to have at least six blank pages in their passports. Staff at Juba International Airport harassed and solicited bribes from humanitarian workers. Interference in recruitment and hiring by local labor officials was reported by international NGOs. Security forces and irregular armed groups routinely solicited payments from aid workers for safe passage on land and river routes using official and unofficial checkpoints. These restrictions were implemented inconsistently, without notice or consultation, prompting confusion regarding the required travel procedures.

Humanitarian organizations experienced delays, some up to six months or longer, and denials of tax exemptions, and were forced to purchase relief supplies on the local market, raising quality concerns. Government authorities required international NGO staff members to pay income taxes and threatened national staff members into paying income tax at the state level.

Continuing conflict and denial of access to humanitarian actors contributed

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.709

to households facing acute food insecurity. It was difficult to accurately gather information and assess some conflict-affected areas due to insecurity and lack of access.

The UN Conduct and Discipline portal listed four instances of sexual exploitation and abuse by UNMISS personnel as of September. Of the four cases, two investigations were underway while two were being substantiated. From 2021 to 2022, UNMISS investigated six allegations of sexual exploitation and abuse, determining one allegation to be substantiated, two as unsubstantiated; three cases were in progress.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The transitional constitution provided for freedom of expression, including for members of the press and other media. The government and its agents, however, frequently violated these rights in the name of national security. In a report published during the year, a UN Commission found the transitional government "treats journalists and civil society members who voice critique as enemies of the ruling political party, reflecting its extreme intolerance of all forms of public scrutiny and critical views."

**Freedom of Expression:** The government regularly attempted to impede

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.710

criticism by monitoring, intimidating, harassing, arresting, or detaining members of civil society who criticized the government.

**Violence and Harassment:** Security forces routinely intimidated or detained journalists whose reporting they perceived was unfavorable to the military or government. Security forces confiscated or damaged journalists' equipment and restricted their movements. During the year, security forces threatened with death, interrogated, harassed, detained, and imprisoned journalists, forcing some to go into hiding. NSS representatives frequently harassed journalists by detaining them at NSS headquarters or local police stations without formal charges. Journalists and media agencies that reported on news of the opposition could expect questioning, arrest, and possible closures. Journalists in Juba frequently experienced threats and intimidation and routinely practiced self-censorship. On several occasions, high-level officials used intimidating language directed toward media outlets and representatives.

On January 3-4, six journalists employed by state-owned South Sudan Broadcasting Corporation Television were detained for allegedly circulating video of President Kiir apparently urinating on himself. The journalists spent up to 3.5 months in detention without charges and were later released. According to the UN Commission on Human Rights in South Sudan, Garang John, the last journalist to be released, appeared to have been subjected to mistreatment and possibly torture. There were reports that he later fled the

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.711

country.

In May political reporter Woja Emmanuel announced he had left journalism. In 2022 the NSS had abducted him at gunpoint and interrogated him, and reportedly threatened him with death.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:** The government maintained strict control of media, both print and electronic. The government suppressed dissenting voices, forcing some journalists to flee the country. Government officials or individuals close to the government regularly interfered in the publication of articles and broadcasting of programs, and high-level government officials stated press freedom should not extend to criticism of the government or soliciting views of opposition leaders. Nonetheless, some print and radio media regularly reported on international and domestic criticism of the transitional government.

Although approval was not required under the Media Authority Act, the Media Authority instituted a requirement for organizers to obtain a letter of clearance prior to any media-related event, including press conferences. The accepted practice was for organizers to obtain a letter of clearance and NSS stamp prior to a media event. Journalists were also required to obtain prior approval from the Media Authority to cover events hosted by the government. It was common practice that only journalists who had registered with the Media Authority would be granted access to

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.712

government-hosted media events. The Media Authority mandated accreditation for freelance journalists, requiring the provision of a work identification card, educational certifications, a curriculum vitae, and recommendation letters from an employer or professional organization.

Most organizations practiced self-censorship to ensure their safety. Authorities directly reprimanded publishers and removed articles deemed critical of the government. The minister of information divulged to media that the government regularly censored articles it deemed harmful to security in order to protect journalists from costly legal action. Many print media outlets reported NSS officers forced the removal of articles at the printing company where all newspapers were printed, often inserting a government announcement, advertisement, or recycled or international news where the article was originally meant to appear.

The Media Authority continued to advise international journalists not to describe clashes in the country in tribal terms and deemed such references as "hate speech." The NSS regularly harassed, intimidated, and summoned journalists for questioning. The environment for media workers remained precarious throughout the year.

## Internet Freedom

The government's South Sudan National Communication Authority at times blocked access to certain websites, such as two popular news websites,

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.713

*Radio Tamazuj* and *Sudans Post*, as well as social media personalities and other online news generators. There were credible reports the government monitored private online communications without appropriate legal authority. The government also targeted and intimidated individuals, especially those outside of Juba, who were critical of the government in open online forums and social media.

## b. Freedom of Peaceful Assembly and Association

The government increasingly restricted freedom of peaceful assembly and restricted freedom of association.

### Freedom of Peaceful Assembly

The transitional constitution provided for freedom of peaceful assembly, but the government in many cases did not respect this right. Many citizens did not gather for planned demonstrations due to fear of targeted violence. Security officials lacked nonviolent crowd control capabilities and at times fired live ammunition into the air to disperse crowds.

### Freedom of Association

The transitional constitution provided for freedom of association, but the government did not respect this right for those suspected of associating with or having sympathies for opposition figures. Some civil society leaders interpreted a 2012 law as an attempt to suppress opposition to the SPLM.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.714

The NSS and other security actors widely enforced a 2016 law strictly regulating the activity and operations of civil society. The law focused particularly on NGOs working in the governance, anticorruption, and human rights fields. The law imposed a range of legal barriers, including limitations on the types of activities in which organizations could engage, onerous registration requirements, and heavy fines for noncompliance. Human rights groups and civil society representatives reported NSS officials continued intimidation, surveillance, and threats against civil society organizations. Civil society organizations reported extensive NSS scrutiny of proposed public events; the NSS reviewed every proposed event and sometimes denied permission, rejected proposed speakers, or disrupted events.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

The transitional constitution provided for freedom of internal movement, foreign travel, and repatriation. The transitional constitution did not address emigration.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.715

**In-country Movement:** There were sporadic reports of county commissioners from one party being detained by persons from another political party despite the lack of provision in law for this. Despite multiple pledges from the government to dismantle checkpoints, they remained a common problem. Security forces manning these checkpoints routinely used them as opportunities to charge illegal fees.

Internally displaced persons (IDPs) remained in IDP camps and the remaining UNMISS POC site in Malakal due to Shilluk-Nuer ethnic tensions and related fear of retaliatory or ethnically targeted violence by government- and opposition-affiliated armed groups. Subnational violence and persistent flooding pushed many of the camps beyond capacity. The government often obstructed travel of members of humanitarian organizations seeking to provide protection and assistance to IDPs and refugees. Continuing conflict between government and opposition forces and subnational violence restricted the movement of UN personnel and the delivery of humanitarian aid.

**Foreign Travel:** Individuals, due to arbitrary restrictions, were sometimes prevented from leaving the country. On April 19, officials confiscated the passport of People's Coalition for Civic Action member Kuel Aguer Kuel as he sought to leave the country.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.716

# e. Protection of Refugees

The government cooperated with the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to refugees, returning refugees, and asylum seekers, as well as other persons of concern.  Overall, coordination with the government continued across all sectors, including with the Ministry of Interior, Ministry of Education, Ministry of Health, Ministry of Humanitarian Affairs and Disaster Management, and Relief and Rehabilitation Commission.  According to UNHCR, there were more than 330,000 registered refugees and asylum-seekers in the country as of September, most of whom were from neighboring Sudan.

**Access to Asylum:**  The law provided for protection of refugees as well as the granting of asylum and refugee status.  The government allowed individuals to access asylum processes, allowed refugees from neighboring countries to settle, and generally did not treat refugees differently from other foreigners.  While most refugees in the country were from Sudan, the government also granted asylum to refugees from Ethiopia, the Democratic Republic of the Congo, Eritrea, the Central African Republic, Burundi, and Somalia.  Credible reports indicated the transitional government charged as much as $1,420 in May to non-South Sudanese citizens at the Sudanese border who sought to enter the country after fleeing violence in Sudan.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.717

**Abuse of Refugees and Asylum Seekers:** While UNHCR could not confirm recruitment by armed groups in refugee camps, UNHCR remained concerned regarding the civilian character of certain elements in camps, particularly those close to the Sudanese border.

On June 7, clashes broke out between members of the Nuer and Chollo tribes at the UN Protection of Civilians (POC) site in Malakal, Upper Nile State, resulting in the deaths of at least 27 persons.

**Access to Basic Services:** While refugees sometimes lacked basic services, this generally reflected a lack of capacity in the country to manage refugee issues and lack of sufficient funding rather than government practices of discrimination against refugees. Refugee children had access to elementary education in refugee camps through programs managed by international NGOs and the United Nations. Some schools were shared with children from the host community. In principle, refugees had access to judiciary services, although a lack of infrastructure and staff meant these resources were often unavailable.

Due to continuing conflict and scarcity of resources, tension existed between refugees and host communities in some areas regarding access to resources.

**Durable Solutions:** According to UNHCR, between 2018 and 2022, more than 600,000 South Sudanese had returned to the country since the signing

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.718

of the revitalized peace agreement.  Following the beginning of the Sudan conflict in April, UNHCR reported the country hosted an aggregate total of more than 1.2 million newly arrived refugees, asylum seekers, and returnees as of August.  Of the 1.2 million, UNHCR counted more than 365,000 total new arrivals who had crossed the border from Sudan since the outset of the conflict.  Of these, UNHCR reported that 314,000 were refugee returnees, i.e., South Sudanese who had been residing in Sudan.  The government accepted refugees and returnees for reintegration.  No national procedures were in place to facilitate the provision of identity documents for returnees or the naturalization of refugees beyond procedures that were in place for all citizens and other applicants.

## f. Status and Treatment of Internally Displaced Persons (IDPs)

Significant levels of subnational violence continued, particularly in Upper Nile, Unity, and Warrap States, and the Greater Equatoria region.  The result was sustained mass population displacement, both within the country and into neighboring countries, and high levels of humanitarian and protection needs, which strained the ability of UN and international humanitarian personnel to provide protection and assistance.  According to UNHCR, there were more than 1.6 million IDPs spread across all 10 states.  The increased violence, historic flooding, and food insecurity forced relief actors to delay plans for the safe return and relocation of some IDP populations.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.719

UNMISS continued to provide physical protection to IDPs in the POC site in Malakal.

According to the UNMISS Human Rights Division and other organizations, violence and simmering ethnic conflict in areas such as Upper Nile, Jonglei, and Warrap States continued to result in dire humanitarian consequences, including significant displacement and serious and systematic human rights abuses, such as the killing of civilians, torture, arbitrary arrests, detentions, looting and destruction of civilian property, forced recruitment, and gender-based violence.

The government promoted the return and resettlement of IDPs but did not provide a safe environment for returns and often denied humanitarian NGOs or international organizations access to IDPs.

## g. Stateless Persons

Citizenship was derived through the right of blood (jus sanguinis) if a person had a South Sudanese parent, grandparent, or great-grandparent on either parent's side, or if a person was a member of one of the country's indigenous ethnic communities. Individuals also could derive citizenship through naturalization. Birth in the country was not sufficient to claim citizenship. While the country had a Nationality Act in place since independence, fewer than 10 percent of South Sudanese were believed to have obtained national identity documents. There were no official statistics

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.720

or estimates on statelessness; however, a UNCHR survey estimated half a million persons were at risk of statelessness. The Nationality Act did not include specific provisions for stateless persons, children whose parents were without nationality, or children born in the country who otherwise would be stateless.

According to a 2018 report from the National Dialogue, a government-sponsored initiative, it was more difficult for those from the southern region of Equatoria to rightfully claim citizenship due to discrimination from other ethnicities, which suspected them of being Ugandans or Congolese. According to UNHCR, certain nomadic pastoralist groups had difficulty accessing application procedures for nationality certification and experienced discrimination according to ethnic group or appearance that required UNHCR's intervention to address matters with the Directorate of Nationality, Passports, and Immigration.

# Section 3. Freedom to Participate in the Political Process

The transitional constitution provided that every citizen had the right to participate in elections in accordance with the constitution and the law. Since the 2011 referendum on South Sudanese self-determination, no elections had been held. Elected officials were arbitrarily removed and others appointed to take their places.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.721

# Elections and Political Participation

**Recent Elections:** Due a lack of political will to address intense violence and insecurity starting in 2013, the government postponed elections several times. Since independence, the president fired and appointed local government officials and parliamentarians by decree. In 2015 and again in 2018, the legislature passed amendments to the transitional constitution extending the terms of the president, national legislature, and state assemblies for three years. The peace agreement signed in 2018 allowed for the extension of all terms for a three-year transitional period from February 2020 until February 2023, with elections slated for December 2022. In 2022, however, the government proposed an extension of the 2018 peace agreement by 24 months to February 2025. Members of the Reconstituted Joint Monitoring and Evaluation Commission voted to approve the government's proposed extension, effectively postponing elections until December 2024. As of the end of the year, UNMISS reported to the UN Security Council that "conditions for holding free, fair and credible elections are not yet in place." A separate report submitted by UNMISS to the Security Council in October described continuing delays to the implementation of the peace agreement as, "principally rooted in the lack of political will, especially among the conventional parties to the Revitalized Agreement."

**Political Parties and Political Participation:** The SPLM enjoyed a near

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.722

monopoly of power in the government and continued to be the most broadly recognized political entity since the signing of the Comprehensive Peace Agreement in 2005. SPLM membership conferred political and financial advantages, and there was great reluctance by opposition parties to shed the SPLM name. For example, the main opposition party was referred to as the SPLM-IO, and most other political parties either were offshoots of the SPLM or affiliated with it. Members of the reconstituted parliament were appointed by presidential decree, and the parliament opened in 2021. Parliament continued to meet regularly and discuss legislation.

Opposition parties complained the government periodically harassed party members. An unfavorable environment for media and citizen expression hampered participation in political processes.

**Participation of Women and Members of Marginalized or Vulnerable Groups:** Women remained poorly represented in the judiciary, local governments, and among traditional leaders. Representation was particularly poor at the local level, where there was little to no implementation of the 2018 peace agreement provision mandating 35 percent of political leadership positions be reserved for women. The system also devolved substantial candidate selection power to political party leaders, very few of whom were women. The government also failed to meet the 35 percent women quota in appointing members to the National

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.723

Election Commission.

An entrenched culture of discrimination presented a major obstacle to women's political participation. Women tended to be discouraged from assuming leadership positions because of the belief that such activities conflicted with their domestic duties. Basic safety and security concerns, including high rates of gender-based violence, also limited women's ability to participate in government.

Several ethnic groups remained underrepresented or unrepresented in government. Intercommunal and political violence exacerbated ethnic tensions and the imbalance in national- and state-level political institutions.

The absence of translations of the constitution in Arabic or local languages limited the ability of minority populations to engage meaningfully in political dialogue.

# Section 4. Corruption in Government

The transitional constitution provided for criminal penalties for acts of corruption by officials, but the government did not implement the law. There were numerous reports of government corruption. Poor recordkeeping, lax accounting procedures, absence of adherence to procurement laws, and a lack of accountability and corrective legislation compounded the problem.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.724

**Corruption:** Corruption was endemic in all branches of government. The UN Panel of Experts and independent analysis by, among others, Small Arms Survey, reported government security forces, including the National Security Service, maintained control of public and natural resources to generate off-budget sources of revenue. The UN Panel of Experts further noted pervasive corruption in the country's critical petroleum industry, findings supported by a detailed study by The Sentry, an investigative NGO. According to a report by Small Arms Survey, "at every opportunity the government attempts to divert funds into its patrimonial system."

In October independent audits revealed fraud in the construction of the Juba-Rumbek Road connecting the capital city Juba and Bahr El Ghazal region. Reports found the construction of the highway, which began in 2019 and was financed by allocating 10,000 barrels of crude oil per day for infrastructure development to China Exim Bank, was only 16 percent complete as of February.

For additional information about corruption in the country, please see the Department of State's *Investment Climate Statement* for the country, and the Department of State's *International Narcotics Control Strategy Report*, which includes information on financial crimes.

# Section 5. Governmental Posture Towards International and Nongovernmental Monitoring and

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.725

# Investigation of Alleged Abuses of Human Rights

A variety of domestic and international human rights groups monitored and investigated human rights conditions and cases and published their findings, often while facing considerable government resistance.  Government officials were rarely cooperative and responsive to the views of these groups and were often actively hostile.  Reports outlining atrocities exacerbated tensions between the government and international organizations and NGOs.  Government and opposition forces often blamed each other or pointed toward militia groups or "criminal" actors.

**The United Nations or Other International Bodies:**  The government sometimes cooperated with representatives of the United Nations and other international organizations.  A planned visit by UN Special Rapporteur on the Human Rights of Internally Displaced Persons Paula Gaviria was abruptly canceled in October in protest of the release of a UN report detailing systematic repression of civil society and independent media.  A lack of security guarantees from the government and opposition on many occasions, as well as frequent government violations of the status of forces agreement, including the restriction of movement of UNMISS personnel, constrained UNMISS's ability to carry out its mandate, which included human rights monitoring and investigations.  Security forces generally regarded international organizations with suspicion.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.726

UNMISS and its staff faced harassment and intimidation by the government, threats against UNMISS premises and POC sites, unlawful arrest and detention, abduction, and restrictions on the importation of goods and equipment. The SSPDF regularly prevented UNMISS from accessing areas of suspected human rights abuses in violation of the status of forces agreement that allowed UNMISS access to the entire country. The government did not formally inform UNMISS regarding arrest and detention incidents as required under the agreement.

There were credible reports the government harassed and intimidated civil society members cooperating with UN bodies, as well as those who sought to lobby foreign missions to pressure the government to respect civil liberties.

**Government Human Rights Bodies:** The president appointed members of the South Sudan Human Rights Commission, whose mandate included education, research, monitoring, and investigation of human rights abuses, either on its own initiative or upon request by victims. International organizations and civil society organizations considered the commission's operations to be generally independent of government influence. The commission cooperated with international human rights advocates and submitted reports and recommendations to the government.

While observers generally regarded the commission to have committed and competent leadership, severe resource constraints prevented it from

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.727

effectively fulfilling its human rights protection mandate.  Salaries and office management accounted for the bulk of its funding, leaving little for monitoring or investigation.  The commission had not produced any substantive reporting since 2015.

The National Committee for the Prevention and Punishment of Genocide remained largely inactive.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:**  Conviction of rape was punishable by up to 14 years' imprisonment and a fine.  The government did not effectively enforce the law, and rape and other forms of sexual violence were widespread.  The law defined forced or nonconsensual sexual intercourse within marriage as "not rape."  No information was available on the number of persons prosecuted, convicted, or punished for rape, and convictions of rape seldom were publicized.  According to observers, sentences for persons convicted of rape were often less than the maximum.  Women and girls also faced the threat of rape while living in UN POC sites and IDP camps.

Although few statistics were available, the UN Commission on Human Rights [in South Sudan] reported in March 2022 that conflict-related sexual violence against women and girls was widespread and systematic

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.728

throughout the country, with one recent study finding that 65 percent of women and girls in conflict areas had experienced some form of gender-based violence.

The law did not prohibit domestic violence. Intimate partner violence against women, including spousal abuse, was common, although there were no reliable statistics on its prevalence. According to NGOs, some women reported police tried to charge them when they attempted to file criminal complaints of rape or abuse. While not mandatory, police often told women they needed to complete an official report prior to receiving medical treatment. Families of rape survivors encouraged marriage to the rapist to avoid public shaming.

In April a father, who served as a police officer, gouged the eyes of his daughter, age 17, when she married a man without his consent. Police arrested the accused, charging him for violating provisions of laws that criminalized gender-based violence and protected the rights of children. In August the defense counsel argued that Western-based laws undercut customary law and practice, violating the defendant's rights. The court denied the defense motion to transfer the case to a customary court.

**Female Genital Mutilation/Cutting (FGM/C):** FGM/C was a criminal offense under the law, but few data existed to determine its prevalence, and enforcement was largely nonexistent. The law prohibited subjecting children to negative and harmful practices that affected their health,

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.729

welfare, and dignity. UNICEF estimated the prevalence of FGM/C at 1 percent among girls and women between the ages of 15 and 49. FGM/C was practiced in both Christian and Muslim communities in the northern regions of the country, including Bahr el-Ghazal and Upper Nile. Several NGOs worked to end FGM/C, and the Ministry of Gender, Children, and Social Welfare raised awareness of the dangers of FGM/C through local radio broadcasts.

**Other Forms of Gender-based Violence or Harassment:** Instances of girl compensation – compensating the family of a crime victim with a girl from the perpetrator's family – occurred. Survivors were generally between ages 11 and 15, did not attend school, and often were physically and sexually abused and used as servants by their captors. Local officials complained the absence of security and rule of law in many areas impeded efforts to curb the practice. Harmful dowry practices were also common. NGOs reported fathers often forced daughters, generally minors, to marry older men in exchange for cattle or money.

Conviction of sexual harassment was punishable by up to three years' imprisonment and a fine. The government rarely enforced the law, and NGOs reported most women were unaware it was a punishable offense or feared retribution for reporting it, since women were often blamed for its occurrence. Observers noted sexual harassment, particularly by military and police, was a serious problem throughout the country.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.730

**Discrimination:** While the transitional constitution provided for gender equality and equal rights for women, including in labor markets and property inheritance, deep cultural prejudices resulted in widespread discrimination against women. High illiteracy rates also impeded women's ability to understand and defend their rights. Communities often followed customary laws and traditional practices that discriminated against women. For example, authorities arrested and detained women for adultery.

Despite statutory law to the contrary, under customary law a divorce was not final until the wife and her family returned the full dowry to the husband's family. As a result, families often dissuaded women from divorce. One NGO reported that husbands' families occasionally accused married women of adultery to recoup the dowry in times of hardship or due to interpersonal conflict. Traditional courts usually ruled in favor of the husband's family in most cases of child custody unless children were between ages three and seven.

Women also experienced discrimination in employment, pay, credit, education, inheritance, housing, and ownership and management of businesses or land. Although women had the right to own property and land under the transitional constitution, community elders often sought to prevent women from exercising these rights because they contravened customary practice.

**Reproductive Rights:** There were no reports of coerced abortion or

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.731

involuntary sterilization on the part of government authorities.

Cultural practices and economic barriers limited reproductive choices. Men who paid dowries often believed they had the right to make reproductive health decisions for their wives and daughters. High illiteracy rates among women limited their access to accurate information concerning the right to control their fertility. Many individuals did not have access to accurate information, modern contraceptive methods, or family planning services. For persons younger than age 18, permission from family was not required to access nonsurgical reproductive health services, including for contraception. Cultural practices and social stigma, however, often prevented minors from exercising their rights. Women needed to obtain their husbands' consent to access sexual and reproductive health services, such as antenatal care, facility delivery, and family planning, while also facing the threat of domestic violence for seeking medical care without the consent of their husbands.

An acute shortage of skilled professionals and nonpayment of staff salaries were the biggest deficiencies in the provision of quality health care. The country faced severe shortages in all categories of trained health professionals. Maternal health services were often provided by less-skilled health workers. On average, there was only one health facility per 10,000 inhabitants, and an estimated 72 percent of the population lived more than three miles from the closest clinic. Many of these facilities were not capable

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.732

of providing specialized care, and there were not enough qualified doctors, nurses, or midwives to treat survivors of sexual violence.

The maternal mortality rate was estimated to be between 789 and 1,150 deaths per 100,000 live births. The high maternal mortality rate was largely due to limited and low-quality medical care, as well as an extremely low rate of skilled birth attendants. More than 80 percent of women delivered at home, assisted by untrained attendants. The lack of access to skilled medical care during pregnancy and childbirth also resulted in maternal death and disability from treatable conditions such as infection, hemorrhage, and obstructed birth.

## Systemic Racial or Ethnic Violence and Discrimination

Inter- and intra-ethnic fighting and violence by government, opposition forces, and armed militias affiliated with the government and the opposition targeting specific ethnic groups resulted in human rights. The country had at least 64 ethnic groups and a long history of interethnic conflict. Ethnic groups were broadly categorized into the Nilotic (Dinka, Nuer, and Shilluk ethnic groups), Nilo-Hamitic, and Southwestern Sudanic groups. For all ethnic groups, cattle represented wealth and status. Competition for resources to maintain large cattle herds often resulted in violent clashes. Violence at the subnational level was often driven by political leaders and other actors in the capital.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.733

Discrimination in employment based on ethnic groups was widespread.

Inter- and intra-ethnic clashes occurred throughout the year.  Movements of Bor Dinka pastoralists from Jonglei State caused widespread dislocation and intercommunal clashes in Central and Western Equatoria States.  There were numerous, corroborated reports of killings, abductions, cattle theft, cattle poisoning, and destruction of fixed and moveable property across communal lines.  As a result of the inflow of refugees and returnee South Sudanese following the start of hostilities in Sudan in April, humanitarian workers reported heightened tensions within resettlement camps and reported self-segregation along ethnic lines.

## Children

**Birth Registration:**  Citizenship was derived through birth if a person had any South Sudanese parent, grandparent, or great-grandparent on either the mother's or the father's side, or if a person was a member of one of the country's Indigenous ethnic communities.  Individuals could also derive citizenship through naturalization.  Birth in the country was not sufficient to claim citizenship.  The government did not register all births immediately.

**Education:**  Girls often did not have equal access to education.  Many girls did not attend school or dropped out of school due to early and forced child marriage, domestic duties, and fear of gender-based violence at school.

**Child Abuse:**  The law prohibited child abuse.  Child abuse, including sexual

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.734

abuse, was reportedly widespread.  Child rape occurred frequently in the context of child, early, and forced marriage, and armed groups also perpetrated it.  Authorities seldom prosecuted child rape due to fear among survivors and their families of stigmatization and retaliation.  Child abduction also was a problem.  Rural communities often abducted women and children during cattle raids.

**Child, Early, and Forced Marriage:**  The law provided that every child had the right to protection from early marriage but did not explicitly prohibit marriage before age 18.  The government did not enforce the law effectively.  Child marriage remained common.  According to the Ministry of Gender, Children, and Social Welfare, nearly half of all girls and young women between ages 15 and 19 were married, and some brides were as young as 12.  According to UNICEF, 9 percent of girls were married by age 15 and 52 percent by age 18.  NGOs reported fathers often forced daughters, generally minors, to marry older men in exchange for cattle or money.  Early marriage sometimes reflected efforts by men to avoid rape charges, which a married woman could not file against her husband.  In other cases, families of rape survivors encouraged marriage to the rapist to avoid public shaming.  Many abducted girls were often repeatedly subjected to rape or sexual slavery, or they were forced into marriage.

**Sexual Exploitation of Children:**  The law designated 18 as the minimum age for consensual sex, although commercial sexual exploitation of children

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.735

occurred. The law criminalized buying or selling a child for the purpose of prostitution and prescribed a punishment of up to 14 years' imprisonment and a fine. The law also criminalized the procurement of a child for commercial sexual exploitation and the facilitation of commercial sexual exploitation of a child by the child's parent or guardian and prescribed penalties of up to 10 years' imprisonment and a fine. The government (enforced/did not enforce) the law effectively. Child sex trafficking was prevalent throughout the country, especially of young girls, who were bartered for cattle and other goods in some communities.

## Antisemitism

There were no official figures regarding the number of Jewish persons in the country. There were no reports of antisemitic incidents.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:** The law criminalized consensual same-sex sexual conduct.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.736

Case: 25-1309  Case 1:25-cv-10676-BEM  Document 128-2  Filed 05/20/25  Page 50 of 57  Date Filed: 05/20/2025  Page 50 of 57  Entry ID: 6749229

Page **50** of **57**

It prohibited "unnatural offenses," defined as "carnal intercourse against the order of nature," with punishment up to 10 years' imprisonment.  There were no reports that authorities enforced the law.  The law also criminalized "any male person who dresses or is attired in the fashion of a woman" in public, with a punishment of up to three months' imprisonment.

**Violence and Harassment:**  Lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) persons reported security forces routinely harassed and sometimes arrested, detained, tortured, and beat them.  LGBTQI+ community leaders reported state actors incited harassment and physical abuses of LGBTQI+ persons, including posting public flyers in resettlement camps seeking the location of LGBTQI+ persons.  Because of overtly hostile government rhetoric and actions, most openly LGBTQI+ citizens fled the country.

**Discrimination:**  The law did not prohibit discrimination by state or nonstate actors based on sexual orientation, gender identity or expression, or sex characteristics.  Anti-LGBTQI+ sentiment was pervasive throughout the country, affecting all aspects of life for openly LGBTQI+ persons.  Human rights and LGBTQI+ activists reported no instances of official action to investigate or punish those complicit in discrimination, harassment, or abuse of LGBTQI+ persons.

**Availability of Legal Gender Recognition:**  Legal gender recognition was not available.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.737

**Involuntary or Coercive Medical or Psychological Practices:** There were no reports of involuntary or coercive medical or psychological practices targeting LGBTQI+ persons. There were no official reports of medically unnecessary and irreversible "normalization" surgeries performed on children or nonconsenting adult intersex persons.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** Human rights groups reported LGTBQI+ persons faced restrictions of freedom of expression, association, and peaceful assembly due to fear of violence, harassment, or other forms of retribution from state and nonstate actors.

## Persons with Disabilities

The law did not specifically prohibit discrimination against persons with physical, sensory, intellectual, and mental disabilities in employment, education, air travel and other transportation, access to health care, or the provision of other government services. NGOs reported community and family members routinely subjected persons with disabilities to discrimination. The government did not enact or implement programs to provide access to buildings, information, or communications public services.

The transitional constitution and the law stipulated that primary education be provided to children with disabilities without discrimination. Very few teachers, however, were trained to address the needs of children with

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.738

disabilities, and very few schools were able to provide a safe, accessible learning environment for children with disabilities. There were no legal restrictions on the right of persons with disabilities to vote and otherwise participate in civic affairs, although lack of physical accessibility constituted a barrier to effective participation. There were no mental-health hospitals or institutions, and persons with mental disabilities were often held in prisons. Limited mental-health services were available at Juba Teaching Hospital.

There were no reports of official action taken to investigate or punish those responsible for violence against persons with disabilities. Awareness of disability matters was low, negative social attitudes prevailed, and persons with disabilities had limited access to services and employment.

Persons with disabilities also faced disproportional hardship under conditions of crisis-level food insecurity and continuing violence.

## Other Societal Violence or Discrimination

Historical clashes intensified between cattle keepers and farmers, and between cattle keepers and persons attempting to raid and steal their herds. The level, scale, and sophistication of these attacks were significantly higher when compared with past clashes. Hundreds of individuals were killed and injured, and thousands were forced to flee their homes.

Civilian casualties and forced displacements occurred in many parts of the

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.739

country when raiders stole cattle, which defined power and wealth in many traditional communities.  Land disputes often erupted when stolen cattle were moved into other areas, also causing civilian casualties and displacement.  The SSPDF, NSS, and police sometimes engaged in revenge killings between and within ethnic groups.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provided for the rights of every employee to form and join unions, bargain collectively, and strike with restrictions.  The law prohibited antiunion discrimination.  The law excluded from these protections military and police but also included a broader list of civil service occupations, including prison service, fire service and wildlife forces, than the international standard.  While labor courts adjudicated labor disputes, the minister of labor could refer them to compulsory arbitration.

The law provided a regulatory framework to govern worker trade unions, but it restricted workers' rights to form and join organizations of their own choosing, allowing only one union per sector or geographical area, and restricted trade unions' rights to organize their own administration.  The largest union, the South Sudan Workers' Trade Union Federation, had

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.740

approximately 65,000 members, working mainly in the public sector. Unions were nominally independent of the governing political party, but there were reports of government interference in labor union activities. In September worker organizations reported that armed police and the acting mayor of Juba city assaulted a woman street vendor and used violent means to remove vendors from public spaces. Following a widely circulated video of the incident, the governor of Central Equatoria State removed the acting mayor from his position. The government did not effectively enforce the law. Administrative and judicial procedures were subject to lengthy delays and appeals, and penalties were not commensurate with those for other laws involving denials of civil rights. Workers across the country were vulnerable to exploitation. Years of conflict, political turmoil, climate shocks, and crime disrupted livelihoods and basic infrastructure in every sector.

## b. Prohibition of Forced or Compulsory Labor

See the Department of State's annual *Trafficking in Persons Report* at
https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.741

https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

## d. Discrimination (see section 6)

## e. Acceptable Conditions of Work

**Wage and Hour Laws:** The law specified the Ministry of Labor could establish and publish a minimum wage, or wages, for different categories of employees. There was no public information that this occurred. Few workers were engaged in formal wage employment, with more than 80 percent of the population engaged in nonwage work, including subsistence or small-scale agriculture not covered by labor law. The law specified normal working hours should not exceed eight hours per day and 40 hours per week and should provide premium pay for overtime.

Inspectors had the authority to make unannounced inspections and initiate sanctions. Violations were common in all sectors. Most employees, including public school teachers, earned less than the World Bank global poverty income level equivalent to two dollars per day. In August, the government dismissed more than 300 civil servants, mostly teachers, for failure to report to their assigned workplaces. The dismissed workers reported the government failed to follow notification procedures; some workers also stated they abandoned their positions because of low pay.

**Occupational Safety and Health:** There were no occupational safety and

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.742

health (OSH) standards. Workers could not remove themselves from situations that endangered their health or safety without jeopardy to their employment. The Ministry of Labor had an Occupational Safety Branch, which consisted of an office director and no staff.

A civil service provisional order applied to the public sector and outlined the rights and obligations of public-sector workers, including benefits, salaries, and overtime. The law provided the Ministry of Labor with authority to issue the schedule of salary rates, according to which all civil servants, officials, and employees were to be paid. This pay scale had not been adjusted for several years, and due to recent inflation and the rapid depreciation of the South Sudanese pound, most civil servants did not receive enough income to support themselves, even when their salaries were delivered on time and in full, which was infrequent. Under the law only unskilled workers were eligible for overtime pay for work more than 40 hours per week. Civil servants, officials, and employees working at higher pay grades were expected to work necessary hours beyond the standard workweek without overtime pay. When exceptional additional hours were demanded, the department head could grant time off in lieu of reimbursement.

**Wage, Hour, and OSH Enforcement:** The government did not effectively enforce minimum wage, overtime, and OSH laws. The government neither investigated nor prosecuted wage and hour violations. Violations of wage

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
Appx.743

and hour laws were common.

Widespread oil spillages and other chemical pollution, exacerbated by sustained, multiyear flooding that damaged oil producing infrastructure, negatively affected the health of workers and others who lived nearby.

More than 66 percent of workers were in the informal sector in 2019, according to African Futures research from the Institute for Security Studies. Labor laws did not apply to informal and part-time workers.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

Appx.744

<div align="center">

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

</div>

|  |  |  |
|---|---|---|
| D.V.D., et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **25-10676-BEM** |
| | ) | |
| **U.S. DEPARTMENT OF HOMELAND** | ) | |
| **SECURITY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

<div align="center">

**ORDER**

</div>

MURPHY, J.

At today's emergency hearing, the Court ordered Defendants to maintain custody and control of class members currently being removed to South Sudan or to any other third country, to ensure the practical feasibility of return if the Court finds that such removals were unlawful. While the Court leaves the practicalities of compliance to Defendants' discretion, Defendants have ensured, and the Court expects, that class members will be treated humanely.

The Court has further ordered that Defendants be prepared at tomorrow's prescheduled hearing to identify by name the affected class members and to address: (1) the time and manner of notice each individual received as to their third-country removal; and (2) what opportunity each individual had to raise a fear-based claim. In the event that Defendants determine that N.M. is not a class member, or was otherwise removed to any country other than South Sudan, Defendants must nonetheless be prepared to address the details of his removal, including when and to where he was removed, the names of individuals personally involved in executing his removal, and any information currently in Defendants' possession regarding his current whereabouts.

**So Ordered.**

                                        /s/ Brian E. Murphy
                                        Brian E. Murphy
Dated:  May 20, 2025                    Judge, United States District Court

Appx.746

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| D.V.D., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. |
| v. | ) | 25-10676-BEM |
| | ) | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM ON PRELIMINARY INJUNCTION

**MURPHY, J.**

At today's hearing, the Court found that Defendants violated the Preliminary Injunction entered in this case by failing to provide six non-citizen class members a "meaningful opportunity" to assert claims for protection under the Convention Against Torture before initiating removal to a third country. *See* Dkt. 64 at 46–47.

Defendants maintain that ambiguity in the phrase "meaningful opportunity" precipitated this controversy. Indeed, when the Court issued the Preliminary Injunction, it declined to elaborate on what constitutes a "meaningful opportunity," preferring instead to let experience show through hard cases the finer points of what is required under the Due Process Clause.

To be clear, this is not one of those hard cases. Giving every credit to Defendants' account, the non-citizens at issue had fewer than 24 hours' notice, and zero business hours' notice, before being put on a plane and sent to a country as to which the U.S. Department of State issues the following warning: "Do not travel to South Sudan due to **crime**, **kidnapping**, and **armed conflict**." *South Sudan Travel Advisory*, U.S. DEPARTMENT OF STATE, Mar. 8, 2025, https://perma.cc/XQN7-VXHV (emphasis in original). As detailed on the record during today's

hearing, further facts regarding the unavailability of information, the hurried and confused notice that the individuals received, language barriers, and attorney access compound and confirm this Court's finding that no reasonable interpretation of the Court's Preliminary Injunction could endorse yesterday's events.

Nevertheless, given Defendants' position that further detail would help Defendants comply, the Court offers the following summary and clarification of its Preliminary Injunction:

All removals to third countries, *i.e.*, removal to a country other than the country or countries designated during immigration proceedings as the country of removal on the non-citizen's order of removal, *see* 8 U.S.C. § 1231(b)(1)(C), must be preceded by written notice to both the non-citizen and the non-citizen's counsel in a language the non-citizen can understand. Dkt. 64 at 46–47. Following notice, the individual must be given a meaningful opportunity, **and a minimum of ten days**, to raise a fear-based claim for CAT protection prior to removal. *See id.* If the non-citizen demonstrates "reasonable fear" of removal to the third country, Defendants must move to reopen the non-citizen's immigration proceedings. *Id.* If the non-citizen is not found to have demonstrated a "reasonable fear" of removal to the third country, Defendants must provide a meaningful opportunity, and a minimum of fifteen days, for the non-citizen to seek reopening of their immigration proceedings. *Id.*

This Preliminary Injunction applies to the Defendants, including the Department of Homeland Security, as well as their officers, agents, servants, employees, attorneys, any person acting in concert, and any person with notice of the Preliminary Injunction. Fed. R. Civ. P. 65(d)(2); *see also* Dkts. 86, 91. Accordingly, no Defendant may avoid their duty to follow the Preliminary Injunction by involving or ceding responsibility to any other person. *See* Dkt. 86.

Appx.748

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated:  May 21, 2025                    Judge, United States District Court

Appx.749

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| D.V.D., et al., ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Civil Action No.** |
| **v.** ) | **25-10676-BEM** |
| ) | |
| **U.S. DEPARTMENT OF HOMELAND** ) | |
| **SECURITY, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____) | |

<u>**ORDER ON REMEDY FOR VIOLATION OF PRELIMINARY INJUNCTION**</u>

**MURPHY, J.**

As set forth in today's hearing and at Dkt. 118, the Court found that Defendants violated the Court's Preliminary Injunction. Having considered the arguments of counsel, the Court ORDERS the following remedy for Defendants' violations of the Preliminary Injunction:

Each of the six individuals must be given a reasonable fear interview in private, with the opportunity for the individual to have counsel of their choosing present during the interview, either in-person or remotely, at the individual's choosing. Each individual must be afforded access to counsel that is commensurate with the access that they would have received had these procedures occurred within the United States prior to their deportation, including remote access where in-person access would otherwise be available. Each individual must also be afforded the name and telephone number of class counsel, as well as access to a phone, interpreter, and technology for the confidential transfer of documents that is commensurate with the access they would receive were they in DHS custody within United States borders.

Each individual, along with class counsel, must be given no fewer than 72-hours' notice of the scheduled time for each reasonable fear interview. Should any individual raise a fear with

respect to deportation to the third country that DHS determines falls short of "reasonable fear," the individual must be provided meaningful opportunity, and a minimum of 15 days, to seek to move to reopen immigration proceedings to challenge the potential third-country removal. During that 15-day period, the individual must remain within the custody or control of DHS, and must be afforded access to counsel that is commensurate with the access they would be afforded if they were seeking to move to reopen from within the United States' borders. Defendants must provide status reports every seven days as to all six individuals. Should any individual move to reopen, the parties must also immediately provide a status report, and continue providing status reports every seven days thereafter, on the status of the motion to reopen.

DHS, in its discretion, may elect to provide this process to the six individuals either within the United States—should it choose to return them to the United States—or abroad, if at all relevant times DHS retains custody and control over the individuals in conditions commensurate to those the individuals would be housed in were they still in DHS's custody within the United States.

This Order reflects a remedy, in light of the Court's finding of a violation of its Preliminary Injunction, that has been narrowly tailored in accordance with principles of equity. The Court cautions Defendants that this remedy should not be construed as setting forth a course of conduct that would constitute compliance with the Preliminary Injunction, and the Court is not—in ordering this remedy—making any findings or conclusions that compliance with these processes before deportation would have satisfied the requirements of its Preliminary Injunction in the first instance.

**So Ordered.**

/s/ Brian E. Murphy
_____
Brian E. Murphy
Dated: May 21, 2025                        Judge, United States District Court

Appx.751

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| D.V.D., *et al.*, | ) | |
| | ) | |
| Individually and on behalf of all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:25-cv-10676-BEM |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. Department of Homeland Security, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' AMENDED DECLARATION

On May 21, 2025, the Court ordered Defendants to identify the class members on the plane that was subject to the Court's inquiries during the May 20 and May 21, 2025 hearings. ECF No. 120-121. Pursuant to the Court's order, Defendants submitted a responsive declaration on May 22, 2025. ECF No. 124. Defendants now submit the attached amended declaration to provide further details about the criminal histories of the aliens on the plane.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

ELIANIS N. PEREZ
Assistant Director

MATTHEW P. SEAMON
Senior Litigation Counsel

/s/*Mary L. Larakers*
MARY L. LARAKERS
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 353-4419
(202) 305-7000 (facsimile)
mary.l.larakers@usdoj.gov

## CERTIFICATE OF SERVICE

I, Mary Larakers, Senior Litigation Counsel, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ *Mary L. Larakers*
Mary L. Larakers
Senior Litigation Counsel

Dated: May 23, 2025

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

D.V.D., *et al.*,
Individually and on behalf of all others
similarly situated,

                    *Plaintiffs*,

    v.

U.S. Department of Homeland Security,
*et al.*,

                    *Defendants*.

Civil Action No. 1:25-cv-10676-BEM

## DECLARATION OF ACTING ASSISTANT DIRECTOR
## MARCOS D. CHARLES

Pursuant to 28 U.S.C. § 1746, I, Marcos D. Charles, declare as follows:

1. I am an Acting Assistant Director for Field Operations at Enforcement and Removal
   Operations ("ERO") at U.S. Immigration and Customs Enforcement ("ICE") within the
   U.S. Department of Homeland Security ("DHS"). As the Acting Assistant Director, I am
   responsible for oversight of the twenty-five ERO Field Offices, ensuring all field
   operations are working to efficiently execute the agency mission.

2. I began my career with the U.S. Government as a Border Patrol Agent for the former
   Immigration and Naturalization Service in Hebbronville, TX. Over time I was promoted
   to Senior Border Patrol Agent, Supervisory Border Patrol Agent, and Field Operations

Supervisor. I joined ICE in 2008 as the Assistant Officer in Charge. Overtime I was

promoted to Supervisory Detention and Deportation Officer, Assistant Field Office

Director, Chief of Staff, Deputy Field Office Director, and Field Office Director before

becoming the Acting Assistant Director.

3.  I provide this declaration based on my personal knowledge, reasonable inquiry, and

information obtained from various records, systems, databases, other DHS employees,

and information portals maintained and relied upon by DHS in the regular course of

business.

4.  Pursuant to the Court's inquiries about the individuals on the plane during the May 21,

2025 hearing, I submit this declaration to inform the Court of the identities and serious

criminal histories of the seven aliens at issue in the litigation on the plane. (ECF No.

104).

██████████████████ (E.A.H.)

5.  I have personally reviewed the case of E.A.H.

6.  E.A.H. is a native and citizen of Cuba.

7.  On May 11, 1999, E.A.H. was convicted in the Eleventh Circuit Court of Florida, County

of Dade, for Robbery, in violation of Florida Statutes § 812.13(2)(c); Robbery Using

Deadly Weapon or Firearm, in violation of Florida Statutes §§ 812.13(2)(a) and 777.011;

Attempted Arm Robbery, in violation of Florida Statutes §§ 812.13(2)(a)(b), 777.04, and

777.0111; Attempted Second Degree Murder, in violation of Florida Statutes §§

782.04(2), 777.04, and 775.087; Unlawful Possession of a Firearm or Weapon by a

Convicted Felon, in violation of Florida Statutes §§ 790.23(1); and Robbery Using a

Deadly Weapon or Firearm, in violation of Florida Statutes §§ 812.13(2)(A) and 777.011.

Appx.755

8. Specifically, on September 19, 1997, E.A.H. pushed the victim from behind as she was entering her car and stole her purse. Subsequently, on October 20, 1997, E.A.H. waited by the elevator of an apartment building with two other co-defendants. When the victim entered the building, E.A.H. pulled out a .38 caliber gun and held it to the victim's head while demanding his wallet. He then pulled the trigger twice while holding the gun to the victim's head, but the gun misfired both times, so he pistol whipped the victim.

9. As a result of these criminal convictions, E.A.H. was sentenced to four years in prison to be followed by two years of probation.

10. On September 13, 1999, E.A.H. was ordered removed to Cuba by an immigration judge. E.A.H. did not file an appeal, and his removal order became administratively final on that date.

11. On February 6, 2007, E.A.H. was convicted in the Eleventh Judicial Circuit of Florida, Miami-Dade County, of Robbery/Strongarm, in violation of Florida Statute 812.13 2(c); Falsely Impersonating an Officer, in violation of Florida Statute § 843.08; and Kidnapping, in violation of Florida Statute 787.01.2, and was sentenced to fifteen years in prison to be followed by five years of probation.

12. Specifically, on March 17, 2006, E.A.H. approached the victim in a restaurant parking lot and falsely identified himself as a police officer. E.A.H. searched the victim and ordered him to get inside his vehicle, wherein he stole the victim's phone and wallet, and drove the victim away from the restaurant. The following day, E.A.H. called the victim and demanded a cash payment or he would otherwise place the victim under arrest. During the meet-up with the victim, E.A.H. was arrested by local law enforcement.

Appx.756

████████████████ **(J.M.R.)**

13. I have personally reviewed the case of J.M.R.

14. J.M.R. is a native and citizen of Cuba.

15. On October 10, 2008, J.M.R. was convicted in the Eighteenth Judicial Circuit of Florida, Brevard County, of Arson in the Second Degree, in violation of Florida Statutes § 806.01(2), and was sentenced to fifteen years of probation.

16. Specifically, on March 18, 2008, J.M.R. towed his vehicle to a remote location and then set fire to it by igniting combustible material in the passenger compartment in an attempt to receive the insurance proceeds.

17. On November 8, 2010, J.M.R. was convicted in the Eleventh Judicial Circuit of Florida, Miami-Dade County, of Cocaine/Trafficking, in violation of Florida Statutes §§ 893.135(1), (B)(1), and 777.011, and was sentenced to three years in prison.

18. Specifically, on August 12, 2008, J.M.R. attempted to sell approximately one kilogram of cocaine worth $22,000 to undercover police officers.

19. On October 24, 2012, J.M.R. was issued a Final Administrative Removal Order pursuant to section 238(b) of the Immigration and Nationality Act following his aggravated felony conviction described above.

20. On October 21, 2020, J.M.R. was convicted in the Seventh Judicial Circuit of Florida, Volusia County, of (1) Possession of a Firearm by a Convicted Felon, in violation of Florida Statute § 790.22(1), and was sentenced to four years in prison, and (2) Possession of Paraphernalia, in violation of Florida Statutes § 893.147(1), and was sentenced to 364 days in prison.

Appx.757

21. Specifically, on April 17, 2019, local law enforcement executed a search warrant at the residence of J.M.R. During the execution of the search, detectives found a .22 caliber rifle hidden behind J.M.R.'s bed. In addition, law enforcement seized the following items: one plastic box containing .22 cartridges, one cannabis oil cartridge, two magazines with .380 cartridges, fifty-two one-gram cannabis cartridges, approximately 8.9 grams of cannabis, miscellaneous drug paraphernalia, $3,240 dollars, two round blue tablets with no markings, approximately one gram of off-white power substance, miscellaneous chicken fighting paraphernalia, and multiple chickens used for cock fighting.

22. On January 12, 2022, J.M.R. was convicted in the Ninth Judicial Circuit of Florida, Orange County, of Attempted First Degree Murder with a Weapon, in violation of Florida Statute § 782.04(1)(A)(1), and was sentenced to four years in prison.

23. Specifically, on April 3, 2019, local law enforcement in Orange County, Florida, responded to multiple 911 calls. Officers arrived on scene to find a victim severely bleeding from his head and neck. The victim was given aid and rushed for emergency surgery. Upon investigation, it was discovered that J.M.R. and the victim were together at dinner, and when J.M.R. drove the victim to his car, he pulled over and attacked the victim with a knife.

██████████████ (T.N.)

24. I have personally reviewed the case of T.N.

25. T.N. is a citizen of the Lao People's Democratic Republic (Laos).

26. On November 13, 1995, T.N. was convicted in the Superior Court of California, County of Riverside, for First Degree Murder, in violation of California Penal Code § 187;

Appx.758

Attempted Murder, in violation of the California Penal Code §§ 664 and 187; and Second-Degree Robbery, in violation the California Penal Code § 211, and was sentenced to life in prison without parole.

27. Conviction records and media reporting on his convictions show that on May 16, 1994, T.N. robbed and murdered a sixty-four-year-old German tourist and seriously injured her husband near a scenic outlook in Idyllwild, California.[1]

28. On March 2, 2018, T.N. was resentenced by the same court to life with the possibility of parole following a change in California law regarding minor offenders.

29. On July 12, 2023, T.N. was ordered removed to Laos by an immigration judge and waived appeal.

████████████████ (J.M.G.)

30. I have personally reviewed the case of J.M.G.

31. J.M.G. is a native and citizen of Mexico.

32. On January 11, 2005, J.M.G. was convicted in the Thirteenth Circuit Court of Florida, County of Hillsborough, for Murder in the Second Degree, in violation of Florida Statutes § 782.04(2), and sentenced to twenty-five years in prison.

33. Specifically, on February 21, 2004, while hosting a gathering at his residence, J.M.G. began fighting with his roommate in their driveway. After multiple attempts to separate the men, J.M.G. went inside his residence and returned to the driveway with a large knife. He then stabbed the victim in the chest and fled on foot.



Appx.759

34. On June 16, 2005, J.M.G. was ordered removed to Mexico by an immigration judge and waived appeal.

35. Recently, J.M.G. was identified as and admitted to being a member of a criminal organization. While incarcerated, ████████ incurred multiple disciplinary violations; some of these violations were related to gang activity.

████████ **(K.M.)**

36. I have personally reviewed the case of K.M.

37. K.M. is a native and citizen of Burma.

38. On September 3, 2019, K.M. was convicted in the Iowa District Court, County of Marshall, of Lascivious Acts with a Child, in violation of Iowa Code § 709.8(1)(a), and was sentenced to no more than ten years of incarceration.

39. Specifically, K.M. was convicted of repeatedly sexually assaulting a minor from 2011 to 2017, which began when the victim was approximately seven years old.

40. Law enforcement found out that K.M. had been sexually assaulting the victim after the victim's mother opened a bedroom door to find K.M. on top of the victim, who was approximately seven years old at the time. Upon being discovered, K.M. separated himself from the victim, put his pants on, and walked away.

41. The last time K.M. raped the victim, he offered her fifty to one-hundred dollars and food in exchange for sex. When the victim rejected the offer, K.M. forced himself on her. At the time, the victim was twelve years old.

42. On September 23, 2021, K.M. was ordered removed by an immigration judge. On March 17, 2023, the Board of Immigration Appeals dismissed his appeal.

████████ **(N.M.)**

Appx.760

43. I have personally reviewed the case of N.M.

44. N.M. is a native and citizen of Burma.

45. On September 22, 2020, N.M. was convicted in the District Court of Nebraska, County of Lancaster, of Attempted Sexual Assault in the First Degree, in violation of Nebraska Revised Statutes §§ 28-201(4)(B) and 28-319(1)(A), and was sentenced from twelve to fourteen years in prison.

46. Specifically, in a March 2017 interview with law enforcement, N.M. admitted to having sex with a twenty-six-year-old woman described by her sister as having the mental capacity equal to that of a three-year-old. In the same interview, N.M., who was forty-four years old at the time, admitted that he had known the victim since she was twelve, knew she had attended a school for children with mental disabilities, and believed her to have the mental capacity of an eleven-year-old. Local law enforcement had been alerted to the situation after the victim was found to be pregnant.

47. On August 17, 2023, N.M. was ordered removed by an immigration judge and waived appeal.

██████████████ (T.T.P.)

48. I have personally reviewed the case of T.T.P.

49. T.T.P. is a native and citizen of Vietnam.

50. On January 12, 2001, T.T.P. was convicted in the Superior Court of Washington, County of Pierce County, of Murder in the First Degree, in violation of Washington Revised Code § 9A.32.030(1)(b), and sentenced to 264 months of imprisonment.

Appx.761

51. On January 12, 2001, T.T.P. was convicted in the Superior Court of Washington, County of Pierce, of Assault in the Second Degree, in violation Washington Revised Code § 9A.36.021(1)(a), and sentenced to fifty months of imprisonment.

52. According to contemporaneous media reports, on June 4, 2000, T.T.P. "randomly" discharged a firearm into a crowd following a gang dispute, where he struck two teenagers (one of whom was a minor) who were unrelated to the gang conflict.[2]

53. On June 17, 2009, T.T.P. was ordered removed to Vietnam by an immigration judge and waived appeal.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on the 23rd day of May 2025

MARCOS D
CHARLES

Digitally signed by
MARCOS D CHARLES
Date: 2025.05.23
19:12:12 -04'00'

Marcos D. Charles
Acting Assistant Director
Field Operations
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

Appx.762

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| D.V.D., *et al.*, | ) | |
| | ) | |
| Individually and on behalf of all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:25-cv-10676-BEM |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. Department of Homeland Security, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

<u>**DEFENDANTS' MOTION FOR RECONSIDERATION OR, IN THE ALTERNATIVE,**</u>
<u>**STAY PENDING APPEAL OF ECF NOS. 116, 118, 119**</u>

## INTRODUCTION

Defendants request that this Court reconsider its order finding that Defendants violated the preliminary injunction and its extraordinary follow-on orders imposing on Defendants additional and highly burdensome requirements. *See* ECF Nos. 116, 118, 119 ("Orders"). Because of this Court's Orders, Defendants are currently detaining dangerous criminals in a sensitive location without clear knowledge of when, how, or where this Court will tolerate their release. Ripa Decl. ¶¶ 19-21, 25, 29; Hegseth Decl. ¶¶ 3-6. This development has put impermissible, burdensome constraints on the President's ability to carry out his Article II powers, including his powers to command the military, manage relations with foreign nations, and execute our nation's immigration authorities.

These detained aliens have already enjoyed the benefit of full process under the laws of the United States and were lawfully removed from the country in accordance with this Court's prior order. To correct these challenged Orders' clear errors of law and prevent the manifest injustice they have caused and will continue to cause, the Court should grant reconsideration. In the alternative, Defendants request that the Court stay these Orders pending appeal pursuant to Federal Rule of Civil Procedure 62. Furthermore, in order to relieve these burdens or, in the alternative, allow for an expeditious appeal, Defendants respectfully request a prompt ruling on this motion.

## THE COURT'S ORDERS

The Court's April injunction instructed Defendants to provide class members with a "meaningful opportunity" to raise a reasonable fear claim after being informed of removal to a third country. ECF No. 64 at 46-47. However, when the Court issued the preliminary injunction, it did not define or elaborate on what constitutes a "meaningful opportunity." On May 21, 2025, the Court found that Defendants violated the injunction when it provided some class members notice of third country removal (akin to the procedures followed in the longstanding expedited

1

removal process) and removed these class members when they did not make a reasonable fear claim. *See* ECF No. 118. The Court newly mandated a "minimum of ten days, to raise a fear-based claim for Convention Against Torture ("CAT") protection prior to removal." *See* ECF No. 118 at 2.

Furthermore, with respect to the six criminal alien class members the Court determined were not provided a "meaningful opportunity," the Court imposed additional burdensome requirements. Specifically, Defendants are required to continuously "maintain custody and control" of these individuals and provide each of them with a "reasonable fear interview in private, with the opportunity for the individual to have counsel of their choosing present during the interview, either in-person or remotely, at the individual's choosing." ECF Nos. 116, 118 at 1. Each alien must also be given the name and telephone number of class counsel, as well as "access to a phone, interpreter, and technology for the confidential transfer of documents that is commensurate with the access they would receive were they in DHS custody within United States borders." ECF No. 118 at 1. Moreover, each alien and class counsel must be given at least 72 hours' notice of the scheduled time for each reasonable fear interview. *Id.* For aliens whose claim falls short of the "reasonable fear" standard, DHS must provide them a minimum of 15 days to seek a reopening of their immigration proceedings in order to challenge the potential third-country removal. *Id.* at 2. During that 15-day period, DHS must maintain the aliens within the "custody or control" of DHS and the aliens must be afforded access to counsel. *Id.*

## **ARGUMENT**

It is well established that a federal court's reconsideration of its orders is warranted where necessary to correct a clear error of law or to prevent manifest injustice. *See Greene v. Union Mut. Life Ins. Co. of Am.*, 764 F.2d 19, 22-23 (1st Cir. 1985) (Breyer, J.) (noting a court's inherent power to provide relief from its decisions "as justice requires"). The Court's Orders are premised

on an erroneous conclusion that Defendants failed to provide "meaningful opportunity" for six class members to assert a claim for protection under CAT, despite having allowed the six class members an opportunity that is eminently reasonable in the removal context. Moreover, the Orders impermissibly infringe on the President's inherent Article II authority to conduct foreign affairs and serve as Commander-in-Chief. The Orders also improperly interfere with the President's ability to faithfully execute immigration laws. For all of these reasons, the Court should grant reconsideration of these Orders or, alternatively, stay these Orders pending appeal.

## I.  The Court Erred in Concluding that Defendants Did Not Provide a "Meaningful Opportunity" to Raise a Fear Claim.

The Court erroneously concluded that Defendants violated the preliminary injunction by failing to provide six class members a "meaningful opportunity" to assert claims for CAT protection before initiating their removal to a third country. ECF No. 118 at 1. Contrary to the Court's Order, Defendants provided a meaningful opportunity for each of these six aliens to assert a fear claim. Prior to the Court's order on May 21, 2025, the preliminary injunction required that, prior to removing any alien to a third country, Defendants must provide class members with only a "meaningful opportunity" to raise a reasonable fear claim after being informed of removal to a third country. ECF No. 64 at 46-47. However, the Court did not specify what constitutes a "meaningful opportunity" even after the Government articulated that the Parties would certainly disagree about such a vague term. Tr. of Mar. 28, 2025 Hr'g. 58:16-25 (explaining that if the Court were to use the word "meaningful" when issuing relief, "we would be in court tomorrow. Because we're going to disagree on that."). Indeed, the Government informed the Court that DHS's definition of meaningful notice would likely be providing such notice "shortly before" an alien is removed using the notice Plaintiff O.C.G. admitted to receiving as an example. Tr. of Mar. 28, 2025 Hr'g. 59:2-17; *see also* ECF No. 8-4 at ¶ 9 ("After I was taken out of the prison the

3

immigration officer told me that I was being deported to Mexico."). The Government even went so far as to suggest that the Court could make legal findings and "allow the agency to draft a proposal" for the parties to discuss and the Court to decide "whether [the proposal] would be enough process." Tr. of Mar. 28, 2025 Hr'g. 59:14-17. The Court did not heed the Government's warning, nor did it ask to review the agency's process for compliance with this injunction. *See* ECF No. 64.

Accordingly, Defendants implemented the Court's preliminary injunction order. Ripa Decl. ¶ 7. ICE provided notice "shortly before" removing these criminal aliens and that notice was "meaningful" and sufficient to comply with this Court's injunction (ECF No. 64) as written. These criminal aliens needed only state that they had a fear of removal to South Sudan to receive the other procedures required by the Court's April 18, 2025 injunction (ECF No. 64). The aliens did not do so. Therefore, DHS attempted to remove these aliens—who have committed the most reprehensible violations of our nation's laws—to a place where they no longer pose a threat to the United States.

The opportunity afforded to these aliens to raise a fear claim was not only meaningful but entirely reasonable in the removal context. For example, the expedited removal process under 8 U.S.C. § 1225(b) permits the government to *immediately* remove certain aliens "without further hearing or review," 8 U.S.C. § 1225(b)(1)(A)(i), subject to only a *limited* window to establish a "credible fear of persecution," *DHS v. Thuraissigiam*, 591 U.S. 103, 109 (2020) (citation omitted). In the expedited removal context, there is no statutory or regulatory requirement to provide aliens with a certain amount of time to assert a fear. 8 U.S.C. § 1225(b)(1)(A)(i); 8 C.F.R. §§ 253.3(b)(2), 1003.42(e); *see also* Ripa Decl. ¶ 13 describing expedited removal procedures). And even when an alien in expedited removal does assert a fear, if the fear is deemed non-credible, the statute

4

provides that review before an immigration judge "shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days." 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 1003.42(e). The Supreme Court has upheld the constitutionality of the statutory expedited removal scheme. *Thuraissigiam*, 591 U.S. at 107 (rejecting due process challenge to expedited removal). Comparison to the expedited removal process is directly on point, because both class members and expedited removal aliens have already been determined to be removable and would be making a fear claim in the first instance. Accordingly, Defendants provided a "meaningful opportunity" for these six criminal alien class members to assert a fear of removal to South Sudan and the Court should reconsider its decision to the contrary and requirement that DHS give class members ten days to express a fear after notice. Ripa Decl. ¶¶ 7, 9-12.

## II.  The Court's Orders Impermissibly Interfere with the President's Article II Foreign Affairs and Commander-In-Chief Powers.

Even if the Court had not erred with respect to "meaningful notice," the Court's Orders would still merit reconsideration because they are plainly inconsistent with the President's Article II authority to manage foreign policy. "[T]he historical gloss on the executive power vested in Article II of the Constitution has recognized the President's vast share of responsibility for the conduct of our foreign relations." *American Ins. Ass'n v. Garamendi,* 539 U.S. 396, 414 (2003). The President possesses in his own right certain powers conferred by the Constitution on him as Commander–in–Chief and as the Nation's organ in foreign affairs. *Id.* at 416. The federal courts have no authority to direct the Executive Branch to conduct foreign relations in a particular way, or engage with a foreign sovereign in a given manner. That is the "exclusive power of the President as the sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936). Such power is "conclusive and

Appx.768

preclusive," and beyond the reach of the federal courts' equitable authority. *Trump v. United States*, 603 U.S. 593, 607 (2024).

The Court's Orders require, *inter alia*, Defendants "to maintain custody and control of class members currently being removed to South Sudan or to any other third country." ECF No. 116. "This requirement has already had, and will continue to have, negative consequences to important U.S. strategic interests, including in Libya, South Sudan, and Djibouti." Rubio Decl. ¶ 3.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██ Because cooperation with other nations is required to transport and distribute international humanitarian aid, it is almost certain the Court's interjection will result in delayed or reduced humanitarian efforts across the region in a time of severe humanitarian crisis. Rubio Decl. ¶ 9. It is therefore critical that the Executive Branch be permitted to maintain effective foreign policy engagements in the region without judicial interference. *Id.*

### III. The Court's Orders Impermissibly Interfere with the President's Ability to Faithfully Execute Immigration Laws.

Furthermore, the Court's Orders impermissibly disrupt the President's ability to faithfully execute the nation's immigration laws. Courts have "long recognized" questions of immigration policy as "more appropriate to either the Legislature or the Executive than to the Judiciary." *Matthews v. Diaz,* 426 U.S. 67, 81 (1976). As a result, courts "review immigration decisions of

6

political branches only with the greatest caution where our action may inhibit their flexibility to respond to changing world conditions." *East Bay Sanctuary Covenant v. Trump,* 932 F.3d 742, 756 (2018) (quoting *Diaz,* 426 U.S. at 81) (cleaned up). While courts may review actions of the political branches to determine "whether they exceed the constitutional or statutory scope of their authority," the scope of the Executive's authority regarding the removal of aliens to third countries *after they have received the full benefit of removal proceedings* is exceedingly broad. Here, both the political branches are in accord in that neither the statute nor regulations require the procedures mandated by this Court's injunction. And, because aliens, *particularly* the criminal aliens at issue, are only entitled to the process guaranteed by Congress, this Court should have wholly declined to issue relief in this case. *See Knauff v. Shaughnessy,* 338 U.S. 537, 544 (1950) ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.").

The relief it has issued, requiring mandatory notice and reopening periods to even the most reprehensible of criminals, greatly interfere with the President's ability to faithfully execute immigration laws. Reaching agreement with foreign governments to accept the return of deported aliens requires careful and delicate negotiations. Rubio Decl. ¶¶ 4, 5; Ripa Decl. ¶¶ 17, 22. This process can be particularly arduous with regard to the many countries that are recalcitrant in accepting the return of their nationals. Ripa Decl. ¶ 17. It can be even more difficult when dealing with dangerous criminals, like the criminal aliens at issue here (including convicted rapists), because countries are naturally hesitant to accept them. *Id.* ¶¶ 17, 22.

The Court's Orders also impose a myriad of logistical burdens that greatly impede ICE's ability to effectively carry out the removal of aliens from the United States. Ripa Decl. ¶ 29, 30. Aliens scheduled for removal are located throughout the country, which requires the coordination

7

of officers in multiple offices across the nation. *Id.* ¶ 24. On any given flight, there may be aliens being removed to numerous foreign nations. *Id.* This requires ICE to coordinate multi-leg flights through multiple countries. *Id.* Given the complicated nature of these operations, charter flights can take 30 days or more to coordinate. *Id.* In order to remove aliens on one flight, ICE must contact and receive permission from each country for each landing. *Id.* ICE must secure country clearance for all flights and visas for all ICE officers on the flight. *Id.* In addition, all stakeholders in country must be notified including, for example, the U.S. Department of State, in-country ICE Homeland Security Investigations and Enforcement and Removal Operations ("ERO") attachés. *Id.* ICE also must coordinate with local foreign law enforcement when releasing an alien into their home country. *Id.* Not all countries will allow ICE to land a plane with third-country nationals onboard, which adds significant logistical difficulties and a significant cost to the American people. *Id.* Chartering flights and making logistical arrangements after agreement is reached requires preparation and precaution, particularly for dangerous aliens. *Id.* But the Court's Orders—especially those portions imposing mandatory notice and reopening periods—effectively requiring new immigration proceedings with attendant delay—risk upsetting all those carefully laid plans by, for example, scuttling sensitive international agreements for the acceptance of aliens or the landing of flights and upsetting complicated and costly logistical arrangements. *Id.* The Court's Orders, in other words, threaten to force the Government to start all over—with the possibility of once again being thwarted in the next attempt at removal.

In interfering with the President's ability to execute the laws related to removal, the Court's Orders also create serious safety risks. If removal cannot be timely effectuated, DHS may be forced, in compliance with *Zadvydas v. Davis*, 533 U.S. 678 (2001), to release the alien into the community while continuing to pursue removal options. Ripa Decl. ¶ 18, 28. This is true even for

convicted rapists like those on the flight at issue in this case. *Id.* ¶ 18. Indeed, multiple criminal aliens on the removal flight at issue in this case earlier had to be released into the community due to DHS not having the ability to remove them. *Id.* In threatening to undo the Government's removal plans, the Court's Orders risk forcing release of dangerous aliens into the public if the Government is not able to timely remove the aliens when the Court's imposed proceedings have concluded. *Id.* ¶ 28.

For all of these reasons, the Court's Orders impose an improper burden on Defendants' ability to faithfully execute immigration laws.

## IV.     Alternatively, The Court Should Stay its Orders Pending Appeal

If the Court declines to grant reconsideration, a stay pending appeal is clearly merited here. Courts consider four factors in assessing a motion for stay pending appeal: (1) the movant's likelihood of prevailing on the merits of the appeal, (2) whether the movant will suffer irreparable harm absent a stay, (3) the harm that other parties will suffer if a stay is granted, and (4) the public interest. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). When the government is a party, its interests and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). As discussed above, Defendants are likely to prevail on the merits of the appeal because the Court erred in concluding the Defendants failed to provide "meaningful opportunity" and impermissibly infringed on the Executive Branch's Article II foreign relations authority, command-in-chief power., and ability to faithfully execute immigration laws. Moreover, the Orders are already causing irreparable harm to important U.S. strategic interests in Libya, South Sudan, Djibouti, and throughout the region. Moreover, the equities clearly favor Defendants.

9

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants ask that the Court reconsider its Orders (ECF Nos. 116, 118, 119). Alternatively, Defendants request this Court stay the Orders pending appeal. In order to allow a meaningful appeal, Defendants respectfully request a prompt ruling on this motion.

Respectfully submitted,

|  |  |
|---|---|
|  | /s/*Matthew P. Seamon* |
| YAAKOV M. ROTH | MATTHEW P. SEAMON |
| Acting Assistant Attorney General | (California Bar #309249) |
|  | Senior Litigation Counsel |
| DREW ENSIGN | U.S. Department of Justice, Civil Division |
| Deputy Assistant Attorney General | Office of Immigration Litigation |
|  | P.O. Box 868, Ben Franklin Station |
| ELIANIS N. PEREZ | Washington, DC 20044 |
| Assistant Director | (202) 598-2648 |
|  | (202) 305-7000 (facsimile) |
| MARY L. LARAKERS | Matthew.Seamon2@usdoj.gov |
| Senior Litigation Counsel |  |

Appx.773

## LOCAL RULE 7.1 CERTIFICATION

I, Matthew Seamon, certify that pursuant to L.R. 7.1(a)(2), counsel for Defendants conferred with counsel for Plaintiffs, who oppose this motion.

/s/ *Matthew P. Seamon*
Matthew P. Seamon
Dated: May 23, 2025                                    Senior Litigation Counsel

## CERTIFICATE OF SERVICE

I, Matthew Seamon, Senior Litigation Counsel, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ *Matthew P. Seamon*
Matthew P. Seamon
Dated: May 23, 2025                                    Senior Litigation Counsel

Appx.774

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

D.V.D., et al.,

Plaintiffs,

v.

U.S. Department of Homeland Security, et al.,

Defendants.

Civil Action No. 25-10676-BEM

## DECLARATION OF SECRETARY OF STATE MARCO RUBIO

I, Marco Rubio, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am the Secretary of State of the United States and head of the United States Department of State, an Executive Department of the United States. *See* 22 U.S.C. § 2651. As Secretary of State, I am the President's chief foreign affairs advisor. I carry out the President's foreign policy through the State Department and the Foreign Service of the United States. *See* 22 U.S.C. § 2651a.

2.      The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, databases, State Department employees, and information portals maintained and

1

Appx.775

relied upon by the United States Government in the regular course of business, and on my evaluation of that information.

3.      The purpose of this Declaration is to confirm, in my capacity as Secretary of State and head of the Department of State, that the Orders by this Court, including on April 30 and May 20, 2025, cause significant and irreparable harm to U.S. foreign policy. The May 20 Order requires Defendants "to maintain custody and control of class members currently being removed to South Sudan or to any other third country, to ensure the practical feasibility of return if the Court finds that such removals were unlawful." This requirement has already had, and will continue to have, negative consequences to important U.S. strategic interests, including in Libya, South Sudan, and Djibouti.

4.      In Libya, the Court's Orders have interfered with quiet diplomatic efforts and exacerbated internal political and security divisions in Libya. As factions opposed to Prime Minister Dabaiba sought to capitalize on public reports of potential migration removals to Libya for political gain, Libya's Government of National Unity (GNU) publicly rejected the use of Libyan territory for accepting deportees; rival authorities based in Benghazi also denied any agreement with the United States to accept deportees. In the context of this political unrest, GNU-aligned forces took action against the two largest armed groups in the Libyan capital on May 12-13, sparking the most serious street fighting in Tripoli since 2022. As of May 21, the situation in Tripoli remains unsettled, as GNU-aligned forces and their opponents seek to consolidate political and military support. On May 19, a senior Libyan official informed the Department that the unrest in Tripoli had forced a postponement in the announcement of a significant commercial deal to expand activities of a U.S. energy company in Libya.

Appx.776

5.      In South Sudan, the Orders threaten to derail significant efforts to quietly rebuild a productive working relationship with the government in Juba. Before the Court's intervention, the government in South Sudan, which previously refused to accept the return of one of its own nationals, had taken steps to work more cooperatively with the U.S. government. Cooperation between the U.S. and South Sudan is critical, both in terms of removals but also to advance the U.S. government's humanitarian efforts in the country. Without South Sudan's cooperation, moving humanitarian relief – food, medicine, etc. – into the region becomes more difficult. It is almost certain the Court's interjection will result in delayed or significantly reduced humanitarian efforts.

6.      The May 20 Order also causes harm in Djibouti. Djibouti is strategically located in the Horn of Africa. The country sits astride the world's busiest shipping lanes and is adjacent to at least seven regional conflicts and the presence of multiple terrorist organizations, including ISIS, al-Shabaab, and the Houthis. For this reason, the U.S. military's Combined Joint Task Force – Horn of Africa (CJTF-HOA) is based in Djibouti and represents the only U.S. military base on the African continent. Ongoing security actions in the Red Sea and across the Horn of Africa are complex and reflect deep ongoing diplomatic negotiations with our Djiboutian hosts.

7.      United States government aircraft use the CJTF-HOA facilities for a range of tasks, all negotiated with the Djiboutians. A flight bringing 8 individual removals from the United States for resettlement in South Sudan used the CJTF-HOA logistical facilities, for which we had consulted and gained approval from the Djiboutians. The Order interrupted the transit process and required that the aircraft and the 8 individuals removed, including convicted felons, temporarily remain in Djibouti. That action required our government to re-engage the Djiboutians to explain that the mission they had approved had subsequently changed.

3

Appx.777

8.      This situation both diverted attention from and further complicated ongoing security cooperation, including counter-terrorism operations and both United States and multinational military movements.

9.      Disruptions at CJTF-HOA as a result of the May 20 Order would have broader, negative implications. For example, such disruptions could interfere with humanitarian assistance across the region in a time of severe humanitarian crisis. Some parts of the region are suffering from famine. It is therefore critical for the United States to maintain effective foreign policy engagements in the region without judicial interference.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of May 2025.

Marco Rubio
Secretary of State

4

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

D.V.D., *et al.*,
Individually and on behalf of all others
similarly situated,


*Plaintiffs*,

v.

U.S. Department of Homeland Security,
*et al.*,


*Defendants*.

Civil Action No. 1:25-cv-10676-BEM

## DECLARATION OF ACTING DEPUTY EXECUTIVE ASSOCIATE DIRECTOR GARRETT J. RIPA

Pursuant to 28 U.S.C. § 1746, I, Garrett J. Ripa, declare as follows:

1. I am the Acting Deputy Executive Associate Director ("D-EAD") for Enforcement and Removal Operations ("ERO") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

2. As the D-EAD, I lead ERO in its mission to protect the homeland through the arrest and removal of aliens who undermine the safety of our communities and the integrity of our immigration laws. I am responsible for a budget of approximately $4.7 billion and lead more than 8,600 employees assigned to 25 ERO field offices and

Appx.779

headquarters, in more than 200 domestic locations and 30 overseas locations. I

oversee the eight Assistant Directors that lead ERO's headquarters divisions,

including: Enforcement, Removal, Non-Detained Management, Custody

Management, Field Operations, ICE Health Service Corps, Law Enforcement

Systems and Analysis, and Operations Support.

3. I began my career with the United States Government in 1996 as a Detention

   Enforcement Officer in Miami, Florida, with legacy U.S. Immigration and

   Naturalization Service. Over time, I have also held the positions of Deportation

   Officer, Supervisory Detention and Deportation Officer, Assistant Field Office

   Director, and Field Office Director of the Miami ERO Field Office at DHS ICE.

4. I am aware of the orders issued in the above-captioned matter.

5. I provide this declaration based on my personal knowledge, reasonable inquiry, and

   information obtained from various records, systems, databases, other DHS

   employees, and information portals maintained and relied upon by DHS in the regular

   course of business.

6. On April 18, 2025, this Court issued a Preliminary Injunction requiring that, prior to

   removing any class member to a country not explicitly listed on the alien's order of

   removal: (1) DHS must provide written notice to the alien—and the alien's

   immigration counsel, if any—of the third country to which the alien may be removed,

   in a language the alien can understand; (2) DHS must provide meaningful opportunity

   for the alien to raise a fear of return for eligibility for Convention Against Torture

   ("CAT") protections; (3) DHS must move to reopen the proceedings if the alien

   demonstrates "reasonable fear"; and (4) if the alien is not found to have demonstrated

"reasonable fear," DHS must provide a meaningful opportunity, and a minimum of fifteen days, for that alien to seek to move to reopen immigration proceedings to challenge the potential third-country removal.

7.  To implement the requirement that it provide a class member a "meaningful opportunity . . . to raise a fear of return for eligibility for CAT protections," ICE generally provides an alien twenty-four hours, depending on exigency, following service of the Notice of Removal for the alien to raise a fear of torture if they are removed to the third country or express an intent to file a CAT claim. A class member's fear claim need not be adjudicated within the twenty-four hours; that timeframe is simply the time given for aliens to express a fear of torture, which is then referred to U.S. Citizenship and Immigration Services for adjudication.

8.  For the aliens on the flight at issue, ICE ERO provided them with written notice of the country of removal in a language they understood; ICE ERO explained the written notice to them; ICE ERO confirmed that they understood the notice; and none raised a fear of removal to South Sudan.

9.  At approximately 10:45 a.m. on May 19, 2025, ████████████████, ████████ ████████████, ████████████, ████████████████, ████████, ████████, ████████, and ████████████████ were housed in the same holding cell at the Port Isabel Service Processing Center in Los Fresnos, Texas. Available records and recent interactions with the aliens reflect that each understood the English language.

10. Between 5:46 and 5:48 p.m. on May 19, 2025, each alien was informed that he would be removed to South Sudan via service of a "Notice of Removal" in the English

language listing South Sudan as the county of removal. The form was explained to each alien in English. Each alien individually affirmatively indicated they understood the contents of the form and refused to sign. ERO also emailed the "Notice of Removal" to the attorney for ███ At no time did any of the above-referenced aliens express a fear of being removed to South Sudan.

11. Based upon my nearly thirty years as an immigration officer at various levels, any alien who is being told that he or she is being removed to a third country would reasonably be expected to immediately notify ICE of any fear of removal to that third country and certainly within twenty-four hours. It usually takes minutes rather than hours for an alien to express fear.

12. Aliens in this situation would have gone through a removal process where they would have been advised of asylum, withholding of removal, and CAT protections. Some would have already sought these protections in the past.

13. In the expedited removal process, including under the Biden Administration's *Securing the Border* regulation, DHS is not limited in how quickly it can execute a removal. Although expedited removals may take more than 24 hours, many are executed in even shorter periods. There, fear claims are and were raised almost immediately.

14. Outside the context of expedited removal, the removal process, beginning with encounter and ending with removal, can take months to several years.

15. Much of this timeline is tied to the immigration court process and its constant delays and backlogs. Once in immigration proceedings, an alien has the opportunity to

challenge their removability from the United States. If removability is established, the alien then has a right to seek relief or protection from removal.

16. An alien ordered removed by an immigration judge may appeal to the Board of Immigration Appeals and, if the immigration judge's order is not overturned, may file a Petition for Review (PFR) with the relevant U.S. Court of Appeals. In multiple jurisdictions, the filing of a PFR automatically triggers a stay of removal for the duration of the process, which could take years and continuously taxes ICE resources.

17. Once an alien is the subject of an executable final removal order, ICE can move forward with the removal process. This process can be arduous, particularly with regard to the many countries that are recalcitrant in accepting the return of their nationals. It can be even more difficult when dealing with dangerous criminals, whose countries—and other countries—are hesitant to accept their nationals where those individuals are convicted rapists and murderers, like those who were on the flight at issue.

18. If removal cannot be timely effectuated, DHS may be forced, in compliance with *Zadvydas v. Davis*, 533 U.S. 678 (2001), to release the alien into the community while continuing to pursue removal options. This is true even for convicted rapists and murderers like those on the flight at issue in this case. In fact, multiple aliens on the flight at issue were forced to be released into the community and continued to terrorize American citizens despite their prior heinous crimes due to an inability to remove them.

19. For example, ███████████, a twice convicted violent criminal, was released from ICE custody in May of 2021 because ICE was unable to secure his removal to

Cuba due to that country's recalcitrance in accepting the return of its nationals. In 1999, ████████ held a .38 caliber gun to a victim's head and pulled the trigger twice. Fortunately, the gun misfired, causing ████████ to pistol whip the victim instead. Despite having an administratively final order of removal, ████████ was released into the community, allowing him to reoffend despite his attempt at murdering an innocent person. In 2007, ████████ was convicted of strongarm robbery and kidnapping, resulting in a sentence of over 15 years. Despite his violent nature, ████████ was released from ICE custody in 2021 because there was no likelihood of removal in the reasonably foreseeable future given the Cuban government's recalcitrance at accepting their citizens. It was not until four years later, in May of 2025, that ████████ was brought back into ICE custody, such that he was in the community for four years despite having convictions for attempted murder, robbery with a deadly weapon, and kidnapping.

20. On October 10, 2008, ████████████████████ was convicted of arson and was sentenced to fifteen years of probation. A short time later, on November 8, 2010, ████████████████ was convicted of trafficking cocaine and sentenced to three years in prison. He was released on December 15, 2015, because there was no significant likelihood of removal in the reasonably foreseeable future given that Cuba refused to accept the return of its citizens from the United States. After his release, ████████████████ went on to commit a string of dangerous crimes to include possession of a firearm by a convicted felon resulting in additional jail time. In 2022, ████████████████ was convicted of attempted murder and sentenced to four years in prison.

21. In 1995, ██████████ was convicted of first-degree murder, attempted murder, and second-degree robbery against a sixty-four-year-old German tourist and her husband after robbing them in the mountains near Idyllwild, California. He shot and killed the wife and shot the husband in the face, who managed to survive. Nonetheless, on February 11, 2023, ICE was forced to release him into the community because he could not be removed, as the government of Laos refused to issue a travel document. ICE was only able to take him back into custody on March 31, 2025.

22. Where ICE cannot remove an alien to the country designated by the IJ, it will focus resources in appropriate cases on removal to a third country. This process is time consuming, operationally burdensome, and requires delicate engagement with foreign officials, often necessitating direct engagement by the U.S. Department of State to convince a foreign government to accept for removal a dangerous criminal alien with no or limited ties to that country.

23. If ICE, or another arm of the U.S. Government, is able to obtain an agreement by a third country to accept an alien, it then often must rearrest the alien in the community, which may require Special Response Teams (SRTs), which are specially trained to engage with violent criminals and conduct other high-risk operations. Deployment of such teams diverts significant additional resources. However, such precautions are necessary when seeking to re-arrest dangerous criminals at large in our communities.

24. Once ICE takes these aliens into custody, ERO must build a manifest for the flight. Aliens scheduled for removal are located throughout the country, requiring the coordination of officers in multiple Areas of Responsibility. On any given flight,

there may be aliens being removed to numerous foreign nations. This requires ICE to coordinate multi-leg flights through up to four countries. Given the complicated nature of these operations, charter flights can take 30 days or more to coordinate. In order to remove aliens on one charter ICE must contact and receive permission from each country for each landing. ICE must secure country clearance for all flights and visas for all ERO officers on the flight. In addition, all stakeholders in country must be notified, for example, U.S. Department of State, in-country ICE Homeland Security Investigations and ERO attachés. When flights are contracted, ICE must contract with additional pilots and crews in order to complete multi-leg flights. ICE also must coordinate with local foreign law enforcement when releasing an alien into their home country. Not all countries will allow ICE to land a plane with third-country nationals onboard, which adds significant logistical difficulties and a significant cost to the American people.

25. The dangerous aliens that were included on the flight at issue in this case needed appropriate levels of security staffing. This additional staffing included ICE SRT officers, who have the expertise, training, and equipment to respond to emergency situations and act to adequately protect the flight crew and ICE personnel. SRT members may be required to address a detainee acting in a violent manner who needs to be subdued for the safety of other detainees and the flights officers on board.

26. Given the planning and resource requirements for special removal charter flights, costs may be exorbitant for removal of even just a few dangerous aliens. For example, the average cost for a special charter to the African continent using the smallest available charter plane is over $1.3 Million. This figure is an approximation that only

accounts for total flight hours of between 30-40 and associated costs under the contract with the charter company and also includes the cost of requiring multiple SRT officers onboard.

27. Arrangements for a country to accept an alien, particularly a third country national, as well as country clearances, related operational requirements, and charter flight schedules are often time limited. For that reason, scheduling delays can result in the need to revisit any or all parts of the process. In addition to operational implications, additional costs associated with delays, or layovers due to unforeseen circumstances would substantially increase the total financial burden of such flights on the government.

28. With the requirements imposed by the court in its April 18, 2025 order, ECF No. 64; April 30, 2025 order, ECF No. 86; May 7, 2025 order, ECF No. 91; and now its May 21, 2025 order, ECF No. 119, the already extraordinary process is unreasonably delayed and will in many cases need to be restarted. With the new requirement that an alien be given a "minimum of ten days, to raise a fear-based claim for CAT protection prior to removal[,]" ICE will be forced to dedicate sparce detention beds to criminal aliens when it is already prepared to execute their lawful removal orders at both a significant expense to the United States and the preclusion of using those detention beds to detain other dangerous aliens and aliens posing a flight risk who are not yet subject to a final order of removal. The process imposed by the court creates a vicious cycle that would require ICE to relitigate enforceable removal orders when attempting to remove aliens who have no right to remain in the United States, but hail from countries who refuse to cooperate with the acceptance of their criminal citizens,

and has the potential to result in ICE being forced to release them back into the communities under *Zadvydas*.

29. With this process, assuming the alien does raise a fear claim in this time (which more will when they learn it will delay their removal and potentially derail them operationally) we are left with two options, neither good. Either aliens are found to have a reasonable fear and DHS is required to seek to reopen their often long-completed proceedings, or they are found not to have a fear and DHS must give them *yet another* fifteen days to seek to reopen their own proceedings. In short, even a frivolous fear claim could delay removal for twenty-five days, if not indefinitely, depending on the circumstances. Travel documents are not valid indefinitely, and ICE often has only a short window to remove an alien. This means that any delay could lead to ICE having to engage in the entire process again, wasting valuable government resources, straining detention capacity, and/or release these dangerous criminals once again.

30. Ultimately, this court-created process, overlaid atop the framework that Congress established and ICE developed to meet operational realities, adds an onerous and duplicative procedure for removal of aliens who have already received the benefit of comprehensive removal proceedings in the United States, who have been found to be removable from the United States, and who have been found to have no valid claim of protection in that process, and who have had access to recourse of Article III courts. Such a burden will significantly impede DHS's ability to effectively enforce immigration laws and remove dangerous criminals from the United States.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on the 23rd day of May 2025

GARRETT J
RIPA

Digitally signed by GARRETT J RIPA
DN: cn=GARRETT J RIPA, o=U.S.
Government, ou=People,
email=Garrett.J.Ripa@ice.dhs.gov,
c=US
Date: 2025-05-23T17:47:52-0400

Garrett Ripa
Acting Deputy Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **D.V.D, et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **U.S. DEPARTMENT OF HOMELAND** | ) |
| **SECURITY, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**Civil Action No.
25-10676-BEM**

## MEMORANDUM AND ORDER
## <u>ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

**MURPHY, J.**

      Plaintiff O.C.G. has no known criminal history. After suffering multiple violent attacks, O.C.G. sought protection in the United States, where an immigration judge granted him withholding of removal from his native country, Guatemala. This means that the immigration judge found it more likely than not that O.C.G. would suffer serious harm if sent back to Guatemala. Two days later, and without any notice, O.C.G. was placed on a bus and sent to *Mexico*, a country where he was previously held for ransom and raped. O.C.G. had said during his immigration proceedings that he was afraid of being sent to Mexico, and even presented evidence of the violence he had experienced there. But the immigration judge told O.C.G.— consistent with this Court's understanding of the law—that he could not be removed to a country other than his native Guatemala, at least not without some additional steps in the process. Those necessary steps, and O.C.G.'s pleas for help, were ignored. As a result, O.C.G. was given up to Mexico, which then sent him back to Guatemala, where he remains in hiding today.

This is the second time Plaintiffs have asked this Court to order the return of O.C.G. The first time, the Court declined to do so because the facts were in dispute—Defendants had submitted a declaration, made under oath, that O.C.G., prior to removal, affirmatively stated that he had no fear of being sent to Mexico. Dkt. 31-1 ¶ 3. O.C.G. adamantly contested this fact, submitting his own declaration stating that he was only told about Mexico essentially as it was happening and that he begged to speak to his attorney but was denied. Dkt. 8-4 ¶ 9. Because of this factual disagreement, the Court declined to conclusively credit O.C.G.'s account and instead ordered discovery of additional evidence. Dkt. 64 at 47–48; Dkt. 80.

Last week, on May 16, 2025, Defendants acknowledged an "error" in their previous filings and statements to the Court. Dkt. 103 at 2. Defendants admitted, hours before the scheduled deposition of the witness who could allegedly verify the facts included in the prior declaration made under oath, that, in fact, there was no such witness and therefore no reliable basis for the statements put forward by Defendants. Defendants apparently cannot find a witness to support their claim that O.C.G. ever said that he was unafraid of being sent to Mexico. The only evidence before the Court therefore is O.C.G.'s uncontroverted assertion that he was given no notice of his transfer to Mexico and no opportunity to explain why it would be dangerous to send him there. Defendants' retraction of their prior sworn statement makes inexorable the already-strong conclusion that O.C.G. is likely to succeed in showing that his removal lacked any semblance of due process, *see* Dkt. 40 at 6; Dkt. 64 at 42 n.43, and it otherwise alleviates concern about the appropriateness of relief. Accordingly, Plaintiffs' motion for a preliminary injunction is GRANTED.

Although a preliminary injunction is always an exceptional remedy, never awarded as of right, *Peoples Federal Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012), the

Appx.791

Court notes that this result is not otherwise so extraordinary.  Courts, including district courts, regularly find that return is the appropriate remedy when a removal is found to be unlawful.  *See, e.g.*, *Grace v. Whitaker*, 344 F. Supp. 3d 96, 144–45 (D.D.C. 2018) (ordering return of non-citizen plaintiffs entitled to further process prior to removal), *aff'd in relevant part, rev'd in part and remanded sub nom. Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020); *L. v. U.S. Immigr. & Customs Enf't*, 403 F. Supp. 3d 853, 860–61, 863–68 (S.D. Cal. 2019) (ordering government to allow return of parents wrongfully prevented from petitioning for asylum); *see also Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025) (denying stay of district court order to facilitate return of non-citizen wrongfully removed); *J.O.P. v. United States Dep't of Homeland Sec.*, 2025 WL 1431263, at *1 (4th Cir. May 19, 2025) (denying stay of district court order to facilitate return of non-citizens removed in violation of a settlement agreement).  Defendants acknowledge that there are procedures in place for facilitating return upon a court's order.  *See* Dkt. 64 at 30 n.34.  No one has ever suggested that O.C.G. poses any sort of security threat.  In general, this case presents no special facts or legal circumstances, only the banal horror of a man being wrongfully loaded onto a bus and sent back to a country where he was allegedly just raped and kidnapped.

Finally, it must be said that, while mistakes obviously happen, the events leading up to this decision are troubling.  The Court was given false information, upon which it relied, twice, to the detriment of a party at risk of serious and irreparable harm.  Defendants then exacerbated that risk by placing O.C.G.'s full name on the public docket, in violation of this Court's Order, Dkt. 13.[1] *See* Dkt. 105 at 8.  The Court has ordered discovery, including depositions of the individuals involved in the false declaration and underlying data entries, to better understand how this happened.

---

[1] The Court accepts Defendants' apology, Dkt. 113 at 1 n.1, and finds no further action necessary.

## I.    <u>Factual Background</u>

O.C.G. is a native and citizen of Guatemala.[2]  Dkt. 31-1 ¶ 4.  In March 2024, O.C.G. entered

the United States without prior authorization.  *Id.* ¶ 5.  O.C.G. alleges that he presented himself for

asylum at the border and was denied an interview.  Dkt. 8-4 ¶ 2.  In any event, he was deported

shortly thereafter to Guatemala.  *Id.*

In April 2024, O.C.G. decided to try again and crossed Mexico on his way to the United

States.  *Id.* ¶ 3.  There, he was raped and held hostage until a family member paid ransom.  *Id.*  In

May 2024, O.C.G. again arrived at the United States and was arrested by Border Patrol.  Dkt. 31-1

¶ 5.  This time, however, he was referred to an asylum officer after expressing fear of return to

Guatemala.  *Id.* ¶¶ 8–9.  That officer determined that O.C.G. had a credible fear of persecution or

torture and initiated withholding-only proceedings, *id.* ¶ 10, where an immigration judge agreed

and determined that it was more likely than not that O.C.G. would be persecuted or tortured if sent

back to Guatemala, *see id.* ¶ 11.[3]  Accordingly, O.C.G. was granted withholding of removal from

Guatemala.  *Id.*

During the withholding-only proceedings, O.C.G. asked if he might be sent to

Mexico—because he was afraid of being sent to Mexico—and the immigration judge told him,

"we cannot send you back to Mexico, sir, because you're a native of Guatemala."  Tr. of

June 17, 2024 H'rg at 10:37–13:12.[4]  During another hearing before the immigration court, O.C.G.

described in detail the violence he experienced while in Mexico.  Tr. of Feb. 19, 2025 H'rg at

---

[2] The Court has "broad discretion in deciding what evidence to consider in connection with a motion for preliminary injunction."  *Rice v. Wells Fargo Bank, N.A.*, 2 F. Supp. 3d 25, 31 (D. Mass. 2014).  Generally speaking, the relevant facts here do not appear to substantially be in dispute.

[3] *See* 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 208.16.

[4] The Court has been provided with audio and partial transcripts of O.C.G.'s hearings in immigration court.

28:48–33:40.   At the close of that hearing, the government's attorney clarified with the immigration judge that, because Guatemala was the country of removal designated on O.C.G.'s order of removal, that was the only relevant country for purposes of the withholding-only proceedings, and the immigration judge agreed.  *Id.* at 1:23:37–1:25:07.

Two days after being granted withholding of removal, and with no advanced warning, O.C.G. was put on a bus and sent to Mexico.  Dkt. 8-1 ¶¶ 8–9.  According to O.C.G., he begged the officers to let him call his attorney but was refused.  *Id.* ¶ 9.  Until one week ago, Defendants maintained that O.C.G. verbally stated that he was not afraid of being sent to Mexico, based on data entries made by immigration officers.  *See* Dkt. 31 at 4.  However, after speaking with those officers, Defendants no longer make that claim.  Dkt. 103 at 2.

In Mexico, O.C.G. was given the option of being detained indefinitely while trying to obtain asylum there—a country where he has consistently maintained that he faces a significant risk of violence—or of being sent back to Guatemala—the very country from which an immigration judge awarded him withholding from removal due to the risk of persecution that he faced.  Dkt. 8-1 ¶ 10.  O.C.G. chose Guatemala.  *Id.*  He remains there today.  *Id.* ¶ 1.

Just yesterday, O.C.G. submitted a declaration informing the Court of his current status.  Dkt. 123.  He reports living in constant fear of his attackers, *id.* ¶ 4, being unable to leave the place where he is staying, *id.* ¶ 6, not being able to rely on the police to protect him, *id.* ¶ 7, and not being able to see his mother for fear of exposing her to violence, *id.* ¶ 8, among other hardships.

## II.   <u>Legal Background</u>

On March 23, 2025, Plaintiffs filed this action and sought a temporary restraining order and preliminary injunction, in part, for the return of Plaintiff O.C.G.  Dkts. 1, 6–8.  The Court

Appx.794

denied this part of Plaintiffs' request, recognizing that there was a factual dispute as to the circumstances surrounding O.C.G.'s removal, Dkt. 64 at 47–48, and ordering discovery, Dkt. 80.

On May 18, 2025, in the course of that discovery, Defendants filed their "Notice of Errata," "correcting" their previous declaration, Dkt. 31-1, regarding the removal of O.C.G. Dkt. 103 at 2. The original version of the Errata filing included an exhibit that publicly revealed O.C.G.'s full name and other identifying information, *see* Dkt. 105 at 8, contrary to this Court's prior order concerning the use of pseudonyms, Dkt. 13.

Shortly thereafter, Plaintiffs moved again for a temporary restraining order and preliminary injunction. Dkt. 104. Following briefing by both parties, Dkts. 105, 113, the Court heard oral argument, Dkt. 117, and took the motion under advisement.

## III.  **Legal Standard**

"[A] preliminary injunction preserve[s] the status quo during the pendency of trial-court proceedings." *Berge v. Sch. Comm. of Gloucester*, 107 F.4th 33, 37 (1st Cir. 2024). The "status quo" refers to "the last uncontested status which preceded the pending controversy." *Baillargeon v. CSX Transportation Corp.*, 463 F. Supp. 3d 76, 82–83 (D. Mass. 2020) (quoting *United Steelworkers of Am., ALF-CIO v. Textron, Inc.*, 836 F.2d 6, 10 (1st Cir. 1987)). Here, the "status quo" is properly viewed as the pre-February 21, 2025 status, before O.C.G.'s removal, *i.e.*, "the last uncontested status . . . preced[ing] the pending controversy." *Id.*[5]

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Together*

---

[5] Accordingly, as a purely academic matter, the Court corrects itself and agrees with Plaintiffs that this is not technically a "mandatory" injunction. *See Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 n.5 (1st Cir. 2010). Nevertheless, for the reasons stated below, the Court has applied heightened scrutiny.

*Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  The last two factors "merge in a case like this one, where the Government is the party opposing the preliminary injunction." *Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Likelihood of success "weighs most heavily" in the preliminary injunction analysis. *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020).

"[T]he more drastic the effect of the injunction, the more carefully the district court should consider staying its hand." *A-Copy, Inc. v. Michaelson*, 599 F.2d 450, 451 (1st Cir. 1978); *see also Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995) (requiring the movant to meet a higher standard where "an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits").  "But the denial of preliminary relief may in some situations be as fraught with adverse consequences to plaintiff as the granting of relief is fraught with consequences to defendant.  In such cases, a court may have no choice but to act even though its decision has the effect of providing most or even all of the ultimate relief in dispute." *A-Copy*, 599 F.2d at 451. Here, the preliminary injunction grants "most or even all," *id.*, of the ultimate relief sought by O.C.G. individually.  It is not obvious that this relief could be undone. *See Tom Doherty*, 60 F.3d at 33–34.  Accordingly, the Court has exercised caution and held Plaintiffs to a stringent standard, as appropriate under the circumstances. *See* Dkt. 40 at 6, 8; Dkt. 64 at 9, 47–48.

## IV.    Discussion

### A.    Likelihood of Success

O.C.G. is likely to succeed in showing that his due-process rights were violated.  This Court has jurisdiction to hear those claims, and the appropriate remedy is return.

Appx.796

1.    <u>**Jurisdiction**</u>

The Court has already addressed most of Defendants' jurisdictional arguments in the context of Plaintiffs' first motion for a preliminary injunction. *See* Dkt. 64 at 10–27. The Court finds the remainder unpersuasive.

Defendants argue that O.C.G.'s case defies the underlying motivation behind 8 U.S.C. § 1252(g), apparently more so than the class claims. Dkt. 113 at 2 (quoting *Reno v. American-Arab Anti-Discrimination*, 525 U.S. 471, 482 (1999) [hereinafter, "*AADC*"]). The Court reads *AADC* differently, *see* Dkt. 64 at 20 (quoting *AADC* at 485 & n.9), but in any event, Defendants' gestalt argument cannot supersede the plain text of the statute as interpreted by authority binding on this Court. *See id.* at 20–21 (citing *Kong v. United States*, 62 F.4th 608 (1st Cir. 2023)).

Next, Defendants claim that O.C.G. received "specific warning[s]" of the possibility of third-country removal during his withholding-only proceedings. Dkt. 113 at 3–4. According to Defendants, these warnings were sufficient to effectively push any claims O.C.G. might have regarding third-country removal into the claim-channeling function of 8 U.S.C. §§ 1252(a)(5) and (b)(9). But the Court has already found that such general warnings are meaningless when the non-citizen has not received notice of removal as to any particular third country. Dkt. 64 at 17 & n.24. O.C.G. is, in fact, the perfect example of why this is correct—he *did* present evidence of his fear of return to Mexico during his withholding-only proceedings, Tr. of Feb. 19, 2025 H'rg at 28:48–33:40, and even asked the immigration court whether he needed to seek protection from Mexico as well, Tr. of June 17, 2024 H'rg at 10:37–13:12. To that, the immigration judge told him—correctly in this Court's estimation—that he only needed to worry about the country of removal already identified on his removal order. *Id.*

Still looking toward sections 1252(a)(5) and (b)(9), Defendants' next argument does highlight one difference between O.C.G.'s circumstances and those of class members not yet

Appx.797

removed—once O.C.G. was removed, he obviously had notice of his third-country removal. Dkt. 113 at 4–5.  With that notice, Defendants argue, O.C.G. could have moved to reopen his administrative case.  *Id.*; *see also* Dkt. 64 at 14–17 (explaining motions to reopen).[6]  This would, according to Defendants, make O.C.G.'s claim subject to the channeling provisions.

In reality, O.C.G.'s post factum notice is a distinction without a difference.  As an initial matter, O.C.G. could not have moved to reopen his immigration case, as he was subject to a reinstated order of removal.  *See Garcia Sarmiento v. Garland*, 45 F.4th 560, 564 (1st Cir. 2022) ("[P]ersons subject to reinstated removal orders following unlawful reentry are barred from reopening their orders of removal." (citing *Cuenca v. Barr*, 956 F.3d 1079, 1088 (9th Cir. 2020))).  Even if O.C.G. could have moved to reopen, it is unclear what precisely that motion would have said—motions to reopen must be based on evidence that was "not available and could not have been discovered or presented at the former hearing," *Escobar v. Garland*, 122 F.4th 465, 472 (1st Cir. 2024) (quoting *Rivera-Medrano v. Garland*, 47 F.4th 29, 35 (1st Cir. 2022)).  Here, there was no new evidence to discover or present; O.C.G. had already testified about the violence he experienced in Mexico.  The awkwardness of trying to imagine how this issue might theoretically be shoehorned into a motion to reopen only confirms that this is not the type of claim one is expected to "cram[]" into judicial review of a final order of removal.  *See Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018).

More fundamentally, Defendants confuse O.C.G.'s claim for the remedy he seeks.  As with every other Plaintiff in this case, O.C.G.'s claim arose the moment he was denied notice and a meaningful opportunity to present his fear-based claim.  For the same reasons as every other

---

[6] Defendants also point out that O.C.G. could still ask the immigration court to reopen sua sponte. Dkt. 113 at 4–5.  However, the Court has explained how the theoretical possibility of sua sponte reopening provides no meaningful relief. Dkt. 64 at 14–16.

plaintiff, that claim could not have been raised in the immigration proceedings, substantially because it occurred outside of, and following the conclusion of, those proceedings. Defendants seem to say that O.C.G. might be able to get his fear-based claims adjudicated some other way. The Court thinks that is dead wrong, but, *even if he could*, that would not alter the fact that his rights were violated in the first place. That wrong calls for a remedy, and the most obvious remedy is to go back and do it over, with proper notice and an opportunity to be heard.

Finally, Defendants argue that the Court implicitly "review[s]" the regulations implementing the Convention Against Torture through its due-process finding. Dkt. 113 at 5 (quoting FARRA § 2242(d)). Defendants point to no regulation that they contend this Court contradicts, nor do they cite any authority for their expansive understanding of what it means to "review" regulations. *Cf. Khouzam v. Att'y Gen. of U.S.*, 549 F.3d 235, 258–59 & n.14 (3d Cir. 2008) (finding FARRA § 2242(d) inapplicable where the regulation itself is non-problematic); *Harrington v. Chao*, 372 F.3d 52, 59 (1st Cir. 2004) (in agency context, holding that inconsistency does not arise where a regulation is silent as to a particular issue).

### 2. <u>Merits</u>

The Court has already found it likely that O.C.G.'s removal lacked due process. *See* Dkt. 40 at 6; Dkt. 64 at 42 n.43. Indeed, at no point in this litigation have Defendants put forth an account of O.C.G.'s removal that would comport with what this Court has found due process requires. *Compare* Dkt. 31-1 (March 25, 2025 Declaration of Brian Ortega) ¶ 13 (indicating that O.C.G. was verbally notified on the day of his removal), *with* Dkt. 64 (requiring written notice to both non-citizen and counsel); *see also A. A. R. P. v. Trump*, 605 U.S. —, 2025 WL 1417281, at *2 (May 16, 2025) ("Under these circumstances, notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not

Appx.799

pass muster.")  Accordingly, the likelihood that O.C.G. is correct in asserting that his due-process rights were violated, in this Court's view, has long hovered near certainty.

It is therefore somewhat of a misnomer to say that O.C.G.'s likelihood of success has "increased" on account of Defendants' new admission of "error" in its Notice of Errata, Dkt. 103 at 2.  Due process is, in some sense, a binary—one either receives what the Constitution requires, or one does not.  It has been clear that O.C.G. did not receive what the Constitution requires.

Nevertheless, O.C.G. seeks injunctive relief, and injunctions require consideration of equity and prudence.  *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).  Until recently, Defendants have maintained that O.C.G. verbally "stated he was not afraid of returning to Mexico" on the day of his removal.  *See* Dkt. 31-1 ¶ 13.  Of course, Plaintiffs have always disputed this fact.[7]  Nevertheless, the Court felt that the possibility that O.C.G. acquiesced in his own third-country removal warranted further factfinding before the Court engaged its equitable powers.  Dkt. 64 at 47–48.

Now, Defendants admit that they "cannot identify any officer who asked O.C.G. whether he had a fear of return to Mexico."  Dkt. 103 at 2 ("advis[ing] the Court of an error in the March 25, 2025, declaration of Brian Ortega" and submitting a "correct[ed]" declaration).  Setting aside concerns about how this "error," *id.*, came to be a central tenet of Defendants' case, its renunciation relieves the Court of fear that it might be overextending itself in granting this remedy.

---

[7] Dkt. 8-4 ¶ 9 (Declaration of O.C.G.):

> After I was taken out of the prison the immigration officer told me that I was being deported to Mexico.  I was so scared and surprised.  I told him that I had won my case and showed him the order the judge gave me.  But the immigration officer said the order had expired. I begged him to let me call my attorney but he said it was too late to call anyone now.

Appx.800

*See also Grace*, 344 F. Supp. 3d at 144–45; *L. v. U.S. Immigr. & Customs Enf't*, 403 F. Supp. 3d at 860–61, 863–68; *Abrego Garcia*, 145 S. Ct. at 1018; *J.O.P.*, 2025 WL 1431263, at *1.

### B.     Irreparable Harm

The Court has no reason to doubt the immigration judge's finding that O.C.G. is more likely than not to be persecuted if he stays in Guatemala.[8]  Nor does the Court question the sincerity of O.C.G.'s sworn declarations, endorsed by counsel.  *See* Dkts. 8-4, 123.

Defendants make no specific argument regarding irreparable harm in their brief.  Dkt. 113 at 6–7.  At oral argument, in response to inquiry from the Court, Defendants stated only that this case calls for heightened scrutiny and that the Court should consider O.C.G.'s "choice" to go back to Guatemala over indefinite detention in Mexico, a country where he has consistently maintained that he faces a significant risk of violence, *see* Dkt. 8-4 ¶¶ 3, 9–10.  The Court does take this fact into account but finds that it likely says more about O.C.G.'s options than his preferences.

O.C.G. daily risks not only loss of life but "of all that makes life worth living."  *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922) (J., Brandeis).  This factor militates strongly in favor of granting the injunction.

### C.     Balance of Equities and Public Interest

The Court recognizes that the public has an interest both in preventing wrongful removals, *Nken v. Holder*, 556 U.S. 418, 436 (2009), and in the prompt execution of removal orders, *id.* "There is, of course, a strong public interest in the protection of constitutional rights."  *Harris v. Adams*, 757 F. Supp. 3d 111, 144 (D. Mass. 2024).

---

[8] Defendants' inadvertent exposure of O.C.G.'s identity, while now remedied on the docket, only heightens concern as a bell that perhaps cannot be un-rung given the permanent nature of the internet.  It is of little comfort that Plaintiffs appear to have done a thorough and diligent job of getting the information removed as fast as possible from major sources.  *See* Dkt. 105 at 3, 8, 17–18 & n.8.

Appx.801

As with irreparable harm, Defendants make no argument that an injunction would go against the public interest or otherwise be unduly burdensome. Dkt. 113 at 6–7. On balance, the Court finds that the public benefits from living in a country where rules are followed and where promises are kept. Rules are tedious and frustrating, but they also keep us fair and honest. At oral argument, Defendants' counsel confirmed that it is "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." FARRA § 2242(a). The return of O.C.G. poses a vanishingly small cost to make sure we can still claim to live up to that ideal.

## V.   <u>Conclusion</u>

The Court finds that all four preliminary injunction factors weigh in favor of granting the injunction. Accordingly, Plaintiffs' motion for preliminary injunction is GRANTED.[9]

Defendants are hereby ORDERED to take all immediate steps, including coordinating with Plaintiffs' counsel, to facilitate[10] the return of O.C.G. to the United States. Defendants shall file a status report within five days of this Order updating the Court as to the status of O.C.G.'s return.

The Court exercises its discretion to waive the requirement to post a bond under Rule 65(c). *See, e.g., Int'l Assoc. of Machinists and Aerospace Workers v. Eastern Airlines*, 925 F.2d 6, 9 (1st Cir. 1991) (finding "ample authority for the proposition that the provisions of Rule 65(c) are not

---

[9] Plaintiffs' motion for a temporary restraining order is therefore denied as moot.

[10] The Court notes that "facilitate" in this context should carry less baggage than in several other notable cases. O.C.G. is not held by any foreign government. Defendants have declined to make any argument that facilitating his return would be costly, burdensome, or otherwise impede the government's objectives. The Court anticipates that Defendants will take at least the same level of action as is routine to return *lawfully* removed aliens. *See* ICE Policy Directive No. 11061.1, § 3.1, Facilitating the Return to the United States of Certain Lawfully Removed Aliens (Feb. 24, 2012). Given that this Court has found that Plaintiffs are likely to succeed in showing that O.C.G.'s removal was *not* lawful, there is no reason for Defendants to take *less* action than they would when returning a lawfully removed alien.

Appx.802

mandatory and that a district court retains substantial discretion to dictate the terms of an injunction

bond").

**So Ordered.**

/s/ Brian E. Murphy

Brian E. Murphy

Dated:  May 23, 2025                                  Judge, United States District Court

Appx.803

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| D.V.D, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. |
| v. ) | 25-10676-BEM |
| ) | |
| U.S. DEPARTMENT OF HOMELAND ) | |
| SECURITY, et al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTIONS FOR RECONSIDERATION AND STAY

**MURPHY, J.**

Defendants have mischaracterized this Court's order, while at the same time manufacturing the very chaos they decry. By racing to get six class members onto a plane to unstable South Sudan, clearly in breach of the law and this Court's order, Defendants gave this Court no choice but to find that they were in violation of the Preliminary Injunction.

Even after finding that violation, however, the Court stayed its hand and did not require Defendants to bring the individuals back to the United States, as requested by Plaintiffs. Instead, the Court accepted _Defendants' own suggestion_ that they be allowed to keep the individuals out of the country and finish their process abroad. In the interest of full transparency, the Court quotes at length from the hearing transcript:

Appx.804

**THE COURT**: [Plaintiffs' counsel] is suggesting that the only remedy is for the plane to return here so that these individuals be given an opportunity to raise any objections they have to being sent to South Sudan.  Do you have another suggestion as to what a remedy that would allow these people to have the process that they are due might be?

**MR. ENSIGN**: If I may, we think any remedy should be narrowly tailored to the violation.   And so, you know, if Your Honor believes they weren't given a meaningful opportunity to express a fear under CAT [Convention Against Torture], that **the remedy should first be limited to giving them such a meaningful opportunity.  If they were to do so, then they would be given that reasonable fear interview.**  But bringing them back would be a much broader remedy than necessary because this Court only requires compliance with procedures and, to the extent that Your Honor believes those procedures were not followed, the Government should be allowed to provide those procedures, and that should satisfy the due process as interpreted by this Court.

**THE COURT**: Thank you, Mr. Ensign.  So let's say that -- I agree with you that I want to make the most narrowly tailored order to address the violation of my preliminary injunction that is possible.  **What you're suggesting is that they can have a reasonable fear interview where they are now.**  Is that a practical possibility?

**MR. ENSIGN**: Your Honor, I don't know.  I'd have to speak to my client, but **I think that would need to be at least one of the compliance options that's presented, because that would be a much more narrowly tailored remedy that is actually tailored to the violation that Your Honor has found.**[1]

After this exchange, Defendants spent several hours conferring internally as to the feasibility of

this option, ultimately deciding that it was doable:[2]

**THE COURT**: I'm very much considering this, but, if this is the route we go, **my inclination would be to say, if you want to do all of these [interviews] where they are, you have to do them appropriately; if you don't want to, you can always bring them home of your own volition and do it there.  And so I'm not going to mandate that the Department do anything overseas, but in an effort to craft as circumscribed a remedy as possible, I'm inclined to say if the Department wants to figure that out, I'm inclined to let them.**

---

[1] Tr. of May 21, 2025 H'rg at 44:8–45:14 (emphases added).

[2] Tr. of May 21, 2025 H'rg at 119:10–21. ("[I.C.E. Assistant Director Charles]:  I know it's possible and the Department can work it out.  We've been working on it for the last couple of hours to make sure that we can do it, and it is possible to do it.").

Appx.805

**MR. ENSIGN**: <u>**And we appreciate that, Your Honor.**</u>  And, you know, to the extent that it poses challenges that are not -- that would be insurmountable, we would quickly inform the Court and figure out -- use one of the options to comply with the Court's orders.[3]

Since that hearing, merely five days ago, Defendants have changed their tune.  It turns out that having immigration proceedings on another continent is harder and more logistically cumbersome than Defendants anticipated.  However, the Court never said that Defendants *had* to convert their foreign military base into an immigration facility; it only left that as an option, again, *at Defendants' request*.  The other option, of course, has always been to simply return to the status quo of roughly one week ago, or else choose any other location to complete the required process.

To be clear, the Court recognizes that the class members at issue here have criminal histories.  But that does not change due process.  "The history of American freedom is, in no small measure, the history of procedure."  *Malinski v. New York*, 324 U.S. 401, 414 (1945) (Frankfurter, J., concurring).  "It is procedure that spells much of the difference between rule by law and rule by whim or caprice.  Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal justice under law."  *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 179 (1951) (Douglas, J., concurring).  The Court treats its obligation to these principles with the seriousness that anyone committed to the rule of law should understand.

It continues to be this Court's sincere hope that reason can get the better of rhetoric.  The orders put in place here are sensible and conservative.  Accordingly, and for the reasons stated herein, Defendants' motions for reconsideration and for stay pending appeal are DENIED.

---

[3] Tr. of May 21, 2025 H'rg at 112:1–25 (emphases added).

Appx.806

I.     **Background**

   A.     **General Background**

This action concerns the procedures that the Government must take before removing non-citizens to "third" countries. The Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, determines the country or countries to which an individual can be removed. *Id.* § 1231(b). In the first instance, the Government generally must remove a non-citizen to their country of origin or to the country designated on their Order of Removal. *See id.* § 1231(b)(2)(A)–(D). If those options prove "impracticable, inadvisable, or impossible," the Government may remove the non-citizen to any other country whose government will accept them, *i.e.*, to a "third" country. *Id.* § 1231(b)(2)(E)(vii). The Government's power to designate third countries for removal is subject to certain limitations set by Congress. *Id.* § 1231(b)(2). In particular, the Government may not remove a non-citizen to a country where they are likely to be tortured. *See* note to 8 U.S.C. § 1231 (codifying the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA")). A non-citizen's claim that he or she qualifies for this type of protection is called a "CAT" claim, referring to the Convention Against Torture, an international agreement implemented by Congress through FARRA. *See id.*

   B.     **Case Background**

On March 23, 2025, Plaintiffs filed this action, claiming that Defendants were removing people to third countries without giving any opportunity to show that they were at risk of persecution or torture. *See generally* Dkts. 1, 6–8. On April 18, 2025, the Court issued a Preliminary Injunction, which required Defendants to tell class members about their third-country removals in advance and to give them a "meaningful opportunity" to show or explain why they qualify for CAT protection. *See* Dkt. 64 at 46–47.

4

Twice, well-founded allegations of non-compliance or imminent non-compliance led this Court to amend or clarify the Preliminary Injunction. *See* Dkts. 86, 91. Neither of those changed the substance of the Preliminary Injunction, which continued to require Defendants to give written notice of the third-country removal and a meaningful opportunity to make a CAT claim. *See id.*

### C.   **Present Issues**

On May 21, 2025, Plaintiffs again moved for a temporary restraining order and preliminary injunction, alleging that Defendants were violating or had already violated the Preliminary Injunction by removing an unknown number of individuals to South Sudan without advanced notice and without an opportunity to demonstrate CAT eligibility. *See generally* Dkts. 111–12. Shortly thereafter, the Court called a hearing by remote videoconference. Dkt. 115. Defendants' attorneys had very little information, and the Court ordered Defendants to maintain custody of the individuals while everybody figured out what was happening. Dkt. 116.

The Court held an in-person hearing the next day, May 21, 2025. Dkts. 114, 117. An hour prior, Defendants held a press conference where they revealed the names and criminal histories of the individuals on the plane, at least six of whom turned out to be class member Plaintiffs in this case.[4] At the hearing, the Court learned that these individuals were being held at a foreign military base in Djibouti.[5] The Court heard sworn testimony from the I.C.E. Acting Assistant Director for

---

[4] *See Immigration and Customs Enforcement Officials Hold News Conference*, CSPAN (May 21, 2025), https://www.c-span.org/program/news-conference/immigration-and-customs-enforcement-officials-hold-news-conference/660241; *see also* Press Release, Department of Homeland Security, DHS Reacts to Activist Judge Ruling to Halt the Deportation of Barbaric Criminal Illegal Aliens Including Murderers, Rapists, and Pedophiles, (May 21, 2025), https://perma.cc/ZAR7-8KWE.

[5] Defendants requested that the country location of the individuals be kept under seal but have since made that information public. *See* Dkt 131-1; *see also* Haley Britzky, et al., *Deported migrant detainees are holding at a US Naval base in Djibouti amid court fight, officials say*, CNN (May 22, 2025 2:12 PM), https://perma.cc/W2FN-C6X8.

Field Operations at Enforcement and Removal Operations, Marcos Charles, and acting General

Counsel of Department of Homeland Security, Joseph Mazzara.  Dkt. 117.

Based on that testimony, Plaintiffs' submissions, and Defendants' submissions in

connection with the instant motion, the Court has made factual findings, substantially reflecting

its understanding of the events immediately following the May 21, 2025, hearing:

Sometime on May 19, 2025, Defendants informed eight individuals in I.C.E. detention that

they were being removed to South Africa.  *See* Dkt. 112-1 at 4–5; Dkt. 112-3 at 4.  Later that day,

no earlier than 5:46 p.m., Defendants told them instead that they were being removed to South

Sudan.  *Id.*; Dkt. 130-2 ¶ 10.[6]

The U.S. Government has issued stark warnings regarding South Sudan, advising its

citizens not to travel to there because of "**crime**, **kidnapping**, and **armed conflict**."  *South Sudan*

*Travel Advisory*, U.S. DEPARTMENT OF STATE, Mar. 8, 2025, https://perma.cc/XQN7-VXHV

(emphases in original).  The U.S. Department of State further warns that "[v]iolent crime, such as

carjackings, shootings, ambushes, assaults, robberies, and kidnappings are common throughout

South Sudan, including [its capital,] Juba.  Foreign nationals have been the victims of rape, sexual

assault, armed robberies, and other violent crimes."  *Id.*

The following day, no later than 9:35 a.m., the class members left detention and were

brought to a nearby airport.[7]  Tr. of May 21, 2025 Hr'g at 39:17.  After leaving the detention center,

class members definitively had no communication access.  *Id.* at 19:10–18.  Thus, these individuals

received fewer than 16 hours' notice before being removed, most of which were non-waking hours,

none within the business day.  During the interim, they had limited, if any, ability to communicate

---

[6] All refused to sign their notices of removal.  Dkt. 130-2 ¶ 10.

[7] One attorney was told by I.C.E. at 8:27 a.m. that her client had already been removed.  Dkt. 112-1 ¶¶ 8–10.

with family or legal representatives and little, if any, opportunity to access information that would have allowed them to determine for themselves the repercussions of being removed to South Sudan.[8]  The plane was in the air by noon.  *Id.* at 17:2–3.

Based on this information, the Court found that Defendants had violated the Preliminary Injunction and crafted a remedy based on Defendants' requests made during the hearing.  *See* Dkt. 119.[9]  The Court further issued a clarification as to the Preliminary Injunction, Dkt. 118, based on Defendants' representations that the initial iteration of the Preliminary Injunction "wasn't specific enough."  *See, e.g.*, Tr. of May 21, 2025 Hr'g at 37:23–38:3 ("I just wanted to highlight, Your Honor, that I think that part of any misunderstanding on the -- from the Department of Homeland Security may have had to do with the fact that the Court's preliminary injunction motion wasn't specific enough, and so we ask that the Court please take that into consideration when issuing its order.").

### D.    Procedural Posture

On May 23, 2025, at 9:03 p.m., Defendants moved the Court to reconsider its finding that Defendants violated the Preliminary Injunction and to vacate its orders accordingly.[10]  Dkt. 130 at 2.  In the alternative, Defendants seek a stay of those orders pending appeal.  *Id.*

The removals at issue were brought to this Court's attention originally via Plaintiffs' May 20, 2025, motion for temporary restraining order and preliminary injunction.  Dkt. 111.  Had

---

[8] Acting Director Charles testified that detainees generally have access to a telephone or tablet for communication purposes while in custody.  Tr. of May 21, 2025 Hr'g at 20:4–17.  However, he could not confirm whether these specific individuals did or at what time their access was cut off.  *Id.*  As stated, at least one attorney attempted but was unable to meet with her client during the short window.  *See generally* Dkt. 112-1.

[9] The Court reserved ruling on whether such a violation warranted a finding of contempt.  *See* Tr. of May 21, 2025 Hr'g at 35:12–17.

[10] Defendants characterize Dkt. 118 as an order.  The Court believes it is more properly a clarification but need not muddy the waters.

the Court not found that Defendants' actions were already covered by the Preliminary Injunction, *see* Dkt. 64, it would have issued the same remedy in the form of a new temporary restraining order or preliminary injunction. In other words, the Court believes that it already ruled prospectively that Defendants' May 20, 2025, actions were unlawful, but even if not, the Court would find them unlawful now, to the same effect. Accordingly, the Court will supplement its analysis to address those factors as necessary below.

## II.    **Legal Standard**

### A.    **Motion for Reconsideration**

A district court "has the inherent power to reconsider its interlocutory orders." *Fernández–Vargas v. Pfizer*, 522 F.3d 55, 61 n.2 (1st Cir. 2008). A motion for reconsideration is allowed where "the original decision was based on a manifest error of law or was clearly unjust." *United States v. Allen*, 573 F.3d 42, 53 (1st Cir. 2009). However, "[u]nless the court has misapprehended some material fact or point of law," a motion for reconsideration "is normally not a promising vehicle for revisiting a party's case and rearguing theories previously advanced and rejected." *Palmer v. Champion Mortg.*, 465 F.3d 24, 30 (1st Cir. 2006).

### B.    **Motion for Stay Pending Appeal**

"Deciding a motion for a stay pending appeal requires an exercise of the court's equitable discretion." *Arkansas Tchr. Ret. Sys. v. State St. Bank & Tr. Co.*, 527 F. Supp. 3d 40, 58 (D. Mass. 2021) (citing *Common Cause Rhode Island v. Gorbea*, 970 F.3d 11, 15–16 (1st Cir. 2020)). The Court considers the following factors, substantially like those considered on a motion for preliminary injunction: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

Appx.811

Likelihood of success is the essential element. *Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 16 (1st Cir. 2002) (calling it the "sine qua non" for a stay pending appeal).

    **C.**    **Motion for Temporary Restraining Order or Preliminary Injunction**

    "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The last two factors "merge in a case like this one, where the Government is the party opposing the preliminary injunction." *Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Likelihood of success "weighs most heavily" in the preliminary injunction analysis. *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020). "The standard for issuing a TRO is 'the same as for a preliminary injunction.'" *Orkin v. Albert*, 557 F. Supp. 3d 252, 256 (D. Mass. 2021) (quoting *Bourgoin v. Sebelius*, 928 F. Supp. 2d 258, 267 (D. Me. 2013)).

**III.**    **Discussion**

    **A.**    **Motion for Reconsideration**

        **1.**    **Defendants Violated the Preliminary Injunction**

    Defendants characterize this last week's events as a big misunderstanding, brought on by the Court's failure to specify what constitutes a "meaningful opportunity" to present fear-based claims. Dkt. 130 at 3–4. Indeed, at the March 28, 2025, hearing, Defendants' counsel did raise the issue and, by way of example, pointed out that Defendants would likely consider the opportunity Plaintiff O.C.G. received to have been "meaningful." *See id.* Defendants now argue that the parties and the Court were essentially on notice that Defendants might apply that same standard prospectively, as a way of complying with the Preliminary Injunction. *Id.* at 4. The fatal

flaw with this argument is that, prior to May 20, 2025, the Court had already twice found that O.C.G.'s process was likely insufficient.[11]  Dkt. 40 at 6; Dkt. 64 at 42 n.43.  Moreover, as of March 28, 2025, Defendants were claiming that O.C.G. was notified of his removal in *January*, roughly *three weeks prior* to his actual removal in February.  Dkt. 31 at 4.[12]  It is therefore impossible to justify Defendants' position that O.C.G.'s case reasonably stood as a benchmark of compliance with the due process protections this Court has determined to be required.

Defendants effectively tell this Court that it should have at least tried to micromanage the Department of Homeland Security as it fulfills its required obligations, but that is not the role of the courts.  *See Martinez v. Bondi*, 132 F.4th 74, 84 (1st Cir. 2025) (explaining that the appropriate remedy for improper agency action, "except in rare circumstances, is to remand to the agency for additional investigation or explanation").  Rather, this Court has strived to give Defendants as much flexibility as possible within legal bounds.  At the end of the March 28, 2025, hearing, the Court presented Defendants with a good-faith opportunity to define the process provided under the Preliminary Injunction:

> **THE COURT**: . . . In the meantime, I take your point about the Court ordering what "meaningful" means to heart.  And so I would consider a motion to reconsider, if you wanted to narrow what that procedure looked like, or you wanted [to] come to an agreement about what it looked like, or you wanted to tell me, [t]his is what we're defining as meaningful, and I would like you to reconsider and adopt this. I'm open to all of those things because you raise a very good point.  And so, to the extent that the guidance that the Court is giving you is nothing more than a meaningful opportunity and you want some more direction or you want to narrow that with some more specificity, I would welcome a motion to consider.

---

[11] At those times, the Court declined to order O.C.G.'s return based on Defendants' then-assertion that O.C.G. disavowed any fear of his removal.  Dkt. 40 at 6 & n.11; Dkt. 64 at 47–48.  That factual dispute has since been resolved in O.C.G.'s favor, and the Court has accordingly ordered Defendants to facilitate his return.  Dkt. 132.

[12] Defendants' brief states that O.C.G. was asked whether he had a fear of being sent to Mexico in January. Dkt. 31 at 4.  The declaration cited states that O.C.G.'s removal was scheduled on or about January 31, 2025, and that O.C.G. was asked whether he had a fear of being sent to Mexico on or around February 21, 2025, the day of his removal.  Dkt. 31-1 ¶¶ 12–13.  While inconsistent either way, a natural reading is that O.C.G. was at least notified of his removal at time of scheduling.

Appx.813

> If you file a motion to consider, I can hear you. I think you're in D.C.; so I can hear
> you, even by Zoom, within 24 hours.

Tr. of Mar. 28, 2025 H'rg at 68:13–69:3. Defendants' counsel thanked the Court for that
opportunity, *id.* at 69:4–5, but then declined to take it.[13]

Consistent with this approach, the Court has repeatedly asked Defendants to weigh in on
the particulars of its remedies, and Defendants have consistently refused. *See* Dkt. 64 at 47 n.49
("The Court has been forced to decide on an appropriate time limit because Defendants were
unable, unwilling, or incapable of meaningfully engaging in a discussion about what process was
required to provide aliens with a meaningful opportunity to contest a finding that their fear was
reasonable."). Even in this latest round of back-and-forth, nearly two months later, the Court again
asked Defendants for input on the appropriate length of time to raise a fear-based
claim—Defendants again refused to engage.[14] Tr. of May 21, 2025 Hr'g at 48:14–49:10
("[Mr. Ensign]: Certainly, our position is that 24 hours is sufficient. We recognize you disagree,
but we don't have a specific proposal in light of this Court's disagreement with that position.").[15]
The Court then suggested that Defendants could provide additional authority after the hearing, *id.*
at 50:21–51:10—Defendants did not. From this course of conduct, it is hard to come to any
conclusion other than that Defendants invite lack of clarity as a means of evasion.

---

[13] Defendants moved for an indicative ruling as to whether the Court would find that subsequent guidance
issued by the Department of Homeland Security mooted Plaintiffs' claims. Dkt. 43. That guidance did not address
or attempt to clarify the substance of what constitutes a meaningful opportunity—indeed, its thrust was that, in certain
circumstances where the United States has received diplomatic assurances, no opportunity would be had at all. *Id.* at
2–3; *see also* Dkt. 64 at 42–43 (finding that the procedures outlined in the guidance were insufficient). For the
remainder, Defendants offered no clarity as to what "opportunity" they would propose as acceptable.

[14] Tellingly, Defendants still do not propose any suggestion for how to define what constitutes a meaningful
opportunity. *See* Dkt. 130 at 4–5. Defendants say that the Court "did not heed the Government's warning" that it
should be allowed to draft a proposal for the Court's review. *Id.* at 5. That is incorrect; the Court expressly welcomed
such a proposal. *See* Tr. of Mar. 28, 2025 H'rg at 68:13–69:3. The Government did not submit any proposal.

[15] Of course, the individuals here had fewer than 24 hours; they had, at most, sixteen. *See* Tr. of May 21, 2025
Hr'g at 12:20–22.

Appx.814

Defendants' argument might be stronger if this were at all close, but the Court breaks no new ground in finding that the events of May 20, 2025, did not include a meaningful opportunity for the class members to present fear-based claims. Defendants' own submission shows that it is I.C.E.'s general practice to provide 24 hours' notice prior to removal.[16] Dkt. 130-2 ¶ 7. Here, the class members "had fewer than 24 hours' notice, and zero business hours' notice, before being put on a plane" to South Sudan. Dkt. 118 at 1. Class members appear not to have had any access to counsel—indeed, a declaration submitted by Plaintiffs alleges that I.C.E. *canceled* at least one attorney's pre-scheduled meeting with her client.[17] Dkt. 112-1 ¶¶ 8–10. Class members likewise had no opportunity to learn anything about South Sudan, a nascent, unstable country to which the United States has recently told its citizens not to travel because of "**crime**, **kidnapping**, and **armed conflict**."[18] The Court notes that class members were flown out on chartered flights, which Defendants state can take "30 days or more to coordinate." Dkt. 130-2 ¶ 24. Then the Court is left to consider, why were these individuals told less than sixteen hours in advance? *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."); *see also A.A.R.P. v. Trump*, 605 U.S. —, 2025 WL 1417281, at *2 (May 16, 2025) ("Under these circumstances, notice roughly 24

---

[16] Indeed Mr. Ensign, Deputy Assistant Attorney General for the Office of Immigration Litigation of the Department of Justice's Civil Division, suggested 24 hours was sufficient, apparently before realizing the notice here was significantly short of even this proffered minimum. Tr. of May 21, 2025 Hr'g at 49:8 ("Certainly, our position is that 24 hours is sufficient.").

[17] One attorney states that, at 8:27 a.m., she was informed that her client had already been removed to South Sudan. Dkt. 112-1 ¶ 8–10. But Defendants claim that the class members did not leave detention until 9:35 a.m. Tr. of May 21, 2025 Hr'g at 39:17.

[18] *South Sudan Travel Advisory*, U.S. DEPARTMENT OF STATE, Mar. 8, 2025, https://perma.cc/XQN7-VXHV (emphases in original).

hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster."). Given the totality of the circumstances, it is hard to take seriously the idea that Defendants intended these individuals to have any real opportunity to make a valid claim.

Defendants' comparison to expedited removal is a red herring.[19] Plaintiffs' class excludes non-citizens removed pursuant to expedited removal. *See* Dkt. 64 at 23 (defining the class to include "individuals who have a final removal order issued in proceedings under Section 240, 241(a)(5), or 238(b) of the INA"). Expedited removal usually involves individuals "apprehended at or near the border" or who are denied admission at ports of entry, before due-process rights attach. *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 106–08 (2020). By contrast, CAT claims emerging from standard removal proceedings, reinstatements of prior removal orders, and administrative removals, *see* Dkt. 64 at 23, have greater protections, including judicial review. *See* 8 U.S.C. §§ 1229a, 1231, 1228, 1252; 8 CFR §§ 208.31, 1208.31, 1208.16.[20] The comparison is thus inapposite.[21]

---

[19] It also goes more toward the merits of the case than the question of whether Defendants violated the Preliminary Injunction. Nevertheless, the Court addresses the argument insofar as it informs what a reasonable person could understand a meaningful opportunity to be and insofar as it bears on the Court's findings in the alternative regarding Plaintiffs' motion for preliminary relief.

[20] The Court notes, as have scholars in this area of the law, that it is somewhat of an anomaly that reinstated removal orders are subject to judicial review, while expedited removal orders—which may form the basis for reinstatement—are not. *See* Jennifer Lee Koh, *When Shadow Removals Collide: Searching for Solutions to the Legal Black Holes Created by Expedited Removal and Reinstatement*, 96 WASH. U.L. REV. 337, 368–72 (2018). Nevertheless, that is how it works.

[21] Even applying the law of expedited removals, however, the events of May 20, 2025, would have been unlawful. On May 9, 2025, the District Court for the District of Columbia struck down the final agency rule that required non-citizens to affirmatively manifest fear of return or removal in order to be given a fear-screening interview, as opposed to the previous rule which "required officials to provide individual advisals to each noncitizen [and] affirmatively ask questions designed to determine if the noncitizen qualifies for a credible fear interview." *Las Americas Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Sec.*, — F.Supp.3d —, 2025 WL 1403811, at *16–17 (D.D.C. May 9, 2025). By Defendants' own admission, these class members were not affirmatively asked any questions regarding their fear of removal. Tr of May 21, 2025 Hr'g at 21:5–9. Accordingly, insofar as Defendants contend that the law of expedited removals informed their understanding of what constitutes a meaningful opportunity, that analogy fails them on its face.

### 2. The Court's Remedy Was Flexible and Narrow

Despite Defendants contention to the contrary, this Court has never "direct[ed] the Executive Branch to conduct foreign relations in a particular way, or engage with a foreign sovereign in a given manner." Dkt. 130 at 6. Rather, this Court's order, remedying Defendants' flagrant violation of the Preliminary Injunction, merely outlines the procedural rights owed to class members, Dkt. 119 at 1, and grants Defendants full flexibility about how and where it can accomplish that:

> DHS, in its discretion, may elect to provide this process to the six individuals either within the United States—should it choose to return them to the United States—or abroad, if at all relevant times DHS retains custody and control over the individuals in conditions commensurate to those the individuals would be housed in were they still in DHS's custody within the United States.

*Id.* at 2.

It cannot be said enough that this is the result Defendants asked for. *See, e.g.*, Tr. of May 21, 2025 H'rg at 103:18–21 ("I think we certainly agree that any remedy should be narrowly tailored. I don't know that return to the United States would be required to carry those [interviews] out. You know, I think that those could potentially be conducted abroad."). This Court sought to fashion a remedy to address the constitutionally inadequate nature of the class members' removals, while not limiting Defendants' ability to effectuate those removals in the most expeditious manner possible—subject, of course, to constitutional requirements. In doing so, the Court offered Defendants a method of compliance that both guaranteed the procedural rights due to the class members but was less exacting than having to turn around a chartered plane. The Court considered Defendants' prerogative in the sensitive and political areas of immigration and foreign policy and offered Defendants complete discretion to provide these interviews in the time and manner they deemed best.

Appx.817

Defendants describe the hardship of having to carry out impromptu immigration proceedings on foreign soil.  Dkt. 130 at 7–9.  But that was—and continues to be—Defendants' daily choice.  "To say more would be to paint the lily."  *Rodríguez v. Encompass Health Rehab. Hosp. of San Juan, Inc.*, 126 F.4th 773, 783 (1st Cir. 2025) (Selya, J.).

**B.    Motion for Stay Pending Appeal**

As a threshold matter, the Court finds this request for a stay perplexing.  The order remedying Defendants' violation of the Preliminary Injunction is as flexible as possible, leaving the details of when, where, and how entirely in Defendants' hands.  *See* Dkt. 119 at 1–2 ("Each of the six individuals must be given a reasonable fear interview . . . DHS, in its discretion, may elect to provide this process to the six individuals either within the United States—should it choose to return them to the United States—or abroad.").  It is the narrow remedy Defendants requested.[22]  In short, there is very little to stay, absent completely blessing Defendants' violation.

As to the clarification to the Preliminary Injunction, Dkt. 118, that addresses a problem *raised by Defendants*.  *See* Dkt. 130 at 4–5; Tr. of May 21, 2025 Hr'g at 37:23–38:3 ("[T]he Court's preliminary injunction [] wasn't specific enough.").  Defendants ask this Court to reverse its clarification but offer nothing to put in its place.  That would do little more than return us to the same spot as before.

As to the request itself, for the reasons stated on the record and further outlined in Dkt. 118 and in Section A, *supra*, Defendants have not "made a strong showing that [they] [are] likely to succeed" in demonstrating that there was no violation of the Preliminary Injunction or in

---

[22] See *supra* at 2.

challenging the appropriateness of the Court's relief.  *See Hilton*, 481 U.S. at 776.  Accordingly, Defendants' motion for stay pending appeal is DENIED.  *See Acevedo-Garcia*, 296 F.3d at 16.[23]

### C.    Motion for Temporary Restraining Order or Preliminary Injunction

In the alternative, the Court finds that it would grant Plaintiffs' motion for temporary restraining order or preliminary injunction.  Likelihood of success and irreparable harm clearly weigh in Plaintiffs' favor, although Defendants raise serious concerns regarding the public interest, which justify the Court's limited remedy.

### 1.    Likelihood of Success

For the reasons stated on the record and further outlined in Dkt. 118 and in Section A, *supra*, the Court finds that Plaintiffs are likely to succeed in showing that the May 20, 2025, attempted removals were unlawful.

### 2.    Irreparable Harm

The Court further finds that the class members at issue were, and continue to be, at risk of irreparable harm in the absence of injunctive relief.  The Court has already outlined the risks faced by class members generally.  *See* Dkt. 64 at 44–45.  Here, that risk becomes tangible as class members were nearly dropped off in a war-torn country where the Government states that "[f]oreign nationals have been the victims of rape, sexual assault, armed robberies, and other violent crimes."[24]

---

[23] The Court notes an additional reason to deny this motion.  Stays are tools of equity, *Common Cause*, 970 F.3d at 15–16, and are thus subject to equitable doctrines.  Here, the unclean hands doctrine bars equitable relief.  *See Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 241, 245 (1933) ("He who comes into equity must come with clean hands.").  Discretion cautions against granting preliminary, extraordinary relief where a party has, at best, sought to get around an injunction through clever compliance.

[24] *South Sudan Travel Advisory*, U.S. DEPARTMENT OF STATE, Mar. 8, 2025, https://perma.cc/XQN7-VXHV.

Appx.819

### 3.    <u>**Balance of Equities and Public Interest**</u>

Defendants' last set of arguments, Dkt. 130 at 6–9, when stripped of rhetoric, sound primarily in the public interest and in the hardship that the government faces in complying with Congress's immigration laws.  This Court shares Defendants' concerns about the limited role courts should play in directing the Executive Branch and continues to be open to solutions for how to craft narrow and effective relief.  This Court has also taken into consideration Defendants' determination that the class members at issue pose a security threat and has withheld action accordingly.  For example, against Plaintiffs' requests, the Court did not dictate the terms of the class members' detention, respecting safety concerns raised by Defendants.  *See* Dkt. 116; Tr. of May 20, 2025 Hr'g at 43:23–44:8.  Likewise, the Court did not order the class members' return to the United States and otherwise gave Defendants remarkable flexibility with minimal oversight. Dkt. 119 (ordering weekly status reports).  All of this is to say that the Court has reviewed the totality of the situation, including the criminal histories of the individuals and the undoubted operational costs, and has weighed those factors in ordering as narrow relief as the Constitution will tolerate.

## IV.    <u>**Conclusion**</u>

For the foregoing reasons, Defendants' motions for reconsideration and for stay pending appeal are DENIED.

**So Ordered.**

<div style="text-align: right;">

/s/ Brian E. Murphy
Brian E. Murphy
</div>

Dated:  May 26, 2025                    Judge, United States District Court

Appx.820

# SUPREME COURT OF THE UNITED STATES

————————

No. 24A1153

————————

## DEPARTMENT OF HOMELAND SECURITY, ET AL. *v.* D.V.D., ET AL.

ON APPLICATION FOR STAY

[June 23, 2025]

The application for stay presented to JUSTICE JACKSON and by her referred to the Court is granted. The April 18, 2025, preliminary injunction of the United States District Court for the District of Massachusetts, case No. 25–cv–10676, is stayed pending the disposition of the appeal in the United States Court of Appeals for the First Circuit and disposition of a petition for a writ of certiorari, if such writ is timely sought. Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of the Court.

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting.

In matters of life and death, it is best to proceed with caution. In this case, the Government took the opposite approach. It wrongfully deported one plaintiff to Guatemala, even though an Immigration Judge found he was likely to face torture there. Then, in clear violation of a court order, it deported six more to South Sudan, a nation the State Department considers too unsafe for all but its most critical personnel. An attentive District Court's timely intervention only narrowly prevented a third set of unlawful removals to Libya.

Rather than allowing our lower court colleagues to manage this high-stakes litigation with the care and attention

SOTOMAYOR, J., dissenting

it plainly requires, this Court now intervenes to grant the Government emergency relief from an order it has repeatedly defied. I cannot join so gross an abuse of the Court's equitable discretion.

## I
## A

Federal law generally permits the Government to deport noncitizens found to be unlawfully in the United States only to countries with which they have a meaningful connection. 8 U. S. C. §1231(b). To that end, Congress specified two default options: noncitizens arrested while entering the country must be returned to the country from which they arrived, and nearly everyone else may designate a country of choice. §§1231(b)(1)(A), (b)(2)(A). If these options prove infeasible, Congress specified which possibilities the Executive should attempt next. These alternatives include the noncitizen's country of citizenship or her former country of residence. §§1231(b)(1)(C), (2)(E).

This case concerns the Government's ability to conduct what is known as a "third country removal," meaning a removal to any "country with a government that will accept the alien." §1231(b)(1)(C)(iv); see §1231(b)(2)(E)(vii). Third-country removals are burdensome for the affected noncitizen, so Congress has sharply limited their use. They are permissible only after the Government tries each and every alternative noted in the statute, and determines they are all "impracticable, inadvisable, or impossible." §§1231(b)(1)(C)(iv), (2)(E)(vii).

Noncitizens facing removal of any sort are entitled under international and domestic law to raise a claim under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U. N. T. S. 113. Article 3 of the Convention prohibits returning any person "to another State where there are substantial grounds for believing

SOTOMAYOR, J., dissenting

that he would be in danger of being subjected to torture." The United States is a party to the Convention, and in 1998 Congress passed the Foreign Affairs Reform and Restructuring Act to implement its commands.  The Act provides that "[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States."  §2242(a), 112 Stat. 2681–822, codified as note to 8 U. S. C. §1231.  It also directs the Executive to "prescribe regulations to implement" the Convention.  §2242(b), 112 Stat. 2681–822. Those regulations provide, among other things, that "[a] removal order . . . shall not be executed in circumstances that would violate Article 3."  28 CFR §200.1 (2024).

### B

On February 18, 2025, the Department of Homeland Security (DHS) issued an internal guidance document directing immigration officers to "review for removal all cases . . . on the non-detained docket" and "determine the viability of removal to a third country."  No. 1:25–cv–10676 (D Mass.), ECF Doc. No. 1–4, p. 2.

Just as DHS circulated this new policy, a Guatemalan man known in this litigation as O. C. G. appeared before an Immigration Judge to seek relief from his impending removal to Guatemala.  O. C. G. explained that he had previously been forced to flee Guatemala after facing torture and persecution there for his identity as a gay man.  See Dkt. 8–4, p. 1; ECF Doc. 1, p. 24.  He fled initially to Mexico, he said, but had not found safety there, either: A group of men raped him and locked him in a room until his sister paid them a ransom.  ECF Doc. 8–4, at 1.  O. C. G. accordingly asked the judge whether he "could be deported to a country other than Mexico or Guatemala."  *Ibid.*  The Immigration

4                    DHS *v.* D.V.D.

SOTOMAYOR, J., dissenting

Judge granted withholding of removal to Guatemala, the only country designated in the order of removal. *Id.*, at 1–2; see also ECF Doc. 1, p. 25. Because the government had not sought to remove O. C. G. to Mexico, the Immigration Judge did not address his request for protection against removal there. ECF Doc. 8–4, at 1–2; ECF Doc., at 25.

Two days later, Immigration and Customs Enforcement escorted O. C. G. out of his cell and put him on a bus to Mexico. ECF Doc No. 8–4, at 2. On the way, they provided him with "oral notice that he would be removed to Mexico." See ECF Doc. 106–1, p. 3 (Defendants' Response to Requests for Admission). DHS did not issue a new order of removal designating Mexico, did not reopen the prior proceedings, and did not provide either O. C. G. or his lawyer with advance notice. *Id.*, at 3–4. Mexican authorities promptly deported O. C. G. back to Guatemala, where he went into hiding. ECF Doc. 1, at 5.

Along with three noncitizens who feared that they, too, would imminently be whisked off to a "third country" without notice, O. C. G. filed this putative class action under the Administrative Procedure Act (APA) against DHS, Secretary Noem, and Attorney General Bondi. Plaintiffs alleged that the Government's apparent policy of removing noncitizens to a third country without notice or the opportunity to file a claim under the Convention violated the immigration laws, the regulations implementing the Convention, and the Fifth Amendment's Due Process Clause. Among other things, plaintiffs sought temporary and permanent injunctive relief preventing their own removal and the removal of putative class members without adequate notice and a "meaningful opportunity" to present a claim under the Convention. *Id.*, at 37. Plaintiffs also requested that the Government return O. C. G. to the United States.

On March 28, 2025, the District Court entered a temporary restraining order (TRO) as to both the three individual plaintiffs who remained in the United States and a putative

SOTOMAYOR, J., dissenting

class of all individuals "subject to a final order of removal
from the United States to a third country."  ECF Doc. 34,
p. 2.  The order prohibited the defendants from removing
the plaintiffs and putative class members to a third country
without "written notice of the third country" and "a mean-
ingful opportunity . . . to submit an application" for relief
under the Convention.  *Ibid*.

### C

On March 30, DHS issued a second guidance document,
which contained a two-step process for executing third-
country removals.  If a country provides the United States
with what DHS believes to be "credible" "assurances that
aliens removed from the United States will not be perse-
cuted or tortured," then (the policy says) DHS may remove
the noncitizen to that country without any process.  See
App. to Application for Stay of Injunction 54a–55a (App.)
The Government says this policy permits DHS to change
someone's "deportation country to Honduras . . . at 6:00
a. m., put [them] on a plane, and fl[y them] to Honduras" 15
minutes later.  ECF Doc. No. 74, p. 12 (Tr. Apr. 10, 2025).

In the absence of credible "assurances" from a foreign
country, the policy provides, "DHS will first inform the al-
ien of" her impending removal.  App. 55a.  Even so, the pol-
icy prohibits officers from providing the noncitizen with an
affirmative opportunity to raise her fear of torture.  Only
one who "states a fear of removal" unprompted will be given
a screening interview, which will take place "within 24
hours of referral." *Ibid.*  Those who cannot establish their
eligibility for relief at the screening interview can appar-
ently be deported immediately, without a chance to provide
evidence or seek judicial review.  See ECF Doc. 74, at 52–
53.

Around the time it adopted this new policy, DHS arrested
four putative class members covered by the TRO.  As the
Government admits, "DHS . . . typically arrests people to

remove them." ECF Doc. 101, p. 39 (Tr. Apr. 28, 2025). Indeed, DHS promptly transferred the four arrested class members to Guantanamo Bay. *Id.,* at 29.

Notwithstanding the TRO's express prohibition on third-country removals without notice or process, on March 31, the Government placed all four class members held in Guantanamo Bay on a Department of Defense flight to El Salvador.[1]

At a subsequent hearing, an attorney for the Government claimed DHS had not violated the TRO because the Department of Defense had conducted the removals. According to the agreement that governs the relationship between DHS and the Department of Defense at Guantanamo Bay, however, DHS "has legal custody" of noncitizens detained at Guantanamo Bay "and is responsible for the custody of detained aliens for administrative purposes related to immigration law violations." ECF Doc. 99–1, p. 2. DHS also remains "responsible for the [noncitizens'] physical custody" at Guantanamo Bay, and for any immigration-related "transfers, releases, and removals." *Id.*, at 3. By contrast, the Department of Defense merely provides security and logistical support consistent with DHS's "guidance." *Id.*, at 4.

The Government was unable to reconcile its representations to this evidence. Nor could it explain "[w]hat authority" the Department had "to effectuate a deportation." ECF Doc. 101, at 37.

### D

On April 18, the District Court granted the plaintiffs' motion for class certification and for a preliminary injunction,

---

[1] Other class members may have been removed to El Salvador as well, but the Government declined to respond to four consecutive requests for information from class counsel seeking clarification. See ECF Doc. 101, at 27. This is presently the subject of discovery in the District Court. See ECF Doc. 88.

holding that the plaintiffs had shown the Government's process for conducting third-party removals likely violated the Due Process Clause. The injunction requires the Government to provide noncitizens with written notice in advance of a third-country removal (as is statutorily required, see *infra*, at 15), along with a meaningful opportunity to raise a claim under the Convention. ECF Doc. 64, pp. 46–47.

On May 7, plaintiffs' counsel received news reports "announcing the imminent removal of . . . Laotian, Vietnamese, and Philippine class members . . . to Libya," again without notice or an opportunity to object. ECF Doc. 89, p. 2. Plaintiffs thus sought emergency relief from the district court. That same day, the court issued an order "clarif[ying]" its preliminary injunction so as to leave no doubt that "the allegedly imminent removals . . . would clearly violate" the preliminary injunction. ECF Doc. 91, pp. 1–2. That order narrowly averted the deportations.

Had the court not acted, 13 class members would have landed in Tripoli in the midst of violence caused by opposition to their arrival. Secretary of State Marco Rubio later averred in a sworn affidavit that "Libya's Government of National Unity (GNU) publicly rejected the use of Libyan territory for accepting deportees," as did "rival authorities based in Benghazi." App. 71a. Indeed (he explained) the "public reports of potential migration removals to Libya" had caused such unrest that "GNU-aligned forces took action against the two largest armed groups in the Libyan capital on May 12–13, sparking the most serious street fighting in Tripoli since 2022." *Ibid.* Contemporary news reports confirm these armed clashes. See, *e.g.*, Armed Clashes Erupt in Libya's Tripoli After Reported Killing of Armed Group Leader, Reuters, May 12, 2025.

Less than two weeks later, plaintiffs' counsel received reports of plans for yet more unannounced third-country removals, this time to South Sudan. ECF Doc. 111. At an

SOTOMAYOR, J., dissenting

emergency hearing, Government lawyers confirmed that several class members were indeed *en route* to South Sudan after having received less than 24 hours' notice of their impending deportations. By the time of the hearing, "DHS believe[d] that the plane [could not] be turned around," but was unwilling to share its location. ECF Doc. 126, pp. 10, 17 (Tr. May 20, 2025). Attorneys for the government also could not confirm whether "the pilot of the plane and the staff onboard" were aware of the District Court's preliminary injunction prohibiting the removals. *Id.*, at 16–17.

More details emerged the next day. At approximately 5:45 on the evening of May 19, DHS provided six inmates of an immigration detention facility with a document indicating that they would be removed to South Sudan. See ECF Doc. 145, p. 11 (Tr. May 21, 2025). At 9:35 a.m. the next morning, DHS removed them from their cells and put them on a flight. *Id.*, at 16. Short of the noncitizens "yelling at any of the jailers that they were afraid to go to South Sudan" (as the District Court put it), *id.*, at 13, DHS did not offer the noncitizens an opportunity to assert a claim under the Convention.[2]

The District Court found that DHS had "unquestionably" violated its order. *Id.*, at 12. Nonetheless, at the Government's request, the court permitted the Government to provide the requisite process in South Sudan, and it did not order the class members' return to the United States. See *id.*, at 21, 86, 96.

Meanwhile, discovery proceeded on the status of O. C. G., the Guatemalan man with whom this case began. The Government had previously attested that, before O. C. G.'s removal, an officer had asked him whether he was afraid of

---

[2] Notably, days before the plaintiffs filed this suit, the administration "ordered the departure of non-emergency U. S. Government employees from South Sudan," due to risks posed by "armed conflict" and "fighting between various political and ethnic groups." Dept. of State, South Sudan Travel Advisory (Mar. 8, 2025).

SOTOMAYOR, J., dissenting

returning to Mexico, and O. C. G. had responded that he was not. On the eve of that officer's deposition, however, the Government submitted an "errata sheet" admitting the information had been false. See ECF Doc. 103–1, p. 2; ECF Doc. 105, pp. 2–3. Because O. C. G. had been removed to Mexico without notice or an opportunity to file a claim under the Convention, the District Court ordered the Government to facilitate his return. The Government eventually agreed to comply with that order. See ECF Doc. 143.

The Government has appealed the merits of the preliminary injunction to the First Circuit, where briefing is ongoing. Pending that appeal, it seeks permission to continue its practice of conducting third-country removals without notice. Both the District Court and the First Circuit denied that request. The Government now asks this Court for an emergency stay of the preliminary injunction.

## II

This Court "will grant a stay pending appeal only under extraordinary circumstances," *Ruckelshaus* v. *Monsanto, Co.*, 463 U. S. 1315, 1316 (1983) (Blackmun, J., in chambers), especially where two lower courts have already denied such relief, *Packwood* v. *Senate Select Comm. on Ethics*, 510 U. S. 1319, 1320 (1994) (Rehnquist, C. J., in chambers). Ordinarily, the Court considers the likelihood of irreparable harm to the applicant absent emergency intervention, the applicant's likelihood of success on the merits of an appeal to this Court, and the equities. See *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*); see also *Nken* v. *Holder*, 556 U. S. 418, 434 (2009).

## A

"[B]egin with the basic proposition that all orders and judgments of courts must be complied with promptly." *Maness* v. *Meyers*, 419 U. S. 449, 458 (1975). This Court often reiterates that "'[a] stay is not a matter of right,'" but "an exercise of judicial discretion." *Scripps-Howard Radio, Inc.*

SOTOMAYOR, J., dissenting

v. *FCC*, 316 U. S. 4, 10 (1942); see also *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7, 24 (2008). That is so because stays are equitable remedies, which courts may (but need not) grant in order to resolve ongoing emergencies and "'clear away all intermediate obstructions against complete justice.'" *Hipp* v. *Babin*, 19 How. 271, 274 (1857).

For centuries, courts have "close[d] the doors" of equity to those "tainted with inequitableness or bad faith relative to the matter in which [they] see[k] relief." *Precision Instrument Mfg. Co.* v. *Automotive Maintenance Machinery Co.*, 324 U. S. 806, 814 (1945); see generally T. Anenson, Announcing the "Clean Hands" Doctrine, 51 U. C. D. L. Rev, 1827 (2018) (reviewing this doctrine's long history). That principle, "rooted in the historical concept of [the] court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith," ensures that courts do not become "'abettor[s] of inequity.'" *Precision Instrument*, 324 U. S., at 814.

Here, in violation of an unambiguous TRO, the Government flew four noncitizens to Guantanamo Bay, and from there deported them to El Salvador. Then, in violation of the very preliminary injunction from which it now seeks relief, the Government removed six class members to South Sudan with less than 16 hours' notice and no opportunity to be heard. The Government's assertion that these deportations could be reconciled with the injunction is wholly without merit. Notice at 5:45 p.m. for a 9:35 a.m. deportation, provided to a detainee without access to an attorney, plainly does not "'affor[d]'" that noncitizen with "'a reasonable time'" to seek relief. *A. A. R. P.* v. *Trump*, 605 U. S. ___, ___ (2025) (*per curiam*) (slip op., at 4).

Even if the Government's overnight notice had been adequate, moreover, DHS also did not provide the required "meaningful opportunity . . . to raise a fear of return" under the Convention. ECF Doc. 64, at 46. The affected class

members lacked any opportunity to research South Sudan, to determine whether they would face risks of torture or death there, or to speak to anyone about their concerns. Instead, they were left in their cells overnight with no chance to raise a claim and deported the next morning.

The Government thus openly flouted two court orders, including the one from which it now seeks relief. Even if the orders in question had been mistaken, the Government had a duty to obey them until they were "'reversed by orderly and proper proceedings.'" *Maness*, 419 U. S., at 459 (quoting *United States* v. *Mine Workers*, 330 U. S. 258, 293 (1947)). That principle is a bedrock of the rule of law. The Government's misconduct threatens it to its core.

So too does this Court's decision to grant the Government equitable relief. This is not the first time the Court closes its eyes to noncompliance, nor, I fear, will it be the last. See *Trump* v. *J. G. G.*, 604 U. S. ___ (2025) (*per curiam*). Yet each time this Court rewards noncompliance with discretionary relief, it further erodes respect for courts and for the rule of law.

### B

In light of the Government's flagrantly unlawful conduct, today's decision might suggest the Government faces extraordinary harms. Yet even that is not the case. Rather, following a recent trend, the Court appears to give no serious consideration to the irreparable harm factor. See, *e.g.*, *id.*, at ___ (slip op., at ___); *SSA* v. *AFSCME*, 605 U. S. ___ (2025). Without a showing that a stay is necessary to avoid irreparable harm, however, this Court's midstream intervention is inexcusable. See, *e.g.*, *Hollingsworth*, 558 U. S., at 190.

Besides the facially absurd contention that the Executive is "irreparabl[y]" harmed any time a court orders it temporarily to refrain from doing something it would like to do, see Application for Stay of Injunction 37, the Government

SOTOMAYOR, J., dissenting

has identified no irreparable harm from the challenged preliminary injunction. Instead, the Government locates the source of its injury in the District Court's efforts to provide relief to the class members in South Sudan. *Id.,* at 37–39. That argument is misguided. First, the District Court's remedial orders are not properly before this Court because the Government has not appealed them, nor sought a stay pending a forthcoming appeal. Second, the court adopted the narrowest possible remedy, allowing the Government itself to choose whether it would return the class members to the United States or provide them with process where they are held. Finally, the Government is in every respect responsible for any resulting harms. Had it complied with the preliminary injunction, no followup orders would have been necessary, nor would the Government have faced a "sudden need . . . to detain criminal aliens" abroad. *Id.,* at 39. It does not face such "need" today, as it can return the noncitizens it wrongfully removed at any time. No litigant, not even the Government, may "satisfy the irreparable harm requirement if the harm complained of is self-inflicted." 11A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §2948.1 (3d ed. 2013); *Bennett* v. *Isagenix Int'l, LLC,* 118 F. 4th 1120, 1129–1130 (CA9 2024).

For their part, the plaintiffs in this case face extraordinary harms from even a temporary grant of relief to the Government. *A. A. R. P.* v. *Trump,* 605 U. S., at ___ (slip op., at 4) (recognizing detainees' interests against removal are "particularly weighty"). The Government has made clear in word and deed that it feels itself unconstrained by law, free to deport anyone anywhere without notice or an opportunity to be heard. The episodes of noncompliance in this very case illustrate the risks. Thirteen noncitizens narrowly escaped being the target of extraordinary violence in Libya; O. C. G. spent months in hiding in Guatemala; others face release in South Sudan, which the State Department says is in the midst of "'armed conflict'" between

SOTOMAYOR, J., dissenting

"'ethnic groups.'"  N. 2, *supra*.  Only the District Court's careful attention to this case prevented worse outcomes. Yet today the Court obstructs those proceedings, exposing thousands to the risk of torture or death.

### III

On the merits of its appeal, the Government principally raises a bevy of jurisdictional objections.  Given its conduct in these proceedings, the Government's posture resembles that of the arsonist who calls 911 to report firefighters for violating a local noise ordinance.  In any event, the Government has not established a likelihood of success on any of its arguments.

### A

The Government points to six separate provisions that, it says, deprived the District Court of jurisdiction to hear this dispute.  See Application for Stay of Injunction 4–6, 19–28.

The Government's core objection is this: By way of a series of complicated immigration-law provisions, Congress sought to consolidate all of an individual's objections to an order of removal into a single petition for review.  See 8 U. S. C. §§1252(a)(4), (5), (b)(9), §1231 note.  Ultimately, the Government says, the plaintiffs in this case object to their removal.  So, they should bring their challenges in a petition for review of an order of removal.  Yet the Government also claims that it need not issue or reopen any orders of removal before deporting someone to a third country.  That is part of the problem plaintiffs seek to remedy: Without an applicable order of removal, they have no way to raise their claims under the Convention.  In the end, then, the Government's view is that the only way to challenge its refusal to provide orders of removal is to appeal those (nonexistent) orders.  That is absurd.  Nothing in the Government's cited provisions bars the plaintiffs from bringing a challenge to

14                    DHS *v.* D.V.D.

the Government's no-notice removals directly in federal district court.

Only one jurisdictional objection remains with any force. Under §1252(f)(1), "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation" of certain provisions in the immigration laws, except on an individual basis. Section 1231(b), the provision governing third-country removals, is one of those provisions. As a consequence, courts may not grant "classwide injunctive relief" to enjoin the "operation" of §1231(b). *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U. S. 471, 481 (1999).

As an initial matter, §1252(f)(1) undisputedly does not affect the District Court's authority to grant relief to the individual plaintiffs here; it affects only the classwide injunction. Thus, even if the Government is correct that classwide relief was impermissible here, it plainly remains obligated to comply with orders enjoining its conduct with respect to individual plaintiffs.

As for the propriety of classwide relief, it is difficult to say whether the District Court's injunction enjoined the "operation" of §1231(b). Certainly, the Government is not enjoined from executing third-country removals. The court has only barred the Government from executing such removals without notice, pursuant to the DHS policy, which (the court found) deprives noncitizens of their statutory and due process rights. This Court has indicated that courts "may enjoin the unlawful operation" of laws "not specified in §1252(f)(1) even if that injunction has some collateral effect on the operation of a covered provision." *Garland* v. *Aleman Gonzalez*, 596 U. S. 543, 553, n. 4 (2022) (emphasis deleted). So §1252(f)(1) would bar classwide relief here only if the Government's no-process policy were central to the "operation" of §1231(b) and not merely "collateral" to it. *Ibid.*, n. 4. At a minimum, that presents a difficult question this Court should not decide without briefing, argument, or

time for reflection.

Even if the Government could establish that its enjoined actions (of providing no notice or process) are integral to the "operation" of §1231(b), that in turn would raise a "'serious constitutional question.'" *Webster* v. *Doe*, 486 U. S. 592, 603 (1988). That is because, as the Government reads it, §1252(f)(1) threatens to nullify plaintiffs' procedural due process rights entirely. Recall that the Government claims it may remove noncitizens in the space of 15 minutes. See *supra*, at 4. Such noncitizens cannot practicably file individual lawsuits to vindicate their due process rights. After all, they will not know of the need to file a claim until they are on a bus or plane out of the country. Nor will their counsel, whom the Government refuses to notify. The Government can hardly expect every deportable noncitizen to file a pre-emptive lawsuit. Thus, if §1252(f)(1) precludes class-wide vindication of the right to notice and due process under these circumstances, then it effectively nullifies those rights.

Whether Congress can nullify a due process right by way of a jurisdiction-stripping provision is a difficult question. See *Webster*, 486 U. S., at 603 (citing *Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667, 681, n. 12 (1986)). The Government has not attempted to show that it is likely to succeed on that issue.

### B

That leaves, finally, the merits of plaintiffs' underlying APA and due process claims. Begin with the statutory and regulatory scheme governing removal. In the Government's view, once a noncitizen has been found removable, she can effectively be removed anywhere at any time. That view would render meaningless the countless statutory and regulatory provisions providing for notice and a hearing. See, *e.g.*, 8 U. S. C. §1229(a)(1) ("In removal proceedings under section 1229a . . . written notice . . . shall be given . . .

16                    DHS *v.* D.V.D.

to the alien or to the alien's counsel of record"); 8 CFR
§1240.10(f) (2024) (in removal hearing, the Immigration
Judge "shall . . . identify for the record a country, or coun-
tries in the alternative, to which the alien's removal may be
made"); §241.8(e) (when a removal order is reinstated after
a noncitizen illegally reenters the country, noncitizen who
"expresses a fear of returning to the country *designated in
that order*" must be given an interview (emphasis added));
8 U. S. C. §§1228(b)(1)–(3) (noncitizens determined remov-
able due to felony conviction must be given notice under
§1229(a) and 14 days "to apply for judicial review"); 8 CFR
§238.1(b)(2) (requiring notice to noncitizens removable due
to felony convictions).

The Government asserts that it need only comply with
these provisions once, for the first removal proceeding, and
can disregard them afterwards. The consequence of that
view is that what happens in removal proceedings simply
does not matter. The Government could designate any lo-
cation in its initial order, lose before the immigration judge,
decline to appeal, and promptly thereafter deport the
noncitizen to a country of the Government's choosing. In-
deed, that is precisely what happened in O. C. G.'s case.

Where did the Government find the authority to disre-
gard Congress's carefully calibrated scheme of immigration
laws? It does not argue the third-country removal statute
provides it. See Application for Stay of Injunction 13. In-
stead, the Government simply falls back on the Executive's
implied authority in this field. Yet "the President must
comply with legislation regulating or restricting the trans-
fer of detainees" even in "wartime." *Kiyemba* v. *Obama*, 561
F. 3d 509, 517 (CADC 2009) (Kavanaugh, J., concurring). It
is a "'cardinal principle of statutory construction,'" more-
over, that statutes should be construed so that "'no clause,
sentence, or word shall be superfluous, void, or insignifi-
cant.'" *TRW Inc.* v. *Andrews*, 534 U. S. 19, 31 (2001). Here
the Government construes the statute's lack of "a particular

SOTOMAYOR, J., dissenting

process for carrying out" third-country removals, Application for Stay of Injunction 13, as conveying near-unlimited power to the Executive, rendering the remaining statutory scheme "'void . . . or insignificant.'" *TRW*, 534 U. S., at 31. To make this claim is to ignore the clear statutory command that notice and a hearing must be provided. See *supra*, at 15. The Government cannot show a likelihood of success on plaintiffs' statutory and regulatory claims, nor can it defend the lawfulness of its no-notice removals.

Turning to the constitutional claim, this Court has repeatedly affirmed that "'the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." *J. G. G.*, 604 U. S., at ___ (slip op., at 3); *A. A. R. P.*, 605 U. S., at ___ (slip op., at 3). Due process includes reasonable notice and an opportunity to be heard. *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 314 (1950). Of course the Government cannot avoid its obligation to provide due process "in the context of removal proceedings," *J. G. G.*, 604 U. S., at ___ (slip op., at 3), by skipping such proceedings entirely and simply whisking noncitizens off the street and onto busses or planes out of the country.

It is axiomatic, moreover, that when Congress enacts a statutory entitlement, basic procedural due process protections attach. *Mathews* v. *Eldridge*, 424 U. S. 319, 332 (1976). Congress expressly provided noncitizens with the right not to be removed to a country where they are likely to be tortured or killed. See 8 U. S. C. §1231 note. As this Court has explained, the "'right to be heard before being condemned to suffer grievous loss of any kind . . . is a principle basic to our society.'" *Mathews*, 424 U. S., at 333 (quoting *Joint Anti-Fascist Refugee Comm.* v. *McGrath*, 341 U. S. 123, 168 (1951) (Frankfurter, J., concurring)). Being deprived of the right not to be deported to a country likely to torture or kill you plainly counts. Thus, plaintiffs have a right to be heard.

SOTOMAYOR, J., dissenting

The Government barely disputes these basic principles. Instead, it obfuscates the issue by asserting that some (perhaps "many") members of the class should be treated as if they never entered the United States. Application for Stay of Injunction 33–34. Yet even if that were true as to some class members, it could show at most that the class might be too broadly defined, not that the Government is likely to succeed on the constitutional merits.

Similarly, the Government relies on precedent about the wartime transfer of detainees to assert that the Executive's determination that "a country will not torture a person on his removal" is "conclusive." *Id.,* at 29 (citing *Munaf* v. *Geren*, 553 U. S. 674 (2008) and *Kiyemba*, 561 F. 3d 509). Yet the immigration laws provide for judicial review of "factual challenges to" orders denying relief under the Convention, *Nasrallah* v. *Barr*, 590 U. S. 573, 581 (2020), so plainly the Executive's determinations are not "conclusive" here. In any event, the plaintiffs in this case do not challenge any executive determination. There is no evidence in this case that the Government ever did determine that the countries it designated (Libya, El Salvador, and South Sudan) "w[ould] not torture" the plaintiffs. Application for Stay of Injunction 29. Plaintiffs merely seek access to notice and process, so that, in the event the Executive makes a determination in their case, they learn about it in time to seek an immigration judge's review. The Fifth Amendment unambiguously guarantees that right.

*        *        *

The Due Process Clause represents "the principle that ours is a government of laws, not of men, and that we submit ourselves to rulers only if under rules." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 646 (1952) (Jackson, J., concurring). By rewarding lawlessness, the Court once again undermines that foundational principle. Apparently, the Court finds the idea that thousands will suffer

SOTOMAYOR, J., dissenting

violence in farflung locales more palatable than the remote possibility that a District Court exceeded its remedial powers when it ordered the Government to provide notice and process to which the plaintiffs are constitutionally and statutorily entitled. That use of discretion is as incomprehensible as it is inexcusable. Respectfully, but regretfully, I dissent.

```
 1                 UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2
                                    )
 3    D.V.D.; M.M.; E.F.D.; and     )
      O.C.G.,                       )
 4                                  )
             Plaintiffs,            )
 5                                  )
      v.                            )    Civil Action
 6                                  )    No. 1:25-cv-10676-BEM
      U.S. Department of Homeland   )    pages 1 to 122
 7    Security; Kristi Noem,        )
      Secretary, U.S. Department    )
 8    of Homeland Security, in her  )
      official capacity; Pamela     )
 9    Bondi, U.S. Attorney General, )
      in her official capacity;     )
10    and Antone Moniz,             )
      Superintendent, Plymouth      )
11    County Correctional Facility, )
      in his official capacity,     )
12                                  )
             Defendants.            )
13                                  )

14
                   BEFORE THE HONORABLE BRIAN E. MURPHY
15                    UNITED STATES DISTRICT JUDGE

16
                         MOTION HEARING
17                  (Sealed Portion Included)

18                         May 21, 2025
                           11:00 a.m.
19

20          John J. Moakley United States Courthouse
                       Courtroom No. 12
21                     One Courthouse Way
                   Boston, Massachusetts 02210

22

23          Jessica M. Leonard, CSR, FCRR
                   Official Court Reporter
24          John J. Moakley United States Courthouse
                       One Courthouse Way
25                 Boston, Massachusetts 02210
                   jessica@wickedsteno.com
```

```
 1     APPEARANCES:

 2
       On Behalf of the Plaintiffs:
 3
           NATIONAL IMMIGRATION LITIGATION ALLIANCE
 4         By:  Trina Realmuto
           10 Griggs Terrace
 5         Brookline, MA 02446
           617-819-4447
 6         trina@immigrationlitigation.org

 7     On Behalf of the Defendants:

 8         DEPARTMENT OF JUSTICE
           By:  Matthew Patrick Seamon
 9         Ben Franklin Station
           Washington, DC 20044
10         202-598-2648
           Matthew.seamon2@usdoj.gov

11

12         U.S. DEPARTMENT OF JUSTICE
           OFFICE OF IMMIGRATION LITIGATION
13         By:  Drew Ensign

14         U.S. DEPARTMENT OF JUSTICE,
           OFFICE OF IMMIGRATION LITIGATION
15         By:  Elianis N. Perez
           PO Box 868
16         Washington, DC 20044
           202-616-9124
17         Elianis.perez@usdoj.gov

18

19         U.S. DEPARTMENT OF JUSTICE,
           OFFICE OF IMMIGRATION LITIGATION
           By:  Mary Larakers
20         PO Box 868
           Washington, DC 20044
21         202-353-4419
           mary.l.larakers@usdoj.gov

22

23

24

25
               Proceedings reported and produced
```

1   to be heard is, has a long history in front of this court, in

2   front of the First Circuit, in front of the Supreme Court, a

3   long history that is familiar to every attorney that has

4   appeared in this court, is aware what an opportunity to be

5   heard is.

6          I also ordered that the notice that was given be done

7   in writing and in the language -- the primary language of the

8   person who received that notice.

9          What I have learned is that notice was given some time

10  in the evening of May 19.  I am not entirely clear on whether

11  that is 5:45 or a later time that was included in the notation

12  given to at least one of the attorneys, but it was provided to

13  these individuals in the evening of May 19.

14         The next morning they were taken from that locked

15  facility, for which they, obviously, could not leave and seek

16  advice or counsel, and they were taken and transported to the

17  airport and put onto a plane.

18         The time that they left that facility is again

19  unclear.  We're going to get an exact answer on that shortly,

20  but it was, at the latest, sometime in the 10:00 hour and, at

21  the earliest, sometime before 9:00 a.m.

22         It is plain to me that an opportunity to be heard --

23  of several hours that were not during business hours, where you

24  could not consult with your attorney, where you could not

25  consult with your family, or where, in this case, if, for

Appx.842

1    country, to have a meaningful opportunity to object to it, they

2    must be given some opportunity to see how their life conditions

3    would be dealt with in that country.

4         I don't know a lot about South Sudan.  I have reviewed

5    some of the materials that have been submitted, but I'm not

6    familiar with their policy on all sorts of things.  I don't

7    know if there is rampant discrimination based on race or

8    gender, or anything else, or sexual orientation.  I'm not

9    saying there is, but I don't know.

10        And if I was in any of those groups and I was going to

11   be deported to South Sudan, I would need an opportunity to

12   investigate that and to be able to articulate a well-founded

13   fear about why being returned to South Sudan would be -- would

14   result in torture or death.

15        The Department did not do it in this case.  They did

16   not offer any opportunity to object.  There are protestations

17   to the contrary, where I have been told -- and I will certainly

18   give them an opportunity to speak again here -- that they

19   believe that they complied with my order because they don't

20   know of any of these people yelling at any of the jailers that

21   they were afraid to go to South Sudan.

22        That's plainly insufficient.  I don't think there's

23   any interpretation of the preliminary injunction that I issued

24   that would comport with the behavior that the Department showed

25   here.

1          THE COURT:  Thank you, Ms. Perez.

2          I hear your points, I'm familiar with the cases that

3    you've read.  I don't agree.  I find that my preliminary

4    injunction order has been violated.

5          I now turn to the next stage of the analysis, which is

6    what the Court can do to remedy that violation.

7          And I'll let Ms. Realmuto begin as to what an

8    appropriate remedy is that you're seeking here and how we would

9    go about effectuating it.

10          MS. REALMUTO:  Well, Your Honor, I think the remedy

11    that we're seeking is the one that we've continued to seek,

12    which is that we bring these individuals back to the United

13    States and give them the process that's due and that should

14    have been afforded to them in the first instance under the

15    preliminary injunction.

16          And I would argue that that process can only take

17    place on U.S. soil because it's essential that they have an

18    opportunity to have notice, to investigate the situation in

19    South Sudan, to consult with counsel, and to present their

20    decision about whether or not they're afraid to go to South

21    Sudan -- I think that anyone who investigates the situation in

22    South Sudan would have a fear of being placed in a war-torn

23    country -- and then, for them to have the reasonable fear

24    process that's afforded under this Court's order.

25          And I think whatever opposing counsel is going to say

```
 1   finally resolved -- either I get direction from the
 2   First Circuit or the Supreme Court or somewhere else -- that
 3   for the status quo, to the degree that there is ambiguity about
 4   what due process means, I am inclined to delineate it.
 5        I could guess what Ms. Realmuto is going to suggest
 6   but -- I'll give her a chance anyway in a moment -- but,
 7   Ms. Perez, I'm going to ask you for a suggestion.
 8        So I had -- again, I give great credit to Ms. Larakers
 9   for highlighting this point at the very inception of this case:
10   that a meaningful opportunity is subject to different
11   understandings.  I didn't think it was subject to
12   understandings as different as they appear to have been today,
13   but, for the sake of clarity, I am going to clarify.
14        And so what would your suggestion be, Ms. Perez,
15   around -- at a minimum, there will be a period of time between
16   when notice is given and the deportation occurs.  What is your
17   suggestion --
18        Or Mr. Ensign.  I'm not sure who's -- either one of
19   you is welcome to speak.
20        -- what's your suggestion about what comports with due
21   process and is reasonable?
22        MR. ENSIGN:  Your Honor, we don't have a specific
23   suggestion.
24        I mean, our understanding is from the expedited
25   removal context where we think that would be meaningful
```

1  opportunity.  We recognize Your Honor disagrees, but that

2  certainly our perspective.

3       I think the nature of any narrowly tailored remedy

4  would be that, if 24 hours isn't sufficient, that Your Honor

5  would shape it as to whatever your understanding would be that

6  is a minimum to satisfy due process.

7       I'm not aware of a specific benchmark to propose.

8  Certainly, our position is that 24 hours is sufficient.  We

9  recognize you disagree, but we don't have a specific proposal

10  in light of this Court's disagreement with that position.

11       THE COURT:  So I appreciate that, Mr. Ensign, and I

12  know you weren't told to be prepared with this.  And so I

13  recognize that I'm asking a lot of you.  But let me explain my

14  reasoning.

15       My reasoning is, generally speaking, Courts analyze

16  whether or not something comports with the constitutional due

17  process on a case-by-case basis, where the Court says, "No,

18  that doesn't comport" and "Yes, that does comport."  And you

19  can see this in a variety of contexts.

20       But that doesn't really work in this scenario and the

21  reason that I had drafted my preliminary injunction in the way

22  that I had is because I had hoped that the Department would

23  exercise its discretion to fashion something that comported

24  with constitutional requirements of due process.

25       Exactly what that is, though, is very hard to say.

Appx.846

1    And so I am giving you an opportunity to offer me some advice

2    on that.  I suspect that Ms. Realmuto is going to say a month

3    or maybe a month and then a month with an attorney.

4            There's lots of cases that fall back to 21 days.  My

5    order had fallen back to the most conservative limited number

6    of days that I could see any justification for, which was 15

7    days.

8            If you could point me to any authority -- and I

9    recognize you're on the spot now, and so -- I'm not resolving

10   this all in the next five minutes; so, if you could point me to

11   any authority or if the Department wants to take a position

12   about what reasonable due process is, I would welcome that

13   input.  But, you know, I'd -- I'd welcome that.

14           So what I intend to do is I will be clarifying my

15   preliminary injunction.  I will be --

16           And don't worry, Ms. Realmuto.  I know I haven't given

17   you a chance to speak, but I intend to.

18           -- I'm going to be clarifying what the minimum amount

19   of time is that the Department has to let go between the time

20   that notice is given and the time that the person is deported.

21           If the Department wants to take a position on that, I

22   give you until the end of the day today.  That -- we will be

23   crafting something.  I would give you more time, but I'm in

24   this position where people may currently be getting loaded onto

25   planes with plainly insufficient notice.

```
 1          So if you want to take me up on that opportunity, you

 2     may.  If you don't, you don't have to.  But I'm going to be

 3     fashioning something that clarifies this, because what is

 4     absolutely clear to me is that not only is 24 hours plainly

 5     insufficient, this was only 17.  And this is undeniably

 6     insufficient; And to the point where I believe it to be

 7     obviously insufficient.

 8          But the exact place where that line should be drawn, I

 9     don't know.  And so, if the Department wants to take a position

10     and tell me by the end of the day, I'd welcome that input.

11          MR. ENSIGN:  Thank you, Your Honor.  We'll certainly

12     run that by our clients and present that option to them and get

13     that back to you if we have a specific proposal.

14          THE COURT:  Thank you.

15          And, Mr. Ensign, this needn't be a treatise.  If you

16     say, "We propose 14 days because of x case," that's really --

17     that would be valuable input.  So feel free to weigh in.  I'm

18     not requiring you to, but I would welcome that input.

19          MR. ENSIGN:  Thank you, Your Honor.

20          THE COURT:  Ms. Realmuto, the same question to

21     you is -- we now are forced to modify the order, to specify.

22     What is the specification that you were suggesting to the Court

23     about?

24          MS. REALMUTO:  30 days, Your Honor.  We believe that's

25     reasonable because it gives the individual time to locate or
```

1    expeditiously.

2          That's why, in the expedited removal context, the

3    people are given, you know, much less time, measured in hours

4    or perhaps even minutes, to manifest a fear, which we think is

5    the same sort of screening concept that would apply here.

6          We'd also note that the statute at issue,

7    8 U.S.C. 1231, does not limit third-country removals to where

8    it is impossible.  I believe the statutory language is that it

9    can be done where it's impossible, impractical, or inadvisable.

10   Any of those are sufficient to permit a third-country removal.

11   Impossibility is not a requirement to carry out a third-country

12   removal, and that's in the statutory language of 1231.

13         THE COURT:  I appreciate that clarification,

14   Mr. Ensign.  It raises the question that I've not received a

15   satisfactory answer to, which is around N.M.  If N.M. was told

16   he was going to be taken to South Sudan on May 19, presumably,

17   he was only told that because it was either impossible,

18   impractical, or -- I can't remember the third word you just

19   used, but -- inadvisable.

20         So, presumably, on May 19 it's impossible, impractical

21   or inadvisable to take N.M. back to his country of origin.  And

22   what we were told is that the position of the Department

23   changed only because he had a lawyer, and then, instead of

24   deporting him to South Sudan, the Department elected to send

25   him to -- back to his home country.

1   preliminary relief cannot show likelihood of success on the

2   merits, the other factors fall away.  And we believe that's the

3   case here.

4        We would also point out that, with respect to

5   irreparable harm, Mr. O.C.G. in his declaration concedes that

6   Mexico gave him the choice to seek asylum there or to be

7   returned to Guatemala, and he chose to go to Guatemala.  So to

8   the extent that that is a self-inflicted harm, we don't believe

9   that qualifies as irreparable harm for turn purposes of

10  preliminary relief.

11       THE COURT:  Thank you.

12       MS. REALMUTO:  A couple points.

13       I mean, a self-inflicted harm?  He chose not to stay

14  in a country where horrible things happen to him?  Where he was

15  going to be detained and he'd have to wait months in detention

16  to apply for asylum, when he was scared of the country he was

17  in?

18       He specifically asked not to be sent to Mexico at his

19  master calendar hearing.  The regulations that the Government

20  is relying on are standard.  They're set by the immigration

21  judge.

22       But I want to put to bed this issue about the

23  application form, the instructions to the I-589 application

24  form.  They convey an expectation that the country or countries

25  of proposed removal will be known to the applicant at the time

**Appx.850**

1    of the application.

2         And I would direct the Court's attention to page 3 of

3    those instructions, where it says, to qualify for withholding,

4    you must establish as more likely than not that --

5    blah-blah-blah -- that your freedom would be threatened on

6    account of race, religion, nationality, membership in a

7    particular social group or political opinion, quote, "in the

8    proposed country of removal."  So it's known to the person.

9         Likewise, the form specifies that the application for

10   asylum is also considered to be an application for withholding

11   under 1231(b)(3) and may also be considered an application for

12   CAT protection or, if the evidence you present indicates that

13   you may be tortured, quote, "in the country of removal."

14        And so at no point in the history that it's been used

15   has this form to be understood to be an invitation to present

16   protection claims vis-à-vis all the member states in the United

17   Nations and in the world, in the country.  So I really want to

18   put that to bed.

19        With respect to the Government's point about FARRA,

20   O.C.G. is the named plaintiff in this case.  He is entitled to

21   withholding, not just CAT protections.

22        With respect to the Government's argument that this is

23   somehow a challenge to the regulations, it is not.  We are

24   seeking the protections for O.C.G. that are due him under

25   withholding statute and the Convention Against Torture.

```
 1              THE COURT:  Okay.  Great.
 2              So if you want to weigh in further, my -- well, I
 3    can't imagine I will have written this up before 5:00 p.m.  So
 4    you will certainly have until then --
 5              THE CLERK:  Mr. Charles is back.
 6              THE COURT:  Well, Mr. Charles is back to tell us
 7    whether or not any of this is conceivable.
 8              Mr. Charles, are you there?
 9              MARCOS CHARLES:  I am, Your Honor.
10              THE COURT:  Mr. Charles, what can you share with us
11    about the possibility of a reasonable fear interview where
12    they -- the seven people -- are?
13              MARCOS CHARLES:  It is possible, sir.
14              THE COURT:  Okay.  Do you have any confounding details
15    or any other details you could share with us about how it would
16    occur?  Or you just know it's possible and the Department can
17    work it out.
18              MARCOS CHARLES:  I know it's possible and the
19    Department can work it out.  We've been working on it for the
20    last couple of hours to make sure that we can do it, and it is
21    possible to do it.
22              I think right now -- I just don't know.  We're going
23    to have to look at how long it would take us to get it done and
24    keeping people there that long with the -- the cooperation with
25    DOD is going to be key.
```

Appx.852

```
 1                  UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
 2

 3                                  )
        D.V.D.; M.M.; E.F.D.; and    )
 4      O.C.G.,                      )
                                     )
 5             Plaintiffs,           )
                                     )
 6      v.                           )    Civil Action
                                     )    No. 1:25-cv-10676-BEM
 7      U.S. Department of Homeland  )    Pages 1 to 87
        Security; Kristi Noem,       )
 8      Secretary, U.S. Department   )
        of Homeland Security, in her )
 9      official capacity; Pamela    )
        Bondi, U.S. Attorney General,)
10      in her official capacity;    )
        and Antone Moniz,            )
11      Superintendent, Plymouth     )
        County Correctional Facility,)
12      in his official capacity,    )
                                     )
13             Defendants.           )
                                     )
14

15          BEFORE THE HONORABLE BRIAN E. MURPHY
                 UNITED STATES DISTRICT JUDGE
16

17                     MOTION HEARING

18
                       April 10, 2025
19                      11:45 a.m.

20
            John J. Moakley United States Courthouse
21                    Courtroom No. 12
                     One Courthouse Way
22               Boston, Massachusetts 02210

23            Jessica M. Leonard, CSR, FCRR
                   Official Court Reporter
24      John J. Moakley United States Courthouse
                     One Courthouse Way
25               Boston, Massachusetts 02210
                  jessica@wickedsteno.com
```

```
 1    APPEARANCES:

 2   On Behalf of the Plaintiffs:

 3        NORTHWEST IMMIGRANT RIGHTS PROJECT
          By: Matt Adams
 4        615 Second Avenue
          Suite 400
 5        Seattle, WA 98104
          206-957-8611
 6        Matt@nwirp.org

 7
          NATIONAL IMMIGRATION LITIGATION ALLIANCE
 8        By: Trina Realmuto
          10 Griggs Terrace
 9        Brookline, MA 02446
          617-819-4447
10        trina@immigrationlitigation.org

11
     On Behalf of the Defendants:
12
          U.S. DEPARTMENT OF JUSTICE
13        OFFICE OF IMMIGRATION LITIGATION
          By: Drew Ensign
14
          U.S. DEPARTMENT OF JUSTICE,
15        OFFICE OF IMMIGRATION LITIGATION
          By: Mary Larakers
16        PO Box 868
          Washington, DC 20044
17        202-353-4419
          mary.l.larakers@usdoj.gov
18

19

20

21

22

23

24
                    Proceedings reported and produced
25                    by computer-aided stenography.
```

```
 1          THE COURT:  Okay.  So I understand that.  I understand
 2     that there's some debate about how available this remedy is and
 3     whether or not it should be raised at an earlier stage.  And I
 4     understand both of those things.
 5          But the -- if there is any availability to try to
 6     contest, I mean, it would require notice and at least some
 7     period of time.  So under this memo are they -- is the
 8     Department giving any notice and an opportunity for the
 9     individual who's being patriated to a different country an
10     opportunity to raise, through any of the mechanisms you've just
11     discussed, an objection to that third country?
12          MR. ENSIGN:  Your Honor, not under this guidance.  I
13     mean, our position is that notice has been provided earlier in
14     the removal proceedings and through other means.  But this
15     guidance, itself, would not provide notice.
16          THE COURT:  So this guidance, if someone is from
17     El Salvador and the Department is changing their deportation
18     country to Honduras, right now the Department gives no time.
19     They can be picked up at 6:00 a.m., put on a plane, and flown
20     to Honduras at 6:15?
21          MR. ENSIGN:  Your Honor, the guidance would not
22     prohibit that.  In individual circumstances, additional notice
23     might be given.  But the guidance would not correct that.
24          THE COURT:  So if someone knows, if they were to go to
25     Honduras for an individualized reason -- they have political
```

```
 1          MR. ENSIGN:  Your Honor, I mean, the -- assuming
 2    you're in the second part of the guidance, then --
 3          THE COURT:  No.  We're in the first part of the
 4    guidance.
 5          MR. ENSIGN:  Your Honor, they would have needed to go
 6    to the BIA before that.  There's nothing under the guidance
 7    that would require additional notice or an opportunity to
 8    challenge it at that moment.
 9          THE COURT:  So it's your position that there is no
10    constitutional or statutory infirmity to send someone to a
11    country where they have an individualized uncontroverted fear
12    of death?
13          MR. ENSIGN:  Your Honor, where they could have raised
14    it previously and did not do so, that the Due Process Clause
15    does not require an additional procedural opportunity to raise
16    in the that context.
17          THE COURT:  Okay.
18          MR. ENSIGN:  But to the extent that Your Honor
19    believes that that would be insufficient under the first step
20    of the guidance, relief should be narrowly tailored to, you
21    know, such that the -- the second part -- and there would be an
22    opportunity to manifest fear would be, you know -- would be a
23    possible remedy if this Court thought there was a
24    constitutional infirmity, which we obviously dispute.
25          THE COURT:  I understand that.  And so I want to turn
```

```
 1   going to let you continue on jurisdiction because it is a
 2   complicated and interesting issue.
 3           But as a practical matter, if the person is told at
 4   6:00 a.m., they have no options.  Right?
 5           MR. ENSIGN:  Their options have --
 6           THE COURT:  Right now -- because historically, the
 7   practice of, certainly, the Immigration Board is to not list
 8   all 60 countries on the 589 and not to bring that up.  And
 9   right now if someone is picked up tomorrow morning at 6:00 a.m.
10   and they're taken to a country where they could be killed
11   because of an individualized danger, they have no way to raise
12   them, right?
13           MR. ENSIGN:  Your Honor, it's our position that they
14   could and should have raised that earlier, but to the extent
15   that you think that raises constitutional issues, any relief
16   should be narrowly targeted to that particular concern and not
17   the sort of blanket relief that the plaintiffs are asking for.
18           THE COURT:  How do you make it more narrowly targeted?
19           MR. ENSIGN:  Then, you know --
20           THE COURT:  Because let me -- I'm new to the bench, as
21   I suspect you know, and so I perhaps share my thoughts more
22   than a more experienced jurist might, to make sure I'm giving
23   you a chance to tell me where I've stepped off the line.
24           The conclusion that if someone is going to be killed
25   if they are brought back to Country B and they're only told
```

1   about going to Country B minutes before they get on the

2   plane -- the fact that the U.S. Government is not required to

3   give them any chance to say, "I'm going to be killed when I get

4   off the plane," is -- that seems very troublesome to me.

5        And I understand what you're saying as a general

6   matter -- that this -- going forward, this should be done

7   differently.  And that's the question I had for the plaintiffs.

8   And I understand that, right?  The position could well be "Now

9   you know.  Raise all the countries that you're worried about at

10  the time that you're going through the immigration proceeding."

11       But the people who didn't know -- the people who

12  currently have orders of removal didn't know that at the time.

13  There wasn't a practice at the time.

14       So if there is more tailored relief to address the

15  concern I just articulated -- the person who knows from an

16  individualized basis when they get off the plane in Country B

17  that they're going to be killed -- what is the more

18  individualized relief you're suggesting I could offer?

19       MR. ENSIGN:  Beginning with, of course, we object to

20  the premises.  But I think, you know, if you thought, for

21  example, that the procedures under the first step of the

22  guidance were insufficient, you would then need to analyze are

23  the procedures under the second step, if this Court were to

24  require it, you know, sufficient to satisfy due process?  Where

25  someone can manifest fear, and, if so, they're given an

1    opportunity to explain that.

2         And then there's a screening process, and, if they

3    satisfy that standard, then they have an opportunity to raise

4    that more fulsomely.  You know, and then, if you thought there

5    was some deficiency in that, any relief should be tailored to

6    whatever deficiencies you thought in the guidance.  But I

7    think --

8         THE COURT:  Let me turn it back to that.

9         Do you agree?  So make the second part of the

10   guidance -- you're familiar with it.  The second part applies

11   to everybody who's getting sent to a third country.  Does that

12   address all of your concerns?

13        MS. REALMUTO:  Oh, absolutely not.  But -- you know, I

14   worried about the people that are covered by the first part of

15   the guidance, for sure.  But when we get to the second part of

16   the guidance, that's extremely problematic.

17        THE COURT:  Okay.

18        MS. REALMUTO:  It simply says the person is informed.

19   We don't know where, when, how, to whom they're informed.  The

20   burden is on them to manifest the fear, right?  That's -- as

21   we've explained, most noncitizens don't know that.  They are

22   supposed to be told of their rights.  They have a right to

23   express a fear.

24        THE COURT:  But as I understand the guidance -- and

25   correct me if I'm misunderstanding it.  But as I understand the

1    But I want to give you an opportunity to complete it.

2          But while we're on this issue of what the remedy would

3    look like, Ms. Larakers the last time we were here correctly

4    brought up that if I was to say "a meaningful opportunity to be

5    heard" -- that those things mean different things to different

6    people.  And they certainly mean different things to the people

7    who are in front of me here.

8          And so if I was inclined to be issuing a preliminary

9    injunction -- but I hear your concern about both the scope of

10   what it would be and perhaps the people that it would include.

11   Because I'm now thinking about whether or not respective relief

12   for people who would be on notice -- that they would have to

13   delineate the full panoply of countries to which they had a

14   fear.

15         What would a more limited -- what would you have --

16   and I understand you don't want me to issue it at all, but what

17   would the more limited version look like for you?

18         Because one answer -- and the answer that I thought

19   you just said -- was part b of the memo.  I understand that you

20   don't agree that that's a meaningful opportunity, but is that

21   what you would suggest?

22         MR. ENSIGN:  That's certainly something we would

23   suggest.  And we think, also, the prospective/retrospective

24   distinction this Court is drawing is something else that could

25   be considered in terms of narrowly tailoring relief.

1        We think it's also important to keep in mind that

2   essentially what they're proposing is a whole nother round of

3   judicial proceedings.  And, you know, the United States has a

4   very strong interest in the execution of final orders of

5   removal.  These are people that have received, you know, quite

6   a lot of process through an IJ, through a BIA, through,

7   potentially, a federal court of appeals, even an opportunity to

8   seek certiorari if that's -- and an extraordinary amount of

9   process has already been provided.

10        And if anyone can trigger, you know, a whole new round

11   of process, which I -- which is what we think Plaintiffs are

12   anticipating, you know, you're talking about potentially years

13   of delay that can be introduced with relative ease.

14        And that is really concerning.  And, certainly, the

15   Due Process Clause, which is flexible and tailored in the

16   circumstances that we're operating under, necessarily should

17   take account of the fact that people have already received

18   quite a lot of process.

19        THE COURT:  So I am -- that's very persuasive for me.

20   And Ms. Larakers had made the point --

21        Am I pronouncing your name correctly?

22        MS. LARAKERS:  Almost, Your Honor.  Larakers.

23        THE COURT:  Ms. Larakers had made the point last time

24   we were here that it's -- I don't think I should be in the

25   position of defining in the first instance what due process is

1   for the Department.  I think that's very correctly in your

2   hands.

3          And that's why even the temporary restraining order

4   was quite vague in terms of what due process was required.  And

5   I was correctly -- it was correctly pointed out to me that

6   vagueness necessarily will engender dispute, which is why

7   I'm --

8          And I'm not asking you to commit to this, but, if I

9   were to tell you that I'm inclined to issue a preliminary

10  injunction, would your recommendation be to say "issue the

11  preliminary injunction for a subset of people," which is what

12  I'm considering, "and make the process that is due what is

13  delineated in the memo"?

14          MR. ENSIGN:  Yes, Your Honor.  I think that would be

15  our first-line position if there were -- if this Court found

16  that there was a violation.

17          THE COURT:  Okay.  I'm sorry that I've taken you a bit

18  off of your direction.  You were speaking to me about on

19  jurisdiction.  If I could redirect you back on that.

20          MR. ENSIGN:  Thank you, Your Honor.  You know, I think

21  in particular, turning back to 1252(g), I mean, we are just

22  squarely within the text of it.  That provision bars, quote,

23  "any cause or claim...arising from the decision or action by

24  the Attorney General to...execute removal orders."

25          That is their claim to a T.  Their claim arises from

```
1              MS. REALMUTO:  It's something I usually do; so --
2       happy to help out.
3              THE COURT:  So here's what I'm left with.  That you'd
4       like the most robust process possible.  I understand that.  The
5       Department would like a more limited amount of due process.
6       I'm reluctant to demand the most amount of due process as a
7       preliminary injunction matter.  That seems like that would be
8       an overreach on my part.
9              Take everything that he just said as true.  That you
10      can reopen.  You certainly can reopen once you get an adverse
11      determination.  For that ability to reopen to be real, what
12      would be required?
13             MS. REALMUTO:  So I assume that we're working on the
14      second part of the memo and that you have disregarded our
15      full-on objections to that.
16             THE COURT:  I understand we're -- no one's happy.
17      We're right there in the middle.  Yes.
18             MS. REALMUTO:  In order to answer your question --
19      caveat that we don't agree, but, answering this question, I
20      think that the notice has to be more tailored, individualized;
21      it has to be written and documented and in a language the
22      person understands.  So that's the first way to correct the
23      problem.
24             THE COURT:  Okay.
25             MS. REALMUTO:  It can't just be "inform the person."
```

1    Meaningful notice.

2            Then, if the person has to have -- be asked, "Are you

3    afraid?", if that answer to that question is yes and the

4    Government wants to go through with this screening mechanism, I

5    think we have to have an automatic stay of, I would request,

6    21 days.

7            But even if you look at the Government's form that was

8    attached to the complaint as an exhibit, even in that instance,

9    they were saying 14 days, or I believe, perhaps, it was 21.

10   I'd have to look back.

11           But as the Austin declaration, the Mayer-Salins

12   declaration, and the Morales declaration all cover, filing a

13   motion to reopen is an intense process.  Application required.

14   Have to show prima facie eligible.  So a person who is

15   detained -- four business days is simply not enough.  Because

16   immigration court closes at 4:00 or 5:00 on a Friday and it

17   doesn't reopen until Monday morning.

18           THE COURT:  So I understand.  And those declarations

19   were useful in terms of the mechanics of what is required.

20           MS. REALMUTO:  I'm glad.

21           THE COURT:  That was educational for me.

22           So your position would be 21 days?

23           MS. REALMUTO:  21 days.  And then the person can seek

24   reopening.  That's fair.  They have an opportunity to do so.

25   And the Government can do the screening thing as well.  But

1    you've got to lower the standard on screening.  It cannot be

2    the same standard.

3              THE COURT:  What should the standard be?

4              MS. REALMUTO:  We would propose a well-founded fear or

5    credible fear.  We feel like that's reasonable for a --

6              THE COURT:  Credible fear is the lowest, right?

7              MS. REALMUTO:  Right.  It is the lowest.  But these

8    are detained people who are in a compressed time frame, who

9    don't have access to getting the facts and the corroborating

10   documentation that they need.  And many of them may not have

11   counsel.

12             THE COURT:  I understand.

13             Do you want to respond to the 21 days?

14             MR. ENSIGN:  Certainly, Your Honor.

15             I mean, 21 days is an awfully long time.  This is a

16   situation where Congress has recognized that the United States

17   has a lot of interest in executing final orders of removal, and

18   they've devised a number of jurisdictional provisions to

19   prevent people from gumming up the system in order to prevent

20   removals.  And the longer the period is, the more that that's

21   going to be problematic.

22             We don't -- again, we don't think that there's any

23   deficiency in the memo, but, if there are, 21 days would be far

24   too long.

25             THE COURT:  What's an appropriate number of days?

Appx.865

```
 1          MR. ENSIGN:  Your Honor, our -- we think it should be
 2    shorter than that.  I'm not prepared to say exactly what that
 3    period is.  We don't believe there's any deficiencies in the
 4    memo, but, you know, 21 days strikes us as quite long.
 5          And, you know, as to the sort of screening point,
 6    there's a reason that credible fear is used for asylum.
 7    There's at least two different reasons that are fundamentally
 8    different here.
 9          One is that the standard for relief under asylum is
10    already lower than both CAT and withholding of removal.  And so
11    the fact that it's for a lower standard necessarily means that
12    there's a lower standard that applies.
13          THE COURT:  CAT is the -- I guess it's the highest of
14    the lowest standard that's applied for any type of protection
15    of removal, right?
16          MR. ENSIGN:  It's the most stringent.
17          THE COURT:  You have to show the most.
18          MR. ENSIGN:  Right.
19          THE COURT:  Okay.
20          MR. ENSIGN:  And it's the same for withholding of
21    removal.  You have to show more likely than not, whereas asylum
22    is just a well-founded fear.  Which I think the Ninth Circuit
23    has said even a 10 percent chance of persecution is enough for
24    a well-founded fear.
25          And so -- and then, even lower than that would be
```

1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS

2
                                        )
3    D.V.D.; M.M.; E.F.D.; and          )
     O.C.G.,                            )
4                                       )
             Plaintiffs,                )
5                                       )    Civil Action
     v.                                 )    No. 1:25-cv-10676-BEM
6                                       )    Pages 1 to 71
     U.S. Department of Homeland        )
7    Security; Kristi Noem,             )
     Secretary, in her official         )
8    capacity; Pamela Bondi, U.S.       )
     Attorney General, in her           )
9    official capacity; and             )
     Antone Moniz, Superintendent,      )
10   Plymouth County Correctional       )
     Facility, in his official          )
11   capacity,                          )
                                        )
12           Defendants.                )
                                        )

13

14            BEFORE THE HONORABLE BRIAN E. MURPHY
                  UNITED STATES DISTRICT JUDGE

15
                       MOTION HEARING

16

17                     March 28, 2025
                        12:00 p.m.

18

19
              John J. Moakley United States Courthouse
20                   Courtroom No. 12
                    One Courthouse Way
21              Boston, Massachusetts 02210

22
                Jessica M. Leonard, CSR, FCRR
23                 Official Court Reporter
              John J. Moakley United States Courthouse
24                  One Courthouse Way
                 Boston, Massachusetts 02210
25             JessicaMichaelLeonard@gmail.com

```
 1    APPEARANCES:

 2    On Behalf of the Plaintiffs:

 3         NATIONAL IMMIGRATION LITIGATION ALLIANCE
           By: Trina Realmuto
 4         10 Griggs Terrace
           Brookline, MA 02446
 5         617-819-4447
           trina@immigrationlitigation.org
 6
           NATIONAL IMMIGRATION LITIGATION ALLIANCE
 7         By: Kristin Macleod-Ball
           10 Griggs Terrace
 8         Brookline, MA 02446
           617-506-3646
 9         kristin@immigrationlitigation.org

10         NORTHWEST IMMIGRANT RIGHTS PROJECT
           By: Matt Adams
11         615 Second Avenue
           Suite 400
12         Seattle, WA 98104
           206-957-8611
13         Matt@nwirp.org

14         HUMAN RIGHTS FIRST
           By: Anwen Hughes
15         75 Broad Street
           31st Floor
16         New York, NY 10004
           212-845-5200
17         Hughesa@humanrightsfirst.org

18
      On Behalf of the Defendants:
19
           U.S. DEPARTMENT OF JUSTICE,
20         OFFICE OF IMMIGRATION LITIGATION
           By: Mary Larakers
21         PO Box 868
           Washington, DC 20044
22         202-353-4419
           mary.l.larakers@usdoj.gov
23
           U.S. DEPARTMENT OF JUSTICE,
24         OFFICE OF IMMIGRATION LITIGATION
           By: Mark Sauters
25         One Courthouse Way
           Ste 9200
```

1        Boston, MA 02169
         617-748-3347
2        Mark.sauter@usdoj.gov

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25             Proceedings reported and produced
                by computer-aided stenography.

1    Government that to switch the third-party country designation

2    requires that the deportee who is going to be moved be given an

3    opportunity to be told that that third-party designation is

4    going to be changed and an opportunity to be heard as to the

5    dangerousness of that removal -- do you agree that that's the

6    Government's position?

7            MS. LARAKERS:  I don't agree with their

8    characterization of it.  The statement was made with regard to

9    required in removable proceedings; so when that individual is

10    before the immigration court.  And we're outside of that

11    context here.  We're in post-final order.

12            THE COURT:  Given that we're -- does that apply at

13    all?  So I understand that they're not asking to go back to

14    immigration.

15            I don't think you're going to ask me that.

16            MS. REALMUTO:  We are not.

17            THE COURT:  In this posture, where it is the

18    discretionary decision of the department that's changing the

19    third-party designation, does the person who's going to be

20    deported have a right to be informed and be given an

21    opportunity to be heard as to the dangerousness of that third

22    country designation?

23            MS. LARAKERS:  DHS's position is no.

24            THE COURT:  They don't have to be told anything and

25    given no opportunity to be heard?

Appx.870

```
 1            MS. LARAKERS:  DHS's position is no.

 2            THE COURT:  Okay.  Thank you.

 3            MS. REALMUTO:  Plaintiff's position is yes.  A strong

 4    yes.  Because, in order to afford the protections provided by

 5    the statute implied in the Convention Against Torture, a person

 6    has to be notified of the country to which they are -- the

 7    Government is seeking to deport them.

 8            The State Department recognizes some 197 countries.

 9    They cannot be guessing what country the Government is seeking

10    to deport them to.  The Government is not providing them with

11    notice, and it is not providing them with an opportunity to

12    make their fear-based claim before the immigration court.

13            And what happened, we think, to Plaintiff O.C.G.

14    illustrates the urgency of the situation.  There an immigration

15    judge granted him protection from removal to Guatemala.

16            He thought he was being released from detention and,

17    two days later, he was put on a bus and deported to Mexico

18    without the Government notifying him or his counsel and without

19    a chance to make his claim of fear of deportation to Mexico

20    based on the fact that he had been raped and held hostage in

21    that country.

22            THE COURT:  I'm familiar with that.  The one thing I

23    was somewhat unclear on is that -- I forget if it was in the

24    declaration from O.C.G. or in the initial briefing, but there

25    was an indication that in the immigration proceeding -- that
```

1    surprising thing to hear the Government say.

2         And so, if that is your -- I want to make sure that I

3    understand your position correctly, that, if the Government is

4    saying, We can deport people to any country that is not

5    prohibited on the notice of removal, and we are not obligated

6    to listen to anything that the deportee has to say about the

7    danger of torture or death that they may face there -- if

8    that's your position, okay. Great. I understand your

9    position.

10        But I don't want to mischaracterize your position; so

11   that's why I'm saying it back to you, to make sure.

12        Is your position that the Government can decide right

13   now that someone who is in their custody is getting deported to

14   a third country, give them no notice and no opportunity to say,

15   I will be killed the moment I arrive there, and, as long as the

16   Department doesn't already know that there's someone standing

17   there waiting to shoot him, that that's fine?

18        MS. LARAKERS: In short, yes.

19        THE COURT: Okay.

20        MS. LARAKERS: And that merits argument about O.C.G.

21   That's alternative arguments down the road.

22        THE COURT: I didn't want to get too far into that

23   because, obviously, I can't resolve it.

24        MS. LARAKERS: Right. But I will say -- shortly --

25   that just because that's, like, the legal position doesn't mean

Appx.872

1    that's not very long at all.  How about to the 4th?  Would that

2    be enough time for you to file an opposition to the class

3    certification and any additional briefing you'd like on the

4    opposition to the preliminary injunction.

5              MS. LARAKERS:  I obviously would love more time,

6    Your Honor, but it sounds like it's going to have to be the

7    4th.

8              THE COURT:  The 4th, I'm sorry, is only a week.  But

9    that kicks it back to them; they have only a couple of days.

10             And a reply brief by the 8th?  I recognize that gives

11   you only two work days, but the deadlines are short.

12             MS. REALMUTO:  We'll make it work.

13             THE COURT:  In the meantime, I take your point about

14   the Court ordering what "meaningful" means to heart.  And so I

15   would consider a motion to reconsider, if you wanted to narrow

16   what that procedure looked like, or you wanted come to an

17   agreement about what it looked like, or you wanted to tell me,

18   This is what we're defining as meaningful, and I would like you

19   to reconsider and adopt this.

20             I'm open to all of those things because you raise a

21   very good point.  And so, to the extent that the guidance that

22   the Court is giving you is nothing more than a meaningful

23   opportunity and you want some more direction or you want to

24   narrow that with some more specificity, I would welcome a

25   motion to consider.

```
 1          If you file a motion to consider, I can hear you.  I
 2   think you're in D.C.; so I can hear you, even by Zoom, within
 3   24 hours.
 4          MS. LARAKERS:  Thank you, Your Honor, for that
 5   opportunity.
 6          I do want to highlight that, in that motion to
 7   reconsider that we may file, we may raise objections to the
 8   issuing of a TRO in a nationwide context without a
 9   provisional -- without even any certification of a class.
10          I just had to make sure I made that point.
11          THE COURT:  That's completely understood and I'm happy
12   to deal with that.  This is only for ten days; so if you want
13   me to deal with that in between, I'm happy to.
14          But if this prevents procedural challenges that I've
15   not anticipated, explain them to me, and I'm happy to try to
16   ameliorate that, to the degree that I can.
17          MS. LARAKERS:  No, thank you, Your Honor.
18          THE COURT:  With that is there anything else I can do
19   for you today?
20          MS. REALMUTO:  No, thank you, Your Honor.
21          THE COURT:  Is there anything else I can do for the
22   Government today?
23          MS. LARAKERS:  No, Your Honor.  Thank you.
24          THE COURT:  Thank you both.  I appreciated the
25   argument.
```