

**National Immigration Litigation Alliance**
*Immigrant justice through the courts*

September 17, 2025

Anastasia Dubrovsky, Clerk of Court
U.S. Court of Appeals for the First Circuit
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2500
Boston, MA 02210

      Re:   *D.V.D., et al., v. DHS, et al.*, Nos. 25-1393, 1631
             Letter Pursuant to Fed. R. App. P. 28(j)

Dear Ms. Dubrovsky:

Plaintiffs-Appellees submit this letter in support of their pending motion to remand to bring to the Court's attention the decision of the U.S. District Court for the District of Columbia in *D.A., v. Noem*, No. 1:25-cv-03135-TSC (D.D.C. Sept. 15, 2025), Dkt. 41.

The *D.A.* case involved five members of the nationwide class certified by District of Massachusetts in this case. All five had final removal orders and had won protection from deportation to their countries of origin. Slip. Op. at 2. They alleged that "in the middle of the night on September 5, 2025, they were awakened from their beds, shackled, and put on a U.S. military cargo plane without being allowed to notify family or legal counsel, and, in at least one case, without identification documents." *Id*. "Defendants transported [the class members] to Ghana with no notice or opportunity to challenge that removal, under what appears to be a hasty and unwritten agreement with Ghana, which has indicated its intention to return [the class members] to their home countries where Defendants agree they will almost certainly be persecuted." *Id*. at 5. "One [class member] was almost immediately sent back to his home country and is currently in hiding." *Id*. at 3. The court denied the *D.A.* plaintiffs' motion for a temporary restraining order, concluding that, for these plaintiffs outside the country, it lacked jurisdiction to remedy their harms. *Id*. at 11-15.

These class members' deportations to Ghana without notice or the opportunity to present a fear-based claim were pursuant to the March 30 policy memo at issue in this case, *see* Appx. 119-21; *see also* Dist. Ct. Dkt. 190-1 (implementing memo).

The district court's decision in *D.A.* supports Plaintiffs-Appellees' arguments urging remand to dissolve the preliminary injunction to allow the District Court to focus on the merits of Plaintiffs-Appellees' claims, including their claim that the March 30 policy is unlawful. *See* Pls-App. Reply in Support of Remand at 1-2, 7-8, 8-9; *see also id*. at 4-5. Further, the decision illustrates why any prejudice to Defendants in remand pales in comparison to the harm class members face. *Id*. at 11-12.

Respectfully submitted,

s/ *Trina Realmuto*

Trina Realmuto
Kristin Macleod-Ball
Mary Kenney
NATIONAL IMMIGRATION
 LITIGATION ALLIANCE
10 Griggs Terrace
Brookline, MA, 02446
(617) 819-4447
trina@immigrationlitigation.org

Matt Adams*
Leila Kang*
Aaron Korthuis*
Glenda M. Aldana Madrid*
NORTHWEST IMMIGRANT
 RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611
matt@nwirp.org

Anwen Hughes
HUMAN RIGHTS FIRST
75 Broad Street, 31st Floor
New York, NY 10004
(212) 845-5244
HughesA@humanrightsfirst.org

*Attorneys for Plaintiffs-Appellants*

CC via ECF: Counsel for Defendants-Appellants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| D.A., T.L., I.O., D.S., and K.S., <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, SECRETARY OF HOMELAND SECURITY, IN HER OFFICIAL CAPACITY; TODD LYONS, ACTING DIRECTOR, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, IN HIS OFFICIAL CAPACITY; PAMELA BONDI, ATTORNEY GENERAL, IN HER OFFICIAL CAPACITY; AND MARCO RUBIO, SECRETARY OF STATE, IN HIS OFFICIAL CAPACITY, <br><br> Defendants. | Civil Action No. 25-cv-3135 (TSC) |

**MEMORANDUM OPINION AND ORDER**

In 1988, the United States signed the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") Treaty, and formally ratified it in October 1994. For over three decades, through five presidential administrations, this country has adhered to its obligations to treat refugees humanely and to comply with the Constitutional requirement of due process, which is afforded to all persons present in this country, regardless of their citizenship status. *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all "persons" within the United States, including [non-citizens], whether their presence here is lawful, unlawful, temporary, or permanent.").

In recent months, the government has embarked upon a series of deportations which signal a drastic change of course. In several cases, authorities have rounded up—often at night and with

1

little or no notice—men, women, and children being held in detention facilities, hastily put them on planes and transferred them to other countries, where they have no connections, do not speak the language, and are unable to contact family or counsel.  This case involves a similar scenario.

Plaintiffs are five citizens of Nigeria and The Gambia who were granted fear-based immigration relief, either withholding of removal under the Immigration and Naturality Act ("INA") or deferral of removal under the CAT.  Compl. ¶¶ 4–8, ECF No. 1.  This means that, after an extensive immigration process, a U.S. immigration judge found that Plaintiffs had shown that they were more likely than not to face persecution, torture, or death if they were returned to their home countries.  One Plaintiff, D.A., who is also married to a U.S. citizen, fled his country after being tortured by the military and police officers who told him that if they ever saw him again, they would kill him.  The immigration court found that he, like the other Plaintiffs, was entitled to protection by the United States.

Plaintiffs, who were being held at a U.S. Immigration and Customs Enforcement ("ICE") facility, allege that in the middle of the night on September 5, 2025, they were awakened from their beds, shackled, and put on a U.S. military cargo plane without being allowed to notify family or legal counsel, and, in at least one case, without identification documents.  They claim that some of them were placed in straitjackets for up to 16 hours.  One Plaintiff alleges that he now has difficulty walking because his straitjacket was secured so tightly.

Plaintiffs were ultimately informed by U.S. officers that they were being taken to Ghana.  Plaintiffs are not Ghanaian citizens, have no connections to Ghana, and did not designate Ghana as a potential country for removal during their immigration proceedings.  They were taken to Dema Camp, a remote, open-air detention facility surrounded by armed military guards.

On September 12, 2025, Plaintiffs filed a Complaint and Motion for Temporary Restraining Order against Defendants Kristi Noem, Todd Lyons, Pamela Bondi, and Marco Rubio, claiming violations of the Administrative Procedure Act ("APA"), Fifth Amendment Due Process Clause, Withholding of Removal statute, the CAT and its implementing regulations, and the Freedom of Information Act. They seek immediate injunctive relief, claiming that they now face imminent removal from Ghana to their countries of origin—a process which they claim is being facilitated by Defendants.

At a hearing on September 12, Defendants agreed that, even though Plaintiffs have final orders of removal, they cannot be returned to their home countries. Sept. 13, 2025, Mot. Hr'g Tr. 4:14–20, ECF No. 23.[1] Defendants claim, however, that they were assured by Ghana that it would not send Plaintiffs to countries where they would likely be tortured. *Id.* at 4:21–5:02.[2] Despite this assurance, one Plaintiff was almost immediately sent back to his home country and is currently in hiding. *See* Decl. of Plaintiff K.S. ¶¶ 8–13 ("K.S. Decl."), ECF No. 1-1.

Although Defendants agree that it appears Ghana is violating the assurances it provided to the United States, and agreed that this practice "is not okay," they claim that they cannot prevent this repatriation because the U.S. government "does not have the power to tell Ghana what to do." Sept. 13, 2025, Mot. Hr'g Tr. 5:12–16.

---

[1] THE COURT: So yesterday we had a hearing and you agreed with me that the United States government was aware that the plaintiffs in this matter, even though they had an order of removal or they're in removal status, could not be returned to their home country. Do you agree [] with that? DEFENSE COUNSEL: Yes.

[2] THE COURT: And the next thing you assured me was that the agreement with Ghana was reached [] as a result of high-level diplomatic discussions. And the government [] had received assurances from Ghana that Ghana would comply with the convention against torture, is that correct? DEFENSE COUNSEL: That is correct.

3

Defendants' actions in this case appear to be taken in disregard of or despite its obligations to provide individuals present in the United States with due process and to treat even those who are subject to removal humanely. These actions also appear to be part of a pattern and widespread effort to evade the government's legal obligations by doing indirectly what it cannot do directly.

These are not speculative concerns, and this case is not an outlier; it is not the first case in which plaintiffs allege that the government has deported or attempted to deport them with no notice or opportunity to contact family or counsel. In some cases, individuals were deported to their home countries despite court orders barring removal. *See, e.g.*, *Abrego Garcia v. Noem*, 777 F. Supp. 3d 501 (D. Md. 2025). In others, individuals—many of them children—were hastily rounded up and put on planes without valid removal orders, and with no notice or opportunity to challenge their removal. *See, e.g.*, *L.G.M.L. v. Noem*, No. 25-cv-2942 (D.D.C. 2025).

In recent months, plaintiffs have filed the following cases:

- *A.A.R.P. v. Trump*, 145 S. Ct. 1364 (2025): Although the government was aware that plaintiffs had a right to challenge their removal under the Alien Enemies Act ("AEA") through a habeas action, several detainees "were served notices of AEA removal and told that they would be removed 'tonight or tomorrow.'" *Id.* at 1366. The Supreme Court was forced to intervene in the middle of the night to order the government not to remove plaintiffs without giving them adequate opportunity to file habeas petitions.

- *L.G.M.L. v. Noem*, No. 25-cv-2942 (D.D.C. 2025): Plaintiffs allege that the government took 76 Guatemalan children from refugee shelters late at night and placed them on a plane bound for Guatemala. *See* Decl. of A.J.D.E., ECF No. 20-1 ("At around 4:00 a.m., a man showed up to take us away in a van. I was afraid of him. I didn't want him to take me."). A court in this district issued a temporary restraining order ("TRO"), holding that plaintiffs were likely to prevail on their claim that the government's efforts to bypass proper procedures violated the Trafficking Victims Protection Act ("TVPRA").

- *Kettlewell v. Noem*, No. 25-cv-491 (D. Ariz. 2025): The government allegedly attempted to immediately deport 53 Guatemalan and 12 Honduran children on short

notice and without valid removal orders. A district court in Arizona held that the government likely violated the TVPRA and issued a TRO.

- *Noem v. Abrego Garcia*, 145 S. Ct. 1017 (2025): The government improperly deported Abrego Garcia to a prison in El Salvador even though he "was subject to a withholding order forbidding his removal to [El] Salvador." The Supreme Court ordered the government to facilitate his return. *See Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112, at *1 (4th Cir. Apr. 17, 2025).

- *Melgar-Salmeron v. Bondi*, No. 23-7792 (2d Cir. 2025): Approximately thirty minutes after the Second Circuit granted Melgar-Salmeron a stay of removal, the government placed him on a plane and deported him to El Salvador. The Second Circuit ordered the government to facilitate his return to the United States.

- *Department of Homeland Security v. D.V.D.*, 145 S. Ct. 2153 (2025): A gay Guatemalan man stated that he feared he would be tortured on account of his sexuality if deported to either Guatemala or Mexico. *Id.* at 2154 (Sotomayor, J., dissenting). An immigration judge granted a withholding of removal to Guatemala but not Mexico because Guatemala was the only country designated on his order of removal. Days later, the government deported the man to Mexico without giving him an opportunity to seek a withholding of removal to that country. Soon after, Mexico deported him to Guatemala, where he went into hiding.

Here, Defendants transported Plaintiffs to Ghana with no notice or opportunity to challenge that removal, under what appears to be a hasty and unwritten agreement with Ghana, which has indicated its intention to return Plaintiffs to their home countries where Defendants agree they will almost certainly be persecuted. This is not merely, as Defendants suggest, "a frustrating situation." Sept. 13, 2025, Mot. Hr'g Tr. 6:19–7:1.

Nonetheless, despite the danger Plaintiffs now face as a result of Defendants' actions, and as explained below, the court cannot grant Plaintiffs the relief they seek because Plaintiffs have not met their burden to establish that this court has jurisdiction to order such relief. At the outset, the court must assure itself that it has jurisdiction before it reaches the merits of Plaintiffs' claims. On this record, it cannot do so. Consequently, for the reasons explained below, the court will DENY Plaintiffs' motion for a temporary restraining order.

5

## I.     BACKGROUND

### A. Statutory and Regulatory Framework

Non-citizens facing removal are entitled under domestic and international law to seek various protections, including asylum, withholding of removal under the INA, and protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U. N. T. S. 113; 8 C.F.R. § 1240.11(c)(1). Plaintiffs in this case had been granted withholding of removal under the INA or deferral of removal under the CAT.

Withholding of removal under the INA and CAT protection are forms of "country specific" relief. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 428, n. 6 (1987); *Johnson v. Guzman Chavez*, 594 U.S. 523, 535–36 (2021). If an immigration judge grants an application for either, the government is prohibited from removing the non-citizen *to* a particular country, not *from* the United States. *Guzman Chavez*, 594 U.S. at 535–36. The government retains the authority to remove the non-citizen to any other country authorized by the statute but not to the specific country as to which the non-citizen has demonstrated a likelihood of persecution, torture, or death. *See* 8 C.F.R. §§ 208.16(f), 1208.16(f), 1240.12(d); 8 U.S.C. § 1231(b)(2).

The United States is a party to the Convention, and in 1998 Congress passed the Foreign Affairs Reform and Restructuring Act ("Act") to implement its dictates. Pub. L. 105-277, Div. G, Title XXII, § 2242(a), 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231). The Act provides that "[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States." *Id.*

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Congress established two processes for removing non-citizens deemed ineligible to enter or remain in the United States—both require an evidentiary hearing before an Immigration Judge. 8 U.S.C. § 1229a. First, a non-citizen may seek statutory withholding of removal under 8 U.S.C. § 1231(b)(3)(A). Withholding of removal relief protects non-citizens from removal to a particular country if it is likely that their "life or freedom would be threatened" based on a protected category such as race, religion, or nationality. 8 U.S.C. § 1231(b)(3)(A) (the government "may not remove an alien to a country if the Attorney General decides that the [non-citizen's] life or freedom would be threatened in that country because of the [non-citizen's] race, religion, nationality, membership in a particular social group, or political opinion.").

Second, the non-citizen may seek withholding under the CAT, which prohibits removal of a non-citizen to a country where they are likely to be tortured. *See* 8 C.F.R. §§ 208.16–208.17, 200.1, 1208.16–1208.17. Both forms of relief are codified in 8 U.S.C. § 1231, and though they do not grant non-citizens any legal status in the United States, *see Cardoza-Fonseca*, 480 U.S. at 428 n.6, the protections are mandatory: "The Executive must provide them to aliens who qualify for them." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 725 (D.C. Cir. 2022).

**B. Factual Background**

a. *Plaintiffs*

Plaintiffs are five citizens of Nigeria and The Gambia, who, before September 5, 2025, were detained in ICE facilities across the country with protection from being deported to their home countries—either withholding of removal under the INA or deferral of removal under CAT. Compl. ¶¶ 4–8, 14. Each had received a final order of removal. Sept. 12, 2025, Mot. Hr'g Tr. at 23:17–19.

7

By September 5, ICE had transferred each Plaintiff to a detention center in Alexandria, Louisiana. Compl. ¶ 15. That night, Plaintiffs were "awoken and removed from their cells," "shackled in chains," and "put on a U.S. military plane without being told where they were going." *Id.* ¶ 16. Plaintiffs allege that at some point during the flight, an ICE officer told Plaintiffs that they were being taken to Ghana, "and then to their countries of origin." *Id.* ¶¶ 17, 21.

Plaintiffs are not Ghanaian, and Ghana was not designated as the country of removal during their immigration proceedings. *Id.* ¶¶ 18, 19. Nonetheless, four Plaintiffs were flown from the United States and taken to Dema Camp, an open-air detention facility in Ghana. *See id.* ¶ 22. Detainees at Dema sleep in tents with little running water, wear the same clothes for several days, and are surrounded by armed military guards. *Id.* ¶ 27. One Plaintiff reports that for at least twenty-four hours, there had been "no reliable power, Internet, or running water." Decl. of Plaintiff D.A. ¶ 20 ("D.A. Decl."), ECF No. 21-1.

Plaintiff K.S. was held at the airport in Accra, Ghana for five days, where he repeatedly expressed his fear of being returned to The Gambia, his home country, and stated that he had won protection from returning to The Gambia under the CAT based on his sexuality. K.S. Decl. ¶ 24. He alleges that he told Ghanaian immigration officials that he wanted to stay in Ghana for his safety. *Id.* ¶ 9. But the officials told him that his "final destination was The Gambia, based on orders from ICE officials and his Ghanaian superiors." *Id.* On September 10, K.S. was placed on a Pan African Airlines flight to The Gambia, where he remains in hiding in "fear of his life." *Id.* ¶ 10.

Plaintiffs D.A., T.L., I.O., and D.S., allege that they face the same fate. D.A. Decl. ¶ 13 ("While on the plane, the leader of the ICE officer who put me into a straitjacket said that he was ordered to make sure we all get to Ghana."); *id.* ¶ 17 ("I fear for my life if I were to go back to Nigeria. If I go back to Nigeria, I will be tortured and possibly killed."). On September 10, and

8

again on September 12, Ghanaian officials told Plaintiffs that they would be imminently removed to their countries of origin. Compl. ¶ 28; Emergency Mot. for Interim Relief at 1 ("Emergency Mot."), ECF No. 18.

      b. *United States' Diplomatic Assurances from Ghana*

Shortly before Plaintiffs were taken to Ghana, the United States and Ghana entered into an unwritten agreement under which it appears that Ghana has agreed to assist the United States with the removal of non-citizens. Compl. ¶ 64; *see* Sept. 12, 2025, Mot. Hr'g Tr. 13:19–23 (acknowledging Ghana would accept non-citizens into their country); Sept. 12, 2025, Mot. Hr'g Tr. 14:11–15 (recognizing discussions with Ghana occurred for "several weeks" to ensure Ghana would "comply with international treaties.").

At the September 12 hearing, counsel for Defendants represented that the State Department had received "diplomatic assurances" from Ghana that Plaintiffs would not be tortured or taken to a place where they would be tortured. *Id.* at 11:18–21 ("[The government] received a diplomatic note indicating assurances from the Ghanaian government that these individuals were going to be taken there and then they were not going to be tortured or taken to a place where they would be tortured."); *see also id.* at 13:14–16 ("[T]he United States received a diplomatic note from Ghana indicating that they were going to abide by the international treaties."); *id.* at 13:19–23 ("[Ghana was] going to accept these individuals into their country, they were not going to torture them, and they were going to make sure that if they were to be taken to another country that they would not take them to a country where they would be tortured."); *id.* at 23:10–14 ("[T]he State Department took this matter and this agreement very seriously, and the agreement that they received, again, it was credible and reliable assurances [from Ghana].").

9

Despite this assurance, Ghana promptly returned one Plaintiff to his home country and has declared its intention to repatriate the remaining Plaintiffs as well. D.A. Decl. ¶ 19 ("[A] Ghanaian military commander came to Dema Camp and informed me and the other people detained here that government officials from our countries would be coming to the camp to see us tomorrow morning. . . . We were told we will be removed the next day, on September 13, 2025."); *see* Sept. 12, 2025, Mot. Hr'g Tr. at 6:7–11 (THE COURT: "Does Ghana appear to be violating the assurances that it gave the U.S. government. DEFENSE COUNSEL: Assuming the plaintiffs – based on the plaintiffs' allegations it seems that is correct.").

### C. Procedural Posture

On September 12, Plaintiffs filed their Complaint and moved for a temporary restraining order under Counts I (Administrative Procedure Act) and II (Due Process Clause), asking the court to (1) enjoin Defendants from removing, facilitating, enabling, or encouraging the removal of Plaintiffs from their countries of origin, and (2) order Defendants to facilitate Plaintiffs' return to the custody of the United States. In the alternative, Plaintiffs ask the court to order Defendants to notify the Ghanaian government not to remove Plaintiffs to their countries of origin or any other country where they fear persecution or torture, nor subject them to unreasonable conditions until they obtain a ruling on a motion for preliminary injunction. *Id.*

At a hearing that same day, the parties agreed to a briefing schedule. *See* Sept. 12, 2025, Min. Order. Three hours later, counsel for Plaintiffs informed the court that they had received information that Plaintiffs would be imminently removed to their home countries, as early as the next day, September 13. Emergency Mot. at 1. Plaintiffs then filed a second emergency interim relief motion. *Id.* The court held a second hearing on September 13, and the parties submitted supplemental briefing the next day.

10

## II.     LEGAL STANDARD

A temporary restraining order is "an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion." *Postal Police Off. Ass'n v. U.S. Postal Serv.*, 502 F. Supp. 3d 411, 418 (D.D.C. 2020) (citation omitted). As with a preliminary injunction, a party seeking a temporary restraining order must establish "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)).

## III.     ANALYSIS

Defendants argue that Plaintiffs fail to demonstrate a likelihood of success on the merits of their claim. Defs.' Mem. Opp'n ("Defs.' Opp'n"), ECF No. 33. They argue that Plaintiffs' injuries cannot be redressed by this court, the relief they seek would improperly insert the judiciary into sensitive issues of foreign affairs, and Plaintiffs' claims are foreclosed because of their membership in the certified Rule 23(b)(2) class in *D.V.D. v. U.S. Dep't of Homeland Security*, No. 25-10676, 2025 WL 1142968 (D. Mass. Apr. 18, 2025), which has been stayed by the Supreme Court, pending appeal of the preliminary injunction in the First Circuit. *See* Defs.' Opp'n at 8–15.

### A.     Jurisdiction

Before the court can address the merits of Plaintiffs' motion, it must first assess its authority to provide the requested relief. Federal district courts, as courts of limited jurisdiction, possess only such authority as is conferred on them by the Constitution and acts of Congress, and this authority cannot "be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "[A] party who fails to show a 'substantial likelihood'" of jurisdiction

11

is not entitled to a temporary restraining order. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

Matters of foreign affairs are "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952). The government's 'inherent foreign affairs power," "like every other governmental power," however, "must be exercised in subordination to the applicable provisions of the Constitution." *Am. Ins. Ass'n v Garamendi*, 539 U.S. 396, 416 n.9 (2003) (internal quotation marks and citation omitted). Courts may review an action implicating foreign policy issues "to ensure that it has not crossed a constitutional line." *See Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 19 (2025) (recognizing that courts "review even legislation implicating foreign policy issues to ensure that it has not crossed a constitutional line," but cautioning that courts should not "cavalierly interfere with the political branches' 'delicate judgments' on matters of foreign affairs.").

Plaintiffs argue that Defendants have dictated Plaintiffs' ultimate destination to the Ghanaian government. *See* K.S. Decl. ¶ 7 ("[T]he apparent head ICE official on the plane . . . told me that those on the plane were being sent to Ghana and that Ghana would send us to our home countries."). Because the government has arranged for their removal, by way of Ghana, to countries from which they have been granted withholding or CAT deferral, they ask the court to:

(1) Enjoin the government from removing, facilitating, enabling, or encouraging the removal of Plaintiffs from to their countries of origin; and
(2) Order the government to facilitate Plaintiffs' return to the custody of the United States.
(3) In the alternative, Plaintiffs ask that the court order the government to notify the Ghanaian government not to remove Plaintiffs to their countries of origin or other countries where they fear persecution or torture nor subject them to unreasonable conditions until a preliminary injunction motion can be briefed and decided by this court.

TRO Mot. at 2.

The court finds that Plaintiffs have not carried their jurisdictional burden. They assert that this court has "equitable authority" to afford them the requested relief under the All Writs Act ("AWA"), 28 U.S.C. § 1651, through the issuance of an injunction to protect its jurisdiction and to preserve the status quo pending a final determination of the merits of this action. Emergency Mot. at 4–6. The AWA authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law," 28 U.S.C. § 1651(a), and "to preserve [its] jurisdiction or maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels," *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966).

But the AWA is not necessarily a freestanding grant of jurisdiction. Congress made clear that the AWA can only be used "in aid" of a court's "respective jurisdiction[]." 28 U.S.C. § 1651(a). Indeed, where the Supreme Court has issued recent relief in an emergency immigration posture under the AWA, the plaintiffs relied on an additional, independent source of Congressional authority that specifically provided for judicial review. *Compare Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) (concluding that "detainees subject to removal orders under the AEA are entitled to notice and an opportunity to challenge their removal"), *with J.G.G. v. Trump*, Case No. 25-cv-766, Compl. ¶¶ 5, 7, ECF No. 1 (D.D.C. Mar. 15, 2025) (seeking relief under the AWA and the AEA); *Compare Abrego Garcia*, 145 S. Ct. at 1017 (granting in part and denying in part the government's emergency application to "facilitate" Abrego Garcia return), *with* Compl. ¶¶ 2, 96–99, *Abrego Garcia v. Noem*, Case No. 25-cv-951, ECF No. 1 (D. Md. Mar. 24, 2025) (seeking relief under the AWA and habeas corpus). Plaintiffs also challenge the government's actions under the APA. Compl. ¶¶ 36–40. But they do not cite a single case in which a court employed that statute in aid of its jurisdiction in the immigration context.

13

While it is true that a district court may act to preserve its jurisdiction under the AWA "[i]f a case presents a 'substantial' jurisdictional question," *Belbacha v. Bush*, 520 F.3d 452, 455 (D.C. Cir. 2008) (citation omitted), here, there is no question that the court lacks the power to order the Executive Branch to order Ghana to keep Plaintiffs in Ghana or to order the Executive Branch "to notify the Ghanaian government not to remove Plaintiffs to their countries of origin or other countries where they fear persecution or torture." TRO Mot. at 2. "Courts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) (en banc).

Plaintiffs argue that this case warrants the same relief afforded in *Abrego Garcia*, Pls.' Mem. Opp'n at 2–7, ECF No. 32, but in that case, the U.S. government improperly removed Abrego Garcia from the United States to El Salvador, where he was detained. *Abrego Garcia*, 145 S. Ct. at 1018. The government acknowledged that Abrego Garcia was subject to a withholding order forbidding his removal to El Salvador, and that his removal to El Salvador was therefore illegal. *Id.* (noting that the government confessed "administrative error" in removing Abrego Garcia). While the Supreme Court upheld the district court's order that the government "facilitate" Abrego Garcia's "release from custody in El Salvador," it provided little reasoning or instruction regarding the district court's jurisdiction over the relief it had ordered. *Id.* at 1018 (Sotomayor, J., concurring in the judgment) (emphasizing only that courts are not barred from granting relief "once a deportee crosses the border"). And the Court cautioned against district courts encroaching upon "the deference owed to the Executive Branch in the conduct of foreign affairs." *Id.*

Because even emergency orders from the Supreme Court "constitute[] a precedent that commands respect," *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2663

14

(2025) (Gorsuch, J., concurring in part and dissenting in part), this court cannot reasonably determine that Plaintiffs' situation here mirrors Abrego Garcia's predicament. Here, unlike Abrego Garcia's case, Defendants do not concede that Plaintiffs were improperly removed to Ghana—to the contrary, they argue that Plaintiffs were properly sent there pursuant to an agreement with Ghana, which agreed to take them. Sept. 13, 2025, Mot. Hr'g Tr. at 21:1–6.[3] That unwritten "agreement" appears to be the result of a diplomatic assurance from Ghana that it would not torture Plaintiffs or send them to a country where they would be tortured. *See* Sept. 12, 2025, Mot. Hr'g Tr. 11:18–21, 13:14–16, 13:19–23. This court cannot order the U.S. government to order a foreign government to take any action, despite facts in the record indicating that this agreement may have been designed to evade Defendants' obligations to Plaintiffs. Sept. 13, 2025, Mot. Hr'g Tr. at 4:14–10:5; 12:8–14:17.

The court does not reach this conclusion lightly. It is aware of the dire consequences Plaintiffs face if they are repatriated. And it is alarmed and dismayed by the circumstances under which these removals are being carried out, especially in light of the government's cavalier acceptance of Plaintiffs' ultimate transfer to countries where they face torture and persecution. But its hands are tied.

---

[3] In similar cases upholding a district court's order to return a non-citizen, the non-citizen was not subject to a lawful removal order. *See J.O.P. v. U.S. Dep't of Homeland Sec.*, No. 25-1519, 2025 WL 1431263, at *1 (4th Cir. May 19, 2025) (Benjamin, J., concurring) (denying the government's requested stay of a district court order that ordered a non-citizen's return from El Salvador and noting that the government admitted removing the non-citizen in violation of a settlement agreement); Order at 2, *Melgar-Salmeron v. Bondi*, Case No. 23-7792, ECF No. 49 (2d Cir. June 25, 2025) (ordering the return of a non-citizen and noting that the government confessed error in its removal).

## IV.  CONCLUSION

For these reasons, it is hereby ORDERED that Plaintiffs' Emergency Motion for a Temporary Restraining Order, ECF No. 2, and Emergency Motion for Interim Relief, ECF No. 18 are DENIED.

Date: September 15, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge