Nos. 25-1393, 25-1631

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

————————————————

D.V.D.; M.M.; E.F.D.; O.C.G.,

Plaintiffs-Appellees,

v.

U.S. Department of Homeland Security; Kristi Noem, Secretary of Department of Homeland Security (DHS); Pamela Bondi, United States Attorney General; Antone Moniz, Superintendent of the Plymouth County Correctional Facility,

Defendants-Appellants

————————————————

On Appeal from the United States District Court for the District of Massachusetts

————————————————

**BRIEF OF *AMICUS CURIAE* HUMAN RIGHTS WATCH IN SUPPORT OF PLAINTIFFS-APPELLEES AND FOR AFFIRMANCE**

————————————————

Ian M. Kysel, Associate Clinical Professor of Law
Courtney Bell, Student Attorney*
Transnational Disputes Clinic
Cornell Law School
Myron Taylor Hall
Ithaca, NY 14853
ian.kysel@cornell.edu
(607) 255-5503
*Motion for Student Appearance
filed concurrently with this brief*

Michael Garcia Bochenek
Reagan Williams
Human Rights Watch
350 Fifth Avenue, 34th Floor
New York, New York 10118
bochenm@hrw.org
(212) 212-1213

*Counsel for Amicus Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1(a) of the Federal Rules of Appellate Procedure, *amicus curiae* Human Rights Watch makes the following disclosures: Human Rights Watch is a donor-funded, nonprofit nongovernmental organization that has no parent corporation and issues no stock.

Dated: November 26, 2025                                      */s/ Michael Garcia Bochenek*
                                                             Michael Garcia Bochenek
                                                             Human Rights Watch

**RULE 29(a)(4)(E) STATEMENT**

Pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and that no person other than *amicus curiae*, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

Dated: November 26, 2025                                      */s/ Michael Garcia Bochenek*
                                                             Michael Garcia Bochenek
                                                             Human Rights Watch

i

# TABLE OF CONTENTS

Corportate Disclosure Statement ........................................................... i

Rule 29(a)(4)(E) Statement..................................................................... i

Table of Authorities ..............................................................................v

Statement of Interest of *Amicus Curiae*..................................................1

Consent of the Parties ...........................................................................2

Summary of Argument ..........................................................................3

Argument ..............................................................................................7

I. Venezuelans held in CECOT faced torture, enforced disappearance, arbitrary detention, refoulement, and other serious human rights violations......................7

A. They faced routine beatings, in some cases amounting to torture...................7

B. Guards inflicted sexual violence on some people held in CECOT.................12

C. People suffered other ill-treatment in CECOT ...............................................12

D. People transferred to El Salvador and held in CECOT were subjected to arbitrary detention, prolonged incommunicado detention, and enforced disappearance ..................................................................................... 13

E. The United States and El Salvador Engaged in Refoulement ......................... 15

II. The experiences of Venezuelans held in CECOT demonstrate the need for and the appropriateness of injunctive relief .......................................................... 17

A. Plaintiffs are likely to succeed on the merits ................................................. 17

B. Class members face the risk of irreparable harm absent injunctive relief ...... 23

C. The balance of equities weighs strongly in favor of class members .............. 27

D. Affirming the District Court's order is in the public interest ......................... 29

Conclusion ............................................................................................................. 31

Certificate of Compliance ...................................................................................... 32

Certificate of Service ............................................................................................. 33

# TABLE OF AUTHORITIES

## Cases

*Amoco Production Co. v. Gambell*, 480 U.S. 531 (1987) ..................................29

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1994)................................................................................29

*Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002).....................29

*Hernandez v. Sessions*, 872 F. 3d 976 (9th Cir. 2017) ............................... 29-30

*INS v. Aguirre-Aguirre*, 526 U.S. 415 (1999)......................................................16

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ..................................................16

*INS v. Stevic*, 467 U.S. 407 (1984) ....................................................................16

*Jama v. ICE*, 543 U.S. 341 (2005)......................................................................30

*Mitchell v. Forsyth*, 472 U. S. 511 (1985)..........................................................28

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ........19, 20

*Munaf v. Geren*, 553 U.S. 674 (2008) ................................................................22

*Murray v. Charming Betsy*, 6 U.S. 64 (1804)....................................................19

*Negusie v. Holder*, 555 U.S. 511 (2009)............................................................16

*New Jersey v. Trump*, 131 F.4th 27 (1st Cir. 2025)............................................17

*N.H. Indonesiam Cmty. Support v. Trump*, No. 25-1348, 2025 LX 455837 (1st Cir. 2025) ......................................................................................24

*Nken v. Holder*, 556 U.S. 418 (2009) ..........................................................17, 30

v

*Preminger v. Principi*, 422 F.3d 815 (9th Cir. 2005) ........................................30

*State of Washington v. Trump*, 145 F.4th 1013 (9th Cir. 2025) .................. 28-29

*Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82 (1st Cir. 2022)..........17

*Trump v. J.G.G.*, 604 U.S. 670 (2025)...............................................................31

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)......................17, 24, 29

*Zepeda v. INS*, 753 F.2d 719 (9th Cir. 1983)......................................................29

*Ziglar v. Abbasi*, 582 U.S. 120 (2017)................................................................28

## Court Filings

Appellant's Appl. Vacate Inj., *Noem v. Abrego Garcia*, No. 24A949
(U.S. filed Apr. 7, 2025) .........................................................................21

Compl., *D.A. v. Noem*, 1:25-cv-03135 (D.D.C. filed Sept. 12, 2025)................26

Def.'s Mem. Opposing TRO, *D.A. v. Noem*, 1:25-cv-03135 (D.D.C.
filed Sept. 14, 2025)................................................................................26

Goebertus Decl., *J.G.G. v. Trump*, No. 1:25-cv-00766-JEB (D.D.C.
filed Mar. 19, 2025), ECF No. 44-3 .......................................................3, 22

Mem. Op. & Order, *D.A. v. Noem*, 1:25-cv-03135 (D.D.C.
Sept. 15, 2025) ........................................................................................26

Notice of United Nations Document, Ex. 1, *J.G.G. v. Trump*, No. 1:25-cv-
00766-JEB (D.D.C. filed July 7, 2025), ECF No. 160-1....................................14

## Statutes

8 U.S.C. § 1231 note............................................................................................16

8 U.S.C. § 1231(b) ..............................................................................................30

8 U.S.C. § 1231(b)(3) ..........................................................................21

Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), § 2242(b),
Pub. L. No. 105-277, 112 Stat. 2681 (Oct. 21, 1998), codified at
8 U.S.C. § 1231 note ............................................................................16

FARRA § 2242(d) ................................................................................21

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102
(Mar. 17, 1980) ....................................................................................16

## Treaties

Convention against Torture and Other Cruel, Inhuman or
Degrading Treatment or Punishment, Dec. 10, 1984,
113 S. Treaty Doc. No.100-20 (1988), 1465 U.N.T.S. 85 ..................11, 13, 16

International Covenant on Civil and Political Rights,
Mar. 23, 1976, 999 U.N.T.S. 171 .................................................... 11, 13, 15, 16

Convention relating to the Status of Refugees, July 28, 1951,
189 U.N.T.S. 150 ................................................................................16

Protocol relating to the Status of Refugees, Jan. 31, 1967,
19 U.S.T. 6223 ....................................................................................16

## Other Authorities

8 C.F.R. § 208 ......................................................................................16

8 C.F.R. § 1208 ....................................................................................16

8 C.F.R.§ 208.16(c)....................................................................................21

8 C.F.R.§ 208.18(b) ...................................................................................21

8 C.F.R.§ 1208.16(c) .................................................................................21

8 C.F.R.§ 1208.18(b) .................................................................................21

Articles on Responsibility of States for Internationally Wrongful Acts, in
GAOR, 55th Sess., Supp. No. 10, U.N. Doc. A/56/10 (2001) ..........................21

@WhiteHouse (White House), X, Mar. 17, 2025,
https://x.com/WhiteHouse/status/1901683343697072328...................................5

*Immigration and Customs Enforcement*,
DEPORTATION DATA PROJECT (2025) ................................................................25

Exec. Comm. of the High Commissioner's Programme, Note on
International Protection, U.N. Doc. A/AC.96/951 (Sept. 13, 2001) .................16

H.R. Conf. Rep. No. 96-781 (1980) ................................................................16

HUMAN RIGHTS WATCH, "NOBODY CARED, NOBODY LISTENED":
THE US EXPULSION OF THIRD-COUNTRY NATIONALS TO
PANAMA (2025).........................................................................................18

HUMAN RIGHTS WATCH, PUNISHED FOR SEEKING CHANGE:
KILLINGS, ENFORCED DISAPPEARANCES, AND ARBITRARY DETENTION
FOLLOWING VENEZUELA'S 2024 ELECTION (2025)................................................1

HUMAN RIGHTS WATCH, STILL AT RISK: DIPLOMATIC ASSURANCES NO
SAFEGUARD AGAINST TORTURE (2005) ............................................................21

HUMAN RIGHTS WATCH, "THE STRATEGY IS TO BREAK US": THE US
EXPULSION OF THIRD-COUNTRY NATIONALS TO COSTA RICA (2025).................18

Human Rights Watch, *U.S./Africa: Expulsion Deals Flout Rights* (Sept. 23,
2025) ..........................................................................................................25

Human Rights Watch, *Venezuela: Brutal Crackdown on Protesters, Voters* (Sept. 4, 2024)...........................................................................................1

Human Rights Watch, *Venezuela: Political Prisoners Cut Off from the World* (Sept. 22, 2025)..............................................................................1

HUMAN RIGHTS WATCH, "YOUR CHILD DOES NOT EXIST HERE": HUMAN RIGHTS ABUSES AGAINST CHILDREN UNDER EL SALVADOR'S STATE OF EMERGENCY (2024)................................................................................1

HUMAN RIGHTS WATCH & CRISTOSAL, "WE CAN ARREST ANYONE WE WANT": WIDESPREAD HUMAN RIGHTS VIOLATIONS UNDER EL SALVADOR'S "STATE OF EMERGENCY" (2022) ..........................................................................1

HUMAN RIGHTS WATCH & CRISTOSAL, "YOU HAVE ARRIVED IN HELL": TORTURE AND OTHER ABUSES AGAINST VENEZUELANS IN EL SALVADOR'S MEGA PRISON (2025)................................................................... passim

Julie Turkewitz et al., *"You Are All Terrorists": Four Months in a Salvadoran Prison*, N.Y. TIMES, Nov. 8, 2025 ......................................................4

Julie Turkewitz & Hamed Aleaziz, *Prisoner Swap Frees Americans in Venezuela for Migrants in El Salvador*, N.Y. TIMES, July 18, 2025.................17

U.N. Human Rights Comm., General Comment No. 20, U.N. Doc. HRI/ GEN/1/Rev.7 (1992) ......................................................................16

U.N. Human Rights Comm., General Comment No. 35: Liberty and Security of Person, U.N. Doc. CCPR/C/GC/35 (Dec. 16, 2014) ......................15

U.N. Human Rights Council, Report of the Working Group on Enforced or Involuntary Disappearances, U.N. Doc. A/HRC/16/48/Add.3 (Dec. 28, 2010) .................................................................................15

U.N. Standard Minimum Rules for the Treatment of Prisoners ("Nelson Mandela Rules"), G.A. Res. 70/175, U.N. Doc. A/RES/70/175 (Jan. 8, 2016)..........................................................................................13

U.N. Working Group on Enforced or Involuntary Disappearances, Report on Enforced or Involuntary Disappearances, Session 136 (Mar. 26, 2025)............14

ix

U.S. Dep't of State, Bureau of Democracy, Human Rights, and Labor,
Country Reports on Human Rights Practices—2023: El Salvador
(2024)..................................................................................................................3

## STATEMENT OF INTEREST OF AMICUS CURIAE

Human Rights Watch is a non-profit, non-partisan organization established in 1978 that investigates and reports on violations of fundamental human rights in over 100 countries worldwide with the goal of securing the respect of these rights for all persons. It has regularly reported on human rights violations in El Salvador and other countries to which the United States has removed or expelled people who are not citizens of those countries.[1] It has also regularly reported on human rights violations in Venezuela and other countries where people have been returned after third-country expulsions by the United States.[2] Human Rights Watch has filed amicus briefs before the U.S. Supreme Court, U.S. courts of appeal, and other courts.

---

[1] *See, e.g.*, HUMAN RIGHTS WATCH ("HRW") & CRISTOSAL, "YOU HAVE ARRIVED IN HELL": TORTURE AND OTHER ABUSES AGAINST VENEZUELANS IN EL SALVADOR'S MEGA PRISON (2025), https://www.hrw.org/report/2025/11/12/you-have-arrived-in-hell/torture-and-other-abuses-against-venezuelans-in-el; HRW, "YOUR CHILD DOES NOT EXIST HERE": HUMAN RIGHTS ABUSES AGAINST CHILDREN UNDER EL SALVADOR'S STATE OF EMERGENCY (2024), https://www.hrw.org/report/2024/07/16/your-child-does-not-exist-here/human-rights-abuses-against-children-under-el; HRW & CRISTOSAL, "WE CAN ARREST ANYONE WE WANT": WIDESPREAD HUMAN RIGHTS VIOLATIONS UNDER EL SALVADOR'S "STATE OF EMERGENCY" (2022), https://www.hrw.org/report/2022/12/07/we-can-arrest-anyone-we-want/widespread-human-rights-violations-under-el.

[2] *See, e.g.*, HRW, *Venezuela: Political Prisoners Cut Off from the World* (Sept. 22, 2025), https://www.hrw.org/news/2025/09/22/venezuela-political-prisoners-cut-off-from-the-world; HRW, PUNISHED FOR SEEKING CHANGE: KILLINGS, ENFORCED DISAPPEARANCES, AND ARBITRARY DETENTION FOLLOWING VENEZUELA'S 2024 ELECTION (2025), https://www.hrw.org/sites/default/files/media_2025/05/venezuela0425%20web_0.pdf; HRW, *Venezuela: Brutal Crackdown on Protesters, Voters* (Sept. 4, 2024), https://www.hrw.org/news/2024/09/04/venezuela-brutal-crackdown-protesters-voters.

## CONSENT OF THE PARTIES

Pursuant to Federal Rules of Appellate Procedure Rule 29(a)(2), *amicus* certifies that all parties to this appeal have consented to *amicus*'s filing a brief in this case.

## SUMMARY OF ARGUMENT

In March and April 2025, the U.S. government sent 252 Venezuelans, including members of the certified class in this case, to El Salvador's Center for Terrorism Confinement (Centro de Confinamiento del Terrorismo, CECOT) mega-prison. U.S. officials knew or should have known that the people it transferred to El Salvador were likely to be tortured and to face other serious human rights violations: International authorities and human rights groups, including *amicus,* have for years reported on the severe human rights abuses to which authorities subject detainees in El Salvador's prisons.[3] The U.S. Department of State has described conditions in El Salvador's prisons as "harsh and life threatening" and acknowledged credible reports of "torture or cruel, inhuman, or degrading treatment or punishment by security forces."[4]

The experiences of the Venezuelans sent to El Salvador demonstrate the existence and the dangers of the U.S. government's policy or practice of carrying out third-country removals without notice or an opportunity to be heard on fear-based claims before an immigration judge.

---

[3] *See* HRW & CRISTOSAL, "YOU HAVE ARRIVED IN HELL," at 26-27; Goebertus Decl., *J.G.G. v. Trump*, No. 1:25-cv-00766-JEB (D.D.C. filed Mar. 19, 2025), ECF No. 44-3.

[4] U.S. DEP'T OF STATE, BUREAU OF DEMOCRACY, HUMAN RIGHTS, AND LABOR, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES—2023: EL SALVADOR (2024), https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/elsalvador/.

As the representative accounts included in this brief illustrate, those removed without due process were subjected to regular, severe physical and psychological abuse by Salvadoran prison guards and police, systematic violations that appear to have been part of a practice designed to subjugate and humiliate them. Security forces regularly beat the Venezuelans, including during daily cell searches, for minor rule violations—such as speaking loudly or showering at the wrong time—or for requesting medical assistance. This abusive treatment constituted cruel, inhuman, or degrading treatment and in many cases torture. These findings are consistent with an independent investigation by the *New York Times*, which likewise documented accounts from Venezuelans who described suffering regular beatings and other physical and psychological abuses while detained at CECOT.[5]

The Venezuelans' detention in CECOT, with no apparent legal basis, no contact with the outside world, and no public acknowledgment of people's whereabouts and fate, amounted to arbitrary detention, prolonged incommunicado detention, and enforced disappearance. Their removal to El Salvador violated the principle of nonrefoulement, the prohibition on sending a person to a country where there are substantial grounds for believing that the

---

[5] Julie Turkewitz et al., *'You Are All Terrorists': Four Months in a Salvadoran Prison*, N.Y. TIMES, Nov. 8, 2025, https://www.nytimes.com/2025/11/08/world/americas/el-salvador-prison-migrants.html.

person would be at risk of persecution or torture. El Salvador's transfer of all 252 Venezuelans to their Venezuela in July 2025 without a process for evaluating any fear of serious harm upon return also violated the principle of nonrefoulement.

The representative accounts included in this brief are drawn from *amicus*'s interviews of 40 of the 252 Venezuelans held in CECOT. Together with Cristosal, a human rights organization working on El Salvador, *amicus* conducted these interviews as part of the most comprehensive account to date of the treatment of detainees in CECOT.[6]

The people interviewed by *amicus* are very likely members of the class certified by the district court: They were each told by DHS officials or immigration judges that they had final orders of removal,[7] and they had not designated El Salvador as their country of removal and had not been informed prior to their removal that they would be sent to El Salvador. Regardless of whether all of the people interviewed by *amicus* are class members, because the experiences recounted here are representative of people who were transferred to El Salvador and held in CECOT and because the government has confirmed that class members were sent to CECOT, *see* Dkt. 72-1, these stories are illustrative

---

[6] *See* HRW & CRISTOSAL, "YOU HAVE ARRIVED IN HELL," at 11-13.

[7] White House Press Secretary Karoline Leavitt announced on March 17, 2025, that 101 of the 252 Venezuelans had been removed pursuant to regular immigration procedures. @WhiteHouse (White House), X, Mar. 17, 2025, https://x.com/WhiteHouse/status/1901683343697072328.

of ongoing harms and risks of harms, *see* Dkt. 227-6, of the U.S. government's third-country removal policy or practice.

Amicus's findings reinforce the district court's conclusion that Plaintiffs are entitled to the "limited and measured remedy" they received from the district court, "the minimum that comports with due process" to uphold their statutory entitlements to not be removed to a country where they are likely to face persecution or torture. Dkt. 64 at 2. These accounts and others documented by *amicus* underscore the need to compel government compliance with legislation prohibiting removal to countries where noncitizens face persecution or torture, including by specifying procedural requirements regarding third-country removals. They support the district court's conclusion that Plaintiffs are likely to succeed on the merits, that they and the class members they represent face irreparable harm if the preliminary injunction is not upheld, that the balance of equities weighs in their favor, and that the preliminary injunction is in the public interest.

# ARGUMENT

## I. Venezuelans held in CECOT faced torture, enforced disappearance, arbitrary detention, refoulement, and other serious human rights violations

### A. They faced routine beatings, in some cases amounting to torture

Venezuelans sent from the United States to El Salvador told *amicus* that Salvadoran police beat them on their arrival in El Salvador, in many cases also subjecting them to other humiliating treatment. Once in CECOT, they faced regular beatings, including during daily cell searches, for asking guards not to beat others, for purported infractions of prison's many, often arbitrary rules, and for requesting medical attention. Many detainees were also beaten after official visits, including those by U.S. Secretary of Homeland Security Kristi Noem in March and by the International Committee of the Red Cross (ICRC) in May and June.

### *Beatings on arrival*

*Tirso Z.,* a 37-year-old man from Falcón State, Venezuela, said that after he landed in El Salvador, officers pushed him down the plane stairs and put him on a bus, where they punched him in the nose, causing it to bleed. As they entered CECOT, officers took off their handcuffs, told them to strip naked, and beat them

with batons on their backs, legs, and feet. "When they put the handcuffs back on, they stood on top of us to hurt our feet. One of the officers hit me with his baton on my back and I fell to the floor," he said. HRW & CRISTOSAL, "YOU HAVE ARRIVED IN HELL," at 53.

### *Routine beatings during cell searches*

*Carlos J.*, a 27-year-old man from Apure State, told *amicus* that during cell searches, guards routinely handcuffed detainees, forced them to kneel in the hallway with their hands on their heads, and beat them. "Every time they carried out searches, they came in to beat us. The only times they didn't beat us were when visits were expected." *Id.* at 66.

Tirso Z. said, "Guards came to search the cells every day. They took us all out of our cells, made us kneel, handcuffed our hands behind our backs and put our arms on our heads, and beat us with batons, kicks and fists . . . and then left us kneeling for 30 or 40 minutes." *Id.* at 65.

### *Beatings for purported violations of minor prison rules*

*Javier L.*, a 26-year-old man from Zulia State, told *amicus*, "We could not speak loudly inside the cell, talk to people in other cells, make noise, or stand near the cell bars. We had to follow a strict schedule: we could only bathe at 4

8

a.m.; eat at the fixed times—5 a.m. for breakfast, 11 a.m. for lunch, and 5 p.m. for dinner; and sleep at 9 p.m. Anything we did outside those hours was punished." *Id.* at 66.

*Ernesto R.*, a 20-year-old man from Zulia State, said that after he refused to eat breakfast on his first morning in CECOT, an officer handcuffed him and took him to a punishment cell known as the "Island," where four officers beat him. They threw him to the floor, one stepped on his handcuffs, and all four punched and kicked him for about five minutes. The next day, an officer reprimanded him for laughing with a cellmate. The guards took him back to the Island, where he said they beat him for 10 minutes, and one of the officers then sprayed him in the face with pepper spray. He collapsed on the floor. When he woke up, officers punched him in the head and ribs and then took him back to his cell. *Id.* at 67.

Others said they were beaten for bathing outside the prescribed times, singing, or declining medication. *Id.* at 66-68.

### Beatings for requesting medical attention

*Mateo R.*, a 27-year-old from Trujillo State, said he was beaten for requesting medical attention for stomach pain. He said that an officer handcuffed him to the bars, left him standing for about two hours, and then, along with another officer, beat him with fists and batons. *Id.* at 70.

9

*Luis S.*, a 27-year-old from Táchira State, said that guards forced him to kneel with his hands behind his head while handcuffed and shackled, a posture known as "search position," for about 24 hours because he asked for medical attention. "Sometimes they also left me without water for up to a day," he said. *Id.*

### Beatings after visits by U.S. and Red Cross officials

*Wilson L.*, a 35-year-old man from Aragua State, told *amicus* that after Secretary Noem's visit, "They took us out of the cell two or three at a time. We were kneeling in 'search position' there in the hallway and they beat us hard." A forensic expert said that photos of Wilson's injuries were consistent with his description of the events. *Id.* at 55.

*Daniel B.*, a 24-year-old man from Miranda State, said after he spoke with ICRC staff members in May, guards took him to the Island, where they beat him with a baton. He said a blow made his nose bleed. "They kept hitting me, in the stomach, and when I tried to breathe, I started to choke on the blood. My cellmates shouted for help, saying they were killing us, but the officers said they just wanted to make us suffer," he said. Photos Daniel showed *amicus* were consistent with his account of ill-treatment. *Id.* at 57.

Carlos J. said that CECOT guards singled out people who had spoken to the ICRC for beatings. "Those of us who were called by name, after being interviewed . . . were badly beaten," he said. *Id.* at 58.

### The abusive treatment in CECOT amounted in many cases to torture

These beatings and other abuses appear to be part of a practice designed to subjugate, humiliate, and discipline detainees through the imposition of grave physical and psychological suffering. Officers also appear to have acted on the belief that their superiors either supported or tolerated their abusive acts. These abuses amounted to cruel, inhuman, or degrading treatment and in many cases torture under international human rights law.[8]

The cases of torture and other ill-treatment of Venezuelans in CECOT documented by *amicus* and Cristosal were not isolated incidents by rogue guards or riot police. They were systematic violations that took place repeatedly during their detention. Every former detainee interviewed reported being subjected to serious physical and psychological abuse on a near-daily basis, throughout their entire time in detention.

---

[8] *See* Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), art. 1, Dec. 10, 1984, 113 S. TREATY DOC. NO.100-20 (1988), 1465 U.N.T.S. 85 (ratified by United States Oct. 21, 1994); International Covenant on Civil and Political Rights ("ICCPR"), art. 7, Mar. 23, 1976, 999 U.N.T.S. 171 (ratified by United States June 8, 1992).

### B. Guards inflicted sexual violence on some people held in CECOT

*Mario J.*, 32, said that during the week following the first protest, guards took him and his cellmates into the hallway for a medical examination. After the exam, several guards took him to the Island, where they beat him. He said four guards sexually abused him. "They played with their batons on my body," he said. "They stuck the batons between my legs and rubbed them against my private parts." Then they forced him to perform oral sex on one of the guards, groped him, and called him a "faggot." *Id.* at 70.

*Nicolás J.* said that during repeated beatings, guards sexually assaulted him. He said officers grabbed his genitals and made sexual comments. "They did this to several of us," he said. "I don't think the others will tell you that because it's very intimate and embarrassing." *Id.* at 71.

### C. People suffered other ill-treatment in CECOT

In addition to periodic beatings, people told *amicus* that guards subjected them to other abusive treatment during their time in CECOT. They said guards tightened their handcuffs excessively or stepped on them while they were handcuffed and shackled, forced them to kneel in "search position" for long periods, and sprayed them with pepper spray without any provocation. Others said guards threatened them and their relatives, telling them they would never

12

leave alive, that they had been sentenced to 100 to 200 years in prison, and that they would never see their families again. *Id.* at 50-51.

Such practices are cruel, inhuman, and degrading treatment or punishment, prohibited under international law.[9] More generally, the conditions of detention in CECOT did not comply with international standards in many other ways.[10]

### D. People transferred to El Salvador and held in CECOT were subjected to arbitrary detention, prolonged incommunicado detention, and enforced disappearance

The Salvadoran government has never offered a legal basis for the detention in CECOT of Venezuelans sent to El Salvador by the U.S. government, and to date, no Salvadoran state institution has officially released a complete list of individuals detained in CECOT as part of El Salvador's agreement with the United States.

El Salvador's General Directorate of Prisons denied access to information on the identity of those detained, their conditions of detention in CECOT, and the legal basis for their detention when *amicus* and Cristosal requested this information. Other government agencies either replied that they did not have this

---

[9] ICCPR, art. 7; CAT, art. 16.

[10] *See* United Nations Standard Minimum Rules for the Treatment of Prisoners ("Nelson Mandela Rules"), G.A. Res. 70/175, U.N. Doc. A/RES/70/175 (Jan. 8, 2016) (rules "applicable to all categories of prisoners, criminal or civil, untried or convicted"), https://docs.un.org/en/a/res/70/175.

information or did not respond.[11] In response to a communication from the U.N. Working Group on Enforced or Involuntary Disappearances, the government of El Salvador denied that its authorities had jurisdiction over or had "detained" these people, claiming instead that El Salvador "facilitated the use of the Salvadoran prison infrastructure for the custody of persons detained within the scope of the justice system and law enforcement of [the United States]."[12]

Salvadoran authorities held the Venezuelans incommunicado in Module 8 of CECOT, without access to legal assistance or contact with the outside world. Despite repeated requests from several detainees, guards never allowed them to make phone calls to their relatives or lawyers.

*Miguel Z.*, a 27-year-old man from Portuguesa State, said, "The hardest part was not knowing what was going to happen, what my future would be, not having access to a lawyer or understanding why we were there. Not being able to speak with our families—without even knowing if they knew we were in El Salvador—we knew nothing. Not being able to talk to our loved ones and basically anyone, that was the worst." HRW & CRISTOSAL, "YOU HAVE ARRIVED IN HELL," at 72.

---

[11] *See* HRW & CRISTOSAL, "YOU HAVE ARRIVED IN HELL," at 46-48 (describing efforts to obtain this information from the government of El Salvador).

[12] UN Working Group on Enforced or Involuntary Disappearances, Report on Enforced or Involuntary Disappearances, Session 136 (Mar. 26, 2025), *available in* Notice of United Nations Document, Ex. 1, *J.G.G. v. Trump*, No. 1:25-cv-00766-JEB (D.D.C. filed July 7, 2025), ECF No. 160-1.

Under international human rights law, any deprivation of freedom must, among other requirements, have a basis in law. Detention without legal basis is arbitrary detention.[13]

The incommunicado detention of Venezuelans in CECOT, prolonged and with no access to legal assistance, violated the internationally recognized right to liberty and security of person and facilitated the violation of other human rights.[14]

Salvadoran authorities' refusal to disclose information on detainees' fates and whereabouts amounted to enforced disappearance under international law.[15] U.S. officials repeatedly denied relatives of people sent to CECOT information on their whereabouts, making the U.S. government complicit in their enforced disappearances.

## E. The United States and El Salvador Engaged in Refoulement

Removing individuals to countries where they would face the threat of persecution or torture violates the principle of nonrefoulement and U.S.

---

[13] *See* ICCPR art. 9(1); U.N. Human Rights Comm., General Comment No. 35: Liberty and Security of Person, U.N. Doc. CCPR/C/GC/35 (Dec. 16, 2014), https://docs.un.org/en/CCPR/C/GC/35.

[14] *See* Human Rights Comm., General Comment No. 35, paras. 35, 46, 56.

[15] Under international law, an enforced disappearance occurs when authorities, or those acting with their support or acquiescence, deprive a person of their liberty and then refuse to acknowledge the detention or disclose that person's fate or whereabouts, placing them outside the protection of the law. *See* U.N. Human Rights Council, Report of the Working Group on Enforced or Involuntary Disappearances, U.N. Doc. A/HRC/16/48/Add.3 (Dec. 28, 2010), https://docs.un.org/en/A/HRC/16/48/Add.3.

obligations under treaties ratified by the United States, U.S. law, and federal regulations.[16]

The government violated these obligations when it sent the 252 Venezuelans in March and April to El Salvador, where they were likely to be tortured and where many were tortured.

El Salvador's return of the Venezuelans to their country of origin on July 18—as part of a tripartite deal that sent 10 U.S. citizens or permanent residents

---

[16] Protocol relating to the Status of Refugees ("Refugee Protocol"), Jan. 31, 1967, 19 U.S.T. 6223 (entered into force Oct. 4, 1967; accession by United States Nov. 1, 1968) (incorporating the substantive protections, including the obligation of nonrefoulement, of the Convention relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150); CAT, art. 3; ICCPR, art. 7; Human Rights Comm., General Comment No. 20, ¶ 9, U.N. Doc. HRI/ GEN/1/Rev.7 (1992) ("States parties must not expose individuals to the danger of torture or cruel, inhuman or degrading treatment or punishment upon return to another country by way of their extradition, expulsion or refoulement."); Exec. Comm. of the High Commissioner's Programme, Note on International Protection, ¶ 96, U.N. Doc. A/AC.96/951 (Sept. 13, 2001) (obligation of nonrefoulement "has come to be considered a rule of customary international law binding on all States").

Congress enacted the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (Mar. 17, 1980), "with the understanding that it is based directly upon the language of the Refugee Protocol and it is intended that the provision be construed consistent with the Protocol." H.R. Conf. Rep. No. 96-781, at 20 (1980). *See also INS v. Stevic*, 467 U.S. 407, 426 n.20 (1984) (noting that a principal motivation of the Refugee Act was to make "U.S. statutory law clearly reflect[] our legal obligations under international agreements."); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987) (same); *INS v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999) (same); *Negusie v. Holder*, 555 U.S. 511 (2009) (same).

Congress also enacted legislation to implement the Convention against Torture's prohibition on removing an individual to a country "where there are substantial grounds for believing that he would be in danger of being subjected to torture." Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), § 2242(b), Pub. L. No. 105-277, 112 Stat. 2681 (Oct. 21, 1998), codified at 8 U.S.C. § 1231 note. *See also* 8 C.F.R. §§ 208, 1208 (implementing FARRA).

imprisoned in Venezuela back to the United States[17]—also violated the principle of nonrefoulement. At least 19 had fled Venezuela to escape threats, abuses, or persecution by state security forces, as well as threats posed by armed and criminal groups, including Tren de Aragua, they or their relatives told *amicus*.

## II. The experiences of Venezuelans held in CECOT demonstrate the need for and the appropriateness of injunctive relief

The representative accounts presented in the previous section and the other cases documented by *amicus* reinforce Plaintiffs' showing that they and the class they represent readily meet the four-part framework the district courts use in determining whether to grant a preliminary injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022); *New Jersey v. Trump*, 131 F.4th 27, 34-35 (1st Cir. 2025) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

### A. Plaintiffs are likely to succeed on the merits

As the district court found, Plaintiffs have established that they are likely to succeed in showing that the government has a policy or practice of removing

---

[17] *See* Julie Turkewitz & Hamed Aleaziz, *Prisoner Swap Frees Americans in Venezuela for Migrants in El Salvador*, N.Y. TIMES, July 18, 2025, https://www.nytimes.com/2025/07/18/world/americas/venezuela-us-prisoner-swap-migrants-el-salvador.html.

people to third countries without providing notice or a meaningful opportunity to present fear-based claims, violating their international and statutory right to protection from return to likelihood of torture. Plaintiffs have also established that this policy or practice constitutes a deprivation of procedural due process.

The existence of the government's policy or practice, and in particular the lack of notice or opportunity to present fear-based claims, is illustrated by the cases documented by *amicus*. None of the 40 Venezuelans interviewed by *amicus* knew they were being sent to El Salvador prior to their removal. All family members interviewed said that U.S. immigration authorities initially told their relatives in immigration detention that they would be sent back to Venezuela. HRW & CRISTOSAL, "YOU HAVE ARRIVED IN HELL," at 41.[18]

---

[18] Moreover, *amicus* has documented dozens of other cases wherein the U.S. government has failed to guarantee meaningful notice or opportunity to be heard prior to expelling noncitizens to third countries to which they did not have a final order of removal, including 48 people expelled to Panama and 36 to Costa Rica. While these individuals did not have final orders of removal, their expulsions are further indications of the government's policy or practice of carrying out third-country transfers without meaningful notice or an opportunity to be heard on fear-based claims. *See* HUMAN RIGHTS WATCH, "NOBODY CARED, NOBODY LISTENED": THE U.S. EXPULSION OF THIRD-COUNTRY NATIONALS TO PANAMA (2025), https://www.hrw.org/sites/default/files/media_2025/04/us_panama0425%20web.pdf; HUMAN RIGHTS WATCH, "THE STRATEGY IS TO BREAK US": THE U.S. EXPULSION OF THIRD-COUNTRY NATIONALS TO COSTA RICA (2025), https://www.hrw.org/sites/default/files/media_2025/05/costarica0525%20web.pdf.

Meaningful notice and an opportunity to be heard are among the essential elements of procedural due process, and the government's policy or practice of removing noncitizens to third countries without notice or an opportunity to present fear-based claims violates the Due Process Clause of the Fifth Amendment. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950). The policy or practice also violates U.S. treaty obligations under the International Covenant on Civil and Political Rights, the Convention against Torture, and the 1967 Protocol relating to the Status of Refugees. The Constitution and statutory law should be interpreted to avoid putting the United States in breach of these international obligations. *Murray v. Charming Betsy*, 6 U.S. 64 (1804).

The government contends that the DHS memorandum of March 30, 2025, in which the government asserted that noncitizens may be removed to a third country that has provided "diplomatic assurances" credible to the Department of State that noncitizens removed there will not be persecuted or tortured, Appx. 120-121, offers noncitizens "notice and an eminently reasonable opportunity to raise a fear of removal." Appellant's Br. at 59. It does not.

Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314. While publication may be "acceptable as notification supplemental to other action which, in itself, may reasonably be expected to convey a warning," it is not sufficient on its own, particularly when the government knows the identities and whereabouts of the affected individuals. *See id.* at 316-320.

Additionally, the March 30 memorandum does not require identification of any specific country to which noncitizens might be removed if there are so-called diplomatic assurances. The government cannot reasonably argue that the memorandum constitutes any kind of notice to noncitizens of their potential removal to one of these unidentified countries. And noncitizens cannot be expected to preemptively raise a fear of removal to every possible country in the world where they would face the threat of torture or persecution.

In addition to not constituting meaningful notice, diplomatic assurances do not relieve the government of its obligation to provide class members with a meaningful opportunity to be heard. Diplomatic assurances are a wholly inadequate substitute for assessing the likelihood that a noncitizen will face persecution or torture if removed to a third country, in order to both satisfy

domestic legal commands and avoid U.S. international responsibility for such violations.[19]

First, blanket assurances offer no insight into the individualized risk a noncitizen faces. Pursuant to regulations implementing the Convention against Torture, noncitizens may apply for withholding of removal if it is "more likely than not that they would be tortured in the proposed country of removal[.]" 8 C.F.R. §§ 208.16(c), 208.18(b), 1208.16(c), 1208.18(b). *See also* FARRA § 2242(d); *accord* 8 U.S.C. § 1231(b)(3). Determining this risk requires an individualized assessment of each noncitizen's case.

Second, countries that commit torture are heavily incentivized to deny it. El Salvador is a prime example. The U.S. government claimed that it had "ensured" that noncitizens "removed to CECOT in El Salvador will not be tortured."[20] But they were—systematically. The well-documented practice of torture and other

---

[19] HRW, STILL AT RISK: DIPLOMATIC ASSURANCES NO SAFEGUARD AGAINST TORTURE (2005), https://www.hrw.org/sites/default/files/reports/eca0405.pdf. Under international law principles, the United States can incur both primary and secondary international responsibility for torture or persecution of an individual following third-country removal. *See* Articles on Responsibility of States for Internationally Wrongful Acts, in GAOR, 55th Sess., Supp. No. 10, U.N. Doc. A/56/10 (2001).

[20] Appellant's Appl. Vacate Inj. at 24, *Noem v. Abrego Garcia*, No. 24A949, (U.S. filed Apr. 7, 2025), https://www.supremecourt.gov/DocketPDF/24/24A949/354843/20250407103341248_Kristi%20Noem%20application.pdf).

serious human rights violations in Salvadoran prisons rendered any diplomatic assurances from El Salvador not credible to begin with.[21]

The government's reliance on *Munaf v. Geren*, 553 U.S. 674 (2008), which involved transfers of noncitizens to face criminal charges abroad in an ongoing criminal proceeding, is inapposite. That case and those the Supreme Court cited in its opinion do not compel the conclusion that a federal court is bound to treat *individual* diplomatic assurances as conclusive in a removal case, let alone blanket diplomatic assurances that are not specific to any individual.

Without knowledge of their imminent removal to El Salvador, none of the Venezuelans had the opportunity to present fear-based claims for withholding or deferral of removal, despite documented acts of torture by the Salvadoran government.

---

[21] Goebertus Decl., *J.G.G. v. Trump*, ECF No. 44-3.

**B. Class members face the risk of irreparable harm absent injunctive relief**

**1. The U.S. government's removal of Venezuelan migrants to El Salvador without meaningful notice and opportunity to contest their removal based on fear of torture caused irreparable harm**

People sent to CECOT continue to suffer lasting injuries and psychological trauma from their transfer to and confinement in El Salvador.

*Javier L.* said he was shot with rubber pellets, punched and kicked, and beaten with a baton on the face while in CECOT, causing him to lose a tooth. Since being returned to Venezuela, he said he is depressed and feels psychologically abused. "I feel like I've lost everything . . . the time I didn't spend with my daughter. We lived in fear, thinking that every time they came into the module it was to beat us," he said. HRW & CRISTOSAL, "YOU HAVE ARRIVED IN HELL," at 79.

Other interviewees also described the lasting impacts of the abuses they suffered.

*Mateo R.* said, "I am psychologically affected, sometimes I can't sleep, I wake up anxious, sweaty and feeling very bad, sometimes I feel depressed, stressed. I need psychological support." *Id.*

*Felipe C.* said, "Now I have psychological problems as a result of my detention in CECOT. I wake up traumatized, thinking that they are going to arrest me and beat me up. I can't sleep well." *Id.*

*Ángel N.*, a 25-year-old from Anzoátegui State, said he hardly ever leaves the house out of fear. "I can't sleep, I'm worried about my health, I live in fear, I feel physically ill," he said. *Id.* at 80.

## 2. Other class members face irreparable harm if removed without a meaningful opportunity to present a fear-based claim for relief

The experiences of the Venezuelan migrants removed to El Salvador illustrate the irreparable harm class members could face if removed to a third country without the opportunity to first present fear-based claims. *N.H. Indonesian Cmty. Support v. Trump*, No. 25-1348, 2025 LX 455837 (1st Cir. 2025) (quoting *Winter*, 555 U.S. at 20) ("At this stage in the proceedings, the plaintiffs need only make a clear showing that they are 'likely to suffer irreparable harm.'"). Absent injunctive relief, such irreparable harm is likely to occur before a decision on the merits is reached. The government has moved swiftly to identify additional third countries to receive deported migrants, including countries known to commit serious human rights violations, including arbitrary detention, torture and other

ill-treatment, and refoulement.[22] As shown in the chart below, *amicus* documented a significant increase in third-country removals from January to March 2025. This number dropped from April to June, while the district court's preliminary injunction was in effect, before increasing again in July.[23]



**Monthly Third-Country Deportations**

Number of deportations per week

*Third-country deportations identified when the country removed to is different than both the citizenship country and birth country according to ICE's data. It is possible that some of these removals do not take into account some with dual or more citizenship.

---

[22] *See, e.g.*, HRW, *U.S./Africa: Expulsion Deals Flout Rights* (Sept. 23, 2025), https://www.hrw.org/news/2025/09/23/us/africa-expulsion-deals-flout-rights.

[23] These figures are based on *amicus*'s analysis of government data provided by ICE to the Deportation Data Project in response to a Freedom of Information Act request and posted on the Deportation Data Project's website. *See Immigration and Customs Enforcement*, DEPORTATION DATA PROJECT (2025), https://deportationdata.org/data/ice.html.

Once an individual has been removed to a foreign jurisdiction, the ability of U.S. courts to timely grant effective relief is more complicated. For example, the government removed 14 people to Ghana on September 5, five of whom had withholding of removal orders for their countries of origin, and none of whom had an opportunity "to express fear of persecution or torture if removed to Ghana." Compl. at 2, 7, *D.A. v. Noem*, 1:25-cv-03135 (D.D.C. filed Sept. 12, 2025). The government has argued that because the individuals "are [now] in the custody of the Republic of Ghana," the district court hearing their case "lacks the power to grant…the relief they seek—an order 'preventing [their] transfer to their countries of origin,' or directing the Government to 'facilitate [their] return to the custody of the United States[.]'" Def.'s Mem. Opposing TRO at 8-9, *D.A. v. Noem*, 1:25-cv-03135 (D.D.C. filed Sept. 14, 2025). And the district court denied the plaintiffs' motion to order the government to facilitate their return. Mem. Op. & Order, *D.A. v. Noem*, 1:25-cv-03135 (D.D.C. Sept. 15, 2025) ("This court cannot order the U.S. government to order a foreign government to take any action, despite facts in the record indicating that this agreement [between the U.S. and Ghana] may have been designed to evade Defendants' obligations to Plaintiffs.").

The logical consequence of this reasoning, still playing out in the lower courts, is that the government can circumvent accountability for wrongfully deporting someone so long as that person is detained by a foreign government, creating a perverse incentive to carry out unlawful removals to countries where individuals face heightened risk of—or in some cases certain—arbitrary detention.

Arbitrary detention, in turn, increases the risk that a person will be tortured, particularly when people are held incommunicado, as in CECOT.

Moreover, these and other serious human rights violations are likely to go undetected. In the case of the Venezuelans who were removed to El Salvador, *amicus* was only able to document and corroborate accounts of torture and other ill-treatment after their repatriation.

Injunctive relief is essential to prevent the potential harms of such removals, which by the government's own reasoning may be impossible to repair.

## C. The balance of equities weighs strongly in favor of class members

The government argues that by requiring it to afford class members a minimum amount of due process, the district court's order hinders its ability to remove "some of the worst of the worst" noncitizens in the country. Appellant's Br. at 2. But that is not what the government did.

At least 123 of the 252 Venezuelans sent to El Salvador by the U.S. government and held in CECOT had no criminal history in the United States. *Amicus*'s analysis of Enforcement and Removal Operations (ERO) data found that only 8 had been convicted of a violent or potentially violent offense.[24]

The government also cites foreign policy and national security concerns. But the government cannot reasonably assert that healthy diplomatic relations with a country hinge on its ability to summarily remove someone there to face torture or persecution. And the law does not allow it. National security concerns, meanwhile, are not a "talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'" *Ziglar v. Abbasi,* 582 U.S. 120, 143 (2017) (quoting *Mitchell v. Forsyth*, 472 U. S. 511, 523 (1985)).

In short, the government is not harmed by the district court's preliminary injunction, which would merely require that it comply with constitutional and statutory obligations and provide class members with a modicum of due process

---

[24] *Amicus* analyzed Enforcement and Removal Operations (ERO) data relating to 226 of the 252 Venezuelan people who were held in CECOT. HRW & CRISTOSAL, "YOU HAVE ARRIVED IN HELL," at 36-38.

The 8 people convicted of a violent or potentially violent offense includes 1 person convicted of a weapon offense, 1 for kidnapping, 1 for domestic violence, 2 aggravated assault, 2 for assault, and 1 convicted of "resisting officer." *Id.* at 36.

The crime of "resisting officer" encompasses non-violent actions like refusing to comply with commands as well as potentially physical acts. If that case were not included as a "violent or potentially violent crime," the total number of people convicted of such crimes would be 7. *Id.* at 36 n.91.

prior to carrying out third-country removals. *See State of Washington v. Trump*, 145 F.4th 1013 (9th Cir. 2025) (quoting *Zepeda v. INS*, 753 F.2d 719, 722 (9th Cir. 1983)) ("[T]he federal government 'cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations.'").

Moreover, the government's claim of harm is not dispositive: under the balance required of competing claims of injury, courts "must consider the effect *on each party*." *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987) (emphasis added), *quoted in Winter*, 555 U.S. at 24.

As detailed above, class members face irreparable harm absent injunctive relief. Noncitizens, including the Venezuelans sent to CECOT, have already been irreparably harmed by the government's practice of removing them to third countries without the opportunity to present fear-based claims.

### D. Affirming the District Court's order is in the public interest

Due process and fundamental fairness are unquestionably in the public interest. *See Giovani Carandola Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("upholding constitutional rights surely serves the public interest"); *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("it is always in the public interest to prevent the violation of a party's

constitutional rights"); *Hernandez v. Sessions*, 872 F. 3d 976, 996 (9th Cir. 2017) (quoting *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution").

The "public interest in prompt execution of removal orders" identified by the Supreme Court in *Nken*, 556 U.S. at 436, does not encompass a scenario in which people are subjected to removal to countries not identified in their prior proceedings and do not receive notice and an opportunity to present a claim of feared persecution or torture upon removal to a third country. This is particularly the case when the government must follow 8 U.S.C. § 1231(b)'s "consecutive removal commands" and those statutory and regulatory requirements implementing international law duties not to remove someone to a risk of persecution or torture. *Jama v. ICE*, 543 U.S. 335, 341 (2005). Indeed, as the Supreme Court noted in *Nken*, "there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Id.* at 436.

## CONCLUSION

People facing removal are entitled to notice "within a reasonable time and in such a manner as will allow them to actually seek . . . relief . . . before such removal occurs." *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025). The cases documented by *amicus* and the representative accounts above underscore the need for these minimum due process protections and the serious harms that result from failing to provide them. For the reasons stated above, *amici* respectfully support the request of Plaintiffs-Appellees that this Court affirm the preliminary injunction.

Dated: November 26, 2025

Respectfully submitted:

/s/ *Michael Garcia Bochenek*

Ian M. Kysel
Courtney Bell, Student Attorney*
Transnational Disputes Clinic
Cornell Law School
Myron Taylor Hall
Ithaca, New York 14850
(607) 255-5503
ian.kysel@cornell.edu
(1st Cir. No. 1221056)

*Motion for Student Appearance
filed concurrently with this brief*

Michael Garcia Bochenek
(1st Cir. No. 1120767)
Reagan Williams
(1st Cir. No. 1220850)
Human Rights Watch
350 Fifth Avenue, 34th Floor
New York, New York 10118
(212) 216-1213
bochenm@hrw.org

*Attorneys for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 6,499 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: November 26, 2025                    */s/ Michael Garcia Bochenek*
                                            Michael Garcia Bochenek
                                            Human Rights Watch

## CERTIFICATE OF SERVICE

I hereby certify that on November 26, 2025, a true and correct copy of the foregoing Brief of Amicus Curiae was served on all counsel of record in this appeal via CM/ECF.


Dated: November 26, 2025           */s/ Michael Garcia Bochenek*
                                          Michael Garcia Bochenek
                                          Human Rights Watch