Nos. 25-1393, 25-1631

_____

UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

_____

D.V.D.; M.M.; E.F.D.; O.C.G.,

Plaintiffs - Appellees,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary
of Department of Homeland Security (DHS); PAMELA BONDI, United States
Attorney General; ANTONE MONIZ, Superintendent of the Plymouth County
Correctional Facility,

Defendants - Appellants.

_____

On Appeal from an Order of the United States District Court
for the District of Massachusetts

_____

**BRIEF FOR PLAINTIFFS-APPELLEES**

_____

Matt Adams                          Trina Realmuto
Leila Kang                          Kristin Macleod-Ball
Aaron Korthuis                      Mary Kenney
Glenda M. Aldana Madrid             National Immigration Litigation Alliance
Northwest Immigrant Rights Project  10 Griggs Terrace
 615 Second Avenue, Suite 400       Brookline, MA 02446
 Seattle, WA 98104                  trina@immigrationlitigation.org

Anwen Hughes
Human Rights First
121 W. 36th St., PMB 520
New York, NY 10018

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ......................................................................1

II.    JURISDICTION .....................................................................5

III.    ISSUES PRESENTED .............................................................5

IV.    STATEMENT OF THE CASE ...................................................5

    A. Legal Background....................................................................5

    B. Procedural History .................................................................8

V.    SUMMARY OF THE ARGUMENT ........................................14

VI.    STANDARD OF REVIEW ......................................................16

VII.    ARGUMENT..........................................................................16

    A. Plaintiffs Are Likely to Prevail on the Merits. ..............................16

        1.  The District Court Had Jurisdiction to Issue Classwide Preliminary Injunctive Relief. ..............................................16

        2.  The District Court Had Jurisdiction to Address the Merits of the Claims Presented in the Preliminary Injunction Motions.....................................22

           a.  FARRA § 2242(d) and Section 1252(a)(4).........................22

           b.  Sections 1252(a)(5) and (b)(9) ..................................28

           c.  Section 1252(g) ....................................................31

        3.  Plaintiffs Are Likely to Prevail on The Merits Claims on Which They Sought Injunctive Relief............................................35

           a.  Plaintiffs Have Statutory, Regulatory, and Constitutional Rights to Meaningful Notice and an Opportunity to Be Heard Prior to any Third-Country Removal. ..............................35

               i.  *Plaintiffs are entitled to meaningful notice.*...................35

               ii.  *Plaintiffs are entitled to a meaningful opportunity to present a CAT claim.*...................................................38

           b.  The March 30 Memo and July 9 Guidance Are Unlawful..................40

      *i.   Blanket diplomatic assurances are unlawful.* ...............................41

      *ii.  Where no diplomatic assurances exist, Defendants' policy also fails.* .................................................................................................46

  B.  In the Absence of the Injunction, Plaintiffs Face Irreparable Harm. ............50

  C.  The Balance of Equities and Public Interest Support Affirmance. ...............54

VIII.  CONCLUSION..............................................................................................55

CERTIFICATE OF COMPLIANCE......................................................................56

CERTIFICATE OF SERVICE ...............................................................................56

# TABLE OF CONTENTS

**Page**

## Cases

*A.A.R.P. v. Trump*, 605 U.S. 91 (2025) .................................................. 37, 41, 47, 48

*Abdullah v. INS*, 184 F.3d 158 (2d Cir. 1999) ........................................................36

*Abrego Garcia v. Noem*, 777 F.Supp.3d 501 (D. Md. 2025) ................................52

*Aden v. Nielsen*, 409 F.Supp.3d 998 (W.D. Wash. 2019) ............................. 37, 39

*Aguilar v. ICE*, 510 F.3d 1 (1st Cir. 2007) ........................................... 25, 29

*Al Otro Lado v. EOIR*, 120 F.4th 606 (9th Cir. 2024) ..................................... 19, 20

*Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021) .............................................54

*Andriasian v. INS*, 180 F.3d 1033 (9th Cir. 1999) ....................................... 37, 39

*Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175 (2023) .............................24

*Becky's Broncos, LLC v. Town of Nantucket*, 138 F.4th 73 (1st Cir. 2025) ..........16

*Biden v. Texas*, 597 U.S. 785 (2022) .......................................................17

*Califano v. Yamasaki*, 442 U.S. 682 (1979) .........................................................46

*Camarena v. Dir., ICE*, 988 F.3d 1268 (11th Cir. 2021)........................................34

*Charles v. Garland*, 113 F.4th 20 (1st Cir. 2024)...................................................27

*Cruz-Medina v. Noem*, No. 25-cv-1768-ABA, --- F.Supp.3d ---, 2025 WL
2841488, at *7 (D. Md. Oct. 7, 2025)............................................................ 49, 51

*D.A. v. Noem*, No. 25-cv-3135 (TSC), --- F.Supp.3d ---, 2025 WL 2646888
(D.D.C. Sept. 15, 2025) ........................................................................................43

*DHS v. DVD*, 145 S. Ct. 2627 (2025) ..................................................................13

*DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020)................................... 29, 33

*E.F.L. v. Prim*, 986 F.3d 959, 961 (7th Cir. 2021) ..............................................34

*Escobar v. Garland*, 122 F.4th 465 (1st Cir. 2024)...............................................43

*Esmail v. Noem*, No. 2:25-cv-08325-WLH-RAO, 2025 WL 3030589 (C.D. Cal.
Sept. 26, 2025).............................................................................. 43, 49, 51

*Esquire, Inc. v. Esquire Slipper Mfg. Co.*, 243 F.2d 540 (1st Cir. 1957) ...............21

*Flores-Ledezma v. Gonzales*, 415 F.3d 375 (5th Cir. 2005)...................................34

*Foster v. Townsley*, 243 F.3d 210 (5th Cir. 2001)..................................................34

*G.P. v. Garland*, No. 21-2002, 2023 WL 4536070 (1st Cir. July 13, 2023)...........48

*Galvez v. Jaddou*, 52 F.4th 821 (9th Cir. 2022) ...................................................18

*Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022) ................................... 18, 19, 20

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ................................................................35

*Gonzalez v. ICE*, 975 F.3d 788 (9th Cir. 2020) .............................................. 18, 19

*Hamama v. Adducci*, 912 F.3d 869 (6th Cir. 2018)................................................33

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944) ............................................................21

*Ibarra-Perez v. United States*, 154 F.4th 989 (9th Cir. 2025) ......................... 29, 34

*INS v. Aguirre-Aguirre*, 526 U.S. 415 (1999) ...........................................................7

*INS v. St. Cyr*, 533 U.S. 289 (2001) .......................................................................33

*INS v. Stevic*, 467 U.S. 407 (1984) .........................................................................39

*J.R. v. Bostock*, No. 2:25-CV-01161-JNW, 2025 WL 1810210 (W.D. Wash. June 30, 2025) ........................................................................................................ 41, 51

*Jama v. ICE*, 543 U.S. 335 (2005) .........................................................................6, 7

*Jennings v. Rodriguez*, 583 U.S. 281 (2018) .................................................... passim

*Khouzam v. Att'y Gen. of U.S.*, 549 F.3d 235 (3d Cir. 2008) .................... 44, 45, 46

*Kiyemba v. Obama*, 561 F.3d 509 (D.C. Cir. 2009) .................................................45

*Kong v. United States*, 62 F.4th 608 (1st Cir. 2023) .................................. 29, 32, 34

*Kossov v. INS*, 132 F.3d 405 (7th Cir. 1998) .................................................... 37, 39

*Kucana v. Holder*, 558 U.S. 233 (2010) .................................................................30

*Kumar v. Wamsley*, No. C25-2055-KKE, 2025 WL 3204724 (W.D. Wash. Nov. 17, 2025) ................................................................................................................49

*Las Americas Immigrant Advoc. Ctr. v. DHS*, 783 F.Supp.3d 200 (D.D.C. 2025).47

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ............................................................39

*McNary v. Haitian Refugee Ctr.*, 498 U.S. 479 (1991) ..........................................23

*Meachum v. Fano*, 427 U.S. 215 (1976) ........................................................... 35, 46

*Moncrieffe v. Holder*, 569 U.S. 184 (2013) ...........................................................38

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) .......... 35, 36, 37

*Munaf v. Geren,* 553 U.S. 674 (2008) .....................................................................45

*Murillo Morocho v. Garland*, 80 F.4th 61 (1st Cir. 2023) .....................................43

*Nadari v. Bondi¸* No. 2:25-cv-07893-JLS-BFM, 2025 WL 2934514 (C.D. Cal. Sept. 3, 2025) ................................................................................................... 43, 52

*Nasrallah v. Barr,* 590 U.S. 573 (2020) .......................................................... 28, 48

*New Jersey v. Trump*, 131 F.4th 27 (1st Cir. 2025) .................................................16

*Nguyen v. Scott*, No. 2:25-CV-01398, --- F.Supp.3d ---, 2025 WL 2419288 (W.D. Wash. Aug. 21, 2025) ......................................................................... 40, 49, 51, 52

*Niz-Chavez v. Garland*, 593 U.S. 155 (2021) .........................................................42

*Paye v. Garland*, 109 F.4th 1 (1st Cir. 2024) .........................................................43

*Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS*, 767 F.Supp.3d 293 (D. Md. 2025) .......................................................................................................20

*Porter v. Warner Holding Co.,* 328 U.S. 395 (1946) .............................................21

*Ramirez v. Young*, 906 F.3d 530 (7th Cir. 2018) ...................................................36

*Rauda v. Jennings*, 55 F.4th 773 (9th Cir. 2022) ...................................................33

*Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471 (1999).... 31, 32, 34

*Reno v. Catholic Social Services, Inc.*, 509 U.S. 43 (1993) ...................................23

*Riley v. Bondi*, 606 U.S. 259 (2025) ................................................................ 23, 24

*Sagastizado Sanchez v. Noem*, No. 5:25-CV-00104, --- F.Supp.3d ---, 2025 WL 2957002 (S.D. Tex. Oct. 2, 2025)................................................................... 49, 51

*Santamaria Orellana v. Baker*, No. CV 25-1788-TDC, 2025 WL 2841886 (D. Md. Oct. 7, 2025) ........................................................................................................51

*Santos-Zacaria v. Garland*, 598 U.S. 411 (2023).....................................................34

*Silva v. United States*, 866 F.3d 938 (8th Cir. 2017).............................................34

*Tazu v. Att'y Gen.*, 975 F.3d 292 (3d Cir. 2020) ...................................................33

*Tesfamichael v. Gonzales*, 411 F.3d 169 (5th Cir. 2005) .......................................54

*Texas v. DHS*, 123 F.4th 186 (5th Cir. 2024) ............................................ 17, 19, 20

*Trump v. J.G.G.*, 604 U.S. 670 (2025).......................................................... 36, 37, 47

*United States v. Fausto*, 484 U.S. 439 (1988) ....................................................... 23, 24

*United States v. Mass. Water Res. Auth.*, 256 F.3d 36 (1st Cir. 2001)...................21

*Vaskanyan v. Janecka*, No. 5:25-CV-01475-MRA-AS, 2025 WL 2014208 (C.D. Cal. June 25, 2025) ......................................................................................51

*Vitkus v. Blinken*, 79 F.4th 352 (4th Cir. 2023) ....................................................54

*Vu v. Noem*, No. 1:25-cv-01366-KES-SKO (HC), 2025 WL 3114341 (E.D. Cal. Nov. 6, 2025) .........................................................................................................49

*Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005) .........................................51

*Xuan Ho v. Noem*, No. 25-cv-02453-BAS-BLM, 2025 WL 3179249 (S.D. Cal. Oct. 20, 2025) .......................................................................................................44

*Y.T.D. v. Andrews*, No. 1:25-CV-01100 JLT SKO, 2025 WL 2675760 (E.D. Cal. Sept. 18, 2025)........................................................................................................51

## Constitutional Provisions

U.S. Const. art. I, § 1...............................................................................................20

## Statutes

6 U.S.C. § 557 ............................................................................................................5

8 U.S.C. § 1103(a)(1)..................................................................................................5

8 U.S.C. § 1158(b)(1)(B)(ii) .....................................................................................39

8 U.S.C. § 1158(b)(1)(B)(iii) ....................................................................................39

8 U.S.C. § 1225 ........................................................................................................19

8 U.S.C. § 1226 ........................................................................................................19

8 U.S.C. § 1228(b) ....................................................................... 8, 11, 25, 39
8 U.S.C. § 1229a ................................................................................. 8, 11, 39
8 U.S.C. § 1229a(c)(7) ...................................................................................25
8 U.S.C. § 1229a(c)(7)(A) .............................................................................27
8 U.S.C. § 1229a(c)(7)(C)(i) ..........................................................................27
8 U.S.C. § 1231 ............................................................................................1, 19
8 U.S.C. § 1231(a)(5) ................................................................. 8, 11, 25, 39
8 U.S.C. § 1231(b) ....................................................................................5, 15
8 U.S.C. § 1231(b)(1) ............................................................................. 5, 6, 18
8 U.S.C. § 1231(b)(1)(A) ................................................................................6
8 U.S.C. § 1231(b)(1)(B) ................................................................................6
8 U.S.C. § 1231(b)(1)(C) ................................................................................6
8 U.S.C. § 1231(b)(1)(C)(iv) ..........................................................................6
8 U.S.C. § 1231(b)(2) ............................................................................. 5, 6, 18
8 U.S.C. § 1231(b)(3) ........................................................................... passim
8 U.S.C. § 1252 ....................................................................... 24, 25, 28
8 U.S.C. § 1252(a)(4) .......................................................... 15, 22, 24
8 U.S.C. § 1252(a)(5) .................................................................. 15, 28
8 U.S.C. § 1252(b)(4)(A) ...............................................................................28
8 U.S.C. § 1252(b)(9) ..................................................... 15, 25, 28, 29
8 U.S.C. § 1252(f)(1) .......................................................................... passim
8 U.S.C. § 1252(g) .............................................................................. passim
8 U.S.C. § 1357(a)(3) .....................................................................................19
8 U.S.C. §1231(b)(3)(A) .................................................................................7
28 U.S.C. § 1292(a)(1) ....................................................................................5
28 U.S.C. § 1331 .............................................................................................5
Foreign Affairs Reform Restructuring Act of 1998, Pub. L. 105-277, Div. G, §
   2242, 112 Stat. 2681 (1998)............................................................ passim
Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L.
   No. 104-208, Div. C, § 306, 1101 Stat. 3009-1 (1996) ................................ 17, 18

## Regulations

8 C.F.R. § 1208.16(b) ...................................................................................39
8 C.F.R. § 208.16(b) .....................................................................................39
8 C.F.R. § 1003.2(c)(2) .................................................................................27
8 C.F.R. § 1208.16 ..........................................................................................7

8 C.F.R. § 1208.16(c)(3) ...................................................................38

8 C.F.R. § 1208.16(a) ......................................................................39

8 C.F.R. § 1208.16(c) ......................................................................47

8 C.F.R. § 1208.16(c)(2) ...................................................................38

8 C.F.R. § 1208.17(b) ......................................................................39

8 C.F.R. § 1208.18(c)(1) ...................................................................42

8 C.F.R. § 1208.18(c)(2) ...................................................................44

8 C.F.R. § 1208.31 ............................................................................8

8 C.F.R. § 1208.31(e) ......................................................................39

8 C.F.R. § 1240.10(f) .........................................................................8

8 C.F.R. § 1292.5(a) ...................................................................36, 46

8 C.F.R. § 208.16 ..............................................................................7

8 C.F.R. § 208.16(a) ........................................................................39

8 C.F.R. § 208.16(c)(2) .....................................................................38

8 C.F.R. § 208.16(c)(3) .....................................................................38

8 C.F.R. § 208.16(c)(4) .....................................................................39

8 C.F.R. § 208.17(b) ........................................................................39

8 C.F.R. § 208.18(c)(1) .....................................................................42

8 C.F.R. § 208.18(c)(2) .....................................................................44

8 C.F.R. § 208.31 ..............................................................................8

8 C.F.R. § 208.31(e) ........................................................................39

8 C.F.R. § 238.1(b)(2)(ii) ....................................................................8

8 C.F.R. § 238.1(f)(2) .........................................................................8

8 C.F.R. § 238.1(f)(3) .........................................................................8

8 C.F.R. § 241.14(d) ........................................................................54

8 C.F.R. § 241.14(f) .........................................................................54

8 C.F.R. § 241.8(e) ............................................................................8

8 C.F.R. § 292.5(a) .....................................................................36, 46

28 C.F.R. § 200.1 ..............................................................................7

Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18078 (Mar. 29, 2022)........................................................48

Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478 (Feb. 19, 1999) ......................................................................................42

**Other Authorities**

Amnesty International, *South Sudan: End Four Deportees' Arbitrary Detention* (Sept. 18, 2025)....................................................................13

Amnesty International, *South Sudan: End Two Deportees' Arbitrary Detention* (Sept. 9, 2025)............................................................... 13, 52

Human Rights Watch & Cristosal, *"You Have Arrived in Hell": Torture and Other Abuses Against Venezuelans in El Salvador's Mega Prison* (Nov. 12, 2025).....52

Oversight of the USA PATRIOT Act: Hearing Before the S. Comm. on the Judiciary, 109th Cong. 10 (2005) .........................................................42

United Nations Committee Against Torture, General Comment No. 4 (2017) on Implementation of Article 3 of the Convention in the Context of Article 22, CAT/C/GC/4, ¶ 12 (Sept. 4, 2018) .....................................................39

United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, art. III, 1465 U.N.T.S. 856, 38

# I.     INTRODUCTION

At the outset of this case, Defendants confirmed their position that the Department of Homeland Security (DHS) may execute a third-country removal without providing notice or an opportunity to be heard on a fear-based claim:

> THE COURT: Is your position that the Government can decide right now that someone who is in their custody is getting deported to a third country, give them no notice and no opportunity to say, I will be killed the moment I arrive there, and, as long as the Department doesn't already know that there's someone standing there waiting to shoot him, that that's fine?
>
> DEFENDANTS' COUNSEL: In short, yes.

Appx.872; Supp. Appx.004. After the district court correctly rejected that position and issued a temporary restraining order (TRO) providing a basic measure of protection against torture, DHS issued its Guidance Regarding Third Country Removals (March 30 Memo)—which the district court also rejected as violating the statutory scheme and due process. In its place, the court issued the preliminary injunction (PI) at issue in this appeal, requiring DHS to notify class members if it intends to deport them to a third country and to employ existing mechanisms for presenting their claims for protection *from torture*.[1] These measures are not "invented" by the district court, Brief for Defendants-Appellants (Dfs. Br.) 4; they

---

[1] The injunction did not afford classwide protection against *persecution* under the withholding statute at 8 U.S.C. § 1231(b)(3), because § 1231 is covered by 8 U.S.C. § 1252(f)(1). *See infra* Section VII.A.1.

are mandated by the Foreign Affairs Reform Restructuring Act of 1998 (FARRA),

implementing regulations, U.S. treaty obligations, and the Constitution.

Defendants repeatedly defied the PI, prompting the district court's additional

orders amending and clarifying it. On March 31 and April 13, Defendants removed

class members to El Salvador via Guantanamo Bay, alleging that the Department

of Defense (DoD) deported them without direction from DHS. On May 7,

Defendants similarly attempted to remove class members to Libya in violation of

the PI. On May 20, Defendants violated the PI by placing eight class members on a

plane destined for South Sudan with less than 16 hours' notice. These last two

flights each included a citizen of Mexico, whose government accepts repatriation

of its citizens, underscoring the punitive nature of Defendants' actions.

Before this Court and the Supreme Court, Defendants claim that the PI

hindered their ability to remove "the worst of the worst," Dfs. Br. 2, citing the

individuals with serious criminal convictions that they hand-picked for the Libya

and South Sudan flights *after* the district court issued the PI. Defendants omit the

fact that Plaintiffs O.C.G. and M.M., and many, if not most, class members have

no criminal record or only minor infractions. They also omit that many entered on

family- or employment-based or student visas, or as refugees. More critically,

statutory protections against torture apply to *everyone*. Furthermore, the PI never

prevented Defendants from executing third-country removals; it only required

compliance with the law in carrying them out.

Plaintiffs are likely to prevail because the district court has jurisdiction both to issue the PI and adjudicate the merits, and the law prohibiting removal to countries where noncitizens face persecution and torture is clear. The PI required only individualized notice and an opportunity to present a claim that deportation to the newly designated country would result in torture or death.

In contrast, Defendants' policy, now in effect, provides no process whatsoever if the third country provides the United States with blanket diplomatic assurances. Such assurances violate the statutory and regulatory framework requiring *individualized* assurances and do not protect against chain refoulment— removal by the third country to the country of origin from which the individual won protection in the United States. For all other third-country removals, DHS officers do not ask about fear. For those individuals who manage to articulate a fear, the policy provides a 24-hour window for a person to establish that they meet the exacting fear standard required to win ultimate protection. The result is that Defendants' policy irreparably harms class members by deporting them to countries where they face persecution, torture, or death, either in the third country or through chain refoulement.

This Court should reject Defendants' attack on the PI. Defendants' contention that class members "have already received extensive legal process in

their removal proceedings," Dfs. Br. 4, is illogical. Defendants did not designate the third country in the underlying proceedings, thus denying Plaintiffs any possibility of obtaining protection from the third country in those proceedings. Additionally, in staying the PI, the Supreme Court did not "conclude" anything, Dfs. Br. 5, let alone that Defendants are likely to succeed on the merits, as the order did not explain the basis for the stay. Finally, it was Defendants' deliberate violations of the PI and their decision to implement the district court's remedy for those violations overseas, rather than in the United States, that manufactured the "diplomatic and logistical morass" about which they complain. Dfs. Br. 4. Defendants' real grievance is with being required to follow the law.

Only restoration of the PI—and ultimately, a ruling on the merits—will protect Plaintiffs from the irreparable harm they are facing and will continue to face under Defendants' policy. Until that happens, class members face third-country deportations to places like El Salvador, where class members have been tortured in a maximum-security prison; South Sudan and Eswatini, where class members are presently detained arbitrarily by armed guards (and have been for months); and Ghana and Mexico, where they are being summarily deported to their countries of origin despite orders of protection from U.S. immigration courts.

## II.     JURISDICTION

The district court has jurisdiction over this case pursuant to 28 U.S.C.

§ 1331. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## III.     ISSUES PRESENTED

1.  Whether the district court had jurisdiction to address Plaintiffs' rights to apply for protection from torture, and if so, whether the district court had jurisdiction to issue a classwide preliminary injunction ordering Defendants to provide Plaintiffs meaningful notice and an opportunity to present a claim for protection under the Convention Against Torture (CAT) prior to removal to a third country.

2.  Whether the district court correctly found that Plaintiffs are likely to succeed on their claims that the Constitution, federal law, and agency regulations require meaningful notice and opportunity to present a fear claim before third-country removal.

3.  Whether Defendants' third-country removal policy violates Plaintiffs' rights to meaningful notice and an opportunity to present a fear claim prior to a third-country removal.

## IV.     STATEMENT OF THE CASE

### A.     Legal Background

Paragraphs (b)(1) and (b)(2) of 8 U.S.C. § 1231 govern the countries to

which DHS is authorized to remove noncitizens with final removal orders.[2] The

---

[2]     Congress delegated to the DHS Secretary "enforcement [of final removal orders] and all other laws relating to immigration . . . of [noncitizens] . . . ." 8 U.S.C. § 1103(a)(1). References to the Attorney General in § 1231(b) are to the DHS Secretary for functions related to carrying out a removal order and to the Attorney General (as delegated to immigration judges (IJs) and the Board of Immigration Appeals (BIA)) for functions related to selection of countries designated for removal and decisions about fear-based claims. *See* 6 U.S.C. § 557.

statutory scheme sets forth "four consecutive removal commands." *Jama v. ICE*,

543 U.S. 335, 341 (2005). DHS must attempt to remove the individual first to the

country of choice (designated on the removal order), then their country of origin,

next a country to which they have a lesser connection, and finally, if removal to

any of those countries is "impracticable, inadvisable, or impossible," DHS may

remove a person to another country "whose government will accept" them. *Id*.

(quoting 8 U.S.C. § 1231(b)(2)). For noncitizens placed in removal proceedings

upon "arriv[ing] in the United States," the designated country is the one from

which they departed, or, alternatively, to which they have a connection. 8 U.S.C.

§ 1231(b)(1)(A)-(C). Another country is permitted only if removal to each of those

countries "is impracticable, inadvisable, or impossible." *Id*. § 1231(b)(1)(C)(iv).

Before removal to *any* country where a noncitizen fears persecution or

torture, U.S. law guarantees the noncitizen the right to raise seek protection from

removal. Two key forms of protection exist: the withholding of removal statute, 8

U.S.C. § 1231(b)(3), and Article 3 of the United Nations Convention Against

Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or

Punishment (CAT). The Immigration and Nationality Act (INA) makes removal to

*any* country to which DHS seeks to remove someone (as described above)

"[s]ubject to paragraph (3)." 8 U.S.C. § 1231(b)(1), (b)(2). Paragraph (3), entitled

"Restriction on removal to a country where [noncitizen's] life or freedom would be

6

threatened," reads:

> *Notwithstanding paragraphs (1) and (2)*, the Attorney General may not remove [a noncitizen] to a country if the Attorney General decides that the [noncitizen's] life or freedom would be threatened in that country because of the [noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion.

*Id*. § 1231(b)(3)(A) (emphasis added);[3] *see also Jama*, 543 U.S. at 348. In addition, Congress enacted FARRA to implement CAT, instructing that the U.S. government may not "expel, extradite, or otherwise effect the involuntary return of *any person* to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." Pub. L. 105-277, Div. G, § 2242(a), 112 Stat. 2681, 2681-822 (1998) (emphasis added) (codified as statutory note to 8 U.S.C. § 1231). Congress directed that the government "shall prescribe regulations to implement the obligations of the United States under Article 3 of [CAT]," *id.* § 2242(b), 112 Stat. at 2681-822, which the government did, *see, e.g.*, 28 C.F.R. § 200.1 (explaining that a Title V removal order "shall not be executed in circumstances that would violate Article 3 of [CAT]").

The statute and regulations require that noncitizens receive meaningful notice and an opportunity to present a fear-based claim. In proceedings under 8

---

[3]    Withholding of removal is a mandatory protection for noncitizens who are ineligible for asylum (for reasons that do not bar them from withholding) but establish that they are more likely than not to face persecution in the designated country. *Id*. § 1231(b)(3)(A); *see also* 8 C.F.R. §§ 208.16, 1208.16; *INS v. Aguirre-Aguirre*, 526 U.S. 415, 419 (1999).

7

U.S.C. § 1229a, the IJ "shall notify" the individual of the designated country of removal, and "shall also identify for the record" all alternative countries to which the person may be removed. 8 C.F.R. § 1240.10(f). DHS officers issuing reinstatement orders under 8 U.S.C. § 1231(a)(5) must provide notice of a designated country. *See* 8 C.F.R. § 241.8(e) (referring to "the country designated in [the reinstatement] order"). Likewise, DHS officers issuing removal orders under 8 U.S.C. § 1228(b) "shall designate the country of removal," 8 C.F.R. § 238.1(f)(2); *see also id*. § 238.1(b)(2)(ii).

Consistent with the United States' obligation to protect such persons from refoulement, DHS must provide individuals who express a fear of return to the designated country an opportunity to demonstrate a reasonable fear of persecution or torture to an asylum officer, and those who pass this threshold are eligible to apply for withholding under 8 U.S.C. § 1231(b)(3) and/or CAT protection in withholding-only proceedings before an IJ. *See* 8 C.F.R. §§ 241.8(e), 238.1(f)(3); *see also id.* §§ 208.31, 1208.31.

### B.    Procedural History

In March 2025, Plaintiffs filed a complaint challenging DHS's failure to provide meaningful notice and an opportunity to raise claims for withholding of removal and CAT protection prior to removal to a third country. Appx.1-50. Plaintiffs D.V.D., M.M., and E.F.D. fear deportation to a third country. *See*

Appx.54, 57, 60. At the time of filing, DHS already had deported Plaintiff O.C.G. to Mexico without notice, two days after the IJ granted him withholding of removal to Guatemala. DHS removed O.C.G. despite his presentation of evidence that he feared persecution in Mexico because he had been raped and held hostage there. Appx.62-63. Mexican authorities then sent O.C.G. to Guatemala. Appx.5, 63, 790-803; Supp. Appx.024-25.[4]

Plaintiffs also moved for a TRO, PI, and class certification. Dkts. 4, 6. In response, Defendants claimed *no* notice or opportunity to make a fear-based claim was required. Appx.872; Supp. Appx.004. On March 28, the district court issued a TRO requiring written notice and a meaningful opportunity to present a CAT application prior to any third-country removal. Appx.115-16; Supp. Appx.001-8. Defendants appealed and moved to stay the TRO, but this Court denied the motion. *D.V.D. v. DHS*, No. 25-1311 (1st Cir. Apr. 7, 2025).

Two days after the TRO, Defendants issued the March 30 Memo. Appx.120-21. It allows removal to a third country without any notice or process if DHS has received "credible" "diplomatic assurances that [class members] will not be persecuted or tortured." *Id*. It does not require that DHS alert the individual or publicly post notice regarding which countries have provided such blanket diplomatic assurances. For all other countries, the Memo instructs DHS to inform

---

[4]    Docket references (Dkt.) are to district court filings.

the person of the intended third country for removal. Appx.121. It does not require DHS to advise the person of their right to apply for protection. Only if a noncitizen "affirmatively states" fear, without any prompting, will DHS refer them to an asylum officer for a screening that typically occurs within 24 hours. *Id.* If the individual fails to establish that it is "more likely than not" they would be persecuted or tortured in the identified country, DHS will remove them. *Id.* If the individual meets this standard, the officer will refer individuals not previously in removal proceedings to an IJ; for all others, U.S. Immigration and Customs Enforcement (ICE) will "consider" filing a motion to reopen or simply choose another third country for intended removal. *Id.*

On March 31, at least four alleged class members were removed to El Salvador, via Naval Station Guantánamo Bay (NSGB), without receiving the TRO's protections. *See* Dkt. 49 at 18-19; Appx.521-22; Supp. Appx.009-21. A second flight from NSGB to El Salvador, also carrying class members, departed on April 13. *See* Supp. Appx.022. Defendants claimed "DHS did not violate" the TRO because the DoD carried out those removals. Supp. Appx.011.[5]

---

[5]     A whistleblower complaint alleges that high-level officials conspired to violate the TRO. *See* Protected Whistleblower Disclosure of Erez Reuveni 16-21 (June 24, 2025), https://s3.documentcloud.org/documents/25982155/file-5344.pdf. Emails corroborate this account. *See* Addendum to June 24, 2025 Protected Whistleblower Disclosure of Erez Reuveni, Exs. 9-10 (July 1, 2025) https://www.documentcloud.org/documents/25995064-reuveni-batch-1/;

At an April 10 hearing, Defendants confirmed their position "that there is no constitutional or statutory infirmity to send [class members] to a country where they have an individualized uncontroverted fear of death." Appx.856; *see also* Appx.855.

On April 18, the court certified the following class:

> All individuals who have a final removal order issued in proceedings under [8 U.S.C. §§ 1229a, 1231(a)(5), or 1228(b)] (including withholding-only proceedings) whom DHS has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed.

Appx.495, 520. It also issued a PI, ordering that, prior to any third-country removal, noncitizens and their counsel, if any, receive written notice of the country of removal in a language the noncitizen understands and a meaningful opportunity to assert a claim for CAT protection. Appx.518-19. If the noncitizen demonstrates a reasonable fear, DHS must move to reopen proceedings to allow an IJ to adjudicate the CAT claim; if the noncitizen has not demonstrated a reasonable fear, the person has 15 days to move to reopen proceedings to challenge the potential third-country removal. Appx.519.

On April 30, in response to the removal of alleged class members to El

---

Addendum to June 24, 2025 Protected Whistleblower Disclosure of Erez Reuveni, Exs. 2-12 (July 7, 2025), https://www.documentcloud.org/documents/25995065-reuveni-batch-2/.

Salvador by DoD via NSGB, the court modified the PI to clarify that Defendants cannot "cede custody or control" to another agency "in any matter that prevents [a noncitizen] from receiving" the protections it had ordered. Appx.522.

On May 7, DHS attempted to remove thirteen non-Libyan class members to Libya. *See* Dkt. 89; Appx.652-65. Plaintiffs filed an emergency TRO motion. *Id*. The court held that the anticipated removals "would clearly violate [the PI]." Appx.643. DHS returned the individuals to ICE custody. *See* Appx.657, 651.

On May 20, DHS initiated removal of eight class members to South Sudan. Plaintiffs filed another emergency TRO motion, this time after the flight departed. Dkt. 111. The court ordered Defendants to maintain custody and explain how they complied with the PI. Appx.745. Declarations and testimony demonstrated that Defendants provided fewer than 24 hours' notice of removal, outside of business hours, and on a form written in English. *See* Appx.747, 781-82, 842. Each "refused to sign" the notice, but DHS did not treat the refusal as an expression of fear. Appx.782. The court concluded that Defendants' actions violated the PI, clarified that a "meaningful opportunity" to seek CAT protection requires a minimum of ten days between notice and removal, and issued a remedial order. Appx.747-51.

Defendants appealed the PI and moved to stay the injunction. This Court denied that motion on May 16, 2025. Doc. No. 00118286763 (May 16, 2025 Order) at 1-2. On May 27, Defendants applied for an emergency stay of the PI with

the Supreme Court, which the Court granted without explanation on June 23.

Appx.821. The order renders the PI unenforceable through the pendency of this

appeal and any subsequent judgment by the Supreme Court. *Id.*

Plaintiffs moved to enforce the remedial order on behalf of the eight class

members targeted for removal to South Sudan, who were then in Djibouti. Dkt.

174. The district court denied the motion as "unnecessary," affirming its May 21

remedial order "remained in full force and effect." Dkt. 176 (citation modified).

On June 24, Defendants filed a motion for clarification with the Supreme

Court, which the Court granted. *DHS v. DVD*, 145 S. Ct. 2627 (2025). DHS

subsequently deported the eight class members to South Sudan. To this day, six

remain "arbitrarily detained in an undisclosed location." Amnesty International,

*South Sudan: End Two Deportees' Arbitrary Detention* (Sept. 9, 2025),

https://www.amnesty.org/en/documents/afr65/0252/2025/en/; Amnesty

International, *South Sudan: End Four Deportees' Arbitrary Detention* (Sept. 18,

2025), https://www.amnesty.org/en/documents/AFR65/0280/2025/en/.[6]

On July 9, ICE issued guidance regarding DHS's now-operative March 30

Memo. Supp. Appx.027-28. It is identical to the March 30 Memo except that, in

---

[6]     One of the eight men, J.M.G., a Mexican national, was returned to Mexico
on September 6 through the Mexican Embassy in Ethiopia. *South Sudan
Repatriates Mexican Man Deported from U.S. in July*, CBSnews.com, Sept. 6,
2025, https://www.cbsnews.com/news/jesus-munoz-gutierrez-south-sudan-
repatriates-deported-us-mexico/.

cases where diplomatic assurances do not exist, an officer will serve a "Notice of Removal" with interpretation. Supp. Appx.027. DHS may effectuate removal 24 hours after serving notice; however, "[i]n exigent circumstances," with approval from certain officials, DHS may execute removal with six hours' notice if ICE provides the noncitizen "means and opportunity to speak with an attorney." *Id.*

Because the PI is inoperable, Plaintiffs moved the district court for an indicative ruling seeking to dissolve the PI if this Court remanded the appeal. Dkts. 191, 192. The court granted Plaintiffs' motion, Dkt. 212, but this Court declined to remand, Doc. No. 00118355231 (Oct. 20, 2025 Order).

## V.    SUMMARY OF THE ARGUMENT

The district court properly issued the PI to prevent Plaintiffs and class members from facing torture in third countries. This Court should affirm the PI, i.e., maintain the obligation to provide written notice to the noncitizen and their attorney, if any; provide a 10-day automatic stay between notice and actual removal; affirm the ability to raise a torture claim prior to removal through a "reasonable fear" screening; and guarantee the opportunity for DHS or the noncitizen to seek to reopen removal proceedings after the fear-screening, including a minimum of 15 days for the noncitizen's motion.

The court correctly determined that 8 U.S.C. § 1252(f)(1) does not bar the classwide injunction. The statute's plain language does not cover FARRA because

14

it is not part of the INA, and any impact the PI has on § 1231(b) is merely collateral. Defendants' sweeping interpretation of § 1252(f)(1) would bar all PIs in class action litigation, contrary to the statutory text, Congressional intent, and binding precedent.

Nor does FARRA § 2242(d) or 8 U.S.C. § 1252(a)(5), (a)(4), or (b)(9) bar the PI. These provisions channel review of CAT decisions made *in removal proceedings* to the petition for review (PFR) process. That process is inapposite, because Plaintiffs' claims arise *after* removal proceedings conclude and are not part of a final removal order. Additionally, 8 U.S.C. § 1252(g) does not apply because the PI provides mandatory procedural protections which Defendants do not have discretion to disavow.

On the merits, the district court correctly concluded that FARRA § 2242(d), as implemented through the Due Process Clause, affirmatively requires meaningful notice and the opportunity to be heard on a CAT claim prior to a third country-removal. To vindicate these rights, the court required Defendants to utilize the existing reasonable fear and motion to reopen processes—allowing asylum officers to screen for a reasonable fear of torture and ensuring that IJs make the ultimate decision whether to grant an individual CAT claim.

The district court also correctly determined that Plaintiffs face irreparable harm in the form of torture or death absent the PI. In the wake of the Supreme

Court's decision to lift the PI, these horrors have materialized. Finally, the court properly weighed the balance of equities and public interest in Plaintiffs' favor. The public interest compels protecting noncitizens from torture or death, and Defendants cannot show any hardship from being required to comply with the law.

## VI.    STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction for abuse of discretion, *New Jersey v. Trump*, 131 F.4th 27, 34 (1st Cir. 2025). It reviews legal determinations de novo and factual findings for clear error. *Becky's Broncos, LLC v. Town of Nantucket*, 138 F.4th 73, 77-78 (1st Cir. 2025).

## VII.   ARGUMENT

### A.    Plaintiffs Are Likely to Prevail on the Merits.

#### 1.    The District Court Had Jurisdiction to Issue Classwide Preliminary Injunctive Relief.

The district court correctly held that 8 U.S.C. § 1252(f)(1) does not bar the injunctive relief sought under FARRA. Appx.496. In denying Defendants' motion to stay the PI, this Court posed three questions regarding § 1252(f)(1), *see* May 16, 2025 Order, which Plaintiffs address in turn.

*First*, the Court asked whether the PI enjoined or restrained the operation of provisions covered by that statute "insofar as it requires compliance with the terms of such [covered] provisions or the terms of removal orders previously generated pursuant to those provisions." *Id*. at 2.

16

The answer is no. The PI enforces FARRA and does not enjoin any provision referenced in § 1252(f)(1); therefore, § 1252(f)(1) does not bar the PI.[7] The text of § 1252(f)(1) limits classwide injunctions only with respect to "the relevant sections of the statute." *Biden v. Texas*, 597 U.S. 785, 798 (2022). It "[p]lainly . . . does not encompass an injunction against statutes it does not cross-reference." *Texas v. DHS*, 123 F.4th 186, 209 (5th Cir. 2024). FARRA—which created CAT protections—is not encompassed by "chapter 4 of title II [of the INA], as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 [IIRIRA]," and thus falls outside the statutes § 1252(f)(1) references. Pub. L. No. 104-208, Div. C, § 306, 1101 Stat. 3009-1, 3009-607-3009-12 (codified at § 1252(f)(1)). Section 1252(f)(1) bars classwide injunctions only as to provisions covered by § 306(a)(2) of IIRIRA when it took effect in April 1997. FARRA was enacted in October 1998, *after* IIRIRA's effective date, and did not amend the INA—rather, it was codified as a Note to 8 U.S.C. § 1231. Accordingly, neither FARRA nor its implementing regulations are within § 1252(f)(1)'s scope.[8]

---

[7] Nor did the PI enjoin or restrain "the terms of removal orders previously generated pursuant to those provisions," May 16, 2025 Order at 2, because the third countries were never designated in those removal orders. *See, e.g.*, Appx.512.

[8] Plaintiffs requested—and the court ordered—a PI only as to CAT. Unlike FARRA and the CAT regulations, § 1252(f)(1) *does* reference the withholding statute, *see* 8 U.S.C. § 1231(b)(3), and therefore classwide injunctive relief is not available to enforce its protections.

17

*Galvez v. Jaddou* supports this reading. 52 F.4th 821 (9th Cir. 2022). There, the Ninth Circuit upheld a classwide injunction that required DHS to timely adjudicate special immigrant juvenile petitions, as mandated by the Trafficking Victims Protection Reauthorization Act (TVPRA), 8 U.S.C. § 1232(d)(2). Explaining that the TVPRA post-dated IIRIRA and was not added to the INA, the *Galvez* Court found that the provision was not among the statutes § 1252(f)(1) references. *Galvez*, 52 F.4th at 830-31; *see also* Appx.499 (citing cases).

Contrary to Defendants' argument, Dfs. Br. 28-29, the district court did not hold that 1252(f)(1) applies to covered provisions only "as properly interpreted." *Id.* at 29 (citation omitted). The Supreme Court already has held that § 1252(f)(1) cannot be interpreted to turn on whether the government acted lawfully, as that would make the statute's effect contingent upon the merits. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 552-54 (2022). Instead, the threshold question is whether the provision addressed by the classwide injunction is one that § 1252(f)(1) references. Here, it is not—the PI enforces FARRA and CAT procedures, which are not covered by § 1252(f)(1).[9]

---

[9]     Defendants err in asserting that "every Justice in *Aleman Gonzalez* rejected the district court's reading of Section 1252(f)(1)." Dfs. Br. 26. Instead, the Court agreed only that that § 1252(f)(1) encompasses a challenge to the statute itself, such as a claim that the referenced statute is unconstitutional or violates some separate statutory right. *Aleman Gonzalez*, 596 U.S. at 552-54. Plaintiffs do *not* challenge DHS's authority to remove class members to third countries under § 1231(b)(1) & (2).

*Second*, the Court asked whether "the APA/due process claims stated in Counts I to III of the complaint have a sufficiently attenuated connection to the statutory removal provisions covered by § 1252(f)(1) that they do not fall within its sweep?" May 16, 2025 Order at 2.

Yes. The PI enforces the CAT procedures under FARRA, and any impact on § 1231, such as a temporary delay in third-country removals, is collateral. Defendants assert in conclusory fashion that the PI is not attenuated, claiming that "§ 1252(f)(1)'s reach" "turns on the injunction's effect on the INA's removal provisions." Dfs. Br. 30. But as the district court explained:

> the *Aleman Gonzalez* Court not only explicitly limited its discussion to the "covered immigration provisions," but suggested in dicta that "a court may enjoin the unlawful operation of a provision that is not specified in § 1252(f)(1) even if that injunction has some collateral effect on the operation of a covered provision."

Appx.498 (citation modified); *see also Texas*, 123 F.4th at 209-10 ("[B]ecause [8 U.S.C.] § 1357(a)(3) is not one of the statutes referenced in § 1252(f)(1), the injunction Texas seeks is not barred. Such an injunction would, at most, have only a 'collateral effect on the operation' of the covered statutes (specifically, [8 U.S.C.] §§ 1225 and 1226)." (citing *Aleman Gonzalez*, 596 U.S. at 553 n.4)); *Gonzalez v. ICE*, 975 F.3d 788, 812-15 (9th Cir. 2020) (affirming injunction against certain immigration detainers because any effect on provisions covered by § 1252(f)(1) was collateral); *Al Otro Lado v. EOIR*, 120 F.4th 606, 628 (9th Cir. 2024) ("Even

though asylum eligibility may change the outcome of a removal proceeding under a covered provision [of § 1252(f)(1)], such an effect is collateral under our precedents" which "[t]he Supreme Court acknowledged . . . in *Aleman Gonzalez* and left . . . undisturbed."); *Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS*, 767 F.Supp.3d 293, 319 (D. Md. 2025) (same) (quoting *Al Otro Lado*, 120 F.4th at 627)).

If Defendants were correct, § 1252(f)(1) would encompass all INA provisions, not just the referenced provisions, since nearly *any* immigration benefit may impact the timing or logistics of removal. Congress chose otherwise, by "legislat[ing] which sections are covered by § 1252(f)(1). The Executive Branch does not get to propose additions." *Texas*, 123 F.4th at 210 (citing U.S. Const. art. I, § 1 (vesting 'All legislative Powers' in Congress)).

*Third*, this Court asked whether "§ 1252(f)(1) presume[s] the availability of individualized judicial review to individuals subject to third-country removals and therefore does not bar classwide injunctive relief where such relief is necessary to make such individualized review available?" May 16, 2025 Order at 2.

Yes. Section 1252(f)(1) by its express terms preserves relief "with respect to the application of [the enumerated] provisions to an individual," confirming that Congress relied on the availability of individual relief to bar broader relief. As such, it did not intend to eliminate all injunctive relief in situations where there

20

would otherwise be no mechanism to seek individualized review. If any ambiguity remains, the statute must be read to "resolve [it] . . . in favor of that interpretation which affords a full opportunity for equity courts to [act] . . . in accordance with their traditional practices." *Hecht Co. v. Bowles*, 321 U.S. 321, 330 (1944); *see also United States v. Mass. Water Res. Auth.*, 256 F.3d 36, 48 (1st Cir. 2001) ("Unless a statute in so many words, or by a *necessary and inescapable inference,* restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." (quoting *Porter v. Warner Holding Co.,* 328 U.S. 395, 398 (1946)). These equitable powers are particularly important in the context of restraining unauthorized executive conduct. *See, e.g.*, *Esquire, Inc. v. Esquire Slipper Mfg. Co.*, 243 F.2d 540, 544 (1st Cir. 1957) ("[C]ourts are not to presume a legislative intention to rigidify the traditionally flexible equity practice of granting or withholding injunctive relief in the exercise of sound judicial discretion.").

These principles reinforce that § 1252(f)(1) does not encompass claims under FARRA, notwithstanding any incidental effects on the INA sections covered by § 1252(f)(1). And any collateral impact is attenuated, as the PI does not actually prevent DHS from executing third country removals; it provides a "small modicum of process," Appx.474—notice and an opportunity to be heard on a torture claim— that FARRA and the Due Process Clause require. The PI presumes DHS will continue to carry out third-country removals and ensures only that class members

can invoke statutory protections against torture not covered by § 1252(f)(1).

## 2. The District Court Had Jurisdiction to Address the Merits of the Claims Presented in the Preliminary Injunction Motions.

### a. FARRA § 2242(d) and Section 1252(a)(4)

Defendants err in arguing that FARRA and 8 U.S.C. § 1252(a)(4) deprive the district court of jurisdiction. FARRA generally limits challenges to regulations implementing CAT or "other determination[s]" respecting CAT, "except as part of the review of a final order of removal." FARRA § 2242(d). Section 1252(a)(4) likewise channels review of CAT decisions made in removal proceedings to the PFR process. Those provisions do not apply here.

First, Plaintiffs seek to *enforce* FARRA and the regulations implementing CAT. Plaintiffs do not challenge the outcome of a CAT case. Plaintiffs cannot use the PFR process to contest Defendants' decision to remove class members—whose removal proceedings have already ended—to a third country.

Defendants' expansive reading of FARRA § 2242(d) and § 1252(a)(4)—to bar any possible challenge implicating CAT—is wrong. FARRA § 2242(d) states that jurisdiction is limited only as to challenges to the *regulations* that "implement" FARRA's CAT protections. Plaintiffs do not seek review of any regulation; to the contrary, the PI directs Defendants to *comply with* FARRA and the CAT regulations, consistent with the policy representations Defendants have made to the Supreme Court. *See* Transcript of Oral Argument at 20-21, *Johnson v. Guzman*

22

*Chavez*, 594 U.S. 523 (2021); Transcript of Oral Argument at 33, *Riley v. Bondi*, 606 U.S. 259 (2025).

Defendants claim FARRA § 2242(d) bars challenges to *any* "procedures" to implement CAT. Dfs. Br. 33. But FARRA § 2242(d)'s remaining clause—limiting challenges to "determination[s] made with respect to the application of [CAT]," *id.*—addresses only "judicial review of a determination respecting an application" for CAT, not "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications." *McNary v. Haitian Refugee Ctr.*, 498 U.S. 479, 491-92 (1991) (citation modified). As the Supreme Court explained when addressing a similar statute in *McNary*, such language simply "describ[es] the process of direct review of individual denials." *Id.* at 492. It does not reach the kind of policy and practice claim that Plaintiffs raise here. Notably, *McNary* is not the only such example of this principle; in *Reno v. Catholic Social Services, Inc.*, the Court similarly permitted challenges to agency policies notwithstanding a statutory provision limiting judicial review of individual application denials. 509 U.S. 43, 63-64 (1993).

Defendants also contend Plaintiffs are out of luck because if "an action does not fit within [the PFR review process], the result is that judicial review is not available." Dfs. Br. 34 (citing *United States v. Fausto*, 484 U.S. 439, 454-55 (1988) and *Riley v. Bondi*, 606 U.S. 259, 272 (2025)). Not so. The governing

statutes channel challenges to the CAT regulations and individual CAT determinations, not policy and practice claims like those brought by Plaintiffs. "Statutory review scheme[s]" like the one here "do[] not necessarily extend to every claim concerning agency action." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023). Instead, the Court must ask "whether the particular claims brought were of the type Congress intended to be reviewed within this statutory structure." *Id.* at 186 (citation omitted). And where the claim challenges an "illegitimate proceeding," later review "come[s] too late to be meaningful." *Id.* at 191. The same principles apply here, as FARRA § 2242(d) and § 1252(a)(4) limit only specified categories of claims and should not be read to "foreclose all meaningful judicial review"—which is exactly what Defendants' reading would do. *Id.* at 190 (citation omitted).[10]

Defendants fault the district court's reliance on *Jennings v. Rodriguez*, 583 U.S. 281 (2018), as clarifying that § 1252 "cannot be read to strip jurisdiction over claims that could not have been raised in the removal proceedings." Dfs. Br. 34-35 (quoting Appx.491). But *Jennings* is on point. There, as here, the Supreme Court confronted statutory text channeling "all questions of law and fact . . . arising from

---

[10]    Unlike *Fausto*, the statute here shows no "congressional intent to preclude review." 484 U.S. at 452 (citation modified)*. And *Riley* cuts the other way: the Court reaffirmed that judicial review *does* exist for individual CAT claims. It merely "follow[ed] the statutory text" to explain how such individual claims must be pursued. *Riley*, 606 U.S. at 272.

any action taken or proceeding brought to remove [a noncitizen]" to the PFR process. *Jennings*, 583 U.S. at 292 (quoting 8 U.S.C. § 1252(b)(9)). The Court rejected "uncritical literalism" that would "depriv[e] [a] detainee of any meaningful chance for judicial review." *Jennings*, 583 U.S. at 293 (citation omitted); *see also Aguilar v. ICE*, 510 F.3d 1, 17 (1st Cir. 2007) (explaining that § 1252 does not bar pattern or practice claims where there would be "a total denial of meaningful judicial review").

Second, Defendants erroneously suggest that Plaintiffs can file motions to reopen their underlying proceedings and, if needed, a PFR of any order denying the motion to reopen. Dfs. Br. 43. As an initial matter, only individuals in removal proceedings under § 1229a have a statutory right to seek reopening. *See* 8 U.S.C. § 1229a(c)(7). Class members with final removal orders resulting from proceedings under § 1231(a)(5) and § 1228(b) have no such statutory right.

Moreover, the factual record—and the district court's findings—show that motions to reopen (and, by extension, the PFRs of denied motions to reopen) are not a viable mechanism to raise Plaintiffs' CAT claims. As a matter of policy, Defendants do not provide notice of third-country removal to an individual where diplomatic assurances exist. Appx.120-21. An individual can be removed without any notice *at all* and without knowing the destination. Even when notice is required, Defendants' policy is that such notice may be provided only hours before

the third-country removal takes place. *See id.*; *see also* Appx.781 (testimony of

ICE Acting Deputy Executive Associate Director explaining that ICE need only

provide 24 hours' notice prior to removal); Appx.815 ("Defendants' own

submission shows that it is [ICE]'s general practice to provide 24 hours' notice

prior to removal."); Supp. Appx.027 (providing ICE policy that "ERO will

generally wait at least 24 hours following service of the Notice of Removal before

effectuating removal. In exigent circumstances, ERO may execute a removal order

six (6) or more hours after service of the Notice of Removal . . . ."). The district

court aptly observed that Defendants' assertion that Plaintiffs can nonetheless file

motions to reopen (and by extension, a PFR of a denied motion to reopen) "is

either an effort to prevaricate or is deeply disingenuous. The suggestion that [a

noncitizen] must—or even can—reopen an immigration proceeding at 6:00 a.m. on

a Saturday prior to being removed that same weekend is preposterous on its face."

Appx.486 n.20. In short, on 24 hours' (or 6 hours') notice, filing a motion to

reopen, obtaining a decision, then filing a PFR before being removed is

"logistically impossible, effectively foreclosing all meaningful judicial review."

Appx.486 (citation modified).

The district court also had before it multiple examples of Defendants' policy

in practice: no notice or only limited notice, and no meaningful opportunity to

contest a third-country removal. For example, Plaintiff O.C.G. received no notice

of his removal (or an opportunity to contest it) before being placed on a bus and removed to Mexico. Appx.791. The men removed to South Sudan "had fewer than 24 hours' notice, and zero business hours' notice, before being put on a plane." Appx.747; *see also, e.g.*, Appx.809. Similarly, Defendants provided no notice or opportunity to challenge third-country removals when they attempted to remove several class members to Libya. *See, e.g.*, Appx.631, 642, 652-62. And third country removals after the Supreme Court's stay of the PI have similarly provided no notice or opportunity to contest removal. *See* Dkt. No. 00118341530 (Pls.' Fed. R. App. P. 28(j) Letter) (addressing third-country removals to Ghana without notice to persons granted withholding of removal, one of whom Ghana immediately sent to the country from which a U.S. IJ had granted protection).

Even if filing a motion to reopen and a PFR *were* logistically possible (which it is not), the process "is simply not an option" for two other reasons. Appx.486. First, "[w]ith a few narrow exceptions, the [INA] limits petitioners to a single motion to reopen filed within ninety days of a removal order." *Charles v. Garland*, 113 F.4th 20, 23 (1st Cir. 2024) (citing 8 U.S.C. § 1229a(c)(7)(A), (c)(7)(C)(i); 8 C.F.R. § 1003.2(c)(2)). Many class members' removal orders became final years ago, and many have already used their one motion, leaving no statutory right to reopening. Second, as a practical matter, IJs typically deny a motion to reopen to challenge removal to a third country not designated in the

27

removal order. *See, e.g.*, Appx.487 (citing several examples of denied motions to reopen); Appx.66, 76-77, 96, 455-58, 460-463 (providing more examples).

In sum, the district court's factual findings leave no doubt that Plaintiffs' claims are not "reviewable 'as part of the review of a final order of removal' under 8 U.S.C. § 1252." *Nasrallah v. Barr,* 590 U.S. 573, 582 (2020) (quoting FARRA § 2242(d)).

### b.    Sections 1252(a)(5) and (b)(9)

Sections 1252(a)(5) and (b)(9) also do not bar jurisdiction. Dfs. Br. 36. Again, Plaintiffs do not seek "judicial review of an order of removal entered or issued," 8 U.S.C. § 1252(a)(5), as they challenge only DHS's post-proceeding designation and removal to a third country. Because the challenged practice arises entirely after removal proceedings conclude, it does not comprise part of an "order of removal" reviewable only by "a petition for review filed with an appropriate court of appeals." *Id.*; *see also id*. § 1252(b)(4)(A) ("the court of appeals shall decide the petition only on the administrative record on which the order of removal is based"); *Nasrallah*, 590 U.S. at 582. ("[F]inal orders of removal encompass only the rulings made by the [IJ] or [BIA] that affect the validity of the final order of removal."). The Ninth Circuit has correctly recognized that third-country removal challenges concern actions "taken after his removal proceedings before the IJ and BIA had ended" and thus "neither [§ 1252(a)(5) nor (b)(9)] applies." *Ibarra-Perez*

28

*v. United States*, 154 F.4th 989, 1000 (9th Cir. 2025).

Defendants dispute that these provisions only cover actions "that 'could have been raised in [a noncitizen's] removal proceedings.'" Dfs. Br. 40 (quoting Appx.485). But the Supreme Court and this Court have rejected such an "expansive interpretation of § 1252(b)(9)," explaining that it would be "absurd" to construe the provision to bar any claim that might tangentially relate to a removal proceeding. *Jennings*, 583 U.S. at 293; *Kong v. United States*, 62 F.4th 608, 614 (1st Cir. 2023) (observing that "the phrase 'arising from' is not 'infinitely elastic'" (quoting *Aguilar*, 510 F.3d at 10-11)); *see also, e.g.*, *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020) (rejecting the contention that § 1252(b)(9) barred review of a challenge to the termination of the Deferred Action for Childhood Arrivals (DACA) program because "the parties are not challenging any removal proceedings"). Prior to those decisions, this Court similarly held that "1252(b)(9) is a judicial channeling provision, not a claim-barring one." *Aguilar*, 510 F.3d at 11.

Here, Plaintiffs had no opportunity to present their claims for protection in the underlying proceedings because DHS did not provide any notice or initiate third-country removal until *after* the final order was issued. Plaintiffs do not challenge "an order of removal," "the decision . . . to seek removal," or "any part of the process by which their removability will be determined." *Jennings*, 583 U.S. at 294. Thus, "§ 1252(b)(9) does not present a jurisdictional bar." *Id.* at 295.

Furthermore, Defendants' assertion that noncitizens "can raise CAT objections to third-country removals in the administrative process—and, in turn, before a court of appeals," Dfs. Br. 42, is unfounded. Noncitizens generally cannot identify "during their initial removal proceedings[] all the countries where they have concerns that they will be tortured." Appx.511-12; *see also, e.g.*, Dkt. 210-1 (IJ denial of motion to reopen for feared third-country removal, rejecting the notion that IJs must adjudicate fear claims to "any and all potential alternative or third countries for removal"). This is true both because immigration courts generally consider claims regarding only those countries proposed as a country of removal, and because it is not possible for noncitizens to anticipate every country in the world that may be designated at some point in the future, let alone those countries' present and future conditions. *See* Appx.512, 850-51 (addressing Form I-589: Application for Asylum and for Withholding of Removal).[11] Defendants' reliance on motions to reopen is equally flawed: as Defendants recognize, such motions are generally subject to time and numerical limits. *See* Dfs. Br. 43; *see also, e.g.*, *Kucana v. Holder*, 558 U.S. 233, 243-44 (2010) (recognizing agency discretion in deciding motions to reopen).

Even setting legal barriers aside, Defendants ignore that detained individuals

---

[11]    For example, one of the men DHS removed to South Sudan was ordered removed to Sudan in July 2011, just ten days *after* South Sudan became a state. *See* Dkt. 175-1.

have no practical ability to file the motions without meaningful advance notice. *See* Appx.486-87 & n. 20; *see also* Appx.652-62, 457, 462. Defendants cannot identify a single provision in "the scheme Congress designed," Dfs. Br. 43, that requires an individual to preemptively identify all the countries in which they might fear torture as a part of their removal proceedings.

### c.    Section 1252(g)

Defendants further err in asserting that 8 U.S.C. § 1252(g) bars jurisdiction. Dfs. Br. 37-40. Section 1252(g) governs jurisdiction over actions "arising from" three discrete discretionary acts: "to commence proceedings, adjudicate cases, or execute removal orders." Here, Plaintiffs do not challenge, nor does the PI infringe upon, DHS's discretionary decisions to execute removal or even the decision to remove Plaintiffs to a third country. Rather, Plaintiffs challenge DHS's failure to provide meaningful notice and an opportunity to apply for protection for any newly designated country of removal. These protections are statutory obligations—not protections imposed on DHS "by the district court." Dfs. Br. 37.

It is well-established that § 1252(g) does not bar challenges to such mandatory, nondiscretionary decisions or actions. *Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 482-87 (1999). Despite § 1252(g)'s seemingly broad language, its reach is "much narrower" when considered against the statutory and historical context. *Id.* at 482. As the Supreme Court found, what

31

Congress sought to channel and otherwise insulate from litigation was the immigration authorities' "exercise of [their] *discretion*" with respect to the three specified actions. *Id.* at 483-84 (emphasis added); *see also id.* at 485 ("Section 1252(g) seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations . . . .")

Defendants do not acknowledge that *AADC* limited § 1252(g)'s application to discretionary decisions, claiming that "misreads" the subsection. Dfs. Br. 38. Nor do they acknowledge that notice and the opportunity to be heard are *nondiscretionary* protections that they themselves have told the Supreme Court are obligatory. Appx.474 n.2 (citing transcripts). Their contrary reading—that "[n]othing in [Section 1252(g)'s] text is limited to acts of 'discretion,'" Dfs. Br. 38—is irreconcilable with *AADC*, *see, e.g.*, 525 U.S. at 487 (referring to § 1252(g) as a "discretion-protecting provision"); *id.* at 485 n.9 ("Section 1252(g) was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion."). Nor does it fit this Court's precedent. *See Kong*, 62 F.4th at 618 ("Kong's FTCA claim does not arise from the discretionary decision to execute removal but instead arises from the government's alleged violations of law . . . in failing to abide by its own regulations.")[12]; *see also INS v. St. Cyr*, 533

---

[12]    In *Kong*, this Court held that § 1252(g) did not apply to the plaintiff's damages claim predicated on his post-final-removal-order arrest and re-detention,

U.S. 289, 311 n.34 (2001) (describing § 1252(g) as "appl[ying] only to three types of discretionary decisions by the Attorney General—specifically, to commence proceedings, to adjudicate cases, or to execute removal orders"); *Regents of the Univ. of Cal.*, 591 U.S. at 19 (noting § 1252(g) is "narrow"); *cf. Jennings*, 583 U.S. at 294 ("We did not interpret this language to sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General.").

Defendants ignore this binding precedent and instead cite inapposite out-of-circuit cases involving attempts to stay removal pending some future *discretionary* action—not to enforce antecedent, mandatory obligations. Dfs. Br. 38-40. In *Rauda v. Jennings*, 55 F.4th 773, 777-78 (9th Cir. 2022), *Tazu v. Att'y Gen.*, 975 F.3d 292, 295, 297 (3d Cir. 2020), and *Hamama v. Adducci*, 912 F.3d 869, 874-77 (6th Cir. 2018), petitioners sought to stay execution of their removal orders to await adjudication of motions to reopen removal proceedings, a "well-understood discretionary form[] of review," *Santos-Zacaria v. Garland*, 598 U.S. 411, 427

---

recognizing that "§ 1252(g) was passed with the understanding that collateral challenges to the legality of a petitioner's detention" were not covered by the statute. 62 F.4th at 615. Likewise, here, Plaintiffs' claims—challenging "Defendants' authority to effectively depart from the removal orders by designating new countries for removal outside of the immigration proceedings and, in doing so, circumvent Plaintiffs' due-process rights" and the statutory/regulatory scheme, Appx.493—are separate from, and collateral to, DHS's discretionary authority to execute removal orders.

(2023); *accord Kong*, 62 F.4th at 618 (distinguishing *Tazu*).[13]

More recently, in *Ibarra-Perez v. United States*, the Ninth Circuit held, in the context of a third-country removal, that § 1252(g) did not bar the noncitizen's claim that "he had a right to meaningful notice and an opportunity to present a fear-based claim before he was removed to [a third country]." 154 F.4th at 997; *id*. ("From the beginning, we have been clear that § 1252(g) does not prohibit challenges to unlawful practices merely because they are in some fashion connected to removal orders.").

Defendants' reliance on *Foster v. Townsley*, 243 F.3d 210 (5th Cir. 2001), Dfs. Br. 40, overlooks the Fifth Circuit's subsequent decision in *Flores-Ledezma v. Gonzales*, 415 F.3d 375, 380 (5th Cir. 2005), in which the court held § 1252(g) does not bar a challenge to the constitutionality of the statutory scheme. Furthermore, *Foster* and *Silva v. United States*, 866 F.3d 938, 941 (8th Cir. 2017), conflict with *AADC* and *Kong* and pre-date the Supreme Court's reaffirmance of *AADC*'s "narrow construction of § 1252(g)." *Kong*, 62 F.4th at 613 (citing *Jennings*, 583 U.S. 281 (2018)). The district court thus properly discounted those cases. Appx.495 n.30.

---

[13]    Likewise, in *E.F.L. v. Prim*, 986 F.3d 959, 961, 964-65 (7th Cir. 2021), and *Camarena v. Dir., ICE*, 988 F.3d 1268, 1272-74 (11th Cir. 2021), petitioners sought stays to await adjudication of a discretionary petition under the Violence Against Women Act and a provisional unlawful-presence waiver, respectively.

Compliance with FARRA, its regulations, and the Constitution is mandatory, not discretionary. Accordingly, § 1252(g) does not bar Plaintiffs' claims.

**3. Plaintiffs Are Likely to Prevail on The Merits Claims on Which They Sought Injunctive Relief.**

**a. Plaintiffs Have Statutory, Regulatory, and Constitutional Rights to Meaningful Notice and an Opportunity to Be Heard Prior to any Third-Country Removal.**

Plaintiffs are likely to prevail because the law unambiguously affords *both* meaningful notice of a third-country removal and an opportunity to present a fear-based claim for CAT protection. Statutes, regulations, and treaties bar Defendants from removing class members to any country—including a newly designated third country—where torture is likely. *See supra* Section IV.A. And due process mandates baseline procedures necessary to make those substantive protections effective. *See Meachum v. Fano*, 427 U.S. 215, 226 (1976).

### *i. Plaintiffs are entitled to meaningful notice.*

"The fundamental requisite of due process of law is the opportunity to be heard," which includes "timely and adequate notice." *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (citation modified); *see also Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (stating that such notice is "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality" (citations omitted)).

Due process protections apply in immigration proceedings. *E.g.*, *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025). Before any removal, a noncitizen must receive notice "within a reasonable time and in such a manner as will allow [the noncitizen] to actually seek . . . relief in the proper venue." *Id.*; *see also Mullane*, 339 U.S. at 315 ("The means employed [of providing notice] must be such as one desirous of actually informing the [other party] might reasonably adopt to accomplish it."); *id.* at 313 (describing "service of written notice within the jurisdiction" as "the classic form of notice").

Due process requires written notice in a language that the noncitizen understands. *See, e.g.*, *Abdullah v. INS*, 184 F.3d 158, 164-65 (2d Cir. 1999) (stating that due process requires that noncitizen claiming persecution abroad be provided interpretation in removal proceedings); *Ramirez v. Young*, 906 F.3d 530, 536-37 (7th Cir. 2018) (following *Abdullah* and finding prisoner denied due process where officials did not provide notice of complaint process in language he could understand). When an individual is represented, notice must also be provided to counsel. *Cf.* 8 C.F.R. §§ 292.5(a), 1292.5(a) (requiring notice to counsel).

Moreover, notice must be provided sufficiently in advance to permit a meaningful opportunity to seek fear-based protection—particularly where the individual has no prior history with the third country and may need to consult an attorney and research country conditions. Thus, "notice roughly 24 hours before

removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster." *A.A.R.P. v. Trump*, 605 U.S. 91, 95 (2025); *see also J.G.G.*, 604 U.S. at 673 (stating that "notice must be afforded within a reasonable time and in such a manner as will allow them to actually seek [ ] relief"); *Mullane*, 339 U.S. at 315 (explaining that adequate notice, *inter alia*, "must afford a reasonable time for those interested to make their appearance" (citations omitted)).

Unsurprisingly, then, courts have held that due process requires meaningful notice before any third-country removal. *See, e.g.*, *Andriasian v. INS*, 180 F.3d 1033, 1041 (9th Cir. 1999) (holding that failure to timely inform a noncitizen that he may need to seek protection from removal to a third country "violated a basic tenet of constitutional due process" (citation omitted)); *Kossov v. INS*, 132 F.3d 405, 408-09 (7th Cir. 1998) (rejecting the government's contention that last-minute notice at a hearing sufficed); *Aden v. Nielsen*, 409 F.Supp.3d 998, 1009-10 (W.D. Wash. 2019) (requiring "sufficient notice" of a third-country removal to permit "a reasonable opportunity to raise and pursue" a fear-claim). Indeed, Defendants have twice conceded before the Supreme Court that they must provide advance notice to provide an opportunity to seek any relevant protection before initiating third-country removals. *See* Transcript of Oral Argument at 20-21, *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021); Transcript of Oral Argument at 33, *Riley v. Bondi*,

606 U.S. 259 (2025).[14]

In sum, the district court correctly held that Plaintiffs are likely to succeed on their claim that they are entitled to meaningful notice of removal to a third country.

### ii.    *Plaintiffs are entitled to a meaningful opportunity to present a CAT claim.*

Advance notice is required so that Plaintiffs have a meaningful opportunity to contest third-country removal based on (1) fear of persecution under the withholding statute, 8 U.S.C. § 1231(b)(3), and (2) fear of torture under FARRA. These protections are mandatory—Defendants have "no discretion to deny relief" to an eligible noncitizen. *Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013).

Relevant here, eligibility for CAT protection must be determined after an evidentiary hearing. *See* 8 C.F.R. §§ 208.16(c)(2), (c)(3); 1208.16(c)(2), (c)(3); United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, art. III, 1465 U.N.T.S. 85, 114; FARRA at 2681-822 (codified at Note to 8 U.S.C. § 1231); United Nations Committee Against Torture, General Comment No. 4 (2017) on Implementation of Article 3 of the Convention in the Context of Article 22, CAT/C/GC/4, ¶ 12 (Sept.

---

[14]    Defendants twice have drafted forms to ensure that individuals receive written notice at least 15 days in advance of third-country removals. *See* Appx.14-15 ¶ 41; Appx.41-47. The form and procedure they have now use differs dramatically from those drafts. *Compare* Appx.41-47, *with* Supp. Appx.027.

4, 2018); *accord INS v. Stevic*, 467 U.S. 407, 421 (1984).[15]

Only IJs have the authority to conduct such hearings and enter eligibility determinations. *See generally* 8 U.S.C. § 1229a; 8 C.F.R. §§ 208.17(b) (detailing information IJ must provide after granting CAT protection), 1208.17(b) (same), 208.16(c)(4) (requiring that asylum officers refer cases to an IJ to decide CAT relief); *accord* 8 C.F.R. §§ 208.16(a) (requiring asylum officers to refer withholding cases to an IJ), 1208.16(a) (same).[16]

A meaningful opportunity to be heard is a fundamental Fifth Amendment due process protection. *See Mathews v. Eldridge*, 424 U.S. 319, 333-35 (1976). Here, that opportunity must include time to prepare a claim—consult counsel, research country conditions, and gather supporting evidence. *Andriasian*, 180 F.3d at 1041; *see also Kossov*, 132 F.3d at 408. Such opportunity must also occur while the noncitizen remains in the United States in order to give effect to the statute's purpose—to protect the person from likely torture. *See Aden*, 409 F.Supp.3d at

---

[15]    Indeed, in the context of withholding of removal, the INA requires IJs to determine whether the applicant has sustained their burden of proof and to make credibility determinations "in the manner described in [8 U.S.C. § 1158(b)(1)(B)(ii) and (iii)]." 8 U.S.C. § 1231(b)(3)(C). *See also* 8 C.F.R. §§ 208.16(b), 1208.16(b). Those sections address the sufficiency of an applicant's testimony to meet their burden, when corroborating evidence may be required, and the factors IJs review to assess credibility.

[16]    Even in proceedings before a DHS officer under 8 U.S.C. §§ 1231(a)(5) or 1228(b), if an asylum officer finds a reasonable fear of persecution, the cases must be referred to an IJ for a hearing on the fear claim. *See* 8 C.F.R. §§ 208.31(e), 1208.31(e).

1010 (holding that a post-removal discretionary motion to reopen "is not an adequate substitute for the process that is due in these circumstances" and ordering reopening); *Nguyen v. Scott*, No. 2:25-CV-01398, --- F.Supp.3d ---, 2025 WL 2419288, at *18 (W.D. Wash. Aug. 21, 2025) (affirming that due process and the government's statutory obligations require "the removal proceedings [to] be reopened so that a hearing can be held").

The record supporting the PI demonstrates that Defendants fail to provide class members with an IJ hearing on their fear-based claims with respect to third-country removals. Appx.120-21. Accordingly, Plaintiffs have shown a likelihood of success on their claim to a meaningful opportunity to make a fear-based claim to an IJ prior to removal to a third country.

### b. The March 30 Memo and July 9 Guidance Are Unlawful.

Defendants' March 30 Memo and July 9 Guidance ("Defendants' policy") deny the basic protections required by law. Contrary to Defendants' argument, Dfs. Br. 45-52, neither their reliance on generic country-wide diplomatic assurances nor their truncated "screening" in cases where there are no assurances, provide adequate notice or a meaningful opportunity to present a fear-based claim. Rather, as the court below and multiple other district courts have recognized, these so-called procedures fall far short of the requirements of FARRA and due process.

*i.*        ***Blanket diplomatic assurances are unlawful.***

Defendants' policy of removals to countries that provide blanket diplomatic

assurances violates statutory and constitutional requirements. First, it authorizes

removal with no prior notice or process, *see* Appx.120-21; Supp. Appx.027,

depriving individuals of any meaningful opportunity to contest removal—

including by arguing that DHS must remove a person to the country designated in

their removal order, *see supra* Section VII.A.3.a.; *J.R. v. Bostock*, No. 2:25-CV-

01161-JNW, 2025 WL 1810210, at *3-4 (W.D. Wash. June 30, 2025) (enjoining

third-country removal where designated country would accept repatriation).

Without advance notice, a person lacks "sufficient time and information to

reasonably be able to contact counsel . . . and pursue appropriate relief," *A.A.R.P.*,

605 U.S. at 95, and indeed, class members have been placed on planes before

knowing the country of removal, *see* Pls.' Fed. R. App. P. 28(j) Letter; Nick Turse,

*ICE Said They Were Being Flown to Louisiana. Their Flight Landed in Africa*, The

Intercept (July 8, 2025), https://theintercept.com/2025/07/08/ice-deportation-

louisiana-south-sudan.

Second, Defendants' policy replaces the *individualized* inquiry required by

FARRA with blanket assurances, directing DHS to remove a person whenever "[a]

country has provided diplomatic assurances that [noncitizens] removed from the

United States will not be persecuted or tortured." Appx.120. But FARRA and CAT

41

regulations require asking whether "there are substantial grounds for believing *the person* would be in danger of being subjected to torture." FARRA § 2242(a) (emphasis added); *see also* 8 C.F.R. §§ 208.18(c)(1), 1208.18(c)(1) (requiring assurances to be "obtained from the government of a specific country" and to guarantee "that [a noncitizen] would not be tortured there if *the* [noncitizen] were removed to that country" (emphasis added)). The use of "a definite article with a singular noun" in both the statute and regulation mandates an individualized inquiry. *See Niz-Chavez v. Garland*, 593 U.S. 155, 166 (2021); *see also, e.g.*, Oversight of the USA PATRIOT Act: Hearing Before the S. Comm. on the Judiciary, 109th Cong. 10 (2005) (testimony of U.S. Attorney General Alberto Gonzales that "each case" involving assurances is "very fact-specific"). Even as to individualized assurances, Congress and the agencies intended they be used sparingly—not as a wholesale substitution to standard protections. *See, e.g.*, Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8484 (Feb. 19, 1999) ("It is anticipated that these cases will be rare.").

Third, diplomatic assurances by a foreign state do not provide any protection against chain refoulment, such as in Plaintiff O.C.G.'s case. S*ee* Appx.794 (Plaintiff O.C.G. sent by Mexico to Guatemala, despite the IJ ordering withholding of removal from Guatemala). On numerous occasions, class members have been removed to a third country that then immediately removes the person back to the

42

country of origin from which they had an IJ order of protection. For example, class members deported to Ghana were immediately refouled to the very countries from which they had won protection. *See D.A. v. Noem*, No. 25-cv-3135 (TSC), --- F.Supp.3d ---, 2025 WL 2646888, at *3-4 (D.D.C. Sept. 15, 2025) (noting that Ghana "has indicated its intention to return [individuals subject to third-country deportation] to their home countries where Defendants agree they will almost certainly be persecuted," and describing an individual returned to his home country, "where he remains in hiding in 'fear of his life'" (citation omitted)); *see also, e.g.*, Camilo Montoya-Galvez, *Judge Says U.S. Trying to Do "End-Run" Around Legal Protections with Deportations to Ghana*, CBS News (Sept. 15, 2025), https://www.cbsnews.com/news/judge-says-u-s-trying-to-do-end-run-around-legal-protections-with-deportations-to-ghana.[17]

---

[17]    Defendants' policy also encompasses withholding of removal claims. But diplomatic assurances by a foreign *state* cannot guarantee against persecution by a *non-state* actor and it is dubious that they can reliably guarantee against torture by such actors either. *See Paye v. Garland*, 109 F.4th 1, 12 (1st Cir. 2024) (recognizing that non-state actors can be persecutors for purposes of withholding of removal); *Escobar v. Garland*, 122 F.4th 465, 481 (1st Cir. 2024) (similar, for CAT claims); *Murillo Morocho v. Garland*, 80 F.4th 61, 71 (1st Cir. 2023) (vacating denial of CAT protection where the BIA failed to properly consider risk of non-state torture); *Esmail v. Noem*, No. 2:25-cv-08325-WLH-RAO, 2025 WL 3030589, at *7 (C.D. Cal. Sept. 26, 2025) (noting that the blanket diplomatic assurances are unlikely to cover conduct by non-state actors); *Nadari v. Bondi¸* No. 2:25-cv-07893-JLS-BFM, 2025 WL 2934514, at *3 n.2 (C.D. Cal. Sept. 3, 2025) (explaining that "threats of harm or persecution to a noncitizen in a third country may be outside that country's government's control"); *Xuan Ho v. Noem*, No. 25-

In addition, the policy's reliance on assurances the State Department "believes" to be credible, Appx.120, also violates CAT regulations, which require *the Attorney General*—"in consultation with the Secretary of State"—to determine their reliability, 8 C.F.R. §§ 208.18(c)(2), 1208.18(c)(2). Thus, IJs and the BIA—as the Attorney General's delegees—cannot abdicate their responsibility to review the credibility of individual diplomatic assurances simply because the State Department asserts to have been provided blanket assurances.

Finally, Defendants' policy violates due process by providing no opportunity "to see the written diplomatic assurances" or receive "information pertaining to the Government's reasons for crediting those assurances." *Khouzam v. Att'y Gen. of U.S.*, 549 F.3d 235, 257 (3d Cir. 2008). Nor does it give the individual any "opportunity to make arguments" that the assurances may not be credible, much less any right to "an individualized determination" about their credibility. *Id.* at 257-58. As the Third Circuit recognized in *Khouzam*, such lack of both notice and hearing deprives a noncitizen of due process. *Id*. Indeed, the Memo does not even require the agency to provide notice of which countries have provided blanket assurances and, to date, Defendants have not made this information public.

---

cv-02453-BAS-BLM, 2025 WL 3179249, at *4 (S.D. Cal. Oct. 20, 2025) (finding Defendants' policy fails to inform the petitioner "of his right to apply for withholding of deportation or of the opportunity to present any fear of persecution or harm upon return to the designated country").

In short, the blanket diplomatic assurances Defendants' policy relies on conflict with the statutory and regulatory scheme and deprive noncitizens of due process. This alone is sufficient to vacate the policy and to declare it unlawful.

Defendants' contrary authorities are unavailing. Their argument that courts cannot question the policy insofar as it draws upon purported diplomatic assurances, *see* Dfs. Br. 46-48, misreads *Munaf v. Geren,* 553 U.S. 674 (2008), and *Kiyemba v. Obama*, 561 F.3d 509 (D.C. Cir. 2009). Here, unlike in those cases, the Executive has not "determine[d]" that any country will not torture a *particular* person, so whether such a determination would be "conclusive" is not at issue. Dfs. Br. 46. Moreover, the district court did not "question the substance of [any] diplomatic assurances," but instead "inquire[d] into the overall process and whether such [blanket] assurances, on their own terms, satisfy the Constitution," which it may do. Appx.514 (citing *Khouzam*, 549 F.3d at 259). The cases are also factually distinguishable. *Munaf* involved transfer of criminal defendants within Iraq for prosecution, reasoning that "[t]hose who commit crimes within a sovereign's territory may be transferred to that sovereign's government for prosecution." 553 U.S. at 700. But *Munaf* expressly declined to address FARRA because the issue had not been fully presented. *Id.*at 703 & n.6. *Kiyemba* addressed *individualized* diplomatic assurances after an assessment of "whether a particular country is likely to torture a particular detainee." 561 F.3d at 514; *cf. id.* at 519

(Kavanaugh, J., concurring) (noting that "fundamentally, this is a case involving transfer of wartime [noncitizen] detainees").[18] Neither decision authorizes DHS's blanket assurance scheme.

### ii. *Where no diplomatic assurances exist, Defendants' policy also fails.*

The meager process that Defendants provide in those cases where the third country has not provided assurances also fails to satisfy statutory and constitutional obligations. Defendants have asserted that mere hours' notice is sufficient, *see, e.g.*, Appx.747, and in testimony have declared that at most 24 hours' notice is required, *see* Appx.781 ¶ 7. The July 9 Guidance memorializes that view. Supp. Appx.027-28. That policy has also been reflected in practice. *Supra* pp. 9, 12. The policy also fails to provide notice to a noncitizen's attorney, as required by regulation. *See* 8 C.F.R. §§ 292.5(a), 1292.5(a).

As the Supreme Court has explained, for statutory rights to be meaningful, "the minimum requirements of procedural due process . . . must be observed." *Meachum*, 427 U.S. at 226 (citation omitted); *Califano v. Yamasaki*, 442 U.S. 682, 693 (1979) ("[T]his Court has been willing to assume a congressional solicitude for fair procedure, absent explicit statutory language to the contrary."). Recently,

---

[18] Even individualized assurances may be insufficient in a particular case. In *Khouzam*, the Third Circuit held that an individualized diplomatic assurance violated due process because DHS failed to provide advance notice or any opportunity to review or challenge it. 549 F.3d at 256-58.

the Supreme Court reaffirmed that "notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster." *A.A.R.P.*, 605 U.S. at 95; *see also J.G.G.*, 604 U.S. at 673 (notice must allow the person "to actually seek . . . relief").

FARRA requires individualized proceedings before a neutral trier of fact to determine eligibility. Defendants' policy, by contrast, requires none: Defendants do not even have to ask whether a person fears persecution or torture in the third country. Appx.121; Supp. Appx.027. This effectively denies Plaintiffs' access to mandatory CAT protections, as they lack "information about how to exercise [their] due process rights." *A.A.R.P.*, 605 U.S. at 95; *see also Las Americas Immigrant Advoc. Ctr. v. DHS*, 783 F.Supp.3d 200, 225-27 (D.D.C. 2025) (invalidating rule requiring noncitizens to affirmatively manifest fear).

If, against all odds, a noncitizen communicates to a deportation officer (often across a language barrier) a fear of removal to the third country (which they may have just heard of for the first time), "USCIS will generally screen the [noncitizen] within 24 hours of referral from the immigration officer." Appx.121; *see also* Supp. Appx.028. But at that initial screening, the noncitizen must demonstrate that they are "more likely than not [to] be persecuted . . . or tortured"—i.e., they must satisfy the standard required to demonstrate full entitlement to protection. *Compare* Appx.121*, with* 8 C.F.R. § 1208.16(c). Requiring noncitizens to meet such a

stringent requirement with 24 hours' notice is both unlawful and unworkable. CAT claims commonly include extensive evidence involving hundreds of pages—declarations, in-court testimony, expert affidavits, and country conditions materials. *See, e.g.*, *G.P. v. Garland*, No. 21-2002, 2023 WL 4536070, at *2 (1st Cir. July 13, 2023). It is impossible for a detained person to compile and present this evidence within hours of receiving notice of a third-country removal.[19] That process plainly fails to offer "sufficient time and information to reasonably be able to contact counsel, file [supporting materials], and pursue appropriate relief." *A.A.R.P.*, 605 U.S. at 95.

Moreover, DHS denies class members any administrative or judicial review by removing a noncitizen who does not meet this standard without any further process. Appx.121; Supp. Appx.028. There is no appeal to an IJ (who is statutorily designated to decide withholding claims), much less the BIA. *See* Appx.121; Supp. Appx.028 Nor does their policy provide any pathway to judicial review, *see id.*, even though Congress provided judicial review for CAT determinations given the life-or-death stakes, *cf. Nasrallah*, 590 U.S. at 585-86 ("Because the factual components of CAT orders will not previously have been litigated in court and

---

[19]    More exacting screenings serve no purpose: DHS itself found "no evidence" that heightened screening standards "resulted in more successful screening out of nonmeritorious claims." Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18078, 18092 (Mar. 29, 2022).

because those factual issues may be critical to determining whether the noncitizen is likely to be tortured if returned, it makes some sense that Congress would provide an opportunity for judicial review . . . .").

Notably, like the court below, several courts have found this aspect of the policy is likely unlawful for failing to provide sufficient due process. *See, e.g.*, *Vu v. Noem*, No. 1:25-cv-01366-KES-SKO (HC), 2025 WL 3114341, at *8 (E.D. Cal. Nov. 6, 2025) ("If ICE follows this policy, petitioner would have no meaningful opportunity to present [a third-country removal] claim in any court before he is removed to a third country."); *Cruz-Medina v. Noem*, No. 25-cv-1768-ABA, --- F.Supp.3d ---, 2025 WL 2841488, at *7 (D. Md. Oct. 7, 2025) ("[R]egulations . . . entitle noncitizens to *de novo* review by an immigration judge of negative asylum officer determinations . . . ."); *Kumar v. Wamsley*, No. C25-2055-KKE, 2025 WL 3204724, at *5 (W.D. Wash. Nov. 17, 2025) (agreeing "that ICE has deprived [the petitioner] of and is continuing to deprive him of . . . baseline procedural protections via its third country removal policy"); *Sagastizado Sanchez v. Noem*, No. 5:25-CV-00104, --- F.Supp.3d ---, 2025 WL 2957002, at *12 (S.D. Tex. Oct. 2, 2025) (faulting Defendants' policy for failing to require IJ review); *Esmail*, 2025 WL 3030589, at *7 ("[W]here ICE's stated policy is that it will only provide a reasonable fear interview when a noncitizen affirmatively asserts such fear, this fails to comport with due process."); *Nguyen*, 2025 WL 2419288, at *18-

19 (concluding "that removal to a third country under ICE's current policy, without meaningful notice and reopening of his removal proceedings for a hearing, would [likely] violate due process"). The failure to provide adequate notice and process is not surprising; Defendants have represented that they believe the statute and due process require *no notice*, *e.g.*, Appx.872, as exemplified by O.C.G.'s removal, *see* Appx.794.

**B.    In the Absence of the Injunction, Plaintiffs Face Irreparable Harm.**

Contrary to Defendants' bald assertion, the Supreme Court did *not* hold "that the government will be irreparably harmed by the [PI]." Dfs. Br. 58. Indeed, it did not address any of the four PI factors.

Plaintiffs have experienced, are experiencing, and will continue to experience irreparable harm absent the requested relief. *See, e.g.*, Appx.53-114, 122-422, 441-70. Since the Supreme Court stayed the PI, class members have been and are being deported, and placed under threat of deportation, to third countries where they have a fear of persecution and/or torture without due process, detained by armed guards in foreign countries, and chain-deported from third countries to countries from which they had won withholding or CAT protection.

Defendants' policy subjects class members to irreparable harm because it omits fundamental procedural safeguards against persecution, torture, and chain refoulement. *See, e.g.*, Supp. Appx.006-7; Appx.516 ("[T]he threatened harm is

clear and simple: persecution, torture, and death."); *Y.T.D. v. Andrews*, No. 1:25-CV-01100 JLT SKO, 2025 WL 2675760, at *12 (E.D. Cal. Sept. 18, 2025) (same); *Cruz-Medina*, 2025 WL 2841488, at *9 (same); *Sagastizado Sanchez*, 2025 WL 2957002, at *13-15 (finding irreparable harm based on threat of torture, persecution, risk of chain refoulement, and lack of status in third country); *Nguyen*, 2025 WL 2419288, at *26-27 (finding irreparable harm based on likelihood of removal to third country without an opportunity to challenge the removal); *Esmail*, 2025 WL 3030589, at *7 ("Where, as here, the 'alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'" (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005))); *J.R.*, 2025 WL 1810210, at *3 (finding irreparable harm based on conditions and the petitioner's lack of connection to potential third countries); *Vaskanyan v. Janecka*, No. 5:25-CV-01475-MRA-AS, 2025 WL 2014208, at *6-7 (C.D. Cal. June 25, 2025) (finding irreparable harm from likelihood of third-country deportation without notice and opportunity to be heard).

This harm is exacerbated by Defendants' alleged inability to return deported individuals. *See, e.g.*, *Cruz-Medina*, 2025 WL 2841488, at *9 (noting "the government's own questioning of its ability to return deported citizens"); *Santamaria Orellana v. Baker*, No. CV 25-1788-TDC, 2025 WL 2841886, at *12 (D. Md. Oct. 7, 2025) ("[T]he Government has now taken the position in some

cases that when an individual is removed from the United States, the Government has no ability to arrange for his return." (citing *Abrego Garcia v. Noem*, 777 F.Supp.3d 501, 507, 512-13 (D. Md. 2025))); *cf. Nadari¸* 2025 WL 2934514, at *3 ("If he is removed unlawfully and without notice, he may never be returned." (citation modified)).

For many class members, these harms have been realized. Others are subject to indefinite detention in deplorable conditions, including solitary confinement without the ability to communicate with family members or attorneys. *See* Human Rights Watch & Cristosal, "*You Have Arrived in Hell": Torture and Other Abuses Against Venezuelans in El Salvador's Mega Prison* (Nov. 12, 2025), https://www.hrw.org/sites/default/files/media_2025/11/elsalvador1125%20web.pdf (detailing beatings, sexual violence, mental abuse, and inhumane conditions U.S. deportees, including class members, suffered in El Salvador's Center for Terrorism Confinement); *Nguyen*, 2025 WL 2419288, at *26 (describing class members "held incommunicado in government custody" in South Sudan (citation modified)); Julie Turkewitz et al., *'You Are All Terrorists': Four Months in a Salvadoran Prison*, N.Y. Times (Nov. 8, 2025), https://www.nytimes.com/2025/11/08/world/americas/el-salvador-prison-migrants.html; Amnesty International, *South Sudan: End Two Deportees' Arbitrary Detention* (Sept. 9, 2025); Gerald Imray, *Lawyers for 5 Men Deported to*

*an African Prison Accuse Trump's Program of Denying Them Due Process*,
Associated Press (Sept. 19, 2025); Daphne Psaledakis & George Obulutsa, *Rwanda
Received Migrants Deported from the U.S. Earlier This Month*, Reuters (Aug. 28,
2025); Gerald Imray, *Men Deported by U.S. to Eswatini in Africa Will Be Held in
Solitary Confinement for Undetermined Tim*e, PBS News (July 18, 2025),
https://www.pbs.org/newshour/politics/men-deported-by-u-s-to-eswatini-in-africa-
will-be-held-in-solitary-confinement-for-undetermined-time; Angeline McCall,
*Wife Shares Family Impact After Cuban Husband Deported to Mexico,* 9News
(July 21, 2025), https://www.9news.com/article/news/local/
wife-shares-family-impact-cuban-husband-deported-to-mexico/73-8703a46d-31bc-
4dd9-9521-29001fddefcc.

Defendants' sole response is that their policy provides sufficient protection
such that class members are not at risk of harm if subject to third-country
deportation. Dfs. Br. 58-59. But that policy is woefully insufficient as a matter of
law. *See supra* Section VII.A.3.b. And the actual experiences of class members
subject to the policy belie Defendants' claims that they face no "realistic risk" of
torture. Dfs. Br. 59.

**C.     The Balance of Equities and Public Interest Support Affirmance.**

Defendants hardly contest that the balance of equities and public interest favor Plaintiffs. Dfs. Br. 58-63. The only public interest Defendants cite is their purported obligation to "retain . . . vicious criminals" if a third-country removal cannot be effectuated. *Id.* at 62. This misstates both the harm and interest because the PI does not prohibit third-country removals or require release from detention; it requires only that Defendants first provide notice and an opportunity to contest removal to a third country if the person faces torture there. Nor does it require release of noncitizens who cannot be removed but who present a documented threat to public safety. *See* 8 C.F.R. § 241.14(d), (f) (specifying procedures for continuing detention of noncitizens found to be "specially dangerous" or security risks).

"The public undoubtedly has an interest in seeing its governmental institutions follow the law." *Vitkus v. Blinken*, 79 F.4th 352, 368 (4th Cir. 2023) (citation modified); *see also Tesfamichael v. Gonzales*, 411 F.3d 169, 178 (5th Cir. 2005) (recognizing "the public interest in having the immigration laws applied correctly and evenhandedly"). This is true even where the government might have laudable policy goals, as "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." Appx.517 (quoting *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021)).

# VIII. CONCLUSION

The Court should affirm the preliminary injunction.

Respectfully submitted,

s/ *Trina Realmuto*

Kristin Macleod-Ball
Mary Kenney
NATIONAL IMMIGRATION
　LITIGATION ALLIANCE
10 Griggs Terrace
Brookline, MA, 02446
(617) 819-4447
trina@immigrationlitigation.org

Anwen Hughes
HUMAN RIGHTS FIRST
121 W. 36th St., PMB 520
New York, NY 10018
(212) 845-5244
HughesA@humanrightsfirst.org

Matt Adams
Leila Kang
Aaron Korthuis
Glenda M. Aldana Madrid
NORTHWEST IMMIGRANT
　RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611
matt@nwirp.org

*Attorneys for Plaintiffs-Appellants and Class Members*

Dated: December 12, 2025

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,941, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the type-face requirements of Federal Rules of Appellate Procedure 32(a)(5) and (6) because it has been prepared using Microsoft Word for Microsoft 365 in proportionally spaced 14-point Times New Roman font.

s/ *Trina Realmuto*
Trina Realmuto
National Immigration Litigation Alliance

## CERTIFICATE OF SERVICE

I, Trina Realmuto, hereby certify that on December 12, 2025, I caused this document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the Court's appellate CM/ECF system. Defendants-Appellants' counsel are registered CM/ECF users and will be served via the Notice of Docket Activity through this Court's CM/ECF system.

s/ *Trina Realmuto*
Trina Realmuto
National Immigration Litigation Alliance